ANDREW SCHMIDT LAW PLLC
By: ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPENCER MEYER, individually and on behalf of those similarly situated,<br><br>                   Plaintiffs,<br><br>   -against-<br><br>TRAVIS KALANICK,<br><br>                    Defendant. | **COMPLAINT**<br><br>1:15 Civ. 9796<br><br>ECF Case<br><br>**Jury Trial Demanded** |

Plaintiff Spencer Meyer, on behalf of himself and those similarly situated, by his counsel, Andrew Schmidt Law PLLC, brings this action against Defendant Travis Kalanick ("Kalanick"), the chief executive officer and co-founder of Uber Technologies, Inc. ("Uber"), alleging as follows:

## NATURE OF THE SUIT

1.     This is a civil antitrust action against Kalanick, the co-founder and CEO of Uber. Uber has a simple but illegal business plan: to fix prices among competitors and take a cut of the profits. Kalanick is the proud architect of that business plan and, as CEO, its primary facilitator. This lawsuit seeks injunctive and monetary relief on behalf of the Uber riders injured by Kalanick's actions.

2.     Kalanick designed Uber to be a price fixer. Kalanick has long insisted that Uber is not a transportation company and that it does not employ drivers. Instead, Uber is a technology company, whose chief products are smartphone apps. Those apps match riders with drivers. The

apps provide a standard fare formula, the Uber pricing algorithm. Drivers using the Uber app do not compete on price. Rather, drivers charge the fares set by the Uber algorithm. Those fares surge at times to extraordinary levels, which are uniformly charged by drivers using the Uber app. Uber takes a cut of those price-fixed fares. Kalanick's business plan thus generates profit through price fixing.

3. Kalanick is not only the co-founder and CEO of Uber, but he is also a driver who has used the Uber app. Kalanick has live tweeted his own experience driving using the app. In charging fares to Uber riders, Kalanick charged prices he ultimately controlled. Every other driver using the Uber app — Kalanick's direct competitors — agreed to use the identical pricing algorithm. Through the Uber app, Kalanick's direct competitors thus empowered him to set his and their fares.

4. The price-fixing Kalanick has arranged among Uber drivers is an open secret. In September 2014, Uber conspired with hundreds of drivers to negotiate an effective hike in fares that would benefit them, collectively, at the expense of their riders. Uber had initially required drivers of SUVs and black cars to accept a lower fare for rides. Drivers, who should have been in direct competition with one another over price, instead banded together to ask Uber to reverse its decision and reinstitute higher fares. Uber colluded with those drivers and put the higher fares back in place. This collective agreement to fix prices among competitors illustrates Uber's essential role, as designed by Kalanick: to fix prices among competing drivers.

5. Ironically, Kalanick has touted Uber's business model as procompetitive. If Uber were to become a transportation company and employ drivers, it would be free to compete with other companies using its pricing algorithm. But Uber has refused to become a transportation company. Consequently, drivers using the app are independent firms, competing with each other

2

for riders. They should compete on price as do drivers using other ride-share platforms, like Sidecar. Instead, they have agreed to Kalanick's scheme to fix prices among direct competitors using Uber's pricing algorithm. Uber's price fixing is classic anticompetitive behavior.

6. Kalanick's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340. In this action, Plaintiffs seek injunctive relief preventing Kalanick from continuing his conspiracy and money damages to all Uber riders injured by his actions. In accordance with N.Y. Gen. Bus. Law § 340(5), notice of commencement of this action is being served upon the New York State Attorney General.

## PARTIES

7. Plaintiff Spencer Meyer is a resident of Connecticut. Plaintiff has used Uber car services on multiple occasions, including the uberX car service experience. In both New York City and elsewhere, Plaintiff paid surge pricing to drivers using UberX.

8. Plaintiff has paid higher prices for car service as a direct and foreseeable result of the unlawful conduct set forth below.

