**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

SPENCER MEYER, individually and on
behalf of those similarly situated,

                    Plaintiffs,

   v.

TRAVIS KALANICK,

              Defendant.

**Case No. 1:15-cv-9796 (JSR)**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT TRAVIS KALANICK'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ALLEGED IN THE COMPLAINT ................................................ 3

ARGUMENT ............................................................................................................ 6

    I.   Plaintiff Does Not Plead A Plausible Conspiracy Among Uber Driver-Partners. .............. 6

        A.  The Complaint lacks any factual allegations indicating an agreement among driver-partners to fix prices. .................................................................................. 7

        B.  Plaintiff has failed to plead a plausible conspiracy. .................................................. 9

            i.   Plaintiff has failed to plead a plausible conspiracy regarding surge pricing. ........ 10

            ii.  Plaintiff's alleged conspiracy between hundreds of thousands of independent drivers is facially implausible. ............................................................. 11

        C.  The driver-partners' decision to use the Uber pricing algorithm is reasonably understood only as a reaction to Uber's lawful, single-firm conduct. ........................ 12

    II.  Plaintiff Does Not Plead An Unreasonable Restraint Of Trade Under Any Antitrust Theory. ................................................................................................. 14

        A.  Plaintiff's theory of per se liability fails because it is predicated on vertical conduct. .................................................................................................. 16

        B.  The Complaint does not allege a rule of reason theory of liability and, in any event, such a theory would fail given the facts alleged. ..................................... 17

    III. The Donnelly Act claim fails for the same reasons as the Sherman Act claim. ............... 20

    IV. Plaintiff Cannot Circumvent the Class Waiver in His User Agreement. ........................ 21

CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page No.**

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
   170 F.3d 349 (2d Cir. 1999) ........................................................................22

*American Bankers Ins. Grp., Inc. v. Long*,
   453 F.3d 623 (4th Cir. 2006) ......................................................................25

*American Express Co., v. Italian Colors Restaurant*, — U.S. —,
   133 S.Ct. 2304 (2013) ................................................................................21

*Arista Records LLC v. Lime Group LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007) ........................................................21

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ...................................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................12

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
   459 U.S. 519 (1983) ...................................................................................17

*Bell Atlantic Corp. v. Twombly*,
   555 U.S. 550 (2007) .............................................................................passim

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013) (JSR) ........................... 8, 13, 15, 19

*Boucher v. Alliance Title Company, Inc.*,
   127 Cal.App.4th 262 (2005) ......................................................................25

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) .....................................................................................4

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ......................................................................14

Commercial Data Servers v. International Business Machines Corp.,
   2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002) .................... 14, 15, 18, 19

*Compare Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ......................................................................10

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010) ........................................................................4

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Products, Inc.*,
  129 F.3d 240 (2d Cir. 1997) ..................................................................................8

*Fisher v. Berkeley*,
   475 U.S. 260 (1986) ..........................................................................................6

*Hughes Masonry Co., Inc., v. Greater Clark Cnty School Building Corp.*,
  659 F.2d 826 (7th Cir. 1981) .............................................................................25

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015) ..................................................................18

*In re Elevator Antitrust Litig.*,
  2006 WL 1470994 (S.D.N.Y. May 30, 2006) .......................................................8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ......................................................................11

*Int'l Chartering Servs., Inc., v. Eagle Bulk Shipping Inc.*,
  2015 WL 5915958 (S.D.N.Y. Oct. 8, 2015) .......................................................22

*Jacobson v. Snap-on Tools Co.*,
  2015 WL 8293164 (N.D. Ca. De. 9, 2015)..........................................................23

*Jones v. Jacobson*,
  195 Cal. App. 4th 1 (2011) ...............................................................................25

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ..........................................................................22

*LaFlamme v. Societe Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...............................................................14

*Lau v. Mercedes-Benz USA, LLC*,
  2012 WL 370557 (N.D. Cal. Jan. 31, 2012).......................................................24

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...................................................................................passim

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ..........................................................................6, 12

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ...............................................................................6, 13, 20

*O'Connor v. Uber Technologies, Inc.*,
  2015 WL 5138097, (N.D. Cal. Sept. 1, 2015) .....................................................5

iii

*People v. Tempur-Pedic Int'l, Inc.*,
    95 A.D.3d 539 (1st Div. 2012) ...................................................................20

*RxUSA Wholesale Inc. v. Alcon Labs.*,
    391 F. App'x 59 (2d Cir. 2010) ...................................................................7

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .........................................................................................16

*Stuyvesant Plaza, Inc. v. Amazon, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013) .......................................................13

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ...............................................................................4, 14, 18

*Turtle Ridge Media Grp. v. Pacific Bell Directory*,
    140 Cal.App.4th 828 (2006) .......................................................................24

*United States v. Apple*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013) ..................................................11, 14

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ...................................................................................13

*United States v. Wise*,
    370 U.S. 405 (1962) ...................................................................................21

*Uptown Drug Co., Inc. v. CVS Caremark Corp.*
    962 F. Supp. 2d 1172 (N.D. Cal. 2013) ...................................................24

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) .......................................................................20

*WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*,
    851 F. Supp. 2d 494 (S.D.N.Y. 2011) .......................................................21

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
    634 N.E.2d 158 (N.Y. 1994) .......................................................................20

**Statutes**

Sherman Act § 1, 15 U.S.C. § 1...............................................................passim

Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.* ........................................20

# **INTRODUCTION**

Uber Technologies, Inc. ("Uber") is an innovative technology company that connects independent driver-partners and riders through its smartphone application.  As a new entrant in the transportation marketplace, Uber has vastly increased options, reduced prices and improved service for millions of Americans.[1]   Antitrust law has long appreciated the procompetitive benefits that come along with technological innovation and new market entry.  Plaintiff's Complaint nonetheless invokes that same antitrust law to attack Uber's innovative technology and its benefits to consumers and competition.  The Complaint attempts this feat by alleging a wildly implausible—and physically impossible—conspiracy among hundreds of thousands of independent transportation providers all across the United States ("driver-partners"), based solely on the fact that they at some point in time accepted ride requests via the Uber App.  This lawsuit, if allowed to proceed, would strangle innovation, decrease competition, and increase prices— defeating precisely the behavior antitrust law is designed to encourage.  For this reason—and because the Complaint fails to state a claim under the antitrust laws— it must be dismissed.

