**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SPENCER MEYER, individually and on
behalf of those similarly situated,

                   Plaintiffs,

   v.

TRAVIS KALANICK,

              Defendant.

**Case No. 1:15-cv-9796 (JSR)**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT TRAVIS KALANICK'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ALLEGED IN THE AMENDED COMPLAINT ............................ 3

ARGUMENT .................................................................................................... 6

    I.   Plaintiff Does Not Plead A Plausible Conspiracy Among Uber Driver-Partners. .............. 6

        A.  The Amended Complaint lacks any factual allegations indicating an agreement among driver-partners to fix prices. ................................................................ 6

        B.  Plaintiff has failed to plead a plausible conspiracy. .................................... 9

            *i.*   Plaintiff pleads only independent, not parallel, action. ......................... 9

            ii.  Plaintiff has failed to plead a plausible conspiracy regarding surge pricing. ........ 10

            iii.  Plaintiff's alleged conspiracy between hundreds of thousands of independent drivers is facially implausible. ............................................................. 11

        C.  The driver-partners' decision to use the Uber pricing algorithm is reasonably understood only as a reaction to Uber's lawful, single-firm conduct. ....................... 12

    II.  Plaintiff Does Not Plead An Unreasonable Restraint Of Trade Under Any Antitrust Theory. ...................................................................................................... 14

        A.  Plaintiff's theory of per se liability fails because it is predicated on vertical conduct. .. ................................................................................................ 16

        B.  The Amended Complaint fails to allege facts sufficient to state a claim for antitrust liability under the rule of reason. ............................................................. 17

    III. The Donnelly Act claim fails for the same reasons as the Sherman Act claim. .............. 21

    IV. Plaintiff Cannot Circumvent the Class Waiver in His User Agreement. ........................ 21

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,*
    170 F.3d 349 (2d Cir. 1999) ....................................................................22

*American Bankers Ins. Grp., Inc. v. Long,*
    453 F.3d 623 (4th Cir. 2006) ............................................................. 12, 25

*American Express Co., v. Italian Colors Restaurant,*
    133 S.Ct. 2304 (2013) ...........................................................................22

*Arista Records LLC v. Lime Group LLC,*
    532 F. Supp. 2d 556 (S.D.N.Y. 2007) ...................................................21

*Arthur Andersen LLP v. Carlisle,*
    556 U.S. 624 (2009). .............................................................................23

*Bell Atlantic Corp. v. Twombly,*
    555 U.S. 550 (2007) ................................................... 2, 6, 7, 9, 12

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,*
    985 F. Supp. 2d 612 (S.D.N.Y. 2013) (JSR) ...............................passim

*Boucher v. Alliance Title Company, Inc.,*
    127 Cal.App.4th 262 (2005) ..................................................................24

*Bulk Oil (ZUG) A.G. v. Sun Co.,*
    583 F. Supp. 1134 (S.D.N.Y. 1983) ......................................................20

*Business Elecs. Corp. v. Sharp Elecs. Corp.,*
    485 U.S. 717 (1988). ...............................................................................5

*California Dental Ass'n v. FTC,*
    526 U.S. 756 (1999) ..............................................................................17

*Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.,*
    117 F.3d 655 (2d Cir. 1997) .................................................................25

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993) .................................................................15

*Chapman v. New York Div. for Youth,*
    546 F.3d 230 (2d Cir. 2008) .................................................................19

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,*
    271 F.3d 403 (2d Cir. 2001) .................................................................23

*Commercial Data Servers v. International Business Machines Corp.*
  No. 00 Civ. 5008(CM), 2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002) .................... 14, 15, 18

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ................................................................................................4

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
  129 F.3d 240 (2d Cir. 1997) ................................................................................................8

*Hughes Masonry Co., Inc., v. Greater Clark Cnty School Building Corp.*,
  659 F.2d 826 (7th Cir. 1981) .............................................................................................25

*In re Elevator Antitrust Litig.*,
  No. 04-cv-1178(TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006) ..................................7

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................................11

*Jacobson v. Snap-on Tools Co.*,
  15 Civ. 2141, 2015 WL 8293164 (N.D. Cal. Dec. 9, 2015) ...............................................23

*Jones v. Jacobson*,
  195 Cal. App. 4th 1 (2011) ................................................................................................25

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ...........................................................................................23

*LaFlamme v. Societe Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010)................................................................................14

*Lau v. Mercedes-Benz USA, LLC*,
  No. CV 11-1940 MEJ, 2012 WL 370557 ..........................................................................24

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .............................................................................14, 15, 16, 21, 22

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) .............................................................................. 6, 7, 8, 9, 12

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984). ................................................................................................ 6, 13, 21

*Int'l Chartering Servs., Inc., v. Eagle Bulk Shipping Inc.*,
  No. 12 Civ. 3463 (AJN), 2015 WL 5915958 (S.D.N.Y. Oct. 8, 2015)................................23

*O'Connor v. Uber Technologies, Inc.*,
  No. C-13-3826, 2015 WL 5138097 (N.D. Cal. Sept. 1, 2015)..............................................5

*People v. Tempur-Pedic Int'l, Inc.*,
   95 A.D.3d 539 (1st Div. 2012) ............................................................21

*Rowe v. Exline*,
   153 Cal. App. 4th 1276 (2007) ...........................................................25

*RxUSA Wholesale Inc. v. Alcon Labs.*,
   391 F. App'x 59 (2d Cir. 2010) .............................................................7

*State Oil Co. v. Khan*,
   522 U.S. 3 ..................................................................................... 14, 16, 17

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006). ...........................................................................5, 15

*Todd v. Exxon Corp.*,
   275 F.3d 191, 200 (2d Cir. 2001) ........................................................19

*Turtle Ridge Media Grp. v. Pacific Bell Directory*,
   140 Cal. App. 4th 828 (2006) .............................................................24

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015) ...............................................................15

*United States v. Apple*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) .................................................11

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ...........................................................................13

*United States v. Wise*,
   370 U.S. 405 (1962) ...........................................................................22

*Uptown Drug Co., Inc. v. CVS Caremark Corp.*,
   962 F. Supp. 2d 1172 (N.D. Cal. 2013)...............................................24

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011) ...............................................................21

*WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*,
   851 F. Supp. 2d 494 (S.D.N.Y. 2011)..................................................21

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
   634 N.E.2d 158 (N.Y. 1994)................................................................21

**Statutes**

Donnelly Act,
   N.Y. Gen. Bus. L. § 340 ...............................................................21, 23

Sherman Act,
    15 U.S.C. § 1................................................................................................................passim

