UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPENCER MEYER, individually and on behalf of those similarly situated,<br>Plaintiffs,<br>-against-<br>TRAVIS KALANICK,<br>Defendant. | 1:15 Civ. 9796 (JSR)<br>ECF Case |

**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT TRAVIS KALANICK'S MOTION TO DISMISS**

ANDREW SCHMIDT LAW PLLC
Andrew Arthur Schmidt

*-and-*

HARTER SECREST & EMERY LLP
Brian Marc Feldman
Jeffrey A. Wadsworth
Edwin M. Larkin
A. Paul Britton

*Attorneys for Plaintiff*
*Spencer Meyer*

February 18, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................... ii

PRELIMINARY STATEMENT ..................... 1

BACKGROUND ..................... 2

A. Uber's Business Model ..................... 2

B. The Uber App ..................... 3

C. Defendant Kalanick as Chief Architect ..................... 5

ARGUMENT ..................... 5

I. PLAINTIFF STATES A *PER SE* SHERMAN ACT SECTION ONE CLAIM ..................... 5

A. Neither *Twombly* Nor *Colgate* Precludes Plaintiff's Claim. ..................... 6

B. Defendant Orchestrated an Illegal Price-Fixing Conspiracy. ..................... 9

1. Driver-Partners Conspired Under the *Interstate Circuit* Rule. ..................... 10

2. Driver-Partners Conspired By Sustaining the Uber Marketplace. ..................... 11

C. Defendant Ignores The September 2014 Conspiracy. ..................... 14

II. IN THE ALTERNATIVE, PLAINTIFF STATES A SHERMAN ACT CLAIM UNDER THE "QUICK LOOK" AND RULE OF REASON TESTS. ..................... 15

A. Defendant's Price-Fixing Lacks Procompetitive Justification. ..................... 15

B. Plaintiff Has Pled a Plausible Relevant Market. ..................... 17

C. Plaintiff Has Alleged Adverse Effects. ..................... 21

III. PLAINTIFF HAS STATED A VALID CLAIM UNDER THE DONNELLY ACT. ..................... 21

IV. PLAINTIFF HAS NOT WAIVED HIS RIGHT TO BRING A CLASS ACTION. ..................... 23

CONCLUSION ..................... 25

## TABLE OF AUTHORITIES

**Cases**: **Page(s)**

*America Online, Inc. v. Superior Court*,
108 Cal. Rptr. 2d 699 (Cal. Ct. App. 2001) ....23

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ....15

*Arista Records LLC v. Lime Group LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007) ....19, 23

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ....16

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....23

*Balaklaw v. Lovell*,
14 F.3d 793 (2d Cir. 1994) ....17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....6, 7

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013) ....8

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) ....17

*Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.*,
996 F.2d 537 (2d Cir. 1993) ....5, 6

*Capitaland United Soccer Club v. Capital Dist. Sports & Entm't, Inc.*,
238 A.D.2d 777 (N.Y. App. Div. 1997) ....21

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
961 F.2d 667 (7th Cir. 1992) ....17

*Commercial Data Servers v. IBM Corp.*,
No. 00 Civ. 5008, 2002 U.S Dist. LEXIS 5600 (S.D.N.Y. Mar. 15, 2002) ....7, 18

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ....16

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ....................................................................................12

*DIRECTV, Inc. v. Imburgia*,
136 S. Ct. 463 (2015)...............................................................................................23

*Discover Bank v. Superior Court*,
113 P.3d 1100 (Cal. 2005) ........................................................................................23

*Dr. Miles Medical Co. v. John D. Park & Sons Co.*,
220 U.S. 373 (1911)...........................................................................................16, 22

*Dunkel v. McDonald*,
57 N.Y.S.2d 211 (N.Y. Sup. Ct. 1945) ......................................................................22

*Eagle Spring Water Co. v. Webb & Knapp, Inc.*,
236 N.Y.S.2d 266 (N.Y. Sup. Ct. 1962) ....................................................................22

*Eastman Kodak Co. v. Image Techn. Servs., Inc.*,
504 U.S. 451 (1992)...................................................................................................17

*FTC v. Whole Foods Mkt.*,
548 F.3d 1028 (D.C. Cir. 2008)...................................................................................20

*George C. Miller Brick Co. v. Stark Ceramics, Inc.*,
2 A.D.3d 1341 (N.Y. App. Div. 2003) .......................................................................22

*George C. Miller Brick Co. v. Stark Ceramics, Inc.*,
9 Misc. 3d 151 (N.Y. Sup. Ct. 2005) .........................................................................22

*Goldfarb v. Virginia State Bar*,
421 U.S. 773 (1975)...............................................................................................6, 15

*Goldman v. KPMG LLP*,
92 Cal. Rptr. 3d 534 (Cal. Ct. App. 2009) ..................................................................24

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys.*,
879 F.2d 1005 (2d Cir. 1989).........................................................................................8

*H.L. Moore Drug Exch. v. Eli Lilly & Co.*,
662 F.2d 935 (2d Cir. 1981)...........................................................................................8

*In re Electronic Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012).........................................................................10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
42 F. Supp. 3d 231 (D. Mass. 2014) ....................................................................11

*In re Wholesale Grocery Prods. Antitrust Litig.*,
707 F.3d 917 (8th Cir. 2013) ..............................................................................24

*Interstate Circuit, Inc. v. United States,*
306 U.S. 208 (1939)..............................................................................10, 11, 12

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959)...............................................................................................9

*Kotteakos v. United States*,
328 U.S. 750 (1948).............................................................................................12

*LaFlamme v. Societe Air Fr.*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...................................................................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007)........................................................................................6, 16

*Laumann v. NHL*,
56 F. Supp. 3d 280 (S.D.N.Y. 2014)....................................................................11

*Laumann v. NHL*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012)..................................................................10

*Mohamed v. Uber Techs., Inc.*,
109 F. Supp. 3d 1185 (N.D. Cal. 2015) .................................................................3

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984)..............................................................................6, 7, 8, 12

*New York Jets LLC v. Cablevision Sys. Corp.*,
No. 05 Civ. 2875, 2005 U.S. Dist. LEXIS 23763 (S.D.N.Y. Oct. 17, 2005) ..............18, 20

*New York v. Actavis, PLC*,
No. 14 Civ. 7473, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y. 2014) ................................20

*People v. B. P. Oil Corp.*,
80 Misc. 2d 566 (N.Y. Sup. Ct. 1975) ...........................................................21, 22

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002)..................................................................................11

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)....................7

*State of New York v. Mobil Oil Corp.*,
38 N.Y.2d 460 (N.Y. 1976)....................21

*State Oil Co. v. Khan*,
522 U.S. 3 (1997)....................15

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................6, 17, 18, 19, 20

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000)....................11

*UFCW & Employers Benefit Trust v. Sutter Health*,
194 Cal. Rptr. 3d 190 (Cal. Ct. App. 2015)....................24

*United States v. Apple*,
791 F.3d 290 (2d Cir. 2015).................... passim

*United States v. Banks*,
10 F.3d 1044 (4th Cir. 1993)....................12, 13

*United States v. Brown*,
587 F.3d 1082 (11th Cir. 2009)....................12, 13

