# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

SPENCER MEYER, individually and on behalf of those similarly situated,

        Plaintiffs,

v.

TRAVIS KALANICK,

        Defendant.

**Case No. 1:15-cv-9796 (JSR)**

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT TRAVIS KALANICK'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

I.  Plaintiff's Horizontal Conspiracy Allegation Is Based On Perfectly Legal Vertical Conduct..1

II. Plaintiff Fails To Allege A Horizontal Agreement Among Uber Driver-Partners. ...................3

    A.  The *Interstate Circuit* Doctrine Does Not Apply. .........................................................4

    B.  Plaintiff's Allegations Regarding Uber's Pricing Are Inconsistent With A Horizontal Conspiracy....................................................................................................................6

    C.  The Uber App Does Not Create a Hub-and-Spoke Conspiracy In This Case...............7

III. Plaintiff's Sherman Act Claim Fails Under the Rule of Reason..............................................8

IV. Plaintiff Fails To State A Claim Under The Donnelly Act. ....................................................9

V.  Plaintiff Waived His Right To Bring A Class Action. ............................................................9

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................8

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ..................................................................................................9

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013) (JSR) ................................................... 2, 5, 8

*Brown v. Pro Football, Inc.*,
    518 U.S. 231 (1996) ..................................................................................................5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    42 F. Supp. 3d 231 (D. Mass. 2014) .......................................................................4

*Interstate Circuit, Inc.v. United States*
    306 U.S. 208 (1939) ............................................................................................ 4, 5

*Kramer v. Toyota Motor Corp.*,
    705 F.3d 1122 (9th Cir. 2013) ...............................................................................10

*Laumann v. Nat'l Hockey League*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ................................................................ 4, 5

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................................ 3, 9

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984) ..................................................................................................3

*People v. Tempur-Pedic Int'l, Inc.*,
    95 A.D.3d 539 (1st Div. 2012) ................................................................................9

*PepsiCo Inc. v. Coca-Cola Co.*,
    315 F. 3d 101 (2d Cir. 2002) ............................................................................. 2, 5

*Pinnacle Museum Tower Ass'n. v. Pinnacle Mkt. Dev. (US), LLC*,
    55 Cal. 4th 223 (2012)..............................................................................................9

*Toys "R" Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ............................................................................. 4, 5

*Bell Atlantic Corp. v. Twombly*,
    555 U.S. 550 (2007) ..................................................................................................3

*United States v. Apple*,
 791 F.3d 290 (2d Cir. 2015) ..................................................................................4, 6

*United States v. Colgate & Co.,*
 250 U.S. 300 (1919). ...................................................................................................2

*United States v. Eppolito*,
 543 F.3d 25 (2d Cir. 2008) .........................................................................................7

*United States v. Ulbricht,*
 31F Supp 3d 540 (S.D.N.Y. 2014)..............................................................................7

*Williams v. Citigroup Inc.*,
 659 F.3d 208 (2d Cir. 2011) .......................................................................................9

**Other Authorities**

Eric Newcomer, *Facing a Price War Uber Bets on Volume*,
 BLOOMBERG BUSINESS NEWSWEEK (01/21/2016) …………………………………...2

Federal Trade Commission (FTC), *Manufacturer-imposed Requirements*……………………….2

Noam Scheiber, *Uber Drivers and Others in the Gig Economy Take a Stand*,
 N.Y. TIMES (02/02/2016)……………………………………………………………….6

In his Opposition, Plaintiff recognizes the many benefits consumers enjoy from Uber Technologies, Inc.'s ("Uber") innovative technology. Plaintiff further recognizes that he cannot establish a horizontal conspiracy among tens of thousands of independent Uber driver-partners to fix prices. Instead, Plaintiff 's concedes that his entire First Amended Complaint ("Amended Complaint") is premised on proving a horizontal conspiracy through exclusively vertical conduct, alleging that driver-partners independently enter into an agreement with Uber and, by doing so, "relinquish all pricing responsibility to Uber." Even if this allegation were correct, nothing about such vertical agreements violates the Sherman Act or the Donnelly Act. To the contrary, this Court, the Second Circuit, New York courts, and the Supreme Court itself have all concluded that such agreements are lawful and, indeed, pro-competitive. This Court should reject Plaintiff's unprecedented and implausible second attempt to plead a horizontal conspiracy based on purely vertical conduct and dismiss the Amended Complaint with prejudice.

