G391meya

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SPENCER MEYER, individually
     and on behalf of those
4    similarly situated,

5                   Plaintiffs,

6         v.                              15-CV-9796 (JSR)

7    TRAVIS KALANICK,

8              Defendant.                 Oral Argument

9    ------------------------------x
                                          New York, N.Y.
10                                        March 9, 2016
                                          3:38 p.m.
11
     Before:
12
                      HON. JED S. RAKOFF,
13
                                          District Judge
14
                           APPEARANCES
15
     HARTER, SECREST & EMERY LLP
16        Attorneys for Plaintiffs
     BY:  BRIAN M. FELDMAN, ESQ.
17        EDWIN M. LARKIN, III, ESQ.
          JEFFREY A. WADSWORTH, ESQ.
18
     ANDREW SCHMIDT LAW PLLC
19        Attorneys for Plaintiffs
     BY:  ANDREW A. SCHMIDT, ESQ.
20
     BOIES, SCHILLER & FLEXNER LLP
21        Attorneys for Defendant
     BY:  WILLIAM A. ISAACSON, ESQ.  PETER M. SKINNER, ESQ.
22
     UBER TECHNOLOGIES, INC.
23   BY:  LINDSEY HASWELL, ESQ., Senior Counsel
          For Defendant
24

25

G391meya

```
 1            (Case called)
 2            MR. FELDMAN:  Good afternoon, your Honor.  Brian
 3   Feldman with my colleagues Jeff Wadsworth, Andy Schmidt, and Ed
 4   Larkin, for plaintiff Spencer Meyer.
 5            THE COURT:  Good afternoon.
 6            MR. ISAACSON:  Good afternoon, your Honor.  Bill
 7   Isaacson from Boies Schiller for the defendant.
 8            MR. SKINNER:  Peter Skinner from Boies Schiller for
 9   defendant.
10            MS. HASWELL:  Good afternoon, your Honor.  Lindsey
11   Haswell from Uber Technologies, Inc., on behalf of
12   Mr. Kalanick.
13            THE COURT:  Good afternoon.
14            All right.  We're here to hear argument on the motion
15   to dismiss the first amended complaint.  Let me hear from
16   moving counsel first.
17            MR. ISAACSON:  Thank you, your Honor.
18            At this point the complaint boils down to an
19   allegation that there's a horizontal conspiracy amongst the
20   Uber driver-partners that's based on individual contracts
21   between Uber and the individual driver-partners.
22            THE COURT:  They're all the same contract, aren't
23   they?
24            MR. ISAACSON:  I don't actually know they're all
25   exactly the same, but for purposes of this motion, I think you
```

G391meya

1    can assume that they are fundamentally the same.

2            And that's self-evident in the complaint at

3    paragraphs 2, 68, and 70, which indicates that it's Uber,

4    according to the allegations of the complaint, and not the

5    driver-partners that are responsible for pricing.  The

6    opposition to the motion to dismiss makes this crystal clear,

7    saying that the Uber driver-partners have, quote, no direct

8    control over prices, the competition does not happen due to the

9    Uber app, and that Uber driver-partners, quote, relinquish all

10   pricing responsibilities to the --

11           THE COURT:  Well, as I understand the allegation --

12   correct me if I'm wrong -- the Uber drivers are agreeing to

13   what they know will, as a practical matter, make their prices

14   identical for all the Uber drivers and so they may not have a

15   choice in the sense that Uber only makes the technology

16   available on these pricing terms.  But nevertheless, they

17   know -- or at least that's what I understood the allegation to

18   be -- that they'll all be charging the same price.

19           MR. ISAACSON:  Right.  So if you insert that the

20   agreement here is between Uber and the Uber driver-partners, I

21   would agree with you that that's the allegation, as opposed to

22   an agreement between the driver-partners.  So for example, if a

23   car for hire company hires independent contractors and says,

24   for a trip to the airport, we're going to charge $50, and

25   everybody signs, and everybody who contracts with them charges

G391meya

| 1 | $50 for a trip to the airport, that is a legal, vertical |

1    $50 for a trip to the airport, that is a legal, vertical

2    relationship that does not become a horizontal conspiracy

3    amongst the drivers.  And that's what the --

4         THE COURT:  Yes, but the relationship there is a

5    little bit different because Uber only holds itself out as

6    being a facilitator of and a supplier of the programming to

7    accomplish this, so at least for many purposes, it holds itself

8    out as the headless horseman, yes?

9         MR. ISAACSON:  I don't agree with that

10   characterization, but for purposes of an antitrust claim --

11        THE COURT:  Probably they don't use horses anymore.

12        MR. ISAACSON:  So to be precise, Uber has suggested

13   prices for Uber driver-partners.  I don't think the fact of

14   whether those are suggested prices or mandatory prices are

15   relevant at the motion to dismiss stage.

16        THE COURT:  Why?  Let's assume they're mandatory.

17        MR. ISAACSON:  Because in a vertical contract, I can

18   say to a contractor, this is what you're going to charge.  That

19   is a perfect -- and otherwise I'm not going to deal with you.

20   That has been the law for over a hundred years and has been

21   increasingly resoundingly the law as we've moved into cases

22   like *Leegin* and whatnot.  That vertical relationship is

23   procompetitive because it allows a brand to compete against

24   other brands and promote new entrants.  There's absolutely no

25   authority and it would be contrary to antitrust doctrine to say

G391meya

1      that if we're going to offer an attractive service or product

2      at a certain price and if we're going to deal together, that's

3      how we're going to deal in a vertical relationship.  That does

4      not transfer into a horizontal relationship amongst the people

5      who say yes.  That's an attractive relationship that I would

6      like to buy into.  All that does is become an attractive

7      alternative for consumers, and it's not in any sense a

8      horizontal conspiracy amongst the people who agree to that

9      attraction.  If a McDonald's franchisee says, I like the

10     suggested price for the Big Mac or the mandatory price for the

11     Big Mac and McDonald's all over the nation charges their price

12     for the Big Mac, that is not a horizontal conspiracy amongst

13     the contracting franchisees.  So once you accept the allegation

14     of the complaint that this is from a contract that is vertical

15     and whether it's suggested or mandatory, you can leave it as a

16     factual issue for later, and in either respect, that is a legal

17     relationship, and it's also an implausible conspiracy, which I

18     think was the first point in our brief.  I mean, if you accept

19     that this is a horizontal conspiracy, just by virtue of the

20     fact the driver-partners say, yes, I'd like to agree to this

21     contract because this looks like a good business for me to get

22     into, then you have a conspiracy of hundreds of thousands of

23     people who have never met each other sprawled across the

24     nation, all of whom are jointly and severally liable and

25     potentially criminally liable for what is now being alleged to

G391meya

1     be a horizontal price-fixing conspiracy, and that simply cannot

2     be the case.  This is much --

3          THE COURT:  I think your second argument is the

4     stronger one than the first.  Let's take a more extreme

5     example.  Supposing someone said, please sign up to use our

6     logo, or something like that, and if you do that, we will

7     guarantee you that it will be enforced in such a way that there

8     will be no competition among all the users because as a

9     condition of using this logo, you all have to charge the exact

10    same price, and you then go ahead and sign up and you say to

11    yourself, terrific, I won't be involved in any price

12    competition as a result because I and all the other folks who

13    sign up for it are going to have exactly the same price.  Why

14    would that be implausible?  I understand the

15    horizontal/vertical aspect of that, but you're saying

16    independent of that, there is an implausibility.  Why is it

17    implausible at all?  You know that everyone who is joining this

18    is making that agreement with you.

