UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SPENCER MEYER, individually and on :
behalf of those similarly situated, :
                                    :          15 Civ. 9796
     Plaintiffs,                    :
                                    :       OPINION AND ORDER
     -v-                            :
                                    :
TRAVIS KALANICK,                    :
                                    :
     Defendant.                     :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

     On December 16, 2015, plaintiff Spencer Meyer, on behalf of

himself and those similarly situated, filed this putative

antitrust class action lawsuit against defendant Travis

Kalanick, CEO and co-founder of Uber Technologies, Inc.

("Uber"). See Complaint, Dkt. 1. Mr. Meyer's First Amended

Complaint, filed on January 29, 2016, alleged that Mr. Kalanick

had orchestrated and facilitated an illegal price-fixing

conspiracy in violation of Section 1 of the federal Sherman

Antitrust Act, 15 U.S.C. § 1, and the New York State Donnelly

Act, New York General Business Law § 340. See First Amended

Complaint ("Am. Compl."), Dkt. 26, ¶¶ 120-140. Plaintiff

claimed, in essence, that Mr. Kalanick, while disclaiming that

he was running a transportation company, had conspired with Uber

drivers to use Uber's pricing algorithm to set the prices

charged to Uber riders, thereby restricting price competition

among drivers to the detriment of Uber riders, such as plaintiff Meyer. See id. ¶¶ 1, 7.

On February 8, 2016, defendant Kalanick moved to dismiss the Amended Complaint. See Notice of Motion, Dkt. 27. Plaintiff opposed on February 18, 2016; defendant replied on February 25, 2016; and oral argument was held on March 9, 2016.[1] Having considered all of the parties' submissions and arguments, the Court hereby denies defendant's motion to dismiss.

In ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 227 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In the antitrust context, stating a claim under Section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough

---

[1] During oral argument, the Court invited both sides to submit letters regarding certain studies cited by plaintiff in the Amended Complaint. See Transcript of Proceedings dated March 9, 2016 ("Tr."), 24:12-16. These letters, respectively dated March 11, 2016 ("Pl. Letter") and March 15, 2016 ("Def. Letter"), will be docketed along with this Opinion.

fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

The relevant allegations of the Amended Complaint are as follows. Uber, founded in 2009, is a technology company that produces an application for smartphone devices ("the Uber App") that matches riders with drivers (called "driver-partners"[2]). See Am. Compl. ¶¶ 2, 21, 24, 27. Uber states that it is not a transportation company and does not employ drivers. See id. ¶¶ 2, 23. Defendant Kalanick, in addition to being the co-founder and CEO of Uber, is a driver who has used the Uber app. See id. ¶ 3. Plaintiff Meyer is a resident of Connecticut, who has used Uber car services in New York. See id. ¶ 7.

Through the Uber App, users can request private drivers to pick them up and drive them to their desired location. See id. ¶ 24. Uber facilitates payment of the fare by charging the user's credit card or other payment information on file. See id. ¶ 32. Uber collects a percentage of the fare as a software licensing fee and remits the remainder to the driver. See Am. Compl. ¶ 27. Drivers using the Uber app do not compete on price, see id. ¶ 2, and cannot negotiate fares with drivers for rides, see id. ¶ 34.

---

[2] The Court uses "drivers" and sometimes "Uber drivers" instead of Uber's term "driver-partners" for the sake of simplicity, but this usage is not meant to imply any employment relationship between Uber and these drivers, which defendant firmly denies.

Instead, drivers charge the fares set by the Uber algorithm. See id. ¶ 2. Though Uber claims to allow drivers to depart downward from the fare set by the algorithm, there is no practical mechanism by which drivers can do so. See id. ¶ 69. Uber's "surge pricing" model, designed by Mr. Kalanick, permits fares to rise up to ten times the standard fare during times of high demand. See id. ¶¶ 26, 48, 50. Plaintiff alleges that the drivers have a "common motive to conspire" because adhering to Uber's pricing algorithm can yield supra-competitive prices, Am. Compl. ¶ 90, and that if the drivers were acting independently instead of in concert, "some significant portion" would not agree to follow the Uber pricing algorithm. See id. ¶ 93.

Plaintiff further claims that the drivers "have had many opportunities to meet and enforce their commitment to the unlawful agreement." Am. Compl. ¶ 92. Plaintiff alleges that Uber holds meetings with potential drivers when Mr. Kalanick and his subordinates decide to offer Uber App services in a new geographic location. See id. ¶ 40. Uber also organizes events for its drivers to get together, such as a picnic in September 2015 in Oregon with over 150 drivers and their families in attendance, and other "partner appreciation" events in places including New York City. See id. ¶ 41. Uber provides drivers with information regarding upcoming events likely to create high demand for transportation and informs the drivers what their

4

increased earnings might have been if they had logged on to the Uber App during busy periods. See id. ¶ 58. Moreover, plaintiff alleges, in September 2014 drivers using the Uber App in New York City colluded with one another to negotiate the reinstitution of higher fares for riders using UberBLACK and UberSUV services (certain Uber car service "experiences"). See id. ¶¶ 25, 87. Mr. Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these drivers, and Uber ultimately agreed to raise fares. See id. ¶ 87.

