UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPENCER MEYER, individually and on behalf
of those similarly situated,

                              Plaintiffs,

         -against-

TRAVIS KALANICK and UBER
TECHNOLOGIES, INC.

                              Defendants.

---

1:15 Civ. 9796 (JSR)

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RELIEF RELATED TO THE ERGO INVESTIGATION

**CONSTANTINE CANNON LLP**
Matthew  L. Cantor
David A. Scupp
335 Madison Avenue
New York, New York 10017

**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
Bryan L. Clobes
Ellen Meriwether
1101 Market Street, Suite 2650
Philadelphia, PA  19107

**ANDREW SCHMIDT LAW PLLC**
Andrew Arthur Schmidt
97 India Street
Portland, Maine 04101

**MCKOOL SMITH, P.C.**
John Briody
James H. Smith
One Bryant Park, 47th Floor
New York, New York 10036

Lewis T. LeClair
300 Crescent Court, Suite 1500
Dallas, Texas 75201

**HARTER SECREST & EMERY LLP**
Brian Marc Feldman
Jeffrey A. Wadsworth
Edwin M. Larkin
A. Paul Britton
1600 Bausch & Lomb Place
Rochester, New York 14604

*Counsel for Plaintiff Spencer Meyer*

## Table of Contents

Preliminary Statement ........................................................................................... 1

    A.  The Ergo Investigation Commences ........................................................ 2

    B.  The Ergo Investigation and Report ......................................................... 5

    C.  Rather Than Come Clean, Defendants Provide Misinformation And Attempt To Extract Litigation Concessions In Exchange For Information ................................. 7

    D.  Notwithstanding the Court's Orders, Defendants Continue to Provide False Information and Attempt to Avoid Discovery .......................................... 8

Argument ............................................................................................................ 10

    A.  Defendants Should be Precluded From Using the Ergo Investigation. ..................... 11

    B.  Defendants and Ergo Should be Precluded From Further Improper Background Investigations Relating to This Litigation .................................... 14

    C.  Defendants Should Be Required to Reimburse Plaintiff's Attorneys' Fees and Costs Relating to the Ergo Matter .................................................. 14

Conclusion .......................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amezcua v. Jordan Transp., Inc.*,
No. 2:13-cv-01608, 2016 U.S. Dist. LEXIS 71259 (D. Nev. May 27,
2016) .......................................................................................................................... 13

*Cielo Creations, Inc. v. Goa Da Trading Co.*,
No. CIV.A. 04 CIV. 1952, 2004 WL 1460372 (S.D.N.Y. June 28,
2004) .......................................................................................................................... 14

*Crown Castle USA Inc. v. Fred A. Nudd Corp.*,
No. 05-CV-6163, 2010 WL 4027780 (W.D.N.Y. Oct. 14, 2010) ............................... 14

*Fayemi v. Hambrecht & Quist, Inc.*,
174 F.R.D. 319 (S.D.N.Y. 1997) ........................................................................ 11, 12

*Fox Indus. v. Gurovich*,
No. CV 03-5166, 2006 U.S. Dist. LEXIS 73035 (E.D.N.Y. Oct. 6,
2006) .......................................................................................................................... 11

*Shanahan v. Vallat*,
No. 03 Civ. 3496, 2006 U.S. Dist. LEXIS 83221 (S.D.N.Y. Nov. 14,
2006) .......................................................................................................................... 12

*United States v. IBT*,
907 F.2d 277 (2d Cir. 1990).................................................................................. 11

*Update Art, Inc. v. Modiin Publ'g, Ltd.*,
843 F.2d 67 (2d Cir. 1988)................................................................................... 15

*Upjohn Co. v. Aetna Cas. & Sur. Co.*,
768 F. Supp. 1186 (W.D. Mich. 1990) .............................................................. 11, 13

*Wood v. Brosse U.S.A., Inc.*,
149 F.R.D. 44 (S.D.N.Y. 1993) .......................................................................... 10

**STATUTES**

28 U.S.C. § 1651(a) ....................................................................................................... 11

Conn. Gen. Stat. § 52-570d.......................................................................................... 13

N.H. Rev. Stat. Ann. § 570-A:2 ................................................................................... 13

N.Y. Gen. Bus. Law § 71 ............................................................................................... 5, 13

**OTHER AUTHORITIES**

22 NYCRR 1200.0, Rules 4.1, 8.4(d) .............................................................................. 13

FED. R. C. P. 37 ............................................................................................................... 10

Pursuant to the Court's June 21 Order, Plaintiff Spencer Meyer ("Plaintiff") respectfully requests that the Court grant the following relief against Uber and Mr. Kalanick (collectively, "Defendants") and Global Precision Research LLC (doing business as "Ergo") to address their litigation misconduct.

