# EXHIBIT B

# Redacted Pursuant to Court Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3

 4    SPENCER MEYER, individually
      and on behalf of those
 5    similarly situated,

 6              Plaintiffs,
      vs.                          No. 1:15 Civ. 9796 (JSR)
 7
      TRAVIS KALANICK,
 8
                Defendant.
 9    _____/

10

11

12        CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13             DEPOSITION OF JOSEPH SULLIVAN

14              SAN FRANCISCO, CALIFORNIA

15             THURSDAY, JUNE 23, 2016

16

17

18

19

20

21

22    BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23         CSR LICENSE NO. 9830

24         JOB NO. 504146

25
```

1           IN THE UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF NEW YORK

3

4   SPENCER MEYER, individually
    and on behalf of those
5   similarly situated,

6               Plaintiffs,
    vs.                          No. 1:15 Civ. 9796 (JSR)
7
    TRAVIS KALANICK,
8
                Defendant.
9   _____/

10

11

12

13          Deposition of Joseph Sullivan, taken on

14      behalf of the Plaintiff, at Gibson, Dunn &

15      Crutcher, LLP, 555 Mission Street, 30th Floor,

16      San Francisco, California, Pursuant to Notice,

17      before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR,

18      CLR ~ CSR License No. 9830.

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3

 4      ON BEHALF OF THE PLAINTIFF:

 5          MCKOOL SMITH, P.C.

 6          By:   JOHN C. BRIODY, Esq.

 7          One Bryant Park, 47th Floor

 8          New York, New York 10036

 9          Phone: 212.402.9400

10          jbriody@mckoolsmith.com

11

12      ON BEHALF OF UBER TECHNOLOGIES:

13          GIBSON DUNN & CRUTCHER, LLP

14          By:   NICOLA T. HANNA, Esq.

15                LAURA J. PLACK, Esq.

16          3161 Michelson Drive

17          Irvine, California 92612-4412

18          Phone:  949.451.3800

19          nhanna@gibsondunn.com

20

21      ALSO PRESENT:  Martin White, Uber

22                     Angela Padilla, Uber

23

24                  ---oOo---

25
```

1                    SAN FRANCISCO, CALIFORNIA

2                    THURSDAY, JUNE 23, 2016

3                        12:59 P.M.

4

5

6

7                    JOSEPH SULLIVAN,

8             having been sworn as a witness

9          by the Certified Shorthand Reporter,

10               testified as follows:

11

12          MR. HANNA:  Before we get started, I wanted

13   to put a couple of matters on the record.

14          With respect to the Ergo matter, Uber

15   Technologies has asserted certain privileges and

16   positions in this litigation within the

17   attorney-client privilege and attorney work product

18   doctrine, with respect to various documents that were

19   submitted in camera to the Court.

20          The Court has ordered some of the documents

21   Uber has provided in camera to be produced to

22   Mr. Meyer and his counsel.  That has been

23   accomplished.  And we expect that the questioning

24   today will focus on some of those documents and the

25   subject matter relating to those documents.

 1              At the outset, I just want to note that,

 2      while we're proceeding with this court-ordered

 3      deposition, Uber is not waiving or relinquishing any

 4      of the privileges or positions that have been

 5      previously asserted in connection with this matter.

 6      Uber intends to preserve those privileges and

 7      positions to the fullest extent provided by law.

 8              Finally, because this deposition will address

 9      matters that we contend are covered by the

10      attorney-client and attorney work product protection,

11      we are going to designate this entire transcript and

12      the documents that are attached as exhibits as

13      "Confidential Under the Protective Order."

14              MR. BRIODY:  And John Briody from McKool

15      Smith for the plaintiff.  We understand counsel's

16      reservation.  We obviously disagree on those issues.

17              But we are ready to proceed.

18

19                        EXAMINATION

20      BY MR. BRIODY:

21          Q   Without further ado, good afternoon,

22      Mr. Sullivan.  My name is John Briody from McKool

23      Smith.  I represent the plaintiffs in this case.

24              Could you please state your name for the

25      record.

