# EXHIBIT C

## Redacted Pursuant to Court Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3

 4   SPENCER MEYER, individually
     and on behalf of those
 5   similarly situated,

 6              Plaintiffs,
     vs.                          No. 1:15 Civ. 9796 (JSR)
 7
     TRAVIS KALANICK,
 8
                Defendant.
 9   _____/

10

11

12       CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13             DEPOSITION OF MATHEW G. HENLEY

14                SAN FRANCISCO, CALIFORNIA

15               WEDNESDAY, JUNE 22, 2016

16

17

18

19

20

21

22   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23        CSR LICENSE NO. 9830

24        JOB NO. 504144

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3

 4    SPENCER MEYER, individually
      and on behalf of those
 5    similarly situated,

 6                  Plaintiffs,
      vs.                            No. 1:15 Civ. 9796 (JSR)
 7
      TRAVIS KALANICK,
 8
                  Defendant.
 9    _____/

10

11

12

13          Deposition of Mathew G. Henley, taken on

14      behalf of the Plaintiff, at Gibson, Dunn &

15      Crutcher, LLP, 555 Mission Street, 30th Floor,

16      San Francisco, California, Pursuant to Notice,

17      before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR,

18      CLR ~ CSR License No. 9830.

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3

 4      ON BEHALF OF THE PLAINTIFF:

 5           MCKOOL SMITH, P.C.

 6           By:   JOHN C. BRIODY, Esq.

 7           One Bryant Park, 47th Floor

 8           New York, New York 10036

 9           Phone: 212.402.9400

10           jbriody@mckoolsmith.com

11

12      ON BEHALF OF UBER TECHNOLOGIES:

13           GIBSON DUNN & CRUTCHER, LLP

14           By:   NICOLA T. HANNA, Esq.

15                 LAURA J. PLACK, Esq.

16           3161 Michelson Drive

17           Irvine, California 92612-4412

18           Phone:  949.451.3800

19           nhanna@gibsondunn.com

20

21      ALSO PRESENT:  Martin White, Uber

22                     Angela Padilla, Uber

23

24                     ---oOo---

25
```

```
 1                    SAN FRANCISCO, CALIFORNIA

 2                   WEDNESDAY, JUNE 22, 2016

 3                        9:11 A.M.

 4

 5

 6                    MAT HENLEY,

 7            having been sworn as a witness

 8         by the Certified Shorthand Reporter,

 9              testified as follows:

10

11        MR. HANNA:  Before we start -- this is Nic

12   Hanna for Uber Technologies.  I wanted to state a

13   couple of things for the record.

14        First of all, with respect to the Ergo

15   matter, Uber Technologies has asserted certain

16   privileges and positions in this matter, including

17   with respect to various documents that were submitted

18   in camera to the Court.

19        The Court has ordered some of the documents

20   produced to Mr. Meyer and his counsel, which has been

21   accomplished, and we expect that the deposition today

22   will focus on those documents and related subject

23   areas.

24        I want to state at the outset that the --

25   that by proceeding with this court-ordered deposition,
```

```
 1    Uber Technologies does not intend to waive or

 2    relinquish any of the privileges or positions that

 3    have been asserted in the past, and hereby preserves

 4    those privileges and positions to the fullest extent

 5    the law allows.

 6           Second, because we believe that this

 7    deposition will encompass matters that relate to the

 8    attorney-client privilege and the attorney work

 9    product doctrine, we intend to designate the entirety

10    of this deposition transcript as "Confidential Under

11    the Protective Order" that's been issued in this case.

12           MR. BRIODY:  Okay.  John Briody, McKool

13    Smith, on behalf of plaintiff.  I understand counsel

14    has made his reservation of rights.  We obviously have

15    a disagreement concerning these issues, but we are

16    proceeding.

17           And we understand that they are making the

18    designation that this transcript be Confidential.

19           We also want to note that counsel for the

20    defendant, Travis Kalanick, was provided notice of

21    this deposition, and I understand that they have

22    elected not to attend, and we're going forward.

