# EXHIBIT D

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4  SPENCER MEYER, individually
    and on behalf of those
 5  similarly situated,

 6            Plaintiffs,
    vs.                      No. 1:15 Civ. 9796 (JSR)
 7
    TRAVIS KALANICK,
 8
              Defendant.
 9  _____/

10

11

12     CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13            DEPOSITION OF CRAIG CLARK

14            SAN FRANCISCO, CALIFORNIA

15            THURSDAY, JUNE 23, 2016

16

17

18

19

20

21

22  BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23       CSR LICENSE NO. 9830

24       JOB NO. 504146

25
```

1              IN THE UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3

4    SPENCER MEYER, individually
     and on behalf of those
5    similarly situated,

6                    Plaintiffs,
     vs.                          No. 1:15 Civ. 9796 (JSR)
7
     TRAVIS KALANICK,
8
                     Defendant.
9    _____/

10

11

12

13          Deposition of Craig Clark, taken on behalf

14     of the Plaintiff, at Gibson, Dunn & Crutcher, LLP,

15     555 Mission Street, 30th Floor, San Francisco,

16     California, Pursuant to Notice, before me,

17     ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~ CSR

18     License No. 9830.

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3

 4       ON BEHALF OF THE PLAINTIFF:

 5            MCKOOL SMITH, P.C.

 6            By:   JOHN C. BRIODY, Esq.

 7            One Bryant Park, 47th Floor

 8            New York, New York 10036

 9            Phone: 212.402.9400

10            jbriody@mckoolsmith.com

11

12       ON BEHALF OF UBER TECHNOLOGIES:

13            GIBSON DUNN & CRUTCHER, LLP

14            By:   NICOLA T. HANNA, Esq.

15                 LAURA J. PLACK, Esq.

16            3161 Michelson Drive

17            Irvine, California 92612-4412

18            Phone:  949.451.3800

19            nhanna@gibsondunn.com

20

21       ALSO PRESENT:  Martin White, Uber

22                      Angela Padilla, Uber

23

24                    ---oOo---

25
```

 1                    SAN FRANCISCO, CALIFORNIA

 2                    THURSDAY, JUNE 23, 2016

 3                         8:04 A.M.

 4

 5

 6

 7                      CRAIG CLARK,

 8              having been sworn as a witness

 9           by the Certified Shorthand Reporter,

10                   testified as follows:

11

12                      EXAMINATION

13   BY MR. BRIODY:

14       Q   Good morning, Mr. Clark.

15       A   Good morning.

16       Q   Can you please state your full name for the

17   record.

18       A   Craig, C-R-A-I-G, Clark, C-L-A-R-K.

19           MR. HANNA:  John, before we get going, there

20   are a couple of matters I did want to put on the

21   record, as we did the other day.

22           First of all, with respect to the Ergo

23   matter, Uber Technologies has asserted certain

24   privileges and positions in this litigation with

25   regard to various documents that were submitted to the

 1    every case is different.

 2            MR. BRIODY:  Q.  Have you had an opportunity

 3    to apprise yourself of how the investigation of

 4    Mr. Meyer was conducted?

 5        A    No.

 6        Q    You have not, as you sit here today, taken it

 7    upon yourself to figure out how Ergo reached out to

 8    the sources in the report that it presented to Uber?

 9        A    Independent of -- not independent of this

10    particular matter.

11        Q    Well, let -- let me be clear about this.

12    With respect to the Meyer investigation, have you gone

13    and figured out and looked into what exactly Ergo did

14    to compile the report that it presented to Uber?

15        A    No.

16        Q    Why not?

17        A    This -- this matter is in litigation at this

18    point.  So, once -- once this issue came up -- and

19    when I say "this issue," this specific -- this -- the

20    reason we're sitting here today -- I would let

21    internal counsel deal with it.

22        Q    Okay.  Now, turning back to the purpose of

23    the investigation, why it was undertaken, I want to be

24    clear on a couple of things.

