# EXHIBIT F

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------------------

5   SPENCER MEYER, individually and on

6   behalf of those similarly situated,

7                        Plaintiffs,

8       vs.                    1:15 Civ. 9796 (JSR)

9   TRAVIS KALANICK,

10                       Defendant.

11  ------------------------------------------

12

13          DEPOSITION OF TODD EGELAND

14

15            Wednesday, June 15, 2016

16                  9:06 a.m.

17

18

19

20

21

22  Reported by:

23  Joan Ferrara, RPR, RMR, CRR

24  Job No. 174300

25

```
 1
 2                         June 15, 2016
 3                         9:06 a.m.
 4                         New York, New York
 5
 6
 7          Deposition of TODD EGELAND, held
 8   at the offices of McKool Smith, One Bryant
 9   Park Avenue, New York, New York, pursuant
10   to Notice, before Joan Ferrara, a
11   Registered Professional and Merit Reporter
12   and Notary Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2     A P P E A R A N C E S:

 3

 4     MCKOOL SMITH, P.C.

 5     Attorneys for Plaintiff

 6              One Bryant Park

 7              47th Floor

 8              New York, New York 10036

 9        BY:   JAMES H. SMITH, ESQ.

10              jsmith@mckoolsmith.com

11              JOHN C. BRIODY, ESQ.

12              jbriody@mckoolsmith.com

13

14

15     WILMER CUTLER PICKERING HALE & DORR, LLP

16     Attorneys for Non-Party - Ergo Global

17     Precision Research, LLC and The Witness

18              1875 Pennsylvania Avenue, NW

19              Washington, D.C. 20006

20        BY:   DAVID W. BOWKER, ESQ.

21              david.bowker@wilmerhale.com

22

23

24                      (Continued)

25
```

```
 1

 2    A P P E A R A N C E S:   (Continued)

 3

 4    GIBSON DUNN & CRUTCHER, LLP

 5    Attorneys for Defendant - Uber Technologies

 6              333 South Grand Avenue

 7              Los Angeles, California 90071-3197

 8       BY:   REED BRODSKY, ESQ.

 9              rbrodsky@gibsondunn.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2            IT IS HEREBY STIPULATED AND

 3       AGREED, by and between the attorneys

 4       for the respective parties herein,

 5       that filing and sealing be and the

 6       same are hereby waived.

 7            IT IS FURTHER STIPULATED AND

 8       AGREED that all objections, except as

 9       to the form of the question, shall be

10       reserved to the time of the trial.

11            IT IS FURTHER STIPULATED AND

12       AGREED that the within deposition may

13       be sworn to and signed before any

14       officer authorized to administer an

15       oath, with the same force and effect as

16       if signed and sworn to before the

17       Court.

18

19

20

21

22

23

24

25
```

1

2              THE COURT REPORTER:  I just need

3         to confirm on the record if everyone

4         would like a daily delivery again for

5         today's witness.

6              MR. BOWKER:  Yes.

7              MR. BRODSKY:  Yes.

8              MR. SMITH:  Yes.

9

10    T O D D    E G E L A N D,

11         called as a witness, having been duly

12         sworn by a Notary Public, was examined

13         and testified as follows:

14    EXAMINATION BY

15    MR. SMITH:

16         Q.    Good morning, Mr. Egeland.

17         A.    Good morning.

18         Q.    I introduced myself earlier, but

19    again, my name is James Smith.  I'm with

20    McKool Smith, and I represent plaintiffs

21    and Spencer Meyer in this action.

22         A.    Okay.

23         Q.    Can you please state your name

24    for the record.

25         A.    Todd Egeland.

```
 1                  T. Egeland

 2        Q.    Is that R.P. Eddy?

 3        A.    Yes.

 4        Q.    Do you have any direct reports?

 5        A.    No.

 6        Q.    Before you worked at Ergo, what

 7   did you do?

 8        A.    I worked at Central Intelligence

 9   Agency.

10        Q.    For about how long?

11        A.    A little over 28 years.

12        Q.    Do Ergo's clients, are they aware

13   of your background with the Central

14   Intelligence Agency?

15        A.    I would say yes, the majority,

16   yes.  I don't know what all of them know,

17   but yeah.

18        Q.    Do you know if Uber is aware that

19   you previously used to work at the CIA?

20        A.    I believe so, yeah.  I can't

21   remember having a specific conversation

22   with Matt Henley about it, but I'm assuming

23   he does.

24        Q.    Do you have a New York State

25   private investigator's license?
```

1                    T. Egeland

2        A.    No, I do not.

3        Q.    Do you know if anyone at Ergo has

4   a New York State private investigator's

5   license?

