# EXHIBIT K

# Redacted Pursuant to Court Order

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------------------

5   SPENCER MEYER, individually and on

6   behalf of those similarly situated,

7                       Plaintiffs,

8       vs.                1:15 Civ. 9796 (JSR)

9   TRAVIS KALANICK,

10                      Defendant.

11  ------------------------------------------

12

13      DEPOSITION OF MIGUEL SANTOS-NEVES

14

15            Tuesday, June 14, 2016

16                  9:13 a.m.

17

18

19

20

21

22  Reported by:

23  Joan Ferrara, RPR, RMR, CRR

24  Job No. 174299

25

Miguel Santos-Neves
June 14, 2016                                                    2

```
 1
 2                          June 14, 2016
 3                          9:00 a.m.
 4                          New York, New York
 5
 6
 7              Deposition of MIGUEL
 8    SANTOS-NEVES, held at the offices of McKool
 9    Smith, One Bryant Park Avenue, New York,
10    New York, pursuant to Notice, before Joan
11    Ferrara, a Registered Professional and
12    Merit Reporter and Notary Public of the
13    State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2   A P P E A R A N C E S:

 3

 4   MCKOOL SMITH, P.C.

 5   Attorneys for Plaintiff

 6           One Bryant Park

 7           47th Floor

 8           New York, New York 10036

 9      BY:  JAMES H. SMITH, ESQ.

10           jsmith@mckoolsmith.com

11           JOHN C. BRIODY, ESQ.

12           jbriody@mckoolsmith.com

13

14

15   WILMER CUTLER PICKERING HALE & DORR, LLP

16   Attorneys for Non-Party - Ergo Global

17   Precision Research, LLC and The Witness

18           1875 Pennsylvania Avenue, NW

19           Washington, D.C. 20006

20      BY:  DAVID W. BOWKER, ESQ.

21           david.bowker@wilmerhale.com

22

23

24                    (Continued)

25
```

```
 1

 2   A P P E A R A N C E S:   (Continued)

 3

 4   GIBSON DUNN & CRUTCHER, LLP

 5   Attorneys for Defendant - Uber Technologies

 6            333 South Grand Avenue

 7            Los Angeles, California 90071-3197

 8       BY:   DANIEL G. SWANSON, ESQ.

 9             dswanson@gibsondunn.com

10             REED BRODSKY, ESQ.

11

12

13   ALSO PRESENT:

14             SPENCER MEYER

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2        IT IS HEREBY STIPULATED AND

 3   AGREED, by and between the attorneys

 4   for the respective parties herein,

 5   that filing and sealing be and the

 6   same are hereby waived.

 7         IT IS FURTHER STIPULATED AND

 8   AGREED that all objections, except as

 9   to the form of the question, shall be

10   reserved to the time of the trial.

11         IT IS FURTHER STIPULATED AND

12   AGREED that the within deposition may

13   be sworn to and signed before any

14   officer authorized to administer an

15   oath, with the same force and effect as

16   if signed and sworn to before the

17   Court.

18

19

20

21

22

23

24

25
```

1

2   M I G U E L   S A N T O S - N E V E S,

3       called as a witness, having been duly

4       sworn by a Notary Public, was examined

5       and testified as follows:

6

7           MR. BOWKER:  I just wanted to

8       make a quick statement on the record.

9       Dave Bowker representing Ergo.

10          Just consistent with our

11      agreement with counsel, the

12      proceedings here are subject to

13      confidentiality, and also I think

14      we're going to have some discussion

15      about the proper scope, and so when we

16      run into scope issues, I think we will

17      politely interrupt and discuss, but

18      otherwise let you do your thing.

19          MR. SMITH:  Okay.

20          MR. SWANSON:  I'm Dan Swanson and

21      I'm here today representing Uber

22      Technologies.  Also present is my

23      partner Reed Brodsky.

