# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
SPENCER MEYER, individually and on
behalf of those similarly situated,
:
Plaintiff,
:
vs.
:
Case No. 1:15-cv-9796 (JSR)
:
TRAVIS KALANICK and UBER
TECHNOLOGIES, INC.,
:
Defendants.
:
---------------------------------------------------------x

**DEFENDANTS UBER TECHNOLOGIES, INC. AND TRAVIS KALANICK'S JOINT OPPOSITION TO
PLAINTIFF'S MOTION FOR RELIEF RELATED TO THE ERGO INVESTIGATION**

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
200 Park Avenue
New York, NY  10166-0193
Telephone:   212.351.4000
Facsimile:   212.351.4035
RBrodsky@gibsondunn.com

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Nicola T. Hanna
Joshua S. Lipshutz
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:   213.229.7000
Facsimile:   213.229.7520
TBoutrous@gibsondunn.com
DSwanson@gibsondunn.com
NHanna@gibsondunn.com
JLipshutz@gibsondunn.com

1

Cynthia E. Richman
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:     202.955.8500
Facsimile:     202.467.0539
CRichman@gibsondunn.com

*Counsel for Uber Technologies, Inc.*


BOIES, SCHILLER & FLEXNER LLP

Karen L. Dunn
William A. Isaacson
Ryan Y. Park
5301 Wisconsin Avenue, NW
Washington, DC  20015
Telephone:     (202) 237-2727
Facsimile:     (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
rpark@bsfllp.com

Alanna C. Rutherford
Peter M. Skinner
Joanna C. Wright
575 Lexington Avenue, 7th Floor
New York, NY  10022
Telephone:     (212) 446-2300
Facsimile:     (212) 446-2350
arutherford@bsfllp.com
pskinner@bsfllp.com
jwright@bsfllp.com

*Counsel for Defendant Travis Kalanick*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................ 2

    A.    Plaintiff Files the Complaint .................................................. 2

    B.    Potential Security Threat is Identified ..................................... 2

    C.    The Security Investigation ..................................................... 4

    D.    The Report is Delivered and the Investigation is Closed ............. 6

    E.    The Miscommunication and Correction ................................... 7

    F.    Meet and Confer Process ...................................................... 8

    G.    Proceedings Before the Court ................................................ 9

ARGUMENT ................................................................................... 11

    A.    Plaintiff Is Not Entitled To Attorney's Fees ............................ 11

        1.    Plaintiff has not shown that Defendants acted in bad faith ........ 12

        2.    Plaintiff has not demonstrated any prejudice ........................... 16

        3.    Defendants' legitimate attempts to protect privileged communications are not grounds for sanctions ......................... 17

    B.    The Cases Plaintiff Cites Do Not Support the Imposition of Sanctions ............... 18

    C.    Plaintiff Is Not Entitled to an Order Precluding Defendants from Seeking Discovery About Him .......................................................... 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................20

*Browning Debenture Holders' Comm. v. DASA Corp.*,
   560 F.2d 1078 (2d Cir. 1977)...............................................14, 15, 16, 19

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)......................................................................................17

*Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc.*,
   586 F.2d 962 (2d Cir. 1978)......................................................................20

*De Beers Consol. Mines v. United States*,
   325 U.S. 212 (1945)...................................................................................12

*Fayemi v. Hembrecht & Quist, Inc.*,
   174 F.R.D. 319 (S.D.N.Y. 1997) ...................................................18, 19, 20

*Gidatex, S.r.L v. Campaniello Imps., Ltd.*,
   82 F. Supp. 2d 119 (S.D.N.Y. 1999)........................................................13

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)...................................................................................12

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)...................................................................................16

*Mackler Prods., Inc. v. Cohen*,
   225 F.3d 136 (2d Cir. 2000)......................................................................17

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983)....................................................................16

*Oliveri v. Thompson*,
   803 F.2d 1265 (2d Cir. 1986)....................................................................12

*Plum Creek Lumber Co. v. Hutton*,
   608 F.2d 1283 (9th Cir. 1979)...................................................................12

*Roadway Exp., Inc. v. Piper*,
   447 U.S. 752 (1980)...................................................................................12

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

*Sakon v. Andreo*,
   119 F.3d 109 (2d Cir. 1997)................................................................12, 14, 16

*Salahuddin v. Harris*,
   782 F.2d 1127 (2d Cir. 1986)...............................................................12

*United States v. Hayman*,
   342 U.S. 205 (1952)...........................................................................12

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of*
   *Am., AFL-CIO*,
   948 F.2d 1338 (2d Cir. 1991)..............................................................1, 12

*Update Art, Inc. v. Modiin Pub., Ltd.*,
   843 F.2d 67 (2d Cir. 1988)..................................................................19

*Upjohn Co. v. Aetna Cas. & Sur. Co.*,
   768 F. Supp. 1186 (W.D. Mich. 1990) ................................................18, 19, 20

*Wilson v. Citigroup, N.A.*,
   702 F.3d 720 (2d Cir. 2012).................................................................12

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
   564 F.3d 110 (2d Cir. 2009).................................................................12, 16

## PRELIMINARY STATEMENT

Plaintiff's exhaustive discovery regarding the Ergo investigation has yielded no evidence that Uber or Mr. Kalanick engaged in wrongdoing.  Indeed, the discovery confirms that Uber retained Ergo, a well-established business intelligence firm, because its corporate security professionals had reasonable concerns about the motivations behind a novel antitrust lawsuit that was filed against its high-profile CEO (and, pointedly, not the company itself).  This concern was fostered by legitimate security risks facing Uber personnel and first-hand experience with malicious lawsuits against executives at high-tech companies.

