# EXHIBIT K

# CONFIDENTIAL

1        A    My name is Joseph Sullivan.

2        Q    And do you have a middle name, Mr. Sullivan?

3        A    Edmund.

4        Q    And where do you reside?

5        A    Palo Alto, California.

6        Q    And where -- your home address?

7        ████████████████████████████████

8        Q    And you're an attorney?

9        A    I am.

10       Q    And where are you admitted to practice law?

11       A    I am licensed to practice law in California.

12   I've been admitted in some other states, but I'm not

13   active.

14       Q    Okay.

15       A    I should say, I'm not a practicing attorney

16   in my current capacity.

17       Q    Okay.  And what is your -- and who is your

18   employer?

19       A    My employer is Uber.

20       Q    And what is your job title at Uber?

21       A    Chief security officer.

22       Q    And how long have you held that position?

23       A    Since April of 2015.

24       Q    And before that, were you employed by Uber?

25       A    No.  Before April of 2015 I was employed by

```
 1   Facebook.

 2        Q   And from how long -- well, how long were you

 3   at Facebook?

 4        A   2008 to 2015.

 5        Q   And what sort of work did you do at Facebook?

 6        A   I started out as an attorney, and then moved

 7   to primarily a security-related role.

 8        Q   And before Facebook?

 9        A   I was at -- I was at PayPal for two years.

10        Q   And you were an attorney there as well?

11        A   I managed the North America legal team for

12   PayPal.

13        Q   And before PayPal?

14        A   I was at the same kind of umbrella company,

15   eBay, for another four and a half years before that.

16        Q   Four and a half years?

17        A   I think, yeah.  So all told at eBay and

18   PayPal, six and a half years.

19        Q   And then before PayPal/eBay?

20        A   U.S. Department of Justice.

21        Q   And were you -- where -- what role did you

22   play in the U.S. Department of Justice?

23        A   I had a number of different roles.  Most

24   recently I was a federal prosecutor here in the

25   Northern District of California.  And before that, I
```

```
 1   was a federal prosecutor in Las Vegas, Nevada.
 2        Q    All right.
 3             And was that -- did -- prior to working at
 4   the Department of Justice, did you have any other
 5   legal employment?
 6        A    I -- my first experience with the Department
 7   of Justice was an honorary law grad clerkship right
 8   out of law school.
 9             But then after I finished the clerkship, I
10   went to a private law firm in Miami named Kaufman
11   Miller Dickstein & Grunspan.  And I was an associate
12   there before going back to the Department of Justice.
13        Q    Okay.  Now, focusing you on your role today,
14   chief security officer, are you a practicing attorney
15   today?
16        A    No.
17        Q    And what role do you play at Uber as chief
18   security officer?
19             If you could just describe it broadly.
20        A    Generally speaking, I'm responsible for
21   anything safety or security or risk management related
22   to safety and security or fraud abuse for the company.
23        Q    And, are you familiar with the retention by
24   Uber of Ergo to conduct an investigation of the
25   plaintiff, Mr. Spencer Meyer, in connection with
```

 1   litigation against CEO Travis Kalanick?

 2       A   I am now familiar with that.

 3       Q   You're now familiar with that?

 4       A   Yes.

 5       Q   Okay.  And when did you become aware of

 6   Uber's retention of Ergo to conduct an investigation

 7   of the plaintiff, Spencer Meyer?

 8       A   I became aware that we retained Ergo when I

 9   saw the report from --

10       Q   Okay.

11       A   -- that Ergo had prepared.

12       Q   And we'll look at some documents.

13           That's about January 19th?

14           Does that sound about right?

15       A   I don't remember the dates.  I'd have to see

16   it.

17       Q   Okay.  Now, when -- are you familiar with the

18   company Ergo?

19       A   I am familiar with them.

20       Q   What does Ergo do?

21       A   So I don't know a lot about them.  I'm

22   familiar with the name and -- but I -- I don't -- I

23   haven't done a very close look at them, so --

24       Q   Do you have -- oh, I didn't mean to cut you

25   off.  Sorry.

```
 1      A    That's okay.

 2      Q    Do you have some sense of the general

 3   business that Ergo is involved in, what they do?

 4      A    Yes.

 5      Q    Can you tell me what that is.

 6      A    Investigations.

 7      Q    Now, when did you first become aware of the

 8   company Ergo?

 9      A    I think last -- I think last fall.  I don't

10   remember the date.

11      Q    The fall of 2015?

12      A    Uh-huh.

13      Q    How did you become aware of Ergo?

14      A    They were recommended to me as a firm that we

15   should consider.

16      Q    And who recommended Ergo to you as a firm

17   that you should consider?

18      A    Some -- another employee at Uber who had

19   run -- I think had a friend -- a friend in common with

20   the leader of Ergo.

21      Q    And who was that employee at Uber?

22      A    Ryan Graves.

23      Q    Okay.  Now, when you say, "They were

24   recommended to me as a firm that we should consider,"

25   consider for what purpose?
```

