# EXHIBIT L

# CONFIDENTIAL

```
 1   question.

 2           THE WITNESS:  I had no context, other than

 3   who is the plaintiff, was the question.

 4           MR. BRIODY:  Q.  What was the last part?

 5   Other than what?

 6       A    Who is the plaintiff.  That was the...

 7       Q    So, could you tell me what your understanding

 8   is for the reason for the investigation of the

 9   plaintiff?

10       A    I had no --

11           MR. HANNA:  Objection to the form of the

12   question.

13           And clarification:  Do you mean his -- his

14   understanding of what he did, or what others'

15   motivation --

16           MR. BRIODY:  His -- his understanding --

17   well, let me take a step back.

18       Q    Mr. Henley, you were responsible for

19   retaining Ergo in connection with this investigation?

20       A    Correct.

21       Q    And why did you understand you were retaining

22   Ergo?

23       A    Because Salle and Joe asked us to just --

24   there was a -- this is an unknown plaintiff, and they

25   wanted diligence on who this person was.
```

```
 1         MR. HANNA:  Objection to the form of the
 2    question; mischaracterizes testimony.
 3         THE WITNESS:  They asked for diligence on
 4    him.  That is correct.
 5         MR. BRIODY:  Q.  And did they tell you any
 6    particular way to conduct that diligence?
 7    A    No.
 8    Q    Who decided to retain Ergo?
 9    A    Me.
10    Q    Did you retain any other investigation firm,
11    any kind of consultant, vendor, or any other party to
12    conduct diligence of Mr. Meyer?
13    A    No.
14    Q    What about Mr. Schmidt?
15    A    No.
16    Q    What about any counsel in this litigation on
17    behalf of the plaintiff?
18    A    No.
19    Q    When did Ergo's investigation of Mr. Meyer
20    conclude?
21    A    I'm not sure the exact date.
22    Q    Was it in February?
23    A    It would have been whenever the date that
24    they sent me the report.
25    Q    Who spoke with Ergo in connection with its
```

 1    investigation of Mr. Meyer -- withdrawn.

 2          Who from Uber spoke to Mister -- withdrawn.

 3          Who from Uber spoke with Ergo concerning its

 4    investigation of Mr. Meyer?

 5    A    Me.

 6    Q    Did anyone else speak with Ergo?

 7    A    Throughout the investigation?

 8    Q    Let's break it up.

 9    A    Yeah.

10    Q    There came a point in time where plaintiff's

11    counsel reached out to counsel for Mr. Kalanick

12    concerning Uber's investigation.

13          Are you familiar with that?

14    A    Just briefly.

15    Q    Okay.  And so there was a time period,

16    though, after plaintiff's counsel reached out to

17    Mr. Kalanick's counsel, that I understand other folks

18    at Uber may have become involved with interacting with

19    Ergo; right?

20    A    Yeah.

21    Q    I want to know before that.

22          Who from Uber was interacting with Ergo

23    during the period of its investigation from December

24    and through January?

25    A    Me.

    1       Q    Anyone else?

    2       A    I don't know exactly when Craig would have

    3   started engaging, because he kind of came -- Craig

    4   Clark.

    5       Q    What about Ms. Yoo?

    6       A    No.

    7       Q    What about Mr. Sullivan?

    8       A    No.

    9       Q    What about any other attorneys at Uber?

   10       A    No.

   11       Q    And -- and are you certain of that?

   12            Do you know that for a fact?

   13       A    Yeah, for sure.

   14       Q    And have you spoken with those other

   15   individuals to find out whether they had

   16   communications with Ergo?

   17            MR. HANNA:  Don't -- just caution the

   18   witness.  I don't think he's asking for the substance

   19   of communications that you've had with internal or

   20   external counsel.

