# EXHIBIT M

# CONFIDENTIAL

```
 1      A    San Francisco.
 2      Q    And can I have your home address, please.
 3           ████████████████████████████████████████
        ████████████████████████████
 5      Q    And who is your employer?
 6      A    Uber.
 7      Q    And what is your title?
 8      A    Legal director.
 9      Q    In any particular area, or just legal
10   director?
11      A    Legal director, security and law enforcement.
12      Q    And how long have you held that position?
13      A    Since December 1st, 2015.  Yeah, last year.
14      Q    And did you have any position at Uber prior
15   to December 1st of last year?
16      A    No.
17      Q    So you joined Uber then?
18      A    Correct.
19      Q    And where were you employed before?
20      A    Facebook.
21      Q    And what was your title there?
22      A    Associate general counsel.
23      Q    And how long were you at Facebook for?
24      A    About six years.
25      Q    And associate general counsel with any
```

1  investigations you've commissioned with respect to
2  plaintiffs in your experience at Facebook or with
3  respect to Mr. Lucas.
4      A   I can't reveal details of those because of my
5  obligations under the attorney-client privilege to
6  those clients.
7          But generally, if a -- somebody is coming --
8  presenting a threat, sending demands, suing, showing
9  up on property.  I mean, it really runs the entire
10 gamut of things you can think of in terms of what --
11 what may present a threat to that high-level -- that
12 high -- high-profile individual.
13     Q   And so -- but what happens next?
14         What -- what sort of investigation is
15 launched, in general terms?
16         I'm not asking for any specific events or
17 people.
18         But, in general terms, how does the
19 investigation of the particular plaintiff unfold?
20         MR. HANNA:  Objection to the form of the
21 question; also relevance.
22         THE WITNESS:  I can give you an example of
23 Ceglia -- the Ceglia matter.
24         So, Mr. Ceglia was an individual in New York
25 who threatened -- or threat -- who sued Mark

```
 1  every case is different.
 2          MR. BRIODY:  Q.  Have you had an opportunity
 3  to apprise yourself of how the investigation of
 4  Mr. Meyer was conducted?
 5      A   No.
 6      Q   You have not, as you sit here today, taken it
 7  upon yourself to figure out how Ergo reached out to
 8  the sources in the report that it presented to Uber?
 9      A   Independent of -- not independent of this
10  particular matter.
11      Q   Well, let -- let me be clear about this.
12  With respect to the Meyer investigation, have you gone
13  and figured out and looked into what exactly Ergo did
14  to compile the report that it presented to Uber?
15      A   No.
16      Q   Why not?
17      A   This -- this matter is in litigation at this
18  point.  So, once -- once this issue came up -- and
19  when I say "this issue," this specific -- this -- the
20  reason we're sitting here today -- I would let
21  internal counsel deal with it.
22      Q   Okay.  Now, turning back to the purpose of
23  the investigation, why it was undertaken, I want to be
24  clear on a couple of things.
25          You did not retain Ergo; correct?
```

1  understanding with -- with respect to this.  We tend

2  to work a lot together.  I don't know that I had an

3  understanding specific to this.

4      Q   Okay.  Do you -- do you know -- tell me all

5  the people who you know this report, the attachment to

6  Exhibit 54, was sent to.

7      A   It would be everyone on this chain, I

8  believe, and internal counsel, and that's it.

9      Q   Did you ever talk about this investigation

10 with Mr. Kalanick?

11     A   No.

12     Q   Did you ever talk about the -- and "this

13 investigation" being the investigation of Mr. Meyer.

14         You never discussed Ergo's investigation of

15 Mr. Meyer with Mr. Kalanick?

16     A   No.

17     Q   How -- do you speak with Mr. Kalanick as part

18 of your work at Uber?

19     A   No.

20     Q   Have you ever spoken to Mr. Kalanick?

21     A   Briefly.

22     Q   Did it at all relate to this litigation?

23     A   No.

24     Q   Did it concern -- just generally, did it

25 concern the use of investigators?

