UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPENCER MEYER, individually and on behalf of those similarly situated,

Plaintiffs,

-against-

TRAVIS KALANICK and UBER TECHNOLOGIES, INC.

Defendants.

1:15 Civ. 9796 (JSR)

**ERGO'S OPPOSITION TO PLAINTIFF'S MOTION FOR RELIEF RELATED TO THE ERGO INVESTIGATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. ERGO ACTED IN GOOD FAITH .......... 2

II. ERGO'S REPORT WAS OBJECTIVE, ACCURATE, AND POSITIVE .......... 6

III. ERGO NEVER OBSTRUCTED THE DISCOVERY PROCESS .......... 8

CONCLUSION .......... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amezcua v. Jordan Transportation, Inc.*,
No. 2:13-cv-01608, 2016 U.S. Dist. LEXIS 71259 (D. Nev. May 27, 2016) ..........................4

*Apple Corps v. Int'l Collectors Soc'y*,
15 F. Supp. 2d 456 (D.N.J. 1998) ..........................3

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996)..........................2

*Dickson v. Slezak*,
902 N.Y.S.2d 206 (2010) ..........................3

*Fox Indus. v. Gurovich*,
No. CV 03-5166, 2006 U.S. Dist. LEXIS 73035 (E.D.N.Y. Oct. 6, 2006) ..........................2

*Germain v. M & T Bank Corp.*,
111 F. Supp. 3d 506, 539 (S.D.N.Y. 2015)..........................3

*Gidatex, S.r.L. v. Campaniello Imports*,
82 F. Supp. 2d 119 (S.D.N.Y. 1999)..........................3

*LeBreton v. Weiss*,
680 N.Y.S.2d 532 (1998) ..........................3

## INTRODUCTION

Ergo respectfully submits this brief in partial opposition to Plaintiff's Motion for Relief Related to the Ergo Investigation ("Motion"). Ergo is a small primary research firm that specializes in assisting clients overseas in emerging and frontier markets with their due diligence, market access, and geopolitical risk issues. Ergo was hired by Uber to perform what Ergo believed was a standard due diligence research project on an individual of interest to Uber. Ergo knew that the individual had filed a lawsuit against Uber's CEO, but Ergo was hired by Uber's security office and never had any contact with an Uber lawyer until after the project was complete. Ergo has no general counsel and no attorney on staff; it had no reason to believe that a lawyer's code of ethics or any other special rules might apply to its work for Uber.

As Ergo has expressed in two letter briefs to the Court, Ergo now understands and appreciates the Court's concerns regarding the integrity of the litigation process. Ergo, for its part, takes these concerns very seriously and would never—and did not here—seek to thwart, disrupt, or otherwise improperly affect the litigation process. Given the importance of the Court's concerns, however, Ergo does not oppose Plaintiff's request for relief in the form of an order enjoining "any further background investigation of any individuals involved in this litigation." That said, Ergo strongly opposes the Plaintiff's Motion insofar as it unfairly accuses Ergo of bad faith, mischaracterizes the facts regarding Ergo's conduct, and presents a false narrative in an apparent effort to gain litigation advantage against Defendants. To the extent Plaintiff seeks additional unspecified "relief" from Ergo, Plaintiff's Motion lacks any basis in fact or law and should be denied.

## ARGUMENT

### I. ERGO ACTED IN GOOD FAITH

Ergo did nothing to warrant Plaintiff's accusation that it engaged in a "bad faith effort to thwart the litigation process." Mot. at 11. In support of that allegation, Plaintiff cites *Fox Indus. v. Gurovich*, No. CV 03-5166, 2006 U.S. Dist. LEXIS 73035 (E.D.N.Y. Oct. 6, 2006), where the court sanctioned defendants' counsel for his "bad faith effort to thwart the litigation process" based upon letters he wrote to non-parties instructing them not to respond to valid, court-issued subpoenas on the false ground that the subpoenas were "null and void as a matter of law and should not be complied with," *id.* at *8-10. Here, in contrast, Ergo is not a party to this litigation and never sought to affect it in any way, much less to "thwart" it in "bad faith." Ergo never contacted Plaintiff or any other represented party. Ergo also never contacted any witnesses, recipients of subpoenas, or anyone else with any known connection to the litigation. Rather, Ergo searched open-source materials and contacted only individuals with no known connection to the litigation as part of a good faith effort to gather truthful information for its client, Uber.

