# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4   SPENCER MEYER, individually
    and on behalf of those
5   similarly situated,

6              Plaintiffs,
    vs.                              No. 1:15 Civ. 9796 (JSR)
7
    TRAVIS KALANICK,
8
               Defendant.
9   _____/

10

11

12       CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13               DEPOSITION OF CRAIG CLARK

14               SAN FRANCISCO, CALIFORNIA

15                THURSDAY, JUNE 23, 2016

16

17

18

19

20

21

22  BY:   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23        CSR LICENSE NO. 9830

24        JOB NO. 504146

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF NEW YORK

 3

 4   SPENCER MEYER, individually
     and on behalf of those
 5   similarly situated,

 6             Plaintiffs,
     vs.                           No. 1:15 Civ. 9796 (JSR)
 7
     TRAVIS KALANICK,
 8
               Defendant.
 9   _____/

10

11

12

13        Deposition of Craig Clark, taken on behalf

14   of the Plaintiff, at Gibson, Dunn & Crutcher, LLP,

15   555 Mission Street, 30th Floor, San Francisco,

16   California, Pursuant to Notice, before me,

17   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~ CSR

18   License No. 9830.

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3

 4     ON BEHALF OF THE PLAINTIFF:

 5          MCKOOL SMITH, P.C.

 6          By:   JOHN C. BRIODY, Esq.

 7          One Bryant Park, 47th Floor

 8          New York, New York 10036

 9          Phone: 212.402.9400

10          jbriody@mckoolsmith.com

11

12     ON BEHALF OF UBER TECHNOLOGIES:

13          GIBSON DUNN & CRUTCHER, LLP

14          By:   NICOLA T. HANNA, Esq.

15                LAURA J. PLACK, Esq.

16          3161 Michelson Drive

17          Irvine, California 92612-4412

18          Phone:  949.451.3800

19          nhanna@gibsondunn.com

20

21     ALSO PRESENT:  Martin White, Uber

22                    Angela Padilla, Uber

23

24                   ---oOo---

25
```

1                    SAN FRANCISCO, CALIFORNIA

2                   THURSDAY, JUNE 23, 2016

3                          8:04 A.M.

4

5

6

7                         CRAIG CLARK,

8              having been sworn as a witness

9           by the Certified Shorthand Reporter,

10                   testified as follows:

11

12                        EXAMINATION

13   BY MR. BRIODY:

14       Q   Good morning, Mr. Clark.

15       A   Good morning.

16       Q   Can you please state your full name for the

17   record.

18       A   Craig, C-R-A-I-G, Clark, C-L-A-R-K.

19           MR. HANNA:  John, before we get going, there

20   are a couple of matters I did want to put on the

21   record, as we did the other day.

22           First of all, with respect to the Ergo

23   matter, Uber Technologies has asserted certain

24   privileges and positions in this litigation with

25   regard to various documents that were submitted to the

1    investigator, This is who I'm working for, and this is

2    what my investigation is about?

3            MR. HANNA:  Objection to the form of the

4    question.

5            THE WITNESS:  My expectations -- again, so

6    I -- you've -- you've kind of asked me generally and

7    specifically.  So I'm not trying to be -- you know,

8    I'm just trying to get to the core of your -- answer

9    the question you're asking.

10           And that is -- so, are you talking about this

11   specific investigation, what my expectations are now,

12   or when?

13           MR. BRIODY:  Q.  I'm asking for right now.

14   Let's go with right now.

15      A   Okay.  I would expect all vendors, including

16   Ergo, to follow the rules, the representations that

17   they make to us, and to proceed professionally and

18   ethically within the law.

19           I would not -- if you -- I would -- I would

20   not sanction or -- nor would I engage in deceiving

21   sources, if this is what you're asking me.

22      Q   Okay.  And so you believe -- did anybody, to

23   your knowledge -- having been involved in this and

24   working with Mr. Henley, did anybody give any thought

25   to how Ergo was reaching out to the sources set forth