9. Upon information and belief, Defendant Travis Kalanick is a resident of California. Kalanick is the mastermind of the Uber pricing conspiracy. He is Uber's CEO and an Uber Board member. Kalanick is the public face of Uber, its co-founder and manager of its operations. Kalanick also acts on occasion as a driver with Uber.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. §§ 4 and 15, and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws. The Court has supplemental jurisdiction of the pendant state law claims pursuant to 28 U.S.C. § 1367. The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because the amount in controversy exceeds $5,000,000, and there are members of the class who are citizens of a different state than the Defendant.

11. This Court has personal jurisdiction over Kalanick.

12. Kalanick conducts business within the State of New York and has regularly and systematically transacted and/or solicited business in this State, either directly or through intermediaries.

13. Kalanick has derived substantial revenue, including as an owner and executive of Uber, from services rendered in New York State. He has likewise derived substantial revenue from interstate commerce.

14. Kalanick has purposely availed himself of the benefits of the State of New York and has committed wrongful acts in whole or in part within the State of New York, which have had direct effects in this State. Kalanick has expected, and should have expected, his actions to have consequences in the State of New York.

15. Among other things, Kalanick has purposefully directed his illegal activities to artificially raise Uber car service prices for persons within the State of New York. Activities in furtherance of these activities include, but are not limited to, providing his Uber car service and pricing algorithm in State of New York, engaging in lobbying efforts in this State related to the provision of Uber car services and use of the pricing algorithm, and appearing in this State for interviews and providing public statements regarding Uber's car services and pricing algorithm (including in November 2014 and at least as recently as September 2015 when he appeared as a guest on the Late Show with Stephen Colbert).

16. The claims in this case arise out of activities that relate to New York State.

17. This Court's exercise of personal jurisdiction over Kalanick would comport with fair play and substantial justice.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this district. New York City is reportedly Uber's biggest market in the United States and its most profitable.

19. Kalanick is engaged in, and his activities substantially affect, interstate trade and commerce.

## **CO-CONSPIRATORS**

20. Various persons and entities including Uber driver-partners, known and unknown to Plaintiff and not named as defendants in this action, have participated as co-conspirators with Kalanick in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## **BACKGROUND**

**Uber and the Uber App**

21. Kalanick founded Uber in 2009.

22. Uber is an on-demand car service that seeks to match riders with drivers.

23. It is Uber's position that it is not a transportation company. Uber does not provide transportation services itself.

24. Uber offers an application for smartphone devices (the "Uber App") through which users of the Uber App can request private drivers to pick them up and take them to their desired location. The Uber App utilizes dispatch software to send the nearest independent driver to the requesting party's location.

25. Uber offers different car service experiences, including uberX, uberTAXI, UberBLACK, UberSUV, and UberLUX (collectively, "Uber car service").

26. Following completion of a ride, Uber calculates a fare based on a base amount, ride distance, and time spent in transit, which may be multiplied during "surge" periods if rider demand is high and/or driver supply is low, and then processes a transaction on behalf of the driver.

27. Uber collects a percentage of the fare as a software licensing fee and remits the remainder to the driver-partner.

**Uber Users: Riders**

28. Uber users provide their name, mobile number, email, language, and credit card numbers or PayPal account information to Uber in exchange for an Uber account and access to the Uber App.

29. To become an Uber account holder, an individual first must agree to Uber's terms and conditions and privacy policy.

30. Uber account holders can obtain a "Fare Quote" directly from the Uber App by entering their pickup location and destination. The Uber App calculates the approximate amount based on the expected time and distance.

31. A rider pays a driver a fare, in a transaction facilitated by Uber but to which Uber is not a party.

32. Uber facilitates payment of that fare by charging the user's credit card or PayPal billing information on file and purportedly serves as the drivers' "limited payment collection agent" in this regard. Uber then sends a receipt to the user's email address.

**Uber's Other Users: Driver-Partners**

33. Uber actively recruits drivers to serve as "partners."

34. Uber and its drivers "expressly agree that no joint venture, partnership, employment, or agency relationship exists between [the driver and] Uber."

35. When Kalanick and his subordinates decide to offer Uber App services in a new geographic location, Uber uses social media to advertise for new "partner" drivers and holds meetings with these potential drivers.