According to Plaintiff, each and every driver-partner joined a single "horizontal" agreement—that is, an agreement between direct competitors—to fix prices when using the Uber App.  But even as it asserts an unreal conspiracy of staggering breadth, the Complaint lacks any specific factual allegations to support any reasonable inference that driver-partners came to an agreement among themselves to violate the law, as opposed to independent decisions to enter

---

[1] As recognized by the Federal Trade Commission, Uber's mobile application-based platform for matching riders and driver-partners represents an "innovative form of competition" that has expanded consumer welfare and prompted competition on a wide variety of fronts, including on price.  *See* Federal Trade Commission, Comment Letter ("FTC Comment Letter") at 2, June 7, 2013, available at  https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comments-district-columbia-taxicab-commission-concerning-proposed-rulemakings-passenger/130612dctaxicab.pdf (last accessed Jan. 15, 2016).

into vertical agreements with Uber.  The Complaint contains no mention of any alleged co-conspirators by name, other than Defendant Travis Kalanick, Uber's CEO, who purportedly joined the horizontal conspiracy when, on a couple of isolated occasions, he acted as a driver-partner—and "tweeted" about his experience.  The Complaint does not explain how Mr. Kalanick supposedly joined the conspiracy.

The Complaint also contains no mention at all of any specific communications between any co-conspirators, nor does it attempt to explain how unidentified communications among unidentified individuals at unidentified places and times could have led to an agreement among hundreds of thousands of independent driver-partners to fix prices.  The Complaint's only indication that any driver-partners have even met one another is that Uber, on occasion, organizes "picnics" for small groups of driver-partners located in a particular city.  Plaintiff would have this Court extrapolate from these isolated Uber-organized picnics the existence of a nationwide price-fixing conspiracy among hundreds of thousands of strangers.  This is exactly the type of conclusory assertion of conspiracy, unaided by any specific factual allegations indicating an actual agreement between the alleged co-conspirators to fix prices, that the Supreme Court held insufficient in *Bell Atlantic Corp. v. Twombly*, 555 U.S. 550 (2007).

The Complaint hypothesizes that the decisions of independent driver-partners to adhere to Uber's pricing algorithm for setting fares can *only* be explained by an impossibly unwieldy conspiracy to engage in unlawful conduct.  Yet an alternative, and unquestionably true, explanation for these parallel actions is immediately apparent:  Uber, an upstream technology company, has proposed contractual terms of dealing to downstream transportation providers that include use of Uber's pricing algorithm and those downstream providers who wish to become driver-partners for Uber have agreed to those contractual terms and used the algorithm.

For nearly a century, the Supreme Court has made clear that it is perfectly lawful for a vertical actor like Uber to announce terms of dealing to prospective downstream counterparties, and to deal only with those who agree to its preferred terms. This lawsuit seeks to sneak around this settled jurisprudence by making manifestly implausible and factually unsupported allegations of a horizontal conspiracy. This Court should reject that effort and dismiss the Complaint, with prejudice.

## STATEMENT OF FACTS ALLEGED IN THE COMPLAINT

Defendant Travis Kalanick is the Chief Executive Officer and co-founder of Uber. Compl. at 1. He is the sole defendant named in Plaintiff's Complaint. *Id.*

"Uber is a technology company" that developed and licenses a mobile application (the "Uber App") for use on smartphone devices. *Id.* ¶ 2. The Uber App allows independent transportation providers—Uber "driver-partners"—to receive trip requests from members of the public, and provides electronic payment processing for trips booked through the Uber App. *Id.* ¶¶ 24, 26, 32; *see id.* ¶ 2 ("Uber is not a transportation company and does not employ drivers" to directly provide transportation services); *id.* ¶ 5 ("drivers using the App are independent firms, competing with each other for riders"). "The Uber App utilizes dispatch software to send the nearest independent driver to the requesting party's location." *Id.* ¶ 24. Following a ride, Uber collects a software licensing fee, which is calculated as a percentage of the fare charged by the driver-partner to the rider, and remits the remainder of the fare to the driver-partner. *Id.* ¶ 27.

Uber enters into individual contracts with each driver-partner pursuant to which Uber agrees to provide the driver-partner with lead generation and payment processing services and the driver-partner agrees to pay Uber a licensing fee. *Id.* ¶¶ 2, 5, 24, 27. As part of these separate contracts, Uber requires each driver-partner to agree to use Uber's pricing algorithm to

arrive at a standard, suggested fare. *Id.* ¶ 42. The pricing algorithm is primarily based on a trip's "time and distance." *Id.* ¶ 50. The algorithm also uses "surge pricing," which may increase the price "based on demand or limited availability of drivers" "to incentivize its driver-partners to use the Uber App" at times of low supply. *Id.* ¶ 52. Uber's contracts with driver-partners expressly permit the driver-partners to reject the fare charged by the pricing algorithm and instead charge a lower fare. Declaration of Michael Colman, Ex. 2 ("Driver Terms") ¶ 4.1 ("You [the driver-partner] shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare").[2] Even so, Plaintiff alleges without support of any kind that "[a]ll of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm" and not "to depart downward from the fare set by the Uber algorithm." Compl. ¶¶ 60-61. Uber offers a variety of "different car service experiences," *id.* ¶ 25, with each "experience" providing a different level of service and price point.[3]

Plaintiff alleges that "[v]arious persons and entities including Uber driver-partners, known and unknown to Plaintiff and not named as defendants in this action, have participated as co-conspirators with Kalanick." *Id.* ¶ 20. Specifically, the Complaint asserts that all driver-

---

[2] "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations and quotations marks omitted).

[3] Uber's agreements with driver-partners relating to use of its pricing algorithm are considered "vertical" because they include price provisions "imposed by agreement between firms at different levels of distribution." *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 (1988). "Price-fixing agreements between two or more competitors," by contrast, are "known as horizontal price-fixing agreements." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Plaintiffs allege that Uber is a vertical actor vis-à-vis driver-partners, who are in a horizontal relationship with one another. Compl. ¶ 95.

partners who have accepted so much as a single ride request through the Uber App have entered into "a horizontal agreement *amongst themselves* to adhere to the artificial price setting embodied in the Uber pricing algorithm." *Id.* ¶ 96 (emphasis added).  Mr. Kalanick is the only person or entity identified by name as a party to the purported horizontal conspiracy.  *See id.* ¶ 66 ("Kalanick is not only the CEO and co-founder of Uber; he has been a driver who has used the Uber App").  The Complaint bases Mr. Kalanick's membership in the alleged horizontal conspiracy on the allegation that he acted as a driver-partner providing the UberX service on February 21 and 22, 2014.  *Id.* ¶ 67 (alleging that Mr. Kalanick "tweeted" about his experience as a driver-partner).