**Other**
FTC Comment Letter ……………………………………………………………………1, 17

## INTRODUCTION

Uber Technologies, Inc. ("Uber") is an innovative technology company that connects independent driver-partners and riders through its smartphone application. As a new entrant in the transportation marketplace, Uber has vastly increased options, reduced prices and improved service for millions of Americans.[1]  Antitrust law has long appreciated the procompetitive benefits that come along with technological innovation and new market entry. Plaintiff's First Amended Complaint ("Amended Complaint") nonetheless invokes that same antitrust law to attack Uber's innovative technology and its benefits to consumers and competition. The Amended Complaint attempts this feat by continuing to allege a wildly implausible—and physically impossible—conspiracy among hundreds of thousands of independent transportation providers all across the United States ("driver-partners"), based solely on the fact that they agreed to use Uber's pricing algorithm, and at some point in time accepted ride requests via the Uber App. This lawsuit, if allowed to proceed, would strangle innovation, decrease competition, and increase prices—defeating precisely the behavior antitrust law is designed to encourage. For this reason—and because the Amended Complaint continues to fail to state a claim under the antitrust laws— it must be dismissed.

According to Plaintiff, each and every driver-partner joined a single "horizontal" agreement—that is, an agreement between direct competitors—to fix prices when using the Uber App. But even as it asserts an unreal conspiracy of staggering breadth, the Amended Complaint,

---

[1] As recognized by the Federal Trade Commission, Uber's mobile application-based platform for matching riders and driver-partners represents an "innovative form of competition" that has expanded consumer welfare and prompted competition on a wide variety of fronts, including on price. Federal Trade Commission, Comment Letter ("FTC Comment Letter") at 2, June 7, 2013, available at https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comments-district-columbia-taxicab-commission-concerning-proposed-rulemakings-passenger/130612dctaxicab.pdf (last accessed Feb. 8, 2016).

like its predecessor, lacks any specific factual allegations to support any reasonable inference that driver-partners came to an agreement among themselves to violate the law, as opposed to their independent decisions to enter into vertical agreements with Uber.   The Amended Complaint still contains no mention of any alleged co-conspirators by name, other than Defendant Travis Kalanick, Uber's CEO, who purportedly joined the horizontal conspiracy when, on a couple of isolated occasions, he acted as a driver-partner—and "tweeted" about his experience.

As Mr. Kalanick pointed out in his Motion to Dismiss the original Complaint, the Amended Complaint continues to fail to mention any specific communications between any co-conspirators, nor does it attempt to explain how unidentified communications among unidentified individuals at unidentified places and times could have led to an agreement among hundreds of thousands of independent driver-partners to fix prices.   The Amended Complaint's only allegation that any driver-partners have even met one another is that Uber, on occasion, organizes "picnics" for small groups of driver-partners located in a particular city.   Plaintiff would have this Court extrapolate from these isolated Uber-organized picnics the existence of a *nationwide* price-fixing conspiracy among hundreds of thousands of strangers.   This is exactly the type of conclusory assertion of conspiracy, unaided by any specific factual allegations indicating an actual agreement to fix prices, that the Supreme Court held insufficient in *Bell Atlantic Corp. v. Twombly*, 555 U.S. 550 (2007).   While the Amended Complaint attempts to remedy this fatal flaw, the amendments only further underscore the total implausibility and vagueness of Plaintiff's theory.

The Amended Complaint attempts to explain how hundreds of thousands of independent driver-partners conspired to fix prices by pointing to each individual driver-partner's agreement

*with Uber* to adhere to Uber's pricing algorithm for setting fares.  But this allegation only serves to underscore the legality of the conduct at issue:  Uber, an upstream technology company, has proposed contractual terms of dealing to downstream transportation providers that include use of Uber's pricing algorithm, and those downstream providers who wish to become driver-partners for Uber have agreed to those contractual terms and used the algorithm.  Those driver-partners, moreover, remain free to contract with Uber's many competitors in the transportation marketplace that offer their own mobile applications for matching riders and drivers—including Lyft and traditional taxi companies.

For nearly a century, the Supreme Court has made clear that it is perfectly lawful for a vertical actor like Uber to announce terms of dealing to prospective downstream counterparties, and to deal only with those who agree to its preferred terms.  This lawsuit seeks to sneak around this settled jurisprudence by making manifestly implausible and factually unsupported allegations of a horizontal conspiracy.  This Court should reject that effort and dismiss the Amended Complaint, with prejudice.

### STATEMENT OF FACTS ALLEGED IN THE AMENDED COMPLAINT

Defendant Travis Kalanick is the Chief Executive Officer and co-founder of Uber.  Am. Compl. at 1.  He is the sole defendant named in Plaintiff's Amended Complaint.  *Id.*

"Uber is a technology company" that developed and licenses a mobile application (the "Uber App") for use on smartphone devices.  *Id.* ¶ 2.  The Uber App allows independent transportation providers—Uber "driver-partners"—to receive trip requests from members of the public, and provides electronic payment processing for trips booked through the Uber App.  *Id.* ¶¶ 24, 26, 32; *see id.* ¶ 2 ("Uber is not a transportation company and does not employ drivers" to directly provide transportation services); *id.* ¶ 5 ("drivers using the App are independent firms

that are in competition with one another for riders"). "The Uber App utilizes dispatch software to send the nearest independent drivers to the requesting parties' location." *Id.* ¶ 24. Following a ride, Uber collects a software licensing fee, which is calculated as a percentage of the fare charged by the driver-partner to the rider, and remits the remainder of the fare to the driver-partner. *Id.* ¶ 27.

Uber enters into individual contracts with each driver-partner pursuant to which Uber agrees to provide the driver-partner with lead generation and payment processing services and the driver-partner agrees to pay Uber a licensing fee. *Id.* ¶ 38; *see* Declaration of Michael Colman, Ex. 2 ("Driver Terms"). As part of these separate contracts, Uber requires each driver-partner to agree to use Uber's pricing algorithm to arrive at a standard, suggested fare. *Id.* ¶ 47. The pricing algorithm is primarily based on a trip's "time and distance." *Id.* ¶ 55. The algorithm also uses "surge pricing," which may increase the price "based on demand or limited availability of drivers" "to incentivize its driver-partners to use the Uber App" at times of low supply. *Id.* ¶ 57. Uber's contracts with driver-partners expressly permit the driver-partners to reject the fare charged by the pricing algorithm and instead charge a lower fare. Driver Terms ¶ 4.1 ("You [the driver-partner] shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare").[2] Even so, Plaintiff alleges that "[a]ll of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm" and not "to depart downward from the fare set by the Uber algorithm." Am. Compl. ¶¶ 68-69. Uber offers a variety of "different car service experiences," *id.* ¶ 25, with each "experience" providing a different level of service and price point.