*United States v. Colgate & Co.*,
250 U.S. 300 (1919)....................6, 7

*United States v. Edwards*,
945 F.2d 1387 (7th Cir. 1991)....................12, 13

*United States v. General Motors Corp.*,
384 U.S. 127 (1966)....................9

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011)....................20

*United States v. Maldonado-Rivera*,
922 F.3d 934 (2d Cir. 1990)....................12

*United States v. Parke, Davis & Co.*,
362 U.S. 29 (1960)....................8

*United States v. Rodriguez*,
525 F.3d 85 (1st Cir. 2008)....................12

*United States v. Ulbricht*,
31 F. Supp. 3d 540 (S.D.N.Y. 2014)....................12, 14

*United States v. Ulbricht*,
79 F. Supp. 3d 466 (S.D.N.Y. 2015)....................13, 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
540 U.S. 39 (2004)....................6

*WorldHomeCenter.Com v. KWC America, Inc.*,
No. 10 Civ. 7781 (NRB), 2011 U.S. Dist. LEXIS 104496 (S.D.N.Y. Sept. 15, 2011).....22

**Statutes**:

Donnelly Act,
N.Y. Gen. Bus. Law § 340....................21

Sherman Act,
15 U.S.C. § 1.................... passim

## PRELIMINARY STATEMENT

Uber drivers are competitors who do not compete. Unlike taxicabs, Uber drivers' fares are not fixed by a government regulator. Yet drivers charge identical prices for identical services at identical times, including surge pricing of up to ten times baseline fares. This price-fixing holds because participating drivers commit to charge fares set by the Uber app (the "App"). Together, drivers create a marketplace in which price competition is impossible. The App perfects price-fixing.

Plaintiff, a user of Uber drivers' services, brings federal and state antitrust claims against Defendant Travis Kalanick, Uber's founder and CEO, for orchestrating this price-fixing scheme. In his motion, Defendant does not contest that Uber's driver-partners are distinct entities that should be competing with each other. Instead, he asserts that a price-fixing conspiracy of such "staggering breadth" is "physically impossible." Yet that is precisely what Uber provides—instant price-fixing among "hundreds of thousands of strangers" without the risk of cheating.

Defendant's motion should be denied. The First Amended Complaint ("FAC") states a *per se* violation of the Sherman Act. There is no merit to the claim that price-fixing is implausible; this case is based on express (and conceded) contracts, not imagined backroom conversations. *See infra* at I.A. Defendant is liable for orchestrating this price-fixing, which amounts to horizontal concerted action between drivers both (i) because drivers agree to fixed prices only with the assurance that all others are bound to the same prices, and (ii) because drivers collectively sustain Uber's viability as a marketplace. *See infra* at I.B. Likewise, the *per se* rule applies to Defendant's negotiation of higher fares with a concerted group of drivers in September 2014, as Defendant nowhere contests. *See infra* at I.C. The *per se* rule thus applies.

In the alternative, the complaint meets the "quick look" and rule-of-reason tests. Because Uber sells nothing for resale, and because drivers in the Uber marketplace face no free-rider

problem, none of the procompetitive benefits of resale price maintenance can justify Defendant's price-fixing. *See infra* at II.A. And contrary to Defendant's proposed market definition, which would include walking, Plaintiff reasonably limits the market to mobile app-generated ride-share services. *See infra* at II.B. Moreover, inflated fares and suppressed output are indisputably clear adverse effects for purposes of assessing antitrust harm. *See infra* at II.C.

In addition, Plaintiff's state law claim survives even if the federal claim does not. New York State's Donnelly Act extends beyond conspiracies to "arrangements" and bars price-fixing without exception. *See infra* at III.

Finally, the Uber User Agreement does not prevent Plaintiff from joining class members to this suit. California law, which Defendant concedes controls this issue, bars enforcement of the User Agreement's class action waiver. In any event, the User Agreement is with Uber. Defendant may not rely on equitable estoppel to step into Uber's shoes because the antitrust claims here do not rest on any obligation in the User Agreement. Nor may Defendant cherry-pick the class waiver within an arbitration agreement he is not enforcing. *See infra* at IV.

For these reasons and those below, the motion should be denied in its entirety.

## BACKGROUND

### A. UBER'S BUSINESS MODEL

Uber's flagship product is an App that helps people find and pay for rides from independent drivers. FAC ¶ 24. Uber may have the look and feel of a single-firm car service with a fleet of drivers, like Dial 7, or of a municipal taxi commission, like the New York City TLC, but it is neither of these things. By its own account, Uber is strictly a technology company, not a transportation company. *Id.* ¶¶ 2, 23; Declaration of Michael Colman dated Feb. 8, 2016 ("Colman Decl."), Ex. 1 ("User Agreement") at 2 ("[Uber] offers information and a method to obtain . . . third party transportation services, but does not and does not intend to provide

transportation services or act in any way as a transportation carrier"). So despite identifying drivers who use its App as "driver-partners," Uber has made painstakingly clear—both in its contract with drivers and in its labor disputes with them[1]—that drivers are not Uber employees, partners, or agents. *See* Colman Decl., Ex. 2 ("Driver Terms") at ¶ 13.1 (Uber and drivers "expressly agree" that no "employment relationship" nor "joint venture, partnership, or agency relationship exists" between the driver and Uber). Drivers are thus wholly independent economic entities who pay Uber a fee to use its App to connect with customers ("riders").

In many ways, Uber resembles online travel companies like Expedia. Expedia's website allows air travelers to compare fares and check availability simultaneously across multiple airlines and routes and to conveniently book and pay for flights through Expedia, which in turn reserves seats with and remits payment to individual airlines. Yet there is a glaring difference between Expedia and Uber. Expedia does not dictate uniform pricing across competing airlines, while Uber fixes prices among competing driver-partners. *See* FAC ¶¶ 56, 68-69.

### B. THE UBER APP

Riders access the App by creating an account and storing their payment information, such as a credit card number or PayPal account. FAC ¶ 28. The App boasts three principal features. *First*, consumers can request rides through their smartphones. *Id.* ¶ 24. A rider can obtain an approximate fare quote by entering a pickup location and destination, *id.* ¶ 30; when a consumer requests a ride, the App utilizes dispatch software to send the nearest driver to the rider's location, *id.* ¶ 24. *Second*, riders pay drivers through the App, eliminating the need to carry cash or credit cards. *Id.* ¶¶ 32, 35. Uber facilitates payment by charging the fare to the rider's stored

[1] *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1209 (N.D. Cal. 2015) ("Uber adamantly contends that the drivers are *not* its employees.") (emphasis in original); Reply Mem. of Uber & Travis Kalanick, et al., at 1, *O'Connor v. Uber Techs.*, 3:13-cv-03826 (N.D. Cal. 2013), ECF No. 45 ("Uber . . . does not itself provide any transportation services").

payment method and then forwarding that fare to the driver less a percentage that Uber collects as a software licensing fee. *Id*. ¶¶ 27, 32. As a result, Uber's revenues are inextricably intertwined with drivers' revenues. *Id*.