## I. Plaintiff's Horizontal Conspiracy Allegation Is Based On Perfectly Legal Vertical Conduct.

The entire premise of Plaintiff's Amended Complaint is an alleged horizontal agreement among tens of thousands of Uber driver-partners. Def. Opening Br. at 6-13. Yet Plaintiff's Opposition begins by effectively conceding that there is no such horizontal conspiracy. His brief opens by stating that "Uber drivers are competitors who do not compete," but only because competition is rendered "impossible" *by the Uber App*. Pl. Br. at 1. Over and over, the Opposition describes a wholly vertical arrangement whereby prices are determined by Uber in competition with app-based transportation providers like Lyft and Gett and other transportation providers, such as taxi companies and traditional car services (many of which also have apps, a fact Plaintiff ignores). Uber driver-partners "retain no direct control over the App's algorithm or resulting prices." *Id.* at 1, 4. In a fatal admission, Plaintiff states that "[i]n agreeing to use the

App, drivers relinquish *all pricing responsibility* to Uber," *id.* at 4 (emphasis added).[1]

In assessing the plausibility of a Sherman Act § 1 claim, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision, or from an agreement." *Bell Atlantic Corp. v. Twombly*, 555 U.S. 550, 556 (2007). Plaintiff dismisses *Twombly* as "irrelevant," Pl. Br. at 7, and fails to set forth any facts—required under *Twombly*—showing a horizontal agreement to set prices among driver-partners. Plaintiff instead contends there is a horizontal conspiracy though "written contracts." *Id.* But those written contracts are between Uber—who Plaintiff has pointedly not named as a defendant here—and its driver-partners, not among the driver-partners themselves. Put simply, Plaintiff cannot carry his burden to plausibly allege a horizontal agreement to fix prices among driver-partners through a written vertical contract.[2]

Indeed, the conduct Plaintiff alleges in the Amended Complaint is wholly legal. As the FTC has explained,

> If a manufacturer, on its own, adopts a policy regarding a desired level of prices, the law allows the manufacturer to deal only with retailers who agree to that policy. . . . That is, a manufacturer can implement a dealer policy on a "take it or leave it" basis.[3]

The same would be true if Uber were a car service that contracted with drivers and told them what to charge—like all car services do—and which the Supreme Court has held is neither

---

[1] The Driver Terms do provide that driver-partners have the discretion to charge less than the suggested price determined by Uber's pricing algorithm. Driver Terms ¶ 4.1. This discretion is not material to this motion because Plaintiff's Amended Complaint fails in its allegations of a horizontal agreement related to pricing, with or without discretion.

[2] *E.g.*, *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013) (JSR) (written distribution contracts irrelevant to the conspiracy alleged because terms of the contracts did not contain an agreement to restrain trade); *PepsiCo Inc. v. Coca-Cola Co.*, 315 F. 3d 101, 110 (2d Cir. 2002) (same).

[3] FTC, *Manufacturer-imposed Requirements*, available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-supply-chain/manufacturer-imposed

horizontal nor forbidden by the antitrust laws. *See United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919). On the contrary, manufacturer-imposed price requirements have been recognized as pro-competitive because they foster interbrand competition.[4] *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-90 (2007). Put simply, sustaining Plaintiff's claims would mean that each and every vertical price restriction would be per se illegal.

## II. Plaintiff Fails To Allege A Horizontal Agreement Among Driver-Partners.

Plaintiff imagines that when each of the driver-partners agrees to Uber's Driver Terms, they are also entering into a horizontal agreement *with each other*. Lacking any factual allegations to support this sprawling conspiracy, Plaintiff contends that he need not point to any evidence of an actual agreement and can instead simply plead that driver-partners have acted in parallel to prove his horizontal conspiracy. Pl. Br. at 1. Plaintiff would hold every driver-partner jointly and severally liable for treble damages that would bankrupt them based on their mere adherence to Uber's proposed terms of dealing. Am. Compl. ¶ 20.

That is not the law. It is long-settled that parallel action among competitors cannot alone support a claim of antitrust conspiracy. Courts may infer the existence of an agreement based on parallel action only when it is taken in a context that "'tends to exclude the possibility' that the alleged conspirators acted independently." *Twombly*, 555 U.S. at 586 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). Plaintiff's Amended Complaint does not exclude the possibility that driver-partners acted independently. Instead, he simply ignores the far more plausible (and true) explanation for this parallel conduct: that driver-partners act

---

[4] Indeed the price competition between Uber and one of its many competitors, Lyft, is well-documented and inures to the benefit of consumers. *Facing a Price War Uber Bets on Volume*, Bloomberg Business Week, Jan. 21, 2015, available at http://www.bloomberg.com/news/articles/2016-01-21/facing-a-price-war-uber-bets-on-volume.