19         MR. ISAACSON:  The reason it's implausible -- and I

20    think this flows directly from *Twombly* -- is, you are

21    describing conduct that is naturally explainable by legal

22    events.  And it's more implausible than *Twombly* because you

23    have so many different actors.  The one thing the *Twombly*

24    plaintiffs had going for them was a limited group of telephone

25    companies that they were making an accusation of.  Here, right,

7

G391meya

```
 1      they actually made an agreement amongst hundreds of thousands
 2      of people to fix prices.  That becomes much less plausible when
 3      you compare it to the natural explanation of what is happening
 4      is, we are entering into an independently advantageous business
 5      relationship, which is why we make that argument as well as the
 6      vertical argument.  I do think your Honor understands that.  In
 7      your hypothetical, you mentioned restricting competition
 8      without any actual examples of whether there was exclusionary
 9      conduct in that example, but even if there was exclusionary
10      conduct in that example, you describe the action of one actor
11      and not a horizontal conspiracy.  You would be describing a
12      Section 2 case in that example.  And here, again, this is not,
13      this is a Section 1 case requiring an agreement, and as long as
14      what their allegations are is that the agreement is between
15      Uber and the individual driver-partners --
16                THE COURT:  No, that's your second argument.
17                MR. ISAACSON:  But again, it's highly implausible and
18      I think devoid of reality to suggest that all of the --
19                THE COURT:  Don't stop there.
20                MR. ISAACSON:  Well, I'll tone down the rhetoric, but
21      you don't see anything quite like this, the idea that you would
22      have a price-fixing agreement amongst all these disparate
23      people and all these different markets all around the nation,
24      none of whom know each other -- occasionally they may go to a
25      picnic together -- and that the --
```

G391meya

```
1        THE COURT:  But only if they can get a good ride.

2        Anyway, I do understand your other argument now.  So

3   maybe it's time to hear from your adversary, unless there was

4   something else you wanted to particularly draw to my attention.

5        MR. ISAACSON:  No.  Everything else is in the briefs,

6   your Honor.

7        THE COURT:  Very good.  Thanks a lot.

8        MR. FELDMAN:  Thank you, your Honor.  Brian Feldman

9   for plaintiff.

10        Your Honor, actually the complaint pleads both a per

11   se argument and a rule of reason argument.  To start with the

12   per se, which is a horizontal agreement, we concede that Uber

13   is a new technology that allows what may not have been

14   plausible before but what very certainly is the case here,

15   which is the identical terms sent to thousands or tens of

16   thousands of drivers and agreed to, like the logo hypothetical

17   your Honor posed.

18        The best place to start to explain our theory of

19   horizontal concerted action here is actually, if I may borrow

20   from a quote, if you'll stay with me for a few lines here:

21        The effect of holding otherwise would be to create a

22   loophole in the enforcement of the antitrust laws which is

23   available in no other sort of conspiracy.  Suppose that a group

24   of laborers were mutually and financially interested in an act

25   of trespass.  Suppose that the ringleader wrote a letter to
```

G391meya

 1    each of them pointing out the nature of the general plan,

 2    offering financial inducements, and asking that each agree to

 3    assist him in the enterprise.  It could scarcely be contended

 4    that in order to make that conspiracy complete, there would

 5    have to be any further agreement between those who were hired

 6    or contracted to assist the ringleader.

 7              Your Honor, that is a quote from Justice Jackson, who

 8    was then the solicitor general, in the *Interstate Circuit*

 9    argument.  What he's explaining there is exactly what we're

10    arguing here.  His argument to the court, which was accepted,

11    is that not every horizontal conspiracy requires an express

12    agreement between horizontal competitors, and the section of

13    his brief that I read from makes the argument, which is what we

14    make, that even if the Court found, as it did, that there

15    wasn't sufficient evidence of an express agreement between the

16    film companies in *Interstate Circuit*, it could still find

17    concerted action among the horizontal players.  They were still

18    linked with each other, in Justice Jackson's words in that

19    phrase.  That's a good starting point for our horizontal

20    conspiracy because it ties together the two arguments we're

21    making in our brief and in this case.  The first is, as the

22    Supreme Court agreed --

23              THE COURT:  If it's not a horizontal conspiracy, do

24    you lose this motion?

25              MR. FELDMAN:  No, your Honor.  There's a rule of

G391meya

1    reason argument that is pled.  We actually plead rule of reason

2    in the complaint, and of course we go through all of the

3    elements of rule of reason in the complaint as well, including

4    market definition, anticompetitive harm, and adverse effects,

5    as well as the lack of any procompetitive justifications.  So

6    there is a rule of reason argument here that we've both

7    extensively briefed, and the case survives even without the

8    horizontal conspiracy.  But the horizontal conspiracy is

9    correct.  It's correct because of *Interstate Circuit*, which

10   stands for the proposition that vertical players acting

11   opportunistically in inviting horizontal competitors to form

12   the cartel that they would all naturally want to form is a

13   violation of Sherman 1.  And the second reason, also reflected

14   in the quote I read, is that there can be a conspiracy under

15   longstanding conspiracy principles between actors who must act

16   together either, in the Jackson example, in a plan that they've

17   hatched, or in the marketplace examples we talked about in our

18   brief, like in *Silk Road*, where each of their participation is

19   required in order to make the scheme work.

20          Your Honor, to start with, *Interstate Circuit* is

21   probably the easiest argument to start with because it's a

22   controlling Supreme Court precedent.  And as I say, it

23   prohibits the opportunistic behavior by vertical actors like

24   defendant Kalanick, who are simply inviting horizontal

25   competitors to form a cartel as they would naturally want to

G391meya

1    do.  The holding of *Interstate Circuit* is that there can be a

2    horizontal conspiracy in the absence of any agreement other

3    than a series of vertical agreements, just like the case here.