As to market definition, plaintiff alleges that Uber competes in the "relatively new mobile app-generated ride-share service market," of which Uber has an approximately 80% market share. Amended Complaint ¶ 94-95. Uber's chief competitor in this market, Lyft, has only a 20% market share, and a third competitor, Sidecar, left the market at the end of 2015. See id. ¶¶ 95-96. Although, plaintiff contends, neither taxis nor traditional cars for hire are reasonable substitutes for mobile app-generated ride-share service, Uber's own experts have suggested that in certain cities in the U.S., Uber captures 50% to 70% of business customers in the combined market of taxis, cars for hire, and mobile-app generated ride-share services. See id. ¶ 107.

Plaintiff claims to sue on behalf of the following class: "all persons in the United States who, on one or more occasions,

have used the Uber App to obtain rides from Uber driver-partners and paid fares for their rides set by the Uber pricing algorithm," with certain exclusions, such as Mr. Kalanick. See id. ¶ 113. Plaintiff also identifies a "subclass" of riders who have paid fares based on surge pricing. See id. ¶ 114. Plaintiff alleges that he and the putative class have suffered antitrust injury because, were it not for Mr. Kalanick's conspiracy to fix the fares charged by Uber drivers, drivers would have competed on price and Uber's fares would have been "substantially lower." See id. ¶ 109. Plaintiff also contends that Mr. Kalanick's design has reduced output and that, as "independent studies have shown," the effect of surge pricing is to lower demand so that prices remain artificially high. Am. Compl. ¶ 110. Based on these allegations, plaintiff claims that Mr. Kalanick has violated the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, New York General Business Law § 340. See id. ¶¶ 120-140.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. "[A] plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities." Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc., 996 F.2d 537, 542 (2d Cir. 1993). "If a § 1 plaintiff establishes the existence of an illegal contract or

combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." Id. at 542.

"Conduct considered illegal per se is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination." Id. (internal citation and quotation marks omitted). By contrast, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).

Antitrust law also distinguishes between vertical and horizontal price restraints. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988). "Restraints that are per se unlawful include

7

horizontal agreements among competitors to fix prices," while, at least in the context of resale price maintenance, "[v]ertical price restraints are to be judged according to the rule of reason." Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 886, 907 (2007). In the instant case, the Court finds that plaintiff has adequately pled both a horizontal and a vertical conspiracy.

As to the horizontal conspiracy, plaintiff alleges that Uber drivers agree to participate in a conspiracy among themselves when they assent to the terms of Uber's written agreement (the "Driver Terms") and accept riders using the Uber App. See Am. Compl. ¶¶ 70-71. In doing so, plaintiff indicates, drivers agree to collect fares through the Uber App, which sets fares for all Uber drivers according to the Uber pricing algorithm. See id.[3] In plaintiff's view, Uber drivers forgo

---

[3] Defendant Kalanick contends that Uber's Driver Terms "do provide that driver-partners have the discretion to charge less than the suggested price determined by Uber's pricing algorithm." Reply Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Dismiss, Dkt. 34 ("Def. Reply Br.") at 2 n.1, citing Declaration of Michael Colman, Dkt. 29, Exhibit 2 ("Driver Terms") ¶ 4.1 ("Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged fare . . ."). "Customer" here refers to "an independent company in the business of providing transportation services," that is, Uber's driver-partners. See Driver Terms; Memorandum of Law in Opposition to Defendant Travis Kalanick's Motion to Dismiss ("Pl. Opp. Br.") at 4. Plaintiff points out, however, that the Driver Terms also require drivers to agree that "the Fare provided under the Fare Calculation is the only payment Customer will receive in connection with the provision of Transportation Services," Driver Terms ¶ 4.1, and that more importantly, "there is no mechanism by which drivers can charge anything but the App-dictated fare." Memorandum of Law in Opposition to Defendant Travis Kalanick's Motion to Dismiss ("Pl. Opp. Br."), Dkt. 33, at 4. For the purposes of evaluating defendant's motion to dismiss, the Court will assume that drivers have no practical mechanism by which to depart from the fares

competition in which they would otherwise have engaged because
they "are guaranteed that other Uber drivers will not undercut
them on price." See id. ¶ 72; Memorandum of Law in Opposition to
Defendant Travis Kalanick's Motion to Dismiss ("Pl. Opp. Br."),
Dkt. 33, at 11. Without the assurance that all drivers will
charge the price set by Uber, plaintiff contends, adopting
Uber's pricing algorithm would often not be in an individual
driver's best interest, since not competing with other Uber
drivers on price may result in lost business opportunities. See
Am. Compl. ¶ 72. The capacity to generate "supra-competitive
prices" through agreement to the Uber pricing algorithm thus
provides, according to plaintiff, a "common motive to conspire"
on the part of Uber drivers. See Amended Complaint ¶ 90.
Plaintiff also draws on its allegations about meetings among
Uber drivers and the "September 2014 conspiracy," in which Uber
agreed to reinstitute higher fares after negotiations with
drivers, to bolster its claim of a horizontal conspiracy. See
Pl. Opp. Br. at 14-15; Am. Compl. ¶¶ 41, 87, 92. In plaintiff's
view, defendant Kalanick is liable as the organizer of the
price-fixing conspiracy, Am. Compl. ¶¶ 76, 88; Pl. Opp. Br. at
9, and as an Uber driver himself, see id. ¶¶ 80-85.