## Preliminary Statement

On December 16, 2015, Plaintiff filed this antitrust putative class action against Travis Kalanick, the CEO of Uber. The same day, Uber's general counsel, Salle Yoo, directed an Uber employee to launch an investigation of Plaintiff. All of Uber's witnesses claim not to know why Ms. Yoo ordered it, and Uber has refused to make its general counsel available. The sole rationale offered by one Uber employee who passed along the assignment was that the investigation—into a class representative in a well-pled antitrust action filed in federal court— was for security purposes. In any event, that reason for the investigation was never shared with either the personnel directly hiring the investigation firm or the investigation firm itself. The investigation Uber ultimately commissioned had nothing to do with Mr. Kalanick's security.

Uber instead hired Ergo to conduct a "reputational" investigation into Plaintiff. Uber did not bother to find out whether Ergo and its investigator were licensed in New York to conduct such investigations; they were not. Uber approved Ergo's proposal to highlight "all derogatories." In response, Ergo produced a January 19 Report ("Ergo Report") with "actionable" items, such as that Plaintiff "may be particularly sensitive to any actions that tarnish his professional reputation."

Ergo conducted its investigation through illegal and unethical means. Uber—including the two Uber lawyers involved in ordering this investigation—claims to have exercised no oversight over the investigation. Ergo obtained information from Mr. Meyer's professional

and personal acquaintances through material false statements, violated New York State's Private Investigator statute by acting without a license (with criminal penalties), and violated the "dual consent" telephone recording laws of Connecticut and New Hampshire (also with criminal penalties), as the investigation proceeded.  Apparently, Uber buried its head in the sand.

This Court had to direct discovery for these facts to come to light.  Defendants and Ergo obfuscated the truth with repeated misrepresentations, total resistance to discovery, both of which required repetitive and wasteful motion practice.  Plaintiff seeks appropriate relief to address Defendants' and Ergo's misconduct and to deter future, similar actions in this litigation or other cases.

## **Relevant Background**

### A.      **The Ergo Investigation Commences**

On December 16, 2015, the same day the Complaint in this case was filed, Uber's General Counsel, Salle Yoo, set in motion the Ergo investigation by asking Uber's Chief Security Officer, Joe Sullivan, to investigate Mr. Meyer. Ex. A.[1]  Ms. Yoo, the initiator of the investigation, has never explained why she did so. As the Court is aware, Uber objected to making Ms. Yoo available in order to offer an explanation.   Mr. Sullivan—an attorney admitted in California but not practicing law in his current role at Uber—forwarded Ms. Yoo's request to Uber's Director of Security, Mat Henley.  *Id.*; Ex. B, Sullivan Tr. at 6:15-21, 8:13-22.  Mr. Sullivan claims Ms. Yoo never told him why she requested the investigation but testified that, in his opinion, he believes an investigation was appropriate to ascertain whether

---

[1] Unless otherwise noted, all references to Exhibits refer to documents attached to the Declaration of James H. Smith in Support of Plaintiffs' Motion for Relief Related to the Ergo Investigation.

Mr. Meyer was a potential threat to Mr. Kalanick.  Ex. B at 17:16-19:16, 20:25-21:8, 23:12-18, 60:13-61:4.