1      A    My name is Joseph Sullivan.

2      Q    And do you have a middle name, Mr. Sullivan?

3      A    Edmund.

4      Q    And where do you reside?

5      A    Palo Alto, California.

6      Q    And where -- your home address?

7      A    Redacted

8      Q    And you're an attorney?

9      A    I am.

10     Q    And where are you admitted to practice law?

11     A    I am licensed to practice law in California.

12  I've been admitted in some other states, but I'm not

13  active.

14     Q    Okay.

15     A    I should say, I'm not a practicing attorney

16  in my current capacity.

17     Q    Okay.  And what is your -- and who is your

18  employer?

19     A    My employer is Uber.

20     Q    And what is your job title at Uber?

21     A    Chief security officer.

22     Q    And how long have you held that position?

23     A    Since April of 2015.

24     Q    And before that, were you employed by Uber?

25     A    No.  Before April of 2015 I was employed by

 1    was a federal prosecutor in Las Vegas, Nevada.

 2       Q   All right.

 3           And was that -- did -- prior to working at

 4    the Department of Justice, did you have any other

 5    legal employment?

 6       A   I -- my first experience with the Department

 7    of Justice was an honorary law grad clerkship right

 8    out of law school.

 9           But then after I finished the clerkship, I

10    went to a private law firm in Miami named Kaufman

11    Miller Dickstein & Grunspan.  And I was an associate

12    there before going back to the Department of Justice.

13       Q   Okay.  Now, focusing you on your role today,

14    chief security officer, are you a practicing attorney

15    today?

16       A   No.

17       Q   And what role do you play at Uber as chief

18    security officer?

19           If you could just describe it broadly.

20       A   Generally speaking, I'm responsible for

21    anything safety or security or risk management related

22    to safety and security or fraud abuse for the company.

23       Q   And, are you familiar with the retention by

24    Uber of Ergo to conduct an investigation of the

25    plaintiff, Mr. Spencer Meyer, in connection with

```
 1   litigation against CEO Travis Kalanick?

 2       A   I am now familiar with that.

 3       Q   You're now familiar with that?

 4       A   Yes.

 5       Q   Okay.  And when did you become aware of

 6   Uber's retention of Ergo to conduct an investigation

 7   of the plaintiff, Spencer Meyer?

 8       A   I became aware that we retained Ergo when I

 9   saw the report from --

10       Q   Okay.

11       A   -- that Ergo had prepared.

12       Q   And we'll look at some documents.

13           That's about January 19th?

14           Does that sound about right?

15       A   I don't remember the dates.  I'd have to see

16   it.

17       Q   Okay.  Now, when -- are you familiar with the

18   company Ergo?

19       A   I am familiar with them.

20       Q   What does Ergo do?

21       A   So I don't know a lot about them.  I'm

22   familiar with the name and -- but I -- I don't -- I

23   haven't done a very close look at them, so --

24       Q   Do you have -- oh, I didn't mean to cut you

25   off.  Sorry.
```

1   sometimes we don't learn about it until someone files

2   a lawsuit.  And so, as a result of that, sometimes we

3   do investigations related to people who are involved

4   in litigation.

5          And it's in that context that I -- I think I

6   would say "yes" to your question, because we're trying

7   to figure out what actually happened in the vehicle.

8   Is this a safe -- is this driver someone who should be

9   allowed to continue to drive?  Is this passenger

10  someone who should continue to be allowed to press a

11  button and get a ride?

12         Other than that, I don't think that we have

13  at Uber.

14     Q   Okay.  And do you have some familiarity, as

15  we sit here today, with the investigation that Ergo

16  undertook with respect to Mr. Meyer?

17     A   I read the report at the time it came in.  I

18  have not gone back and looked at it since then.

19     Q   Do you have an understanding of how Ergo went

20  about obtaining the information that was contained in

21  its report to you?

22     A   I don't.

23     Q   Have you attempted to figure that out as you

24  sit -- prior to today, as we sit here today?

25     A   No.

 1    get restraining orders or considered getting

 2    restraining orders.

 3           And in all of these situa- -- and -- and so,

 4    you know, I think that we have a -- a healthy approach

 5    to managing risk for our executives, because we want

 6    them to be able to go about their lives.  And so I --

 7    you know, none of these -- none of these founders or

 8    CEOs wants to have a security team around them 24/7.

 9    So, what we try and do is manage risk efficiently and

10    evaluate risks, and then move on and help them move on

11    with their life.