23    ///

24    ///

25    ///
```

Matthew Henley - Confidential
June 22, 2016
6

| | |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MR. BRIODY: |
| 3 | Q   Good morning, Mr. Henley. |
| 4 | A   Good morning. |
| 5 | Q   Can you please state your name for the |
| 6 | record. |
| 7 | A   Mat Henley. |
| 8 | Q   Do you have a middle name? |
| 9 | A   Gene. |
| 10 | Q   Okay.  And can you state your home address, |
| 11 | please. |
| 12 | A   Redacted |
| | |
| 14 | Q   And who is your employer, Mr. Henley? |
| 15 | A   Uber. |
| 16 | Q   And what is the title of your position at |
| 17 | Uber? |
| 18 | A   Director of security. |
| 19 | Q   And tell me a little bit about what the |
| 20 | director of security does. |
| 21 | A   I focus on threats against the company, our |
| 22 | driver partners, our riders, our employees, our |
| 23 | facilities. |
| 24 | Q   Can you give me a brief overview of what |
| 25 | kinds of threats you're talking about. |

Matthew Henley - Confidential
June 22, 2016

```
 1   question.
 2           THE WITNESS:  I had no context, other than
 3   who is the plaintiff, was the question.
 4           MR. BRIODY:  Q.  What was the last part?
 5   Other than what?
 6       A   Who is the plaintiff.  That was the...
 7       Q   So, could you tell me what your understanding
 8   is for the reason for the investigation of the
 9   plaintiff?
10       A   I had no --
11           MR. HANNA:  Objection to the form of the
12   question.
13           And clarification:  Do you mean his -- his
14   understanding of what he did, or what others'
15   motivation --
16           MR. BRIODY:  His -- his understanding --
17   well, let me take a step back.
18       Q   Mr. Henley, you were responsible for
19   retaining Ergo in connection with this investigation?
20       A   Correct.
21       Q   And why did you understand you were retaining
22   Ergo?
23       A   Because Salle and Joe asked us to just --
24   there was a -- this is an unknown plaintiff, and they
25   wanted diligence on who this person was.
```

```
 1        Q    Why did they want to have diligence done?
 2             MR. HANNA:  Objection to the form of the
 3   question; calls for speculation.
 4             THE WITNESS:  I have no idea.
 5             MR. BRIODY:  Q.  Did they -- did -- now,
 6   Salle is who?
 7        A    Our general counsel.
 8        Q    And that's Salle Yoo?
 9        A    Yes.
10        Q    And Joe refers to who?
11        A    Joe Sullivan.
12        Q    Do you have -- did Ms. Yoo or Mr. Sullivan
13   communicate to you why they wanted to have diligence
14   done?
15        A    No.
16        Q    Okay.  Did you ever communicate directly with
17   Ms. Yoo in connection with the retention of Ergo?
18        A    No.
19        Q    What about Mr. Sullivan?
20        A    Just the -- with the retention of Ergo or --
21        Q    Correct.
22        A    I don't think I quite understand it.
23             As in deciding whether or not to --
24        Q    Let me -- let me clarify.
25             When did you retain Ergo?
```

```
 1       A   When did we first talk with them, or when did

 2   we -- in this case?

 3       Q   I'd like to focus on the -- let me take a

 4   step back.

 5           So, you understand that Ergo undertook an

 6   investigation of Mr. Meyer?

 7       A   Correct.

 8       Q   When did Uber retain Ergo to conduct an

 9   investigation?

10       A   To do that specific one?

11       Q   Yes.

12       A   I don't know the exact date.

13       Q   Was it in December?

14       A   I believe so, yes.  I think late December.

15       Q   And -- and did anyone at Uber tell you to

16   retain Ergo?

17           MR. HANNA:  Objection to the form of the

18   question.

19           THE WITNESS:  I'm getting held up on the

20   "retain" word.

21           MR. BRIODY:  Q.  So my understanding is --

22   well, let me take a step back.