25            You did not retain Ergo; correct?

```
 1        A   Correct.

 2        Q   And you weren't involved in any way in the

 3   decision to retain Ergo?

 4        A   I was not.

 5        Q   And prior to the retention -- and let me take

 6   a step back.  All these questions are with respect to

 7   the investigation of Mr. Meyer.

 8            So, in terms of the investigation of

 9   Mr. Meyer, you did not retain Ergo; correct?

10        A   Correct.

11        Q   And you didn't say, Hey, let's use Ergo for

12   the investigation of Mr. Meyer; is that right?

13        A   Correct.

14        Q   And you were at the company as of

15   December 1st.  You had no role in suggesting to anyone

16   that an outside consultant should be retained to

17   perform an investigation of the plaintiff in the Meyer

18   litigation; is that right?

19        A   Correct.

20        Q   Who made those decisions?

21        A   I don't know.

22        Q   Okay.  Why -- and this is general -- going

23   back to your general experience and your testimony

24   concerning why an investigation like this might be

25   undertaken.
```

1      Q    And that was the telephone conversation?

2      A    I -- I believe so.  I'm not certain.

3      Q    Now, are you aware that information

4   concerning the Ergo investigation was provided to

5   plaintiffs through Mr. Kalanick's counsel?  Are you

6   aware of that?

7      A    I'm sorry.  Can you say that again?

8      Q    Yeah.

9           I'm asking you:  Are you aware that

10  information, details about the Ergo investigation,

11  were provided to plaintiff's counsel in this lawsuit

12  by counsel for Mr. Kalanick?

13     A    I'm not aware of the specifics.  I have to

14  assume that that happened.

15     Q    Okay.  Did you -- and what I'm trying to

16  figure out is:  Did you interact, yourself

17  personally -- I'm not looking for the details.

18          I just want to know:  Did you interact

19  personally, participate in phone calls, in any way

20  with counsel for Mr. Kalanick at Boies Schiller?

21     A    No, not that I recall.

22     Q    Do you know of anybody at Uber that did so?

23     A    I -- I -- probably internal counsel, but I

24  don't know.

25     Q    And you personally did not do anything to

 1    monitor how Ergo undertook and went about its

 2    investigation of Mr. Meyer?

 3        A   So there's -- there's nothing to monitor

 4    since it was completed.

 5        Q   Okay.  So, as from the period between -- let

 6    me go back to that guidepost -- January 4th through

 7    January 19th, you did nothing to monitor the

 8    investigation of Mr. Meyer by Ergo?

 9        A   No.  I'm not sure what you mean by monitor.

10            But January 19th, again, we established

11    that's when I became aware of it.

12        Q   But you wanted --

13        A   Completed the work --

14        Q   Oh, I'm sorry.  Please finish your answer.  I

15    cut you off.

16            And I just want to clarify:  You're not aware

17    of anyone at Uber monitoring Ergo and what it was

18    doing in connection with the Meyer investigation, and

19    how it was carrying out the investigation from

20    January 4th through January 19th?

21            MR. HANNA:  Objection; form.

22            THE WITNESS:  No.

23            MR. BRIODY:  Q.  Did you have an expectation

24    in connection with -- withdrawn.

25            I'll start at the beginning.

 1    to a potential interviewee."

 2            Let me stop right there.

 3            Did you discuss with Mr. Egeland or

 4    Mr. Moneyhon, before this e-mail was sent, an Ergo

 5    investigator going beyond the scope of the project?

 6        A    I don't recall specifically.

 7        Q    When you received this e-mail from

 8    Mr. Egeland, what did you understand him to mean when

 9    he talked about we should -- that -- that they have

10    safeguards in place that should have prevented our

11    investigator from going beyond the scope of the

12    project?

13        A    So, my understanding was that they had an

14    employee or an investigator who had -- who had gone

15    beyond or gone rogue -- I think they used the term

16    "rogue" -- and not followed their -- their internal

17    procedures and was operating without supervision.

18        Q    In what manner did the employee go rogue?

19        A    I don't know the specifics.

20        Q    They never told you?

21        A    Not that I recall.

22        Q    You never formulated a belief as to how the

23    employee went rogue?

24        A    The -- my -- my understanding is that the

25    employee was -- had gone beyond the scope of the -- of

```
 1    the protocols that Ergo had in place, and was acting

 2    on his -- on his or her own without supervision.

 3         Q   In what manner did the employee go beyond the

 4    scope of the protocols that Ergo had in place?

 5         A   I don't know.

 6         Q   You weren't curious, when they told you --

 7    when they sent you this e-mail, about how the employee

 8    went beyond the scope of the project that Uber

 9    commissioned?

10         A   Was I curious?

11             I think -- yeah, I suppose I was -- I don't

12    recall being curious.

13         Q   Did you ever find out how the employee went

14    beyond the scope of the project?

15         A   Yes.

16         Q   When?

17         A   In connection with this letter.

18         Q   When did you first learn about how the

19    employee went beyond the scope of the project?

20         A   Oh, I'm -- I'm sorry.  How they -- when did I

21    first learn?

22             On -- again, my understanding was that the

23    employee was acting without supervision and had

24    breached internal protocols that Ergo had in place.

25    So yeah, that's --
```

1          And when did I understand that?

2          It would have been around this time,

3  February 24th.

4     Q   Okay.  And I want to know:  What specifically

5  was your understanding of what the employee did that

6  breached the protocols at Ergo?