6        A.    I don't believe we do.

7        Q.    So among the different types of

8   work that Ergo does, I'm assuming this

9   probably falls under stakeholder mapping,

10   does Ergo conduct investigations of

11   individuals?

12        A.    Typically that's under our -- it

13   usually falls under our due diligence

14   capability, but yes.

15        Q.    And what is involved in an

16   investigation of an individual?

17        A.    It depends on what the client is

18   looking for, but in nearly every case I can

19   think of, the client is looking to have us

20   do a reputational due diligence.  They've

21   done the financial due diligence, the legal

22   due diligence, they're looking for a

23   reputational due diligence.

24        Q.    Just to backup for a second, what

25   do you mean by financial due diligence and

```
 1                    T. Egeland

 2    title of the person who is sort of

 3    instructing or guiding the junior person?

 4        A.    It could be anywhere from an Ergo

 5    partner, to an engagement manager, to a

 6    senior analyst.

 7        Q.    And so do you know whether or not

 8    analysts at Ergo use false and misleading

 9    statements when they're contacting primary

10    sources?

11        A.    I'm not quite sure what you mean

12    by false and misleading statements.

13        Q.    So I guess I can give you some

14    examples.  Do you know if whether or not an

15    analyst at Ergo will reach out to a primary

16    source, if they will make a false statement

17    about who they are?

18        A.    I don't believe we mislead people

19    on who we are.  That's not been my

20    experience.

21        Q.    Do you know if whether or not an

22    analyst will mislead a potential target

23    about the reason that they're reaching out

24    to them to collect information?

25        A.    Yes.
```

```
 1                 T. Egeland

 2        Q.    So Ergo analysts do do that?

 3        A.    Yes.

 4        Q.    Okay.

 5              And why is that?

 6        A.    For a couple of reasons.  One is

 7    to protect the identity of our client.  In

 8    many cases it may only be the client who

 9    would be asking that information.  So a

10    company or investor wouldn't want their

11    potential acquisition target to know who

12    was interested in them.  And also it helps

13    us get unbiased information.

14        Q.    How does it help get unbiased

15    information?

16        A.    As we go out and ask questions,

17    we typically want to do it without leading

18    questions.  We want to ask questions that

19    ask in a way that the person receiving the

20    question doesn't ask themselves what answer

21    are they looking for, I'll tell them what I

22    think they want to know, which is common in

23    many cultures.

24              So what we want to do is we may

25    make the target a part of a larger survey
```

```
 1                  T. Egeland

 2             We will ask our client are they

 3   being diligenced and can we be, you know,

 4   very direct.  And they go yes, they know

 5   they're undergoing diligence.  So we will

 6   go right in and be very, you are being --

 7   you know, we're talking to his colleagues

 8   and his friends and saying we're doing a

 9   diligence on Mr. Smith, I have some

10   questions, would you like to answer those.

11        Q.    Understood.

12             But in the situations where

13   you're unable to tell the primary source

14   that you're doing diligence or Mr. Smith or

15   whoever, do you think it makes them more

16   forthcoming with information if you say,

17   well, we're doing this general survey as

18   opposed to we're doing a research project

19   on Mr. Smith?

20        A.    I think it -- yes, I do.

21        Q.    So you said that you're in

22   business development.  Does Ergo market its

23   ability to obtain, you know, hard to find

24   or hidden information to clients and

25   potential clients?
```

```
 1                    T. Egeland

 2        A.    No, I didn't.

 3        Q.    Did you communicate through

 4   encrypted e-mails with Mr. Henley from that

 5   point onward?

 6        A.    Yes, until -- we were having

 7   difficulty decrypting a number of the

 8   e-mails back and forth and we had the wrong

 9   keys.  So at one point, I believe it was me

10   suggested, you know, maybe you want to on

11   notes back and forth use Wickr instead of

12   PGP, and we'll use PGP for attachments and

13   longer notes.

14        Q.    What is Wickr?

15        A.    Wickr is an app that you can

16   communicate securely with each other and

17   the message, as far as I know, the message

18   then disappears in 24 hours, or whoever you

19   set the message to be deleted.

20        Q.    Did you communicate with

21   Mr. Henley using Wickr?

22        A.    I believe I did.  I thought about

23   that a lot.  I can't remember any specific

24   conversation.  I remember sending him my

25   Wickr address.  To the best of my
```

```
 1                    T. Egeland
 2    recollection, I think we did have a back
 3    and forth, but I can't recall it at all.
 4        Q.    Do you recall -- or when would
 5    that have roughly been?
 6        A.    There is an e-mail in the
 7    documents that when I suggest maybe we want
 8    to use Wickr, it would have happened from
 9    that point on, but I don't remember if we
10    used it after that.
11            I'm thinking it was around 4
12    January.
13            (Exhibit 29, E-mail, Bates
14        stamped ERGO-0000381, marked for
15        identification, as of this date.)
16    BY MR. SMITH:
17        Q.    I've handed you a document marked
18    as Exhibit No. 29, Bates stamped
19    ERGO-0000381.
20            Is this the e-mail that you were
21    just referring to?
22        A.    Yes.  So I stand corrected.  It
23    was Matt Henley to suggested we use --
24    unless this was a response to my e-mail to
25    use Wickr.  I'm not sure who at this point
```