24          Uber is a putative intervenor in

25      this case, so we're here in a somewhat

```
 1              M. Santos-Neves

 2   MR. SMITH:

 3        Q.    Good morning, Mr. Santos-Neves.

 4        A.    Good morning.

 5        Q.    I introduced myself earlier, but

 6   again, my name is James Smith.  I'm with

 7   McKool Smith.  I represent plaintiff,

 8   Spencer Meyer, in this case.

 9              Can you please state your name

10   for the record.

11        A.    My full name is Miguel

12   Hershberger Santos-Neves.

13        Q.    Can you give me your current

14   address?

15        A.    509 West 155th Street, Apartment

16   3B, New York, New York 10032.

17        Q.    Thank you.

18              Are you represented by counsel

19   here today?

20        A.    Counsel represents Ergo, and I am

21   an employee of Ergo, so...

22        Q.    Does counsel represent you

23   specifically?

24        A.    No.

25        Q.    So before I begin, I just want to
```

```
 1              M. Santos-Neves
 2    doesn't know you, to willingly provide you
 3    information about someone that they know or
 4    ostensibly know.
 5        A.    Uh-huh.
 6              MR. BOWKER:  Objection.  Form.
 7    BY MR. SMITH:
 8        Q.    One way, you said you ask for a
 9    reference request.  How else?
10        A.    The question was confusing.  Can
11    you reword it, please?
12        Q.    All right.  I'll word it a
13    different way.
14              Do you ever use pretextual
15    statements or false statements when you are
16    going to information sources to try and
17    collect information about the target of a
18    reputational assessment?
19              MR. BOWKER:  Objection.  Form.
20        A.    What do you mean by pretext?
21        Q.    I mean like not disclosing, you
22    know, who you are or why you're asking the
23    questions or providing a misleading
24    statement with regard to why you are trying
25    to obtain information.
```

```
 1              M. Santos-Neves

 2              MR. BOWKER:  Object to the form.

 3       A.      So you just asked me a series of

 4   questions.  So we are instructed at Ergo,

 5   this is a hard and fast rule, that we

 6   approach people as ourselves.  We never

 7   assume another identity.

 8              We also always say who we're

 9   working for, which is Ergo.  So that, you

10   know, covers one aspect, which is the

11   identity of the individual, right, and

12   place of work.

13              The other question, which was in

14   your one question, has to do with the

15   intentions, right.  And here, we -- like I

16   said, it really depends on the project.  In

17   certain instances, we can use -- well, let

18   me backtrack.

19              As I said earlier, the

20   confidentiality of our clients is of utmost

21   importance.  One of the ways that we

22   maintain that confidentiality is by, as I

23   said earlier, crafting questions that can,

24   you know, maintain that confidentiality.

25              We can do that by being less
```

```
 1                M. Santos-Neves

 2   than -- we can be sort of vague about our

 3   intentions and -- but -- and we can use

 4   what I would describe as a cover to reach

 5   out to sources or experts.

 6       Q.    And so a cover would be an untrue

 7   statement with regard to why you're asking

 8   a source the questions?

 9            MR. BOWKER:  Objection to form.

10       A.    Not necessarily.

11       Q.    But it could be, like you say,

12   I'm asking these questions for X, but the

13   real reason is Y?

14       A.    Not necessarily.

15       Q.    I'm not asking if it's

16   necessarily that way.  I'm asking is it

17   ever that way.

18       A.    Could you please reask the

19   question?

20       Q.    Have you ever used a cover when

21   reaching out to sources to obtain

22   information?

23       A.    I have used a -- I've used a --

24   what do you call it -- a statement about

25   my -- a statement about sort of -- yes, I
```

```
 1                M. Santos-Neves

 2   have used a cover.

 3        Q.    Do you recall how many times

 4   you've used a cover when conducting

 5   reputational assessments?

 6        A.    I cannot recall.

 7        Q.    More than once?

 8        A.    Yeah, yes.

 9        Q.    Would you say the majority of the

10   times in which you've conducted a

11   reputational assessment?

12        A.    I cannot say for sure.

13        Q.    Did Sam Worby ever use covers

14   when he was conducting reputational

15   assessments?

16             MR. BOWKER:  Objection.

17        Relevance.

18        A.    I can't speak to what Sam did or

19   didn't do.

20        Q.    You can, in the fact that you

21   worked with him and sort of as you

22   described were an apprentice under him?

23        A.    Right.

24             MR. BOWKER:  Objection to form.

25   BY MR. SMITH:
```

```
 1                   M. Santos-Neves
 2    internet, the press, you know.
 3         Q.    Okay.
 4               But you don't -- you're not -- or
 5    are you aware of people that work at Uber
 6    through your work for them as an employee
 7    for Ergo?
 8         A.    No.
 9         Q.    So you said that Uber was a