Moreover, in its retention agreement, Uber required Ergo—an independent contractor— to perform in a "competent and professional manner," to take "reasonable measures to ensure" its investigators were "properly trained," and to "comply with all applicable state, federal and local laws."  To the extent Ergo violated any professional standards or laws, the undisputed evidence establishes that Uber neither directed nor knew of the methods Ergo would employ. Mr. Kalanick, for his part, did not participate in any way in hiring Ergo, did not even know Ergo had been retained, and never saw Ergo's report.

Given these undisputed facts, it is not surprising that Plaintiff fails to point to any evidence of Defendants' bad faith, as he must to justify an award of attorney's fees.  *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, *AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("[T]his Court, in recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court's inherent power."). Instead, he asks the Court to impute Ergo's purported misconduct to Uber, merely because Uber hired Ergo, and to Mr. Kalanick, merely because he is Uber's CEO.  Because it has no basis in law, Plaintiff's request for sanctions should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff Files the Complaint

On December 16, 2016, Plaintiff Spencer Meyer filed his Complaint targeting Travis

Kalanick, CEO of Uber, in his individual capacity, while conspicuously omitting Uber as a

defendant.  The same day, Uber's General Counsel, Salle Yoo, learned of the Complaint and

asked Uber's Chief Security Officer, a lawyer and former federal prosecutor, Joseph Sullivan, to

"find out a little more about this Plaintiff."  Smith Exh. A; Sullivan Tr. 6-8.

### B.    Potential Security Threat is Identified

As Chief Security Officer, Mr. Sullivan is responsible for ensuring the safety of Uber, its

employees, its driver-partners, and its riders.  Sullivan Tr. 8.  Unlike many companies, Uber

operates in a high threat environment and is a "business that attracts a lot of volatility."  *Id.* at

13.[1]  The security risks surrounding Uber's high-profile executives are of particular concern.

Mr. Sullivan's team handles daily threats from people "show[ing] up in our lobbies, accost[ing]

our executives, flam[ing] them on Twitter, sen[ding] them death threats, show[ing] up outside

their homes, throwing eggs at their homes, [and] threaten[ing] to file lawsuits for . . . strange

reasons."  *Id.* at 16.; *see also* Clark Tr. 20.  In light of these threats, it is Mr. Sullivan's job to

---

[1] These threats are not imaginary.  *See* http://www.nydailynews.com/news/crime/kalamazoo-
uber-driver-accused-killing-6-sues-taxi-service-article-1.2566964 (lawsuit filed by Kalamazoo
killer against Uber a hoax).  Likewise, Uber's entry into various markets has sometimes been
met with hostile and even violent reactions.  *See*
http://www.timeslive.co.za/local/2016/05/20/Uber-suspends-Sandton-service-after-violent-
attack-outside-Gautrain-station (South African partner-drivers fired on as part of protest);
http://www.thenational.ae/business/economy/mumbais-taxi-drivers-strike-in-protest-against-
ubers-pricing (taxi drivers threatening violence if demands regarding Uber pricing were not met);
http://www.abc.net.au/news/2016-05-10/taxi-drivers-protest-outside-premiers-electorate-
office/7401870 (Melbourne taxi drivers threatening violence if Government did not accede to
demands regarding Uber).

"always [be] on the lookout when situations arise that could be a cause for concern," and he is "always careful to make sure that we do our diligence" when there are potential threats. Sullivan Tr. at 60. As a result, it is not unusual for Uber's security team to investigate when individuals "come onto the scene, and it seems a little bit unusual." *Id.* at 17. Beyond Uber, Mr. Sullivan had direct experience with these kinds of potential threats in his previous employment at Facebook, *id.* at 7, including his work on the Paul Ceglia lawsuit against Mark Zuckerberg, *id.* at 16. *See* Bob Van Voris, *Facebook Claimant Ceglia Charged With Faking Contract*, Bloomberg, Oct. 26, 2012, http://www.bloomberg.com/news/articles/2012-10-26/facebook-claimant-ceglia-charged-with-faking-contract.[2]

Thus, although Mr. Sullivan did not know why Ms. Yoo requested he "find out a little more" about Plaintiff—and never spoke with her about the request—he independently concluded that it was a good idea and concurred from a security perspective. Sullivan Tr. 20-22. Believing there could be a safety risk to Mr. Kalanick, he asked Mathew Henley, Uber's Director of Investigations, to "do a careful check on this Plaintiff." Smith Exh. A; Sullivan Tr. 20.

Mr. Sullivan did not discuss the litigation or the investigation with Mr. Kalanick. *Id.* at 20-24. Additionally, Mr. Sullivan had no further conversations with Mr. Henley about the investigation, and did not give any direction about how to conduct the diligence. *Id.* at 9, 40-41, 46. Because he recognized that each situation is unique, Mr. Sullivan had no expectations as to how any investigation would be implemented. *Id.* at 30-32. Generally, Mr. Sullivan does not directly manage investigations, or any outside consultants; these tasks fall to Mr. Henley and his

---

[2] Messrs. Henley and Clark, who also worked at Facebook, shared similar experiences. Henley Tr. 155; Clark Tr. 6, 20.