Case 1:15-cv-09796-JSR Document 109-12 Filed 02/07/16 Page 7 of 35
Rosenblatt v. Cook et al.
June 23, 2016                                                            11

```
 1       A    Investigative work.

 2       Q    Any particular type of investigative work?

 3       A    No.

 4       Q    Now, who is -- who is Ryan Graves?

 5       A    He is an employee at Uber who runs

 6  operations.

 7       Q    Do you report to Mr. Graves?

 8       A    No.

 9       Q    And when you say "operations," what general

10  sort of work does Mr. Graves perform at Uber?

11       A    So, he oversees our general managers and

12  regional general managers around the world who run our

13  city and regional teams.  He oversees our customer

14  support organization.  He oversees our HR

15  organization.

16       Q    And you may have said this.  What does he --

17  what is his title at Uber?

18       A    I am not sure --

19       Q    Okay.

20       A    -- what his exact title is --

21       Q    Okay.  Is he --

22       A    -- to be honest.

23       Q    Is he an attorney?

24       A    I don't think so.

25       Q    Does he perform any legal function at Uber,
```

```
 1   as far as you know?

 2       A   No.

 3       Q   So -- all right.

 4           Mr. Graves suggested Ergo to you as a firm

 5   that you should consider.

 6           Have you used Ergo on any projects yourself?

 7       A   No.

 8       Q   Okay.  And so, is it your understanding --

 9   well, let me take a step back.

10           Do you have any understanding of all of the

11   projects at Uber where Ergo has been retained as a

12   consultant?

13       A   No.

14       Q   Did you do anything to investigate that

15   issue?

16       A   Sorry.  I don't understand the question.

17       Q   Did you try and figure out whether, in

18   addition to the matter concerning Spencer Meyer, Ergo

19   has done other work for Uber?

20       A   No.

21       Q   Have you, in your role as chief security

22   officer, ever retained a -- a consultant like Uber or

23   vendor to conduct a background investigation of a

24   plaintiff in a current pending litigation?

25           MR. HANNA:  You said Uber.  I think you meant
```

 1   Ergo.

 2        MR. BRIODY:  I did.  I did.  I apologize.

 3    Q   Have you, in your role as chief security

 4   officer at Uber, ever retained a consultant like Ergo

 5   to conduct a background litigation of a plaintiff in a

 6   current pending litigation?

 7    A   So to -- let me give you a little context

 8   on -- on how we do investigations at Uber -- we -- and

 9   why we do investigations at Uber.

10        We retain outside firms like Ergo on a

11   regular basis for different types of investigations in

12   the security context, primarily because we need to --

13   we -- we're -- as a company, we are in a -- we're in a

14   business that attracts a lot of volatility.  In some

15   jurisdictions around the world, it plays out in the

16   political context, and in a lot of places around the

17   world, it plays out in a more physical context.

18        And so, we have a physical security team, and

19   we have an executive protection team, and we have the

20   investigations team that Mat oversees.  We -- we see a

21   lot of different challenging things.  We also have a

22   trust and safety team that's responsible for safety in

23   the vehicle.

24        We would like to have information at the time

25   that an accident or incident happens in a vehicle, but

1    sometimes we don't learn about it until someone files

2    a lawsuit.  And so, as a result of that, sometimes we

3    do investigations related to people who are involved

4    in litigation.

5         And it's in that context that I -- I think I

6    would say "yes" to your question, because we're trying

7    to figure out what actually happened in the vehicle.

8    Is this a safe -- is this driver someone who should be

9    allowed to continue to drive?  Is this passenger

10   someone who should continue to be allowed to press a

11   button and get a ride?

12        Other than that, I don't think that we have

13   at Uber.

14       Q   Okay.  And do you have some familiarity, as

15   we sit here today, with the investigation that Ergo

16   undertook with respect to Mr. Meyer?

17       A   I read the report at the time it came in.  I

18   have not gone back and looked at it since then.