   21            THE WITNESS:  Yeah.

   22            MR. HANNA:  He's asking if there were any

   23   conversations, or did you do anything to try to verify

   24   whether anybody else spoke with Ergo during the period

   25   of -- from retention to report --

Marchewka Vol 13 Confidential

```
 1        Q   You never communicated with Miguel

 2   Santos-Neves?

 3        A   No.

 4        Q   To your knowledge, did anyone at Uber

 5   communicate with Miguel Santos-Neves?

 6        A   No.

 7        Q   What about Mr. Egeland?  To your knowledge,

 8   has anyone else at Uber communicated with Mr. Egeland

 9   in relation to the Meyer matter?

10            And I'm talking at any point in time.

11        A   Just Craig Clark.

12        Q   And what about Mr. Moneyhon?  Do you know of

13   anybody at Uber who communicated with Mr. Moneyhon

14   concerning the subject matter of the Meyer

15   investigation?

16        A   No, I don't know of anyone else.

17            MR. HANNA:  You've got to keep your voice up.

18            THE WITNESS:  Yeah, I know.  I was just

19   thinking that as well.

20            MR. HANNA:  And let him finish his

21   question --

22            MR. BRIODY:  Right.

23            MR. HANNA:  -- before you give your answer.

24            MR. BRIODY:  Q.  And one sort of rule of the

25   road, we should try not to step on each other.  I'll
```

```
 1    do the best I can.  Sometimes I might get my signals

 2    crossed, thinking --

 3        A    Oh.

 4        Q    -- you've finished an answer.  Please finish

 5    your answer.  I'm happy to let you do that.

 6             If -- you've been doing a fine job of this

 7    already.  If I ask anything that you don't understand

 8    what I'm asking you, please ask me to clarify.  I'll

 9    be happy to do that, too.

10             Now, who at Uber received reports from Ergo

11    concerning the Meyer investigation?

12             MR. HANNA:  Objection to the form of the

13    question.

14             THE WITNESS:  Who received them directly from

15    Ergo --

16             MR. BRIODY:  Yes.

17             THE WITNESS:  -- or who saw the report?

18             MR. BRIODY:  Let's start with directly from

19    Ergo.

20             THE WITNESS:  Me.

21             MR. BRIODY:  Okay.

22        Q    Who else -- anyone else other than you

23    received direct communication from Ergo --

24        A    No.

25        Q    -- with the report?
```

     1        A    Just me.

     2        Q    And what about after you received -- and the

     3   report we're talking about, that's a January 19th

     4   report provided by Ergo to Uber; right?

     5        A    I assume that's the date.  I don't know

     6   exactly the date.

     7        Q    Was that report passed along to anyone else

     8   at Uber?

     9        A    It was passed to Craig Clark and Joe

    10   Sullivan.

    11        Q    Anyone else?

    12        A    I -- not to my knowledge.

    13        Q    Okay.  Do you know if that report was passed

    14   along to the defendant, Travis Kalanick?

    15        A    I have no idea.

    16        Q    What about his counsel at Boies Schiller?  Do

    17   you know if it was --

    18        A    No idea.

    19        Q    Let me finish.

    20             Are you -- just for the record, are you aware

    21   if the -- Ergo's report concerning Mr. Meyer was

    22   passed along to Mr. Kalanick's counsel at Boies

    23   Schiller?

    24        A    I have no idea.

    25        Q    Now, I think you -- this is probably

1       Q    Uh-huh.

2       A    Poosha, business operations, worked with

3  legal on the master services agreement.

4       Q    Anyone else?

5       A    At that point it would be me and Poosha, if

6  you don't have me down.

7       Q    And in terms of Ms. Yoo and Mr. Sullivan,

8  their role was not -- are you saying that they were

9  not specifically involved in retaining Ergo, that that

10 was --

11      A    They -- it was -- Ergo was originally

12 recommended to me by Joe, who received it from Ryan

13 Graves.

14      Q    And was Ergo recommended by Joe Sullivan?

15           That's who you're talking about, Joe?

16      A    Joseph.

17      Q    For the Meyer project?

18      A    No.

19      Q    And why was Ergo -- do you know, why did

20 Mr. Sullivan recommend Ergo to you?

21      A    Because Ryan recommended that we talk to

22 them.

23      Q    With respect to any particular types of

24 projects?