1      A    No.

2      Q    Okay.  Now, what -- aside from receiving this

3  report that Mr. Henley forwarded to you on

4  January 19th, what other interactions did you have

5  with Ergo concerning its investigation of Mr. Meyer?

6      A    So sometime after this, when the report came

7  in, I talked to Todd Egeland and someone else from

8  Ergo, but I can't remember their name.

9      Q    What did you talk to them about?

10     A    Well, it had -- it had -- this issue --

11 the -- the issue came up as to whether Ergo was still

12 active in -- in this investigation.  And I needed

13 to -- I had asked them to -- to ensure that they had

14 stopped the engagement.

15     Q    And what -- what -- when did that happen?

16     A    I don't recall the specific date.  It would

17 have been sometime after this, within the -- I'm

18 sorry.  I apologize.  I'm terrible with dates.  It all

19 bleeds together for me.

20     Q    Sometime after this --

21     A    Some -- it would have been sometime after

22 January 19th.

23     Q    Okay.  And you mentioned before Miss --

24 contact with Ms. Haswell was your first awareness of

25 the Meyer investigation.

1       Did that happen before you got this report?
2       A    No.  I -- I -- I'll correct that.  I believe
3  this was my first -- this is the first time I became
4  aware of the Ergo investigation.
5            MR. HANNA:  And --
6            THE WITNESS:  So I think previously, you had
7  asked me the first person I talked to about the Ergo
8  investigation.
9            So this -- I recall this being my first --
10 the first time I became aware of it.
11           MR. HANNA:  And just for the record, the
12 witness is pointing -- when he says "this," he's
13 pointing to --
14           THE WITNESS:  Exhibit 54.
15           MR. HANNA:  -- Exhibit 54, the e-mail.  But I
16 just wanted to make sure it's clear on the record.
17           MR. BRIODY:  Q.  And so what about that
18 January 7th e-mail we looked at from Mr. Henley
19 talking to Ergo?
20           Is it possible you were involved then, or
21 were aware of the Ergo investigation of Mr. Meyer,
22 back on January 7th?
23      A    I don't recall being aware of it then.
24      Q    Okay.  So, you said you spoke with another
25 individual at Ergo.

1     Q   And you're not aware, based on your work with
2  Mr. Henley, of his communications with Ergo, if any,
3  concerning the Meyer investigation?
4     A   I was not aware of any communications.
5     Q   Okay.  Now, I mentioned before discussions
6  with Mr. Kalanick concerning the Ergo investigation.
7         Are you familiar with the law firm Boies
8  Schiller?
9     A   Generally.
10    Q   Do you understand that Boies Schiller
11 repre- -- represents Mr. Kalanick in this litigation?
12    A   I accept that, yeah.
13    Q   Okay.  Do you know a fellow named Peter
14 Skinner?
15    A   I do not.
16    Q   Have you ever had e-mails with Peter Skinner?
17    A   I don't believe so.
18    Q   Okay.  Have you communicated -- are you aware
19 of -- I'll withdraw that question.
20        Do you have any knowledge of the report that
21 you received on January 19th from Ergo being
22 distributed to anyone at Boies Schiller?
23    A   I do not.
24    Q   Did you send the January 19th Ergo report to
25 anyone?

1    A    I did not.

2    Q    Did you print it out and give it to anyone?

3    A    No.

4    Q    Okay.  Now, I want to go back as of
5    January 19th, and if you can tell me in general -- in
6    general terms, what your understanding was of your
7    responsibility, with respect to the Ergo investigation
8    of Mr. Meyer, as of January 19th.

9    A    I don't know that I had any responsibility
10   with respect to this matter.  Again, it was -- the
11   report had been completed.

12   Q    Okay.  So, you didn't have any idea of
13   anything that you were supposed to do with this report
14   or anything relating to the Meyer litigation when you
15   received the report?

16   A    No.

17   Q    Okay.

18   A    I mean --

19   Q    Did there come a time when that changed?

20   A    When what changed?

21   Q    Your understanding of what you needed to do,
22   if anything, with respect to the Ergo investigation of
23   Mr. Meyer.