Ergo's research analyst used false pretenses to initiate conversations with third parties—a decision that, in this context, he regrets and would not repeat—but there is nothing inherently wrong or unlawful with such conduct.[1] To the contrary, courts have recognized that dissemblance

---

[1] Contrary to Plaintiff's suggestion, Mot. at 6, Mr. Santos-Neves did not make "fraudulent" statements. A fraudulent misrepresentation occurs when an individual (1) makes a material false representation, (2) intends to defraud the recipient thereby, (3) the representation induces reasonable reliance by the recipient, and (4) the recipient suffers damage as a result of that reliance. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (citation omitted). Here, there is no evidence in the record that the statements in question were genuinely "material" to the interviewees. There is also no evidence that Ergo's research analyst "intended to defraud" the interviewees. Nor is there evidence that any interviewee suffered damage. In short, there was no actionable fraud here. As Mr. Santos-Neves explained in his deposition, he truthfully disclosed to every interviewee his name, the name of his employer Ergo, and the fact that he was collecting information on behalf of a private client. *See, e.g.*, Santos-Neves e-mail, dated Jan. 7, 2016, attached as Ex. I to Smith Decl. Although he gave a false reason for his outreach—*e.g.*, that he was gathering information regarding "various up-and-coming researchers in

by investigators is "an accepted investigative technique, not a misrepresentation." *Gidatex, S.r.L. v. Campaniello Imports*, 82 F. Supp. 2d 119, 122 (S.D.N.Y. 1999); *Apple Corps v. Int'l Collectors Soc'y*, 15 F. Supp. 2d 456, 474 (D.N.J. 1998) (holding that it was lawful and appropriate for counsel to engage investigators who, in turn, misrepresented their identities and the purposes of their questions in investigating violations of a marketers' consent decree); *cf. Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 539 (S.D.N.Y. 2015) (no suggestion of illegality where investigator posed as mortgage broker); *Dickson v. Slezak*, 902 N.Y.S.2d 206, 207 (2010) (no suggestion of illegality where investigator posed as real estate seller); *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (1998) (no suggestion of illegality where investigators posed as landlords); *see also* Ergo Letter to Court, June 16, 2016, at 2-3 (discussing same). In this case, the Ergo research analyst was truthful about his name, the name of his employer Ergo, and the fact that he was doing research for a private client; he merely dissembled about the reason for his inquiries.

The individuals involved at Ergo now understand that a lawyer may not direct the use of deception in the context of a litigation, but that is not what happened here. No lawyer ever directed Ergo to use such techniques; lawyers at Uber gave no such direction and Ergo itself has no lawyers. Nor did Uber's project manager or any lawyer ever tell Ergo to adhere to any rules applicable to lawyers or parties engaged in litigation. Accordingly, Ergo had no reason to give such direction to the research analyst who conducted the work. Plaintiff nonetheless claims that Ergo's use of "false statements to obtain information about a party … is a classic example of bad faith litigation conduct and in violation of New York's ethical rules." Mot. at 13. That claim is outrageous and unfair under the circumstances; Ergo was not engaged in any "litigation conduct" and was not bound by

---

environmental conservation"—that was not for any "fraudulent" purpose and it caused no harm. Rather, Mr. Santos-Neves sought only to initiate a conversation without disclosing the purpose of his outreach or the identity of his client, Uber. *See*, *e.g.*, Ergo Letter to Court, June 16, 2016, at 2 (quoting and discussing deposition testimony of Mr. Santos-Neves).