```
 1   in this report?
 2            MR. HANNA:  Objection to the form of the
 3   question.
 4            THE WITNESS:  I don't know who gave thought
 5   to what.  I can't know.
 6            MR. BRIODY:  Okay.
 7      Q   And do you have -- generally speaking, based
 8   on your past and involvement -- and involvement in
 9   investigations and retaining investigators, do you
10   have an expectation that, when you retain an
11   investigator to conduct an investigation, that the
12   investigator will tell people who the client is and
13   what the investigation is about?
14      A   So, I would expect -- so we're -- we're
15   talking generally here now; right?
16      Q   Uh-huh.
17      A   Again, I would expect the vendor to follow
18   the rules, to act professionally, and within the --
19   within the bounds of the law.
20      Q   What do you think about -- if someone told
21   you -- if Ergo told you, "Hey, we're going to go out
22   and we're going to tell these people an untrue story
23   about why we're looking for this information.  Is that
24   okay, Mr. Clark?"
25            Is that okay?
```

1   only one I've spoken with directly.  Other people may
2   have been on the call, but I can't recall who.  I'm
3   not sure if it was Matthew or somebody else.
4       Q   During those conversations, did you discuss
5   the scope of work and the project that Ergo had been
6   retained to perform for Uber with respect to
7   Mr. Moneyhon?
8       A   Yes.
9       Q   And what -- what did -- what was discussed
10  with respect to that?
11      A   Again, my -- my focus was to ensure that
12  they -- to get the details of the -- who they spoke
13  to, when, and to ensure that any contact had ceased.
14      Q   Did you discuss with Ergo the manner in which
15  Ergo went out and contacted sources for the report
16  that it submitted on January 19th?
17      A   I don't recall that.
18      Q   All right.
19          I want to bring your attention to the last
20  paragraph of the e-mail that Mr. Egeland wrote you.
21  He writes:
22          "I do want to assure you that we have
23  safeguards in place (and training) that should have
24  prevented our investigator from going beyond the scope
25  of the project, or sending Ergo-identified questions

1  to a potential interviewee."
2          Let me stop right there.
3          Did you discuss with Mr. Egeland or
4  Mr. Moneyhon, before this e-mail was sent, an Ergo
5  investigator going beyond the scope of the project?
6      A   I don't recall specifically.
7      Q   When you received this e-mail from
8  Mr. Egeland, what did you understand him to mean when
9  he talked about we should -- that -- that they have
10 safeguards in place that should have prevented our
11 investigator from going beyond the scope of the
12 project?
13     A   So, my understanding was that they had an
14 employee or an investigator who had -- who had gone
15 beyond or gone rogue -- I think they used the term
16 "rogue" -- and not followed their -- their internal
17 procedures and was operating without supervision.
18     Q   In what manner did the employee go rogue?
19     A   I don't know the specifics.
20     Q   They never told you?
21     A   Not that I recall.
22     Q   You never formulated a belief as to how the
23 employee went rogue?
24     A   The -- my -- my understanding is that the
25 employee was -- had gone beyond the scope of the -- of

1   the protocols that Ergo had in place, and was acting
2   on his -- on his or her own without supervision.
3       Q   In what manner did the employee go beyond the
4   scope of the protocols that Ergo had in place?
5       A   I don't know.
6       Q   You weren't curious, when they told you --
7   when they sent you this e-mail, about how the employee
8   went beyond the scope of the project that Uber
9   commissioned?
10      A   Was I curious?
11          I think -- yeah, I suppose I was -- I don't
12  recall being curious.
13      Q   Did you ever find out how the employee went
14  beyond the scope of the project?
15      A   Yes.
16      Q   When?
17      A   In connection with this letter.
18      Q   When did you first learn about how the
19  employee went beyond the scope of the project?
20      A   Oh, I'm -- I'm sorry.  How they -- when did I
21  first learn?
22          On -- again, my understanding was that the
23  employee was acting without supervision and had
24  breached internal protocols that Ergo had in place.
25  So yeah, that's --

1          And when did I understand that?
2          It would have been around this time,
3   February 24th.
4      Q   Okay.  And I want to know:  What specifically
5   was your understanding of what the employee did that
6   breached the protocols at Ergo?
7          MR. HANNA:  Objection; asked and answered.
8          THE WITNESS:  Yeah, I don't have that
9   specifically with the -- I don't know the protocols or
10  the breach.
11         MR. BRIODY:  Okay.
12     Q   Do you have an understanding today of what --
13  and I'm not talking about back then; as we sit here
14  today -- of what the employee did that was rogue at
15  Ergo?
16         MR. HANNA:  Objection to the form of the
17  question.
18         THE WITNESS:  He wasn't following the
19  internal protocols and was acting without supervision.
20         MR. BRIODY:  Q.  What protocols was the --
21  the investigator not following?
22     A   Ergo's protocols.
23     Q   Relating to what?
24     A   I don't know.
25     Q   That never came up in your discussions with

```
 1   Ergo?
 2          They just said, "He's violating internal
 3   protocols," and you said, "Okay"?
 4          MR. HANNA:  Objection to the form of the
 5   question; misstates testimony.
 6          THE WITNESS:  So I -- I don't recall that
 7   specific exchange as you have characterized it.
 8          MR. BRIODY:  Okay.  Well, I'm just doing my
 9   exchange by way of example.
10      Q   Tell me the exchange that you had with Ergo
11   with respect to the protocols that this rogue employee
12   supposedly breached.
13      A   So, I don't know what those protocols were.
14   The details were not discussed.  An employee had --
15   they -- Ergo explained to me -- I believe it was Todd
16   who had said they had an employee who was operating
17   without supervision and had gone beyond and breached
18   their internal protocols.
19      Q   Okay.  Let's take a step back.
20          Beyond the scope of the project.  He doesn't
21   say that they did something in breach of internal
22   protocols.  It said scope of the project; right?
23          That's what he wrote you?
24      A   Yeah, that's what it says.
25      Q   Okay.  What about the scope of the project
```

```
 1   did the investigator supposedly ignore?
 2       A   I -- I don't have that information.
 3   Mr. Egeland probably would.
 4       Q   As the company that obtained Ergo to perform
 5   the investigation, you have no understanding of what
 6   aspect of the project that you commissioned that they
 7   went beyond the scope of?
 8           MR. HANNA:  Objection to the form of the
 9   question.
10           THE WITNESS:  I -- I didn't commission this.
11           So I -- I would expect -- I don't know.  I
12   haven't read their internal protocols.  I don't know
13   what their internal protocols are.
14           MR. BRIODY:  Right.
15       Q   But you had discussions with Ergo, after
16   January 19th, concerning the Ergo investigation of
17   Mr. Meyer; correct?
18       A   Correct.
19       Q   Okay.  And in those discussions with Ergo
20   about the investigation of Mr. Meyer, it came up that
21   the investigator went beyond the scope of the project;
22   right?
23       A   Correct.
24       Q   As the person from Uber who was handling
25   those discussions with Ergo, your -- your testimony is
```