36. Uber also organizes events for its driver-partners to get together. For example, in September 2015, Uber hosted a picnic at a park in Oregon where more than 150 driver-partners and their families reportedly joined Uber. Similar "partner appreciation" events have been organized for driver-partners in Burlington, Vermont, Portland, Maine, and New York City, among other places.

37. Uber tells potential drivers that "Uber gives you the freedom to get behind the wheel when it makes sense for you. Choose when you drive, where you go, and who you pick up."

38. Drivers have discretion as to whether to transport riders and may decline or cancel a request if, for example, a rider is unruly or intoxicated.

39. As of October 2015, Uber had an estimated 20,000 uberX driver-partners operating in New York City. Uber reported at that time that "average uberX gross fares per hour increased by 6.3% year over year."

40. At times, Uber has sought to mobilize its driver-partners to lobby on Uber's behalf.

**Kalanick and Uber Control Pricing**

41. Uber has steadfastly maintained that the driver-partners are not employees of Uber, not part of any Uber joint venture, and are wholly independent. In exchange for being listed on the Uber App, the drivers agree to pay a percentage of the fare to Uber.

42. The fares are calculated based on an Uber-generated algorithm. As demand for car services increases among users, applying the Uber algorithm results in increased fares ("surge pricing").

43. Kalanick's surge pricing model allows for up to eight times (8x) the standard fare to be charged during periods of high demand, and Kalanick and his co-conspirators have employed surge pricing on a regular basis.

44. Uber has not publicly revealed the specifics of its pricing algorithm, but Kalanick has commented about the "surge pricing" feature embedded in the algorithm.

45. Upon information and belief, Kalanick conceived of and implemented the "surge pricing" model into the Uber algorithm. Kalanick is a fierce defender of the surge pricing model.

46. In a December 17, 2013 report by Marcus Wohlsen posted on Wired.com and entitled "*Uber boss says surging prices rescue people from the snow*," Mr. Kalanick is quoted as saying: "We are not setting the price. The market is setting the price. We have algorithms to determine what the market is." www.wired.com/2013/12/uber-surge-pricing (last visited on Oct. 20, 2015). Mr. Kalanick further explained the "surge pricing" component of the Uber pricing conspiracy: "There's a harsh reality to situations where demand outstrips supply. As much as I'd love to give everybody a really cheap option, it's just simply not possible in certain sorts of extreme events. … I guarantee that our strategy on surge pricing is the optimal way to get as many people home as possible." *Id.*

47. In a September 17, 2015 post on the Uber website, Uber explains Kalanick's surge pricing to riders this way:

> Our goal at Uber is to ensure you can push a button and get a ride within minutes — even on the busiest nights of the year. And due to surge pricing, that's almost always possible. Here's how it works. When demand for rides outstrips the supply of cars, surge pricing kicks in, increasing the price. You'll automatically see a 'surge' icon

next to the products (uberX, UberBLACK, etc.) that are surging. If you still want a ride, Uber shows the surge multiplier and then asks for your consent to that higher price.

The website post continues:

> Surge pricing has two effects: people who can wait for a ride often decide to wait until the price falls; and drivers who are nearby go to that neighborhood to get the higher fares. As a result, the number of people wanting a ride and the number of available drivers come closer together, bringing wait times back down.
>
> Together with Chris Nosko, a professor at The University of Chicago, we have been studying the effects of surge pricing. On New Year's Eve last year, Uber experienced a technical glitch causing surge pricing in New York City to fail for 26 minutes. This created what we call in economics a "natural experiment" — when something varies, which you can then study after the fact.
>
> Today we are releasing a case study of rider and driver behavior during the surge glitch, and on the night of a sold-out-concert at Madison Square Garden when surge worked as intended. This study is not exhaustive, but will form the basis of more comprehensive research in the future.
>
> We found that, without surge pricing, Uber is not really Uber — you can't push a button and get a ride in minutes:
>
> - On the night of the concert, even though the number of people opening the Uber app experienced a 4x increase, the number of actual ride requests only rose slightly. In other words people decided not to request a ride. Meanwhile, 100% of ride requests were completed and ETAs were virtually unaffected.
>
> - By comparison on New Year's Eve, without surge, ride requests skyrocketed and only 25% of these requests were completed. ETAs also increased sharply. Without surge pricing, rider and driver behavior did not adapt to the increased interest in getting a ride.
>
> These two real-world scenarios illustrate a bit of Economics 101: supply and demand adjust in response to price changes. On Uber, this means a ride is more likely than not just a few minutes away, at the simple touch of a button.