The Complaint alleges that this conspiracy spans across the entire United States, *id.* ¶ 84, and includes an estimated 20,000 driver-partners operating in New York City in October 2015, *id.* ¶ 39.  Though the exact size of the alleged conspiracy is not specifically pleaded, the conspiracy must include at least several hundred thousand individual driver-partners in more than a hundred cities and 47 states across the United States.  *See id.* ¶ 36; *O'Connor v. Uber Technologies, Inc.*, No. C-13-3826, 2015 WL 5138097, *7 (N.D. Cal. Sept. 1, 2015) (certifying a plaintiff class of 160,000 driver-partners operating in California alone).  Plaintiff asserts that Mr. Kalanick, in his capacity as Uber's CEO, somehow "coordinated" the unlawful horizontal agreement among all of these driver-partners.  Compl. ¶ 93; *see also id.* ¶ 72 (alleging that "Kalanick, in his position as Uber CEO, has orchestrated collusion among driver-partners"); *id.* ¶ 49 ("Kalanick and Uber control the fare charged to riders").

Plaintiff Spencer Meyer, like all users of the Uber App, expressly agreed to Uber's terms and conditions.  *Id.* ¶ 29.  Among those conditions was the following:  "**You [the user] acknowledge and agree that you and [Uber] are each waiving the right to a trial by jury or**

**to participate as a plaintiff or class User in any purported class action or representative proceeding.**" Declaration of Michael Colman, Ex. 1 ("User Terms") at 9 (bold in original).

## ARGUMENT

### I.    Plaintiff Does Not Plead A Plausible Conspiracy Among Uber Driver-Partners.

To state a claim under § 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must plead "enough factual matter (taken as true) to suggest an agreement was made." *Bell Atlantic Corp. v. Twombly*, 555 U.S. 550, 556 (2007); *id.* at 553 ("the crucial question is whether the challenged anticompetitive conduct stems from independent decision, or from an agreement") (quotation marks and brackets omitted); *id.* at 557 (an agreement requires an actual "meeting of the minds" between each of the alleged co-conspirators to violate the Sherman Act); *Fisher v. Berkeley,* 475 U.S. 260, 266 (1986) ("there can be no liability under § 1 [of the Sherman Act] in the absence of agreement" between separate entities).   For there to be an "agreement" under § 1, the co-conspirators must have each made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  In a § 1 case, therefore, a plaintiff can survive a motion to dismiss in one of two ways. First, a plaintiff may proffer "direct evidence that the defendants entered into an agreement in violation of the antitrust laws," for example by advancing particularized allegations of "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013).  Second, "a complaint may, alternatively, present circumstantial facts supporting the *inference* that conspiracy existed." *Id.*

**A.     The Complaint lacks any factual allegations indicating an agreement among driver-partners to fix prices.**

Plaintiff's Complaint is devoid of any direct evidence of an agreement between conspirators or even circumstantial facts to support a reasonable inference that a conspiracy existed among driver-partners for Uber.  Instead, the Complaint's sole allegation of a conspiracy is its conclusory statement that there is "an unlawful agreement among the . . . driver-partners to adhere to the Uber pricing algorithm."  Compl. ¶ 93.  Conclusory allegations such as these are insufficient under *Twombly*.  550 U.S. at 557 (A "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d Cir. 2010) (affirming dismissal of antitrust claims because "assertion[s] of an agreement among the Manufacturers is entirely conclusory"); *Mayor of Baltimore*, 709 F.3d at 135-36 ("The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation").

The facts included in the Complaint fall far short of what is required to support the inference that any agreement existed, let alone an agreement to engage in unlawful conduct.  Other than Mr. Kalanick, the Complaint fails to identify by name any individual and fails to even delineate the precise numerical scope of the co-conspirator class (probably because the enormity of the class itself proves the implausibility of Plaintiff's claims).  The Complaint is also silent on the timing of the alleged agreement, or where the agreement was entered.  It offers no guidance whatsoever as to how such a numerous and geographically diffuse group of co-conspirators came to reach a single, common agreement.  And it fails to indicate how new driver-partners become party to the supposed conspiracy.

Further, while the Complaint includes the conclusory suggestion that Mr. Kalanick, as CEO, somehow "orchestrated" this conspiracy, Compl. ¶ 72, it offers nothing to explain how he

could have possibly coordinated a horizontal agreement among such a large and diverse group of independent transportation providers.[4]  Even more glaring, there is no allegation of any identified driver-partner *ever* communicating with another driver-partner—or Mr. Kalanick—about prices, let alone the "high level of interfirm communications" that could plausibly suggest an agreement. *Mayor of Baltimore*, 709 F.3d at 139 (no inference of agreement where Complaint makes particularized allegations of "only two actual communications between competitors"); *see also In re Elevator Antitrust Litig.*, No. 04-cv-1178(TPG), 2006 WL 1470994, at *3 (S.D.N.Y. May 30, 2006) ("if nothing in the way of specific transactions or patterns of transactions can be alleged indicating possible conspiratorial collusion or agreement to fix prices for the sale and maintenance of elevators, then the complaint is entirely lacking in any basis for claiming an illegal agreement or conspiracy"), *aff'd* 502 F.3d 47 (2d Cir. 2007).