---

[2] "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint . . . and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The Amended Complaint asserts that all Uber driver-partners who have accepted so much as a single ride request through the Uber App, by virtue of their agreement to Uber's Driver Terms, are "participa[nts] in a conspiracy, combination, or contract *among themselves* to adhere to the artificial price setting embodied in the Uber pricing algorithm." *Id.* ¶ 126 (emphasis added). Mr. Kalanick is the only person or entity identified by name as a party to the purported horizontal conspiracy. *Id.* ¶ 80. Plaintiff bases Mr. Kalanick's membership in the alleged horizontal conspiracy on the allegation that he acted as a driver-partner providing the UberX service on February 21 and 22, 2014. *Id.* ¶ 81 (alleging that Mr. Kalanick "tweeted" about his experience as a driver-partner).[3]

The Amended Complaint alleges that this conspiracy spans across the entire United States, *id.* ¶¶ 113, 122, and includes an estimated 20,000 driver-partners operating in New York City in October 2015, *id.* ¶ 44. Though the exact size of the alleged conspiracy is not specifically pleaded, the conspiracy must include at least several hundred thousand individual driver-partners in more than a hundred cities and 47 states across the United States. *See id.* ¶ 41; *O'Connor v. Uber Technologies, Inc.*, No. C-13-3826, 2015 WL 5138097, *7 (N.D. Cal. Sept. 1, 2015) (certifying a plaintiff class of 160,000 driver-partners operating in California alone). Plaintiff asserts that Mr. Kalanick, in his capacity as Uber's CEO, somehow "orchestrat[ed]" the unlawful horizontal agreement among all of these driver-partners. Am. Compl. ¶ 127.

Plaintiff Spencer Meyer, like all users of the Uber App, expressly agreed to Uber's terms and conditions. *Id.* ¶ 29. Among those conditions was the following: "**You [the user]**

---

[3] Uber's agreements with driver-partners relating to use of its pricing algorithm are considered "vertical" because they include price provisions "imposed by agreement between firms at different levels of distribution." *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 (1988). "Price-fixing agreements between two or more competitors," by contrast, are "known as horizontal price-fixing agreements." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

**acknowledge and agree that you and [Uber] are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**" Declaration of Michael Colman, Ex. 1 ("User Terms") at 9 (bold in original).

## ARGUMENT

I.   **Plaintiff Does Not Plead A Plausible Conspiracy Among Uber Driver-Partners.**

To state a claim under § 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must plead "enough factual matter (taken as true) to suggest an agreement was made." *Bell Atlantic Corp. v. Twombly*, 555 U.S. 550, 556 (2007); *id.* at 553 ("the crucial question is whether the challenged anticompetitive conduct stems from independent decision, or from an agreement") (quotation marks and brackets omitted); *id.* at 557 (an agreement requires an actual "meeting of the minds"). For there to be an "agreement" under § 1, the co-conspirators must have each made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). In a § 1 case, therefore, a plaintiff can survive a motion to dismiss in one of two ways. First, a plaintiff may proffer "direct evidence that the defendants entered into an agreement in violation of the antitrust laws," for example by advancing particularized allegations of "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013). Second, "a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.*

### A.   The Amended Complaint lacks any factual allegations indicating an agreement among driver-partners to fix prices.

Plaintiff's Amended Complaint is devoid of any direct evidence of an agreement between conspirators or even circumstantial facts to support a reasonable inference that a conspiracy existed among driver-partners for Uber. *Id.* Instead, the Amended Complaint principally relies

on the assertion that "Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination or conspiracy in restraint of trade."  Am. Compl. ¶ 123.  Conclusory allegations such as these are insufficient under *Twombly*.  550 U.S. at 557 (a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d Cir. 2010) (affirming dismissal of antitrust claims because "assertion[s] of an agreement among the Manufacturers is entirely conclusory"); *Mayor of Baltimore*, 709 F.3d at 135-36 ("The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation").

Even more glaring, there is no allegation of any driver-partner *ever* communicating with another driver-partner—or Mr. Kalanick—about prices, let alone the "high level of interfirm communications" that could plausibly suggest an agreement.  *Mayor of Baltimore*, 709 F.3d at 139 (no inference of agreement where complaint makes particularized allegations of "only two actual communications between competitors"); *see also In re Elevator Antitrust Litig.*, No. 04-cv-1178(TPG), 2006 WL 1470994, at *3 (S.D.N.Y. May 30, 2006) ("if nothing in the way of specific transactions or patterns of transactions can be alleged indicating possible conspiratorial collusion or agreement to fix prices for the sale and maintenance of elevators, then the complaint is entirely lacking in any basis for claiming an illegal agreement or conspiracy"), *aff'd* 502 F.3d 47 (2d Cir. 2007).[4]

---

[4] The closest the original Complaint came to alleging with particularity that any two driver-partners ever communicated, about any topic, is that Uber organizes "picnics" in various cities for "driver-partners and their families."  Compl. ¶ 36.  The Amended Complaint makes a half-hearted attempt to expand on these meager allegations by asserting, with no supporting details, that there have been "numerous" unidentified "meetings and events organized by Uber" and that "smart phone apps facilitat[e] communications" between driver-partners.  Am. Compl. ¶ 92.  This is plainly insufficient to establish the "actual communications" necessary to facilitate an alleged nationwide conspiracy between hundreds of thousands of unrelated driver-partners.

The Amended Complaint in this case contains even fewer factual allegations to support an inference of conspiracy than the Complaint dismissed by this Court in *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013) (JSR).  In that case, the plaintiffs alleged a conspiracy among a small group of six direct competitors, book publishers, and a vertical actor, Amazon.  Plaintiffs alleged that there "may have been oral discussions or agreements directly between one or more of the [publishers] and AMAZON regarding the use of restrictive DRMs." *Id.* at 618.  This Court found plaintiffs' allegation of a conspiracy "remarkable" in its "evasiveness," in part because "plaintiffs d[id] not specify who participated in these hypothetical discussions or agreements, only that they may have involved 'one or more' of the Publishers and Amazon." *Id.*

Here, there are even fewer indicia of an agreement:  Plaintiff does not hypothesize a single "oral discussion" between driver-partners—arguing instead that mere use of the App somehow evidences conspiratorial communications across cities, counties, and states—nor does he attempt to identify particular individuals who had such discussions.[5]  Put simply, the poverty

---

*Mayor of Baltimore*, 709 F.3d at 139.  An App is merely a medium of communication, like a phone or an email account.  The existence of a *means* of communication is, of course, not evidence that a communication took place.  Plaintiff fails to identify any particular meeting, event, or app-based communication in which driver-partners discussed prices, nor could he.  *See* Declaration of Ryan Park, Ex. 1 (redline comparison of the Complaint and the Amended Complaint).