Fares are calculated through the App's *third* key feature, a proprietary pricing algorithm. *Id*. ¶¶ 26, 47, 49. After a ride is completed, the algorithm calculates a fare from a base amount and the ride's distance and duration. *Id*. ¶ 26. During periods of high demand in an area, the algorithm automatically integrates "surge pricing," increasing fares by up to ten times. *Id*. ¶ 48.

In agreeing to use the App, drivers relinquish all pricing responsibility to Uber; they retain no direct control over the App's algorithm or resulting prices. *Id*. ¶¶ 56, 68–69. Defendant claims that "Uber's contracts with driver-partners expressly permit the driver-partners to reject the fare charged by the pricing algorithm and instead charge a lower fare." Defendant's Memorandum of Law dated February 8, 2016 ("Def. Mem.") at 4 (quoting Driver Terms ¶ 4.1). But this is doubly misleading. First, the contractual provision Defendant quotes also requires each driver to acknowledge and agree "that the Fare provided under the Fare Calculation is the only payment [the driver] will receive in connection with the provision of Transportation Services." Driver Terms ¶ 4.1. The contract is thus internally inconsistent, at best. More importantly, drivers are bound by the Uber-set fare because there is no mechanism by which drivers can charge anything but the App-dictated fare. FAC ¶ 69. The App makes negotiated or manually discounted fares impossible. *Id*.

The App's automated and binding fares result in a uniform pricing scheme for all similarly situated drivers in a given area.[2] Those fares rise and fall together as the Uber pricing algorithm detects increased or decreased user demand. *Id.* ¶¶ 47, 52. Absent the App's pricing

[2] Drivers are categorized into different "car service experiences," such as UberX, UberBLACK, UberSUV, and UberLUX, depending on the type of car they drive. FAC ¶ 25.

algorithm, drivers would compete on price as all other horizontal competitors do. *Id.* ¶¶ 70–72, 92. The App relieves drivers of the need to compete. Indeed, it renders competition impossible.

### C. DEFENDANT KALANICK AS CHIEF ARCHITECT

Defendant Kalanick is Uber's co-founder and CEO and the chief architect of this business strategy. *Id.* ¶ 1. He fiercely defends his business and its surge-pricing model, which he devised and implemented into the Uber pricing algorithm. *Id.* ¶ 50. He tries to justify his pricing algorithm as simply capturing the dynamics of supply and demand. *Id.* ¶¶ 50–51, 61–62. But, in reality, his pricing algorithm artificially manipulates supply and demand, guaranteeing higher fares for drivers who would otherwise have to compete with one another. *Id.* ¶ 53. Drivers have thus flocked to participate in Defendant's price-fixing scheme for good reason. *Id.* ¶ 95 ("Uber has approximately 80% market share in the U.S.").

Defendant's scheme of fixed, non-competitive fares serves the mutual interests of driver-partners and Defendant alike—at the expense of consumers—and the parties work together to ensure the conspiracy's continued success. For example, when Uber lowered fares for services in New York City in September 2014, drivers colluded with one another to negotiate the reinstatement of higher fares. Defendant is believed to have directed or ratified those negotiations; Uber ultimately agreed to raise fares. *Id.* ¶¶ 4, 86-89.

## ARGUMENT

### I. PLAINTIFF STATES A *PER SE* SHERMAN ACT SECTION ONE CLAIM.

The Sherman Act prohibits every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. A Section 1 violation requires "a combination or some form of concerted action between at least two legally distinct economic entities." *Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993). Concerted action means "a conscious commitment to a common scheme designed to

achieve an unlawful objective," like an agreement to follow "rules of the game" that require price-fixing. *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 766 & n.11 (1984).

A plaintiff must also "demonstrate that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Capital Imaging Assocs.*, 996 F.2d at 542. *Per se* restraints "include horizontal agreements among competitors to fix prices." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007); *see Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Traditional 'hard-core' price-fixing remains *per se* unlawful."). Agreements between competitors to fix prices are the "supreme evil of antitrust." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 39, 408 (2004); *accord Goldfarb v. Virginia State Bar*, 421 U.S. 773, 782 (1975) ("a naked agreement was clearly shown, and the effect on prices is plain"). Thus, "horizontal price-fixing conspiracies traditionally have been, and remain, the archetypal example of a *per se* restraint on trade." *United States v. Apple*, 791 F.3d 290, 321 (2d Cir. 2015) (quotation marks omitted).

This is a *per se* case. Defendant created express "rules of the game" for driver-partners to use his pricing algorithm to build and sustain a competition-free marketplace. *See* FAC ¶¶ 56, 68-71. As explained below, Defendant's challenges to the complaint are misplaced, as this case presents a horizontal price-fixing conspiracy orchestrated by Defendant.

### A. NEITHER *TWOMBLY* NOR *COLGATE* PRECLUDES PLAINTIFF'S CLAIM.

Most of Defendant's arguments can be dispensed with quickly. He principally argues from two irrelevant cases: *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *United States v. Colgate & Co.*, 250 U.S. 300 (1919). *See* Def. Mem. at 2-3, 6-12. Neither applies here.

Defendant spends many pages arguing that concerted action among driver-partners is implausible, citing *Twombly* and its progeny. *See id*. Yet Plaintiff's claim presents none of the speculation that *Twombly* addressed. In particular, there is no mystery as to why Uber driver-

partners charge the same fares. Defendant himself admits that each driver-partner expressly "agree[s] to use Uber's pricing algorithm" as "a condition" of the agreement with Uber. Def. Mem. 12-13; *see also id.* at 9 (each driver-partner "sign[s] up with Uber and accept[s] the contractual terms offered, which include use of the pricing algorithm"); *id.* at 10-11 ("Uber's terms of dealing . . . include surge pricing as a component of its pricing algorithm"). A price-fixing agreement is thus not merely plausible; Defendant has admitted it. *See id*.

In *Twombly*, by contrast, the Supreme Court confronted behavior that was consistent with an agreement, but which was "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." 550 U.S. at 554. Here, by contrast, driver-partners avoid competing with each other and instead use Defendant's pricing algorithm because of their collective agreements with Uber. That conclusion does not flow from remote inferences or depend on circumstantial proof. It reflects a written contract. Moreover, it is Defendant's own explanation. *See* Def. Mem. at 12-13. Defendant's heavy reliance on *Twombly* is thus misplaced.[3]

The *Colgate* doctrine is also irrelevant here. *See* Def. Mem. at 3, 13. In *Colgate*, the Supreme Court distinguished concerted action from a refusal to deal. The Court explained that the Sherman Act "does not restrict the long recognized right of a trader . . . to exercise his own independent discretion as to parties with whom he will deal" and to "announce in advance the circumstances under which he will refuse to sell." 250 U.S. at 307; *accord Monsanto*, 465 U.S.