3

independently because they each believe it is in their own self-interest to do so.

### A. The *Interstate Circuit* Doctrine Does Not Apply.

In his Opposition, Plaintiff largely relies on the *Interstate Circuit* doctrine, which Plaintiff contends permits him to use circumstantial evidence to infer the existence of an agreement. This argument fares no better.

*Interstate Circuit* permits a horizontal agreement to be inferred from circumstantial evidence showing that (1) a party entered a vertical agreement on the condition that its competitors do the same, and (2) that the vertical agreement was against the party's own immediate economic self-interest. *United States v. Apple*, 791 F.3d 290, 320 (2d Cir. 2015). Plaintiff has satisfied none of these requirements.

Plaintiff's "circumstantial evidence" is that no driver-partner would agree to Uber's Driver Terms unless they knew the Driver Terms bound all other driver-partners, because that is the only way they could be assured that their competitors "will not undercut them on price." Pl. Br. at 9. This is not "circumstantial evidence" at all. Indeed, under Plaintiff's theory, all vertical relationships that are attractive to contractors, distributors or franchises would be treated as a horizontal agreement among them. Despite the FTC's statements to the contrary, manufacturers would no longer be permitted to adopt a policy regarding a desired price.

Second, Plaintiff cannot show any driver-partner's willingness to agree to the Driver Terms was "contingent upon" any other driver-partner agreeing to "identical terms." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012). Instead, "the complaint simply alleges that drivers are drawn to Uber" because they know the Driver Terms are standardized. Pl. Br. at 11.[5]

---

[5] The cases cited in the Opposition all require specific allegations that the vertical agreements were actually *contingent on* competitors making the same agreement. In *Toys "R" Us v. FTC*,

4

As this Court held in *Bookhouse*, "[t]hat simply is not enough. Under *Monsanto*, it is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms." 985 F. Supp. 2d at 619.[6]

Third, the Amended Complaint does not plausibly allege, as it must, that individual driver-partners acted against their "immediate self interest" in agreeing to the Driver Terms. *Brown v. Pro Football, Inc.,* 518 U.S. 231, 242 (1996). Circumstantial evidence is probative if it shows competitors acting in the same competitively irrational manner. In *Interstate Circuit*, a group of movie distributors acceded to a requested price increase from a vertical actor, even while knowing that doing so independently posed the "risk of a substantial loss of . . . business and good will." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222 (1939); *see Toys "R" Us*, 221 F.3d at 932 (parallels acts were "against their independent economic self-interest"). The Amended Complaint itself indicates that driver-partners act in their independent self-interest by contracting with Uber in order to receive the benefits of Uber's lead generation and payment processing services. Am. Compl. ¶¶ 22-27. The Opposition goes further, stating that Uber driver-

---

the Seventh Circuit held the FTC reasonably inferred the existence of a horizontal agreement based on a series of vertical agreements because "the manufacturers were unwilling to limit sales to the clubs without assurances that their competitors would do likewise." 221 F.3d 928, 932 (7th Cir. 2000). In *Nexium*, the Court inferred the existence of a conspiracy among competitors based on written contractual provisions in "three separate [bilateral] agreements" in which "each agreed to delay its market entry on the express condition that every other . . . Defendant do the same." *In re Nexium Antitrust Litig.*, 42 F. Supp. 3d 231, 253 (D. Mass. 2014). *See also Laumann*, 907 F. Supp. 2d at 486 (inferring agreement where it is "plausible that the *terms* of the agreement between the clubs and the RSNs are contingent upon th[e] knowledge" "that all other RSNs have analogous agreements with the respective individual clubs") (emphasis added)

[6] Plaintiff's Amended Complaint contains even fewer indicia of a horizontal agreement than those the Second Circuit found insufficient in *Pepsi*. That case involved Coca-Cola's policy requiring distributors to sign "loyalty agreements" agreeing not to contract with Pepsi. Coca-Cola expressly "assured each of [its distributors] that it would uniformly enforce similar loyalty agreements with other [distributors]" and "encouraged them to report violations." 315 F. 3d at 109-110. The Second Circuit concluded Pepsi failed to state a Section 1 claim because it "failed to proffer sufficient evidence of a horizontal agreement among the [distributors]." *Id.* at 110.

partners would still use the App to access these services even if the pricing algorithm were "turned off." Pl. Br. at 17. By Plaintiff's own admission, therefore, this is far from the situation presented by the *Apple* e-books case, where the Court inferred the existence of a horizontal agreement because the vertical "contracts were *only attractive* to the Publisher Defendants to the extent they acted collectively." *Apple*, 791 F.3d at 320 (emphasis added).