4    And the elements of that holding are that: (1) there was a

5    common motive to conspire; (2) each competitor was given a

6    substantially similar invitation, which was an open invitation

7    to engage in the conspiracy, and success depended on the

8    cooperation, what the court there called substantial

9    unanimity --

10           THE COURT:  I understand all that, but in going to

11   defendant's first argument, why is that plausible as opposed to

12   just the natural, these are drivers who want to get fares and

13   this is a computerized system that will place them in contact

14   with their fares expeditiously and that's a very valuable thing

15   for them?

16           MR. FELDMAN:  It's plausible; in fact, it's not merely

17   plausible.  Most of the elements of *Interstate Circuit* have

18   been conceded here, meaning the fact that they all received a

19   substantially identical invitation with price fixing as a term

20   is not in dispute in this motion, and that success depends on

21   their cooperation can't be in dispute.

22           So the question is, really, the first element, a

23   common motive to conspire, why is that plausible here?  It's

24   plausible because with the price fixing as alleged in the

25   complaint, the fares for all of the drivers are increased.

G391meya

1    This is an all boats rise situation.  What they have in common

2    is an interest in above-market prices for fares, and that is

3    the common motive.  It's no different, your Honor, than the

4    common motive in *Interstate Circuit*, where the motive there was

5    for the film companies, United Artists and Twentieth Century

6    Fox, to increase their revenue for first-run films, and they

7    all had that same interest.  They could have, absent the

8    Sherman Act, formed a cartel to do that, but they were invited

9    to do so by Interstate Circuit, and the Supreme Court held that

10   that was a conspiracy, just as if they had formed a cartel

11   themselves.

12        THE COURT:  So there you had, what, a dozen

13   corporations or so engaging in this and here you're talking

14   about thousands of drivers, yes?

15        MR. FELDMAN:  That's the genius of the defendant and

16   the company, your Honor, and the genius is taking advantage of

17   the internet technology of today in order to do essentially the

18   same thing, take a group of competitors, even though it's a

19   larger group of competitors -- the only challenge here is

20   coordination.  That's the difference between the small group

21   and the large group is there's a coordination problem.  Easier

22   to coordinate a small group of ten to get them to the same

23   agreement and to coordinate a group of ten to make sure no

24   one's cheating, but the defendant, through Uber, has figured

25   all of that out.  They have the ability to invite on their app,

G391meya

just with a swipe of the finger, each of these driver-partners
to agree to the same terms, so there's no coordination problem,
they've solved it, and there's no cheating problem that a
cartel would normally have because they've controlled, they've
taken the pricing out of the control of the individual drivers.
So if we weren't talking about this today but before the advent
of the technology, it would be implausible, but it's entirely
plausible today.  In fact, that's exactly what Uber has to
offer.  It's one of the things it has to offer.  It allows the
collective action problem of tens of thousands of drivers, if
there are that many, to be solved very simply through an
elegant app.

         THE COURT:  I should mention for the record that I
don't have the Uber app, although now we're talking about the
passenger app, but I don't have any Uber app.  I've never used
Uber.  And so I have what is always the prime requirement for
any federal judge in hearing a case, which is total ignorance.
But anyway, go ahead.

         MR. FELDMAN:  Certainly, your Honor.

         Defendant in reply concedes, on page 4 of the reply
brief, that *Interstate Circuit* applies when there are two
conditions, both of which are actually satisfied here, and
those conditions are: first, to use defendant's brief,
defendant on page 4 says, where a party enters a vertical
agreement on the condition that its competitors do the same;

G391meya

and the second element cited by defendant is that the vertical

agreement was against the party's own economic self-interest.

We don't have a disagreement there.  When those conditions both

apply, when those elements are both present, *Interstate Circuit*

should control.  And both of them are present here.  The

defendants cite the *Apple* opinion, which is helpful authority

here.  What *Apple* meant by the first element --

THE COURT:  Just going back to the question I raised a

minute ago --

MR. FELDMAN:  Sure.

THE COURT:  -- why wouldn't a driver be motivated to

use this app that puts them in such rapid contact with their

passengers, even if other drivers were charging different

rates?  I mean, supposing the app was different and it simply

said, we'll make contact between you and your prospective

passengers and you'll work out the rates individually with each

passenger, wouldn't they have the same motivation to sign up

that they have now?

MR. FELDMAN:  They very well might, your Honor.  What

would be different in that case is none of them would on their

own accept the condition that they are tied to the rates set by

Uber and set by the defendant, right?  So with the current Uber

app, as we pled in the complaint, the way it works is that

there is no competition among the drivers on the Uber platform.

All of them are guaranteed the same price for the same service.

G391meya

1   If we had a platform like another app mentioned in the

2   complaint called Sidecar, where there could be negotiations

3   between the driver and the passenger, free economics would

4   apply and they would find their own rates.  What we are arguing

5   under the *Interstate Circuit* rubric is that if we had that free

6   system as in Sidecar, where riders and drivers could reach

7   their own rates, no driver would agree that his rates would be

8   set at an artificially high rate that he could not negotiate

9   with passengers, and that's the distinction we're drawing.  And

10  that's the state in *Interstate Circuit* as well.  It was

11  certainly possible for any of those film companies to agree to

12  tie their hands and reduce their second-run films, but it

13  wasn't in anyone's interest to do that unless they had

14  substantial unanimity.

15        THE COURT:  Okay.  Anything else you wanted to raise?

16        MR. FELDMAN:  Well, your Honor, the other prong of the

17  horizontal conspiracy theory here goes back to traditional

18  common law and criminal law conspiracy, and we've cited the

19  *Silk Road* case, so even putting aside *Interstate Circuit*, which

20  should control here, under common law conspiracy, the fact that

21  this marketplace, this platform, Uber, requires each of the

22  drivers to participate for the platform to exist, renders this

23  a full single conspiracy, and we've analogized to the *Silk Road*

24  case.  I'm not sure if your Honor is familiar with it.  Okay.

25  In *Silk Road* --

G391meya

1           THE COURT:  You're talking about *United States v.*

2    *Ulbricht*?

3           MR. FELDMAN:  That's correct.

4           THE COURT:  Decided in quite a good court, the

5    Southern District of New York --

6           MR. FELDMAN:  That's right, your Honor.

7           THE COURT:  -- on January 7, 2015, and reported at

8    79 F. Supp. 3d. 486.  That's the case you're talking about?

9           MR. FELDMAN:  That's correct.

10          THE COURT:  I have no knowledge of that case at all.

11          MR. FELDMAN:  So just as in that case, the creator and

12   the mastermind of the Silk Road was found responsible, was held

13   responsible, criminally responsible there for a single

14   conspiracy that consisted of all the narcotics dealers on that

15   site, so too a defendant here has a single conspiracy that

16   includes a rim between all of the driver-partners, because if

17   he built the Uber app and no driver-partners came, he would not

18   have a platform.  It requires each driver-partner to buy into

19   the fixed-price platform, and without that there is no

20   platform.  So just as in *Silk Road*, so too here, you have a

21   conspiracy which includes a rim, a horizontal agreement, that

22   is tacit, not explicit, between all of the driver-partners.