---

set by Uber's algorithm. Defendant acknowledges that any discretion drivers
may have to charge a lower fare "is not material to this motion," Def. Reply
Br. at 2 n.1, and oral argument proceeded on the assumption that Uber sets
mandatory prices for drivers to charge. See Transcript of Oral Argument dated
March 9, 2016 at 4:12-16.

Defendant Kalanick argues, however, that the drivers'
agreement to Uber's Driver Terms evinces no horizontal agreement
among drivers themselves, as distinct from vertical agreements
between each driver and Uber. See Memorandum of Law in Support
of Defendant Travis Kalanick's Motion to Dismiss ("Def. Br."),
Dkt. 28, at 9, 12-13; Transcript of Oral Argument dated March 9,
2016 ("Tr.") 3:19-22. According to Mr. Kalanick, drivers'
individual decisions to enter into contractual arrangements with
Uber constitute mere independent action that is insufficient to
support plaintiff's claim of a conspiracy. See Def. Br. at 9.
Defendant asserts that the most "natural" explanation for
drivers' conduct is that each driver "independently decided it
was in his or her best interest to enter a vertical agreement
with Uber," and doing so could be in a driver's best interest
because, for example, Uber matches riders with drivers and
processes payment. See Def. Br. at 12-13. In defendant's view,
the fact that "a condition of [the agreement with Uber] was that
the driver-partner agree to use Uber's pricing algorithm" does
not diminish the independence of drivers' decisions. See id. at
13.

It follows, defendant contends, that such vertical
arrangements do not support a horizontal conspiracy claim. See
Def. Br at 13-14, citing, e.g., Leegin, 551 U.S. at 885
(manufacturer's agreements requiring retailers to charge certain

10

minimum prices, a form of "vertical minimum resale price maintenance," were to be judged by the rule of reason); United States v. Colgate & Co., 250 U.S. 300, 307 (1919) (a manufacturer with no purpose to create a monopoly may "exercise his own independent discretion as to parties with whom he will deal" and "announce in advance the circumstances under which he will refuse to sell").

The Court, however, is not persuaded to dismiss plaintiff's horizontal conspiracy claim. In Interstate Circuit v. United States, 306 U.S. 208 (1939), the Supreme Court held that competing movie distributors had unlawfully restrained trade when they each agreed to a theater operator's terms, including price restrictions, as indicated in a letter addressed to all the distributors. For an illegal conspiracy to exist, the Supreme Court stated:

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

Interstate Circuit, 306 U.S. at 226-27. Much more recently, the Second Circuit stated:

> [C]ourts have long recognized the existence of "hub-and-spoke" conspiracies in which an entity at one level of the market structure, the "hub," coordinates an agreement among competitors at a different level, the

11

"spokes." These arrangements consist of <u>both</u> vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.

<u>United States v. Apple, Inc.</u>, 791 F.3d 290, 314 (2d Cir. 2015),

<u>cert. denied</u>, Mar. 7, 2016 (internal citation and quotation

marks omitted); <u>see also</u> <u>Laumann v. Nat'l Hockey League</u>, 907 F.

Supp. 2d 465, 486-87 (S.D.N.Y. 2012)("where parties to vertical

agreements have knowledge that other market participants are

bound by identical agreements, and their participation is

contingent upon that knowledge, they may be considered

participants in a horizontal agreement in restraint of trade.").

    In this case, plaintiff has alleged that drivers agree with

Uber to charge certain fares with the clear understanding that

all other Uber drivers are agreeing to charge the same fares.

<u>See</u> Amended Complaint ¶¶ 70-71. These agreements are organized

and facilitated by defendant Kalanick, who as at least an

occasional Uber driver, is also a member of the horizontal

conspiracy. <u>See</u> <u>id.</u> ¶¶ 76, 84.

    On a motion to dismiss, the Court is required to draw all

reasonable inferences in plaintiff's favor. <u>See</u> <u>Town of Babylon</u>,

699 F.3d at 227. Given this standard, the Court finds that

plaintiffs have plausibly alleged a conspiracy in which drivers

sign up for Uber precisely "on the understanding that the other

[drivers] were agreeing to the same" pricing algorithm, and in which drivers' agreements with Uber would "be against their own interests were they acting independently." Apple, 791 F.3d at 314, 320. Further, drivers' ability to benefit from reduced price competition with other drivers by agreeing to Uber's Driver Terms plausibly constitutes "a common motive to conspire." Apex Oil Co. v. DiMauro, 822 F.2d 246, 254 (2d Cir. 1987). The fact that drivers may also, in signing up for Uber, seek to benefit from other services that Uber provides, such as connecting riders to drivers and processing payment, is not to the contrary. Of course, whether plaintiff's allegations are in fact accurate is a different matter, to be left to the fact-finding process.