Mr. Henley—not Mr. Craig Clark (Uber's Legal Director of Security of Law and Enforcement), as stated in Mr. Kalanick's May 20 Letter to the Court—alone retained Ergo to perform an investigation of Mr. Meyer.  Ex. C, Henley Tr. at 9:18-20, 11:23-12:9; Ex. D, Clark Tr. at 23:25-24:13; Ex. B at 17:16-21.  Mr. Henley claims to not know why Uber was asking Ergo to investigate Mr. Meyer.  Ex. C at 9:18-10:15.  But from the outset, Mr. Henley stressed to Ergo the need to keep the investigation of Mr. Meyer "very under the radar," Ex. E at ERGO-0001170, and that he "would like to keep any communications about [the investigation] encrypted or over chat to avoid potential discovery issues."  *Id.* at ERGO-0001172.  Mr. Henley also advised Ergo that he wanted the Ergo statement of work to be "general enough so that the research remains discreet from a discovery perspective."  *Id.* at ERGO01176.[2]  Furthermore, Ergo managing partner Todd Egeland testified that he communicated with Mr. Henley through "Wickr," a covert message system, which automatically deletes messages within 24 hours. Ex. F, Egeland Tr. at 58:14-61:23.  No Wickr communications have been produced, and Mr. Henley denies communicating with Ergo via Wickr.  Ex. C at 28:9-10; 31:3-10.

On January 4, 2016, Mr. Henley and Mr. Egeland exchanged emails in which Ergo mapped out and Uber authorized the parameters of a "Level 2" investigation of Mr. Meyer and

---

[2] Mr. Henley testified that he did not know what he meant when he wrote "under the radar" but was "okay" with Uber's involvement in the investigation being disclosed to strangers. Ex. C at 101:10-102:5, 104:17-105:4.  His testimony is contradicted by his consistent written statements, as well as Ergo's understanding of Mr. Henley's directives.  Ex. F at 79:3-80:1, 181:7-182:17 (testifying that Ergo protected Uber's confidentiality in conducting the investigation and that Uber was upset over the investigation's discovery).  Mr. Henley's testimony also is in tension with Mr. Sullivan's testimony concerning his confidentiality expectations of the Meyer investigation.  Ex. B at 46:17-22.

Mr. Meyer's counsel.   Ex. G.   The agreed-upon parameters do not suggest that the investigation was prompted by any "safety" concern, and Mr. Egeland was never told that the investigation was being conducted for security purposes.   Ex. F at 76:7-11.   Instead, the parameters of the Level 2 investigation appear designed to elicit information that could be used to pressure or intimidate Mr. Meyer or his counsel.   Those parameters included:

- "An initial 'light touch' reputational due diligence, engaging in 7 primary source interviews"

- "A written report that highlights all derogatories and areas requiring additional investigation"

- "[D]etermining the likelihood that the attorney . . . is the driving force behind the complaint."

*Id.*

Once launched, no one at Uber, including either lawyer involved in ordering the investigation (*i.e.*, Ms. Yoo or Mr. Sullivan), did anything further to oversee the Meyer investigation.   Ex. C at 21:12-22:1.   Mr. Henley did not, for example, ask how Ergo was going to approach seven individuals acquainted with Mr. Meyer in order to obtain information.   *Id.* at 95:1-15.   Similarly, Mr. Sullivan did nothing to oversee the investigation and claims to have no idea how it was carried out.   Ex. B at 9:5-11, 14:19-25, 55:14-17.   Mr. Clark testified he had nothing to do with the investigation until after Ergo's Report was completed and still has no idea how the investigation was carried out.   Ex. D at 55:25-56:22.   To this day, Messrs. Henley, Sullivan, and Clark insist that they have no idea how the investigation was carried out.   Ex. C at 95:1-19; Ex. D at 23:11-15; Ex. B at 14:19-25.

Notwithstanding that (i) all of Uber's executives involved in requesting the Ergo investigation, including its General Counsel, were aware of the pending litigation involving

4

Mr. Kalanick; and (ii) Uber's assertion that all of its communications concerning the investigation were protected by the attorney-client privilege and work-product immunity, *see*, *e.g.*, Uber Privilege Log dated June 6 ("Uber Privilege Log"), at 1-3, no one at Uber ever did anything to ensure that the investigation was undertaken ethically, legally, or in a manner that maintained the integrity of the judicial process.