12           So we -- I've been involved with many times

13    asking our investigations teams to do diligence on

14    people who kind of come on the scene, and it seems a

15    little bit unusual.

16       Q   Can you tell me why Uber retained Ergo to

17    investigate Mr. Meyer?

18           MR. HANNA:  Objection to the form of the

19    question.

20           THE WITNESS:  I don't know.  You'd have to

21    ask the person who retained them.

22           MR. BRIODY:  Q.  Well -- well, Mr. Henley --

23    I asked Mr. Henley that.  And he told us that he was

24    ordered to do diligence, and that's why he retained

25    Ergo.

```
 1        A    Okay.

 2        Q    And so I guess my question for you is:  Why

 3   was Mr. Henley asked to do diligence?

 4             What was the reason why Mr. Henley was tasked

 5   with looking into the plaintiff, Mr. Meyer?

 6        A    I asked him -- because I asked him to do it.

 7        Q    For what purpose?

 8        A    I think probably for -- I -- I received a

 9   request from our general counsel.  I reviewed it,

10   thought it was a good idea, and -- and then passed it

11   on to Mr. Henley and asked him to do the

12   investigation.

13        Q    What I'm -- you said what was a good idea?

14             You said, "I reviewed it, thought it was a

15   good idea."

16             What did you think was a good idea?

17        A    Doing diligence.

18        Q    Why?

19        A    Because when I looked at the circumstances,

20   it seemed like the type of scenario that I was

21   describing a little while ago, where it seemed like a

22   head scratcher to me and something worthy of taking a

23   look.

24        Q    Do you know if the purpose of the Ergo

25   investigation was to determine whether Mr. Meyer's
```

1   lawsuit posed a safety issue for Mr. Kalanick?

2       A    That's what ran through my head.  It was a --

3   I -- I don't remember, you know, sitting -- and all

4   the details of what went through my head at the time.

5            But, you know, the fact that I think

6   Mr. Kalanick was named personally and the company

7   wasn't, is one of those things that you would -- you

8   know, you would see in some of the -- the more unusual

9   situations I've seen in the past.

10           And the fact that it involved antitrust,

11  which I'm not an antitrust lawyer, and I -- but it

12  just -- it -- and I -- and I -- it just seemed like an

13  unusual situation for a number of different reasons.

14           And -- and that made me think we better --

15  like, we better check to make sure that this is not

16  someone who has it in for our CEO.

17      Q    Was -- do you know why Ms. Yoo -- did you

18  discuss -- let me take a step back.

19           And let me give you a document.  And there's

20  documents in front of you.  If you could take out

21  Exhibit 47.

22           MR. HANNA:  Did we get these back in order?

23           MR. BRIODY:  We got them back in numerical

24  order, yes.

25      Q    Do you have the document?

 1      A    47.  I do, yeah.

 2      Q    Okay.  And, for the record, Exhibit 47 is a

 3   document bearing Bates UBER-PRIV '1.

 4           Do you recognize this document, Mr. Sullivan?

 5      A    I do.

 6      Q    What is it?

 7      A    It is a -- it's an e-mail thread.

 8      Q    And who is on the e-mail thread?

 9      A    Three people.  The first e-mail is from Salle

10   Yoo to me, and the second e-mail is from me to Mat

11   Henley.

12      Q    And what is the date of this e-mail thread?

13      A    December 16th.

14      Q    Okay.  And so -- and who is Salle Yoo?

15      A    She's Uber's general counsel.

16      Q    And Mr. Henley?

17      A    He's our -- Uber's head of investigations.

18      Q    Now, we were discussing before, the e-mail

19   chain begins on -- with an e-mail from Ms. Yoo to

20   yourself, stating:

21           "Joe, could we find out a little more about

22   this plaintiff?"