23           Ms. Yoo and Mr. Sullivan advised you that

24   they wanted you to undertake an investigation of

25   Mr. Meyer; correct?
```

1        MR. HANNA:  Objection to the form of the

2   question; mischaracterizes testimony.

3        THE WITNESS:  They asked for diligence on

4   him.  That is correct.

5        MR. BRIODY:  Q.  And did they tell you any

6   particular way to conduct that diligence?

7   A    No.

8   Q    Who decided to retain Ergo?

9   A    Me.

10  Q    Did you retain any other investigation firm,

11  any kind of consultant, vendor, or any other party to

12  conduct diligence of Mr. Meyer?

13  A    No.

14  Q    What about Mr. Schmidt?

15  A    No.

16  Q    What about any counsel in this litigation on

17  behalf of the plaintiff?

18  A    No.

19  Q    When did Ergo's investigation of Mr. Meyer

20  conclude?

21  A    I'm not sure the exact date.

22  Q    Was it in February?

23  A    It would have been whenever the date that

24  they sent me the report.

25  Q    Who spoke with Ergo in connection with its

```
 1        Q    Okay.  Now, let's talk about the retention of

 2   Ergo with respect to the Meyer project.

 3             Who was involved in that?

 4        A    Me.

 5        Q    Just you?

 6        A    For the retention piece, just me.

 7        Q    Now -- now, there -- we can -- I'd like to

 8   stop now and talk about the Ergo investigation itself.

 9             Who managed, from Uber's standpoint, the Ergo

10   investigation itself?

11        A    What do you mean by managed?

12        Q    Did anyone perform oversight, after Ergo was

13   retained for the Meyer project, over what Ergo was

14   doing on the Meyer project?

15             MR. HANNA:  Objection to the form of the

16   question.

17             THE WITNESS:  There -- yeah, there's no

18   management from our part.

19             MR. BRIODY:  Q.  So there was pre-retention,

20   retention, then Ergo was conducting the investigation?

21        A    Yep.

22        Q    And Uber is not participating in that

23   investigation or overseeing it --

24        A    No.

25        Q    -- is that fair?
```

```
 1        A    Fair, yes.

 2        Q    Now, when -- a report is tendered by Ergo to

 3   you; right?

 4        A    Yep.

 5        Q    And we can -- we'll go through some documents

 6   later on, but I just want to get the broad picture

 7   here.

 8             That happens, I can tell you, around

 9   January 19th.

10        A    Uh-huh.

11        Q    When is Uber's next involvement with respect

12   to Ergo?

13             MR. HANNA:  Objection to the form of the

14   question.

15             THE WITNESS:  What do you mean by

16   involvement?

17             MR. BRIODY:  Next contact, next reach-out to

18   Ergo.

19             THE WITNESS:  I don't know.

20             MR. BRIODY:  Q.  What was -- when was your

21   next reach-out to Ergo after you got the report?

22        A    Really, at that point, Craig had been fully

23   on-boarded and was managing it.  And I don't remember

24   if I talked to them after the report piece.

25        Q    And "Craig" refers to Craig Clark?
```

```
 1        A    Uh-huh.

 2        Q    My first question is:  Do you have documents

 3   that were created in connection with the -- I'm going

 4   to withdraw that question.

 5             Are there documents that you created or were

 6   sent to you in connection with Ergo's investigation of

 7   Mr. Meyer that were destroyed?

 8        A    No.

 9        Q    Now, did you communicate with Ergo via Wickr?

10        A    No.

11        Q    Okay.

12             MR. HANNA:  You've got to slow down and give

13   me a chance to hear the question.

14             THE WITNESS:  Sorry.

15             MR. BRIODY:  Q.  Do you know what Wickr is?

16        A    Yes.

17        Q    And how do you spell Wickr?

18        A    W-I-C-K-R.

19        Q    And what is Wickr?

20        A    A chat program.

21        Q    Okay.  And is one of the features of Wickr

22   that the messages that you send automatically delete

23   themselves?

24             MR. HANNA:  Objection to the form of the

25   question.
```

```
 1          And Mr. Egeland testified that you did indeed

 2   use Wickr in communicating with him.

 3          And so, are you telling me that Mr. Egeland

 4   is wrong, that you never did communicate with him via

 5   Wickr?

 6          MR. HANNA:  Objection to the form of the

 7   question.

 8          THE WITNESS:  I have no -- besides us

 9   switching or exchanging user names, I don't believe we

10   ever actually communicated over Wickr.