7          MR. HANNA:  Objection; asked and answered.

8          THE WITNESS:  Yeah, I don't have that

9  specifically with the -- I don't know the protocols or

10  the breach.

11         MR. BRIODY:  Okay.

12    Q   Do you have an understanding today of what --

13  and I'm not talking about back then; as we sit here

14  today -- of what the employee did that was rogue at

15  Ergo?

16         MR. HANNA:  Objection to the form of the

17  question.

18         THE WITNESS:  He wasn't following the

19  internal protocols and was acting without supervision.

20         MR. BRIODY:  Q.  What protocols was the --

21  the investigator not following?

22    A   Ergo's protocols.

23    Q   Relating to what?

24    A   I don't know.

25    Q   That never came up in your discussions with

```
 1   Ergo?
 2         They just said, "He's violating internal
 3   protocols," and you said, "Okay"?
 4         MR. HANNA:  Objection to the form of the
 5   question; misstates testimony.
 6         THE WITNESS:  So I -- I don't recall that
 7   specific exchange as you have characterized it.
 8         MR. BRIODY:  Okay.  Well, I'm just doing my
 9   exchange by way of example.
10     Q   Tell me the exchange that you had with Ergo
11   with respect to the protocols that this rogue employee
12   supposedly breached.
13     A   So, I don't know what those protocols were.
14   The details were not discussed.  An employee had --
15   they -- Ergo explained to me -- I believe it was Todd
16   who had said they had an employee who was operating
17   without supervision and had gone beyond and breached
18   their internal protocols.
19     Q   Okay.  Let's take a step back.
20         Beyond the scope of the project.  He doesn't
21   say that they did something in breach of internal
22   protocols.  It said scope of the project; right?
23         That's what he wrote you?
24     A   Yeah, that's what it says.
25     Q   Okay.  What about the scope of the project
```

```
 1   and obtain information through the use of a cover?

 2       A   No, not that I recall.

 3       Q   Is that something that you expected to hear

 4   when you spoke to the folks at Ergo?

 5       A   So, I would not expect -- I would not expect

 6   that.

 7       Q   "Expect that" being an apology or that

 8   conduct?

 9       A   That conduct.

10       Q   Now, did you ever say that to Ergo?

11       A   I don't recall.

12       Q   Did you ever tell Ergo -- Mr. Egeland,

13   Mr. Moneyhon, anyone at Ergo, "Hey, guys, this was

14   wrong.  You should not have reached out to the sources

15   and told them that you were something that you were

16   not" -- or rather -- I'll withdraw that question.

17           Did you ever reach out to Ergo and say, Hey,

18   guys, you were wrong.  You should not have reached out

19   to sources telling them you were working on some

20   project that you weren't actually working on?

21       A   I don't recall.

22       Q   Did you say -- ever say anything to that

23   effect, if not those specific words?

24       A   I don't recall.

25           MR. HANNA:  John, is now a good time for a
```

```
 1   there were distinct functions being performed between

 2   litigation counsel?

 3          What litigation -- what counsel was the

 4   litigation working on?

 5      A   Ms. Haswell.

 6      Q   Okay.  And they -- and what -- and when you

 7   say -- when you talk about litigation counsel, what

 8   litigation?

 9      A   The -- so there is -- maybe it will help you

10   understand a little bit about the -- kind of the

11   division of the -- there is -- within legal, there is

12   a team that handles litigation.

13      Q   Okay.  And who's on that team?

14      A   I don't know everybody, but Ms. Haswell and

15   somebody named Mr. White.

16      Q   And, with respect to this case -- this case

17   -- what I was wondering about before -- you said a

18   miscommunication -- and I don't -- correct me if I'm

19   wrong -- between litigation counsel and counsel

20   retained in the investigation; is that right?

21      A   Yeah, I think there was a miscommunication

22   between -- within the legal department where the

23   litigation team wasn't aware.

24      Q   Okay.  And the litigation team -- was the

25   litigation team working on the Meyer matter?
```

 1    somebody from Ergo on the phone.