Todd Egeland
                           June 15, 2016                    60

```
 1                    T. Egeland
 2    initiated it.
 3        Q.    Okay.
 4              But this was January 4, 2016?
 5        A.    Yes.
 6        Q.    And in the e-mail Matt Henley
 7    states:
 8              "We can also communicate via
 9    Wickr, if that's preferable"?
10        A.    Yes.
11        Q.    And your recollection is that you
12    had some communications using Wickr with --
13        A.    I believe we did.  I know I sent
14    him my address.  I saw a GChat a few days
15    ago where he, Matt Henley had sent Matthew
16    Moneyhon his Wickr address, but I remember
17    sending him my Wickr address.
18        Q.    Do you know if Mr. Moneyhon
19    communicated with Mr. Henley using Wickr?
20        A.    I don't know.
21        Q.    Do you know if any of the Wickr
22    messages or Wickr communications that you
23    had with Mr. Henley were collected and
24    produced to plaintiffs in this lawsuit?
25        A.    I don't believe so.  I believe
```

Todd Egeland
June 15, 2016                                                 61

```
 1                    T. Egeland
 2     that the Wickr, any Wickr messages
 3     automatically, for lack of a better word,
 4     destroy themselves.
 5              MR. BOWKER:  I can represent that
 6          I personally asked for those
 7          communications and ascertained that
 8          they couldn't be recovered.
 9     BY MR. SMITH:
10          Q.    Do you recall what your Wickr
11     settings were, meaning how long would
12     transpire before the communications were
13     destroyed?
14          A.    I did not -- whatever the default
15     was -- I'm not really a tech guy, so I
16     didn't fiddle with it -- so I believe the
17     default is 24 hours.
18          Q.    So to the best of your knowledge,
19     any Wickr communications you would have had
20     with Matt Henley around the January 4th
21     time frame would have been destroyed
22     shortly thereafter?
23          A.    Yes.
24          Q.    I want to go back to Exhibit No.
25     28.
```

```
 1                   T. Egeland

 2    people at Uber regarding the scope or

 3    purpose of the Meyer investigation?

 4        A.    No, no.

 5        Q.    Just Mr. Henley?

 6        A.    Mr. Menly.

 7        Q.    Did Mr. Menly ever discuss or

 8    mention that he wanted the investigation

 9    done because he believed Mr. Meyer was a

10    security threat?

11        A.    No.

12        Q.    Okay.

13              Under the heading methodology, it

14    says:

15              "Ergo will undertake a medium

16    'level 2' assessment of Spencer Meyer."

17        A.    Yes.

18        Q.    Do you know what a level 2

19    assessment refers to?

20        A.    Yes.

21        Q.    What is it?

22        A.    At Ergo, we typically have a

23    3-level pricing sheet on due diligence.  So

24    we have level 1, 2 and 3 and we help

25    clients understand what the basic price is.
```

```
 1                    T. Egeland

 2        Q.    Which I think you just mentioned.

 3              What does light touch

 4    reputational due diligence mean?

 5        A.    I wrote light touch to mean we're

 6    going to go out and not ask -- we're going

 7    to ask open-ended questions that would

 8    protect the client's identity and just not

 9    be directing -- not asking leading

10    questions or asking, you know, has this

11    person done anything wrong -- you know,

12    asking derogatory questions.

13              The light touch means we just go

14    out, say do you know this person, what do

15    you think of this person.  We get what we

16    get.  We don't -- we don't have questions

17    that go down paths.

18              And again, most of that is to

19    ensure that -- you know, in theory, at

20    least, that we're protecting the client's

21    identity.

22        Q.    Protecting the client's identity

23    was important to Mr. Henley?

24        A.    Well, when he said sensitive

25    under the radar, I took it to mean that,
```