10    client of Ergo's?
11         A.    Yes, I confirmed that.
12         Q.    Okay.
13               How many projects has Ergo
14    conducted for Uber?
15         A.    Four.
16         Q.    Four?
17               Do you recall when the first
18    project was?
19         A.    It began in the fall.
20         Q.    Of last year?
21         A.    Of 2015.
22         Q.    What type of project was that?
23               MR. SWANSON:  At least from the
24         standpoint of Uber, I'm going to
25         interject here that some of the Ergo
```

```
 1                M. Santos-Neves

 2   BY MR. SMITH:

 3       Q.    I'm going to turn to the fourth

 4   project.  Do you recall when that project

 5   started?

 6       A.    The fourth project, I believe,

 7   began in May.

 8       Q.    Were you involved in that project

 9   at all?

10       A.    No.

11       Q.    Can you give me in general terms

12   the type of project that one was?

13       A.    In general terms, it was a market

14   assessment.

15            MR. BOWKER:  This one is foreign.

16            Can we go off the record for just

17       one second?

18            (Whereupon, an off-the-record

19       discussion was held.)

20   BY MR. SMITH:

21       Q.    Turning back to the third project

22   for a moment, did you work on that project?

23       A.    I did.

24       Q.    And how long did that project

25   last?
```

```
 1                M. Santos-Neves
 2        A.    Since he was an up-and-coming
 3    researcher in environmental conservation,
 4    and that is part of his reputation, yes.
 5        Q.    I'm asking the reason you were
 6    doing the project, the research project on
 7    Mr. Meyer, was not because he was an
 8    up-and-coming environmental
 9    conservationist, but because it was -- he
10    had sued the CEO of Uber, Mr. Kalanick, and
11    Uber had commissioned a study, is that
12    right?
13        A.    Yes.
14              MR. BOWKER:  Objection.  Form.
15    BY MR. SMITH:
16        Q.    Is that yes?  Strike it.
17              So where did get the idea to
18    inform primary sources related to Mr. Meyer
19    that you were doing a research project on
20    various up-and-coming researchers and in
21    environmental conservation?
22        A.    Where did I get the idea?
23        Q.    Yes.
24        A.    I developed it.
25        Q.    So it was your idea?
```

```
 1              M. Santos-Neves

 2      A.    Yes.

 3      Q.    Did anyone else at Ergo know that

 4  you were making this representation to

 5  primary sources related to Mr. Meyer?

 6      A.    At what point?

 7      Q.    Prior to delivery of the report.

 8      A.    Yes, my supervisors knew that --

 9      Q.    Who was that, Mr. Egeland and

10  Mr. Moneyhon?

11      A.    Yes.

12      Q.    And they both knew it?

13      A.    Yes.

14      Q.    Did they ever tell you that what

15  you were doing was wrong in any way?

16      A.    No.

17      Q.    When did they learn that you were

18  making these representations to primary

19  sources related to Mr. Meyer?

20      A.    I have a recollection of having a

21  conversation with Mr. Moneyhon, in which I

22  very quickly mentioned to him how I was

23  approaching source engagement, and then I

24  believe that Mr. Egeland found out through

25  an e-mail at some point, I can't remember
```

```
 1              M. Santos-Neves

 2   the specific date.

 3       Q.    So prior to the completion of the

 4   project?

 5       A.    Yes.

 6       Q.    Do you recall roughly when you

 7   had the conversation with Mr. Moneyhon?

 8   Was it towards the beginning of the project

 9   or towards the end?

10       A.    It was after initial source

11   engagement.  I would say the first half.

12       Q.    But you were still in the process

13   of engaging the primary sources at that

14   time?

15       A.    Yes.

16       Q.    And so Mr. Egeland and

17   Mr. Moneyhon knew that you were making a

18   representation about doing a project on

19   various researchers, and it was condoned?

20            MR. BOWKER:  Objection.  Form.

21       A.    I can't speak to whether it was

22   condoned or not.

23       Q.    They never told you it was wrong,

24   right?

25       A.    They didn't say one way or the
```

```
 1              M. Santos-Neves

 2    other.

 3        Q.    And they never reprimanded you?

 4        A.    No.

 5        Q.    Did they tell you that you were

 6    in breach of any guideline or protocol?

 7        A.    No.

 8              MR. BOWKER:   Off the record.

 9              (Recess taken from 12:10 p.m. to

10        12:24 p.m.)

11              (Exhibit 4, E-mail chain, Bates

12        stamped ERGO-0001080, marked for

13        identification, as of this date.)

14    BY MR. SMITH:

15        Q.    Before we went on break, you had

16    just said that your supervisors were aware

17    of statements made to primary sources with

18    regard to the Meyer project and that -- you

19    said that they never had any issue with

20    your conduct, right?

21        A.    Yeah.

22        Q.    So I've handed you a document

23    that's Bates labeled ERGO-0001080.

24              Can you take a look at the

25    document?  It's an e-mail chain and you're
```