3

team.  *Id.* at 28-29.  Mr. Sullivan expects his team to "be extremely ethical and diligent in the way that we conduct ourselves," *id.*; likewise, he expects consultants to follow the law.  *Id.* at 30.

### C.      The Security Investigation

Upon receiving Mr. Sullivan's email, Mr. Henley recognized that this was a sensitive request, as it came from the General Counsel and the Chief Security Officer.  Henley Tr. 46.  The next day, Mr. Henley reached out to Todd Egeland of Ergo, a company that had previously been recommended to him (Henley Tr. 12, 20; Sullivan Tr. 10-11, 32-33), to inquire if Ergo would be available to help with an investigation of an individual.[3]  UBER-PRIV000022; Henley Tr. 9, 41, 60.  Ergo is a well-established primary research company that specializes in diligence, stakeholder analysis, market access issues, regulatory issues, and geopolitical risk analysis.  Mr. Henley's primary contact there, Todd Egeland, was a former high-level U.S. government official.  Egeland Tr. 16-17.  Mr. Henley did not speak with anyone, including Mr. Kalanick, before engaging Ergo.  Henley Tr. at 61-62.

In anticipation of possible future projects, Uber's legal department and Ergo executed a comprehensive Master Services Agreement ("MSA") to govern the relationship.  UBER-PRIV000043.  The MSA prohibits the creation of an agency relationship between Uber and Ergo and states that Ergo is not authorized to make any representation, contract, or commitment on behalf of Uber.  *Id.* § 4.1.  Additionally, under the MSA, Ergo represents and warrants that, "the Services will be performed in a competent and professional manner by Personnel skilled in the relevant areas of expertise" and that "Consultant shall comply with all applicable state, federal

---

[3]Mr. Henley used encrypted emails when he was handling sensitive security matters, including many of his communications with Ergo regarding this investigation.  Henley Tr. 46.  Sensitive emails sent outside of Uber were encrypted in order to protect against data breaches of Ergo's mail servers.  *Id.* at 44-45.

and local laws and regulations in the performance of Services and provision of Deliverables under this Agreement." *Id.* § 7.1(a), (c). In addition, the MSA required Ergo to represent and warrant that "Consultant and its employees are skilled, experienced and fully qualified to perform and deliver the Services consistent with the highest standards of Consultant's profession, business or industry" and that Ergo would "take reasonable measures to ensure that its Personnel" were "properly trained in performing their duties." *Id.* §§ 2.3, 2.4.

After Mr. Egeland confirmed Ergo's interest, UBER-PRIV000039, Mr. Henley sent him the Complaint on December 24, 2015. *Id.* On December 28, 2015, Mr. Egeland sent Mr. Henley a summary of the initial information gathered from publicly available sources and recommended a further assessment of Mr. Meyer, to include a public records search, a social media assessment, and a "'light-touch' reputational due diligence, engaging in 7 primary source interviews." UBER-PRIV000040. On January 4, 2016, Mr. Henley responded "sounds good." UBER-PRIV000055. Mr. Henley did not consult with anyone, including counsel, on the scope of the project. Henley Tr. 93-94.

After authorizing the work, Mr. Henley did not directly monitor Ergo's work efforts. Henley Tr. 96. Based upon the terms of the MSA, he "assumed [Ergo's work] would be professional and legal." *Id.* No one at Uber communicated with Ergo until Ergo provided its final report, approximately two weeks later, on January 19, 2016. Henley Tr. 13-14, 21, 78-79.

Unbeknownst to Uber, the assigned Ergo investigator, Miguel Santos-Neves, went "beyond the scope of the project" (ERGO-0000936) by presenting a pretextual reason for his inquiries to primary sources and sometimes recording the interviews. Smith Exh. I. No one at Uber was aware that Mr. Santos-Neves was misstating the purpose for his inquiries or that he

5

was recording some of his phone conversations.  Henley Tr. 95-96, 111-13; Sullivan Tr. 14, 45-46, 55; Clark Tr. 23, 105.  Nor is there evidence that anyone at Uber ever interacted with Mr. Santos-Neves.  Henley Tr. 16.

On January 13, 2016, Mr. Santos-Neves, as part of his investigative work, spoke to Alex Hood, a friend of Plaintiff's counsel, Andrew Schmidt.  Declaration of Brian M. Feldman in Support of Plaintiff's Mem. of Law ("Feldman Decl.") ¶ 2.  Plaintiff's co-counsel, Brian Feldman, learned of this contact and voiced his concerns to Mr. Kalanick's counsel.  *Id.* ¶ 3.

### D.    The Report is Delivered and the Investigation is Closed

Ergo completed its investigation on January 19, 2016, and Mr. Egeland emailed Mr. Henley a copy of Ergo's report, UBER-PRIV000058; Henley Tr. 12, which featured a "glowing" description of Mr. Meyer, Br. at 13.  Mr. Henley did not read the report, instead forwarding it to Mr. Sullivan and copying Craig Clark, Uber's Legal Director for Security and Enforcement.  Henley Tr. 90; UBER-PRIV000059.  Mr. Clark began working for Uber in December 2015, and had not been aware of the investigation until he received the report on January 19, 2016.  Clark Tr. 6.  After forwarding the report, Mr. Henley had no further involvement.  Henley Tr. 23.