19       Q   Do you have an understanding of how Ergo went

20   about obtaining the information that was contained in

21   its report to you?

22       A   I don't.

23       Q   Have you attempted to figure that out as you

24   sit -- prior to today, as we sit here today?

25       A   No.

1   individuals in the company, or our CEO directly, to

2   make sure that there's no risk.  That decision is not

3   tied to whether there is litigation or not.  It's --

4   it comes from the experiences that we've had.

5          And, you know, my experiences go back to,

6   like I talked about, working on security and safety

7   issues at eBay and at Facebook.  And so I've spent

8   the -- the better part of two decades supporting

9   security organizations that have had to deal with the

10  risks of having high-profile founders and CEOs in --

11  in businesses that are changing business practices and

12  angering people.

13         I think that, you know, what's reflected in

14  the media is a small sliver of the volatility that we

15  see.  You know, I've had to deal with many instances

16  where people have, you know, showed up in our lobbies,

17  accosted our executives, flamed them on Twitter, sent

18  them death threats, showed up outside their homes,

19  throwing eggs at their homes, threatened to file

20  lawsuits for, you know, strange reasons, you know.

21         You know, an example of a -- of a public case

22  that got a lot of attention when I was at Facebook was

23  the Paul Ceglia case.

24         There have been a number of times, at all

25  three of these companies, where we've had to either

```
 1   get restraining orders or considered getting

 2   restraining orders.

 3        And in all of these situa- -- and -- and so,

 4   you know, I think that we have a -- a healthy approach

 5   to managing risk for our executives, because we want

 6   them to be able to go about their lives.  And so I --

 7   you know, none of these -- none of these founders or

 8   CEOs wants to have a security team around them 24/7.

 9   So, what we try and do is manage risk efficiently and

10   evaluate risks, and then move on and help them move on

11   with their life.

12        So we -- I've been involved with many times

13   asking our investigations teams to do diligence on

14   people who kind of come on the scene, and it seems a

15   little bit unusual.

16     Q   Can you tell me why Uber retained Ergo to

17   investigate Mr. Meyer?

18        MR. HANNA:  Objection to the form of the

19   question.

20        THE WITNESS:  I don't know.  You'd have to

21   ask the person who retained them.

22        MR. BRIODY:  Q.  Well -- well, Mr. Henley --

23   I asked Mr. Henley that.  And he told us that he was

24   ordered to do diligence, and that's why he retained

25   Ergo.
```

```
 1    A    47.  I do, yeah.

 2    Q    Okay.  And, for the record, Exhibit 47 is a

 3  document bearing Bates UBER-PRIV '1.

 4         Do you recognize this document, Mr. Sullivan?

 5    A    I do.

 6    Q    What is it?

 7    A    It is a -- it's an e-mail thread.

 8    Q    And who is on the e-mail thread?

 9    A    Three people.  The first e-mail is from Salle

10  Yoo to me, and the second e-mail is from me to Mat

11  Henley.

12    Q    And what is the date of this e-mail thread?

13    A    December 16th.

14    Q    Okay.  And so -- and who is Salle Yoo?

15    A    She's Uber's general counsel.

16    Q    And Mr. Henley?

17    A    He's our -- Uber's head of investigations.

18    Q    Now, we were discussing before, the e-mail

19  chain begins on -- with an e-mail from Ms. Yoo to

20  yourself, stating:

21         "Joe, could we find out a little more about

22  this plaintiff?"

23         Do you see that?

24    A    Uh-huh.

25    Q    Did you have further discussions with Ms. Yoo
```

```
 1   concerning this e-mail?

 2       A   No.

 3       Q   Did you discuss with her what sort of

 4   information she was looking for?

 5       A   No.

 6       Q   Did you discuss with her why she wanted to

 7   find out a little bit more about the plaintiff?

 8       A   No.

 9       Q   Now, the e-mail from Ms. Yoo to you reflects

10   a forward.

11           Do you see that in the subject line?

12       A   Yes.

13       Q   Do you know what was -- what communications

14   she forwarded to you?

15       A   I don't.

16       Q   Do you have any understanding of -- well,

17   I'll withdraw that question.

18           You take Ms. Yoo's communication and forward

19   it along to Mr. Henley; correct?

20       A   Yes.

21       Q   And you also attach a copy of the complaint,

22   which I presume was attached to what Ms. Yoo sent you?

23       A   I think so, but I can't say for certain

24   without -- I mean, yeah, it showed -- actually, I can.

25   It shows that I forwarded it to -- I forwarded it to
```

```
 1    Mat Henley, and there was an attachment, which was a

 2    PDF.

 3         Q    Okay.