25      A    No.

```
1      Q   Okay.  Now, let's talk about the retention of

2   Ergo with respect to the Meyer project.

3          Who was involved in that?

4      A   Me.

5      Q   Just you?

6      A   For the retention piece, just me.

7      Q   Now -- now, there -- we can -- I'd like to

8   stop now and talk about the Ergo investigation itself.

9          Who managed, from Uber's standpoint, the Ergo

10  investigation itself?

11     A   What do you mean by managed?

12     Q   Did anyone perform oversight, after Ergo was

13  retained for the Meyer project, over what Ergo was

14  doing on the Meyer project?

15         MR. HANNA:  Objection to the form of the

16  question.

17         THE WITNESS:  There -- yeah, there's no

18  management from our part.

19         MR. BRIODY:  Q.  So there was pre-retention,

20  retention, then Ergo was conducting the investigation?

21     A   Yep.

22     Q   And Uber is not participating in that

23  investigation or overseeing it --

24     A   No.

25     Q   -- is that fair?
```

```
 1       A    Fair, yes.

 2       Q    Now, when -- a report is tendered by Ergo to

 3   you; right?

 4       A    Yep.

 5       Q    And we can -- we'll go through some documents

 6   later on, but I just want to get the broad picture

 7   here.

 8            That happens, I can tell you, around

 9   January 19th.

10       A    Uh-huh.

11       Q    When is Uber's next involvement with respect

12   to Ergo?

13            MR. HANNA:  Objection to the form of the

14   question.

15            THE WITNESS:  What do you mean by

16   involvement?

17            MR. BRIODY:  Next contact, next reach-out to

18   Ergo.

19            THE WITNESS:  I don't know.

20            MR. BRIODY:  Q.  What was -- when was your

21   next reach-out to Ergo after you got the report?

22       A    Really, at that point, Craig had been fully

23   on-boarded and was managing it.  And I don't remember

24   if I talked to them after the report piece.

25       Q    And "Craig" refers to Craig Clark?
```

```
 1      A    (Witness nods head.)

 2      Q    And was Craig -- you need --

 3      A    Yes.

 4      Q    -- to speak your -- sorry.

 5           So I'll say that again.

 6      A    You were talking over me.

 7      Q    I -- fair point.

 8           "Craig" refers to Craig Clark?

 9      A    Correct.

10      Q    And so is it correct that Craig Clark was not

11   involved with respect to the retention of Ergo for the

12   Meyer project before the report was tendered by Ergo

13   to Uber?

14      A    Correct.

15      Q    Now, after the report is tendered to Uber,

16   sort of breaking up, going back to my earlier line,

17   the pre-retention, the retention, then there's a

18   report.  Uber gets the report.

19           Can you tell me, to your knowledge, what

20   happens next at Uber with respect to the Meyer

21   investigation?

22      A    My involvement stopped at the point of

23   forwarding it to Craig and Joe.

24      Q    And so, after you forwarded the report, for

25   the events happening after that, I should talk to
```

```
 1   Craig or Joe; is that right?

 2       A   Yes.

 3       Q   Are you familiar with the defendant in the

 4   case, Travis Kalanick?

 5       A   Am I -- say it again.

 6       Q   Are you familiar with the defendant in the

 7   case --

 8       A   No.

 9       Q   -- Travis Kalanick?

10       A   Oh, am I familiar with Travis?

11       Q   Yes.

12       A   Yes.

13       Q   Do you speak with him regularly?

14       A   I don't -- what's regularly?

15       Q   Once a week.

16       A   No.

17       Q   Once a month?

18       A   Yes.

19       Q   Okay.  Have you ever discussed the Ergo

20   investigation of Mr. Meyer with him?

21       A   No.

22       Q   Have you ever discussed with Mr. Kalanick any

23   retention of Ergo for any project on behalf of Uber?

24       A   No.

25       Q   Are you familiar with Mr. Kalanick's counsel
```

```
 1    investigation to be done in a way where no one could
 2    figure out that Uber was the one commissioning it?
 3            MR. HANNA:  Objection to the form of the
 4    question.
 5            MR. BRIODY:  Q.  You can answer.
 6        A   No.
 7        Q   Okay.  You didn't want the investigation to
 8    be conducted in a way to avoid discovery issues?
 9        A   No.
10            MR. HANNA:  Objection to the form of the
11    question.
12            MR. BRIODY:  Q.  You can answer.
13        A   No.
14        Q   Can you turn to the page with the '1172.
15        A   (Witness complies.)  Yeah.
16        Q   And let me take a step back for a minute.
17            The header on that e-mail says -- do you see
18    where it says "Begin PGP Message" and "End PGP
19    Message" on that last e-mail we were just looking at?
20        A   What's the page number you're --
21        Q   It's '1170 at the bottom right.
22        A   Yes.
23        Q   Okay.  And you see -- and so what's a PGP
24    message?
25        A   An encrypted message.
```

```
 1      Q   What potential discovery issues did you have
 2   in mind when you wrote that?
 3      A   You use encryption to protect it when it's at
 4   rest.  And you're usually using encryption when you're
 5   dealing with sending encrypted -- or sending sensitive
 6   data to infrastructure you don't control, which would
 7   be, say, Ergo's mail spools.
 8          We want to protect from breaches on their
 9   end, breaches on our end, of sensitive matters
10   becoming public.
11      Q   How would they become public if you sent an
12   e-mail that just communicated your message to
13   Mr. Moneyhon in plain text without PGP?
14      A   You want an example of how they would become
15   public?
16      Q   I want to know what you were worried about --
17      A   Yeah, a potential breach --
18          MR. HANNA:  Don't talk over one another.
19          MR. BRIODY:  Yeah.
20      Q   I want to know the -- I want to know the
21   potential discovery issues.
22      A   Yeah.
23      Q   What are they?
24      A   So, we refer to it as dumping a mail spool.
25   So, when people compromise a network, one of the
```