24   A    As I mentioned before, when the issue of this
25   came up, I contacted Ergo to ensure -- to -- to ensure

1            Is it your understanding that Ergo, when
2    conducting the investigation concerning Mr. Meyer,
3    reached out to individuals and made false
4    representations concerning the purpose of their
5    inquiry?
6        A    As I sit here today, yes.
7        Q    And you say, as you sit here today.
8             When did you become aware that, Ergo had done
9    this?
10       A    I -- I can't recall specifically.
11       Q    Was it when you received this e-mail from
12   Mr. Egeland that attached a copy of the questions that
13   the Ergo investigator actually sent to one of the
14   subjects of the investigation?
15       A    I'm -- I honestly don't recall seeing this
16   when it -- when it came in, this attachment.
17       Q    Okay.  So when you -- did you look at
18   attachment -- Exhibit 61, the attachment to
19   Mr. Egeland's e-mail to you, when he sent it on
20   February 24th?
21       A    When he sent it, I -- I can't recall.
22       Q    Now, are you aware that Ergo made phone
23   recordings of conversations that it had with its
24   sources for the Meyer report?
25       A    No.

1    A    I do not.

2    Q    Do you know how the -- the representations

3    came to be corrected?

4    A    Again, I don't know the -- I don't know what

5    representations were made, so I don't know what

6    representations were made to correct the

7    representations.

8    Q    Well, I'm going to -- I can -- if the -- if

9    the issue is you weren't involved in the specific

10   communication where the representations were made, I

11   can tell you that they were made.

12   A    Okay.

13   Q    That in January, a representation was made

14   that Mr. Kalanick and Uber had nothing to do with

15   retaining Ergo, and that sometime thereafter,

16   approximately February 19th, that representation was

17   corrected.

18        What I'm trying to understand from you is

19   your knowledge about how that happened, how the

20   initial representation was made, and how it came to be

21   corrected.

22        Do you have any knowledge about that?

23   A    Okay.  So, my understanding is that there was

24   a miscommunication.

25   Q    Okay.  And miscommunication between who and

1   who?
2       A   Between -- between internal counsel on the
3   litigation and the -- and the -- the -- the e-mail
4   sent to -- or the commission of the -- of the
5   investigation, as you will.
6       Q   Okay.  And so internal -- and so internal
7   counsel on the litigation, were they involved in the
8   Ergo investigation in any way?
9           And let's take time frames.
10          Prior to the report being submitted to you on
11  the 19th.
12      A   I don't know.
13      Q   And what about thereafter?  In your
14  experience, when was the first time you were dealing
15  with litigation counsel in connection -- about the
16  Ergo investigation of Mr. Meyer?
17      A   Sometime after the -- sometime after --
18  sometime after I had received the report.
19      Q   Was it a week after or a couple of days?
20      A   I don't recall.  I really don't.
21      Q   No ability -- two weeks after?
22      A   I -- I lose all sense of time.
23      Q   Okay.
24      A   I...
25      Q   But is it your understanding that there --

1  there were distinct functions being performed between
2  litigation counsel?
3         What litigation -- what counsel was the
4  litigation working on?
5     A   Ms. Haswell.
6     Q   Okay.  And they -- and what -- and when you
7  say -- when you talk about litigation counsel, what
8  litigation?
9     A   The -- so there is -- maybe it will help you
10 understand a little bit about the -- kind of the
11 division of the -- there is -- within legal, there is
12 a team that handles litigation.
13    Q   Okay.  And who's on that team?
14    A   I don't know everybody, but Ms. Haswell and
15 somebody named Mr. White.
16    Q   And, with respect to this case -- this case
17 -- what I was wondering about before -- you said a
18 miscommunication -- and I don't -- correct me if I'm
19 wrong -- between litigation counsel and counsel
20 retained in the investigation; is that right?
21    A   Yeah, I think there was a miscommunication
22 between -- within the legal department where the
23 litigation team wasn't aware.
24    Q   Okay.  And the litigation team -- was the
25 litigation team working on the Meyer matter?

```
 1  somebody from Ergo on the phone.
 2      Q   R.P. Eddy?  Does that sound familiar?
 3      A   I don't know.  I don't know who was on the
 4  phone.
 5      Q   What did you talk about at that meeting?
 6      A   We talked about the -- the -- this matter.
 7      Q   Okay.  "This matter" being what?
 8      A   The -- the -- the Meyer matter.
 9      Q   The investigation of Mr. Meyer?
10      A   Yes.
11      Q   What did you say to the folks at Ergo at this
12  meeting?
13      A   I don't recall specifically what I said to
14  them.
15      Q   You don't need to tell me specifically.
16      A   Only.
17      Q   Can you give me the gist of what you
18  communicated to them?
19      A   So I -- so I can't recall the -- again,
20  who -- who asked for the meeting.
21          I remember -- I do remember the meeting, and
22  I remember Todd being very apologetic and -- and
23  expressing regret for -- for -- for what had happened.
24      Q   And what was it that happened that he was
25  apologizing for?
```