"New York's ethical rules." Moreover, there is no evidence to support the claim that Ergo acted in bad faith. Tellingly, the only case cited by Plaintiff for the contrary proposition is *Amezcua v. Jordan Transportation, Inc.*, No. 2:13-cv-01608, 2016 U.S. Dist. LEXIS 71259 (D. Nev. May 27, 2016), which concerns a completely different set of issues having nothing to do with the use of false pretenses to obtain information. There, the district court in Nevada sanctioned a defendant for "making false statements in her answer and in an interrogatory response in the course of [] judicial proceedings." 2016 U.S. Dist. LEXIS 71259, at *5-6. Here, Ergo is not a party to the litigation and has never made any false statement in the course of these judicial proceedings.

Plaintiff's insinuation that Ergo misled the Court at the May 27 hearing is completely baseless. *See* Mot. at 10 (insinuating that Ergo was wrong to suggest that Ergo's research analyst acted on his own). In reality, what happened at the May 27 hearing is that undersigned counsel responded candidly and truthfully to the Court's understandable concerns regarding the hypothetical possibility that perhaps Ergo had previously used false pretenses when doing work for Uber and that perhaps Uber's lawyers expected Ergo to use such tactics in this particular investigation. *See* May 27 Hearing, Tr. 27:1-11. In response, undersigned counsel stated:

> I understand the nature of your concerns, and obviously I'm not in a position to know all of the facts given how new I am to the case, and also am not in a position, of course, to testify, given that I am counsel. But my understanding is that there's been only one other project between these two companies, that these practices were not used, that the investigator who said what he said in this circumstance did that without anybody else's knowledge, and did that for reasons that only he will, I guess, be able to explain, and so plaintiffs' counsel will have an opportunity to ask him why he did that.

*Id.*, Tr. 27:15-25. That statement was both candid and truthful when made—just two days after counsel was formally engaged—and it remains both candid and truthful today. In particular, it remains true that Ergo had not previously used false pretenses when doing work for Uber and that Uber had no reason to expect that false pretenses would be used in this particular investigation. It also remains true that Ergo's research analyst "developed" the idea on his own to dissemble

regarding the true purposes of his inquiry in an effort to initiate conversations with third-parties while protecting the identity of the client. Santos-Nevos Depo., Tr. 125:17-25, 126:1-2, attached as Ex. J to Smith Decl.

Plaintiff criticizes Ergo for not reprimanding Mr. Santos-Neves for his use of "false statements," Mot. at 10, but Ergo's management had no reason to think that Mr. Santos-Neves had done anything wrong until it became an issue in the litigation. Thereafter, Ergo's management was focused on responding to Uber's requests for information and managing the client relationship. Contrary to Plaintiff's allegation, Mot. at 5, Ergo management did not "condon[e]" Mr. Santos-Neves's use of false pretenses in this instance. Nor did they approve or direct his use of false pretense; as Mr. Santos-Neves testified, he came up with the idea on his own. Although Mr. Santos-Neves evidently told Mr. Moneyhon and Mr. Egeland (sometime before the project was completed) that he had used false pretenses, neither Mr. Moneyhon nor Mr. Egeland has any memory of discussing it with Mr. Santos-Neves. Mr. Moneyhon was very busy at that time covering a wide range of projects and Mr. Egeland was recovering from major surgery for thyroid cancer and still undergoing radiation treatment:

> The date that Mat[] Henley first sent me the project on 17 December, I was going in for surgery, I had thyroid cancer. … I was having trouble focusing, I was tired, and I was happy to throw this over the transom and because I now had more treatments coming up later in January. So I'm not saying that for pity. It was that I kind of launched this over and I was focused on my health and I was focused on something else. … [I]t was like, just take this and I've got other things to worry about. So I had medical tests all month, and then I had to take radioactive pill[s] to kill the rest of my thyroid cells and all that. So that was happening during all of this. Q. Understood. I can certainly see why it wasn't at the top of your mind. A. I wanted to put this in perspective for you.