48. In reality, Kalanick's pricing algorithm artificially manipulates supply and demand by imposing his surge pricing on drivers who would otherwise compete against one another on price.

49. Kalanick and Uber control the fares charged to riders. Through the pricing algorithm and its surge pricing component, Kalanick and Uber artificially set the fares for its driver-partners to charge to riders.

50. Uber provides a driver guide for its driver-partners, which contains a FAQs section. One of the questions is "What will the total fare be?" The answer is: "Total fare is based on time and distance, so you won't know until the trip ends. It's not a good idea to estimate fares for riders because the actual charges may be higher."

51. Although they are independent partners, the drivers are not controlling the fare.

52. Uber uses "surge pricing" to incentivize its driver-partners to use the Uber App during periods of peak demand. Uber provides alerts to its driver-partners relating to "surge pricing" based on demand or limited availability of drivers.

53. Uber also communicates with its driver-partners to inform them of what their increased earnings might have been had they logged into the Uber App during recent busy periods. Uber also provides its driver-partners with information regarding upcoming events that are likely to create high-demand for transportation services (e.g., concerts, sporting events, busy holidays).

54. Uber manipulates its pricing algorithm by, among other things, encouraging drivers who are not available or willing to receive trip requests to log out of the Uber App in order to show less supply (which equates to higher fares).

55. As Kalanick is quoted as saying: "You want supply to always be full, and you use price to basically either bring more supply on or get more supply off, or get more demand in the system or get some demand out. It's classic Econ 101."

56. Kalanick has further explained his surge pricing model. "When demand outstrips supply, the price comes up in a particular neighborhood or across a city." (Sept. 10, 2015 appearance on Late Show with Stephen Colbert)

57. Kalanick can turn off surge pricing, if he so chooses. As he has admitted: "Sometimes, something happens in a city; we don't know what it is. And if it's an emergency, we basically turn it off. Because I just think community expectations are [such that in] an emergency, major weather events, things like that, we turn it off." *Id.*

58. In fact, very rarely if ever, does Kalanick or his subordinates "turn off" the surge pricing feature of the pricing algorithm.

59. Instead, Kalanick and his co-conspirators reap artificially high profits during other peak demand periods like New Year's Eve, Valentine's Day, and stormy weather.

**The Driver-Partners Agree To Kalanick's Price-Fixing Scheme**

60. All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm.

61. Uber purports to allow its driver-partners to depart downward from the fare set by the Uber algorithm. In reality, however, drivers cannot do so. The drivers collect fares through the Uber App, rather than through a direct transaction with the rider. Accordingly, Uber controls the fare.

62. Uber's pricing is not always in the individual driver-partner's best interest. Upon information and belief, some drivers have lamented that Uber's "surge pricing" component can result in greater rider dissatisfaction and fewer rides for drivers. Upon information and belief, some drivers believe that having a more stable fare would increase rider satisfaction, as well as the number of riders willing to use Uber driver-partners at certain times.

63. For his part, Kalanick has staunchly defended the Uber price-fixing algorithm. "Airlines and hotels are more expensive during busy times. Uber is as well. We don't just charge to make a buck though, we take a small fee of the transaction, but the vast majority goes to the driver so that we can maximize the number of drivers on the road. ***The point is in order to provide you with a reliable ride, prices need to go up***."

64. Implicit in Kalanick's statement is his manipulation of free market principles by insisting that *all* of the Uber driver-partners must adhere to the Uber algorithm in order to deliver the experience that Kalanick desires: high-priced reliable rides. In an efficient market, however, the balance between reliability and price would sort itself out, with some riders willing to pay more for greater reliability and others willing to sacrifice some reliability for a lower fare. Kalanick, however, has abandoned the free market principles that he purports to support by tilting the scales in favor of higher fares.