Indeed, the Complaint in this case contains even fewer factual allegations to support an inference of conspiracy than the Complaint dismissed by this Court in *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013) (JSR).  In that case, the plaintiffs alleged a conspiracy among a small group of six direct competitors, book publishers, and a vertical actor, Amazon.  Plaintiffs alleged that there "may have been oral discussions or

---

[4] Plaintiff's suggestion that a horizontal agreement can be inferred based on the happenstance that Mr. Kalanick has acted as a driver-partner cannot be taken seriously.  While Mr. Kalanick, as Uber's CEO, may play a distant role in determining the nature of *Uber's* contractual relationships with downstream driver-partners, the Complaint does not allege that Mr. Kalanick has ever met or communicated with any driver-partner in his capacity *as a driver-partner*.  *See* Compl. ¶¶ 33-40, 66-71.  That Mr. Kalanick, on a few isolated occasions, acted as a driver-partner cannot somehow transform Uber's vertical agreements with driver-partners into horizontal agreements involving Mr. Kalanick personally.  The Second Circuit has squarely held that the mere fact that a vertical actor also competes horizontally with its downstream competitors does not turn a vertical agreement into a horizontal one.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (price restraint between distributor and downstream manufacturer treated as a vertical agreement, "even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its products through a distributor and independently").

8

agreements directly between one or more of the [publishers] and AMAZON regarding the use of restrictive DRMs." *Id.* at 618.   This Court found plaintiffs' allegation of a conspiracy "remarkable" in its "evasiveness," in part because "plaintiffs d[id] not specify who participated in these hypothetical discussions or agreements, only that they may have involved 'one or more' of the Publishers and Amazon." *Id.*

Here, there are even fewer indicia of an agreement:   Plaintiff does not hypothesize a single "oral discussion" between the driver-partners, nor does he attempt to identify particular individuals who had such discussions.   Put simply, the poverty of plausible allegations in Plaintiff's Complaint—the absence of any factual allegations to support a nationwide conspiracy between hundreds of thousands of driver-partners—is reason enough to dismiss this Complaint.

**B.      Plaintiff has failed to plead a plausible conspiracy.**

Plaintiff's Complaint also fails because the alleged conspiracy is impossible.   Indeed, beyond proffering a legal conclusion and with no citation to any communications whatsoever between driver-partners, Plaintiff relies on nothing more than the independent decisions of hundreds of thousands of driver-partners to use the Uber App as evidence of parallel conduct to support a conspiracy.   Compl. ¶¶ 60.   This reliance is misplaced.   Courts have universally found conduct to be "parallel" only when a small number of competitors have taken the same action at or around the same point in time.   *E.g.*, *Mayor of Baltimore*, 709 F.3d at 138 (action by eleven banks to "withdraw[] from the [auction rate securities] market in a virtually simultaneous manner on February 13, 2008" deemed parallel).

This allegation also fails for the same essential reason mentioned above: to support a price-fixing Complaint, parallel action must be presented in the context of "a preceding agreement" among co-conspirators.   *Twombly*, 550 U.S. at 557.   In the absence of a preceding agreement, parallel conduct "could just as well be independent action."   *Id.* (parallel conduct is

"just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"). Here, that independent action is the decision of each driver-partner to sign up with Uber and accept the contractual terms offered, which include use of the pricing algorithm.

i.  *Plaintiff has failed to plead a plausible conspiracy regarding surge pricing.*

Plaintiff states that "the driver-partners had a common motive to conspire to adhere to the Uber pricing algorithm" in order to capture the higher fares that result from surge pricing. Compl. ¶ 76; *see id.* ¶¶ 42-44. In a direct contradiction of that statement, Plaintiff also alleges that surge pricing "is not always in the individual driver-partner's best interest" because it can "result in greater rider dissatisfaction and fewer rides for drivers." *Id.* ¶ 62.

Regardless of how Plaintiff tries to characterize it, the common motive suggested here is nothing more than the profit motive of any transportation provider, which is not the same as a motive to conspire. The Complaint fails to even hint at how such a common motive could plausibly translate into an actual agreement among hundreds of thousands of transportation providers around the nation. More to the point, the Complaint is entirely devoid of facts indicating that driver-partners' collective agreement to surge pricing somehow confers collective benefits that overwhelm each driver-partner's individual interest in avoiding it. *Cf. Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (complaint survived motion to dismiss because "plaintiffs have alleged behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals").

Plaintiff also fails to explain how surge pricing demonstrates a motive to *conspire* as opposed to simply a motive to agree independently to Uber's terms of dealing, which include surge pricing as a component of its pricing algorithm. The Complaint alleges no facts suggesting that collective action on the part of driver-partners is required for surge pricing to take effect for

10

any individual driver-partner.  Quite the contrary, no "conspiracy" is needed:  Plaintiff asserts that Uber sets the pricing algorithm as part of its proposed terms of dealing, and independent driver-partners may either accept or reject those terms.  Compl. ¶¶ 41-44, 49-52.

>        ii.    *Plaintiff's alleged conspiracy between hundreds of thousands of independent drivers is facially implausible.*

Under Plaintiff's theory, all driver-partners who ever accepted so much as a single ride request through the Uber App are all co-conspirators and therefore are all jointly and severally liable for the full measure of antitrust damages.  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 519 (S.D.N.Y. 1996) ("Liability for antitrust violations is joint and several.  Each Class member may therefore recover his or her full loss from any defendant who can be shown to have participated in the alleged conspiracy").  This theory is at significant variance from those cases in the Second Circuit that have allowed antitrust complaints to survive pleading challenges.

*United States v. Apple*, for example, involved allegations that a small group of competitor book publishers had engaged in numerous conversations specifically related to the fixing of prices, and that those conversations yielded an actual agreement to increase prices.  952 F. Supp. 2d 638, 651 (S.D.N.Y. 2013) ("On a fairly regular basis, roughly once a quarter, the CEOs of the Publishers held dinners in the private dining rooms of New York restaurants, without counsel or assistants present, in order to discuss the common challenges they faced, including most prominently Amazon's pricing policies"); *id.* (describing the Publishers' communications and agreement "to force [Amazon] to accept a price level higher than 9.99.").  Plaintiff alleged that Apple, a vertical actor, joined and facilitated that horizontal conspiracy—which was again supported by allegations of scores of conversations and meetings between Apple and the publishers that yielded a particularized agreement to raise prices.  *Id.* at 657-58 ("On the heels of their initial meetings with Apple, the Publisher Defendants enthusiastically shared the good news

that Apple was willing to enter the e-book market with a significantly higher price point" that would force Amazon to also raise prices). In stark contrast to the Complaint in *Apple*, Plaintiff here alleges an impossible horizontal conspiracy involving many thousands of competitors who are not alleged to have ever met or communicated with one another and are not even identified.[5]

### C.      The driver-partners' decision to use the Uber pricing algorithm is reasonably understood only as a reaction to Uber's lawful, single-firm conduct.