[5] Plaintiff's suggestion that a horizontal agreement can be inferred based on the happenstance that Mr. Kalanick has acted as a driver-partner cannot be taken seriously.  The Amended Complaint does not allege that Mr. Kalanick has ever met or communicated with any driver-partner in his capacity *as a driver-partner*.  *See* Am. Compl. ¶¶ 37-45, 80-85.  That Mr. Kalanick, on a few isolated occasions, acted as a driver-partner cannot somehow transform Uber's vertical agreements with driver-partners into horizontal agreements involving Mr. Kalanick personally.  Moreover, even if Uber's vertical agreements with driver-partners somehow included Mr. Kalanick, the Second Circuit has squarely held that the mere fact that a vertical actor also competes horizontally with its downstream competitors does not turn a vertical agreement into a horizontal one.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,

of plausible allegations of a conspiracy in Plaintiff's Amended Complaint is reason enough to dismiss it, just as it was in the original Complaint.

### B. Plaintiff has failed to plead a plausible conspiracy.

#### i. *Plaintiff pleads only independent, not parallel, action.*

Plaintiff's Amended Complaint also fails because the alleged conspiracy is impossible. Beyond proffering an unsupported legal conclusion without citation to any communications whatsoever between driver-partners, Plaintiff relies on the independent decisions of hundreds of thousands of driver-partners to agree to Uber's Driver Terms and subsequently use the Uber App as evidence of parallel conduct to support a conspiracy. Am. Compl. ¶¶ 70-71. This reliance is improper. Courts have universally found conduct to be "parallel" only when a small number of competitors have taken the same action at or around the same point in time. *E.g.*, *Mayor of Baltimore*, 709 F.3d at 138 (action by eleven banks to "withdraw[] from the [auction rate securities] market in a virtually simultaneous manner on February 13, 2008" deemed parallel).

This allegation of parallel conduct also fails for the same essential reason mentioned above: to support a price-fixing complaint, parallel action must be presented in the context of "a preceding agreement" among co-conspirators. *Twombly*, 550 U.S. at 557. In the absence of a preceding agreement, parallel conduct "could just as well be independent action." *Id.* (parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"). Here, that independent action is the individual decision of each driver-partner to sign up with Uber and accept the contractual terms offered, which include use of the pricing algorithm.

---

129 F.3d 240, 243-44 (2d Cir. 1997) (price restraint between distributor and downstream manufacturer treated as a vertical agreement, "even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its products through a distributor and independently").

ii.    *Plaintiff has failed to plead a plausible conspiracy regarding surge pricing.*

Plaintiff states that "the driver-partners had a common motive to conspire to adhere to the Uber pricing algorithm" in order to capture the higher fares that result from surge pricing.  Am. Compl. ¶ 90.  In a direct contradiction of that statement, Plaintiff also alleges that "[o]ftentimes, using Uber's pricing would not be in an individual driver-partner's best interest" because it can "result in greater rider dissatisfaction and fewer rides for drivers."  *Id.* ¶ 72.  Regardless of how Plaintiff tries to characterize it, the common motive suggested here is nothing more than the profit motive of any transportation provider, which is not the same as a motive to conspire.  The Amended Complaint fails to even hint at how such a common motive could plausibly translate into an agreement among hundreds of thousands of transportation providers around the nation.

The Amended Complaint also asserts that driver-partners' agreement to use surge pricing "only makes sense because drivers are guaranteed that other Uber drivers will not undercut them on price."  *Id.* ¶ 72.  This argument wrongly assumes that Uber driver-partners do not compete with other transportation providers that do not use surge pricing.  It is also contradicted by Uber's Driver Terms, which permit driver-partners to operate independently, for a taxi provider, or to simultaneously receive ride requests from the Uber App and any competing mobile application service—such as Lyft, Gett, or the many apps offered by taxi companies.[6]

Regardless, Plaintiff fails to explain how surge pricing demonstrates a motive to *conspire* as opposed to simply a motive to agree independently to Uber's terms of dealing, which include

---

[6] Driver Terms ¶ 2.4 ("[The driver partner] acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from [use of the Uber App]. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services."); *id.* ¶ 3.1 (driver-partners may "us[e] the Uber App to provide Transportation Services in conjunction with operating a taxi").

surge pricing as a component of its pricing algorithm.  Plaintiff alleges no facts suggesting that collective action on the part of driver-partners is required for surge pricing to take effect for any individual driver-partner.  Quite the contrary, no "conspiracy" is needed:  Plaintiff asserts that Uber sets the pricing algorithm as part of its proposed terms of dealing.  *Id.* ¶¶ 46-49, 54-57.

<div style="padding-left:2em">

    iii.    *Plaintiff's alleged conspiracy between hundreds of thousands of independent drivers is facially implausible.*

</div>

Under Plaintiff's theory, all driver-partners who ever agreed to Uber's Driver Terms and then accepted so much as a single ride request through the Uber App are all co-conspirators and therefore are all jointly and severally liable for the full measure of antitrust damages.  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 519 (S.D.N.Y. 1996) ("Liability for antitrust violations is joint and several.").  Plaintiff's expansive theory of a conspiracy between hundreds of thousands of driver-partners is at significant variance from those cases in the Second Circuit that have allowed antitrust complaints to survive pleading challenges.

*United States v. Apple*, for example, involved allegations that a small group of competitor book publishers had engaged in numerous conversations specifically related to the fixing of prices, and that those conversations yielded an actual agreement to increase prices.  952 F. Supp. 2d 638, 651 (S.D.N.Y. 2013) ("On a fairly regular basis, roughly once a quarter, the CEOs of the Publishers held dinners in the private dining rooms of New York restaurants, without counsel or assistants present, in order to discuss the common challenges they faced, including most prominently Amazon's pricing policies"); *id.* (describing the Publishers' communications and agreement "to force [Amazon] to accept a price level higher than 9.99").  Plaintiff alleged that Apple, a vertical actor, joined and facilitated that horizontal conspiracy—which was again supported by allegations of scores of conversations and meetings between Apple and the publishers.  *Id.* at 657-58.  In stark contrast to the complaint in *Apple*, Plaintiff here alleges an

<div style="text-align:center">11</div>

impossible horizontal conspiracy involving many thousands of competitors who are not alleged to have ever met or communicated with one another and are not even identified. *See Mayor of Baltimore*, 709 F.3d at 132, 138-39 (allegation that a small group of banks with a common motive of "cut[ting] losses," had, on a single, specific date and "in a virtually simultaneous manner," suddenly stopped placing support auction bids, despite consistently doing so for the previous several years, was insufficient to survive motion to dismiss even where there were allegations of specific communications between some of the banks because banks' decision to leave a failing market made independent "business sense").