[3] Driver-partners charge identical fares by contract, and *not* based on their "common perceptions of the market," *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010), *nor* in response to external stimuli like "rapidly rising jet fuel prices," *LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136 (E.D.N.Y. 2010), or threats, *see Commercial Data Servers v. IBM Corp.*, No. 00 Civ. 5008, 2002 U.S Dist. LEXIS 5600, at *9 (S.D.N.Y. Mar. 15, 2002). Their conduct is more than just parallel or independent. Def. Mem. at 14. *See Apple*, 791 F.3d at 317-18 ("'independent reasons' can also be 'interdependent,' and in no way undermine[] . . . an agreement to raise . . . prices').

at 760. Cases applying *Colgate* have thus examined firms' refusals to deal. *See, e.g.*, *Monsanto*, 465 U.S. at 757-58 (examining refusal to deal with distributor); *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys.*, 879 F.2d 1005, 1013-14 (2d Cir. 1989) (same); *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) (same). The doctrine means "no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43 (1960). Here, Plaintiff does not allege any such refusal to deal. Thus, the *Colgate* doctrine, like *Twombly*, is inapplicable.

Defendant erroneously offers this Court's decision in *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013), as misplaced support for his *Twombly* and *Colgate* arguments. *See* Def. Mem. at 4, 13. The differences between *Bookhouse* and this case are stark. There, defendant Amazon had promised publishers that it would take measures to block customers from copying the digital ebooks it sold. *See* 985 F. Supp. 2d at 617. Then, to the detriment of publishers, Amazon decided to disable the ebooks from working on any non-Amazon devices. *See id.* at 617-19. Amazon unilaterally implemented these restrictions, without agreeing with the publishers that such conditions would be imposed. *Id.* Plaintiff brick-and-mortar booksellers claimed that Amazon's restrictions, along with its refusal to sell ebooks to them, violated the Sherman Act. *Id.* at 617. This Court found no concerted action because there was neither an agreement between Amazon and the publishers restricting ebooks to Amazon devices nor even a reason why the publishers would want such restrictions. *Id.* at 619.

The facts here are nearly the opposite of those in *Bookhouse*. Whereas *Bookhouse* lacked facts plausibly suggesting an agreement to engage in anti-competitive conduct, this case centers on a written price-fixing agreement whose existence no one disputes. Moreover, while the *Bookhouse* publishers had no hand in restricting ebooks to Amazon devices, Uber's driver-

partners impose fixed prices each and every time they charge an App-set fare. Finally, whereas there was no reason why the *Bookhouse* publishers would have benefitted from Amazon's restrictions, here Plaintiff has detailed the benefits that driver-partners enjoy from Defendant's price-fixing. *See, e.g.*, FAC ¶¶ 72, 87, 109. *Bookhouse* thus reinforces the conclusion that neither *Twombly* nor *Colgate* applies to this case.

### B. DEFENDANT ORCHESTRATED AN ILLEGAL PRICE-FIXING CONSPIRACY.

Contrary to Defendant's suggestion, the *per se* rule applies to Defendant's conduct even if his relationship with driver-partners is deemed a vertical one. *See* Def. Mem. at 13, 16. In *United States v. Apple*, the Second Circuit held Apple liable *per se* for orchestrating an unlawful conspiracy among five major publishers to raise the retail prices of ebooks. 791 F.3d at 297-98. In so holding, the Circuit reaffirmed that "where the vertical organizer has not only committed to vertical agreements, but also agreed to participate in [a] horizontal conspiracy," *per se* treatment applies to "all participants." *Id.* at 325; *see also United States v. General Motors Corp.*, 384 U.S. 127, 145 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959).

Defendant cannot seriously contest that he organized uniform price-fixing among driver-partners. That was his design. FAC ¶ 2. As in *Apple*, such price-fixing is attractive to driver-partners for the very reason that all driver-partners are bound to it. *Id.* ¶ 72 (Forgoing "such competition only makes sense because drivers are guaranteed that other Uber drivers will not undercut them on price and that, consequently, drivers who do pick up riders can collect above-market fares from them."); *see Apple*, 791 F.3d at 316 (noting Apple "understood that its proposed Contracts were attractive . . . *only* if [the competitors] collectively" adopted them). Likewise, Defendant's "use of the promise of higher prices as a bargaining chip to induce [competitors] to participate in [the platform] constituted a conscious commitment to the goal of raising [such] prices." *Id.* at 317. Yet Defendant's price-fixing is more even egregious than

Apple's was. Apple was unwilling to directly set prices, *id.* at 303-05, 317; Defendant bluntly does so. Ultimately, like Apple, Defendant "imposed [his] view of proper pricing, supplanting the market's free play" and competitors—here, driver-partners—agreed. *Id.* at 329.

Defendant is liable for such conduct. And, for their part, the driver-partners must be deemed to have conspired horizontally for two independent reasons, as explained below.

### 1. Driver-Partners Conspired Under The *Interstate Circuit* Rule.

*First,* each driver-partner understood that Uber invited, required, and only worked with other driver-partners who agreed to follow Defendant's pricing. As Judge Cote held in her *Apple* decision, competitors conspire where "the only condition on which a [competitor] would agree to [the] terms was if it could be sure its competitors were doing the same thing." *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012) (quotation marks omitted); *see also Apple*, 791 F.3d at 316 (fixing prices "something no individual [competitor] had sufficient leverage to do on its own"). That is what Plaintiff here alleges. FAC ¶¶ 70-72.

It is well established that, "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012). This principle comes from *Interstate Circuit, Inc. v. United States*, where competing movie distributors, without checking with each other, accepted a theater's terms as proposed in a letter jointly addressed to the various distributors. 306 U.S. 208, 215-19 (1939). The Supreme Court explained:

> It was enough that, knowing that concerted action was contemplated and invited, the [competitors] gave their adherence to the scheme and participated in it. Each [competitor] was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce . . . and, knowing it, all participated in the plan. . . . [E]ach [competitor] early became

> aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

*Id*. at 226-27. The *Interstate Circuit* doctrine applies where, as here, competitors agree to identical terms with a vertical actor in reliance on the fact that all competitors are doing so. *See id.; Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000).[4]

Defendant has ignored this doctrine. Instead, as in *In re Nexium (Esomeprazole) Antitrust Litig.*, Defendant "seems to assume that the Plaintiff[] imagine[s] the existence of a secret, back room deal" between driver-partners, by which they all agreed to Defendant's pricing algorithm. 42 F. Supp. 3d 231, 254 (D. Mass. 2014). Yet that "is not the inference the Plaintiff[] ask[s] the Court to draw." *Id.* The App is an exceptionally effective price-fixing mechanism that permits disparate drivers to join Uber with a built-in guarantee against competition from other participating driver-partners. The complaint simply alleges that drivers are drawn to Uber because of this assurance. FAC ¶ 72. That allegation fits squarely within the *Interstate Circuit* doctrine's scope—*i.e.*, that driver-partners "would not have undertaken their common action without reasonable assurances that all would act in concert." *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d at 225. This action does not posit a secret backroom deal; the operation of the App itself evidences an illegal horizontal conspiracy.