Fourth, Plaintiff asserts that the App's pricing algorithm "guarantee[s] that . . . Uber drivers will not undercut [each other] on price." Am. Compl. ¶ 72. Yet Plaintiff does not dispute that the Driver Terms are non-exclusive, in that they explicitly permit driver-partners to provide transportation services independent of the Uber App. Driver Terms ¶ 2.4. Driver-partners can drive for taxi companies, for traditional car service companies (many of whom have their own app), and based on leads generated by competing app-based platforms such as Lyft and Gett.[7] Agreeing to the Driver Terms does not provide driver-partners a "built-in guarantee against [price] competition from other participating driver-partners," as Plaintiff maintains. Pl. Br. at 11. Instead, Driver-partners are free to compete on price, or any other basis, by running another company's app simultaneously or by turning off Uber's App.

### B. Plaintiff's Allegations Regarding Uber's Pricing Are Inconsistent With A Horizontal Conspiracy.

Plaintiff's theory that Mr. Kalanick orchestrated a horizontal conspiracy to raise prices to supra-competitive levels is not just implausible, it is wrong. Uber's pricing algorithm helps it compete by *reducing* prices. Plaintiff asserts that the surge pricing component of Uber's pricing algorithm leads to increased prices during periods of high demand as a mechanism for increasing

---

[7] An article cited by Plaintiff notes: "When Uber entered Dallas in 2012, many of the drivers were either independent hired-car operators or contractors for limousine companies." These drivers "had their own business . . . [and] just used Uber as a complement." *Uber Drivers and Others in the Gig Economy Take a Stand*, N.Y. Times (Feb. 2, 2016).

supply. Am. Compl. ¶¶ 52, 57-62. But these "higher prices" during high demand periods are "higher" only in comparison to Uber prices in lower demand periods. A firm raising its own prices unilaterally is not horizontal price fixing. And the fact Uber sets prices based on demand is fatal to an allegation that Uber sets a supra-competitive price through a horizontal agreement.[8]

### C. The Uber App Does Not Create a Hub-and-Spoke Conspiracy in This Case.

Plaintiff cites to the criminal law's notion of hub-and-spoke conspiracies, and to the recent case of *United States v. Ulbricht* in particular, to argue that the Uber App itself is evidence of a horizontal conspiracy between driver-partners. Pl. Br. at 12-14. Plaintiff fundamentally misunderstands criminal conspiracy law, as well as Judge Forrest's reasoning in *Ulbricht*.

For a criminal conspiracy to exist, each conspirator must agree to participate in what "he knew to be a collective venture directed towards a common goal." *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008). Plaintiff hypothesizes a "wheel" conspiracy with Mr. Kalanick as the hub, driver-partners as the spokes, and the Uber App as the rim. Pl. Br. at 14. This analogy fails because Plaintiff has pled no facts indicating that driver-partners entered into agreements *with Mr. Kalanick*. Plaintiff has not connected the spokes to the hub.

Plaintiff's argument that the Uber App provided the "rim" for the conspiracy is likewise mistaken because Plaintiff does not and cannot claim that the driver-partners' common objective in using the Uber App was to set prices. Plaintiff concedes that driver-partners use the Uber App

---

[8] For example, Plaintiff highlights Uber's September 2014 reversal of a price reduction in New York City. Pl. Br. at 15. As detailed in the Amended Complaint, Uber "initially required drivers . . . to accept a lower fare," but then backtracked when faced with a "strike" among driver-partners. But the mere possibility that driver-partners *could* strike in one city hardly supports a wide-ranging, multi-year, nation-wide conspiracy among thousands driver-partners. And there is no allegation that Uber's CEO participated in or organized this strike. To the contrary, the Amended Complaint suggests the strike was contrary to his and Uber's desire to lower prices. Simply put, it is preposterous to assert that a vertical actor "orchestrates" a horizontal price-fixing conspiracy when it faces pricing pressure from downstream actors.

for lead generation and payment processing, distinguishing this case from *Ulbricht*. 31F Supp 3d 540 (S.D.N.Y. 2014) (drug dealers using the Silk Road website had "a common aim or purpose . . . to sustain the online market place" to sell narcotics). There is simply no common purpose amongst the driver-partners here.