23          Your Honor, there's one more part of the horizontal

24   conspiracy I'd like to touch on that does not get much

25   attention in defendant's brief but is important, and that is,

G391meya

even if you don't agree with us on *Interstate Circuit's*

application or traditional conspiracy common law, the complaint

alleges in paragraph 4, and later I believe in paragraph 78 --

make sure I get that right, but it explains later on about a

strike in September of 2014, and the strike in 2014 is a

horizontal concerted activity on defendant's own terms.  The

strike involved competing drivers getting together and asking

Uber, through defendant, to change the prices, to keep the

prices higher.  That is uncontestedly horizontal activity.  And

as alleged in paragraph 4, the defendant, through Uber, then

agreed to that price hike, and that completes a conspiracy

between the horizontal competitors and the vertical actor, as

in *Apple* and as in other cases.  Regardless of whether or not

Uber and defendant would have preferred a lower price or not,

they did not passively acquiesce to that but in fact reached an

agreement, as alleged in paragraph 4, to keep the rates

artificially high.  So that's a standalone conspiracy.  It's

also further evidence of what the agreement did, what the deal

is here, that these drivers do have --

          THE COURT:  I see that in paragraph 4.  Just so that

I --

          MR. FELDMAN:  I'm sorry.  I had it backwards.  Not 78.

It was 87, your Honor.  I reversed them.

          THE COURT:  All right.  Let me take a look.  Hold on.

          This was a conspiracy with Uber drivers in New York

G391meya

1    City, it says.

2              MR. FELDMAN:  That's correct, your Honor.

3              THE COURT:  How is Mr. Meyer prejudiced or injured by

4    that conspiracy?

5              MR. FELDMAN:  Mr. Meyer, as alleged in the complaint,

6    used Uber, including in the New York City area, so that's in

7    paragraph 7 of the complaint.

8              THE COURT:  I see.  Okay.

9              All right.  Go ahead.

10             MR. FELDMAN:  Turning to the vertical theory, the rule

11   of reason theory, if the Court accepts defendant's position

12   that there is no horizontal concerted activity and that this is

13   merely a vertical agreement, nevertheless the vertical

14   agreement fails the rule of reason test at least on a motion to

15   dismiss, and that's for three reasons, your Honor.  The first

16   is there is no procompetitive justification for the price

17   fixing; the second is that there are alleged adverse effects;

18   and the third is that Uber, defendant's company, had market

19   power in the relevant market.

20             To begin with the procompetitive justifications, in

21   short, this is a case that presents all the evils of *Dr. Miles*,

22   which led to the ban on price fixing in vertical agreements,

23   with none of the saving grace of the *Leegin* case, which found

24   procompetitive justifications to reverse the court's position

25   on a per se ban on vertical price fixing.  The argument made by

G391meya

```
1    defendant -- and so far as I can tell, it's the only argument
2    made by defendant -- about procompetitive justifications for
3    this price fixing, is that they are a new market entrant and
4    that is a justification for fixing prices.  The Second Circuit,
5    in United States v. Apple, for which cert was just denied last
6    week, rejected that argument, a very similar argument.  Apple
7    made the argument that the iBooks Store was great for
8    competition.  They had evidence that it lowered prices other
9    than the best sellers, and Apple pointed to that as a
10   justification for fixing the prices in vertical agreements with
11   the publishers for best sellers, and the Second Circuit rightly
12   rejected that and said two wrongs basically do not make a
13   right, and the fact that you are a new entrant in a competitive
14   field does not give you the right to fix prices.  It's not a
15   justification.  The Second Circuit called that --
16             THE COURT:  If it's a vertical conspiracy, it's a
17   conspiracy between whom and whom?
18             MR. FELDMAN:  If it's a vertical conspiracy, it's a
19   conspiracy between the defendant and each of the individual
20   driver-partners, your Honor.
21             THE COURT:  But not the individual drivers among
22   themselves.
23             MR. FELDMAN:  Certainly we argue that there is a
24   conspiracy among the drivers themselves, and that is our first
25   argument.
```

G391meya

1          THE COURT:  That's your horizontal.

2          MR. FELDMAN:  That's our horizontal argument.

3          THE COURT:  Yes.  But on the vertical, it would be a

4     one on one.

5          MR. FELDMAN:  That's correct, your Honor.

6          THE COURT:  Okay.  I just wanted to be sure I

7     understood that.

8          MR. FELDMAN:  The *Leegin* case actually provides a very

9     sharp contrast in terms of procompetitive justification.  The

10    *Leegin* case relied primarily on two justifications that were

11    procompetitive.  The first was that individual resellers made

12    their own promotional efforts in order to sell a product, and

13    the second was that there was a potential free riding problem

14    that resulted from a disparity in the promotional efforts made

15    by resellers.  As a doctrinal matter, we have no resale here,

16    and I think that's conceded, so *Leegin* and its whole construct

17    of minimum resale price maintenance should not apply.  But even

18    if it did, the procompetitive justifications don't apply.  Uber

19    itself is the one promoting the product.  Uber is always the

20    front door for a ride.  The drivers themselves are not creating

21    fine showrooms or product demonstrations, which were the

22    examples from the *Leegin* court, in order to bring in riders.

23    Uber is doing all that itself.  So there is no procompetitive

24    justification in terms of promotional investment by the

25    drivers.

G391meya

1          The second rationale in *Leegin* fails here as well.  So

2     the second rationale was there was a free riding problem, that

3     because different sellers of Brighton goods in that case took

4     two different tacks, one of which was promoting the item,

5     putting a lot of money into selling the item, and the other was

6     free riding on those sales by discounting sharply, in that case

7     there was a free riding problem.  Here there is no such free

8     riding problem, nor could there be.  Again, it's for the same

9     reason.  The Uber driver-partners all get their clients, they

10     get their customers through the Uber app.  In fact, Uber does

11     not even allow customers to choose their driver.  It's all

12     through Uber.  So the procompetitive rationales in *Leegin*,

13     which made sense there, simply don't apply here.

14          Just to return briefly, your Honor, to the horizontal

15     conspiracy, *Leegin* is not in tension with *Interstate Circuit*.