The Court's conclusion that plaintiff has alleged a plausible horizontal conspiracy is bolstered by plaintiff's other allegations concerning agreement among drivers. Plaintiff, as noted supra, contends that Uber organizes events for drivers to get together, see Am. Compl. ¶ 41, and, more importantly, that Mr. Kalanick agreed to raise fares following drivers' efforts to negotiate higher rates in September 2014. See id. ¶ 87.[4] While it is true that these allegations about agreements

---

[4] Though defendant's counsel argued at oral argument that if these events were "an antitrust violation, Mr. Kalanick would be a victim and not a participant in the conspiracy," since he allegedly initially opposed the higher rates, Tr. 37:8-9, the fact remains that, if plaintiff's allegations are taken as

among drivers reaching even beyond acceptance of Uber's Driver
Terms are not extensive, see Def. Reply Br. at 7 n.8,
nonetheless, they provide additional support for a horizontal
conspiracy, and plaintiff need not present a direct, "smoking
gun" evidence of a conspiracy, particularly at the pleading
stage. Mayor & City Council of Baltimore, Md. v. Citigroup,
Inc., 709 F.3d 129, 136 (2d Cir. 2013).

More basically, it is well to remember that a Sherman Act
conspiracy is but one form of conspiracy, a concept that is as
ancient as it is broad. It is fundamental to the law of
conspiracy that the agreements that form the essence of the
misconduct are not to be judged by technical niceties but by
practical realities. Sophisticated conspirators often reach
their agreements as much by the wink and the nod as by explicit
agreement, and the implicit agreement may be far more potent,
and sinister, just by virtue of being implicit. Recently, for
example, in United States v. Ulbricht, the Government alleged
that defendant Ulbricht had organized an online marketplace for
illicit goods and services called Silk Road. See United States
v. Ulbricht, 31 F. Supp. 3d 540, 546-47 (S.D.N.Y. 2014). In
ruling on motions in limine in Ulbricht, Judge Forrest rejected
the defense's argument that transactions among Silk Road's users

---

true, Mr. Kalanick agreed to a fare raise that set higher fares for all Uber
drivers in the relevant groups.

gave rise to "only buy-sell relationships and not conspiratorial behavior" or, at most, to "a multitude of discrete conspiracies." United States v. Ulbricht, 79 F. Supp. 3d 466, 481 (S.D.N.Y. 2015). Instead, Judge Forrest noted that the Government charged the defendant with sitting "atop an overarching single conspiracy, which included all vendors who sold any type of narcotics on Silk Road at any time." Id. at 490. In the instant case, Uber's digitally decentralized nature does not prevent the App from constituting a "marketplace" through which Mr. Kalanick organized a horizontal conspiracy among drivers.

Defendant argues, however, that plaintiff's alleged conspiracy is "wildly implausible" and "physically impossible," since it involves agreement "among hundreds of thousands of independent transportation providers all across the United States." Def. Br. at 1. Yet as plaintiff's counsel pointed out at oral argument, the capacity to orchestrate such an agreement is the "genius" of Mr. Kalanick and his company, which, through the magic of smartphone technology, can invite hundreds of thousands of drivers in far-flung locations to agree to Uber's terms. See Tr. 12:15-16. The advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind. Cf. Ulbricht, 31 F. Supp. 3d at 559 ("if there were an automated telephone line that

15

offered others the opportunity to gather together to engage in narcotics trafficking by pressing "1," this would surely be powerful evidence of the button-pusher's agreement to enter the conspiracy. Automation is effected through a human design; here, Ulbricht is alleged to have been the designer of Silk Road . . ."). The fact that Uber goes to such lengths to portray itself – one might even say disguise itself – as the mere purveyor of an "app" cannot shield it from the consequences of its operating as much more.

Recent jurisprudence on vertical resale price maintenance agreements does not, as defendant would have it, undermine plaintiff's claim of an illegal horizontal agreement. See Def. Br. at 15. In Leegin, the Supreme Court held that resale price maintenance agreements – e.g., a retailer's agreement with a manufacturer not to discount the manufacturer's goods beneath a certain price - are to be judged by the rule of reason, unlike horizontal agreements to fix prices, which are per se illegal. See Leegin, 551 U.S. at 886, 907. The Court cited various "procompetitive justifications for a manufacturer's use of resale price maintenance," id. at 889, and concluded that although this practice may also have anticompetitive effects, the rule of reason is the best approach to distinguishing resale price maintenance agreements that violate the antitrust laws from those that do not. See id. at 897-900.

16

Here, unlike in Leegin, Uber is not selling anything to drivers that is then resold to riders.[5] Moreover, the justifications for rule of reason treatment of resale price maintenance agreements offered in Leegin are not directly applicable to the instant case. See Pl. Opp. Br. at 15-16; Tr. 20-21. In particular, the Court's attention has not been drawn to concerns about free-riding Uber drivers, or to efforts that Uber drivers could make to promote the App that will be under-provided if Uber does not set a pricing algorithm. See Leegin, 551 U.S. at 890-91. While Mr. Kalanick asserts that Uber's pricing algorithm facilitates its market entry as a new brand, see Def. Br. at 16-17, this observation – which is fairly conclusory – does not rule out a horizontal conspiracy among Uber drivers, facilitated by Mr. Kalanick both as Uber's CEO and as a driver himself. The Court therefore finds that plaintiff has adequately pleaded a horizontal antitrust conspiracy under Section 1 of the Sherman Act.