**B.       The Ergo Investigation and Report**

After receiving Mr. Henley's approval, Mr. Egeland forwarded the approved investigation parameters to Miguel Santos-Neves, a Senior Ergo Analyst (the "Investigator"). Ex. H.  The Investigator, unlawfully acting without a New York State Private Investigator's License,[3] contacted twenty-eight friends, acquaintances, and/or co-workers of Mr. Meyer.  The Investigator lied to every one of them.  Specifically, the Investigator told the primary sources that he was seeking information on "up-and-coming researchers in environmental conservation," Ex. I, or "up-and-coming labor lawyers," Ex. J, or even "what due diligence steps property owners take to vet a potential tenant" in a communication to Mr. Meyer's landlord, Ex. K, Santos-Neves Tr. at 222:8-223:17.  These false statements were made in order to elicit information from these sources that would otherwise not have been provided.  Ex. F at 36:12-20.  Such tactics are apparently widely used by Ergo investigators and condoned by Ergo management.  Ex. K at 39:14-42:8; 125:17-128:7; Ex. F at 32:21-33:3.

The Investigator's initial outreach led to phone conversations with eight primary sources, Ex. L, which were recorded without the sources' knowledge or consent.  *See, e.g.*, Ex.

---

[3] Subject to criminal misdemeanor prosecution, a New York State Private Investigator's License is first required before any firm or individual (outside of a law firm, among other material exceptions) can conduct "investigations for the purpose of obtaining information with reference to . . . [the] reputation or character of any person . . . ."  Art. 7 N.Y. Gen. Bus. Law § 71.  Both Mr. Santos-Neves and Mr. Egeland testified that no one at Ergo has a private investigator's license.  Ex. K at 80:16-21; Ex. F at 17:24-18:6.

K at 183:6-16; 193:9-16.   All eight sources provided information to the Investigator that was used in the Ergo Report.   Ex. L; Ex. K at 158:5-14.   In addition to being conducted through fraudulent means, the investigation sought to uncover numerous details about Mr. Meyer's personal life that were untethered to Mr. Meyer's potential motivations for bringing suit.   For example, the Investigator asked primary sources whether Mr. Meyer had any "personal issues" that might affect his reputation, *see, e.g.*, Ex. M, and gathered information regarding Mr. Meyer's income and finances, and could not explain how such information related to Mr. Meyer's potential motivations for bringing suit.   Ex. K at 229:14-231:6.

Ergo's internal communications demonstrate that Ergo drafted the Report seemingly to emphasize negative aspects of Mr. Meyer's reputation, ostensibly to provide Uber with matters it could take "action" on.   For instance, when finalizing the Report, Mr. Egeland inquired whether there were "enough negative things said about Meyer to write a text box" in the Report.   Ex. N at ERGO-0000697.   Further, after receiving a first draft of the Report, Mr. Egeland "redrafted the Key Findings to focus on "actionable" issues for the client."   Ex. O at ERGO-0000665.   Among the "actionable" items Mr. Egeland added was that "Meyer may be particularly sensitive to any actions that tarnish his professional reputation, such as either being a witting 'tool' of his friend Schmidts [*sic*], or looking to 'cash in' on the lawsuit."   Ex. P at ERGO-0000670.   When the Investigator asked Mr. Moneyhon, another managing partner at Ergo whom the Investigator understood to be the company's General Counsel, whether these comments should be included in the final version of the Report, Mr. Moneyhon replied affirmatively, stating that they were needed to "connect [the] dots[.]"   Ex. Q at ERGO-0000695; Ex. K at 285:5-22.

On January 19, 2016, Ergo delivered its report to Mr. Henley and Mr. Clark. The Report included numerous bolded comments that emphasized how seriously Mr. Meyer treats his professional reputation and, as a "Key Finding," contained the "actionable" comment that "Meyer may be particularly sensitive to any publicity that tarnishes his professional reputation." Ex. R at ERGO-0000823.

**C.      Rather Than Come Clean, Defendants Provide Misinformation And Attempt To Extract Litigation Concessions In Exchange For Information**

After discovering that an investigation was taking place, Plaintiff immediately sought to understand its purpose and scope. Initially, Defendants denied any involvement. Then, after acknowledging their involvement, Defendants were unapologetic and flat-out defiant.