23           Do you see that?

24      A    Uh-huh.

25      Q    Did you have further discussions with Ms. Yoo

```
 1   concerning this e-mail?

 2       A   No.

 3       Q   Did you discuss with her what sort of

 4   information she was looking for?

 5       A   No.

 6       Q   Did you discuss with her why she wanted to

 7   find out a little bit more about the plaintiff?

 8       A   No.

 9       Q   Now, the e-mail from Ms. Yoo to you reflects

10   a forward.

11           Do you see that in the subject line?

12       A   Yes.

13       Q   Do you know what was -- what communications

14   she forwarded to you?

15       A   I don't.

16       Q   Do you have any understanding of -- well,

17   I'll withdraw that question.

18           You take Ms. Yoo's communication and forward

19   it along to Mr. Henley; correct?

20       A   Yes.

21       Q   And you also attach a copy of the complaint,

22   which I presume was attached to what Ms. Yoo sent you?

23       A   I think so, but I can't say for certain

24   without -- I mean, yeah, it showed -- actually, I can.

25   It shows that I forwarded it to -- I forwarded it to
```

```
 1    looking for you to look into Mr. Meyer?

 2            MR. HANNA:  Objection to the form of the

 3    question; asked and answered.

 4            You can -- you can answer again.

 5            THE WITNESS:  Yeah, I already answered that I

 6    had not.

 7            MR. BRIODY:  Q.  Did there come a time, after

 8    you forwarded the e-mail to Mr. Henley, when you

 9    discussed with Ms. Yoo the reasons why she suggested

10    to you to find out a little bit more about Mr. Meyer?

11        A    No.

12        Q    And I just want to be clear on this.  I would

13    like you to tell me all of the reasons why you

14    understand the investigation of Mr. Meyer was

15    undertaken.

16        A    I can't tell you why Salle Yoo made the

17    request to me.  I can tell you why I thought it was a

18    good idea.

19        Q    Okay.

20        A    And I already did.

21        Q    Okay.  Now, after you sent this e-mail to

22    Mr. Henley, did you -- well, let me take a step back.

23            Did you understand, when Ms. Yoo sent this

24    e-mail to you about finding out a little bit more

25    about the plaintiff, she had discussed this lawsuit
```

 1      A    I don't know if he -- they did or not.

 2      Q    You haven't gotten any recordings or any of

 3   the sort of work product behind this report?

 4      A    All I've seen is this report, and I've only

 5   reviewed it one -- one time in January.

 6      Q    Now, was it expected when you tasked -- well,

 7   let me -- let me ask you this:  Did you have a

 8   conversation with Mr. Henley, when you gave him his

 9   assignment back on December 16 -- December 16, 2015,

10   that it should be kept confidential?

11      A    What do you -- what do you mean a

12   conversation?

13      Q    Did you tell him, Hey, look into this

14   plaintiff, but don't let anyone know we're doing it?

15      A    I don't think I had any conversations with

16   him, other than the e-mail exchange.

17      Q    Okay.  Was it your understanding, based on

18   your prior work with Mr. Henley, that the

19   investigation would be kept confidential and not

20   published to everybody that it was happening?

21      A    I think -- I think that would be consistent

22   with my expectation.