11          MR. BRIODY:  Q.  Now, it's your understanding

12   that, if you did indeed communicate via Wickr, we

13   wouldn't be able to get those communications today?

14          MR. HANNA:  Objection to the form of the

15   question.

16          THE WITNESS:  Correct.

17          MR. BRIODY:  Q.  Now, is -- do you -- do you

18   communicate using Wickr as part of -- in your role at

19   Uber -- as a part of your work at Uber?

20          MR. HANNA:  Objection to the form of the

21   question.

22          THE WITNESS:  Yes, we use it.

23          MR. BRIODY:  Q.  Have you used Wickr to

24   communicate in connection with the Meyer -- with other

25   folks at Uber in connection with the Meyer litigation?
```

```
 1        Q   Now, were you aware of the manner in which

 2   Ergo is going to reach out and contact the seven

 3   primary sources in order to obtain interviews and

 4   information?

 5            MR. HANNA:  Objection to the form of the

 6   question.

 7            MR. BRIODY:  And let me be clear about this.

 8        Q   Prior -- let's pick a date.  Jan- -- prior to

 9   January 19th, prior to receiving Ergo's report, were

10   you aware of the manner in which Ergo was going to

11   reach out to the seven primary sources?

12        A   I still don't know how they reached out.

13        Q   Oh, so -- so the answer to that question is

14   "no"?

15        A   No.

16        Q   And after you received the report, did you

17   ever learn how Ergo was reaching out to the seven

18   primary sources?

19        A   No.

20            MR. HANNA:  Slow down.

21            MR. BRIODY:  Q.  Is that something that you

22   were ever concerned about, how Ergo might be reaching

23   out to the seven primary sources --

24            MR. HANNA:  Objection --

25            MR. BRIODY:  Q.  -- in the period between the
```

```
 1   telling people about?

 2       A    It depends on the people.

 3       Q    Do you go tell strangers about a sensitive

 4   matter?

 5            MR. HANNA:  Objection to the form of the

 6   question.

 7            THE WITNESS:  I don't know what that means.

 8            MR. BRIODY:  Q.  You said it depends on the

 9   people; right?

10            I asked you:  Is a sensitive matter something

11   you go telling people about?

12            It depends on the people.

13            I'm giving you a category of people:

14   Strangers.

15            Would you go telling strangers about a

16   sensitive matter?

17            MR. HANNA:  Objection to the form of the

18   question.

19            THE WITNESS:  It would depend on the matter.

20            MR. BRIODY:  Q.  What about this matter?

21            What about the investigation --

22       A    What aspect of this investigation?

23       Q    The fact that it was being undertaken.

24       A    Would I -- okay.  So that's better.

25            You're asking, would the elements of the fact
```

 1   that Uber is involved, be told to a stranger?

 2       Q    Correct.

 3       A    That would be fine.

 4       Q    That would be fine?

 5       A    Yes.

 6       Q    What about the target -- what about the

 7   sources?

 8            MR. HANNA:  Objection; calls for speculation.

 9            MR. BRIODY:  Q.  What about the sources in

10   connection, who were going to give information with

11   respect to the investigation, who Ergo was going to go

12   to and ask for information?

13            Is it okay --

14       A    Are you referring --

15       Q    -- to tell them?

16       A    -- to the -- sorry.

17            MR. HANNA:  Objection to the form of the

18   question; calls for speculation; hypothetical.

19            THE WITNESS:  Are you referring to the

20   seven primary source interviews?

21            MR. BRIODY:  Yes.

22            THE WITNESS:  And now --

23            MR. HANNA:  Same objections.

24            THE WITNESS:  And state the question again.

25            MR. BRIODY:  Q.  I'm asking you if it was