 2         Q    R.P. Eddy?  Does that sound familiar?

 3         A    I don't know.  I don't know who was on the

 4    phone.

 5         Q    What did you talk about at that meeting?

 6         A    We talked about the -- the -- this matter.

 7         Q    Okay.  "This matter" being what?

 8         A    The -- the -- the Meyer matter.

 9         Q    The investigation of Mr. Meyer?

10         A    Yes.

11         Q    What did you say to the folks at Ergo at this

12    meeting?

13         A    I don't recall specifically what I said to

14    them.

15         Q    You don't need to tell me specifically.

16         A    Only.

17         Q    Can you give me the gist of what you

18    communicated to them?

19         A    So I -- so I can't recall the -- again,

20    who -- who asked for the meeting.

21              I remember -- I do remember the meeting, and

22    I remember Todd being very apologetic and -- and

23    expressing regret for -- for -- for what had happened.

24         Q    And what was it that happened that he was

25    apologizing for?

1       A    So, it had been -- again, they had an

2   employee who had gone rogue, that had breached their

3   internal protocols, and was acting without

4   supervision.  And they also -- they had trouble kind

5   of understanding what was -- figuring that out, if you

6   will.

7       Q    Tell me what you mean on -- by the last --

8   what you mean by the last point, that they had trouble

9   on figuring that out.

10      A    I -- I think that it was -- it seemed to

11  me -- based on my recollection today on the meeting,

12  that it seemed to me that there was some confusion on

13  their part about exactly what had happened with the

14  employee and the -- figuring out who they had spoken

15  with, those kind of matters, so yes.

16      Q    Had they fixed those problems at the time of

17  the March 22nd meeting?

18      A    So, I don't know what they had done.

19      Q    Okay.  You said that -- I'm going to ask you

20  again about whether anybody discussed how it was this

21  employee went rogue at this meeting?

22      A    I don't recall.

23      Q    What about breach of protocols?

24      A    I recall a discussion about them being very

25  apologetic that the employee had breached internal

1   protocols and was acting without supervision.

2       Q    What protocols were breached?

3       A    I don't know their protocols.

4       Q    Do you know that Uber has retained Ergo for

5   additional projects since the Meyer matter?

6           MR. HANNA:  Objection to the form of the

7   question.

8           THE WITNESS:  I'm -- I'm not sure.

9           MR. BRIODY:  Q.  You don't know one way or

10  another?

11      A    I -- actually, I'm not -- yeah, I'm not sure.

12  When you say before, I don't know.

13      Q    I didn't say before.  I said since.

14      A    Oh, since.

15      Q    Since the Meyer matter -- since the Meyer --

16  let me finish my point.

17          Since the Meyer investigation, has Uber

18  retained Ergo to do any sort of work for Uber?

19          MR. HANNA:  Objection; asked and answered.

20          THE WITNESS:  So I -- since the -- I don't

21  know, since the Meyer matter, since they filed

22  litigation.

23          MR. BRIODY:  Q.  Let's -- let's --

24      A    I need a time frame.

25      Q    Okay.  So, we have the two market analyses

```
 1   that were done; right?

 2       A   That I'm aware of, yes.

 3       Q   Did one of those get -- did Ergo get retained

 4   to perform those marketing analyses after your

 5   March 22nd meeting with Ergo?

 6       A   I'm not sure.

 7       Q   Do you know if Uber retained Ergo to perform

 8   a project for Uber in May of this year?

 9           MR. HANNA:  Objection; asked and answered.

10           THE WITNESS:  I'm not sure.

11           MR. BRIODY:  Q.  Did -- did -- were you upset

12   at the March 22nd meeting?

13       A   Upset?  I don't know if I'd characterize it

14   as upset.

15       Q   Were you unhappy with what Ergo did with

16   respect to its investigation of Mr. Meyer?

17       A   I'm sorry.  Can you ask that again?

18       Q   Sure.

19           Were you unhappy with what Ergo did with

20   respect to its investigation of Mr. Meyer?

21       A   So you've characterized it as -- you've

22   changed it from upset to unhappy.  So I -- I -- I

23   don't know if I would characterize it that way.  I

24   would say that I had concerns.

25       Q   How did you feel about the Ergo investigation
```

 1    of Mr. Meyer before the meeting on March 22nd, right

 2    before they walked in the door?