Todd Egeland
June 15, 2016                                          80

```
 1                      T. Egeland

 2     yes.

 3          Q.    And is that, in part, why you

 4     recommended a light touch reputational due

 5     diligence approach?

 6          A.    Yes.

 7          Q.    Do you know if Mr. Henley had an

 8     understanding of what light touch

 9     reputational due diligence approach meant?

10          A.    I have no idea.  He had a very

11     short response back to that e-mail.  And I

12     had no other communication with him about

13     that.

14          Q.    And so further in this paragraph,

15     after it says an initial light touch

16     reputational due diligence, it goes on:

17               "Engaging in seven primary source

18     interviews that should highlight any issues

19     for further digging, such as participating

20     in any lawsuits (particularly with Andrew

21     Schmidt) and his relationship with Andrew

22     Schmidt."

23               Do you see that?

24          A.    Yes.

25          Q.    So the statement of work
```

```
 1                    T. Egeland

 2      action lawsuit against Uber, have you heard

 3      anything about this, would this be in

 4      keeping with his character?'"

 5              He goes on:

 6                  "All the sources believe that I

 7      am profiling Mr. Meyer for report on

 8      leading figures in conservation.  I think

 9      this cover could still protect us from any

10      suspicion in the event that I ask a

11      question.  Asking such a question could

12      have all sorts of consequences for

13      Mr. Meyer himself, as it would get the

14      academic rumor mill going."

15              Do you see that?

16          A.    Yes.

17          Q.    And so on January 15th,

18      Mr. Santos-Neves told you that the sources

19      he was contacting believed that he was

20      creating a report on leading figures in

21      conservation?

22          A.    Yes.

23          Q.    Is that correct?

24          A.    Yes.

25          Q.    So you were aware of that --
```

Todd Egeland
June 15, 2016                                           98

```
 1                    T. Egeland

 2        A.    Yes.

 3        Q.    On January 15th?

 4        A.    Yes.

 5        Q.    And we said before -- well, let

 6   me back up.

 7              And was that a problem for you in

 8   any way?

 9        A.    When I read this at the time, no.

10        Q.    Why is it not a problem?

11        A.    Because he was doing a light

12   touch outreach to sources -- this is what I

13   was assuming, because I didn't know -- this

14   is all I knew.  I had no other idea how he

15   was going out to people, on each specific

16   person what he was.

17              But he -- I didn't see any issue

18   with him going out asking people.  He was

19   making a report on leading figures in

20   conservation.  That didn't strike me at the

21   time as being of issue.

22        Q.    And he notes that he could ask a

23   couple of sources directly about the suit,

24   but that might create suspicion about the

25   representation that he was creating a
```

```
 1                    T. Egeland
 2    were singularly focused on that issue.
 3         Q.    Is that what they meant by this,
 4    how could this have happened?
 5              MR. BRODSKY:  Objection.  Form.
 6         A.    That was my assumption.
 7         Q.    So it's fair to say that they
 8    were fairly upset?
 9         A.    They weren't yelling or
10    screaming, but they had a stern tone of
11    voice -- Craig.  Matt didn't say anything
12    in the meeting that I remember.
13         Q.    Do you know what they, what Matt
14    and Craig were upset over?
15         A.    They didn't say.  My assumption
16    was -- my assumption was how could your guy
17    be so stupid as to reach out to an opposing
18    counsel's former colleague.  That was my
19    take on it.
20         Q.    Why would that have been stupid?
21         A.    Well, we thought that's what
22    precipitated the whole issue --
23         Q.    The discovery of the
24    investigation?
25         A.    Exactly.  We thought it was that
```

```
 1              T. Egeland

 2   one issue precipitated everything.

 3        Q.    So you thought that they were

 4   upset because the investigation had been

 5   discovered?

 6        A.    I thought they were upset because

 7   we did a stupid thing that went beyond what

 8   we said we were going to do.

 9        Q.    That resulted in it being

10   discovered by plaintiff's counsel?

11              MR. BRODSKY:  Objection to form

12        on that.

13              MR. BOWKER:  Objection to form.

14        A.    I can only answer the question if

15   it was flipped -- if it wouldn't have been

16   discovered, I wouldn't have been in that

17   meeting.

18        Q.    So earlier on I was asking you

19   about the extent of your communications

20   with basically anyone about the Meyer

21   investigation, and I was focusing on your

22   communications with individuals prior to

23   delivery of the report on January 19th of

24   this year.

25              Who all did you speak with about
```