Miguel Santos-Neves
June 14, 2016
158

```
 1            M. Santos-Neves
 2   name, potential source that I definitively
 3   contacted as part of this investigation.
 4        Q.    Okay.
 5             You see the third column that
 6   says, "Ergo Source"?
 7        A.    Yes.
 8        Q.    And there is either a yes or
 9   no --
10        A.    Right.
11        Q.    -- in that column.  What does
12   that column refer to?
13        A.    The individuals who became
14   sources in our report.
15        Q.    So if any information was
16   collected from any of these people that
17   made it into the report, they would be
18   designated as a source?
19        A.    Yes, if the information went into
20   the report, there would be a source.
21        Q.    For other people that aren't
22   listed as sources, were you able to collect
23   information about Mr. Meyer that didn't go
24   into the report?
25        A.    So -- I don't believe so.  So I
```

```
 1                 M. Santos-Neves

 2      A.    Yes.

 3      Q.    And this led to Mr. Whitman

 4  reaching out to to set up a phone call?

 5      A.    That's right.

 6      Q.    And so you did have a follow-up

 7  phone call with Mr. ███████ , correct?

 8      A.    I did.

 9      Q.    And did you record that call?

10      A.    Yes.

11      Q.    And did Mr. ███████  know it was

12  recorded?

13      A.    No, not that I'm aware of.

14      Q.    Did you ask him permission to

15  record it?

16      A.    No.

17      Q.    Do you know if Uber was aware

18  that the phone call with Mr. ███████  was

19  recorded?

20      A.    I have no way of knowing whether

21  it was aware or not.

22      Q.    And you didn't tell him that you

23  were recording the phone conversation?

24      A.    I did not tell him, no -- not

25  that I can recall.
```

```
 1              M. Santos-Neves

 2              MR. BOWKER:  Objection.  Form.

 3        A.    I stand by my previous statement

 4   regarding this sentence at issue.

 5        Q.    And this e-mail led to a

 6   follow-up call with Mr. [Redacted] ?

 7        A.    Yes.

 8        Q.    Okay.

 9              And you had a phone call with

10   Mr. [Redacted] , correct?

11        A.    That's right.

12        Q.    And did you record that call?

13        A.    I did.

14        Q.    Did you tell him it was being

15   recorded?

16        A.    I did not.

17        Q.    Did you --

18        A.    Or I do not recall telling him

19   whether it was being recorded or not.

20        Q.    Was Mr. [Redacted]  aware that it was

21   being recorded?

22        A.    I can't speak for Mr. [Redacted] ,

23   but -- so...

24        Q.    Well, did he have any indication

25   on the call, did he make any indication on
```

```
 1                    M. Santos-Neves

 2     aid of the recording.

 3                    (Exhibit 20, Write-up of

 4          conversation with Mr. Redacted, Bates

 5          stamped ERGO-000583, marked for

 6          identification, as of this date.)

 7     BY MR. SMITH:

 8          Q.    You've been handed Exhibit Number

 9     20, Bates ERGO-000583.

10                    Do you recognize this document?

11          A.    I do.

12          Q.    What is this document?

13          A.    This is a write-up of my

14     discussion with Mr. Redacted.

15          Q.    So is the first part of this

16     document, the paragraph in bold, what you

17     said to Mr. Redacted?

18          A.    It was intended to be an

19     introductory statement to Mr. Redacted, but I

20     can't say with 100 percent certainty that

21     this was -- that I said these exact words

22     to Mr. Redacted.

23          Q.    But the words would be on a

24     recording, right?

25          A.    I would assume so, yes.
```

```
 1              M. Santos-Neves
 2         Q.    So in this introductory paragraph
 3    that you said was intended to be an
 4    introductory statement to Mr. Redacted, you
 5    wrote in the second sentence:
 6              "As part of the real estate
 7    market research project for a client, I am
 8    interviewing property owners in New Haven.
 9    We are looking to find out what due
10    diligence steps property owners take to vet
11    a potential tenant."