Upon receiving the report, Mr. Sullivan quickly reviewed it and forwarded it to Ms. Yoo.  UBER-PRIV000059; Sullivan Tr. 43-44.  Satisfied that there was no security concern, Mr. Sullivan was "comfortable that [Uber] did not need to do anything further" and considered the matter closed.  Sullivan Tr. 41.  He did not discuss it with Ms. Yoo, and she did not reply to his email sending her the report.  *Id.* at 51.

There is no evidence that any Uber employee forwarded the report to anyone else at this time,[4] or took any action on the report.  Henley Tr. 18, 22-24, 129, 149; Sullivan Tr. 58; Clark Tr. 50-51, 132-33.  And there is no evidence that Mr. Kalanick ever saw the report, knew that Uber had contracted with Ergo, or even that an investigation had occurred.  Henley Tr. 24, 63; Sullivan Tr. 24; Clark Tr. 43.  Additionally, as of the date the report was delivered, no one from the security team had communicated with the litigation team handling this lawsuit about the Ergo investigation.  Henley Tr. 130; Sullivan Tr. 53-54; Clark Tr. 44-45.

### E.    The Miscommunication and Correction

On January 19, 2016, the same day the report was delivered to the security team, Mr. Feldman asked Mr. Kalanick's counsel at Boies, Schiller & Flexner ("BSF") whether Uber had initiated the Ergo investigation.  Feldman Decl. ¶ 6.  BSF conferred with the in-house litigation team at Uber, *id.*, which was not, at that time, aware of its existence, Henley Tr. 130; Sullivan Tr. 53-54; Clark Tr. 112.  As a result, the in-house litigation team mistakenly informed BSF that Uber had not retained Ergo and BSF, in turn, disclaimed Uber's involvement to Plaintiff's counsel on January 20, 2016.  Feldman Decl. ¶ 7.

On February 9, 2016, Mr. Feldman asked BSF for consent to a proposed application to the Court for permission to serve Ergo with a subpoena.  *Id.* ¶ 8.  BSF did not consent, believing Uber had not hired Ergo, that Mr. Kalanick's motion to dismiss was still pending with a discovery stay in place, and that the issue was both irrelevant to the litigation and premature.  *Id.* ¶ 9.

---

[4]The report was later forwarded to the in-house litigation team and outside counsel after the in-house litigation team discovered its existence in February.

On February 19, 2016, immediately after discovering that Uber's security team had in fact initiated the investigation, BSF  telephoned Mr. Feldman to correct the record.  *Id.* ¶ 10. BSF informed Mr. Feldman of the error and told him that Uber had initiated the Ergo investigation.  *Id.*  The mistake resulted from miscommunication between the litigation team and the security team, wherein the litigation team was not informed that the security team had initiated the investigation until February 2016.  Clark Tr. 110-12.

After learning of the miscommunication and the resulting confusion in the litigation, Mr. Clark contacted Ergo to confirm that the investigation had ceased.  ERGO-0000936.  On February 24, 2016, Mr. Egeland provided Mr. Clark a spreadsheet of the individuals whom Mr. Santos-Neves had contacted.  ERGO-0000936.  Mr. Egeland assured Mr. Clark that Ergo had "safeguards in place (and training) that should have prevented our investigator from going beyond the scope of the project[.]"  *Id.*  On March 22, 2016, Mr. Egeland and Ergo's CEO met with Mr. Clark, Mr. Henley, and another colleague at Uber to apologize for the "rogue investigator" who had broken protocol and gone outside the scope of his assignment.  Henley Tr. 138; Clark Tr. 117-18.

### F.    Meet and Confer Process

On April 25, 2016, following several communications, BSF offered to produce the names and contact information of all individuals contacted, if Plaintiff would agree not to use the information in the underlying litigation.  Smith Exh. T.  On May 10, 2016, Plaintiff rejected the offer and requested a call to the Court.  Smith Exh. X.  BSF responded the next day, confirming that the offer remained open to provide the names, contact information, date and method of communication of those contacted.  Smith Exh. Y.  On May 13, 2016, Plaintiff again rejected the offer and sought the Court's involvement.  Smith Exh. Z.

On May 17, 2016, Mr. Clark contacted Ergo again, to confirm that Uber was in possession of a true and complete list of all people contacted by Mr. Santos-Neves, including their contact information.  ERGO-0000986.  The next day, May 18, 2016, Mr. Egeland provided a revised list to Mr. Clark.  ERGO-0001067.  Following a meet and confer held the same day, BSF sent Plaintiff another letter, confirming that the inquiry had ceased, that no further inquiries would be made, and attaching a list of all individuals with whom Mr. Santos-Neves spoke, along with the date and method of communication for each contact.  Smith Exh. U.

### G.    Proceedings Before the Court

This Court held a hearing on May 20, 2016.[5]  The Court granted Plaintiff leave to serve subpoenas on Uber and Ergo regarding the investigation, *id.* at 15, and acknowledged that Mr. Kalanick, Uber, or Ergo had the right to object to the scope of the subpoenas.  *Id.*

On May 24 and 25, 2016, Plaintiff served two document subpoenas and five deposition subpoenas on Uber's and Ergo's counsel.  Smith Exh. V.  On May 25, 2016, Uber offered to:

- produce documents (including emails) reflecting the instructions or assignments given to Ergo in regard to this case by Uber personnel;
- produce the email from Uber General Counsel Salle Yoo to Joe Sullivan dated December 16, 2015, constituting the request that precipitated the investigation;
- produce two Uber witnesses for deposition (Craig Clark and Mat Henley) who were involved in engaging and instructing Ergo;
- not object to the deposition of the Ergo investigator, Miguel Santos-Neves; and
- not assert privilege (subject to the agreement discussed above) to deposition questions seeking the instructions or assignments given to Ergo or the investigator's communications with third parties in this case (i.e., the alleged misrepresentations).