 4         A    And the label is on the document.

 5         Q    And so you tell Mr. Henley to please do a

 6    careful check on this plaintiff.

 7              Do you see that?

 8         A    I do.

 9         Q    Okay.  And why did you tell him to do that?

10         A    Because I thought it would be a good idea.

11         Q    And you thought it would be a good idea when

12    you wrote this e-mail because why?

13         A    Because, as I mentioned earlier, I -- I

14    reviewed -- I looked at the document -- that attached

15    document, the -- and I noticed a couple of things, and

16    agreed with the -- you know, in my head thought this

17    is a risk situation worthy of examination.

18         Q    And -- and to go back a second, did -- did

19    you have any further discussions with Ms. Yoo -- let

20    me -- I want to put a time frame on this.

21              After you forwarded the e-mail from Ms. Yoo

22    on to -- or rather -- let me withdraw that.

23              Before you forwarded the e-mail from Ms. Yoo

24    on to Mr. Henley, did you have a discussion with

25    Ms. Yoo about what she was looking for and why she was
```

```
 1   looking for you to look into Mr. Meyer?

 2          MR. HANNA:  Objection to the form of the

 3   question; asked and answered.

 4          You can -- you can answer again.

 5          THE WITNESS:  Yeah, I already answered that I

 6   had not.

 7          MR. BRIODY:  Q.  Did there come a time, after

 8   you forwarded the e-mail to Mr. Henley, when you

 9   discussed with Ms. Yoo the reasons why she suggested

10   to you to find out a little bit more about Mr. Meyer?

11      A    No.

12      Q    And I just want to be clear on this.  I would

13   like you to tell me all of the reasons why you

14   understand the investigation of Mr. Meyer was

15   undertaken.

16      A    I can't tell you why Salle Yoo made the

17   request to me.  I can tell you why I thought it was a

18   good idea.

19      Q    Okay.

20      A    And I already did.

21      Q    Okay.  Now, after you sent this e-mail to

22   Mr. Henley, did you -- well, let me take a step back.

23          Did you understand, when Ms. Yoo sent this

24   e-mail to you about finding out a little bit more

25   about the plaintiff, she had discussed this lawsuit
```

```
 1   with Mr. Kalanick?

 2      A   I'm sorry.  Say that again.

 3      Q   Sure.

 4          Did you have any understanding of whether

 5   Ms. Yoo spoke with Mr. Kalanick before she sent this

 6   e-mail to you on December 16th?

 7      A   I don't know if they had any conversations

 8   ever about this case.

 9      Q   Do you regularly speak to Mr. Kalanick?

10      A   I do.

11      Q   Okay.  Did you -- have you discussed this

12   matter, this litigation, with Mr. Kalanick?

13      A   Never.

14      Q   Have you ever discussed the retention of Ergo

15   in any capacity with Mr. Kalanick?

16      A   No.

17      Q   Have you ever -- are you familiar with the

18   law firm Boies Schiller?

19      A   I am.

20      Q   Do you know a fellow named Peter Skinner?

21      A   I don't know if I do.

22      Q   Okay.  I'm interested in knowing if you ever

23   discussed with -- we'll take it one by one -- Peter

24   Skinner, the fact that Ergo was conducting an

25   investigation concerning Mr. Meyer?
```

```
 1    can have a chance to understand the privileged

 2    contexts --

 3            MR. BRIODY:  Okay.

 4            MR. HANNA:  -- that these might come in.  And

 5    if it's not -- you know, we want to be helpful.  We

 6    want to give you information.  I just don't want to

 7    inadvertently waive any privilege on any matters.

 8            MR. BRIODY:  I understand.  I'm just trying

 9    to make the questioning concrete.

10        Q   So, I mean, if we can go back.  If you

11    don't -- if you don't want to give me the names of the

12    entities, that's fine.

13            But I -- what I'd like to understand is:

14    When you commission a consultant to perform diligence

15    on an individual who is a perceived threat of some

16    variety, what is -- what is understood that the vendor

17    will do -- the consultant will do?

18        A   I think it would be better -- a better

19    question for Mr. Henley, in particular, as he oversees

20    the actual engagements with outside consultants.  I

21    don't -- I don't have active direct engagement with

22    them or determine the scope of the engagement.

23        Q   Can you tell me what you know, please.

24        A   I have not given direct guidance to any

25    outside consultants on this type of investigation, so
```

 1    I can't.

 2          The -- you know, the guidance that I give to

 3    Mat and to our team, that's responsible for working

 4    with the legal department on setting up all of our

 5    consultants, is that I expect them to be extremely

 6    ethical and diligent in the way that we conduct

 7    ourselves.