 1  biggest things they will target is the corporate mail

 2  spool.  Anything that's not encrypted will be dumped

 3  to plain text.

 4       If things are encrypted, those will not be

 5  able to be dumped because they require the key of the

 6  corporation that the individual has.

 7  Q   And what was so problematic if someone -- so

 8  would your -- let me -- so I can understand what

 9  you're envisioning, you're envisioning a situation

10  where someone hacks into Ergo's system --

11  A   Or yours.

12       THE REPORTER:  Okay.  One at a time, please.

13       MR. BRIODY:  Q.  You're envisioning someone

14  hacking into Ergo's system or yours, and then dumping

15  the e-mails into the public domain?

16  A   Correct.

17  Q   And that's what you were talking about in

18  this e-mail?

19  A   Yes.

20  Q   And what would be the problem if your project

21  asking for research about Mr. Meyer reached a public

22  domain?

23  A   It's more that it's sensitive discussions

24  between, you know, our executives that we want to

25  protect from being dumped in the public domain.

 1        Q   But there's no discussion between executives.

 2   This is -- you're asking Ergo to -- you said -- you

 3   called it due diligence.

 4            So what's the problem if it's in the public

 5   domain that Uber retained Ergo to do due diligence,

 6   from your perspective?

 7            MR. HANNA:  Objection to the form of the

 8   question.

 9            THE WITNESS:  We encrypt anything that we

10   feel may be sensitive.  And the fact that this came

11   from Salle and Joe, in my head, is something that

12   raises a sensitivity level.

13            MR. BRIODY:  Q.  But Salle and Joe didn't ask

14   you to retain Ergo; right?

15        A   Correct.

16        Q   Do you encrypt everything, all your

17   communications?

18        A   No.

19        Q   Is it standard operating procedure at Uber to

20   encrypt all communications?

21        A   No.

22        Q   Do you encrypt communications between -- even

23   in connection with this litigation -- let me take a

24   step back.

25            Have you had any involvement in this

```
 1   from Ergo to Mr. Sullivan, did you have any other

 2   communications with Mr. Sullivan concerning the Ergo

 3   investigation of Mr. Meyer?

 4       A    Not to my knowledge.

 5            The only thing I would have asked was date

 6   for completion, but I don't remember when or how.

 7       Q    And there were no other communications

 8   concerning what form the investigation would take, how

 9   it would be conducted; is that right?

10       A    Correct.

11            MR. HANNA:  Objection to the form of the

12   question.

13            MR. BRIODY:  Q.  And the only --

14            MR. HANNA:  You've got to give me a chance.

15            THE WITNESS:  I know.

16            MR. BRIODY:  Q.  -- directive -- the only

17   directive that you received from Mr. Sullivan or

18   Ms. Yoo concerning the investigation of Mr. Meyer and

19   his counsel was to:

20            "Do a careful check on this plaintiff (the

21   person who was the named driver/named party in the

22   case)."

23            Is that right?

24       A    Correct.

25       Q    And did -- I just want to be sure I'm clear
```

```
 1   here, and I think it is from your prior testimony.
 2          Before Ergo was retained, Exhibit 47 is the
 3   only communications that you received from anyone at
 4   Uber relating to the investigation of Mr. Meyer; is
 5   that right?
 6          MR. HANNA:  Objection; asked and answered.
 7          THE WITNESS:  Can you state it again.  It was
 8   very long.
 9          MR. BRIODY:  Sure I can.
10      Q   I'm trying to find out if you talked with
11   anybody else at Uber concerning the investigation of
12   Mr. Meyer before you retained Ergo?
13      A   No.
14      Q   Did you speak to Mr. White, who is here
15   today, before you retained Ergo?
16      A   No.
17      Q   And what about Ms. Haswell?  Did you speak
18   with her?
19      A   No.
20      Q   And who is Ms. Haswell, Lindsey Haswell?
21          Do you know her?
22      A   Yes.
23      Q   And who is she?
24      A   Someone on our litigation team.
25      Q   And do you know Jonathan Lieberman?
```