1    A   So, it had been -- again, they had an
2  employee who had gone rogue, that had breached their
3  internal protocols, and was acting without
4  supervision.  And they also -- they had trouble kind
5  of understanding what was -- figuring that out, if you
6  will.
7    Q   Tell me what you mean on -- by the last --
8  what you mean by the last point, that they had trouble
9  on figuring that out.
10   A   I -- I think that it was -- it seemed to
11 me -- based on my recollection today on the meeting,
12 that it seemed to me that there was some confusion on
13 their part about exactly what had happened with the
14 employee and the -- figuring out who they had spoken
15 with, those kind of matters, so yes.
16   Q   Had they fixed those problems at the time of
17 the March 22nd meeting?
18   A   So, I don't know what they had done.
19   Q   Okay.  You said that -- I'm going to ask you
20 again about whether anybody discussed how it was this
21 employee went rogue at this meeting?
22   A   I don't recall.
23   Q   What about breach of protocols?
24   A   I recall a discussion about them being very
25 apologetic that the employee had breached internal

1   would pass it along to Ms. Haswell, and you were done.
2   And you don't have any knowledge of how the
3   information ultimately reached Mr. Kalanick or
4   Mr. Kalanick's counsel; right?
5        A    Correct.
6        Q    Okay.  You can put that aside.
7             Just a few more questions, briefly.
8             What did -- I think I referenced this before,
9   but did Uber do anything with the Ergo report?
10            Did they act on any of the information
11  contained in it?
12       A    I'm -- not to my knowledge.  That's a very
13  broad question.  Can you be more specific?
14       Q    Sure.
15            I'm trying to get an understanding of whether
16  anyone took the report and used the information about,
17  for example, the Ergo comment we looked at earlier
18  about Mr. Meyer, being concerned about his reputation.
19            Did anybody act on that sort of information
20  contained in the Ergo report?
21       A    Not to my knowledge.
22       Q    Did anyone at Uber reach out to further
23  contact any of the folks that were part of Ergo's
24  investigation?
25       A    Do you mean people at Ergo?

1      Q    No.
2           Did -- sorry -- did Uber reach out to any of
3    the sources that Ergo had reached out to?
4      A    Not to my knowledge.
5      Q    And you're not aware of this report being
6    disseminated to Mr. Kalanick?
7      A    No.
8      Q    Do you know if Mr. Kalanick had any
9    discussions with Ms. Yoo before the investigation into
10   Mr. Meyer was commissioned?
11     A    I do not.
12     Q    Do you know -- if you could take out very
13   quickly Exhibit 54 again.
14     A    I've made a mess of the pile here.
15     Q    Well, 47 is probably the easiest.  It's this
16   one right here.
17     A    I don't know if I can do it quickly because
18   I've made a mess of the pile.
19          47?
20     Q    47, yes, sir.
21     A    I'm sorry.  I can't find 47.  What does it
22   look like?
23     Q    It looks like this right here.
24          MR. HANNA:  With the complaint attached.
25          MR. BRIODY:  Yeah, you have it right there.