*See* Egeland Depo., Tr. 89:7-25, 90:1-10 (Attached as Exhibit 1). Eventually, when Ergo management focused on the various research tactics employed by Mr. Santos-Neves, it concluded that he had made some mistakes. Ergo management tentatively decided to "dismiss him for breach of [Ergo's] research protocol." *See*, *e.g.*, Santos-Neves Depo., Tr. 129:12-19 (Attached as Exhibit

2) (quoting e-mail from Mr. Moneyhon to Mr. Egeland, dated May 20, 2016). Although Ergo management could have articulated more clearly how Mr. Santos-Neves had "exercise[d] poor judgment," *see*, *e.g.*, Santos-Neves Depo., Tr. 134:1-4, 135:1-5 (Attached as Exhibit 3) (expressing uncertainty about the reasons for management's criticism of his work), Ergo never condoned or approved his tactics in this context.

Plaintiff would have the Court believe that Ergo is engaged in widespread fraud and deceit, but nothing could be further from the truth. Although Ergo employees sometimes use false pretenses about the precise reasons for their questions—for example, in the context of business-related due diligence, where "a company or investor wouldn't want their potential acquisition target to know who was interested in them," Egeland Depo. at 33:6-13, attached as Ex. F to Mot.—Plaintiff has stretched this fact to make it seem as if Ergo is in the business of lying to people for unlawful purposes designed to thwart litigation processes, *see*, *e.g.*, Mot. at 5, 10. This is false. In fact, Ergo is in the business of researching and gathering information through lawful means. It has training and compliance protocols in place to ensure that research and investigations are conducted in accordance with applicable law. To the extent any license was required for certain work or any employee was insufficiently supervised, these were oversights of a small company with limited resources, not the intentional or reckless acts of a company acting in bad faith.

## II. ERGO'S REPORT WAS OBJECTIVE, ACCURATE, AND POSITIVE

Plaintiff attacks Ergo for drafting a Report "seemingly to emphasize negative aspects of Mr. Meyer's reputation," Mot. at 6, but this mischaracterizes Ergo's work. Ergo did not emphasize the negative. To the contrary, Ergo's final Report was almost uniformly positive and emphasized primarily positive facts based on Ergo's conclusion that this was the most accurate way to present the facts to Uber. Indeed, far from highlighting anything negative, the "Key Findings" on the opening page of the Report are overwhelmingly positive. They include in the very first paragraph

the "Key Findings" that people view Mr. Meyer as "an up-and-coming and dedicated conservationist," "speak of [his] personality in glowing terms," and "find him to be professional, thoughtful, and trustworthy." *See* Final Report, attached as Ex. R to Smith Decl., at ERGO-0000823. Plaintiff claims that Ergo was looking for "derogatories," Mot. at 1, but Mr. Egeland explained the research process differently. When asked what it means to conduct a "light touch reputational due diligence," Mr. Egeland explained that it means "we're going to ask open-ended questions that would protect the client's identity … not asking leading questions or asking, you know, has this person done anything wrong – you know, asking derogatory questions. The light touch means we just go out, say do you know this person, what do you think of this person. We get what we get. We don't – we don't have questions that go down paths." Egeland Depo., Tr. 79:6-17 (Attached as Exhibit 4). To the extent Ergo sought to discover derogatory information, this was not for any nefarious purpose such as thwarting the litigation process or misrepresenting facts about Mr. Meyer. Rather, it is simply part of the business of gathering and honestly reporting all the relevant information on an individual or corporation of interest to a client.