65. Kalanick is the chief architect of the price-fixing conspiracy. The driver-partners agree to adhere to it because the artificial rates set by the pricing algorithm are higher on average than the fares that Plaintiff and Class Members would otherwise be charged in a competitive marketplace.

**Kalanick is a Driver and a Direct Competitor with Driver-Partners**

66. Kalanick is not only the CEO and co-founder of Uber; he also has been a driver who has used the Uber App.

67. Kalanick has publicized his work as a driver. Among other things, he has live tweeted his driving experience. For instance, on February 21, 2014, Kalanick tweeted, "Driving a range rover black on black . . . on uberX . . So legit." That same night, he further tweeted "3 trips down," among other things. His tweets continued through February 22, 2014.

12

68. As a driver, Kalanick has competed directly with other drivers using the Uber App.

69. Kalanick, as Uber's CEO, has ultimate control over the fares charged by himself, as a driver, and other drivers using the Uber App.

70. Kalanick and his direct competitors, by using the Uber App, agreed to charge identical fares to riders. Kalanick and his direct competitors using the Uber App understood that, by using the Uber App, they would charge identical fares to riders.

71. Kalanick's direct competitors delegated to Uber and to Kalanick, as Uber's CEO, the ability to fix prices through the Uber App algorithm. They agreed to charge those fares by becoming driver-partners and using the Uber App.

**Driver-Partners Have Colluded With Kalanick to Raise Fares**

72. Kalanick, in his position as Uber CEO, has orchestrated collusion among driver-partners to raise fares.

73. For instance, in September 2014, drivers using the Uber App in New York City colluded with each other to negotiate the reinstitution of higher fares for riders using UberBLACK and UberSUV services. Upon information and belief, Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares.

74. By organizing this price-fixing conspiracy, Kalanick ensured that fares would rise to a level that Uber, and the New York City drivers (*i.e.*, direct competitors), had jointly agreed upon.

75. As a result, riders using the Uber App have suffered by paying for increased fares resulting from this price-fixing conspiracy.

**Plus Factors**

76. The driver-partners had a common motive to conspire to adhere to the Uber pricing algorithm and the resulting artificially high fares because they could yield supra-competitive prices through their collective action.

77. Were it not for the unlawful agreement, individual driver-partners would have sought to differentiate themselves from other drivers on the basis of price, among other factors.

78. The driver-partners had many opportunities to meet and enforce their commitment to the unlawful arrangement.

79. Were the driver-partners acting independently, some significant portion would not agree to adhere to the Uber pricing algorithm in charging fares to riders.

**Plaintiff and the Putative Class Suffered Antitrust Injury**

80. But for Kalanick's conspiracy to fix fares charged by drivers using the Uber App, Uber ride-share service fares would have been substantially lower, including during the implementation of surge pricing. Absent Kalanick's anticompetitive actions, riders would have been able to obtain rates resulting from fare competition among drivers.

81. Studies have shown that the result of Kalanick's imposition of surge pricing is not to perfectly match supply with demand as he purports, but instead to remove some demand so that prices stay artificially high and Kalanick reaps artificially high profits.

82. Upon information and belief, Kalanick's Uber ride-share service comprises approximately 80 percent of the mobile app-generated ride-share service market.

83. As a result of Kalanick's anticompetitive actions, competition in the market for mobile app-generated ride-share service, and the sub-market of Uber car service, has been restrained.

**Nationwide Class**

84. Plaintiffs sue on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23. The Class consists of all persons in the United States who, on one or more occasions, have used the Uber App to obtain a ride from an Uber driver-partner and paid a fare for that ride set by the Uber pricing algorithm. Excluded from the Class is Kalanick, his co-conspirators, Uber's employees, officers, and directors, and Kalanick's legal representatives and heirs.

85. The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each Class member can be identified by using Defendant's records and/or the records of Uber. Plaintiff is informed and believes that there are many thousands of Class members.

86. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

    a. Whether Kalanick and the Uber driver-partner co-conspirators unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to charge all Uber riders the fare calculated by the Uber algorithm;

    b. Whether Kalanick's actions in orchestrating the Uber pricing conspiracy violated Section 340 of New York's General Business Law;

    c. Whether consumers and Class members have been damaged by Kalanick's conduct;

    d. Whether punitive damages are appropriate;

    e. Whether Kalanick should disgorge unlawful profits;

f. The amount of any damages; and

g. The nature and scope of injunctive relief necessary to restore a competitive market.

87. Plaintiff's claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

88. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained as Class Counsel able class action litigators.

89. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual Class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant. Separate actions by individual Class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of Class members to pursue their claims. A class action also makes sense because Defendant has acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**(Violation of the Sherman Act, 15 U.S.C. § 1)**

90. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

91. Plaintiff does not believe it is necessary to prove a relevant market. To the extent one is required the relevant product market is mobile app-generated ride-share service, with a relevant sub-market of Uber car service.

92. To the extent required, the relevant geographical market is the entire United States.

93. Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Specifically, Kalanick coordinated an unlawful agreement among the Uber driver-partners to adhere to the Uber pricing algorithm (including its Surge Pricing component) for fares charged to Uber riders.

94. This unlawful arrangement consists of a series of vertical agreements between Kalanick and each of the Uber driver-partners, as well as a horizontal agreement among the Uber driver-partners to adhere to the Uber pricing algorithm.

95. Were it not for their understanding that the other driver-partners were agreeing to the same thing, some driver-partners would not have entered the vertical agreements with Kalanick and Uber.

96. Through Kalanick's and Uber's actions, the Uber driver-partners have been enabled to participate in a horizontal agreement amongst themselves to adhere to the artificial price setting embodied in the Uber pricing algorithm. Defendant and Uber have sought to obscure the unlawful nature of this arrangement by disingenuously claiming that Uber driver-partners can charge a lower fare than the one generated by the Uber algorithm. At the same time, Defendant and Uber tout the ability for Uber driver-partners to earn more money by adhering to the Uber algorithm, and they facilitate Uber driver-partners' opportunities to meet together.

97. In orchestrating the horizontal price-fixing conspiracy, Kalanick committed himself to achieving an unlawful objective: namely, collusion with and among the co-conspirator drivers to set prices.

98. Despite Kalanick's position as a vertical market participant, his organizing of the conspiracy subjects him to per se liability for the results of the horizontal price-fixing agreement just as much as if operated at the same level as the driver-partners.

99. In addition, Kalanick's role as an occasional Uber driver puts him in a horizontal relationship with his driver-partner peers, which further supports per se treatment of his arrangements in restraint of trade.

100. Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

101. Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

102. The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained. Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340)

103. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

104. Through unlawful contracts, agreements, arrangements or combinations, Defendant has restrained trade in violation of the New York General Business Law, § 340, *et seq.*,

105. For the same reasons that Kalanick is liable for a Sherman Act violation for orchestrating an unlawful price fixing agreement among the Uber driver-partners, so too is he liable under the Donnelly Act.

106. In addition, Kalanick's conduct in requiring Uber driver-partners to adhere to the Uber pricing algorithm, subjects him to liability under the Donnelly Act on the alternative grounds that his actions constitute an unlawful vertical agreement in restraint of trade. Such vertical price-fixing is unlawful *per se*.

107. Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

108. Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

109. The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained. Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## **JURY DEMAND**

110. Plaintiff requests a jury trial of all issues triable of right to a jury.

**WHEREFORE**, Plaintiff demands judgment against Kalanick as follows:

A. Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel.

B. A declaration that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct or damage inflicted by any other co-conspirator;

C. A declaration that the use of the pricing algorithm for setting fares as described above is unlawful;

D. An award of monetary damages in an amount to be proved at trial, plus interest, to Plaintiff and Class members;

E. Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F. Pre-judgment and post-judgment interest on such monetary relief;

G. Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

H. The costs of bringing this suit, including reasonable attorneys' fees, as further provided under the statutes cited herein; and

I. All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

Dated: December 16, 2015

ANDREW SCHMIDT LAW PLLC

By:     /s/ Andrew Schmidt
ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

*Attorneys for Plaintiffs*