Even where a plaintiff properly pleads parallel conduct among several competitors along with circumstances that support an inference of an illegal agreement among them—which Plaintiff in this case has not done—a complaint fails to state a claim if there is an "obvious alternative explanation" for the co-conspirators' parallel actions. *Twombly*, 550 U.S. at 567; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (courts must apply "judicial experience and common sense" in assessing a claim's plausibility). In *Twombly*, the Supreme Court considered a complaint alleging "sparse competition among large firms dominating separate geographical segments of the market." 550 U.S. at 567. The Court agreed that the defendants' "parallel conduct" of declining to compete in one another's respective geographic spheres "could very well signify illegal agreement," if considered in a vacuum. *Id.* Nevertheless, the Court held that plaintiff had failed to plausibly allege existence of an illegal agreement because the complaint evinced "a natural explanation for the noncompetition alleged," namely that the defendants were merely "sitting tight, expecting their neighbors to do the same thing." *Id.* at 568.

---

[5] Indeed, even an alleged conspiracy among a discrete number of actors who have had communications between each other and have a common motive may be insufficient to survive a pleading challenge where the alleged conspirators have a plausible alternative motive for their actions. *See Mayor of Baltimore*, 709 F.3d at 132, 138-39 (allegation that a small group of banks with a common motive of "cut[ting] losses," had, on a single, specific date and "in a virtually simultaneous manner," suddenly stopped placing support auction bids, despite consistently doing so for the previous several years, was insufficient to survive motion to dismiss even where there were allegations of specific communications between some of the banks because banks' decision to leave a failing market made independent "business sense").

Here, there is a far more "natural explanation" for the parallel conduct than the alleged conspiracy.  Namely, each driver-partner independently decided it was in his or her best interest to enter a vertical agreement with Uber, a condition of which was that the driver-partner agree to use Uber's pricing algorithm for suggested pricing.  Driver Terms ¶ 4.1; Compl ¶ 60 ("All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm").

The only reasonable inference to be drawn from the Complaint's allegations is that Uber has proposed terms of dealing to downstream independent contractors (the driver-partners), each of whom is free to make the independent decision to accept or reject those terms.  For nearly a century, this type of vertical conduct—by which a vertical actor "announce[s] its resale prices in advance, and refuse[s] to deal with those who fail to comply"—has been recognized as perfectly lawful under § 1 of the Sherman Act.  *Monsanto*, 465 U.S. at 761 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see Bookhouse*, 985 F. Supp. 2d at 619 ("It is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms") (citation omitted).

Plaintiff's entire Complaint, then, is based on a fundamental misunderstanding of antitrust law.  Specifically, Plaintiff asserts that this Court may infer the existence of a horizontal agreement among competitors based merely on allegations that those competitors each submitted to terms of dealing proposed by a vertical actor.  *See* Compl. ¶ 93.

That is not the law.  *See Bookhouse*, 985 F. Supp. 2d at 622 ("plaintiffs only allege that each individual Publisher entered into an unlawful vertical agreement with Amazon, making no allegation of any horizontal conspiracy among the Publishers").  In *Commercial Data Servers v. International Business Machines Corp.*, for example, Judge McMahon held that parallel action by IBM's downstream distributors, allegedly prompted by IBM's "threat" to cease doing

13

business with them if they did not take the action, did not plausibly suggest that "the downstream distributors agreed amongst themselves" to comply with IBM's demand.  No. 00 Civ. 5008(CM), 2002 WL 1205740, at *3 (S.D.N.Y. Mar. 15, 2002).  Similarly, in *LaFlamme v. Societe Air France*, the court held that plaintiff had failed to plausibly allege a horizontal agreement by competing airlines "to impose surcharges" where "rapidly rising jet fuel prices" were "an obvious potential stimuli and discernible reason aside from collusion that plausibly could have instigated independent decisions by defendants" to take the same action.  702 F. Supp. 2d 136, 152 (E.D.N.Y. 2010) (quotation marks omitted).  The instant Complaint similarly supplies nothing by which this Court could reasonably infer that any driver-partner ever came to an agreement *with a competing driver-partner*, as opposed to completely independent and lawful vertical agreements *with Uber*.  The Complaint should be dismissed for this independent reason.

## II.    Plaintiff Does Not Plead An Unreasonable Restraint Of Trade Under Any Antitrust Theory.

To state a § 1 Sherman Act claim, a plaintiff alleging an unlawful agreement must plausibly allege that the "agreement constituted an unreasonable restraint of trade."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537, 542 (2d Cir. 1993).  This may be established by facts showing that the alleged agreement is per se unlawful, or that it fails the so-called "rule of reason."  *Id.*

Per se liability is exclusively available for conspiracies that have as a component an unlawful agreement between horizontal competitors.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-7 (2006).  Vertical price restraints, by contrast, are judged by the rule of reason.  *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 898-99 (2007).  To the extent that a vertical actor may be subject to per se liability post-*Leegin*, it must have actively participated in or facilitated an underlying horizontal conspiracy.  *See United States v. Apple*, 791 F.3d 290, 323

(2d Cir. 2015) ("The rule of reason is unquestionably appropriate to analyze an agreement between a manufacturer and its distributors to, for instance, limit the price at which the distributors sell the manufacturer's goods or the locations at which they sell them. . . . But the relevant 'agreement in restraint of trade' in this case is not Apple's vertical Contracts with the Publisher Defendants . . . ; it is the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices"); *Commercial Data Servers*, 2002 WL 1205740 at *3 (vertical actor may not be held per se liable based on "horizontal effects" of a series of vertical agreements; "a restraint is not horizontal because it has horizontal effects but because it is the product of a horizontal agreement"); *Bookhouse*, 985 F. Supp. 2d at 622 (allegation that a group of horizontal competitors each entered into an unlawful vertical agreement, but did not conspire with one another, is not subject to per se liability).