### C.    The driver-partners' decision to use the Uber pricing algorithm is reasonably understood only as a reaction to Uber's lawful, single-firm conduct.

Even where a plaintiff properly pleads parallel conduct among several competitors along with circumstances that support an inference of an illegal agreement among them—which Plaintiff in this case has not done—a complaint fails to state a claim if there is an "obvious alternative explanation" for the co-conspirators' parallel actions. *Twombly*, 550 U.S. at 567. In *Twombly*, the Supreme Court considered a complaint alleging "sparse competition among large firms dominating separate geographical segments of the market." 550 U.S. at 567. The Court agreed that the defendants' "parallel conduct" of declining to compete in one another's respective geographic spheres "could very well signify illegal agreement," if considered in a vacuum. *Id.* Nevertheless, the Court held that the plaintiff had failed to plausibly allege existence of an illegal agreement because the complaint evinced "a natural explanation for the noncompetition alleged," namely that the defendants were merely "sitting tight, expecting their neighbors to do the same thing." *Id.* at 568.

Here, there is similarly a far more "natural," and undoubtedly true, explanation for the parallel conduct than the alleged conspiracy. Namely, each driver-partner independently decided

it was in his or her best interest to enter a vertical agreement with Uber, a condition of which was that the driver-partner agree to use Uber's pricing algorithm.  Driver Terms ¶ 4.1; Am. Compl. ¶ 68 ("All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm").  There are many reasons, separate from the pricing algorithm, that Uber driver-partners might make this choice, including access to riders through Uber's lead generation service, and Uber's payment processing services.  Driver Terms ¶ 1.17.

The only reasonable inference to be drawn from the Amended Complaint's allegations is that Uber has proposed terms of dealing to downstream independent contractors (the driver-partners), each of whom is free to make the independent decision to accept or reject those terms.  For nearly a century, this type of vertical conduct—by which a vertical actor "announce[s] its resale prices in advance, and refuse[s] to deal with those who fail to comply"—has been recognized as perfectly lawful under § 1 of the Sherman Act.  *Monsanto*, 465 U.S. at 761 (citing *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919)); *see Bookhouse*, 985 F. Supp. 2d at 619 ("It is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms") (citation omitted).

Plaintiff's entire Amended Complaint, then, is based on a fundamental misunderstanding of antitrust law.  Specifically, Plaintiff asserts that this Court may infer the existence of a horizontal agreement among competitors based merely on allegations that those competitors each submitted to terms of dealing proposed by a vertical actor.  Am. Compl. ¶ 70-71 ("Driver-partners agree to participate in a combination, conspiracy, or contract to fix prices when they swipe 'accept' to accept [Uber's Driver Terms]" and further manifest this agreement "each time they accept a rider using the Uber App.").  But if alleging a series of vertical agreements were sufficient to support an inference of a horizontal conspiracy, then all vertical resale price

maintenance arrangements would be per se illegal.  That is not the law.  *Infra* II.A; *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 882-83 (2007) (clothing manufacturer's vertical agreements requiring retailers to charge certain prices for its products judged by the rule of reason); *State Oil Co. v. Khan*, 522 U.S. 3, 8-9, 22 (1997) (oil supplier's vertical agreements requiring gas stations to charge certain prices for gasoline judged by the rule of reason); *Bookhouse*, 985 F. Supp. 2d at 622 ("plaintiffs only allege that each individual Publisher entered into an unlawful vertical agreement with Amazon, making no allegation of any horizontal conspiracy among the Publishers").

Courts have soundly rejected Plaintiff's suggestion that a horizontal agreement may be inferred merely from parallel action motivated by the same external stimulus.  In *Commercial Data Servers v. International Business Machines Corp.*, for example, Judge McMahon held that parallel action by IBM's downstream distributors, allegedly prompted by IBM's "threat" to cease doing business with them if they did not take the action, did not plausibly suggest that "the downstream distributors agreed amongst themselves" to comply with IBM's demand.  No. 00 Civ. 5008(CM), 2002 WL 1205740, at *3 (S.D.N.Y. Mar. 15, 2002).  Similarly, in *LaFlamme v. Societe Air France*, the court held that plaintiff had failed to plausibly allege a horizontal agreement by competing airlines "to impose surcharges" where "rapidly rising jet fuel prices" were "an obvious potential stimuli and discernible reason aside from collusion that plausibly could have instigated independent decisions by defendants" to take the same action.  702 F. Supp. 2d 136, 152 (E.D.N.Y. 2010) (quotation marks omitted).

## II.  Plaintiff Does Not Plead An Unreasonable Restraint Of Trade Under Any Antitrust Theory.

To state a § 1 Sherman Act claim, a plaintiff alleging an unlawful agreement must plausibly allege that the "agreement constituted an unreasonable restraint of trade."  *Capital*

*Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537, 542 (2d Cir. 1993)

This may be established by facts showing that the alleged agreement is per se unlawful, or that it

fails the so-called "rule of reason." *Id.*

    Per se liability is exclusively available for conspiracies that have as a component an

unlawful agreement between horizontal competitors. *Dagher*, 547 U.S. at 5-7. Vertical price

restraints, by contrast, are judged by the rule of reason. *Leegin*, 551 U.S. at 898-99. To the

extent that a vertical actor may be subject to per se liability post-*Leegin*, it must have actively

participated in or facilitated an underlying horizontal conspiracy. *See United States v. Apple*,

791 F.3d 290, 323 (2d Cir. 2015) ("The rule of reason is unquestionably appropriate to analyze

an agreement between a manufacturer and its distributors to, for instance, limit the price at which

the distributors sell the manufacturer's goods or the locations at which they sell them. . . . But

the relevant 'agreement in restraint of trade' in this case is not Apple's vertical Contracts with

the Publisher Defendants . . . ; it is the horizontal agreement that Apple organized"); *Commercial

Data Servers*, 2002 WL 1205740 at *3 ("a restraint is not horizontal because it has horizontal

effects but because it is the product of a horizontal agreement"); *Bookhouse*, 985 F. Supp. 2d at

622 (allegation that a group of horizontal competitors each entered into an unlawful vertical

agreement, but did not conspire with one another, is not subject to per se liability).