**2. Driver-Partners Conspired By Sustaining the Uber Marketplace.**

*Second*, consistent with conspiracy case law, the driver-partners conspired by sustaining the Uber marketplace based on their common interest in attracting buyers and charging fixed prices. Federal antitrust law has long drawn upon criminal conspiracy law to define hub-and-

[4] *Interstate Circuit* is distinguishable from *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002), a case in which there was no "evidence that [Coca-Cola dealers distributers] benefitted from [a] restriction" against distributing PepsiCo products. *Laumann v. NHL*, 56 F. Supp. 3d 280, 306 (S.D.N.Y. 2014). Here, as in *Interstate Circuit*, competitors enjoyed higher profits (including surge pricing) as a result of Defendant's uniform agreement. FAC ¶ 109.

spoke antitrust conspiracies. *See, e.g., Interstate Circuit*, 306 U.S. at 227 (relying on criminal conspiracy cases); *Dickson v. Microsoft Corp*., 309 F.3d 193, 203-04 (4th Cir. 2002) (relying on the criminal conspiracy decision in *Kotteakos v. United States*, 328 U.S. 750 (1948)), *cited by Apple*, 791 F.3d at 314 n.15.[5] A hub-and-spoke conspiracy with a rim (*i.e.*, a connection between spokes) is deemed "a single conspiracy" in the criminal context. *See Dickson*, 309 F.3d at 203-04; *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014).

Criminal courts have regularly found that sellers within distinct marketplaces or operations were members of a single conspiracy with other sellers in the same distinct marketplace. *See, e.g.*, *United States v. Brown*, 587 F.3d 1082, 1090 (11th Cir. 2009); *United States v. Rodriguez*, 525 F.3d 85, 102-03 (1st Cir. 2008); *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993). Unlike disaggregated sellers, sellers within a distinct marketplace often share the "conscious commitment to a common scheme" described by *Monsanto*, 465 U.S. at 764. "To function effectively, a complex . . . network must necessarily include reliable suppliers . . . as well as executives and managers." *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991) (quotation marks omitted). Sellers are linked together "by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of [the] particular . . . market." *Banks*, 10 F.3d at 1054. Moreover, sellers in a distinct marketplace have "a common goal: to [sell] and to provide a marketplace for [their sales], and an overlap of participants." *Brown*, 587 F.3d at 1090. The "'marketplace' is at the heart of [the] conspiracy because [buyers are] drawn to a location and not to a particular [seller]." *Id*. Criminal conspiracy law is thus

[5] The criminal conspiracy standard—"agree[ment] to participate in what [one] kn[o]w[s] to be a collective venture directed toward a common goal," *United States v. Maldonado-Rivera*, 922 F.3d 934, 963 (2d Cir. 1990) —is almost identical to the antitrust standard of "a conscious commitment to a common scheme," *Monsanto Co.*, 465 U.S. at 764.

clear that sellers conspire together—*i.e.*, horizontally—when they comprise a distinct marketplace.

Uber is a distinct marketplace comprised of its driver-partners. Its driver-partners share a common interest in attracting riders, with the commitment that none will compete on price. The App, which buyers (riders) visit like a marketplace, matches those buyers (riders) with sellers (drivers). FAC ¶¶ 22, 24. The Uber marketplace, and the price-fixing of the marketplace, requires the participation and agreement of driver-partners as "reliable suppliers." *Edwards*, 945 F.2d at 1393. It likewise requires the participation of "executives and managers," such as Defendant. *Id.* Together, Defendant and the driver-partners are linked by a mutual interest in "sustaining the overall enterprise of catering to the ultimate demands" of riders. *Banks*, 10 F.3d at 1054. Riders are "drawn to a location"—the Uber App—rather than any particular driver-partner. *Brown*, 587 F.3d at 1090. Without driver-partners, the marketplace would fail to meet demand and would collapse. Thus, just as in a distinct black market, driver-partners here conspire horizontally to make the Uber marketplace work.[6]

Defendant's Uber marketplace conspiracy is analogous to the conspiracy organized by Ross William Ulbricht, the creator of the black market website Silk Road. The Government alleged and proved that Ulbricht "sat atop an overarching single conspiracy, which included all vendors who sold any type of narcotics on Silk Road at any time." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 482, 490 (S.D.N.Y. 2015).[7] Judge Forrest rejected the argument that the marketplace's various sellers "at most gave rise to a multitude of discrete conspiracies, rather

[6] As driver-partners have recently explained, "No drivers, no Uber." *See* "Some Uber Drivers Planning City-Wide Post-Super Bowl Shutdown," The Gothamist (Feb. 7, 2016), at http://gothamist.com/2016/02/07/uber_drivers_planning_city-wide_pos.php.

[7] *See* Superseding Indictment at 4-7, *Ulbricht*, No. 14-cr-68 (S.D.N.Y. Aug. 21, 2014), ECF No. 52 (charging single conspiracy in count three); Verdict at 3, *Ulbricht*, No. 14-cr-68 (S.D.N.Y. Feb. 5, 2015), ECF No. 183 (returning guilty verdict on single conspiracy count).

than the enormous, anonymous, and essentially unlimited conspiracy charged." *Id.* at 481-82 (quotation marks omitted). Instead, she recognized that Ulbricht could be the "hub of the conspiracy," with "the website itself [a]s the flypaper, the stickiness that's around it," and the sellers as "spokes." Trans. at 6-7, *Ulbricht*, No. 14-cr-68 (S.D.N.Y. Dec. 17, 2014), ECF No. 145 ("Dec. 17 Trans."). Among themselves, sellers had "mutual dependence" "in terms of audience attraction." *Id.* at 20. Thus, evidence "that Silk Road operated as a marketplace" could prove a single conspiracy—*i.e.*, a horizontal conspiracy—among "all vendors who sold narcotics on Silk Road." *Ulbricht*, 79 F. Supp. 3d at 490.

The same is true for Uber: Defendant is the hub, Uber is the marketplace, and the driver-partners are a rim, bound together by their mutual dependence in attracting riders.[8] Judge Forrest explained that "if there were an automated telephone line that offered others the opportunity to gather together in narcotics trafficking by pressing '1,' this would surely be powerful evidence of the button-pusher's agreement to enter the conspiracy." *Ulbricht*, 31 F. Supp. 3d at 559. That is what Defendant concedes here: that it is "undoubtedly true" that each driver-partner accepted Uber's offer to "enter into a[n] . . . agreement, a condition of which was that the driver-partner agree to use Uber's pricing algorithm" along with all other driver-partners. Def. Mem. at 12-13.

In so doing, the driver-partners formed a classic hub-and-spoke conspiracy with a rim.

### C. DEFENDANT IGNORES THE SEPTEMBER 2014 CONSPIRACY.

Even if this Court were to reject Plaintiff's arguments above and adopt Defendant's erroneous interpretation of the Sherman Act, the complaint would still state a claim. Defendant insists that he cannot be liable absent allegations describing how "driver-partners came to an

[8] This case is more straightforward than the Silk Road case, which also involved a thorny question as to whether sellers of different wares (*e.g.*, drug dealers versus counterfeiters) formed a single rim. *See, e.g.*, Dec. 17 Trans. at 11; *Ulbricht*, 79 F. Supp. 3d at 483 n.9. Here, all driver-partners share a mutual interest in attracting riders for the same service: rides.

agreement among themselves" to fix prices. Def. Mem. at 2-3. Yet the complaint describes exactly such a scenario.