**III. Plaintiff's Sherman Act Claim Fails Under the Rule of Reason.**

The Amended Complaint purports to allege a single, horizontal conspiracy among driver-partners. Am. Compl. ¶ 76 ("Kalanick is the chief architect of *the* price-fixing conspiracy" that "driver-partners have joined"). It does not allege a vertical restraint in violation of the antitrust laws (and such an allegation against a new technology company would also be implausible). The allegation that Mr. Kalanick is also liable "[i]n the alternative . . . under a 'quick look' or 'rule of reason' analysis," *id.* ¶ 130, fails under any analysis because the Complaint has failed to allege a plausible horizontal agreement.

Even if the Court were to consider Plaintiff's Sherman Act claim under the rule of reason, that effort fails because Plaintiff offers no basis for his market definition rooted in the "methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand." *Bookhouse*, 985 F. Supp. 2d at 620. Rather, Plaintiff defines the relevant market as, effectively, Uber itself, in "another failed attempt to limit a product market to a single brand . . . that competes with potential substitutes." *Id.* (quotation marks and brackets omitted). He offers no plausible explanation for why taxis and other traditional car services-—not to mention the many other public and private transportation options available to consumers—are not "potential substitutes" for rides provided by Uber driver-partners. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (courts must apply "judicial experience and common sense" in assessing a claim's plausibility). Plaintiff provides no

8

explanation for his illogical position that a change in Uber's prices would not at minimum affect demand for taxis and car services, and vice versa.

Plaintiff's Sherman Act claim also fails under the rule of reason given the many acknowledged pro-competitive benefits provided by Uber's innovative technology. The Supreme Court has explicitly recognized that new market entrants like Uber may use vertical pricing arrangements to deliver innovative products and services that benefit consumers, promote competition, and reduce prices. *Leegin*, 551 U.S. at 891 ("by facilitating market entry for new firms and brands," resale price maintenance can introduce "valuable services" into the market").[9]

## IV. Plaintiff Fails To State A Claim Under The Donnelly Act.

"The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents." *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 (2d Cir. 2011). Plaintiff contends that, post-*Leegin*, New York courts continue to adhere to the rule that vertical price restraints are per se illegal, yet cites only New York cases that pre-date *Leegin*. In fact, the Appellate Division cited *Leegin* when it rejected the New York Attorney General's position that vertical price restraints are per se violations of the Donnelly Act. *People v. Tempur-Pedic Int'l, Inc.*, 95 A.D.3d 539, 540 (1st Div. 2012). Because Plaintiff's Sherman Act claim fails, so does his Donnelly Act claim.

## V. Plaintiff Waived His Right To Bring A Class Action.

Plaintiff relies on *Discover Bank v. Superior Court*—subsequently substantially abrogated by *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)—for the proposition that

---

[9] For this reason, the Amended Complaint also cannot state a claim for antitrust liability under quick-look analysis. *California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999) (If an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," quick look scrutiny does not apply).

9

class action waivers are unenforceable in all consumer contracts. *See* Pl. Br. at 23. Not so. While it remains possible post-*Concepcion* to conclude that a given class waiver is unconscionable, it is plaintiff's burden to establish unconscionability. *Pinnacle Museum Tower Ass'n. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 247 (2012). Plaintiff has not even attempted to meet his burden here. Nor could he. Class action waivers are unconscionable where "they operate to insulate a party from liability that otherwise would be imposed under *California* law." *Discover Bank*, 36 Cal.4th at 161 (emphasis added). Here, Plaintiff raises claims under federal and New York State law, not California law. Plaintiff therefore could not establish that the class action waiver in the User Terms was unconscionable.

Plaintiff's contention that Mr. Kalanick, a non-party to the User Terms, cannot enforce those terms also fails. Plaintiff claims Mr. Kalanick used the Uber App to illegally fix prices. The Amended Complaint therefore turns entirely on the Uber App and its associated terms. *See* User Terms at 1, 3 (limiting use of the App to those who agree to the terms). Because Plaintiff's "allegations of interdependent misconduct" by Mr. Kalanick were "founded in or intimately connected with the obligations of the underlying agreement," he is equitably estopped from avoiding the class waiver. *Kramer v. Toyota Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013).

Finally, the class action waiver is not dependent on the arbitration clause. It provides for waiver of "the right to a trial by jury **or** to participate as a plaintiff or class User in any purported class action or representative proceeding." User Terms at 9 (emphasis removed). Nothing here ties the class waiver to arbitration.

Dated: February 25, 2016   Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

s/ Karen L. Dunn
Karen L. Dunn

10

William A. Isaacson
Ryan Y. Park
5301 Wisconsin Ave, NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
rpark@bsfllp.com

Peter M. Skinner
575 Lexington Ave, 7th Floor
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350
pskinner@bsfllp.com

*Counsel for Defendant Travis Kalanick*