16     *Leegin*, at the end of the opinion, said, we are not addressing

17     the claims of horizontal price fixing between the Brighton

18     dealers and *Leegin*.  So as a doctrinal matter, that's not even

19     addressed by Justice Kennedy in the *Leegin* opinion.  In any

20     event, *Interstate Circuit* is not purportedly overruled by any

21     Supreme Court opinion.  The Supreme Court would tell us if they

22     were overruling a decision, as they did in *Leegin*, by

23     explaining they were overruling *Dr. Miles*.  No mention of

24     *Interstate Circuit*.  And that's because the two decisions are

25     aimed at very different problems.  *Interstate Circuit* is aimed

G391meya

1     at the field of competition where competitors have a natural

2     interest in forming a cartel.  Uber is a great example.  The

3     drivers are in a situation where all boats rise if they can

4     achieve artificially inflated prices.  Same with Apple and the

5     publishers, who wanted higher best sellers, which Judge Cote

6     called a classic collective action problem.  And so too in

7     *Interstate Circuit*, where all of the film companies wanted

8     higher commissions off of first-run films*.*

9             *Leegin* and all resale price maintenance cases that

10    follow *Leegin* present an entirely different scenario.  In those

11    cases you have disparity in services, and the competitors

12    themselves would never form a cartel, or virtually would never

13    form a cartel.  The high-end retailers aren't all going to get

14    together and decide, we're going to lock ourselves in to a high

15    price.  That doesn't do them any good.  They're still undercut

16    by the discounters.  The discounters would never agree to lock

17    themselves into a higher price, because they could not compete

18    with the high-end retailers.  So the *Leegin* case does not

19    confront the opportunism confronted by Judge Scheindlin in the

20    *Laumann v. NHL* case, the Second Circuit in *Apple*, or the

21    Supreme Court in *Interstate*, where interstate was coming in,

22    Apple was coming in, the NHL was coming in and letting

23    competitors do exactly what they dreamed of, forming a cartel

24    that benefited all of them by rising all boats and increasing

25    their revenues.

G391meya

1          To return to the vertical conspiracy, there's no

2   procompetitive justification under *Leegin*.  The Court can stop

3   there.  Under the quick look doctrine, if there are no

4   procompetitive justifications, that's enough.  But there's

5   more.  There are adverse effects alleged in the complaint, both

6   including higher prices, and that's alleged in paragraphs 89

7   and 112, and decreased output, and the complaint at

8   paragraph 110 cites studies that show that surge pricing, this

9   phenomenon where defendant's algorithm increases prices up to

10  ten times the baseline number, that surge pricing does not in

11  fact increase output but decreases output, that riders and

12  drivers actually engage in fewer transactions as a result of

13  surge pricing, so those are alleged, your Honor -- did you have

14  a question?

15          THE COURT:  Well, I was struck, and maybe it's

16  somewhere else in the complaint, but you say this is a more

17  sort of technical issue.  You say in paragraph 110, "Kalanick's

18  actions have further restrained competition by decreasing

19  output.  As independent studies have shown, the result of

20  Kalanick's collusive surge pricing is not, as he claims, to

21  perfectly match supply with demand but instead to remove some

22  demand so that prices stay artificially high and Kalanick reaps

23  artificially high profits."

24          I wonder, as a matter of pleading, without even

25  referencing what those studies are, whether that's anything

G391meya

1    more than just conclusory.  Now maybe you cite them somewhere

2    else in your complaint and I missed it?

3              MR. FELDMAN:  We do not.  It would be simple for us to

4    amend our complaint if that is a sticking point.

5              THE COURT:  Well, I'm not sure.  I doubt that that

6    will be a definitive sticking point, given all the other issues

7    that are out here, but since you were relying on it in your

8    argument right now, I do think probably it's not adequately

9    pled in its present form.

10             MR. FELDMAN:  Your Honor, I can mention a few of the

11   studies, if you'd like to hear about them.

12             THE COURT:  Well, why don't you do this.  Send me a

13   letter -- and we'll fix a time for this at the end of the

14   argument -- giving what studies you're relying on, and your

15   adversary can then respond to that letter if it wishes to.  But

16   go ahead.

17             MR. FELDMAN:  We'll do that, your Honor.

18             THE COURT:  Okay.

19             MR. FELDMAN:  So in the Second Circuit the showing of

20   adverse effects is, again, a sufficient showing to survive a

21   motion to dismiss on the rule of reason, and that's true under

22   *Capital Imaging Associates*, which we cite in our papers.

23             But there's yet another basis for this complaint to

24   survive a motion to dismiss, and that's the existence of Uber's

25   market power.  As the Second Circuit has explained, this is a

G391meya

deeply fact-intensive inquiry and usually not properly resolved

on a motion to dismiss.  Here, however, the complaint lays out

that Uber had 80 percent of the market power in the e-hailed

ride share market, and the question -- and there's not a

disagreement on this question -- about what constitutes a

reasonable substitute in that market is whether buyers would

respond to a slight increase in price by shifting to another

substitute, and the complaint alleges, goes through an

explanation for why the substitutes that the defendant cites --

taxis, car services, buses, and walking -- are not actual

substitutes in that market; that consumers would not respond to

slight increases in the Uber pricing by heading out on foot or

waiting for the bus, or even taking a taxi.

          And the taxi example is probably the one that merits

the most attention.  Taxis are regulated, which provides

different benefits, including perceived safety benefits and

attractions to consumers that is different than the ride

sharing market that is not regulated.  In addition, there are

features throughout the Uber app, like most importantly perhaps

the ability to hail a Uber driver by application, by smartphone

app, rather than going out in a snowstorm or the rain on the

street to hail a taxi; and the ability also to pay in advance,

to prearrange payment so you don't have to worry about having

anything but your smartphone when you're in an Uber ride share

car versus a taxi, where you need a credit card that's working

G391meya

1  and/or cash.  There are other features like car tracking and

2  rating systems that have not traditionally existed with the

3  taxi industry.

4  　　　　The opposition brief explains, or quotes a DC Circuit

5  opinion, *FTC v. Whole Foods,* that it's often the case that

6  sufficiently innovative retailers can constitute a distinct

7  product market even when they take consumers from existing

8  retailers, and that's an important insight here because

9  obviously Uber has been taking consumers from taxis, but that

10  does not mean they are not a distinct market.  They're a

11  distinct market because of the great attractiveness of the app

12  itself.

13  　　　　One last point on taxis, your Honor, which is that in

14  the complaint at paragraph 105, we cite Uber itself as

15  recognizing that they are not competing against taxis.  The

16  Second Circuit, in *Todd v. Exxon,* at 275 F.3d 206, explained

17  that this sort of industry recognition is well-established

18  probative value in defining the market.  The defendant, or in

19  this case Uber's, perceptions of the market are certainly

20  telling and important under Second Circuit caselaw in defining

21  the market.

22  　　　　THE COURT:  Of course, and again, this is sort of a

23  technical point, but the quote from Uber is not necessarily a

24  quote from Mr. Kalanick.