As to plaintiff's claim of a vertical conspiracy, a threshold question is whether plaintiff has alleged a vertical

---

[5] Leegin's statement that "[t]o the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason," 551 U.S. at 893, thus does not clearly apply to the instant case, since Uber is setting no minimum resale prices. Moreover, Leegin did not purport to overrule Interstate Circuit, which, for the reasons described supra, permits a finding of a conspiracy among competitors in circumstances such as those of the instant case. See Interstate Circuit, 306 U.S. at 226-27.

17

conspiracy in the Amended Complaint, which defendant denies. See Def. Reply Br. at 8; Def. Letter at 1. Although plaintiff's allegations of a vertical conspiracy are much more sparse than his contentions about a horizontal conspiracy, the Court finds that the Amended Complaint adequately pleads a vertical conspiracy between each driver and Mr. Kalanick.[6] In particular, plaintiff alleges that "[a]ll of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm," Am. Compl. ¶ 68, and that Mr. Kalanick designed this business model, see id. ¶¶ 76, 78. The Amended Complaint also includes several allegations that would be pertinent to a rule of reason, vertical price-fixing theory. See id. ¶¶ 94-108. Under the Sherman Act count, plaintiff states that the "unlawful arrangement consists of a series of agreements between Kalanick and each of the Uber driver-partners, as well as a conscious commitment among the Uber driver-partners to the common scheme of adopting the Uber pricing algorithm . . ." Am. Compl. ¶ 124. Plaintiff claims that Mr. Kalanick is per se liable as organizer of the conspiracy and as an occasional Uber driver, ¶¶ 128-29, and then states that "[i]n the alternative, Kalanick is also liable under Section 1 of the Sherman Act under a 'quick look'

---

[6] Indeed, defendant himself referred in the briefing to "a vertical price arrangement like that described in the Amended Complaint." Def. Br. at 17. But see Def. Reply Br. at 8 ("The Amended Complaint . . . does not allege a vertical restraint in violation of the antitrust laws.").

or 'rule of reason' analysis." Id. ¶ 130. In the Court's view, these allegations of legal theory, when coupled with the allegations of pertinent facts, are sufficient to plead a vertical conspiracy theory.

The question, then, is whether this theory is plausible under a "rule of reason" analysis. Under this analysis, "plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." Capital Imaging, 996 F.2d at 543. "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes — analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (internal citation and quotation marks omitted).

As to market definition, plaintiff defines the relevant market as the "mobile app-generated ride-share service market." Am. Compl. ¶ 94. Plaintiff alleges that Uber has an approximately 80% market share in the United States in this market; Uber's chief competitor Lyft has nearly a 20% market share; and a third competitor, Sidecar, left the market at the end of 2015. Id. ¶¶ 95-97. Plaintiff then explains that traditional taxi service is not a reasonable substitute for

Uber, since, for example, rides generated by a mobile app can be arranged at the push of a button and tracked on riders' mobile phones; riders need not carry cash or a credit card, or, upon arrival, spend time paying for the ride; and riders can rate drivers and see some information on them before entering the vehicle. Id. ¶ 104. Indeed, plaintiff claims, Uber has itself stated that it does not view taxis as ride-sharing competition. Id. ¶ 105.

Plaintiff also alleges that traditional cars for hire are not reasonable substitutes, since they generally need to be scheduled in advance for prearranged locations. Id. ¶ 106. However, plaintiff nevertheless contends that "Uber has obtained a significant share of business in the combined markets of taxis, cars for hire, and mobile-app generated ride-share services," and that Uber's own experts have suggested that in some U.S. cities, Uber has 50% to 70% of business customers "among all types of rides," which seems to refer to these combined markets. Id. ¶ 107.

Defendant contests plaintiff's proposed market definition, arguing that plaintiff provides inadequate justification for the exclusion not just of taxis and car services, but also of public transit such as subways and buses, personal vehicle use, and walking. See Def. Br. at 18; Def. Reply Br. at 8. In defendant's

view, "[e]ach of these alternatives is a clear substitute for the services provided by driver-partners." Def. Br. at 18.

One could argue this either way (and defendant's attorneys are encouraged to hereinafter walk from their offices to the courthouse to put their theory to the test). But for present purposes, plaintiff has provided plausible explanations for its proposed market definition, and the accuracy of these explanations may be tested through discovery and, if necessary, trial. "Market definition is a deeply fact-intensive inquiry [and] courts [therefore] hesitate to grant motions to dismiss for failure to plead a relevant product market." Chapman v. New York State Div. for Youth, 546 F.3d 230, 238. Plaintiff's allegation that Uber – an industry member – recognizes that it does not compete with taxis, see Am. Compl. ¶ 105, also deserves consideration. See Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001) (declining to exclude evidence of industry recognition from the analysis of market definition). The Court finds that plaintiff has pleaded a plausible relevant product market. See Capital Imaging Associates, 996 F.2d at 546.