In mid-January of this year, Plaintiff's counsel was made aware that Ergo was contacting people who knew Mr. Meyer in order to obtain information about him. Plaintiff's counsel immediately asked Mr. Kalanick's counsel, Boies Schiller & Flexner LLP ("Boies"), whether Mr. Kalanick or Uber were behind these inquires. Declaration of Brian Feldman in Support of Plaintiffs' Motion for Relief Related to the Ergo Investigation ("Feldman Declaration") at ¶¶3-5. On January 19, the same day Ergo delivered the Report to Uber, Peter Skinner of Boies represented that, after speaking with Uber in-house counsel, no one affiliated with Mr. Kalanick or Uber was believed to be responsible for hiring Ergo. *Id.* at ¶6. In ongoing communications regarding the investigation, Mr. Kalanick's counsel held firm that neither Mr. Kalanick nor Uber were behind the investigation but refused to consent to service of a subpoena on Ergo. *Id.* at ¶¶8-9. It was only after Plaintiff sought to obtain the Court's

approval of a subpoena to Ergo that Mr. Kalanick's counsel admitted that Mr. Kalanick had indeed hired Ergo. [4] *Id.* at ¶6.

Even after admitting to involvement in the Ergo investigation, Mr. Kalanick refused to provide basic information about it. Instead, Mr. Kalanick stalled and then offered quid-pro-quo demands that sought to limit the information provided and Plaintiff's ability to use the information. First, Mr. Kalanick took the position that it was not proper to respond to Plaintiff's information requests regarding Ergo until "after Judge Rakoff rules on the [then-]pending motion to dismiss." Ex. S. Next, Mr. Kalanick offered only to provide limited information concerning who was contacted by Ergo, but only on the condition that "Plaintiff agrees not to use the information in this litigation for any purpose whatsoever." Ex. T. It was only after Plaintiff threatened to bring the issue to the Court's attention yet again that Mr. Kalanick provided a list that purported to contain the names of (1) "any individual or entity contacted by Ergo" and (2) "the date and method of communication for each contact." Ex. U. But that list contained yet more misinformation. In fact, it identified only *eleven* of the twenty-eight individuals contacted by the Investigator and did not include all instances when each source was contacted. *Compare id.* with Ex. L. Unable to obtain complete information regarding the investigation consensually, Plaintiff brought the matter to the Court's attention during a phone call on May 19, 2016.

**D.      Notwithstanding the Court's Orders, Defendants Continue to Provide False Information and Attempt to Avoid Discovery**

During a May 20 Hearing, the Court advised Kalanick and Ergo that it had "serious questions" if "false representations were made to obtain information about both a party and a

---

[4] Defendant's counsel later denied that Mr. Kalanick was involved in Ergo's retention. 5/20 Hearing Tr. at 18:25-19:3.

lawyer in [the] case," and was concerned with the process of justice, before ordering Mr. Kalanick to provide "the name of the person who hired Ergo . . . [a]nd the position of that person and when he or she hired Ergo and what he told, he or she, told them they should do." 5/20 Hearing Tr. 6:9-15.  The Court also ordered Plaintiff to serve subpoenas on Uber and Ergo concerning the investigation.  5/20 Hearing Tr. 5:11-19; 15:8-16:8.  The Court's directive did not stop Defendants from continuing to provide incorrect information about the investigation or dissuade them from resisting discovery.

Mr. Kalanick's May 20 letter stated that Mr. Clark "retained Ergo." Dkt. No. 79.  But Mr. Clark testified that he "wasn't involved in any way" with the retention of Ergo.  Ex. D at 23:25-24:4.  Moreover, the May 20 Letter omitted key players in the Ergo investigation:  Mr. Henley (the individual who actually retained Ergo) and Messrs. Egeland and Moneyhon, who were the primary points of contact with Uber and participated in the drafting of the Ergo Report.  *See generally* Uber Privilege Log; Ex. Q.

Defendants and Ergo thereafter continued to frustrate the discovery process.  As this Court is aware, Uber and Ergo challenged the entirety of Plaintiff's Court-authorized document subpoenas, attempted to avoid all depositions and *in camera* review, and later asserted that virtually every single document related to the Ergo investigation—including cold call emails to non-parties and audio recordings of calls with non-parties—was protected by the attorney-client privilege or work-product doctrine.  Ex. V; Uber Privilege Log; Ergo Privilege Log, dated June 6, 2016.  Defendants maintain this position despite that Ergo was retained by a non-attorney, no one has testified about why Ms. Yoo ordered the investigation, and no litigators were involved.  Ex. B at 18:2-19:16, 53:15-54:1; Ex. D at 112:6-23.