23           MR. HANNA:  Is now a good time for a break,

24   John?

25           MR. BRIODY:  Let me check.  Yeah, that's

```
 1      A    In the -- in the recent -- in the recent

 2   past, as this -- as this process was initiated, that's

 3   how I learned that there had been complaints.

 4      Q    It came to your attention -- when did it come

 5   to your attention that there were complaints by

 6   plaintiff's counsel concerning the Ergo investigation?

 7      A    I don't recall the specific date, but it was

 8   in the context of this process by our legal

 9   department.

10      Q    And I just want names.

11           Who did you communicate with on that issue in

12   your legal department?

13      A    I think I was originally -- I think I

14   originally heard it from Lindsey Haswell.

15      Q    Okay.  Now, I want to ask you a question

16   about Ms. Haswell.

17           Was Ms. Haswell at all involved or having any

18   discussions with you in connection with the retention

19   of Ergo and the request for an investigation of

20   Mr. Meyer?

21      A    No.

22      Q    And when, if you can -- did you first

23   discuss -- or I'll withdraw that question.

24           Did you speak with Mr. White concerning the

25   investigation of Mr. Meyer by Ergo?
```

```
 1     A    I don't -- who is Mr. White?

 2     Q    I'm sorry.

 3          MR. WHITE:  It's okay.

 4          MR. BRIODY:  He's right here.

 5     Q    In any case, I'll take that as a "no."

 6          And is it -- you're -- you're --

 7     A    Does his business card say Mr. White?

 8     Q    -- chief secure -- as chief security --

 9     A    I'm not used to referring to people by their

10   last name and Mister at Uber.

11     Q    Okay.  Understood.

12     A    That sounded like something out of Clue.

13     Q    That's Mrs. White --

14     A    Yeah.

15     Q    -- if I remember correctly.

16          So in your role at Uber, do you work with --

17   withdrawn.

18          Is it your understanding that Ms. Haswell

19   works in litigation at Uber?

20     A    I think so.

21     Q    Okay.  And do you work with the litigation

22   group frequently?

23     A    Not frequently.

24     Q    Is it unusual for you to be working and

25   interacting with the litigation group at Uber?
```

```
 1      A   It's not unusual.  I mean, it happens.

 2      Q   Now, are you aware that, when Ergo approached

 3  information sources, it did not tell them the truth

 4  about the reasons why it was asking for information in

 5  connection with the Meyer investigation?

 6      A   I was not aware of that.  I understand from,

 7  like, the preparation for today that that's been an

 8  issue that's been suggested.

 9      Q   Okay.  Sitting here today, are you aware that

10  Ergo made false statements in connection with its

11  investigation of Mr. Meyer?

12      A   I can't say whether they have or have not --

13  whether they did or did not.

14      Q   Okay.  And you -- to be clear on the question

15  before, you did not do anything to supervise Ergo's

16  investigation as it was unfolding; correct?

17      A   That's right.

18      Q   Now, if you could tell me briefly, I just

19  want to know what your role was after you became aware

20  that the plaintiff's counsel had approached

21  Mr. Kalanick's counsel with a problem about the Ergo

22  investigation of Mr. Meyer.

23          What role, if any, did you play?

24      A   I don't know if -- I don't know if the

25  attorneys you described ever talked, so I don't know
```

```
 1    or go to certain places.  Sometimes we have to put

 2    photo -- give photographs to guards in the lobbies of

 3    people we -- who keep showing up.  Sometimes we have

 4    to clean up broken windows.

 5          Sometimes we have to deal with -- you know,

 6    we just have to deal with, on a daily basis, threats

 7    to our employees, and not just threats, but actual

 8    manifestation of those threats.

 9          So, I'm always on the lookout when situations

10    arise that could be a cause for concern, and I'm

11    always careful to make sure that we do our diligence

12    in those situations.

13          MR. BRIODY:  Q.  And so what I'm -- I -- I

14    want to know is, if you can tell me specifically with

15    respect to this situation and -- and Mr. Meyer's suit:

16    What was it about it that made you feel like --

17       A    Sure.

18       Q    -- that this was a situation where you had to

19    go and look at the individual?

20       A    I think I -- I answered this already earlier

21    as well.  But the two things that, you know, looking

22    again at it now, stand out pretty clearly were that it

23    was a -- it was naming our CEO individually rather

24    than the company, and that it was titled as an

25    antitrust lawsuit, which I don't -- as I said earlier,
```

1    I don't know anything about antitrust law, but I

2    don't -- like, being a small company that has a small

3    percentage of transportation facilitation doesn't

4    strike me -- it just seemed, like, odd to me.

5         MR. HANNA:  A lawsuit that didn't have merit?

6    Just kidding.

7         THE WITNESS:  Well, I mean --

8         MR. BRIODY:  You've gotten away with a few

9    jokes today, Mr. Hanna.  That one was the least funny

10   of all of them and was most incorrect, but...

11        THE WITNESS:  And with that -- like, I can't

12   speculate on the merits of a particular lawsuit.  But

13   I have seen suggestions of lawsuits or lawsuits

14   involving people who were potentially of concern.

15   And -- and so, you know, that's what was -- was

16   something that made me want to take a look.

17        MR. BRIODY:  Q.  Now, Uber is involved in

18   litigations brought by Uber drivers from time to time;

19   right?

20     A   I don't -- I don't know for certain, but I

21   would -- I think so.

22     Q   Have you commissioned investigations or

23   diligence similar to the -- what you requested of

24   Mr. Henley here for drivers that are in litigation

25   against Uber?