```
 1            MR. BRIODY:  I'm -- it's my expla- -- no,
 2    it's my explanation.  He's asking me -- and look, I'm
 3    giving you a lot of liberty here, Mr. Hanna.  But
 4    I'm -- I'm trying to get an answer to a specific
 5    question.  I'm asking the witness.
 6       Q    When you characterized something as under the
 7    radar, did you expect to have Ergo -- was it okay for
 8    Ergo -- did you support Ergo going and telling the
 9    people that it was reaching out to, in connection with
10    this investigation, who it was being conducted for and
11    what it was about?
12            MR. HANNA:  Objection to the form of the
13    question.
14            THE WITNESS:  Not knowing who the seven
15    primary sources are, I -- I don't know what was
16    appropriate or not appropriate.
17            MR. BRIODY:  Q.  So, it would have been fine,
18    from Uber's perspective, for Ergo's investigator to
19    reach out to anybody in connection with this
20    investigation -- and we'll put the plaintiff and his
21    counsel specifically to the side -- and tell them,
22    "I'm trying to find out more about the plaintiff," or,
23    "I'm trying to find out more about plaintiff's
24    counsel.  I'm doing it for Uber in connection with a
25    lawsuit.  What can you tell me?"
```

```
 1            That would be okay from Uber's perspective?

 2            MR. HANNA:  Objection to the form of the

 3  question.

 4            THE WITNESS:  Yes.

 5            MR. BRIODY:  Q.  Did you want to know or were

 6  you interested in knowing the means by which Ergo goes

 7  out and gets its information?

 8            MR. HANNA:  Objection to the form of the

 9  question.

10            THE WITNESS:  Can you restate?  You asked

11  kind of two questions there.

12            MR. BRIODY:  Sure.  Sure.

13     Q   Did you want to know how Ergo was going about

14  getting its information in connection with the Meyer

15  investigation?

16     A   Did I want to know?

17     Q   (Counsel nods head.)

18     A   It's -- no.  I think, you know, the fact

19  that, you know, they are the company that they are,

20  and they are -- work through our MSA process with our

21  legal team under how they operate, you know, as long

22  as it's, again, legal and professional, I'm good with

23  it.

24     Q   Did you have any chance to look up Ergo's

25  website ever?
```

```
 1      Q   But you did participate -- you attended the

 2   meeting?

 3      A   Correct.

 4      Q   And tell me everything that you remember Ergo

 5   stating to you and Mr. Clark at the meeting.

 6      A   I don't remember much.  I mean, it was not

 7   a -- it was not a long meeting.  It was really an

 8   apology regarding the rogue investigator.  And I --

 9   yeah, I -- that's all.  It wasn't something that

10   was -- that I was heavily involved with at the time.

11   So it was kind of more to meet Todd face-to-face, but

12   it was more of a Craig meeting.

13      Q   What did Mr. Clark say to the Ergo folks at

14   the meeting?

15      A   I don't remember what Mr. Clark said.

16      Q   If you could paraphrase the subject matter,

17   tell me all that you know about what was communicated

18   by Mr. Clark to Ergo.

19      A   Beyond the general subject matter of what

20   they were discussing and, you know, having multiple

21   executives talking to Craig and apologizing, I don't

22   know the details that were discussed.  I don't

23   remember if there was much more beyond the apology.

24      Q   And you say "beyond the general subject

25   matter of what they were discussing."
```

```
 1          What -- what do you mean by that?
 2      A   The fact that they were apologizing for the
 3  rogue investigator.
 4      Q   Was Mr. Clark upset at the meeting?
 5      A   Was he upset at the meeting?
 6      Q   Yeah.  Did you -- when you were at the
 7  meeting and you perceived him, did he seem upset with
 8  Ergo?
 9      A   I don't remember if I perceived a mood.
10      Q   Did -- did you or Mr. Clark tell Mister --
11  and let me be clear on something.
12          In terms of from Uber, the only individuals
13  who were there were you and Mr. Clark; is that right?
14      A   Yes, I believe that's correct.
15      Q   And no one participated via telephone or
16  video con?
17      A   The Ergo person?
18      Q   Right.
19      A   No.
20      Q   But beyond that, no one from Uber; right?
21      A   I don't believe so.
22      Q   Okay.  Did you -- did you or Mr. Clark
23  communicate to Ergo that you were displeased because
24  the Ergo investigators used pretext and false
25  statements in connection with the investigation of
```

 1    Mr. Meyer and Mr. Schmidt?

 2        A    I don't remember what Craig said for sure.

 3    And I don't remember necessarily being very active in

 4    this -- in this meeting; right.

 5        Q    I know.

 6             But did you hear anybody say, Hey, this was a

 7    bad thing.  You guys shouldn't have done this?

 8        A    No.

 9        Q    Something like that?

10        A    I'm not remembering specifics of what was

11    said when.

12        Q    Did -- did anyone tell -- was the sub- --

13    withdrawn.

14             Was the subject matter of Ergo's apology

15    relating to the fact that Uber's identity was

16    discovered in connection with this investigation?

17             MR. HANNA:  Objection to the form of the

18    question.

19             THE WITNESS:  The -- sorry.

20             MR. HANNA:  You can answer.

21             THE WITNESS:  The apology was -- or the

22    subject of the apology was the fact that they had a

23    rogue investigator.

24             MR. BRIODY:  Q.  And that -- was it just that

25    they had -- they told you they had a rogue