 3         MR. HANNA:  Objection to the form of the

 4    question; relevance.

 5         THE WITNESS:  I -- honestly, before --

 6    directly before a meeting, I was probably not thinking

 7    anything about this.

 8         I mean, you have to understand the -- the --

 9    kind of pace and scale of things that happen in an

10    in-house role.

11         So I -- to the extent I could even pinpoint a

12    feeling that I would have right before a meeting, it

13    probably was my last meeting.

14         MR. BRIODY:  Q.  Now, did they apol- -- they

15    apologized to you -- Mr. Egeland did, you said?

16      A    Yes, there was -- yes, they were apologetic.

17      Q    Did you tell Mr. Egeland there was no need

18    for an apology?

19      A    I don't recall saying that.

20      Q    Did you tell Mr. Egeland or Mr. Eddy, the

21    individual who was participating via the phone, that

22    you were displeased because Ergo investigators used

23    pretext in connection with the investigation --

24      A    I don't recall --

25      Q    -- of Mr. Meyer?

    1        A    -- saying that.

    2        Q    Did you tell anyone at this meeting that you

    3   were displeased because the investigation was traced

    4   back to Uber?

    5        A    I -- I don't recall.

    6        Q    Did you -- did you say to Ergo, We'll never

    7   use you or employ you again in any project for Uber?

    8        A    I don't recall.

    9        Q    You may have said that?

   10        A    I -- I don't know.  I don't recall saying

   11   that.

   12        Q    Was the focus of Mr. Egeland's apology to you

   13   on the fact that Ergo's investigator should not have

   14   contacted a source acquainted with plaintiff's

   15   counsel, and should not have sent questions in

   16   writing?

   17        A    I don't recall the specific words that

   18   Mr. Egeland said.

   19        Q    I'm not asking for the specific words.

   20             I'm asking you:  Is that the substance of

   21   what he was apologizing for?

   22        A    I don't recall the specific substance, or

   23   with that level of detail.  Mr. Egeland's -- and I

   24   wouldn't -- I don't know that I would even

   25   characterize it as an apology.  I said that they were

```
 1    apologetic -- Mr. Egeland was apologetic that this had

 2    occurred, that the -- they had an employee that they

 3    did not have control of, who had -- who had breached

 4    their internal protocols.

 5        Q    Part of the apology or the apologetic

 6    demeanor of Mr. Egeland, as you phrase it, did not

 7    concern the fact that Ergo made misrepresentations

 8    about the purpose for its investigation to sources

 9    that it used in its investigation; right?

10            MR. HANNA:  Objection to the form of the

11    question.

12            THE WITNESS:  I don't recall that -- the

13    specifics beyond what I've already stated.

14            MR. BRIODY:  Q.  Did Mr. Egeland apologize --

15    was Mr. Egeland apologetic to you because Ergo got

16    caught?

17            MR. HANNA:  Objection to the form of the

18    question.

19            THE WITNESS:  The -- again, the specifics of

20    the -- that I recall in the meeting were about the

21    rogue employee who had breached protocols and was

22    acting outside -- outside the -- without supervision.

23            MR. BRIODY:  Q.  But you don't know what the

24    protocols were?

25        A    I don't.
```

```
 1       Q   And you don't know what the supervision was

 2   that needed to be in place?

 3       A   I do not.

 4           (Documents marked Exhibits 62 - 63

 5            for identification.)

 6           MR. BRIODY:  I'm going to hand you what's

 7   been marked -- this is another e-mail and attachments,

 8   so I'm going to mark these 62 and 63.  Oh, that's not

 9   helpful.

10       Q   And, Mr. Clark, if you can take a moment to

11   review the document.

12           And, for the record, these are documents

13   ERGO '1067, with the attachment ERGO '1070.

14           Mr. Clark, do you recognize this e-mail and

15   attachment?

16       A   I need to take a look at the chain.

17       Q   Sure.  Please do so.

18       A   (Witness reading document.)  Okay.

19       Q   Okay.  And do you recognize this document?

20       A   Yes.

21       Q   What is it?

22       A   It appears to be an e-mail from Todd -- or an

23   e-mail chain from Todd Egeland to myself, Mat Henley,

24   and Nick Jacinto, Matt Moneyhon, dated May 18th, yes.

25       Q   Okay.  And so, if we go back -- let me ask
```