12              Do you see that?
13         A.    Yes.
14         Q.    That's not a true statement, is
15    it?
16         A.    It is a -- it is a -- no, it's
17    not a true statement.
18         Q.    Why did you make this statement
19    to Mr. Redacted
20         A.    Again, to have a cover that would
21    protect the identity of my client while at
22    the same time allowing me to ask Mr. Redacted
23    questions that would shed light on
24    Mr. Meyer.
25         Q.    While speaking with Mr. Redacted,
```

```
 1              M. Santos-Neves

 2      A.    The value of -- the property

 3 value?

 4      Q.    Correct.

 5      A.    Would have been in the deeds.

 6      Q.    Was that included in the report?

 7      A.    For this particular unit?

 8      Q.    Yes.

 9      A.    Well, he didn't own the unit,

10 so...

11      Q.    His prior units.

12      A.    Yes.  For a house that he had

13 owned in Maine.

14      Q.    So why include information

15 regarding his potential salary and

16 properties he used to own in the report?

17      A.    That information is part of a

18 standard Ergo report.  So when we do a due

19 diligence, it -- there is a section of it

20 that includes information about sources of

21 what we, based on our research, were able

22 to gather on sources of wealth.

23      Q.    Does that bear any relation in

24 your mind to motivations of Mr. Meyer to

25 bring a lawsuit against Mr. Kalanick?
```

```
 1              M. Santos-Neves
 2       A.    I cannot say whether it would
 3  have really any role in his motivations
 4  or --
 5       Q.    I'm asking you as the initial
 6  drafter of the report, a report whose
 7  objective, at least in part, was to explore
 8  the objectives of Mr. Meyer in deciding to
 9  bring suit against Mr. Kalanick, whether or
10  not you believed his financial information
11  was relevant to those motivations?
12              MR. BOWKER:  Objection to form.
13       A.    You know, I was tasked to do the
14  research.  One of the components of it was
15  coming to an accurate, as accurate as
16  possible an assessment of, you know, his
17  sources of wealth.
18              So...
19       Q.    Why was that a component of the
20  project?
21       A.    As I said, it's included as part
22  of a standard report for, an Ergo report,
23  so...
24       Q.    But sitting here today, you can't
25  think of how it relates to potential
```

```
 1            M. Santos-Neves

 2   motivations of Mr. Meyer to bring a suit

 3   against Mr. Kalanick?

 4            MR. BOWKER:  Objection.

 5       Relevance.

 6       A.    I can't speculate.

 7       Q.    So back to your conversations

 8   with Mr. Redacted, was the phone call, which

 9   is reflected here in your write-up, was

10   that your only communication with Mr.

11   Redacted?

12       A.    There was an earlier phone call

13   to set up the call, and then the actual

14   call.

15       Q.    Okay.

16            And then that was the extent of

17   your communication with Mr. Redacted?

18            THE WITNESS:  Could we take a

19       break?

20       Q.    If I can just finish up with this

21   document, like another 30 seconds?

22            MR. BOWKER:  You're doing okay?

23            THE WITNESS:  I could use a bit

24       of a break.

25            MR. SMITH:  If you insist, that's
```

```
 1              M. Santos-Neves

 2      Q.    Anyone else?

 3      A.    He was the one who prepared me

 4  for deposition.

 5      Q.    Did you speak to any other

 6  counsel in preparation for your deposition

 7  today?

 8      A.    I spoke -- not in preparation

 9  for -- am I allowed to check with counsel

10  to determine what qualifies preparation for

11  deposition?

12              MR. SMITH:  I'll allow it.  Go

13      ahead.

14      A.    So at the beginning of our

15  preparation, Ergo's GC general counsel was

16  there.

17              MR. BOWKER:  Go ahead.

18      A.    But then Mr. Bowker and I -- he

19  was only there briefly at the beginning --

20  and yeah.

21      Q.    And who is Ergo's GC?

22      A.    Matthew Moneyhon.

23      Q.    And when did you meet with

24  counsel to prepare for your deposition?

25      A.    Yesterday afternoon.
```