---

[5]Plaintiff identified two concerns arising from this alleged misconduct: (1) the potential for "professional/ reputational harm to [Plaintiff]" from the inquiries; and (2) the need to have "assurances that this won't happen again in this litigation."  May 20, 2016 Hearing Tr. at 7. Plaintiff did not identify any specific harm or prejudice from the contacts.

*Id.*  Plaintiff's counsel rejected this offer, *see* May 27, 2016 Hearing Tr. at 25, and Uber served objections and responses the following day, May 26, 2016.

The Court convened another hearing on May 27, 2016, during which the Court explained it was concerned with, first, whether "fraudulent misrepresentations were made by Ergo to persons who were being contacted to dig up negative information about the plaintiff and the plaintiff's counsel[.]" *Id*. at 8.  Second, the Court noted its concern over "whether that was being done at the behest of [or] with the knowledge of Uber and/or Mr. Kalanick or both." *Id.*  Finally, the Court posed the question whether "false representations were made by Uber or by Mr. Kalanick or their counsel to plaintiff's counsel about what was actually transpiring." *Id.*

The Court modified Plaintiff's subpoenas "on the grounds of burdensomeness and overbreadth," *id.* at 5, observing that Uber had made a "very sensible and professional" offer to Plaintiffs to consent to the depositions of Mr. Clark, Mr. Henley, and Mr. Santos-Neves and provide a limited waiver of privilege provided it would not result in a broader waiver in the litigation.  *Id.* at 6, 24.  The Court instructed counsel for Uber and Ergo to submit all documents subject to claims of privilege for *in camera* review.  *Id.* at 4.

On June 2, 2016, the Court granted leave for Uber to file a letter brief requesting reconsideration of the Court's Order to produce privileged documents for *in camera* review.  Uber and Plaintiff filed their respective positions the next day, June 3, 2016.  The Court denied Uber's motion.  ECF No. 82.  On June 6, 2016, Uber provided the Court 60 documents marked privileged and confidential for *in camera* review.

After reviewing Uber and Ergo's *in camera* submissions, the Court issued an Order on June 8, 2016.  ECF No. 82.  As to Uber, the Court affirmed Uber's claims of privilege and work-

10

product protection as to many of its documents and denied it as to others. *Id.* The Court provided a list of documents for Uber to produce to Plaintiff and denied Plaintiff's request to depose Uber's General Counsel, Ms. Yoo. *Id.*

Following the production of documents to Plaintiff, and the deposition of three Uber employees and two Ergo employees, the Court issued an Order on June 22, 2016, inviting Plaintiffs to indicate what relief, if any, was sought. ECF No. 93. Plaintiff filed his motion on June 29, 2016, requesting:

> (1) an order prohibiting Defendants from using any of the information obtained through Ergo's investigation in any manner, including by presenting arguments or seeking discovery concerning the same; (2) an order enjoining Defendants and Ergo from undertaking any further personal background investigations of individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful means; [and] (3) an order for monetary sanctions, including Plaintiff's attorneys' fees and costs related to the investigation of Plaintiff by Ergo.

Mtn. at 1-2.

## ARGUMENT

Defendants[6] Uber and Mr. Kalanick submit that, for the following reasons, Plaintiff's request for sanctions should be denied in its entirety.

### A.      Plaintiff Is Not Entitled To Attorney's Fees

Plaintiff relies on Rule 37 and the All Writs Act to support his request for sanctions. But neither Rule 37 nor the All Writs Act authorizes sanctions under these circumstances, much less an award of attorney's fees. Rule 37 authorizes sanctions only for specific types of enumerated discovery misconduct not at issue here. *See, e.g.*, *Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986). And "[t]he All Writs Act is not a grant of plenary power to the federal courts." *Plum*

---

[6]Uber was joined as a party on June 19, 2016. ECF No. 90.

*Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979).[7]  The clear standards

governing when a court may award attorney's fees pursuant to its inherent power—standards that

do not appear anywhere in Plaintiff's brief—establish that Plaintiff is not entitled to fees.[8]  To

establish entitlement to fees, Plaintiff must show with "a high degree of specificity" that Uber

and Mr. Kalanick acted in "bad faith."  *See Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564

F.3d 110, 114 (2d Cir. 2009).  He cannot do so on this record.

### 1.    Plaintiff has not shown that Defendants acted in bad faith

"The general rule in federal courts is that a litigant cannot recover his counsel fees."

*Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765-66 (1980).  The Second Circuit's "case law is

clear that a district court may not impose attorney's fees as a sanction without first making an

explicit finding that the sanctioned party, whether a party or a party's counsel, acted in bad faith

in engaging in the sanctionable conduct."  *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir.