 8          I think that that personally is my approach.

 9    And it's -- it's stood me well through my career to

10    take -- to take a deliberate and careful approach to

11    things like investigations.

12          You know, I come from a background of being a

13    thorough prosecutor, where I over- -- oversaw

14    investigations that, you know, had standards and

15    frameworks and expectations.  And I want to have that

16    same level of expectations and quality and respect in

17    the way we do our work.

18          I also think that is of importance, not only

19    because of my personal perspective, but because it's

20    the right thing to do.

21          And I also believe, thirdly, that Uber is

22    under a microscope in everything we do, you know.  At

23    every one of the companies I've been at, it's been

24    that way, where media enjoy writing about us.  People

25    enjoy reading about us.  And I can't control how we're

 1   characterized in those circumstances, other than make

 2   sure that we do our best to follow high standards.

 3           So, you know, in our contracts with any

 4   consultants, we put that we expect them to follow the

 5   law, and we try and give them guidelines.  And I

 6   expect Mat Henley and his team to follow that

 7   perspective.

 8      Q    Okay.  And I appreciate that.  Thank you for

 9   that answer.

10           But what I -- I want an understanding of --

11   from -- from you, if I can have it, is in your

12   experience -- so what it sounds to me is you -- you're

13   referring me to Mr. Henley for how -- an expectation

14   of how an investigation is going to be carried out of

15   a potential threat for the time period you're at Uber.

16           I'm asking about your general experience and

17   the work that you've done over the years.

18           If you retain a vendor to do diligence on an

19   individual who you perceive to be a potential threat,

20   what is your expectation about how that investigation

21   is going to be carried out?

22      A    I think every situation is a little bit

23   unique, and so I probably can't give you a generalized

24   answer.

25      Q    Okay.

1      A    Also, I've been a little bit away from the

2    front line for -- well, quite a few years now.

3      Q    Is it your expectation that, as part of an

4    investigation, the investigator who is looking into an

5    individual will go to people who are familiar with the

6    target of the investigation and make false statements

7    about the reason why they're looking into the target?

8      A    No.

9      Q    Is it -- are you familiar with the concept of

10   an investigator using a cover for an investigation?

11     A    I'm familiar with that concept for sure.

12     Q    What do you --

13     A    When I was a prosecutor, I managed undercover

14   investigations all the time.

15     Q    Okay.  So I want to -- let's -- thank you.  I

16   appreciate that.

17          Do you have an understanding of -- and I was

18   talking about in the private realm where you're

19   undertaking to retain a consultant to do diligence or

20   look into a particular individual who you're

21   perceiving is a threat to an executive.  That's what

22   I'm talking about.

23          Are you familiar with the consultant using a

24   cover as part of that sort of work?