1      A    I know of him.

2      Q    Do you know what his job is?

3      A    No.

4      Q    Do you know if he's a lawyer?

5      A    I don't know.  I'm guessing he is.

6      Q    So I take it you didn't --

7      A    No.

8      Q    -- talk with him before you retained Ergo?

9           If you could just --

10          MR. HANNA:  Slow down, don't talk over him,

11   and keep your voice up.

12          MR. BRIODY:  Q.  So, you didn't talk -- you

13   didn't talk with him before you retained Ergo?

14     A    No.

15     Q    Okay.  Before you -- do you know if, before

16   you received this e-mail, Ms. Yoo had any discussions

17   with Mr. Kalanick concerning the complaint attached to

18   the e-mail?

19     A    Not to my knowledge.

20     Q    Do you have any understanding of whether

21   Mr. Kalanick was aware of Ms. Yoo's request of

22   Mr. Sullivan to look into the plaintiff in -- in the

23   Meyer litigation?

24     A    Not to my knowledge.

25     Q    Do you have any understanding of whether

```
 1   Mr. Kalanick's lawyers were aware of Ms. Yoo's request

 2   of Mr. Sullivan, or of Mr. Sullivan's request to you,

 3   to look into the plaintiff in the Meyer litigation?

 4       A   Not to my knowledge.

 5       Q   Okay.  Now, I want to clarify my question

 6   before.

 7           Do you have any understanding of whether

 8   Mr. Kalanick was aware of Mr. Sullivan's communication

 9   to you about the investigation -- requesting the

10   investigation of the plaintiff?

11       A   Not to my knowledge.

12       Q   Okay.  Now, you signed -- now, the retention

13   of Ergo -- Uber had done business with Ergo before;

14   correct?

15           Before -- withdrawn.  That's a terrible

16   question.

17           When was the first time Uber did business

18   with Ergo?

19       A   This case.

20       Q   Okay.  Uber didn't do business with Ergo in a

21   project on or about November 2015 relating to foreign

22   market?

23       A   Not to my knowledge.

24       Q   Okay.  Who would know any projects that Ergo

25   has ever done for Uber?
```

```
 1   because I -- I think you said before during Ergo's

 2   investigation of Mr. Meyer, while that was taking

 3   place, you did not communicate with anyone at Ergo; is

 4   that right?

 5        A   Give me the time frame again.

 6        Q   Sure.

 7            Say, from December -- say, from January 6th

 8   'til January 19th, when the report was sent.

 9            MR. HANNA:  Objection to the form of the

10   question.

11            But you can answer if you recall.

12            THE WITNESS:  There were the e-mail

13   communications.  Is that what you're asking?

14            MR. BRIODY:  Q.  I'm asking about any

15   communications -- phone call, meeting, Gchat --

16   because I think before, you indicated there maybe were

17   some Gchats.

18        A   When did I say Gchat?

19        Q   Or -- sorry -- SMS messages.  Sorry.

20        A   Yeah, there would have been some

21   communication, but, like, almost all of it would have

22   been over e-mail.  And, if there was anything else, I

23   don't remember.

24        Q   And what did you discuss with the folks at

25   Ergo?
```

```
 1      A    What did we discuss?

 2      Q    Yeah, about the Meyer project.

 3           MR. HANNA:  Objection to the form of the

 4   question.

 5           THE WITNESS:  There wasn't a discussion.  I

 6   sent them the complaint and that we needed research

 7   into the -- who the plaintiff was.

 8           MR. BRIODY:  Q.  And that was it?

 9      A    Yes.

10      Q    Okay.  Now, let me hand you -- you can put

11   that -- yeah.

12           MR. HANNA:  Done with that.

13           MR. BRIODY:  Thank you.

14      Q    I'm going to hand you -- they sent you --

15   Ergo sent you a statement of what the Meyer

16   investigation generally would entail; right?

17      A    If I could see the e-mail, I --

18      Q    Sure.  I'm going to give it to you right now.

19      A    -- can comment on that.

20           (Document marked Exhibit 49

21            for identification.)

22           MR. BRIODY:  I'm handing you what's been

23   marked as Exhibit 49.