Plaintiff accuses Mr. Egeland of adding to the Report the comment that Mr. Meyer may be "particularly sensitive to any actions that tarnish his professional reputation, such as either being a witting 'tool' of his friend Schmidts, or looking to 'cash in' on the lawsuit," Mot. at 6, but most of that comment was deleted from the final Report, *see* Final Report, attached as Ex. R to Smith Decl., at ERGO-0000823 (omitting the second clause). Of the part that remained, the comment was revised to replace the phrase "any actions" with the word "publicity." *See id.* Plaintiff opted not to ask Mr. Egeland why he included this comment in the Report; if they had asked, Mr. Egeland would have explained—as the documents suggest, *see*, *e.g.*, Email from Egeland to Santos-Neves, dated January 16, 2016, attached as Ex. O to Mot.—that he merely sought to add some level of insight beyond the factual material gleaned from the open-source materials and interviews. On

review of Mr. Santos-Neves's research, Mr. Moneyhon, Mr. Egeland, and Mr. Santos-Neves were surprised that an individual with such a highly focused professional and academic career, unrelated to transportation or Uber, would dedicate the time and effort to sue Uber's CEO, and risk the negative publicity that sometimes comes with such high-profile litigation.[2] Mr. Egeland's comment sought to highlight that apparent contradiction.

## III. ERGO NEVER OBSTRUCTED THE DISCOVERY PROCESS

Plaintiff is wrong to level the false allegation that Ergo has somehow "frustrate[d]" the discovery process. Mot. at 9. Ergo made clear from the moment it retained counsel its desire to provide the information necessary to help the parties and the Court ascertain the relevant facts. *See*, *e.g.*, May 27 Hearing, Tr. 7:12-20 ("If what plaintiffs' counsel is interested in is what exactly Mr. Santos-Neves said to the people he spoke with, we're happy to provide him for that purpose or even to provide a sworn statement by him for that purpose, whichever your Honor would prefer."); *see also id.* 7:1-5, 17-20 (also offering that Mr. Egeland and not Mr. Santos-Neves would be the appropriate person to provide the information regarding communications between Uber and Ergo). Plaintiff complains that Ergo asserted the attorney-work-product protection with regard to certain documents, Mot. at 9, but that decision was based on direction from Uber and Ergo's understanding that the protection belonged to Uber and therefore only Uber could waive it. Under these circumstances, there is no basis to claim that Ergo sought to obstruct discovery or is somehow responsible for the litigation costs incurred in the fight between Plaintiff and Defendants.

[2] It bears noting that much of Ergo's work occurs outside the United States in a context that is often unrelated to litigation. As Mr. Egeland explained, Ergo frequently conducts "due diligence," "stakeholder mapping," and other types of research regarding business opportunities or targets for acquisitions or mergers, where clients are in need of standard "financial due diligence … legal due diligence … and reputational due diligence." *See* Egeland Depo., Tr. 18:17-23, attached as Ex. F. to Smith Decl. This particular case was unusual for Ergo, in the sense that the focus of the inquiry was an individual who had initiated a class action in U.S. court.

To the extent the Court remains concerned with Ergo's conduct in the context of this litigation, Ergo and its senior management are prepared to provide any further information the Court may require and wish to reiterate that Ergo had no intent to affect this litigation in any way. No one at Ergo is a lawyer; and given the fact that the assignment came from Uber's security team, it simply did not occur to the individuals involved at Ergo that there might be special duties incumbent on lawyers or others at Uber who were involved in the litigation. The individuals involved at Ergo had no intention of involving themselves—and were never involved—in the litigation process at all. Rather, they were focused on providing a factually-accurate report regarding Mr. Meyer and his potential motivations for bringing the case. The use of false pretenses regarding the purported reason for the questions was simply meant to elicit truthful information while preserving the confidentiality of Ergo's client. Ergo's research analyst believed that those were lawful and appropriate lines of inquiry, and no one suffered any harm as a result of his communications.

**CONCLUSION**

For the foregoing reasons, Ergo does not oppose Plaintiff's request for relief in the form of an order enjoining any further background investigations in connection with this litigation; and Ergo respectfully submits that Plaintiff's request for any other unspecified relief from Ergo should be denied.

Dated: July 7, 2016

Respectfully submitted,

/s/ *David W. Bowker*
David W. Bowker
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6000
david.bowker@wilmerhale.com

*Counsel for Ergo*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2016, I caused the foregoing document to be served via e-mail on all parties registered for CM/ECF in the above-captioned matter:

*/s/ David W. Bowker*
David W. Bowker