The rule of reason is the default standard for determining whether a practice unreasonably restrains trade in violation of § 1, with per se treatment "appropriate only after courts have had considerable experience with the type of restraint at issue" and, based on that experience, determined that it "would always or almost always tend to restrict competition and decrease output." *Leegin*, 551 U.S. at 885; *see id.* at 895 (per se illegality is the exception, not the rule, because "[p]er se rules . . . can be counterproductive" by "prohibiting procompetitive conduct the antitrust laws should encourage" and "increas[ing] litigation costs by promoting frivolous suits against legitimate practices"); *id.* at 886 ("To justify a *per se* prohibition a restraint must have ''manifestly anticompetitive'' effects,  and ''lack any redeeming virtue")) (quotation marks and citation omitted).

### A.   Plaintiff's theory of per se liability fails because it is predicated on vertical conduct.

Not only does the Complaint fail to allege a plausible horizontal conspiracy among driver-partners to support its theory of per se liability, the facts set forth in the Complaint establish only that a legal structure was in place—specifically, a single firm acting vertically. The Complaint describes Uber as a "technology company" that offers the "Uber App" to match riders with independent driver-partners, and which requires them to agree to use Uber's pricing algorithm to set fares.  *Id.* ¶¶ 2, 24, 41, 60.  These allegations, if accepted as true, only establish a single firm acting vertically.

The Supreme Court and this Circuit have repeatedly confirmed that a single firm acting vertically does not offend antitrust laws.  In *Leegin*, for example, the Supreme Court held that such vertical price restraints do not fall within the narrow category of activities that are anticompetitive per se, emphasizing that "economics literature is replete with procompetitive justifications for . . . use of resale price maintenance."  551 U.S. at 889.  The Court noted that a vertical price restriction such as resale price maintenance "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand."  *Id.* at 890; *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("the primary purpose of the antitrust laws is to protect interbrand competition").

One of the ways interbrand competition is enhanced by way of vertical price restraints is "by facilitating market entry for new firms and brands."  *Leegin*, 551 U.S. at 891.  Uber's entry into the broader market for transportation services offers a perfect illustration for how this functions in practice:  Aided by its use of a pricing algorithm, Uber's mobile application-based platform for matching riders and driver-partners represents an "innovative form of competition"

that has expanded consumer welfare and prompted competition on a wide variety of fronts, including price.[6] As the Supreme Court has explained:

> New manufacturers and manufacturers entering new markets can use [vertical price restraints] in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. New products and new brands are essential to a dynamic economy, and if markets can be penetrated by using resale price maintenance there is a procompetitive effect.

*Leegin*, 551 U.S. at 891. In addition, by reducing intrabrand price competition, for example, resale price maintenance prompts "the manufacturer's retailers [to] compete among themselves over services." *Id.* Not only does this introduce "valuable services" into the market, but it "has the potential to give consumers more options so that they can choose among low-price, low-service brands; high-price, high-service brands; and brands that fall in between." *Id.* at 890, 892.

If Plaintiff's theory of proving conspiracy were credited, every vertical resale price maintenance arrangement would automatically support an inference of a horizontal price-fixing conspiracy. The Supreme Court has squarely rejected that theory. *Id.* at 895.

**B.     The Complaint does not allege a rule of reason theory of liability and, in any event, such a theory would fail given the facts alleged.**

The Complaint never uses the words "rule of reason," nor does it attempt to plead facts necessary to satisfy the standard by which rule of reason claims are evaluated. *See Khan*, 522 U.S. at 10. As the Supreme Court has advised repeatedly, courts are not permitted to supplement a plaintiff's allegations in search of possible antitrust violations that have not been pled. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983) ("As the case comes to us, we must assume that the [plaintiff] can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the

---

[6] FTC Comment Letter at 2-3.

[plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged."); *Twombly*, 550 U.S. at 563 n.8 (same).[7]

Even assuming that Plaintiff had sought to state a rule of reason claim, the Complaint would fail. First, as described *supra*, the facts as alleged actually establish a single firm acting vertically in a legal manner. Second, Plaintiff's market definition is facially inadequate to satisfy a rule of reason analysis. *See In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 448 (S.D.N.Y. 2015) ("to engage in rule of reason analysis, the Court must determine what the relevant market is, and then examine that market" to determine whether the alleged restraint of trade had an actual adverse effect on competition). The Complaint proposes a relevant market defined as "mobile app-generated ride-share service, with a relevant sub-market of Uber car service." Compl. ¶ 91. This market definition fails because it offers no "theoretically rational explanation" for excluding non-mobile app generated ride-share services, such as legacy taxi companies, or other transportation methods including public transit such as subway and bus travel, and private transit such as personal vehicle use and walking.[8] *Commercial Data Servers*, 2002 WL 1205740, at *4. Each of these alternatives is a clear substitute for the services provided by driver-partners.

---

[7] *See also Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) ("As a single entity, a joint venture, like any other firm, must have the discretion to determine the prices of the products that it sells, including the discretion to sell a product under two different brands at a single, unified price. If [the single entity's] price unification policy is anticompetitive, then respondents should have challenged it pursuant to the rule of reason. But it would be inconsistent with this Courts antitrust precedents to condemn the internal pricing decisions of a legitimate joint venture as *per se* unlawful.") (footnotes omitted); *Leegin*, 551 U.S. at 907-08 (refusing to consider theory of antitrust liability that was not alleged in the Complaint).

[8] Not only does Uber compete with other transportation services such as public and private transit, as well as taxis and drivers using competing platforms such as Lyft and Gett, driver-partners utilizing the Uber App are free to provide competing services as taxi drivers or by using competing platforms, and they frequently do. Driver Terms ¶ 2.4.

In *Bookhouse*, this Court rejected plaintiffs' limitation of the relevant market to "the market for e-books" where the Complaint did not allege facts indicating that "e-books and print books are not acceptable substitutes." 985 F. Supp. 2d at 621. Similarly here, the Complaint contains nothing to rebut the commonsense proposition that "mobile app generated ride share services" provided by driver-partners, traditional taxi services, and public transit are reasonably interchangeable such that the change in price for one service would affect demand in the others (*i.e.*, these services have a positive cross-elasticity of demand). The "failure to define the relevant market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal" of a rule of reason claim. *Commercial Data Servers*, 2002 WL 1205740, at *4 (citing cases); *see also BookHouse*, 985 F. Supp. 2d at 621 ("where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.") (citations and quotation marks omitted).