    The rule of reason is the default standard for determining whether a practice

unreasonably restrains trade in violation of § 1, with per se treatment "appropriate only after

courts have had considerable experience with the type of restraint at issue" and, based on that

experience, determined that it "would always or almost always tend to restrict competition and

decrease output." *Leegin*, 551 U.S. at 885; *see id.* at 895 (Per se rules "can be

counterproductive" by "prohibiting procompetitive conduct the antitrust laws should encourage" and "increas[ing] litigation costs by promoting frivolous suits against legitimate practices").

### A.      Plaintiff's theory of per se liability fails because it is predicated on vertical conduct.

The facts set forth in the Amended Complaint establish that a legal structure was in place—specifically, a single firm acting vertically.  The Amended Complaint describes Uber as a "technology company" that offers the "Uber App" to match riders with independent driver-partners, and which requires them to agree to use Uber's pricing algorithm to set fares.  *Id.* ¶¶ 2, 24, 47, 68.  These allegations, if accepted as true, only establish a single firm acting vertically.

The Supreme Court and the Second Circuit have repeatedly confirmed that a single firm acting vertically does not offend antitrust laws.  In *Leegin*, for example, the Supreme Court held that such vertical price restraints do not fall within the narrow category of activities that are anticompetitive per se, emphasizing that "economics literature is replete with procompetitive justifications for . . . use of resale price maintenance."  551 U.S. at 889.  The Court noted that a vertical price restriction such as resale price maintenance "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand."  *Id.* at 890; *see also State Oil Co. v. Khan*, 522 U.S. at 15 ("the primary purpose of the antitrust laws is to protect interbrand competition").

One of the ways interbrand competition is enhanced by way of vertical price restraints is "by facilitating market entry for new firms and brands."  *Leegin*, 551 U.S. at 891.  Uber's entry into the market for transportation services illustrates how this functions in practice:  Aided by its use of a pricing algorithm, Uber's mobile application-based platform for matching riders and driver-partners represents an "innovative form of competition," which by definition enhances

consumer welfare and competition on a wide variety of fronts, including price.  FTC Comment Letter at 2-3.  As the Supreme Court has explained:

> New manufacturers and manufacturers entering new markets can use [vertical price restraints] in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer.  New products and new brands are essential to a dynamic economy, and if markets can be penetrated by using resale price maintenance there is a procompetitive effect.

*Id.*  In addition, by reducing intrabrand price competition, for example, resale price maintenance prompts "the manufacturer's retailers [to] compete among themselves over services."  *Id.*  Not only does this introduce "valuable services" into the market, but it "has the potential to give consumers more options so that they can choose among low-price, low-service brands; high-price, high-service brands; and brands that fall in between."  *Id.* at 890, 892.[7]

### B.  The Amended Complaint fails to allege facts sufficient to state a claim for antitrust liability under the rule of reason.

The legality of a vertical price arrangement like that described in the Amended Complaint is measured by the rule of reason, according to which a Plaintiff must allege facts indicating that "the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  *State Oil Co. v Khan*, 522 U.S. at 10.  The Amended Complaint fails to state a claim under the rule of reason for least three reasons.

---

[7] For these reasons, the Amended Complaint also does not state a claim for antitrust liability under so-called "quick look" analysis, which applies "to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability."  *Texaco*, 547 U.S. at 5; *see California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999) (If an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," quick look scrutiny does not apply).

First, as described *supra*, the facts as alleged show a single firm acting vertically in a legal manner by proposing mandatory terms of dealings to downstream actors.

Second, Plaintiff's market definition woefully fails to satisfy a rule of reason analysis. The "failure to define the relevant market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismiss[ing]" a rule of reason claim. *Commercial Data Servers*, 2002 WL 1205740, at *4 (citing cases); *see Bookhouse*, 985 F. Supp. 2d at 621 ("where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.") (citations and quotation marks omitted). The Amended Complaint proposes a relevant market defined as "mobile app-generated ride-share service, with a relevant sub-market of Uber car service." Am. Compl. ¶ 121. This market definition fails because it offers no "theoretically rational explanation" for defining the relevant market so narrowly. *Commercial Data Servers*, 2002 WL 1205740, at *4. Plaintiff's market definition excludes clear potential alternatives to the consuming public, such as legacy taxi companies, public transit such as subway and bus travel, and private transit such as personal vehicle use and walking—*i.e.*, the numerous other non-mobile app generated ride-share services that compete in the transportation marketplace. Each of these alternatives is a clear substitute for the services provided by driver-partners, rendering Plaintiff's market definition irrational. *Id.*

Plaintiff contends without factual support of any kind that traditional car transportation services, such as taxis and "cars for hire," do not compete with Uber driver-partners because the Uber App provides a range of innovative and desirable services to consumers, such as automated

payment processing and the ability "to arrange for rides at the push of a button and then watch on their mobile phones for the nearest driver approach for pick up."  Am. Compl. ¶ 104-05. Similarly, Plaintiff contends that public transportation options, such as subway or bus, are not reasonable substitutes for Uber driver-partners because they are less convenient.  *Id.* ¶ 106. Plaintiff apparently believes that the relevant market should be defined based on the features and functionality of a product or service, with any new or innovative features leading to the creation of a distinct market.  That is not the law.  "[T]he methodology courts prescribe to define a market for antitrust purposes" is "the interchangeability of use or the cross-elasticity of demand," meaning that two products are in the same antitrust market if a change in price for one product affects demand for the other product.  *Chapman v. New York Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008); *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (dismissals on pleadings for failure to allege a relevant market "frequently involve either (1) failed attempts to limit a product market to a single brand . . . that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way").