Specifically, "[i]n September 2014, Uber conspired with hundreds of drivers to negotiate an effective hike in fares that would benefit them, collectively, at the expense of their riders." FAC ¶¶ 4, 86-89. That strike arose after Uber "initially required drivers of SUVs and black cars to accept a lower fare." *Id.* ¶ 4. In an incontrovertible act of concerted action, "[d]rivers who should have been in direct competition with one another over price instead banded together to ask Uber to reverse its decision and reinstitute higher fares." *Id.* Plaintiff believes Defendant "directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares." *Id.* ¶ 87. This appears to be one of multiple examples of such blatant price-fixing.[9]

Defendant does not and cannot contest that this horizontal concerted action between driver-partners was sufficiently pled under *Twombly*. *Cf. Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 192 (2d Cir. 2012). There is no basis to dismiss this claim.[10]

## II. IN THE ALTERNATIVE, PLAINTIFF STATES A SHERMAN ACT CLAIM UNDER THE "QUICK LOOK" AND RULE OF REASON TESTS.

Even if the Court declines to apply a *per se* rule in this case, Plaintiff has still stated a plausible Sherman Act claim under either the "quick look" doctrine or the rule of reason.

### A. DEFENDANT'S PRICE-FIXING LACKS PROCOMPETITIVE JUSTIFICATION.

Defendant urges that Uber's price-fixing is "resale price maintenance" under *Leegin* and *State Oil Co. v. Khan*, 522 U.S. 3 (1997). Def. Mem. at 14, 16. As a threshold matter, this case does not involve "resale" at all. Uber is not in the transportation services business; it is a

[9] *See, e.g.*, "Uber Drivers and Others in the Gig Economy Take a Stand," N.Y. Times (Feb. 2, 2016) (describing similar negotiations in other cities).

[10] Defendant is liable for this price-fixing, regardless of how many driver-partners negotiated with him, because all drivers "adhere[d] to the fee schedules." *Goldfarb*, 421 U.S. at 778 n.6.

technology company that provides "lead generation" and "payment processing services." Def. Mem. at 4; Colman Dec., Ex. 2; FAC ¶¶ 2, 5, 23. Thus, when Defendant causes driver-partners to charge uniform fares to riders, those drivers are not "reselling" anything.

In any event, even if "resale price maintenance" were a proper analogue, Plaintiff has plainly alleged enough for a factfinder in this case to conclude that the vertical price restraint is unlawful—under the "quick look" doctrine or the rule of reason—because it imposes an unreasonable restraint on competition. *See*, *e.g.*, *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990) (restraint is unlawful when "its anticompetitive effects outweigh its procompetitive effects"). While *Leegin* opened the door to examining minimum resale price maintenance through the rule of reason, the circumstances in *Leegin* fell far short of the price-fixing scheme by Defendant here.

Indeed, Defendant's price-fixing scheme gives rise to all the evils underlying nearly one hundred years of antitrust jurisprudence condemning minimum resale price maintenance, *see Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911),[11] without any of the procompetitive effects that convinced the Supreme Court to apply the rule of reason, *see Leegin*, 551 U.S. at 889. As the Second Circuit has explained, under *Leegin*, "[v]ertical price restraints are unfit for the *per se* rule because they can be used to encourage retailers to invest in promoting a product by ensuring that other retailers will not undercut their prices for that good." *Apple*, 791 F.3d at 324. *Leegin* rested in good part on the rationale that "discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand [generated by] those services," such as "fine showrooms, . . . product demonstrations, or . . . knowledgeable employees." *Leegin*, 551 U.S. at 890-91. But no similar free-riding problem justifies

[11] Defendant reverses history when he erroneously suggests that the law has permitted vertical price-fixing "for nearly a century." Def. Mem. at 3. The opposite is true.

Defendant's price-fixing scheme. The App, not any driver-partner's car or individual marketing efforts, produces demand. Driver-partners are essentially commoditized on the Uber platform. If the price-fixing features of the App were turned off so driver-partners could compete on price, discounting driver-partners would not be able to take advantage of other driver-partners' efforts to capture demand. Instead, they simply would be able to compete on price.

Because no logical procompetitive justifications have been proffered for the price restraint at issue here, this Court need go no further in concluding under the "quick look" doctrine that Defendant's motion to dismiss fails on rule of reason grounds. *See*, *e.g.*, *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674-76 (7th Cir. 1992), *cited with approval in Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *see also Apple*, 791 F.3d at 330 (Livingston, J., writing for herself) (applying "quick look" review to relieve "plaintiff of its burden of providing a robust market analysis by shifting the inquiry directly to a consideration of the defendant's procompetitive justifications") (citations omitted).

### B. PLAINTIFF HAS PLED A PLAUSIBLE RELEVANT PRODUCT MARKET

Defendant also mistakenly contends that Plaintiff's proposed market definition "woefully fails to satisfy a rule of reason analysis." Def. Mem. at 18-20.

Yet to survive a Rule 12(b)(6) motion to dismiss, Plaintiff's alleged product market must only "bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be 'plausible.'" *Todd*, 275 F.3d at 200 (citations and quotation marks omitted). The basic test is that the "relevant market definition must encompass the realities of competition." *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994). This frequently requires "a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Techn. Servs., Inc.*, 504 U.S. 451, 482 (1992). "Because market definition is a deeply fact-intensive inquiry, courts

hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200; *see also New York Jets LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875, 2005 U.S. Dist. LEXIS 23763, *17-18 (S.D.N.Y. Oct. 17, 2005).

Here, Plaintiff has alleged a plausible and rational product market of mobile app-generated ride-share services, and a relevant geographic market of the United States.[12] Uber is the dominant force in that market with approximately 80% market share, while Lyft has less than 20%. FAC ¶¶ 94-96. "Uber's market position has already helped force Sidecar out of the marketplace." FAC ¶ 102. And, "[g]iven Uber's dominant position in the market, Kalanick's price-fixing scheme has resulted in higher prices in the market as a whole." FAC ¶ 101.

Defendant ignores the complaint in arguing that Plaintiff "offers no 'theoretically rational explanation' for defining the relevant market so narrowly," *i.e.*, encompassing all mobile app-generated ride-share services. Def. Mem. at 18 (quoting *Commercial Data Servers*, 2002 U.S. Dist. LEXIS 5600, at *11-13).[13] Yet the complaint expressly distinguishes the mobile app-generated ride-share service market from "[t]raditional taxi service," "traditional cars for hire," and "[p]ublic transportation offerings, such as subway or bus." FAC ¶¶ 104, 106, and 108. Furthermore, the complaint explains why these other offerings are not reasonable substitutes for mobile app-generated ride-share service and thus not reasonably interchangeable. These differences include the ease with which mobile app-generated ride-share consumers can order rides, the on-demand nature of the service, and the automatic payment systems. *See id.* In addition, the "heavily regulated" nature of legacy taxi service is another important distinction in

[12] Defendant does not contest the nationwide geographic market that Plaintiff alleges.