25  　　　　MR. FELDMAN:  That's correct, your Honor, which is why

G391meya

1   the argument I'm making is that industry recognition is

2   significant.  Certainly Mr. Kalanick and Uber are in the same

3   industry.  And so the industry recognition is the point I'm

4   making, or plaintiff is making.  The quote I read you was about

5   a defendant, and yes, that is not exactly true here because

6   Mr. Kalanick is the defendant, Uber is not.

7            THE COURT:  Okay.  Very good.  Thank you so much.

8            Let me hear from defense counsel on rebuttal.

9            MR. ISAACSON:  Your Honor, let me begin on the rule of

10  reason point, does this complaint survive in the absence of

11  horizontal conduct, because the answer is no.  And the

12  distinction here is between horizontal and vertical conduct and

13  per se, quick look, and rule of reason, right?  Just because

14  you utter the words "rule of reason," does not mean you have

15  alleged an illegal vertical conspiracy.  This complaint does

16  not do that.  This complaint alleges solely a horizontal

17  conspiracy.  It then says that that conspiracy is per se

18  illegal and that in the alternative it would fail under quick

19  look or rule of reason.  That's in Count One of their complaint

20  at paragraphs 127 through 130.

21            Now this complaint simply does not have a fallback

22  count where they say, okay, assuming that there is no

23  horizontal conspiracy, we will now describe to you an illegal

24  vertical relationship.  It is not in there, despite the fact

25  that they took a second crack at this.  Now there's reasons for

G391meya

1    that.  This would be an incredibly implausible complaint

2    alleging a vertical relationship against Mr. Kalanick as

3    opposed to Uber, but set that aside, in the wake of the law on

4    vertical relationships.

5            Counsel talks about how they say there's no

6    procompetitive benefits to this relationship.  Uber, the

7    technology company, comes into existence, Uber driver-partners

8    then begin to compete against taxi and other commercial driving

9    services and they take business away, according to counsel.  It

10   is by definition a new entrant in the field who counsel says is

11   competing.  That is at the heart of what is a procompetitive

12   benefit.  They would not be able to plead around that.  He says

13   there are adverse effects.  Now the relevant adverse effects

14   here would be on competition, not just things that we don't

15   happen to like on any particular day.  And this complaint is

16   devoid -- for example, surge pricing, which is alleged to be a

17   higher price in a higher demand time.  There's no restraint on

18   competition or effect on competition that is alleged from surge

19   pricing.  And I agree that the one paragraph of the complaint

20   isn't going to be the rise or fall of this, but even the

21   complaint your Honor pointed to that says this reduced output

22   says, in actuality, there's reduced demand, which is not the

23   same thing as reduced output, because reduced demand is a

24   function of consumer choice.  So if the weather is terrible and

25   there's not sufficient supply, the price goes up, supply goes

G391meya

1   up, with the higher price, but some people say:  I'm going to

2   stay home.  I don't want to pay the price.  That is not a

3   restriction on -- that's not a competitive effect if someone

4   says:  I want to stay home, instead of taking an Uber

5   driver-partner.

6           And then on the last piece, which is in the complaint

7   but inadequately, as to whether there would be a relevant

8   market, you would have to directly confront whether that has

9   been pled if you were actually handed a complaint alleging an

10  illegal vertical relationship as opposed to an illegal

11  horizontal relationship, and there, as we've said in our

12  briefs, it fails because it doesn't take into account the

13  reasonable substitute of who's competing with the Uber

14  driver-partners.  Now Uber is a technology company, right?  It

15  facilitates Uber driver-partners, who then compete and work in

16  transportation, and operate in transportation markets.  That's

17  not a remarkable statement for Uber to say we don't directly

18  compete with the taxicab drivers; it's the Uber driver-partners

19  that do.  But it's indisputable -- counsel said it -- that the

20  driver-partners have taken away business from the taxicabs.

21  Which means -- and there's no explanation of why this is a

22  different market other than the fact we have an app and it

23  works well.  Now that's an attempt to change this -- if you

24  were to write a complaint with a vertical relationship, you'd

25  be writing a single brand case.  You would be saying, this

G391meya

market is defined by the quality of apps in this market, which
makes it a better service, providing better products.  It would
be the same thing if they then sued a very high-quality car
service and said it's a great car service and that's all we
need to do for a relevant market.  A lot of the propositions,
for example, when counsel was discussing *Leegin*, are not just
antithetical to antitrust doctrines as it's developed.  These
are legitimately dangerous propositions for competition.
Counsel is actually arguing against a company coming in and
saying that, all right, we're going to work with
driver-partners in a contracting relationship and we are going
to have a suggested price or a mandatory price, however they
want to characterize it, and that's going to be the best way to
operate, for you driver-partners to operate in competition with
the other driving services that are out there, that that is
somehow forbidden by the antitrust laws.  While this isn't in
the complaint, he starts arguing, well, there's no free riding
risk here.  *Leegin* talked about, we want to promote new
entrants, we want to have single brand competition.  And now we
have Uber driver-partners who get to associate with the Uber
brand, all right, and to the extent that there are suggested
prices or mandatory prices -- which, frankly, out there in the
world people are saying lower prices, not increased prices, and
that's what the taxicab drivers had to say, but set that aside,
if you're going to have a certain price, you can do that to

G391meya

1    maintain the quality of your brand.  And that goes back to

2    *Colgate* at the beginning of this century.  They're going to

3    say, if you're going to operate with us in a vertical

4    relationship, we want to maintain the power of a brand and sell

5    a successful product.  We don't want to have a crummy car at a

6    crummy price and these sorts of things in order to build that.

7    And then you know what, another company can come in with an app

8    that says, all right, we'll let you negotiate.  You have a

9    company like Uber, a technology company, that says, all right,

10   we'll build the price into the app because people will get into

11   the car and they can say, I'm not negotiating price, this is

12   great.  In their world all companies would be required to say

13   at the beginning, We have to negotiate the price; that

14   McDonald's can't have suggested prices for any of its

15   franchisees for the Big Mac.  When you go into McDonald's, you

16   have to say, All right, here's what I'm going to pay today,

17   because that's freedom, as he describes it.  And what that

18   actually is are restraints, it's regulation and restraints in

19   competition and the opposite of freedom.  You're getting

20   freedom, as he would describe it, by disallowing complaints

21   such as this.

22          The hub and spoke conspiracy and the *Silk Road* thing

23   is even an odder analogy.  Again, we are in the world of

24   antitrust, which I'm not always able to detect from counsel's

25   argument.

G391meya

1          THE COURT:  Well, but I think the point he's making

2    there, the law of conspiracy, which of course goes back to

3    common law times, is not, in its general principles, any

4    different whether it's an antitrust conspiracy, a narcotics

5    conspiracy, or any other kind of conspiracy.  It is really a

6    subset of the law of agency and in that sense is governed by

7    the same basic concepts throughout, so I don't think the mere

8    fact that the *Silk Road*, for example, case is not in the

9    antitrust world is the end of the story.