The Court further finds that plaintiff has adequately pleaded adverse effects in the relevant market. Specifically, plaintiff pleads that "Kalanick's actions have further restrained competition by decreasing output," Am. Compl. ¶ 110 (citing "independent studies"); "Uber's market position has

21

already helped force Sidecar out of the marketplace," id. ¶ 102;

"Uber's dominant position and considerable name recognition has

also made it difficult for potential competitors to enter the

marketplace," id. ¶ 103.[7]

Defendant counters that Uber provides many pro-competitive

benefits, see Def. Reply Br. at 9, and also disputes the

conclusions that plaintiff purports to draw from the cited

studies. See Def. Letter. Defendant's counter-assertions, while

certainly well worth a fact-finder's consideration, do not

persuade the Court to grant a motion to dismiss. The Court hence

determines that plaintiff has plausibly pleaded adverse effects

in the relevant market. Consequently, the Court finds that

plaintiff has presented a plausible claim of a vertical

conspiracy under Section 1 of the Sherman Act.

Finally, the Court addresses plaintiff's state law Donnelly

Act claim. The Second Circuit has held that this New York

antitrust statute "was modeled on the Sherman Act and has

generally been construed in accordance with federal precedents."

Williams v. Citigroup Inc., 659 F.3d 208, 211 n.2 (2d Cir.

2011). Though plaintiff contends that his Donnelly Act claim

survives even if his Sherman Act claim fails, see Pl. Opp. Br.

at 21, the Court has no occasion to assess this contention, for

---

[7] In plaintiff's letter submitted after oral argument, plaintiff further
described the "independent studies" quoted anonymously in Amended Complaint ¶
110 that supposedly support these assertions. See Pl. Letter.

it holds that plaintiff's Sherman Act claim withstands defendant's motion to dismiss and, for the same reasons, the Court declines to dismiss plaintiff's Donnelly Act claim.[8]

For these reasons, the Court denies defendant Kalanick's motion to dismiss. Concomitantly, the Court lifts the stay of discovery previously imposed pending the Court's decision on this motion. Counsel are directed to submit to the Court, by no later than April 7, 2016, a case management plan in the Court's Form D that will have this case ready for trial by November 1, 2016.

The Clerk of Court is directed to close docket entries 22 and 27.

Dated:     New York, NY
           March 31, 2016                    JED S. RAKOFF, U.S.D.J.

---

[8] Defendant argues that plaintiff is equitably estopped from avoiding the class action waiver in the user agreement that plaintiff made with Uber. See Def. Br. at 21; Colman Declaration, Dkt. 29, Exhibit 1 (User Agreement), at 8-9. The relevant provision of the User Agreement reads:

> Dispute Resolution: You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement . . . will be settled by binding arbitration . . . You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.

User Agreement at 8-9. Although plaintiff has sued Mr. Kalanick personally and not Uber, defendant claims that plaintiff's claims against Mr. Kalanick are "intimately founded in and intertwined with" the underlying agreement with Uber. See Def. Br. at 23, quoting Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1128 (9th Cir. 2013). The Court finds, however, that since defendant is not seeking to compel arbitration, and plaintiff is not seeking to enforce the User Agreement against defendant, plaintiff is not equitably estopped from pursuing a class action suit against Mr. Kalanick, nor has plaintiff waived the right to proceed through this mechanism.



### Harter Secrest & Emery LLP

ATTORNEYS AND COUNSELORS

WWW.HSELAW.COM

March 11, 2016

**BY ELECTRONIC MAIL**
Hon. Jed S. Rakoff
United States District Judge
United States Courthouse
500 Pearl Street, Room 1340
New York, New York 10007

  Re: Meyer v. Kalanick, 15 Civ. 9796 (JSR)

Dear Judge Rakoff:

  We write in response to the Court's request that Plaintiff identify the studies referenced in Paragraph 110 of the First Amended Complaint. That paragraph alleges that Defendant's "actions have further restrained competition by decreasing output," and that "independent studies have shown [that] the result of Kalanick's collusive surge pricing is not, as he claims, to perfectly match supply with demand, but instead to remove some demand so that prices stay artificially high and Kalanick reaps artificially high profits." This letter cites two independent studies supporting these allegations.

  The first is a Northeastern University study by researchers Le Chen, Alan Mislove, and Christo Wilson, published in October 2015 (the "Northeastern University Study"). *See* L. Chen, A. Mislove, & C. Wilson, Peeking Beneath the Hood of Uber, October 2015, *available at* http://www.ccs.neu.edu/home/cbw/pdf/chen-imc15.pdf (last visited Mar. 10, 2016). The Northeastern University Study concluded that surge pricing "seem[s] to have a small effect on attracting new cars," but "appears to have a larger, negative effect on demand, which causes cars to either become idle or leave the surge area." *Id.* at 12. Significantly, although the study used the term "demand," it actually measured output, defining "demand" as "fulfilled demand," *i.e.*, the number of rides supplied by Uber driver-partners. *Id.* at 4. That is the equivalent of output. *See, e.g., General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (Posner, J.) (equating "amount supplied" to "output"). Thus, the study concluded that surge pricing had "a large, negative effect" on "demand," *see* Northeastern University Study at 12, by measuring a large, negative effect on output.