At a May 27 hearing concerning Plaintiff's document and deposition subpoenas, Ergo suggested that the use of pretext in the Meyer investigation was the result of a renegade investigator.   Uber embraced Ergo's characterization and later, in a wasteful motion for reconsideration, suggested that Plaintiff should not receive any discovery concerning the Meyer investigation because Uber had no reason to understand what happened.  Dkt. No. 77 at 4-5, 7.  Testimony from Ergo has revealed that the pretextual Meyer investigation was not the act of a renegade employee.  Both Ergo witnesses testified that use of pretext is common in their investigations.  Ex. K at 39:14-42:8; 125:17-128:7; Ex. F at 32:21-33:3.  And the notion that Uber had no understanding or reason to know that Ergo would be misleading the targets of its investigation is simply not credible given:  (i) the types of contacts that Uber authorized; (ii) the type of information that Uber sought; and (iii) Uber's demand that the investigation be kept "far under the radar."   Tellingly, Ergo's Investigator was never reprimanded by either his superiors or anyone at Uber for making false statements in order to obtain information about Mr. Meyer.  Ex. K at 125:17-128:7; Ex. F at 97:17-98:21; Ex. C at 142:4-147:22; Ex. D at 84:7-87:18, 100:17-24, 117:5-119:3, 120:11-124:3.   At bottom, the only real consternation resulting from the Ergo investigation was that it was uncovered, not because it was based on pretext.  Ex. F at 181:13-182:17; Ex. C at 142:4-147:20; Ex. D at 84:7-87:18, 100:17-24, 117:5-119:3, 120:11-124:3.  Uber even hired Ergo to conduct another diligence project last month, well after Ergo's investigatory tactics were brought to light.  Ex. K at 70:9-15; 76:3-14.

## Argument

The Court has broad discretion under its inherent powers and Federal Rule of Civil Procedure 37 to sanction misconduct.  *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 49 (S.D.N.Y. 1993) ("A court has, as part of its inherent powers, the ability to impose sanctions for improper conduct. The Supreme Court has located this power in the court's very nature and

in its need to be able to manage its own affairs as to achieve the orderly and expeditious disposition of cases." (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (brackets, citation, and internal quotation marks omitted)). ).  In addition, the All Writs Act empowers to Court to issue all writs in aid of its jurisdiction, 28 U.S.C. § 1651(a), to anyone "in a position to frustrate . . . the proper administration of justice," including non-parties, *United States v. IBT*, 907 F.2d 277, 281 (2d Cir. 1990).

Uber's reckless lack of oversight of Ergo's investigation into a named plaintiff and his lawyer in a putative class action, Ergo's use of false pretenses and unlawful means to deliver its Report, and Defendants' steadfast refusal to cooperate in Plaintiff's pursuit of the truth warrant party sanctions.  Defendants' and Ergo's conduct constitutes "a pattern of behavior which could reasonably be construed as a bad faith effort to thwart the litigation process[.]"  *Fox Indus. v. Gurovich*, No. CV 03-5166, 2006 U.S. Dist. LEXIS 73035, at *29-31 (E.D.N.Y. Oct. 6, 2006) (quoting *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)); *see also Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1212 (W.D. Mich. 1990) (finding defendants' interviewing of plaintiff's employees through an investigation firm without disclosing that they worked for defendant or the purpose of the interviews to be improper).

Without sanctions, this conduct would set a dangerous precedent:  consumer class action plaintiffs need to be concerned about investigators reaching out and lying to their friends and colleagues.  Defendants must be held accountable.

**A.**      **Defendants Should be Precluded From Using the Ergo Investigation.**

Where information has been obtained through unlawful means, a party should not be permitted to benefit from it.  *See Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997) ("a court must be able to sanction a party that seeks to introduce improperly

obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct"); *Shanahan v. Vallat*, No. 03 Civ. 3496, 2006 U.S. Dist. LEXIS 83221, at \*4 (S.D.N.Y. Nov. 14, 2006) (recognizing the court's power to "restrict[] the disclosure or use of such information when a party has obtained the information wrongfully").   For that reason, Defendants should be precluded from using information obtained through the Ergo investigation in any manner, including by presenting arguments or seeking any discovery concerning Plaintiff's personal background.