```
 1    investigator, and that was the end of the meeting, or

 2    was there some discussion about what they believed, at

 3    least -- I'm going -- I'm going from what you heard --

 4    from their perspective, that what the rogue

 5    investigator did was wrong, and why they should be

 6    apologizing to Ergo -- I mean, to Uber?

 7        A    No.  I -- whatever details were discussed

 8    between Ergo and Uber up until that meeting would have

 9    been when those details were discussed.

10        Q    Okay.  And so no one said any -- from Ergo

11    said anything like, Look, we're sorry.  This

12    investigator was a rogue investigator.  You know, your

13    confidentiality was breached, and people -- the

14    plaintiffs in the lawsuit were able to figure out that

15    you were behind the investigation.

16             No one said anything like that?

17        A    To the best of my --

18             MR. HANNA:  Objection to the form of the

19    question.

20             THE WITNESS:  To the best of my knowledge,

21    no.

22             MR. BRIODY:  Q.  And I take it no one from --

23    neither you nor Mr. Clark said to anyone at Ergo, Hey,

24    you shouldn't be using pretext or false

25    representations to individuals to get information
```

```
 1    about a party in litigation with Uber's CEO.

 2            No one said anything like that?

 3            MR. HANNA:  Objection to the form of the

 4    question.

 5            THE WITNESS:  You've asked this a few times.

 6    The answer is no.

 7            MR. BRIODY:  Q.  And no one from Ergo

 8    explained to you or Mr. Clark, during this meeting,

 9    that the apology was because Ergo was found out, and

10    the investigation was traced back to Uber?

11            MR. HANNA:  Objection; asked and answered

12    several times.

13            THE WITNESS:  Yeah, restate it.  It's rambly

14    [sic].  I don't -- I couldn't follow again.  So --

15            MR. BRIODY:  Q.  I'm just trying to figure

16    out -- I'm asking -- well, I'm trying -- you're saying

17    you don't remember very much, or I'm not getting much.

18    I'm trying to jog your memory.  I'm trying to ask

19    specific questions about what was --

20        A   Can you make --

21        Q   -- referenced.

22        A   -- it more specific, is what I'm asking.

23        Q   I sure can.  I'm trying to be specific.

24            And I'm trying to ask if the apology that was

25    delivered by Ergo was an apology based on the fact
```

```
 1   that the rogue employee's conduct led to the

 2   investigation being traced back to Uber?

 3        MR. HANNA:  Objection to the form of the

 4   question; asked and answered.

 5        THE WITNESS:  The subject of the meeting was

 6   an apology based on a rogue investigator.

 7        MR. BRIODY:  Q.  And no one said why the

 8   investigator was rogue?

 9        MR. HANNA:  Same objection.

10        THE WITNESS:  And not to my recollection.

11        MR. BRIODY:  Q.  And it wasn't -- as the

12   person who retained Ergo to conduct this

13   investigation, it wasn't important to you to find out

14   what that -- exactly that rogue employee did that was

15   outside of what normally should have been done at

16   Ergo; is that right?

17        MR. HANNA:  Objection to the form of the

18   question.

19        THE WITNESS:  It was not important.  It had

20   been handed over to Craig Clark --

21        MR. BRIODY:  Okay.

22        THE WITNESS:  -- who was running it.

23        MR. BRIODY:  Q.  So you -- so after 19,

24   you're putting that over -- Mr. Clark is the one who's

25   going to --
```