2012); *see also Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997); *Oliveri v. Thompson*, 803

---

[7]As Plaintiff acknowledges, Br. at 11, the All Writs Act "is designed to aid the courts in the exercise of their jurisdiction."  *Id.*  Plaintiff does not explain how the relief he seeks is in aid of the Court's jurisdiction.  *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 221 (1945). Nor does he argue that such relief was available by writ at common law.  *See United States v. Hayman*, 342 U.S. 205, 222 n.35 (1952) (in determining whether relief is available under the All Writs Act courts must "look first to the common law").  While Plaintiff requests an "injunction," *see* Br. at 14, he cites no case in which a court relied on the All Writs Act to grant "intermediate relief" that is not "of the same character of that which may be granted finally," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 326 (1999) (quoting *De Beers*, 325 U.S. at 220), and which did not further the Court's jurisdiction.  *Cf. De Beers*, 325 U.S. at 223 .

[8]Plaintiff asserts, without citing any relevant case law, that "[t]he Court has broad discretion under its inherent powers . . . to sanction misconduct."  Br. at 10.  He further argues that attorney's fees may be awarded for unintentional misstatements.  Br. at 15.  In fact, the law is just the opposite.  The Second Circuit, "in recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court's inherent power."  *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991).

F.2d 1265, 1272 (2d Cir. 1986) ("[D]etailed findings of bad faith [are] necessary to justify invocation of the inherent power exception to the American Rule.").

Plaintiff cites no evidence that Defendants or BSF acted in bad faith.  Uber hired Ergo to conduct what was presented as "'light-touch' reputational due diligence" to vet whether Plaintiff posed a safety risk to Mr. Kalanick.  This was not, in itself, wrongful, let alone a ground for finding that Uber acted in bad faith.  *See* May 27, 2016 Hearing Tr. at 8 (observing "I don't know of anything that prohibits per se" conducting a "background check on your adversary"); *cf. Gidatex, S.r.L v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 119, 122 (S.D.N.Y. 1999) (finding no misconduct where plaintiff hired investigators to go undercover and pose as customers to collect evidence of trademark infringement).  Indeed, Mr. Sullivan testified that such investigations are sometimes necessary because of credible threats to Uber's high-profile executives and the hostile reactions that have sometimes accompanied Uber's entry into certain geographic areas.

Plaintiff's assertion that Uber hired Ergo "to pull together a report that featured 'derogatory' information about Plaintiff" is belied by the report itself.  If anything, the report featured *laudatory* information about the Plaintiff.  Moreover, the report contained information that bore directly on whether Plaintiff posed a safety risk to Mr. Kalanick.  For example, its "Key Findings" section reported that "[s]ources speak of Meyer's personality in glowing terms," and described him as "non-confrontational," "professional, thoughtful, and trustworthy."  UBER-

PRIV0000063.  This information allowed Uber's security team to conclude that Mr. Meyer did not pose a safety risk to Mr. Kalanick.[9]

Furthermore, it is undisputed that Uber and Mr. Kalanick were unaware that Ergo would use misrepresentations during its investigation.  *See* Henley Tr. 95-96, 111-13; Sullivan Tr. 14, 45-46, 55; Clark Tr. 23, 105.  Indeed, the undisputed evidence is that Mr. Kalanick *was not aware of this investigation at all* (*see* Henley Tr. 24, 61-63; Sullivan Tr. 24; Clark Tr. 43), and that Uber had a reasonable—indeed contractual—expectation that Ergo would comply with the law, that its investigators would be properly trained in performing their duties, and that Ergo would conduct the investigation consistent with the highest standards of the profession, business or industry (*see* UBER-PRIV0000044, UBER-PRIV0000047).

Finding no evidence that Defendants were aware of Ergo's alleged misconduct, let alone directed it, Plaintiff argues that Defendants may be sanctioned for failing to "ensure that the investigation was conducted ethically and legally."  Br. at 12.  This argument is without merit.  As an initial matter, Uber's purported failure to supervise Ergo cannot possibly be the basis for sanctions against Mr. Kalanick, who was unaware of the investigation.  *See Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977).

Nor can attorney's fees be awarded against Uber for its purported failure to supervise Ergo, an independent contractor.  Plaintiff cites no case holding that a failure to supervise an independent contractor amounts to bad faith conduct subject to sanctions.  *See Sakon*, 119 F.3d at 114 (finding that sanctions were likely "unsupportable" where the conduct at issue "was the

---

[9]Plaintiff makes much of Uber's miscommunication regarding the investigation.  But not all internal miscommunications are nefarious conspiracies.  There is no evidence that this was anything other than a simple mistake that was later corrected voluntarily.

result of excusable neglect") (internal quotation marks omitted).  In any event, Uber took reasonable steps to ensure that Ergo complied with the law.  The Uber-Ergo MSA provided that "the Services will be performed in a competent and professional manner by Personnel skilled in the relevant areas of expertise," Ergo warranted that its investigators were "skilled experienced and fully qualified to perform and deliver" consistent with "the highest standards of . . . [the] business or industry," that Ergo would take "reasonable measures to ensure" that its investigators were "properly trained in performing their duties," and that Ergo would "comply with all applicable state, federal and local laws and regulations in the performance of Services and provision of Deliverables under this Agreement."  UBER-PRIV0000044, UBER-PRIV0000047. Plaintiff cites no authority—and Uber is aware of none—supporting the proposition that Uber was required to police Ergo's compliance after specifically securing a warranty that Ergo would comply with the law and with no indication—or reason to think—that Ergo would engage in any potential wrongdoing.