25     A    No.

```
 1       Q    After you sent this e-mail to Mr. Henley,

 2   what did you expect Mr. Henley would do?

 3       A    I expected that he would conduct -- engage in

 4   conducting an investigation, either through, you know,

 5   his team or through an outside vendor.

 6       Q    Was there some sort of template or rules of

 7   the road between you and Mr. Henley, where you had an

 8   expectation of a particular type of work product he

 9   would return to you?

10       A    No.  It can -- it can vary.

11       Q    Now, the retention of Ergo in connection with

12   the Meyer investigation, my understanding is that's

13   something that was done solely by Mr. Henley; is that

14   correct?

15       A    I don't know if it was solely by him, but it

16   didn't involve me.

17       Q    Did you have any contact with -- you

18   mentioned before Ryan Graves.

19            Did you ever recommend the use of Ergo to Mat

20   Henley after your discussion with Mr. Graves?

21       A    So, what happened was Ryan Graves connected

22   me by e-mail with someone from Ergo.

23            And then I connected that person with Mat

24   Henley and said, Mat is our head of investigations.

25   To the extent that -- to the effect that if -- if
```

```
 1    there's any oppor- -- if there's any business

 2    opportunity here, it would be working with

 3    Mr. Henley's team.

 4              And that was the extent of my engagement.

 5       Q    And to take -- the individual who you had the

 6    e-mails with at Ergo was who?

 7       A    I don't remember.

 8       Q    Was it Todd Egeland?

 9       A    I think so, but I don't remember.

10       Q    Now, what I'm wondering is:  How is it your

11    understanding of how Ergo came to be retained to do

12    the work on the Meyer matter?

13       A    I didn't know that they were retained until I

14    saw the report.

15       Q    Okay.  Now, if -- I'm going to show you -- if

16    you could take out -- oh, let me ask you a question

17    about your interactions with Ergo.  So, there was this

18    e-mail exchange.

19              What other communications, if any, did you

20    have directly with Ergo?

21       A    None.

22       Q    And that goes for -- for this initial e-mail

23    intro with Mr. Henley forward, no communications at

24    all?

25       A    Correct.
```

```
 1        A   I don't know.

 2        Q   Okay.  So I -- I had handed you Exhibit 54.

 3   And, for the record, Exhibit 54 is a document bearing

 4   Bates UBER-PRIV59.  If you could take a moment and

 5   look at it.

 6            And my first question is:  Do you recognize

 7   it?

 8        A   Yeah.  Yes, I do.

 9        Q   And what is it?

10        A   Well, it's a -- it's an e-mail thread that

11   includes a number of people.  At the top is my -- an

12   e-mail from me to Salle Yoo, forwarding an e-mail I

13   had received from Mat Henley.

14        Q   And that e-mail had an attachment; correct?

15        A   It had an attachment.

16        Q   And that attachment is -- if you turn the

17   page, that's:

18            "The Reputational Investigation of Spencer

19   Meyer, Prepared for Mr. Craig Clark."

20            Do you see that?

21        A   Yes.

22        Q   Okay.  Now, to be clear, this is -- you send

23   the e-mail on December 16th to Mr. Henley.  And then

24   you have no involvement in the Meyer investigation at

25   all.  And then you receive this e-mail from
```

1    Mr. Henley, which you forward on to Ms. Yoo; is that

2    right?

3        A    That's right.

4        Q    Okay.  Now, did you review the report when

5    you received it from Mr. Henley?

6        A    I did.

7        Q    And was the work product what you expected to

8    receive from Mr. Henley?

9        A    I'm not sure what you mean.

10       Q    Were you pleased with the report?

11       A    I don't remember thinking in terms of whether

12   I was pleased or not.

13       Q    Did you think -- was the report what you

14   expected to receive from Mr. Henley, when you tasked

15   him with the investigation of looking into the

16   plaintiff?

17       A    I think that it -- you know, obviously, I

18   don't remember specifically my reaction at the time,

19   other than that it satisfied my concerns from a

20   security risk management standpoint and made me

21   comfortable that we didn't need to do anything

22   further.

23       Q    And when you say it satisfied your concerns

24   from a security risk management standpoint, was that

25   your only concern when you forwarded the assignment to

1   tarnishes his professional reputation."

2         Do you see that?

3     A   I do.

4     Q   Now, can you tell me how that aligns with

5   concern about Mr. Meyer from a safety perspective for

6   Mr. Kalanick?

7     A   No.

8     Q   When you read this report, did you wonder,

9   why is this stuff in here about, you know, the fact

10  that Ergo believed that Meyer may be sensitive to

11  publicity that tarnishes his professional reputation?

12    A   So, at a general level, when I get

13  investigative reports, they have a lot of -- they have

14  a lot of stuff in them.  They use -- A, they use a lot

15  of fluff forms in -- in -- that they probably include

16  in every report, and then they -- you know, they have

17  their observations.

18        You know, my preference is -- in -- in

19  reports is to just have concrete facts so that I can

20  draw my own conclusions.

21        But -- so, when I read reports, I guess my

22  training and focus is on zooming in quickly on finding

23  the things that I'm interested in, and then moving

24  through it.

25        A lot of things come across my desk on a

1   daily basis.  And so my goal, when I get a report is,

2   I don't -- I'm not going to necessarily read every

3   line of a report.  I'm going to focus on the risks

4   that I'm worried about, and then I'm going to move on

5   to my next -- the next thing I've got to deal with.

6       Q   Did you have any understanding of whether

7   Ms. Yoo was interested in finding out information

8   concerning what issues Mr. Meyer may or may not be

9   sensitive to?

10      A   So sorry.  Can I read that or say that again?

11      Q   Sure.

12          I'm wondering if you had any sense of

13  whether -- in connection with the Ergo investigation

14  that was undertaken, was it Miss -- Ms. Yoo's

15  expectation that there would be a report on matters of

16  what Mr. Meyer may be particularly sensitive to?