24           MR. HANNA:  Thank you.

25           MR. BRIODY:  Q.  Please take a moment to
```

```
 1      A   Correct.

 2      Q   And then the report came in -- I just want to

 3 get the time frame here.

 4          And from the report coming in forward, your

 5 understanding is, then it was Craig's job to deal with

 6 both the report and the interface with Ergo; is that

 7 fair?

 8      A   Yeah, absolutely.

 9      Q   Okay.  Now, did you -- and I want to be very

10 specific about this question.  I think it's covered by

11 my other ones.

12          But did you consult with anyone in the legal

13 department at Uber?

14          And who -- you said before that there is --

15 you have an attorney on staff in security; is that

16 right?

17      A   Craig Clark.

18      Q   And that's Craig Clark.

19          And was Mr. Clark involved in overseeing

20 matters or playing any role in security at Uber as of

21 January 4, 2016, when you signed off on Ergo's work?

22      A   I don't know when his start date was.

23      Q   Okay.  And -- and when you referenced before

24 that there is an attorney on the security team, was

25 that Mr. Clark who you were referring to?
```

```
 1        A    Yes.

 2        Q    Okay.  And so, what I would like to know is:

 3   Did any attorney at Uber review this statement of work

 4   that Ergo would be performing before you signed off on

 5   it?

 6             MR. HANNA:  You're referring to the e-mail

 7   now --

 8             MR. BRIODY:  Correct, correct.

 9             MR. HANNA:  -- which is Exhibit 49?

10             MR. BRIODY:  Correct.

11             THE WITNESS:  No.

12             MR. BRIODY:  Okay.

13        Q    And did you discuss with anybody -- any

14   attorney at Ergo -- and let me give -- let me ask you

15   this, and that's:  Is the same thing true of

16   Mr. Kalanick?

17             You didn't discuss this with Mr. Kalanick?

18        A    No.

19        Q    And you didn't discuss this with

20   Mr. Kalanick's lawyers, "this" being Exhibit 49?

21        A    No.

22        Q    Okay.  And did you discuss with anyone the

23   fact that Ergo would be reaching out to seven primary

24   sources as part of its work?

25        A    No.
```

```
 1        Q    Now, were you aware of the manner in which
 2   Ergo is going to reach out and contact the seven
 3   primary sources in order to obtain interviews and
 4   information?
 5             MR. HANNA:  Objection to the form of the
 6   question.
 7             MR. BRIODY:  And let me be clear about this.
 8        Q    Prior -- let's pick a date.  Jan- -- prior to
 9   January 19th, prior to receiving Ergo's report, were
10   you aware of the manner in which Ergo was going to
11   reach out to the seven primary sources?
12        A    I still don't know how they reached out.
13        Q    Oh, so -- so the answer to that question is
14   "no"?
15        A    No.
16        Q    And after you received the report, did you
17   ever learn how Ergo was reaching out to the seven
18   primary sources?
19        A    No.
20             MR. HANNA:  Slow down.
21             MR. BRIODY:  Q.  Is that something that you
22   were ever concerned about, how Ergo might be reaching
23   out to the seven primary sources --
24             MR. HANNA:  Objection --
25             MR. BRIODY:  Q.  -- in the period between the
```

 1    January 4th e-mail and the January 19th report?

 2            MR. HANNA:  Objection to the form of the

 3    question.

 4            THE WITNESS:  Say it again.

 5            MR. BRIODY:  Q.  Is that -- were you ever

 6    concerned about the manner in which Ergo was going to

 7    be reaching out to its seven primary sources in the

 8    time period between January 4th and January 19th?

 9        A    I was not concerned, based on our MSA and

10    legal involved, with how they conduct their work.  I

11    assumed it would be professional and legal.

12        Q    But you did nothing to apprise yourself and

13    monitor whether that would be the case actively during

14    the period January 4th to January 19th?

15        A    No.

16            MR. HANNA:  Objection to the form of the

17    question.