The rule of reason further requires a Plaintiff to allege facts indicating that "the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. The only factual allegations in the Complaint suggesting any adverse effect arising from Uber's pricing algorithm is that, "during periods of peak demand," prices increase "to incentivize . . . driver-partners to user the Uber App." Compl. ¶ 52. But as the Complaint itself makes clear, the entire point of surge pricing is to increase the supply of transportation providers

available in the market, and thereby satisfy consumer demand.  *Id.* ¶¶ 52-56, 63.   An increase in supply cannot be alleged to be anticompetitive.  Accordingly, even the surge pricing aspect of the pricing algorithm is a procompetitive measure that plainly benefits consumers.

**III.   The Donnelly Act claim fails for the same reasons as the Sherman Act claim.**

Plaintiff's claim under New York's Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*, must be dismissed for the same reasons that apply to his Sherman Act claim.  *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 (2d Cir. 2011) ("The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents."); *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994) (same).

The Appellate Division has specifically held that vertical price arrangements are legal under New York law.  *People v. Tempur-Pedic Int'l, Inc.*, 95 A.D.3d 539, 540 (1st Div. 2012) (affirming grant of motion to dismiss complaint alleging that manufacturer violated New York law "by entering Resale Price Maintenance agreements (RPM) with its retailers, setting the price of their products at an artificially high rate" because "there is nothing in the text [of the referenced section of the Donnelly Act] to declare those contract provisions illegal or unlawful").  The Appellate Division has also made clear that it is perfectly lawful for a vertical actor to establish price policies that prompt downstream actors to "independently determine [whether] to acquiesce to the pricing scheme in order to continue" the business relationship with the vertical actor.  *Id.* at 541 (citing *Leegin*, 551 U.S. at 901-02 and *Monsanto*, 465 U.S. at 764).  Courts in this District have uniformly held that *Leegin*'s rule—that vertical price restraints are not subject to per se treatment, but instead judged by the rule of reason—applies to parallel claims brought under New York's Donnelly Act.  *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F.

Supp. 2d 494, 501 (S.D.N.Y. 2011); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 569, 581 (S.D.N.Y. 2007).

## IV.    Plaintiff Cannot Circumvent the Class Waiver in His User Agreement.

Finally, the Court should dismiss the class claims in Plaintiff's Complaint because Plaintiff is equitably estopped from avoiding the class action waiver contained in his user agreement with Uber.  *See American Express Co., v. Italian Colors Restaurant*, — U.S. —, 133 S.Ct. 2304, 2308, 2312 (2013) (affirming enforcement of class action waiver to compel arbitration and dismiss class action complaint).

The User Agreement governs use of the Uber App.  *Id.* ¶ 29; User Terms at 1.  Users of the Uber App agree to arbitration[9] and to waive class actions with respect to disputes arising out of their use of the App.  User Terms at 9 ("**You acknowledge and agree that you and [Uber] are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**") (bold in original).  Plaintiff seeks to avoid that waiver by raising class action claims against the company's CEO as opposed to Uber itself.[10]  But Plaintiff's claims do not arise out of the CEO's actions; they arise out of the pricing algorithm administered by Uber through the Uber App.

---

[9]   Mr. Kalanick does not seek to enforce the arbitration agreement here.  For the reasons explained below, arbitration would be mandated if Mr. Kalanick sought to enforce the arbitration provision of the User Agreement, and Mr. Kalanick does not waive and expressly reserves his right to move to compel arbitration in other cases arising out of the User Agreement.

[10] There appears to be no case in the century-long history of federal antitrust regulation in which an individual company officer or director was ever held personally liable in the context of vertical resale price maintenance.  Individual liability for vertical resale price maintenance arrangements—even those, unlike Uber's, that fail the rule of reason—would have broad and unpredictable consequences.  At the very least, it would chill individuals from engaging in a wide swath of activity that promotes competition and expands the range of goods and services available to consumers.  *See Leegin*, 551 U.S. at 889-91; *United States v. Wise*, 370 U.S. 405, 416 (1962) (noting that individuals may be subject to criminal penalties for organizing a horizontal price-fixing conspiracy in violation of § 1 of the Sherman Act).

Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes. *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). As the Supreme Court explained in the arbitration context, a litigant who is not a party to an arbitration agreement may invoke arbitration if the relevant state contract law allows the litigant to enforce the agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).[11] In this case, the relevant contract law is the law of California. *See* User Terms at 8-9. California law provides that a non-signatory to a contract can enforce that contract's terms where, *inter alia*, "the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013); *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir. 2001) (same, applying New York law). Here, there can be no credible dispute that Plaintiff claims concerted misconduct between Uber and Mr. Kalanick that was founded in and intimately interconnected with his User Agreement.

First, the Complaint clearly alleges collusion and interdependent misconduct by Uber and its CEO: "Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination and conspiracy in restraint of trade." Compl. ¶ 93. Were that not enough, the Complaint is rife with allegations that Mr. Kalanick and Uber worked closely together.[12]

---

[11]  The same principle that permits non-signatories to enforce arbitration clauses permits non-signatories to enforce other provisions of contractual agreements. *Int'l Chartering Servs., Inc., v. Eagle Bulk Shipping Inc.*, No. 12 Civ. 3463 (AJN), 2015 WL 5915958, at *5 (S.D.N.Y. Oct. 8, 2015) (choice-of-law clauses).

[12]  *See, e.g.,* Compl. ¶ 9 ("Kalanick is the public face of Uber, its co-founder and manager of its operations."); *id.* ¶¶ 42-45 (raising allegations about an "Uber-generated algorithm" that Mr. Kalanick allegedly "conceived of," "implemented" and "defend[ed]"); *id.* ¶ 47 (alleging Mr.

Moreover, many of Plaintiff's allegations—at least 28 of the 110 paragraphs in the Complaint—refer exclusively to Uber, not Mr. Kalanick. *See, e.g.*, Compl. ¶¶ 22-34, 36-37, 39-42, 50, 52-54, 60-62, 76, 79. In short, Plaintiff does little, if anything, to distinguish between Mr. Kalanick and Uber. *See Jacobson v. Snap-on Tools Co.*, 15 Civ. 2141 (JD), 2015 WL 8293164, at *6 (N.D. Ca. De. 9, 2015) (finding conduct "interdependent" where, as here, plaintiff treated two entities "as a single actor" and "consistently refer[ed] to them collectively").