Nothing in the Amended Complaint even attempts to rebut the commonsense proposition that the "mobile app generated ride share services" provided by Uber driver-partners are reasonably interchangeable with other transportation services such as traditional taxi services, public transit, and private transport such that a change in price for one service affects demand for the others.  Nor does Plaintiff attempt to rebut the even more obvious proposition that "mobile app generated ride share services" provided by Uber's driver-partners are reasonably interchangeable with competitors that similarly connect independent driver-partners and riders

19

through a smartphone such as Lyft, Gett, and the many taxi companies that also have apps.[8] Plaintiff's market definition therefore suffers from the same defects identified by this Court in *Bookhouse*, where plaintiffs' proposed limitation of the relevant market to "the market for e-books" was rejected because the complaint did not allege any facts indicating that "e-books and print books are not acceptable substitutes."  985 F. Supp. 2d at 621.[9]

Finally, Plaintiff fails to state a rule of reason claim because the only factual allegations in the Amended Complaint suggesting any adverse effect arising from Uber's pricing algorithm is that, "during periods of peak demand," prices increase "to incentivize . . . driver-partners to use the Uber App."  Am. Compl. ¶ 57.  But as the Amended Complaint itself makes clear, the entire point of surge pricing is to *increase* the supply of transportation providers available in the market, and thereby satisfy consumer demand.  *Id.* ¶ 52 ("When demand for rides outstrips the supply of cars, surge pricing kicks in, increasing the price"); *see* ¶¶ 57-62.  An increase in supply cannot by definition be anticompetitive.  *Bulk Oil (ZUG) A.G. v. Sun Co.*, 583 F. Supp. 1134, 1137 (S.D.N.Y. 1983) (dismissing § 1 Sherman Act claim because "the net result of defendants' [action] was to increase the supply of crude oil in the United States, and thus the actual effect in the United States was pro-competitive").

---

[8] Plaintiff's defined "relevant sub-market" is "Uber['s] car service," further stretching credulity. That market—by definition—excludes any possible competing product.  Plaintiff has not—and cannot—provide any rational reason for defining the market so narrowly.

[9] The Amended Complaint's allegation that in "certain cities in the United States, Uber captures 50 to 70 percent of business customers" in the sub-market of "taxis, cars for hire and mobile-app generated ride-share services" is entirely deficient.  Plaintiff does not identify which cities where Uber allegedly enjoys this market share, nor does he allege that "business customers" are a relevant market dimension.  Plaintiff further alleges a nationwide geographic market, with no geographic sub-markets, Am. Compl. ¶ 122, and so Uber's market share in any individual city is irrelevant to Plaintiff's claims as alleged.

III.    **The Donnelly Act claim fails for the same reasons as the Sherman Act claim.**

Plaintiff's claim under New York's Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*, must be dismissed for the same reasons that apply to his Sherman Act claim. *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 (2d Cir. 2011) ("The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents."); *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158 (N.Y. 1994) (same).

The Appellate Division has specifically held that vertical price arrangements are legal under New York law. *People v. Tempur-Pedic Int'l, Inc.*, 95 A.D.3d 539, 540 (1st Div. 2012) (affirming grant of motion to dismiss complaint alleging that manufacturer violated New York law "by entering Resale Price Maintenance agreements (RPM) with its retailers" because "there is nothing in the text [of the referenced section of the Donnelly Act] to declare those contract provisions illegal or unlawful"). The Appellate Division has also made clear that it is perfectly lawful for a vertical actor to establish price policies that prompt downstream actors to "independently determine [whether] to acquiesce to the pricing scheme in order to continue" the business relationship with the vertical actor. *Id.* at 541 (citing *Leegin*, 551 U.S. at 901-02 and *Monsanto*, 465 U.S. at 764). Courts in this District have uniformly held that *Leegin*'s rule—that vertical price restraints are not subject to per se treatment, but instead judged by the rule of reason—applies to parallel claims brought under New York's Donnelly Act. *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 501 (S.D.N.Y. 2011); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 569, 581 (S.D.N.Y. 2007).

IV.    **Plaintiff Cannot Circumvent the Class Waiver in His User Agreement.**

Finally, the Court should dismiss the class claims in Plaintiff's Amended Complaint because Plaintiff is equitably estopped from avoiding the class action waiver contained in his

user agreement with Uber.  *See American Express Co., v. Italian Colors Restaurant*, — U.S. —, 133 S.Ct. 2304, 2308, 2312 (2013) (affirming enforcement of class action waiver to compel arbitration and dismiss class action complaint).

The User Agreement governs use of the Uber App.  *Id.* ¶ 29; User Terms at 1.  Users of the Uber App agree to arbitration[10] and to waive class actions with respect to disputes arising out of their use of the App.  User Terms at 9.  Plaintiff seeks to avoid that waiver by raising class action claims against the company's CEO as opposed to Uber itself.[11]  But those claims do not arise out of the CEO's actions; they arise out of the pricing algorithm administered by Uber through the Uber App.

Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.  *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999).  As the Supreme Court has explained in the arbitration context, a litigant who is not a party to an arbitration agreement may invoke arbitration if the relevant state contract law allows the litigant to enforce the agreement.

---

[10]  Although Mr. Kalanick does not seek to compel arbitration here, arbitration would be mandated for the reasons explained below if Mr. Kalanick sought to enforce the arbitration provision of the User Agreement.  Mr. Kalanick does not waive and expressly reserves his right to move to compel arbitration in other cases arising out of the User Agreement.

[11]  There appears to be no case in the century-long history of federal antitrust regulation in which an individual company officer or director was ever held personally liable in the context of vertical resale price maintenance.  Individual liability for vertical resale price maintenance arrangements—even those, unlike Uber's, that fail the rule of reason—would have broad and unpredictable consequences.  At the very least, it would chill individual executives, and by extension, companies, from engaging in a wide swath of activity that promotes competition and expands the range of goods and services available to consumers.  *See Leegin*, 551 U.S. at 889-91; *United States v. Wise*, 370 U.S. 405, 416 (1962) (individuals may be subject to criminal penalties for organizing a horizontal price-fixing conspiracy in violation of § 1 of the Sherman Act).

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).[12]  In this case, the relevant contract

law is the law of California.  User Terms at 8-9.  California law provides that a non-signatory to

a contract can enforce that contract's terms where, *inter alia*, "the signatory alleges substantially

interdependent and concerted misconduct by the nonsignatory and another signatory and the

allegations of interdependent misconduct are founded in or intimately connected with the

obligations of the underlying agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-

29 (9th Cir. 2013); *see Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d

403, 404 (2d Cir. 2001) (same, applying New York law).

Here, there can be no credible dispute that Plaintiff claims concerted misconduct between

Uber and Mr. Kalanick that was founded in and intimately interconnected with his User

Agreement.  The Amended Complaint clearly alleges collusion and interdependent misconduct

by Uber and its CEO:  "Kalanick, Uber, and Uber's driver-partners have entered into an unlawful

agreement, combination and conspiracy in restraint of trade."  Am. Compl. ¶ 123.  Were that not

enough, the Amended Complaint is rife with allegations that Mr. Kalanick and Uber worked

closely together.[13]  Moreover, many of Plaintiff's allegations refer exclusively to Uber, not Mr.