[13] The holding in *Commercial Data Servers* supports Plaintiff, not Defendant. There, the court noted that "'a pronouncement as to market definition is not one of law, but fact,'" and went on to "find that the allegation of a market limited to existing IBM customers owning 'low-end IBM mainframe S/390 computers with processing power of 10 MIPS, or less' is plausible on its face." 2002 U.S. Dist. LEXIS 5600, at *19.

analyzing the proper market definition. *Id.* ¶ 104. A more than plausible inference that follows from these allegations is that a change in price for mobile app-generated ride-share services does not affect demand for legacy taxi service or public transport. Indeed, Uber itself has expressly disavowed that it competes with taxis. *See id.* ¶ 105 ("Among other things, Uber has stated, 'It's not Uber versus taxis, we don't see them as a ride-sharing competition,'" and that Uber "is not 'in competition with taxi[s].'").

These allegations are more than sufficient. In *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007), Judge Lynch held that Lime Wire had alleged a plausible relevant product market "for the digital distribution of copyrighted music over the Internet." *Id.* at 576. The court explained:

> Lime Wire alleges sufficient facts to offer a plausible explanation of why the relevant product market should be limited to the digital distribution of copyrighted music over the internet. The FAC expressly distinguishes this market from the 'sale and distribution of physical products (i.e., records, audio cassettes and CDs),' discusses the differences between physical recordings and digital music files 'unburdened by any tangible media such as a CD,' and describes consumers' ability to arrange, place, and play digitally recorded music on their personal computers, iPods, and other hand held devices. Read broadly, these allegations provide at least a 'plausible' reason why consumers would not respond to a 'slight increase' in the prices charged by digital distributors of music by switching to physical products such as audio cassettes or CDs—i.e., that such physical products are not readily compatible with consumers' preferences and expectations regarding the portability, arrangement, and playing of music.

*Id.* (citing *Todd*, 275 F.3d at 200, 202; other internal citations omitted). The complaint includes similar allegations to support the proposed product market, with rational explanations for why traditional taxi service, or public transit, or traditional cars for hire are not "clear substitutes" for the services provided by Uber driver-partners. *See* FAC ¶¶ 104-108.

The plausibility of Plaintiff's market is highlighted by the absurdity of Defendant's proposed "market for transportation services." *See* Def. Mem. at 16. Defendant would include not only mobile app-generated ride-share service providers like Uber and Lyft, but also "legacy

taxi companies, public transit such as subway and bus travel, and private transit such as personal vehicle use and walking." *Id.* at 18. This boundless transportation market theory culminates with the conclusion that "[e]ach of these alternatives is a clear substitute for the services provided by driver-partners, rendering Plaintiff's market definition irrational." *Id.* Defendant has it backwards—Plaintiff's market definition is rational; Defendant's is not.

Markets are often more much limited than Defendant insists. Contrary to his position that "new or innovative features [cannot] lead[] to the creation of a distinct market," Def. Mem. at 19, "courts have often found that sufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J., concurring); *see also United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52-60 (D.D.C. 2011) (relevant product market consisted of digital do-it yourself tax preparation products, such as TurboTax, but not "pen and paper" tax returns or "assisted preparation" through a CPA; defendant's proposed relevant market of "all methods of tax return preparation" was overbroad).[14]

Here, Plaintiff has met his burden of defining a rational market. *See Todd*, 275 F.3d at 200. The market question "is too fact-intensive an inquiry to appropriately resolve at this stage of the proceedings" and should await "[f]urther discovery." *New York Jets LLC*, 2005 U.S. Dist. LEXIS 23763, at *17-18.

---

[14] Plaintiff's submarket of Uber car service is also plausible. Uber controls more than 80% of the mobile app-generated ride-share market, a dominant position that has already helped eliminate Sidecar as a competitor. Many consumers who use the Uber App may not view its remaining competitor, Lyft, as a reasonable substitute. An August 2015 study revealed that, while 6% of sampled smart phones had the App installed, only 1% had the Lyft App. FAC ¶ 100. These consumers may view various Uber experiences (*e.g.*, UberX and UberSUV) as reasonable substitutes for each other, as they are all available through the App, but may not consider Lyft rides a substitute. *Cf. New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 U.S. Dist. LEXIS 172918, at *97-99 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 638 (2d Cir. 2015) (single product memantine used in the treatment of Alzheimer's constituted a relevant market by itself).

### C. PLAINTIFF HAS ALLEGED ADVERSE EFFECTS.

Finally, the complaint alleges adverse effects from Defendant's pricing algorithm. These effects include decreased output. *See* FAC ¶ 110 ("Kalanick's actions have further restrained competition by decreasing output") (citing studies). They also include "higher prices in the market as a whole." FAC ¶ 101. In addition, the complaint explains that "Uber's dominant position and considerable name recognition has also made it difficult for potential competitors to enter the marketplace." *Id.* at 103. Finally, "[a]s a result of Kalanick's anticompetitive actions, competition in the market for mobile app-generated ride-share service, and the sub-market for Uber car service, has been restrained." *Id.* at 112. These allegations more than suffice to support the Sherman Act claims under the "quick look" doctrine and rule of reason.

## III. PLAINTIFF HAS STATED A VALID CLAIM UNDER THE DONNELLY ACT.

Plaintiff's Donnelly Act claims, *see* FAC ¶¶ 134–140, survive even if his Sherman Act claims fail because the Donnelly Act sweeps more broadly than the Sherman Act.

*First*, Defendant's orchestration of an App-based price-fixing conspiracy across driver-partners is unlawful under the Donnelly Act because the Act proscribes "arrangements" in restraint of trade, N.Y. Gen. Bus. Law § 340, which are not prohibited by the Sherman Act. The New York Court of Appeals in *State of New York v. Mobil Oil Corp.* recognized that the term "arrangement" under the Donnelly Act is similar to but "undoubtedly" broader than the terms "agreement" or "conspiracy"; it brings within the state statute circumstances in which there is "a reciprocal relationship of commitment between two or more legal or economic entities similar to but not embraced within the more exacting terms, 'contract', 'combination' or 'conspiracy'." 38 N.Y.2d 460, 464 (N.Y. 1976); *see also Capitaland United Soccer Club v. Capital Dist. Sports & Entm't, Inc.*, 238 A.D.2d 777, 779 (N.Y. App. Div. 1997) (an allegation of "a conspiracy or reciprocal relationship" is needed); *People v. B. P. Oil Corp.*, 80 Misc. 2d 566, 568 (N.Y. Sup.