10          MR. ISAACSON:  Well, I do think it matters because

11   here's the way conspiracy law and antitrust law does not

12   overlap, because a horizontal conspiracy to fix prices is per

13   se illegal, all right?  And a vertical relationship is not.  A

14   vertical --

15          THE COURT:  That's true, but that's a function of the

16   fact that when the Sherman Act was passed in 1890, it was

17   originally attacked in the famous case of *United States v.*

18   *Nash*, a little bit before your time -- I think it was 1910 or

19   something like that -- on the grounds that it was

20   unconstitutionally vague because what's meant by a restraint of

21   trade.  That's a pretty broad term.  And the Supreme Court, in

22   an eight-to-one decision by some guy named Oliver Wendell

23   Holmes, said, well, there are two answers to that.  One is the

24   term is a term of art because it really is a common law term

25   that carries a certain meaning developed in the common law, but

G391meya

he didn't want to stop because then it would have been frozen,
the Sherman Act, as of what the common law meant in 1890.  He
said, and the court said, However, we will leave it to the
Department of Justice and then ultimately the courts to work
out sort of rules that give more precise meaning to this
otherwise potentially vague term.  And so along came the rule
of reason, along came per se, and all those other things you're
referring to.  But it wasn't because the law of conspiracy was
being changed or given a unique meaning; it was because they
had to give more specificity to what was meant by the term
"restraint of trade."

MR. ISAACSON:  Yes.  And my point is really, counsel
is mushing together all illegal acts, so if we have a website
where all the vertical and horizontal actors are involved in
the drug trade or in the murder for hire trade, which I think
is the *Silk Road* case, you don't stand up and say, I'm not part
of that conspiracy because I'm in a vertical relationship.  In
the antitrust -- and what he's trying to do by saying this is
one conspiracy is to avoid the line of cases with *Leegin* going
back to the beginning of the century with *Colgate* that say, no,
look, vertical relationships, properly done, are innocent
behavior, and to use the analogy to the drug trade, where
everybody's involved in illegal activity and then rope them
into the conspiracy, and that's my complaint with the use of
that analogy in this case.

G391meya

1          THE COURT:  Okay.

2          MR. ISAACSON:  So finally, the *Interstate Circuit*

3    doctrine, which is being much abused here.  The doctrine

4    relates to when a horizontal agreement is facilitated by a

5    vertical actor.  For example, in *United States v. Apple*, the

6    Second Circuit affirmed Judge Cote's findings that Apple was

7    involved, the publishers, the horizontal conspirators, were

8    involved in many, many communications about price and that

9    Apple was also involved in those communications and that they

10   set up a contract that I'll explain in a minute that caused the

11   publishers to all act together.  Now that's an application of

12   *Interstate Circuit*.  It is the defining of a horizontal

13   conspiracy with lots of evidence of it and then actual

14   involvement in facilitation -- that's the word that is used by

15   the Second Circuit -- of that conspiracy by the vertical actor.

16   And here, we have a complaint devoid of any communications from

17   Mr. Kalanick, facilitating any type of conspiracy, whether it

18   be vertical or horizontal.

19          Now the two prongs, which are not being precisely laid

20   out for the Court, of *Interstate Circuit*, first, a party

21   entered a vertical agreement on the condition that its

22   competitors do the same.  Now the condition there is amongst

23   the horizontal competitors.  Counsel wants to make this, well,

24   if the actor on top makes it attractive such that everybody

25   below says, gee, that's a good idea and I can see they're doing

G391meya

1    this too, that that somehow meets the first prong of the

2    doctrine, and that's not it, because it's the horizontal

3    actors, in this case the driver-partners, who would have a

4    condition amongst themselves that we're all joining in this

5    together.  And the complaint is utterly devoid of that.

6    Instead what you have is an attractive relationship, and like I

7    said, the example is that all McDonald's franchisees would

8    potentially be involved in the conspiracy end of this.  So in

9    the *Apple* case, for example, the Second Circuit and district

10   court were concerned that the contract offered by Apple had a

11   pricing provision, an MFN, which basically amounted to, if

12   Amazon charged 9.99 for an e-book, that everybody could lower

13   the prices, and this was not what the publishers wanted or what

14   Apple wanted, according to that case.  But by having that in

15   everybody's contract, it created the incentive for the

16   publishers to move Amazon to an agency model where they weren't

17   in charge of the prices, and the decisions expressly say that

18   the contract was structured to cause the horizontal actors to

19   move another vertical actor to the agency relationship.

20   There's nothing like that here.  And the other cases that are

21   being cited by counsel all have express conditions where you

22   say, we're the horizontal actors, the driver-partners here,

23   we're all saying by agreement we're not going in unless you're

24   going in.

25            Now the second part of it is the vertical agreement,

G391meya

1    that under the *Interstate Circuit* doctrine, if the vertical

2    agreement was against the parties' own immediate economic

3    self-interest -- and here we're just getting labels -- you must

4    act together.  All the boats rise.  All he's describing is a

5    beneficial relationship.  I think this is what is missing.  He

6    says, a plan that they hatched together falls under this prong.

7    And of course that's what's utterly missing here.  There's

8    nothing in the vertical agreement that is against their own

9    economic interests; in fact, it's all in their economic

10   interests and makes perfectly normal logical and economic

11   sense, which is why you have more competition from the point of

12   view of the people who might want to get in the cars.

13          THE COURT:  All right.  That's all very helpful, and

14   I'm going to have to cut you off because I have to teach a

15   class every week at Columbia Law School on some subject called

16   class actions, so I need to go leave for that in about five

17   minutes.  I will give your adversary five minutes but no more

18   to respond.

19          MR. ISAACSON:  Can I say one thing about the strike

20   allegation?

21          THE COURT:  Yes, go ahead.

22          MR. ISAACSON:  Paragraph 87.  There's no allegation

23   that the plaintiff bought during that month -- there's no

24   specificity of any conduct by Mr. Kalanick.  There's a general

25   legal conclusion based upon information and belief, but even if

G391meya

1    you were to accept a plausible allegation like that, that that

2    allegation is plausible, that does not support the count of the

3    complaint of a price fixing conspiracy amongst all those Uber

4    drivers.  All you have is a limited group of drivers within one

5    area, for one type of car, who said, in a vertical

6    relationship, we're protesting your prices, and then in that

7    situation the company is alleged to have acceded to that.  Now

8    if that was an antitrust violation, Uber would be a victim and

9    not a participant in the conspiracy.  But all it's indicating

10   is adverse conduct by one small group of drivers,

11   driver-partners, and not the sprawling conspiracy that's being

12   described here.

13            THE COURT:  Thank you very much.

14            MR. ISAACSON:  Sorry I took more than a minute.

15            THE COURT:  I'll hear very briefly from the

16   plaintiff's counsel.