  The second study supporting the allegations in paragraph 110 was conducted by Nicholas Diakopoulos of the University of Maryland (the "University of Maryland Study"). *See* N. Diakopoulos, "How Uber surge pricing really works," Washington Post, *available at*

Harter Secrest & Emery LLP
ATTORNEYS AND COUNSELORS

Hon. Jed S. Rakoff
March 11, 2016
Page 2


https://www.washingtonpost.com/news/wonk/wp/2015/04/17/how-uber-surge-pricing-really-works/ (last visited Mar. 10, 2016). The University of Maryland Study suggested "that rather than motivating a fresh supply of drivers, surge pricing instead re-distributes drivers already on the road." *Id.* "[I]t appears that rather than getting more drivers on the road in the short-term, Uber's surge pricing instead depletes drivers in adjacent areas. A price hike in one area means drivers move there, but away from another, leaving it underserved…. At the end of the day the Uber systems appears to be more about *re-allocation* of existing supply." *Id.*

These studies support the allegation in paragraph 110 that Defendant's actions, including his implementation of an agreement among all driver-partner competitors to surge prices, have decreased output. In particular, these studies suggest that drivers' commitments to Defendants' surge pricing have artificially lowered output during periods of high demand by decreasing output—either by decreasing output in absolute terms (*i.e.*, decreasing the number of fulfilled sales), *see* Northeastern University Study at 12, or by decreasing output in relative terms (*i.e.*, preventing supply from increasing as expected during periods of heightened demand), *see* University of Maryland Study.

Paragraph 110 of the First Amended Complaint thus alleges that Defendant has orchestrated a surge pricing conspiracy among competing drivers to maintain "prices artificially high and . . . reap[] artificially high profits." First Amended Complaint ¶ 110. That conclusion reflects the economic reality that price-fixing agreements, like the one orchestrated by Defendant, are the equivalent to restrictions on output: "If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus . . . raising price [and] reducing output . . . have the same anticompetitive effects." *General Leaseways, Inc.*, 744 F.2d at 594-95.

Thank you for your consideration of this submission. If Plaintiff can provide any further assistance to the Court, please do not hesitate to contact us.

Respectfully submitted,

Harter Secrest & Emery LLP

/s/ Brian M. Feldman

Brian M. Feldman
DIRECT DIAL  585 231 1201
EMAIL  BFELDMAN@HSELAW.COM


cc:    Peter M. Skinner (via electronic mail)
       *Lead Counsel for Defendant*

# B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

5301   Wisconsin   Avenue   N.W.   *   Washington,   DC   20015-2015   *   PH  202.237.2727   *   FAX  202.237.6131

**VIA E-MAIL**                                                                                  March 15, 2016

Hon. Jed. S. Rakoff
500 Pearl Street, Room 1340
New York, NY 10007

      Re:   *Meyer v. Kalanick*, 15 Civ. 9796 (JSR)

Dear Judge Rakoff:

We write in response to Plaintiff's letter brief dated March 11, 2016, in which Plaintiff purports to identify the "studies" he relies on for his allegation that surge pricing "restrain[s] competition by decreasing output." Am. Compl. ¶ 110.

As an initial matter, even if Plaintiff is correct about these "studies," he has still failed to state a claim for a vertical restraint in violation of the rule of reason. As we noted at oral argument, the Amended Complaint alleges only a horizontal price-fixing conspiracy *among driver-partners* in which Mr. Kalanick allegedly participated. *Id.* ¶ 126 (alleging a single claim under the Sherman Act based on "a conspiracy, combination, or agreement between all driver-partners to charge the same price"). The Amended Complaint nowhere contains a claim based on a *vertical* restraint in violation of the rule of reason (or the quick look doctrine). Plaintiff's allegations of a horizontal conspiracy, whether examined under per se, quick look or the rule of reason, fail because the Amended Complaint describes an implausible horizontal agreement based exclusively on legal vertical conduct in which individual driver-partners agree with Uber to the Driver Terms. *Id.* ¶ 38. Any allegations that Plaintiff now relies on to argue for a claim of a vertical restraint in violation of the rule of reason are irrelevant because the Complaint does not make such a claim.

Notwithstanding this threshold pleading defect, Plaintiff's self-styled "studies" in fact disprove the very proposition he cites them for: that surge pricing reduces output. The Chen Paper—which has never been accepted for publication in any academic journal (or non-academic journal for that matter)—finds that surge pricing operates only "during times of strained supply" and modestly expands the supply of driver-partners in the short-term by providing an immediate financial incentive to offer rides. Chen Paper at 10-11. The Diakopoulos Blog Post—which was written by a journalism professor and was not subjected to any peer review—concludes that surge pricing, in the short term, reallocates supply from low demand areas to high demand areas—meaning it increases efficiency at no cost to output. More broadly, Diakopoulos observes that surge pricing greatly expands supply in the *long-term*: "The benefit of surge pricing on overall driver supply . . . appears to stem from the long term effects of communicating to drivers when they should in general get on the road for . . . periods of expected high demand." *See* Am. Compl. ¶ 58 (Uber informs drivers of "recent busy periods" and expected periods of high future demand). To expand supply when supply is strained expands output—it does not "decrease" it, as Plaintiff alleges. *See United Air Lines, Inc. v. C.A.B.*, 766 F.2d 1107, 1115 (7th Cir. 1985) (Posner, J.).[1]