In assessing the appropriate sanction for the wrongful acquisition of information, the Court weighs two factors: "the severity of the wrongdoing and the prejudice to the adversary." *Fayemi*, 174 F.R.D. at 325.   "[M]atching the sanction to any prejudice suffered by the adversary is important because the party's wrongful acquisition of evidence should not be permitted to redound to its benefit in the litigation."   *Id.*   Both severity and prejudice weigh in favor of Plaintiff's requested preclusion order.

Defendants' misconduct with respect to the Ergo investigation is severe.   Uber, in reaction to Plaintiff's filing of a consumer antitrust lawsuit, turned loose a private investigator to contact the Plaintiff's personal and professional contacts in order to pull together a report that featured "derogatory" information about the Plaintiff.   Uber attempts to distance itself from the Ergo investigation by asserting that it had no precise knowledge of how the Ergo investigation was undertaken.   But that only makes Uber's conduct more egregious.   Willful blindness and a reckless abdication of oversight are not an excuse.   Uber, through a directive initiated by its general counsel, set the contours of Ergo's investigation and had an obligation to ensure that the investigation was conducted ethically and legally.   *See Upjohn*, 768 F. Supp. at 1212 ("When a lawyer hires a nonlawyer to do his work, the lawyer must make reasonable

12

efforts to ensure that the nonlawyer accomplishes his task in compliance with the standards governing the conduct of lawyers."); New York Rules of Professional Conduct (22 NYCRR 1200.0) ("RPC") Rule 5.3(b).  Mr. Kalanick, as Uber's CEO and ultimate authority, likewise should be prevented from benefitting from the fruits of the Meyer investigation.

Uber utterly failed to satisfy its obligations.  As detailed above, the investigation was conducted through the use of false statements.  Employment of false statements to obtain information about a party that is otherwise not available is a classic example of bad faith litigation conduct and in violation of New York's ethical rules.  *See Amezcua v. Jordan Transp., Inc.*, No. 2:13-cv-01608, 2016 U.S. Dist. LEXIS 71259, at *3 (D. Nev. May 27, 2016) ("A material false statement is sufficient grounds for a bad faith finding to support a sanction under the court's inherent power." (citing *Whitney Bros. Co. v. Sprafkin*, 60 F.3d 8, 14 (1st Cir. 1995))); RPC 4.1 (While representing a client, "a lawyer shall not knowingly make a false statement of fact or law to a third person.") & 8.4(d) ("A lawyer or law firm shall not: engage in conduct involving dishonesty, fraud, deceit or misrepresentation.").[5]

Notwithstanding the glowing terms with which his personal and professional acquaintances and colleagues described him, Plaintiff will be prejudiced if Defendants are permitted to leverage the Ergo investigation and use its findings in this case.  *See Upjohn*, 768 F. Supp. at 1212 (excluding the fruits of an investigation by an investigation firm that interviewed plaintiff's employees without disclosing the purpose of the interviews).  Nothing in the Report is relevant to any issue in this case, and the Report should be precluded on that basis

---

[5] Moreover, Ergo conducted the investigation illegally in at least two other ways.  First, Ergo's Investigator acted without a New York State Private Investigator's License for himself or Ergo in violation of Art. 7 N.Y. Gen. Bus. Law § 70.  Second, Ergo secretly recorded phone conversations with various individuals in New Hampshire and Connecticut in violation of N.H. Rev. Stat. Ann. § 570-A:2 and Conn. Gen. Stat. § 52-570d, respectively.

alone.   Moreover, permitting Defendants to present arguments or seek any discovery concerning Mr. Meyer's personal affairs would be doubly improper given the Report's insinuation that Mr. Meyer was not suited to deal with "the potential backlash of this lawsuit" and was consequently "particularly sensitive to any publicity that tarnishes his professional reputation."  Ex. R at ERGO-0000823.