Plaintiff seeks to impute Ergo's purported misconduct to Defendants solely because Uber hired Ergo.  Indeed, the only mention of "bad faith" in Plaintiff's brief refers to *Ergo's* use of false statements.  *See* Br. at 13 ("Employment of false statements . . . is a classic example of bad faith litigation . . . .").  But it is *Defendants'* motives that are relevant to whether the sanction of attorneys' fees is available, not those of Ergo.  "Bad faith is personal," and "an award of costs or attorneys' fees based on bad faith must likewise be personal."  *Browning*, 560 F.2d at 1089 (holding that plaintiffs could not be sanctioned for co-plaintiff's procedural bad faith absent a finding that they were "personally aware of or otherwise responsible for" his actions).  Plaintiff fails to point to any evidence that Defendants personally acted in bad faith.  *See id.*

15

In sum, Plaintiff has failed to show with "a high degree of specificity"—as he must—that Uber and Mr. Kalanick acted in "bad faith." *See Wolters*, 564 F.3d at 114.  The Court should reject his request for sanctions on this basis alone.[10]

### 2.      Plaintiff has not demonstrated any prejudice

Plaintiff's request for attorney's fees also fails because he has not shown any prejudice as a result of the investigation.  Sanctions are typically "unsupportable" where the conduct at issue "did not unduly prejudice" the opposing party and "was the result of excusable neglect." *Sakon*, 119 F.3d at 114 (internal quotation marks omitted).  Plaintiff acknowledges that there was nothing prejudicial in the "glowing" report itself.  Br. at 13.  Instead, the report describes Plaintiff as "professional," "conscientious," "trustworthy," "affable," "thoughtful," "a cut above his cohort," "charming and steady," a "natural leader," and "a star."  UBER-PRIV0000069-70.  Plaintiff himself concedes that "[n]othing in the Report is relevant to any issue in this case," Br. at 13, and Defendants do not intend to introduce this "glowing" report as evidence.[11]

---

[10] Plaintiff's request for attorney's fees should also be denied because he has failed to provide any evidence of the amount or reasonableness of the fees.  "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983) ("[C]ontemporaneous time records are a prerequisite for attorney's fees in this Circuit.").  Aside from a stray—and very general—reference in his combined Opposition to Uber and Kalanick's motions to compel arbitration, Plaintiff has failed to even articulate what those fees amount to, much less whether they are reasonable.

[11] As described, *supra*, Plaintiff cannot demonstrate entitlement to sanctions merely by pointing to legal fees incurred, without some evidence of bad faith on the part of Defendants, which is utterly lacking here.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991).

### 3. Defendants' legitimate attempts to protect privileged communications are not grounds for sanctions

Plaintiff also contends that fees are appropriate because Defendants' opposition to his broad requests for discovery related to Ergo "forced [him] to incur substantial time and resources with respect to the Ergo matter."  Br. at 15.  But Plaintiff must show more than that he merely incurred fees, as the "'American Rule' prohibits fee shifting in most cases."  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991).  Instead, he must show that Defendants "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" in opposing his requests.  *Id*. at 45-46 (internal quotation marks and citation omitted).  He has not done so, nor could he in light of the facts.

Attorney's fees incurred by Plaintiff were a result of his litigation strategy, not any improper attempt by Defendants "to avoid discovery."  Br. at 15.  The day after Plaintiff first served document subpoenas on Mr. Kalanick—more than a month after Plaintiff learned about the Ergo investigation—Uber offered to provide discovery that mirrored closely the discovery the Court ultimately ordered.  Plaintiff's counsel rejected this offer, *see* May 27, 2016 Hearing Tr. at 25, which the Court characterized as "very sensible and professional," *id*. at 24, because he wanted to use the Ergo discovery in this litigation, *id*. at 24-25.[12]  Absent any indication of bad faith, and in light of the ample evidence that Defendants' response was "very sensible and professional," there is absolutely no basis to shift the fees Plaintiff incurred to Defendants.[13]

---

[12] A goal, it should be noted, he achieved.  *See* Mem. in Opp. to Uber's Mtn. to Intervene (ECF No. 75) at 5-6; Mem. in Opp. to Defs.' Mtns. to Compel Arbitration (ECF No. 102) at 8, 17, 20.

[13] Plaintiff also seeks "[m]onetary sanctions beyond Plaintiff's costs," Br. at 15, and characterizes the relief he seeks as a "financial penalty," Br. at 14.  Among the several reasons such sanctions are not appropriate here, punitive sanctions may not be imposed "without employing the procedures appropriate to a criminal trial."  *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 142 (2d Cir. 2000).

**B.     The Cases Plaintiff Cites Do Not Support the Imposition of Sanctions**

The district court cases Plaintiff cites establish only that a party who obtains evidence by improper means *for use in litigation* may be precluded from introducing the wrongfully obtained evidence.  *See Br*. at 11-13 (citing *Fayemi v. Hembrecht & Quist, Inc.*, 174 F.R.D. 319 (S.D.N.Y. 1997), and *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1212 (W.D. Mich. 1990)).  That principle does not apply here.  Even if it did, it would warrant only a narrowly tailored preclusion order barring the introduction of the Ergo report, not the broad relief Plaintiff seeks.