17      A   I have no idea.

18      Q   What about Mr. Meyer's motivations -- an

19  analysis of Mr. Meyer's motivations for bringing a

20  lawsuit?

21      A   I -- I can't -- I can't tell you anything

22  about Salle Yoo's expectations, because I haven't

23  talked to her about them.

24      Q   Did you ever -- if we can turn to page --

25  it's a couple of pages forward.  There's "Source

```
 1   Biographies."  It's got 67 at the bottom right.

 2        A    (Witness complies.)

 3        Q    And I just want to ask you:  Is this

 4   something you read?

 5             Did you read the source biographies when you

 6   received the report on the 19th of January?

 7        A    I don't remember.

 8        Q    Did you read them at any time thereafter?

 9        A    I haven't gone back to -- this is the first

10   time I've looked at the report since that date.

11        Q    Did you give any consideration to the fact

12   that there were source biographies in here and how

13   those sources, which include, for example, "Meyer's

14   peer and friend," how those individuals were

15   contacted?

16        A    I don't recall.

17        Q    Do you know that, in conducting its

18   investigation, Ergo made telephone recordings of the

19   sources -- the conversations that the investigator had

20   with the sources in the Meyer investigation?

21        A    Do I know what about them?

22        Q    Do you know that in the Meyer investigation,

23   the Ergo investigator made phone recordings, without

24   advising the people he was talking to, that he was

25   doing that?
```

```
 1      A   I don't know if he -- they did or not.
 2      Q   You haven't gotten any recordings or any of
 3  the sort of work product behind this report?
 4      A   All I've seen is this report, and I've only
 5  reviewed it one -- one time in January.
 6      Q   Now, was it expected when you tasked -- well,
 7  let me -- let me ask you this:  Did you have a
 8  conversation with Mr. Henley, when you gave him his
 9  assignment back on December 16 -- December 16, 2015,
10  that it should be kept confidential?
11      A   What do you -- what do you mean a
12  conversation?
13      Q   Did you tell him, Hey, look into this
14  plaintiff, but don't let anyone know we're doing it?
15      A   I don't think I had any conversations with
16  him, other than the e-mail exchange.
17      Q   Okay.  Was it your understanding, based on
18  your prior work with Mr. Henley, that the
19  investigation would be kept confidential and not
20  published to everybody that it was happening?
21      A   I think -- I think that would be consistent
22  with my expectation.
23          MR. HANNA:  Is now a good time for a break,
24  John?
25          MR. BRIODY:  Let me check.  Yeah, that's
```

```
 1            MR. BRIODY:  Okay.

 2       Q    And -- and to go back to those e-mails, 54

 3   was when you sent the report to her.  And I think you

 4   said -- I just want to confirm -- you heard nothing

 5   further from Ms. Yoo concerning the report prepared by

 6   Ergo concerning Mr. Meyer; is that correct?

 7       A    After passing the report on to her, as I did

 8   in this e-mail, we did not talk about the report

 9   again.

10       Q    And did you have any discussions about the --

11   about Spencer Meyer after that report was forwarded?

12       A    No.

13       Q    Had any discussions about this litigation,

14   the -- the litigation brought by Mr. Meyer against

15   Mr. Kalanick?

16       A    The only -- I think the only conversation

17   we've had at all, since this e-mail exchange, was

18   related to the logistics of this process that we're in

19   now.

20       Q    Okay.  And meaning the deposition?

21       A    Meaning the deposition.

22       Q    Okay.  Are you aware -- let me do it this

23   way.

24            And, in your deposition today, did you meet

25   with anyone to prepare for the deposition?
```

 1      A   In the -- in the recent -- in the recent

 2   past, as this -- as this process was initiated, that's

 3   how I learned that there had been complaints.

 4      Q   It came to your attention -- when did it come

 5   to your attention that there were complaints by

 6   plaintiff's counsel concerning the Ergo investigation?

 7      A   I don't recall the specific date, but it was

 8   in the context of this process by our legal

 9   department.

10      Q   And I just want names.

11          Who did you communicate with on that issue in

12   your legal department?

13      A   I think I was originally -- I think I

14   originally heard it from Lindsey Haswell.

15      Q   Okay.  Now, I want to ask you a question

16   about Ms. Haswell.