18            MR. BRIODY:  Q.  At any point during

19    January 4th to January 19th, did you discuss with

20    attorneys at Uber whether or not you should be

21    overseeing the investigation, and the manner in which

22    it was carried out by Ergo?

23            MR. HANNA:  Objection to the form of the

24    question; asked and answered.

25            You can go ahead and answer again.

```
 1   reaching out and telling people what it's doing and

 2   for who because that would ostensibly be done in a

 3   conversation, as opposed to written down in data at

 4   rest?

 5          MR. HANNA:  Objection to the form of the

 6   question; misstates testimony.

 7          THE WITNESS:  No.  I'm saying they're, again,

 8   two different things.

 9          What Ergo is doing and how they carry out

10   their investigation is under their guise of how they

11   act professionally and legally.

12          My job as a security engineer and the

13   director of security is to protect our data, right,

14   and specifically, our data at rest.  That's why we use

15   encryption.

16          MR. BRIODY:  Okay.

17     Q    Now, I want to be clear on something.

18          Sitting here today, do you know that, when

19   Ergo reached out to sources, it used a pretext, or a

20   cover to those sources it reached out to, in

21   connection with the Meyer investigation?

22          MR. HANNA:  Exclusive of anything you've

23   learned from counsel?

24          MR. BRIODY:  I'm asking if he knows.  If you

25   want to instruct him not to answer that on the basis
```

```
 1   of learning it from counsel, you can go ahead and do

 2   that.

 3         I want to know if he knows that the Ergo

 4   investigation involved the use of pretext, false

 5   information, to sources.  I want to know if he knows

 6   that as he sits here today.

 7         MR. HANNA:  I -- I will instruct you not to

 8   answer if you've learned any information from internal

 9   or external counsel after the -- after the report

10   comes in.

11         If you know it's from some other way, heard

12   it from somebody else, you can say.

13         THE WITNESS:  I never read the report.  I

14   don't know details of anything beyond that they've

15   sent a report back.  And that landed with Craig and

16   Joe.

17         MR. BRIODY:  Q.  So, as the director of

18   security, you didn't -- withdrawn.

19         So, you understand you're here today because

20   of Ergo's investigation of the plaintiff; right?

21     A   I'm here today because of -- yes.

22     Q   Okay.  And -- and you understand that the

23   plaintiff has a problem with this investigation and

24   how it was done and what was done; right?

25     A   I would guess that that's implied.
```

1     Q   Okay.  And you're the director of security

2  for Uber; right?

3     A   Correct.

4     Q   And you didn't think it was an important

5  thing to do to find out, before you testified here

6  today, the manner in which Ergo reached out to the

7  sources in connection with the Meyer investigation,

8  what it told them?  You didn't think that was

9  important to do?

10         MR. HANNA:  Objection to the form of the

11  question; argumentative.

12         THE WITNESS:  No.

13         MR. BRIODY:  Q.  So, you've never seen any of

14  the communications that Ergo's investigator sent to

15  individuals in an effort to perform its work for Uber?

16     A   Correct.  I have not seen any of their

17  communications.

18         (Document marked Exhibit 52

19          for identification.)