The Complaint's allegations are founded in and interconnected with the User Agreement. Plaintiff alleges that he "used Uber car services on multiple occasions," Compl. ¶ 7, and "paid higher prices for car services" as a result, *id.* ¶ 8. Plaintiff further alleges that drivers charged prices set by the pricing algorithm in the Uber App. *E.g., id.* ¶ 3 ("*Through the Uber App*, Kalanick's direct competitors thus empowered him to set his and their fares.") (emphasis added); *id.* ¶ 30 ("Uber account holders can obtain a 'Fare Quote' directly from the Uber App"). The Complaint contains no allegations that prices were set outside of the Uber App's pricing algorithm. To resolve Plaintiff's antitrust claim at trial, the trier of fact would need to resolve questions—such as Plaintiff's right to use Uber's services, the services Uber was obligated to provide Plaintiff, and whether payment was made using the Uber App—that turn on interpretation of the User Agreement. *See id.* ¶ 29 ("To become an Uber account holder, an individual first must agree to Uber's terms and conditions"); User Terms at 1-2.

This case is thus similar to *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, where the Northern District of California applied the doctrine of equitable estoppel to permit non-

---

Kalanick posted statements on the Uber website); *id.* ¶ 49 ("the pricing algorithm and its surge pricing component, Kalanick and Uber artificially set the fares for its driver-partners to charge to riders."); *id.* ¶ 73 ("Upon information and belief, Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares.") *id.* ¶ 82 (referring to the Uber App as "Kalanick's Uber ride-share service"); *id.* ¶ 96 ("Through Kalanick's and Uber's actions . . .").

signatories to enforce the terms of a contract.  962 F. Supp. 2d 1172, 1184-86 (N.D. Cal. 2013).
*Uptown* involved a retail pharmacy chain ("Uptown") and four corporate affiliates (collectively, the "CVS Companies").  Uptown provided confidential customer information to one of the CVS Companies, which allegedly illegally shared it with another CVS Company that directly competed with Uptown.  Uptown's business relationship was governed by a provider agreement it had with yet another CVS Company.  *Id.* at 1176-77.  Uptown sued all of the CVS Companies for misappropriation of trade secrets and argued that the non-signatories to the provider agreement could not enforce the arbitration clause contained in that agreement.  *Id.* at 1183.  The court rejected that argument, finding that Uptown's claims were intertwined with the underlying contract because the provider agreement "explicitly govern[ed] the use of [the confidential information] and because it provide[d] the basis for Uptown's disclosure of such information." *Id.* at 1185.  Similarly, here, the User Agreement governed Plaintiff's use of the Uber App and provided the basis for Plaintiff to use and pay for Uber's services.  *See id.* at 1185-86.[13]

Artful pleading cannot conceal the fact that this dispute is interconnected with the User Agreement—it arises out of the very services Plaintiff received under the User Agreement.  *See Boucher v. Alliance Title Company, Inc.*, 127 Cal.App.4th 262, 272 (2005) ("That the claims are cast in tort rather than contract does not avoid the arbitration clause."); *accord American Bankers*

---

[13] *See also id.* ("the dependent relationship between Uptown's misappropriation claims and the Provider Agreement is evident from the simple fact that, absent the Provider Agreement, Uptown would have no claims against Defendants with respect to the customer information at issue, because in that scenario, Uptown would not have been required to disclose such information to Defendants"); *Lau v. Mercedes-Benz USA, LLC*, No. CV 11-1940 MEJ, 2012 WL 370557, at *4 (N.D. Cal. Jan. 31, 2012) (applying California law to compel arbitration with non-signatory because, among other things, the plaintiff "must rely on [certain] terms in the [purchase agreement] to prosecute his [claim]"); *Turtle Ridge Media Grp. v. Pacific Bell Directory*, 140 Cal.App.4th 828, 833 (2006) (allowing non-signatory to enforce arbitration clause arising out of "business dealings" with signatory because, "outside of" the relevant contracts, the signatory had "no business relationship" with the non-signatory).

*Ins. Grp., Inc. v. Long*, 453 F.3d 623, 630 (4th Cir. 2006) ("although each of the [plaintiffs']

individual claims is phrased in tort, [plaintiffs] may not use artful pleading to avoid arbitration");

*Hughes Masonry Co., Inc., v. Greater Clark Cnty School Building Corp.*, 659 F.2d 826, 839 (7th

Cir. 1981) (Plaintiffs "cannot have it both ways. [They] cannot rely on [a] contract when it works

to [their] advantage and repudiate it when it works to [their] disadvantage.").  Permitting Mr.

Kalanick to invoke the class action waiver contained in the User Agreement "comports with, and

indeed derives from, the very purposes of the [equitable estoppel] doctrine: to prevent a party

from using the terms or obligations of an agreement as the basis for his claims against a

nonsignatory, while at the same time refusing to [abide by] another clause of the same

agreement."  *Jones v. Jacobson*, 195 Cal. App. 4th 1, 20 (2011).

Under California law, moreover, "a nonsignatory sued as an *agent* of a signatory may

enforce the terms of an arbitration agreement."  *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1284

(2007); *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997)

(same, applying New York law).  This same principle should apply to Plaintiff's class action

waiver.  The Complaint alleges that Mr. Kalanick acted "in his position as Uber CEO" to

orchestrate the asserted price-fixing conspiracy.  Compl. ¶ 72; *see also id.* ¶ 1 (describing Mr.

Kalanick as Uber's "CEO" and "primary facilitator").

## CONCLUSION

For the reasons described in this Memorandum, Defendant Travis Kalanick respectfully

requests this Court dismiss the Complaint in its entirety, with prejudice.

Dated: January 15, 2016                          Respectfully submitted,

                                                 BOIES, SCHILLER & FLEXNER LLP

                                                 s/ Karen L. Dunn

Karen L. Dunn
William A. Isaacson
Ryan Y. Park
5301 Wisconsin Ave, NW
Washington, DC 20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
rpark@bsfllp.com

Peter M. Skinner
575 Lexington Ave, 7th Floor
New York, NY 10022
Tel:  (212) 446-2300
Fax:  (212) 446-2350
pskinner@bsfllp.com

*Counsel for Defendant Travis Kalanick*