Kalanick.  Am. Compl. ¶¶ 22-39, 41-42, 45-47, 55-60, 68-73.  In short, Plaintiff does little, if

anything, to distinguish between Mr. Kalanick and Uber.  *Jacobson v. Snap-on Tools Co.*, 15

---

[12] The same principle that permits non-signatories to enforce arbitration clauses permits non-signatories to enforce other provisions of contractual agreements.  *Int'l Chartering Servs., Inc., v. Eagle Bulk Shipping Inc.*, No. 12 Civ. 3463 (AJN), 2015 WL 5915958, at *5 (S.D.N.Y. Oct. 8, 2015) (choice-of-law clauses).

[13] E.g., Am. Compl. ¶ 9 ("Kalanick is the public face of Uber, its co-founder and manager of its operations."); *id.* ¶¶ 47-50 (referencing the "Uber-generated algorithm" Mr. Kalanick allegedly "conceived," "implemented" and "defend[ed]"); *id.* ¶ 54 ("Kalanick and Uber artificially set the fares for its driver-partners to charge to riders."); *id.* ¶ 87 ("Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares.").

Civ. 2141, 2015 WL 8293164, at *6 (N.D. Cal. Dec. 9, 2015) (conduct "interdependent" where plaintiff treated two entities "as a single actor" and "consistently refer[ed] to them collectively").

Plaintiff's allegations are founded in and interconnected with the User Agreement. Plaintiff alleges that he "used Uber car services on multiple occasions" and "paid higher prices for car services" as a result. Am. Compl. ¶¶ 7-8. Plaintiff further alleges that driver-partners are required to charge prices set by the pricing algorithm in the Uber App. *Id.* ¶¶ 30-36, 68-69.[14]

Artful pleading cannot conceal the fact that this dispute is interconnected with the User Agreement—it arises out of the very services Plaintiff received under the User Agreement. *See Boucher v. Alliance Title Company, Inc.*, 127 Cal.App.4th 262, 272 (2005) ("That the claims are cast in tort rather than contract does not avoid the arbitration clause."); *accord American Bankers*

---

[14] This case is thus similar to *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, where the Northern District of California applied the doctrine of equitable estoppel to permit non-signatories to enforce the terms of a contract. 962 F. Supp. 2d 1172, 1184-86 (N.D. Cal. 2013). *Uptown* involved a retail pharmacy chain ("Uptown") and four corporate affiliates (collectively, the "CVS Companies"). Uptown provided confidential customer information to one of the CVS Companies, which allegedly illegally shared it with another CVS Company that directly competed with Uptown. Uptown's business relationship was governed by a provider agreement it had with yet another CVS Company. *Id.* at 1176-77. Uptown sued all of the CVS Companies for misappropriation of trade secrets and argued that the non-signatories to the provider agreement could not enforce the arbitration clause contained in that agreement. *Id.* at 1183. The court rejected that argument, finding that Uptown's claims were intertwined with the underlying contract because the provider agreement "explicitly govern[ed] the use of [the confidential information] and because it provide[d] the basis for Uptown's disclosure of such information." *Id.* at 1185; *see also id.* at 1185-86 ("the dependent relationship between Uptown's misappropriation claims and the Provider Agreement is evident from the simple fact that, absent the Provider Agreement, Uptown would have no claims against Defendants with respect to the customer information at issue, because in that scenario, Uptown would not have been required to disclose such information to Defendants"). Similarly, here, the User Agreement governed Plaintiff's use of the Uber App and provided the basis for Plaintiff to use and pay for Uber's services. *See also Lau v. Mercedes-Benz USA, LLC*, No. CV 11-1940 MEJ, 2012 WL 370557, at *4 (N.D. Cal. Jan. 31, 2012) (compelling arbitration with non-signatory because the plaintiff "must rely on [certain] terms in the [purchase agreement] to prosecute his [claim]"); *Turtle Ridge Media Grp. v. Pacific Bell Directory*, 140 Cal. App. 4th 828, 833 (2006) (allowing non-signatory to enforce arbitration clause arising out of "business dealings" with signatory because, "outside of" the relevant contracts, the signatory had "no business relationship" with the non-signatory).

*Ins. Grp., Inc. v. Long*, 453 F.3d 623, 630 (4th Cir. 2006) ("although each of the [plaintiffs']

individual claims is phrased in tort, [plaintiffs] may not use artful pleading to avoid arbitration");

*Hughes Masonry Co., Inc., v. Greater Clark Cnty School Building Corp.*, 659 F.2d 826, 839 (7th

Cir. 1981) (Plaintiffs "cannot have it both ways. [They] cannot rely on [a] contract when it works

to [their] advantage and repudiate it when it works to [their] disadvantage").  Permitting Mr.

Kalanick to invoke the class action waiver contained in the User Agreement "comports with, and

indeed derives from, the very purposes of the [equitable estoppel] doctrine: to prevent a party

from using the terms or obligations of an agreement as the basis for his claims against a

nonsignatory, while at the same time refusing to [abide by] another clause of the same

agreement."  *Jones v. Jacobson*, 195 Cal. App. 4th 1, 20 (2011).

 Moreover, the Amended Complaint alleges that Mr. Kalanick acted "in his position as

Uber CEO" to orchestrate the asserted price-fixing conspiracy.  Am. Compl. ¶ 86; *see also id.* ¶ 1

(describing Mr. Kalanick as Uber's "CEO" and "primary facilitator").  Under California law, "a

nonsignatory sued as an *agent* of a signatory may enforce the terms of an arbitration agreement."

*Rowe v. Exline*, 153 Cal. App. 4th 1276, 1284 (2007); *Campaniello Imports, Ltd. v. Saporiti

Italia, S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997) (same, applying New York law).  Plaintiff's

allegation that Kalanick is Uber's agent, therefore, likewise bars him from avoiding the class

action waiver in the User Agreement.

## CONCLUSION

 For the reasons described in this Memorandum, Defendant Travis Kalanick respectfully

requests this Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: February 8, 2016        Respectfully submitted,

           BOIES, SCHILLER & FLEXNER LLP

s/ Karen L. Dunn
Karen L. Dunn
William A. Isaacson
Ryan Y. Park
5301 Wisconsin Ave, NW
Washington, DC 20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
rpark@bsfllp.com

Peter M. Skinner
575 Lexington Ave, 7th Floor
New York, NY 10022
Tel:  (212) 446-2300
Fax:  (212) 446-2350
pskinner@bsfllp.com

*Counsel for Defendant Travis Kalanick*