Ct. 1975) ("the tone of the statute is broad enough to reach the unilateral exertion of power by the defendant in stifling competition among its own classes of dealers having varying purchasing arrangements"); *Eagle Spring Water Co. v. Webb & Knapp, Inc.*, 236 N.Y.S.2d 266 (N.Y. Sup. Ct. 1962) ("[t]he word 'arrangement' in the [Donnelly Act] has a broader meaning than the words 'contract', 'agreement' or 'combination'"); *Dunkel v. McDonald*, 57 N.Y.S.2d 211, 211 (N.Y. Sup. Ct. 1945) (the federal antitrust statute "is not as broad as the Donnelly Act"). Defendant's App-based price-fixing arrangement with driver-partners fits comfortably with this proscription of "arrangements" in restraint of trade.

*Second*, vertical price restraints remain *per se* unlawful under the Donnelly Act. Before *Leegin*, New York courts followed the rule of *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), and held vertical price restraints *per se* unlawful. *E.g.*, *George C. Miller Brick Co. v. Stark Ceramics, Inc.*, 2 A.D.3d 1341 (N.Y. App. Div. 2003), *explained in George C. Miller Brick Co. v. Stark Ceramics, Inc.*, 9 Misc. 3d 151, 165-67 (N.Y. Sup. Ct. 2005) (New York adheres to the *Dr. Miles* rule in Donnelly Act cases). Post-*Leegin*, the New York Court of Appeals has not undermined the viability of the *Dr. Miles* doctrine under the Donnelly Act. Thus, as a matter of New York law, the rule in *Dr. Miles* has not been overruled. *See WorldHomeCenter.Com v. KWC America, Inc.*, No. 10 Civ. 7781 (NRB), 2011 U.S. Dist. LEXIS 104496, at *8, *11 (S.D.N.Y. Sept. 15, 2011) (explaining that "[a]fter *Leegin*, it is uncertain whether New York courts evaluating vertical RPM claims brought under the Donnelly Act will continue to apply the *per se* rule or will follow *Leegin* in adopting the rule of reason" and declining to reach the question).[15] As the Office of the New York Attorney General has opined,

[15] Contrary to Defendant's argument, *see* Def. Mem. at 21, the court in *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007), did not dismiss the Donnelly Act under *Leegin*. There, the court decided only that the defendant had not demonstrated "the requisite

following *Leegin*, "minimum vertical price-fixing [remains] a per se antitrust violation that violates the Donnelly Act in and of itself, without any need for inquiry into market conditions or other circumstances." Jay L. Himes, N.Y. Attorney General Antitrust Bureau Chief, "New York's Prohibition of Vertical Price-Fixing," New York Law Journal, Jan. 29, 2008.

**IV. PLAINTIFF HAS NOT WAIVED HIS RIGHT TO BRING A CLASS ACTION.**

Defendant's class action waiver argument fails for at least three independent reasons.

*First*, the User Agreement's class action waiver is unenforceable under California law. As Defendant correctly notes, California contract law governs the User Agreement. *See* Def. Mem. at 23. California law is clear that class action waivers are unenforceable in consumer contracts such as the one between Plaintiff and Uber. *See Discover Bank v. Superior Court*, 113 P.3d 1100, 1110 (Cal. 2005), *abrogated on other grounds*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011); *see also America Online, Inc. v. Superior Court*, 108 Cal. Rptr. 2d 699, 710 (Cal. Ct. App. 2001) (holding outside the arbitration context that contractual class action waiver violates "strong California public policy" and California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*).

Nothing in the Federal Arbitration Act ("FAA") preempts California law here because Defendant is not seeking to arbitrate. *See* Def. Mem. at 22 n.10. In *Concepcion*, the Supreme Court enforced a class-arbitration waiver despite California law, reasoning that "it [is] beyond dispute that the FAA was designed to promote arbitration" and that California law "interfere[d] with arbitration." 563 U.S. at 345–46; *cf. DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015). The logic of preemption has no application here, however, because Defendant does not seek to arbitrate. Thus, California law controls; the waiver is unenforceable.

---

antitrust injury necessary to establish standing" for a price-fixing challenge, *id.* at 570; and, for that same reason, the defendant's Donnelly Act counterclaim was also dismissed, *id.* at 582.

*Second*, even if the waiver were enforceable, Defendant Kalanick could not enforce it because he is not a party to the User Agreement. Defendant concedes that, under governing California law, he cannot seek to enforce the User Agreement under the doctrine of equitable estoppel unless Plaintiff's allegations are "founded in or intimately connected with the obligations of the underlying agreement." *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 541 (Cal. Ct. App. 2009); *see* Def. Mem. at 23 (citing case quoting *Goldman*). This element requires a showing that Plaintiff's claims are "dependent upon, or inextricably bound up with, the obligations imposed by the contract." *Goldman*, 92 Cal. Rptr. 3d at 550.

Defendant's equitable estoppel argument fails because Plaintiff's price-fixing claim does not depend on any obligation in the User Agreement. Under California law, estoppel does not apply where a plaintiff "seek[s] to enforce [antitrust laws]" and "is clearly not seeking to enforce or otherwise take advantage of any portion" of the underlying contract. *UFCW & Employers Benefit Trust v. Sutter Health*, 194 Cal. Rptr. 3d 190, 206 (Cal. Ct. App. 2015); *accord In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 923 (8th Cir. 2013) (rejecting equitable estoppel argument because antitrust claims independent of underlying contract). Here, Plaintiff seeks only to enforce the Sherman Act and the Donnelly Act, not any portion of the User Agreement. Indeed, Plaintiff would have an identical cause of action even if Uber distributed its App without any user terms and conditions. Defendant's one-sided benefit narrative is thus fictional, and there is no basis for equitable estoppel.

*Third*, Defendant's waiver of arbitration also precludes him from cherry-picking the arbitration provision's class action waiver. The class waiver does not operate independently of the arbitration provision. Rather, it is woven into a single paragraph containing arbitration-specific terms in a "Dispute Resolution" section wholly devoted to arbitration. *See* User

Agreement at 9. That paragraph is further tied to the arbitration section by its severability clause, which provides that "[i]f this specific paragraph is held unenforceable, then the entirety of this 'Dispute Resolution' section will be deemed void." *Id.* Moreover, the waiver must be limited to the arbitration section; otherwise, it would absurdly forfeit Plaintiff's right to participate "in any purported class action or representative proceeding" against anyone about anything. *Id.* For these reasons, Plaintiff has not waived his right to proceed by class action.

**CONCLUSION**

For the reasons set forth above, the Court should deny Defendant's motion to dismiss or, in the alternative, should provide Plaintiff an opportunity to replead.

Dated: February 18, 2016

ANDREW SCHMIDT LAW PLLC

By: /s/ Andrew Schmidt
ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

HARTER SECREST & EMERY LLP
Brian Marc Feldman
Jeffrey A. Wadsworth
Edwin M. Larkin
A. Paul Britton
1600 Bausch & Lomb Place
Rochester, New York 14604
Telephone No. (585) 232-6500
Facsimile No. (585) 232-2152
bfeldman@hselaw.com
jwadsworth@hselaw.com
elarkin@hselaw.com
pbritton@hselaw.com

*Attorneys for Plaintiff Spencer Meyer*