17            MR. FELDMAN:  I'll make five points as briefly as

18   possible, your Honor.

19            The first is that the complaint pleads both horizontal

20   and vertical, which defendant understood in moving --

21            THE COURT:  Well, forget what they understood.  Show

22   me, because what he just pointed out, which I had not focused

23   on previously, is, forget about what's in the first --

24            MR. FELDMAN:  Paragraph 130, your Honor.

25            THE COURT:  130.  Okay.  Let me take a look at that.

G391meya

 1          MR. FELDMAN:  Right.  So the Sherman Act claim is a

 2     single claim.  We know of no ruling --

 3          THE COURT:  "In the alternative, Kalanick is also

 4     liable under Section 1 of the Sherman Act under a quick look or

 5     a rule of reason analysis."  But that's pretty, to say the

 6     least, barebones, and while you have in paragraph 120 the

 7     standard that all the allegations are incorporated by

 8     reference, when you look at the rest of your allegations under

 9     first cause of action from 120 through 133, they all are

10     spelling out with some degree of specificity the horizontal per

11     se arrangement that you then pick up the stuff for later.  So

12     it may not be per se, but where is, in that one sentence in

13     paragraph 130, a meaningful allegation of a specified vertical

14     count?

15          MR. FELDMAN:  Your Honor, as you point out, of course

16     paragraph 120 incorporates the rest of the allegations in the

17     complaint.  Those spell out in detail a vertical agreement.  In

18     fact, defendant said the only thing they spell out is a

19     vertical agreement between the defendant and the drivers.  In

20     addition, there are portions of this complaint that are in

21     there only for support of the vertical rule of reason theory.

22     Those include paragraphs 94 through 108, which lay out a

23     market, and a market definition, which we need not do under a

24     horizontal price-fixing conspiracy; and paragraphs 109 through

25     112, which lay out the adverse effects prong of the vertical

G391meya

1  price-fixing theory.  So together the complaint very clearly

2  alleges a vertical arrangement in addition to a horizontal

3  conspiracy.  It lays it out in quite a bit of detail and then

4  lays out the other components of a typical rule of reason

5  complaint, incorporates those by reference, and then

6  specifically says in paragraph 130 that in the alternative,

7  plaintiff is pleading a rule of reason case.

8           THE COURT:  All right.  Go ahead to your other points.

9           MR. FELDMAN:  Your Honor, the second point is that

10  counsel made the argument that this is *Leegin* because it's just

11  like a manufacturer reselling something.  This is not like

12  *Leegin*.  Uber and defendant don't produce anything that is

13  resold to riders.  Uber itself, in other litigation, has used

14  the metaphor of becoming a concierge, taking people in and

15  pointing them to drivers.  Well, it's the concierge who is

16  fixing the prices between all of the drivers, and *Leegin* does

17  not apply for that reason.

18           THE COURT:  I should mention to our court reporter

19  that *Leegin* is spelled in this context L—E—E—G—I—N as opposed

20  to L—E—G—I—O—N, which you might have otherwise expected.

21           THE REPORTER:  Thank you.

22           THE COURT:  Okay.  Go ahead.

23           MR. FELDMAN:  Thank you, your Honor.  I should have

24  done that.

25           THE COURT:  That's all right.

G391meya

1          MR. FELDMAN:  Defense counsel also took a position

2    that this complaint states a dangerous proposition and in doing

3    so, defendant is ignoring *Interstate* and the facts alleged in

4    the case.  We don't contest that this could become -- defendant

5    could turn Uber into a unilateral firm, a single entity under

6    the *American Needle* rule, and, if so, certainly could set its

7    own prices.  And likewise the facts here are not the facts in

8    the hypothetical of a company selling directly to consumers and

9    taking on all the risk of doing so and then reselling to cars

10   and particular drivers.  If we had those scenarios, we probably

11   would not be here, but that's not the case.

12          THE COURT:  No, they're saying if they have to live

13   with the consequences of not portraying themselves as that kind

14   of company --

15          MR. FELDMAN:  Exactly, exactly.  The actual dangerous

16   proposition here is if we fail on this motion to dismiss and

17   the case is dismissed, it opens the door for any price fixer to

18   create an app to do that as well.  A price-fixing app, somebody

19   could come in, organize a cartel, and take a cut, and there

20   would be no principle stopping them from doing that.

21          The fourth point, your Honor, is that plaintiff is not

22   avoiding *Colgate*.  This simply isn't a *Colgate* case.  *Colgate*

23   has to do with the refusal to deal.  If Uber suggested prices

24   to its drivers and cut those off who didn't charge the price,

25   we might be in a *Colgate* scenario and the *Colgate* doctrine may

G391meya

apply, but that can't happen because Uber controls the pricing

and they've all agreed to use that pricing.  It's not a refusal

to deal case.  There's an actual conceded agreement, at least

at the vertical level.

          Finally, plaintiff is not abusing the *Interstate*

*Circuit* doctrine.  In fact, the Supreme Court was very clear in

*Interstate Circuit*, in pages 221 through 222, that they were

not deciding at the Supreme Court that there was evidence of

express horizontal agreement, as defense counsel suggests.

Those weren't the facts accepted by the Supreme Court.  In

fact, on page 221, the Supreme Court states that everyone

agreed in the case that if there had been evidence of a

horizontal agreement between the film distributors, they would

lose in the Supreme Court.  The Supreme Court on the next page

says, we don't have to assess the sufficiency of the evidence

because the legal effect -- even without the express agreement,

the legal effect of this common motive to conspire an open

invitation to all of the horizontal competitors accepted

because everybody else was accepting, the legal effect of that

was concerted action among the competitors.  That's what *Leegin*

actually means.  It does not stand for the proposition cited by

defense counsel.

          THE COURT:  All right.  Thank you very much, and thank

you to both counsel for excellent argument.  It's been a little

while since I had an antitrust case, so this is very

G391meya

1    interesting to me.  I did have an antitrust course in law

2    school, but my professor was some guy named Stephen Breyer.  I

3    don't know whatever happened to him.  But it is really

4    interesting stuff.  And so I will get you a bottom-line ruling

5    by the end of March.  I'm sure I will not be able to get you

6    the opinion.  If I grant the motion, judgment will not be

7    entered until I write the opinion.  If I deny the motion, then

8    we'll have to set new dates under an amended case management

9    plan to move forward with discovery and the like.  But either

10   way I will get you at least the bottom line by the end of

11   March.

12            Anything else anyone needs to raise today?

13            MR. FELDMAN:  Not for plaintiff, your Honor.  Thank

14   you.

15            MR. ISAACSON:  Thank you, your Honor.

16            THE COURT:  Thanks very much.

17            (Adjourned)

18

19

20

21

22

23

24

25