The "studies" also squarely refute Plaintiff's allegation in Paragraph 110 that surge pricing is used to maintain "artificially high" prices beyond that necessary to equalize supply and demand. The Chen Paper finds that "the vast majority of surges are short-lived" (less than 10 minutes) and that surge pricing occurs only when supply is constrained. Chen Paper at 10. They further show that, contrary to Plaintiff's allegation, surge pricing is rarely applied and is eliminated as soon as supply and demand equalize. *See id.* at 8 (in New York

---

[1]   The Chen Study finds that surge pricing correlates with low numbers of fulfilled rides, and somehow concludes that surge pricing is *causing* low output. But in acknowledging that surge pricing only arises when supply is constrained, the Chen Study itself proves that low output drives surge pricing rather than the other way around. For example, when a Yankees game concludes, demand may outstrip supply in the Bronx, leading both to fewer fulfilled rides and to surge pricing taking effect. But in no way could surge pricing be deemed the cause of the low output.

City, surge pricing is in effect only 14% of the time); Diakopoulos Blog Post (surge "prices tend to tick down in bigger steps than they move up" and "change every three or five minutes," which is "great for riders").

Even if surge pricing reduced output, which it does not, Plaintiff's own "studies" expose why he cannot state a rule of reason claim under any antitrust theory. First, both "studies" confirm that Plaintiff's relevant market definition—which Plaintiff defines as the "mobile app-generated ride-share service, with a relevant sub-market of Uber car service"—utterly fails as a matter of law. Am. Compl. ¶ 121. As the "studies" explain, Uber competes in a broad transportation marketplace that includes an array of local transport options, including taxis and public transportation. By its own terms, the Chen Paper's methodology is only valid if one assumes the relevant market includes taxis. Because Uber driver-partners "compete with traditional taxis," the Chen Paper purports to use publicly available taxi data as the control group to "validate[] the accuracy of our Uber measurement methodology." Chen Paper at 2-3. Plaintiff's allegation of a "proposed relevant market that clearly does not encompass all interchangeable substitutes" alone requires granting the motion to dismiss. *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013).

Chen's paper also observes that "[t]axis are much denser than Ubers" in Manhattan—with 43 Uber driver-partners competing in the same space as 172 taxis in midtown—and states that the "dearth of Ubers in Manhattan . . . may be due to greater availability of taxis and public transport." *Id.* at 3, 7. According to Chen, "Uber accounted for 29% of all rides in NYC during 2014." *Id.* at 3. Even if the relevant market were limited just to car services, therefore, Uber would not have market power in New York City, the only specified place that Plaintiff has used Uber's services. Am. Compl. ¶ 7; *see Bookhouse*, 985 F. Supp. 2d at 622 ("courts have rejected market shares between 30 percent and 40 percent as inadequate to demonstrate market power").

Second, the "studies" confirm that Uber has benefited consumers by lowering prices and improving service. A study relied on by Chen found that the average cost of a ride with an Uber driver-partner—including rides subject to surge pricing—is more than 10% cheaper than the average taxi fare.[2]  In addition, both studies observe that surge pricing is an essential component of Uber's goal to provide consumers the ability to "push a button and get a ride within minutes." Am. Compl. ¶ 52. The Chen Paper states that "Uber offers expedient service" with average wait times of approximately 3 minutes in New York City, and concludes that the "complex interplay between supply and demand supports Uber's case for implementing dynamic pricing" to reduce wait times for consumers. Chen Paper at 7-8; *see* Diakopoulos Blog Post ("surge pricing works to maintain or improve service quality" by "reduc[ing] estimated times"). Surge pricing is therefore a classic example of what the Supreme Court concluded was legal in *Leegin*: a new market entrant using resale price maintenance to offer enhanced services. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 891 (2007). Surge pricing must therefore survive the rule of reason as a pro-competitive action.

Finally, Plaintiff's assertion of reduced output attributable to surge pricing assumes that Uber driver-partners do not compete with any other transportation service. Yet Plaintiff's "studies" show the exact opposite: when surge pricing is in effect, riders react by switching to reasonably substitutable services, such as taxis and public transport. Unless one assumes that consumers react to surge pricing by deciding to cancel their social plans or not go to work, options which are not suggested in either "study," the price-sensitivity of riders proves that Uber driver-partners have a positive cross-elasticity of demand with competing services—and therefore that Plaintiff's market definition fails as a matter of law. This not only accords with common sense, but also the facts as presented by Plaintiff's "studies." If a consumer facing surge pricing is in midtown surrounded by 172 taxis, 43 Uber driver-partners, the crosstown 7 subway line, several bus lines, and is wearing comfortable walking shoes, she will naturally, and economically rationally, survey the range of her local transportation options and perhaps choose a competing service—or just walk. Output in the relevant market is not reduced.

Sincerely,

/s/ William A. Isaacson

---

[2]   Brad Stone, *Uber Is Winning Over Americans' Expense Accounts*, Bloomberg, April 7, 2015, available at http://www.bloomberg.com/news/articles/2015-04-07/uber-is-winning-over-americans-expense-accounts.