**B.      Defendants and Ergo Should be Precluded From Further Improper Background Investigations Relating to This Litigation**

Defendants have recognized the impropriety of the investigation of Mr. Meyer and have already made numerous representations to Plaintiff and the Court that all its investigatory activities have ceased.  *See, e.g.*, Ex. S; Ex. T; May 20 Hearing Tr. at 3:24-4:2.  Given the past multiple misstatements concerning the Ergo matter and Uber's disregard for any oversight responsibilities for Ergo's actions, however, a Court order is necessary to ensure Plaintiff and Plaintiff's counsel that such conduct truly has ended and will not reappear at any point in the future.

Accordingly, Plaintiff requests that the Court enjoin Defendants and Ergo from undertaking any further background investigations of any individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful means.

**C.      Defendants Should Be Required to Reimburse Plaintiff's Attorneys' Fees and Costs Relating to the Ergo Matter**

A financial penalty is an appropriate sanction in this case.    At a minimum, reimbursement of Plaintiff's attorneys' fees and costs is appropriate, especially where, as here, the fees and costs are incurred as a result of a party's misconduct.  *See, e.g., Cielo Creations, Inc. v. Goa Da Trading Co.*, No. CIV.A. 04 CIV. 1952, 2004 WL 1460372, at *4 (S.D.N.Y. June 28, 2004) (awarding costs for second deposition of a witness necessitated by the

14

misconduct at first deposition); *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05-CV-6163, 2010 WL 4027780, at *4 (W.D.N.Y. Oct. 14, 2010) (awarding costs for second deposition necessitated by late document production).

Defendants' refusal to admit to the nature and extent of the Ergo investigation, failure to provide Plaintiff with accurate information, and persistent motion practice to avoid discovery, forced Plaintiff to incur substantial time and resources with respect to the Ergo matter. What should have been a simple voluntary production of relevant information was instead transformed into a lengthy, and adversarial discovery process as a result of Defendants' misstatements (whether knowing or not) and obstruction. Defendants—not Plaintiff—should be required to shoulder the resulting costs.[6] Monetary sanctions beyond Plaintiff's costs are also appropriate in order to discourage Defendants' (and other parties') future fraudulent and/or reckless conduct related to the investigation of parties to a litigation. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (sanctions "are intended to serve a general deterrent effect on the case at hand and on other litigation").

## Conclusion

For the reasons set forth above, Plaintiff respectfully requests that the Court grant the relief described herein, as well as any other relief the Court deems just and proper, including against Ergo.

---

[6] Monetary sanctions beyond Plaintiff's costs are also appropriate in order to discourage Defendants' (and other parties') future fraudulent and/or reckless conduct related to the investigation of parties to a litigation. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (sanctions "are intended to serve a general deterrent effect on the case at hand and on other litigation").

Dated:  New York, New York
        June 29, 2016

**CONSTANTINE CANNON LLP**
Matthew L. Cantor
David A. Scupp
335 Madison Avenue
New York, New York 10017
Tel: (212) 350-2700
Fax: (212) 350-2701
mcantor@constantinecannon.com
dscupp@constantinecannon.com

**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
Bryan L. Clobes
Ellen Meriwether
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Tel: (215) 864-2800
Fax: (215) 864-2800
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

**ANDREW SCHMIDT LAW PLLC**
Andrew Arthur Schmidt
97 India Street
Portland, Maine 04101
Tel: (207) 619-0320
Fax: (207) 221-1029
andy@maineworkjustice.com

**MCKOOL SMITH, P.C.**
John C. Briody
James H. Smith
One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400
Fax: (212) 402-9444
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com

Lewis T. LeClair
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Tel: (214) 978-4984
Fax: (214) 978-4044
lleclair@mckoolsmith.com

**HARTER SECREST & EMERY LLP**
Brian Marc Feldman
Jeffrey A. Wadsworth
Edwin M. Larkin
A. Paul Britton
1600 Bausch & Lomb Place
Rochester, New York 14604
Tel: (585) 232-6500
Fax: (585) 232-2152
bfeldman@hselaw.com
jwadsworth@hselaw.com
elarkin@hselaw.com

*Counsel for Plaintiff Spencer Meyer*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2016, I filed and therefore caused the foregoing document to be served via e-mail and the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter:


_/s/ James H. Smith_____
James H. Smith