Plaintiff relies on *Upjohn v. Aetna*, 768 F. Supp. 1186 (W.D. Mich. 1990), an out of Circuit district court case, to support his position that a party may be sanctioned for failing to supervise an independent contractor.  *See* Br. at 12-13.  But the facts of *Upjohn* are readily distinguishable.  There, the defendant's "lawyers hired an investigation firm to . . . interview former employees of Upjohn to disclose more information about the environmental damages that [were] the underlying subject matter of the dispute." *Id*.  The court expressed concern that the investigators sought to mislead "prospective witnesses who are not represented by counsel." *Id*. at 1214.  By contrast, Uber hired Ergo to ensure that Plaintiff did not pose a threat to Mr. Kalanick, not to uncover information about "the underlying subject matter of the dispute." Uber's litigators were not even aware of the investigation—Uber's delay in reporting that it had hired Ergo was because the litigation department initially had no idea that Uber's security team had commissioned the investigation.  Furthermore, unlike the investigation at issue in *Upjohn*, Ergo did not contact any witnesses or potential witnesses associated with this litigation.  There is nothing in the report that is even relevant to this case, and Ergo's investigation was not intended to, and did not, confer any advantage in the litigation.

18

Moreover, *Upjohn* provides no support for the proposition that a party may be *sanctioned* where an independent investigator allegedly breaches the explicit terms of the engagement by committing misconduct.  The *Upjohn* court did not consider whether inherent powers sanctions were warranted.  Instead, it held only that a party may be precluded from introducing evidence that is tainted by misconduct, "regardless of the lawyer's efforts to ensure compliance."  *Id*. at 1215.  There is a critical distinction between finding that a party should not benefit from another's misconduct and finding that the party *himself* has acted in bad faith, as would be required to award fees under the Court's inherent powers.  *See Browning*, 560 F.2d at 1089.

*Fayemi v. Hembrecht and Quist, Inc.*, 174 F.R.D. 319 (S.D.N.Y. 1997), on which Plaintiff also relies extensively, illustrates the distinction.  There, the plaintiff *himself* "furtively removed confidential information [about his co-workers' bonuses] from a computer disk that his supervisor had kept secured in his desk drawer."  *Id*. at 324-25.  Because this conduct was "clearly wrongful" it was "an appropriate subject for sanctions."  *Id*. at 325.  *Fayemi* thus stands for the unremarkable proposition that a court may sanction a party who commits clear misconduct.  No such misconduct by Defendants is at issue here.

At most, Plaintiff has shown that the laudatory Ergo report should not be introduced as evidence, not that Defendants have committed sanctionable misconduct.

### C.   Plaintiff Is Not Entitled to an Order Precluding Defendants from Seeking Discovery About Him

Plaintiff's request for an order precluding Defendants from "presenting arguments or seeking any discovery concerning Plaintiff's personal background" (Br. at 12) is overbroad and unwarranted.  *See Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)

19

(describing "preclusion of evidence" as a "harsh remed[y]" that "should be imposed only in rare situations").

None of the cases Plaintiff cites support the broad preclusion order he seeks.  In *Upjohn*, where the defendant sought information from unrepresented former employees of Upjohn *about the subject matter of the litigation*, the court still permitted the defendant to interview former employees as long as it disclosed the purpose of the interviews.  *Upjohn*, 768 F. Supp. at 1212.  And in *Fayemi*, where the plaintiff *himself* removed evidence from his supervisor's desk *for use in the litigation*, the court held that its narrow preclusion order was "sufficient to ameliorate any prejudice to the defendants."  174 F.R.D. at 326.  The very cases on which Plaintiff relies demonstrate that the proper remedy, if any, is an order precluding Defendants from introducing evidence obtained by Ergo, not a broad order limiting discovery.

To be sure, Defendants will not use an investigator to collect evidence about Plaintiff.  But they should not be precluded from using normal civil discovery mechanisms to seek information about him and his suitability as a class representative.  Plaintiff is seeking to represent the interests of an enormous, nationwide class consisting of absent consumers, and to bind them to the results of this litigation.  Therefore, Defendants—and the Court—must be able to evaluate whether he "'possess[es] the same interest and suffer[ed] the same injury' as the class members," *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  *See Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978) ("Failure to allow discovery, where there are substantial factual issues relevant to certification of the class, makes it impossible for the party seeking discovery to make an adequate presentation either in its memoranda of law or at the hearing on the motion if one is held.").

Dated:   July 6, 2016

Respectfully submitted,


/s/ Nicola T. Hanna
     Nicola T. Hanna


GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:      212.351.4035
RBrodsky@gibsondunn.com

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Nicola T. Hanna
Joshua S. Lipshutz
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:    213.229.7000
Facsimile:      213.229.7520
TBoutrous@gibsondunn.com
DSwanson@gibsondunn.com
NHanna@gibsondunn.com
JLipshutz@gibsondunn.com

Cynthia E. Richman
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:     202.955.8500
Facsimile:     202.467.0539
CRichman@gibsondunn.com

*Attorneys for Uber Technologies, Inc.*


BOIES, SCHILLER & FLEXNER LLP

Karen L. Dunn
William A. Isaacson
Ryan Y. Park
5301 Wisconsin Avenue, NW
Washington, DC  20015
Telephone:     (202) 237-2727
Facsimile:     (202) 237-6131
kdunn@bsfllp.com
wisaacson@bsfllp.com
rpark@bsfllp.com

Alanna C. Rutherford
Peter M. Skinner
Joanna C. Wright
575 Lexington Avenue, 7th Floor
New York, NY  10022
Telephone:     (212) 446-2300
Facsimile:     (212) 446-2350
arutherford@bsfllp.com
pskinner@bsfllp.com
jwright@bsfllp.com

*Counsel for Defendant Travis Kalanick*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2016, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter.

/s/ Nicola T. Hanna
Nicola T. Hanna