17          Was Ms. Haswell at all involved or having any

18   discussions with you in connection with the retention

19   of Ergo and the request for an investigation of

20   Mr. Meyer?

21      A   No.

22      Q   And when, if you can -- did you first

23   discuss -- or I'll withdraw that question.

24          Did you speak with Mr. White concerning the

25   investigation of Mr. Meyer by Ergo?

```
 1    A    I don't -- who is Mr. White?

 2    Q    I'm sorry.

 3         MR. WHITE:  It's okay.

 4         MR. BRIODY:  He's right here.

 5    Q    In any case, I'll take that as a "no."

 6         And is it -- you're -- you're --

 7    A    Does his business card say Mr. White?

 8    Q    -- chief secure -- as chief security --

 9    A    I'm not used to referring to people by their

10   last name and Mister at Uber.

11    Q    Okay.  Understood.

12    A    That sounded like something out of Clue.

13    Q    That's Mrs. White --

14    A    Yeah.

15    Q    -- if I remember correctly.

16         So in your role at Uber, do you work with --

17   withdrawn.

18         Is it your understanding that Ms. Haswell

19   works in litigation at Uber?

20    A    I think so.

21    Q    Okay.  And do you work with the litigation

22   group frequently?

23    A    Not frequently.

24    Q    Is it unusual for you to be working and

25   interacting with the litigation group at Uber?
```

 1      A    It's not unusual.  I mean, it happens.

 2      Q    Now, are you aware that, when Ergo approached

 3  information sources, it did not tell them the truth

 4  about the reasons why it was asking for information in

 5  connection with the Meyer investigation?

 6      A    I was not aware of that.  I understand from,

 7  like, the preparation for today that that's been an

 8  issue that's been suggested.

 9      Q    Okay.  Sitting here today, are you aware that

10  Ergo made false statements in connection with its

11  investigation of Mr. Meyer?

12      A    I can't say whether they have or have not --

13  whether they did or did not.

14      Q    Okay.  And you -- to be clear on the question

15  before, you did not do anything to supervise Ergo's

16  investigation as it was unfolding; correct?

17      A    That's right.

18      Q    Now, if you could tell me briefly, I just

19  want to know what your role was after you became aware

20  that the plaintiff's counsel had approached

21  Mr. Kalanick's counsel with a problem about the Ergo

22  investigation of Mr. Meyer.

23           What role, if any, did you play?

24      A    I don't know if -- I don't know if the

25  attorneys you described ever talked, so I don't know

 1   next.

 2       Did you send that report to anyone else

 3   besides Ms. Yoo?

 4       A   No.

 5       Q   Do you know if the report was sent to anyone

 6   else besides Ms. Yoo?

 7       A   I don't know.

 8       Q   Has Uber taken any action, based upon the

 9   information contained in the Ergo report?

10       A   Well, I made the decision to not do any

11   action around risk mitigation in a security context.

12   I mean, if inaction can be action, that...

13       Q   Anything else?

14       A   Not that I'm aware.

15       THE WITNESS:  I'll grab a water.

16       MR. BRIODY:  Can we go off -- can we go off

17   for a few minutes?

18       MR. HANNA:  Sure.

19       MR. BRIODY:  Off the record.

20       (Recess taken.)

21       MR. BRIODY:  Q.  Mr. Sullivan, to be clear on

22   a couple of points, you did -- you did not refer

23   Mr. Henley to Ergo for this specific Meyer project;

24   correct?

25       A   That's correct.

1    or go to certain places.  Sometimes we have to put

2    photo -- give photographs to guards in the lobbies of

3    people we -- who keep showing up.  Sometimes we have

4    to clean up broken windows.

5         Sometimes we have to deal with -- you know,

6    we just have to deal with, on a daily basis, threats

7    to our employees, and not just threats, but actual

8    manifestation of those threats.

9         So, I'm always on the lookout when situations

10   arise that could be a cause for concern, and I'm

11   always careful to make sure that we do our diligence

12   in those situations.

13        MR. BRIODY:  Q.  And so what I'm -- I -- I

14   want to know is, if you can tell me specifically with

15   respect to this situation and -- and Mr. Meyer's suit:

16   What was it about it that made you feel like --

17        A    Sure.

18        Q    -- that this was a situation where you had to

19   go and look at the individual?

20        A    I think I -- I answered this already earlier

21   as well.  But the two things that, you know, looking

22   again at it now, stand out pretty clearly were that it

23   was a -- it was naming our CEO individually rather

24   than the company, and that it was titled as an

25   antitrust lawsuit, which I don't -- as I said earlier,