20         MR. BRIODY:  That's for you.  Sorry.

21         MR. HANNA:  Thank you.

22         MR. BRIODY:  Okay.  For the record,

23  Exhibit 52 is a document produced by Ergo at

24  ERGO '509, designated "Confidential."  This is an

25  e-mail from Mr. Santos-Neves to a Matthew Duveneck,

```
1   report, concerning Mr. Meyer, being sent to anyone

2   else besides the folks on this e-mail chain?

3       A   Not that I'm aware of.

4       Q   Now, after you get this report -- and we

5   discussed this before -- what happens after you get

6   the January 19th report from Ergo?

7           What do you -- what's your involvement with

8   respect to Mr. Meyer and the investigation?

9       A   Nothing.  This is -- I forwarded it to Craig

10  and Joe, and that's been kind of the extent of my

11  involvement.

12      Q   Did you ever suggest to anyone at Ergo that

13  they -- the report -- actually, withdrawn.

14          So I'm going to go through a couple of names

15  here.  I think you're going to probably not know them,

16  but I just need to make sure.

17          So, are you familiar at all with Peter

18  Skinner?

19      A   No.

20      Q   And Mr. White, who's here, and Ms. Haswell,

21  did you have any discussions with them after the

22  report -- I just want to know yes or no -- after the

23  report was received on the 19th concerning Ergo?

24          MR. HANNA:  I'll let you answer yes or no.

25          THE WITNESS:  Yes.
```

```
 1              MR. BRIODY:  Okay.

 2       Q   Now, while the investigation -- the Ergo

 3   investigation was taking place -- and let's put the

 4   marker as -- we'll use January 4th to January 19th --

 5   were you communicating with Mr. White or Ms. Haswell

 6   concerning the Ergo investigation?

 7       A   No.

 8       Q   Did you have any -- what about Mr. Lieberman?

 9       A   Who is Mr. Lieberman?

10       Q   Okay.  That says it all.

11           Now, did there come a time when you came to

12   understand that Mr. Meyer's counsel was complaining

13   about Ergo's investigation of Mr. Meyer and

14   Mr. Schmidt?

15       A   Yeah, I became aware that there was an issue

16   at some point.

17       Q   And when was that?

18       A   I don't remember.

19       Q   Was it in February?

20       A   I don't remember.

21       Q   Was it in January?

22       A   I don't remember.

23       Q   Was it yesterday?

24       A   I don't remember.

25       Q   On -- so dates are -- I'm going to be focused
```

```
 1   get from Aspen does not mean much to me.
 2           MR. BRIODY:  Right.  I figured as much as you
 3   were looking at it.
 4      Q   So, tell me what was discussed at the meeting
 5   in March.
 6      A   It was an apology meeting.
 7      Q   What was the apology for?
 8      A   The investigation apologizing for, you know,
 9   what they had referred to as a rogue investigator.
10   Tried to ensure that if we knew that it was the first
11   time that they had someone go kind of out of scope,
12   and -- and that, you know, this was not normally how
13   they act.
14      Q   When you say "this was not normally how they
15   act," what was the "this" that they were apologizing
16   for?
17      A   The rogue investigator.
18      Q   What was rogue about what the investigator
19   did?
20      A   I don't know the details.
21      Q   Why don't you know the details?
22           MR. HANNA:  Objection to the form of the
23   question.
24           THE WITNESS:  I talked about it previously.
25   This is -- Craig had been -- Craig Clark had been
```

```
 1              "Ergo Comment."

 2              Do you see that?

 3       A    Where it says:

 4              "Recommended Additional Research."

 5       Q    No, above that.  It says:

 6              "Ergo Comment."

 7       A    Okay.  Yes, I see that.

 8       Q    Okay.  And it says:

 9              "Meyer's carefully built professional focus

10    and persona and lack of supporting causes outside of

11    environmentalism is somewhat at odds with the

12    potential backlash of this lawsuit.  As such, Meyer

13    may be particularly sensitive to any publicity that

14    tarnishes his professional reputation."

15              Do you see that?

16       A    I do see that.

17       Q    Okay.  And I'm wondering if you're aware of

18    whether anyone at Uber has taken steps to act on the

19    Ergo comment that Meyer may be particularly sensitive

20    to any publicity that tarnishes his professional

21    reputation?

22       A    Not to my knowledge.

23       Q    Is it your understanding that anybody at Uber

24    is taking steps to act on that Ergo comment?

25       A    Not to my knowledge.
```

```
 1        Q    Okay.  And do you know if Uber said to

 2   Ergo -- anyone at Uber said to Ergo that, in any

 3   projects that Ergo performs for Uber, it should not

 4   make false statements to individuals about the reasons

 5   why it's seeking -- Ergo, that is -- seeking

 6   information?

 7        A    I'm not aware of any communication.

 8        Q    Are you familiar with the phrase

 9   "reputational assessment"?

10        A    I know it from the context of, like, these

11   discussions.  I don't know it as a common phrase that

12   I know it from before this, though.

13        Q    And by "these discussions," you mean

14   discussions about the investigation of Mr. Meyer?

15        A    The discussions here today.

16        Q    Okay.  Have you been responsible in your time

17   at Uber -- when did you start working at Uber?

18        A    Almost exactly a year ago.

19        Q    And before you worked at Uber --

20        A    I was at Facebook.

21        Q    Okay.  And be- -- and when you joined Uber

22   about a year ago, what was your title?

23        A    Head of investigations.

24        Q    And -- and that title has changed?

25        A    Yes.
```