# EXHIBIT D

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    -------------------------------------
 5    SPENCER MEYER, individually and on
 6    behalf of those similarly situated,
 7                    Plaintiffs,
 8         vs.              1:15 Civ. 9796 (JSR)
 9    TRAVIS KALANICK,
10                    Defendant.
11    -------------------------------------
12
13            DEPOSITION OF TODD EGELAND
14
15           Wednesday, June 15, 2016
16                  9:06 a.m.
17
18
19
20
21
22    Reported by:
23    Joan Ferrara, RPR, RMR, CRR
24    Job No. 174300
25
```

```
 1
 2                    June 15, 2016
 3                       9:06 a.m.
 4                    New York, New York
 5
 6
 7         Deposition of TODD EGELAND, held
 8   at the offices of McKool Smith, One Bryant
 9   Park Avenue, New York, New York, pursuant
10   to Notice, before Joan Ferrara, a
11   Registered Professional and Merit Reporter
12   and Notary Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2    A P P E A R A N C E S:
 3
 4    MCKOOL SMITH, P.C.
 5    Attorneys for Plaintiff
 6            One Bryant Park
 7            47th Floor
 8            New York, New York 10036
 9       BY:  JAMES H. SMITH, ESQ.
10            jsmith@mckoolsmith.com
11            JOHN C. BRIODY, ESQ.
12            jbriody@mckoolsmith.com
13
14
15    WILMER CUTLER PICKERING HALE & DORR, LLP
16    Attorneys for Non-Party - Ergo Global
17    Precision Research, LLC and The Witness
18            1875 Pennsylvania Avenue, NW
19            Washington, D.C. 20006
20       BY:  DAVID W. BOWKER, ESQ.
21            david.bowker@wilmerhale.com
22
23
24                            (Continued)
25
```

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3
 4    GIBSON DUNN & CRUTCHER, LLP
 5    Attorneys for Defendant - Uber Technologies
 6             333 South Grand Avenue
 7             Los Angeles, California 90071-3197
 8        BY:  REED BRODSKY, ESQ.
 9             rbrodsky@gibsondunn.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1
2             THE COURT REPORTER:  I just need
3       to confirm on the record if everyone
4       would like a daily delivery again for
5       today's witness.
6             MR. BOWKER:  Yes.
7             MR. BRODSKY:  Yes.
8             MR. SMITH:  Yes.
9
10   T O D D   E G E L A N D,
11       called as a witness, having been duly
12       sworn by a Notary Public, was examined
13       and testified as follows:
14   EXAMINATION BY
15   MR. SMITH:
16       Q.    Good morning, Mr. Egeland.
17       A.    Good morning.
18       Q.    I introduced myself earlier, but
19   again, my name is James Smith.  I'm with
20   McKool Smith, and I represent plaintiffs
21   and Spencer Meyer in this action.
22       A.    Okay.
23       Q.    Can you please state your name
24   for the record.
25       A.    Todd Egeland.

1                    T. Egeland
2    title of the person who is sort of
3    instructing or guiding the junior person?
4         A.   It could be anywhere from an Ergo
5    partner, to an engagement manager, to a
6    senior analyst.
7         Q.   And so do you know whether or not
8    analysts at Ergo use false and misleading
9    statements when they're contacting primary
10   sources?
11        A.   I'm not quite sure what you mean
12   by false and misleading statements.
13        Q.   So I guess I can give you some
14   examples.  Do you know if whether or not an
15   analyst at Ergo will reach out to a primary
16   source, if they will make a false statement
17   about who they are?
18        A.   I don't believe we mislead people
19   on who we are.  That's not been my
20   experience.
21        Q.   Do you know if whether or not an
22   analyst will mislead a potential target
23   about the reason that they're reaching out
24   to them to collect information?
25        A.   Yes.

1                    T. Egeland
2       Q.    So Ergo analysts do do that?
3       A.    Yes.
4       Q.    Okay.
5             And why is that?
6       A.    For a couple of reasons.  One is
7   to protect the identity of our client.  In
8   many cases it may only be the client who
9   would be asking that information.  So a
10  company or investor wouldn't want their
11  potential acquisition target to know who
12  was interested in them.  And also it helps
13  us get unbiased information.
14      Q.    How does it help get unbiased
15  information?
16      A.    As we go out and ask questions,
17  we typically want to do it without leading
18  questions.  We want to ask questions that
19  ask in a way that the person receiving the
20  question doesn't ask themselves what answer
21  are they looking for, I'll tell them what I
22  think they want to know, which is common in
23  many cultures.
24            So what we want to do is we may
25  make the target a part of a larger survey

1           T. Egeland
2           We will ask our client are they
3  being diligenced and can we be, you know,
4  very direct.  And they go yes, they know
5  they're undergoing diligence.  So we will
6  go right in and be very, you are being --
7  you know, we're talking to his colleagues
8  and his friends and saying we're doing a
9  diligence on Mr. Smith, I have some
10 questions, would you like to answer those.
11     Q.   Understood.
12          But in the situations where
13 you're unable to tell the primary source
14 that you're doing diligence or Mr. Smith or
15 whoever, do you think it makes them more
16 forthcoming with information if you say,
17 well, we're doing this general survey as
18 opposed to we're doing a research project
19 on Mr. Smith?
20     A.   I think it -- yes, I do.
21     Q.   So you said that you're in
22 business development.  Does Ergo market its
23 ability to obtain, you know, hard to find
24 or hidden information to clients and
25 potential clients?

1                 T. Egeland
2      action lawsuit against Uber, have you heard
3      anything about this, would this be in
4      keeping with his character?'"
5              He goes on:
6              "All the sources believe that I
7      am profiling Mr. Meyer for report on
8      leading figures in conservation.  I think
9      this cover could still protect us from any
10     suspicion in the event that I ask a
11     question.  Asking such a question could
12     have all sorts of consequences for
13     Mr. Meyer himself, as it would get the
14     academic rumor mill going."
15             Do you see that?
16         A.   Yes.
17         Q.   And so on January 15th,
18     Mr. Santos-Neves told you that the sources
19     he was contacting believed that he was
20     creating a report on leading figures in
21     conservation?
22         A.   Yes.
23         Q.   Is that correct?
24         A.   Yes.
25         Q.   So you were aware of that --

```
 1                     T. Egeland
 2       A.    Yes.
 3       Q.    On January 15th?
 4       A.    Yes.
 5       Q.    And we said before -- well, let
 6   me back up.
 7             And was that a problem for you in
 8   any way?
 9       A.    When I read this at the time, no.
10       Q.    Why is it not a problem?
11       A.    Because he was doing a light
12   touch outreach to sources -- this is what I
13   was assuming, because I didn't know -- this
14   is all I knew.  I had no other idea how he
15   was going out to people, on each specific
16   person what he was.
17             But he -- I didn't see any issue
18   with him going out asking people.  He was
19   making a report on leading figures in
20   conservation.  That didn't strike me at the
21   time as being of issue.
22       Q.    And he notes that he could ask a
23   couple of sources directly about the suit,
24   but that might create suspicion about the
25   representation that he was creating a
```

1                    T. Egeland
2   what's generating the issue that Craig
3   Clark is dealing with.
4        Q.   Why were you so taken aback?
5        A.   Because Mr. Schmidt was never the
6   subject of our reputational due diligence.
7        Q.   But Mr. Schmidt's relationship
8   with Mr. Meyer was part of that due
9   diligence, right?
10       A.   Right.  And as part of my, the
11  tasking to Miguel was all focused on if we
12  can learn of that through questions of
13  Mr. Meyer's primary sources.  We never
14  intended for him or asked him to go reach
15  out regarding Mr. Schmidt and we felt it
16  was bad judgment on his part and we
17  couldn't believe that he did that.
18       Q.   And you write in the next
19  paragraph:
20            "I do want to assure you that we
21  have safeguards in place (and training)
22  that should have prevented our investigator
23  from going beyond the scope of the project
24  or sending Ergo-identified questions to a
25  potential interviewee."

1                    T. Egeland
2              So what were the safeguards and
3    training that you were referring to here?
4        A.    The safeguards and training in
5    place were my assumption that Matthew
6    Moneyhon was running this project, that he
7    was overseeing it, and that Miguel should
8    have asked somebody for advice and guidance
9    before he went beyond the scope of the
10   project.
11       Q.    What did you consider to be
12   beyond the scope of the project?
13       A.    Specifically going out and doing
14   primary research on Mr. Schmidt.
15       Q.    And so specifically, I guess
16   specifically what training were you
17   thinking of that would prevent
18   Mr. Santos-Neves from going beyond the
19   scope of the project?  Did you have
20   anything in mind?
21       A.    What I had in mind was actually
22   that he's a junior analyst but he's
23   experienced and he should have had
24   mentorship training that when in doubt, go
25   seek out a senior person and get guidance.

```
 1                    T. Egeland
 2   because when they invited me, I went to
 3   Uber headquarters and they aren't at Uber
 4   headquarters, and it took about 30, 40
 5   minutes for me to go get to the right
 6   place, much to my embarrassment as a
 7   researcher.  So they had a time commitment
 8   at the top of the hour.  So thank goodness
 9   it was short.
10         Q.    How long was the meeting?
11         A.    I estimate the meeting with those
12   two was 20 minutes.
13         Q.    How did it leave off?
14         A.    I'm sorry?
15         Q.    How did it leave off or end up?
16               MR. BRODSKY:  Same objection.
17    Same stipulation.
18               MR. SMITH:  Yes.
19         A.    From my perspective, it was a
20   strange meeting in hindsight because we
21   went in with the assumption it was all
22   about reaching out to Mr. Hood.  And that
23   was our narrative and that's where we were
24   focused.
25               You know, their questions were,
```

1                    T. Egeland
2      well, why did this happen, what do you have
3      in place to prevent this -- and it just
4      kept on, and on, and on.
5                 We kept going as far down the
6      road we could, and they kept asking and
7      kept asking.  Then the meeting was -- you
8      know, Craig was a very nice guy, he said
9      thank you, and basically got up and left.
10                It was -- there was no other
11     conversation about other parts of other --
12     there were no questions concerning other
13     people Miguel had reached out to at all.
14     They just didn't ask any questions, didn't
15     go there.  I was focused just on hood, so I
16     was kind of had blinders on, and same with
17     R.P., he was on the phone.
18          Q.    So you've said a couple of times
19     that they kept asking you questions about
20     how could have this happened.  What is the
21     "this" you're referring to?
22          A.    "This" in my mind was, we were
23     then and until other issues popped up
24     focused on this whole thing was caused by
25     Miguel reaching out to Mr. Hood, and we

```
 1                    T. Egeland
 2    were singularly focused on that issue.
 3         Q.    Is that what they meant by this,
 4    how could this have happened?
 5              MR. BRODSKY:  Objection.  Form.
 6         A.    That was my assumption.
 7         Q.    So it's fair to say that they
 8    were fairly upset?
 9         A.    They weren't yelling or
10    screaming, but they had a stern tone of
11    voice -- Craig.  Matt didn't say anything
12    in the meeting that I remember.
13         Q.    Do you know what they, what Matt
14    and Craig were upset over?
15         A.    They didn't say.  My assumption
16    was -- my assumption was how could your guy
17    be so stupid as to reach out to an opposing
18    counsel's former colleague.  That was my
19    take on it.
20         Q.    Why would that have been stupid?
21         A.    Well, we thought that's what
22    precipitated the whole issue --
23         Q.    The discovery of the
24    investigation?
25         A.    Exactly.  We thought it was that
```

1            T. Egeland
2    one issue precipitated everything.
3        Q.    So you thought that they were
4    upset because the investigation had been
5    discovered?
6        A.    I thought they were upset because
7    we did a stupid thing that went beyond what
8    we said we were going to do.
9        Q.    That resulted in it being
10   discovered by plaintiff's counsel?
11            MR. BRODSKY:  Objection to form
12       on that.
13            MR. BOWKER:  Objection to form.
14       A.    I can only answer the question if
15   it was flipped -- if it wouldn't have been
16   discovered, I wouldn't have been in that
17   meeting.
18       Q.    So earlier on I was asking you
19   about the extent of your communications
20   with basically anyone about the Meyer
21   investigation, and I was focusing on your
22   communications with individuals prior to
23   delivery of the report on January 19th of
24   this year.
25            Who all did you speak with about

|    |                                                          |
|----|----------------------------------------------------------|
| 1  |                T. Egeland                                |
| 2  | target of questioning?                                   |
| 3  |     A.    No.                                            |
| 4  |           MR. SMITH:  Objection.  Form.                  |
| 5  | BY MR. BOWKER:                                           |
| 6  |     Q.    In the Meyer investigation, was               |
| 7  | it ever Ergo's intention to collect                      |
| 8  | inaccurate information?                                  |
| 9  |           MR. SMITH:  Objection.  Form.                  |
| 10 |     A.    No.                                            |
| 11 |     Q.    In the Meyer investigation, did               |
| 12 | Ergo comply with applicable law?                         |
| 13 |           MR. SMITH:  Object to the form.                |
| 14 |     A.    To my knowledge, yes.                          |
| 15 |           MR. BOWKER:  Thank you.                        |
| 16 |           MR. SMITH:  Give me just one                   |
| 17 |     second, please.                                      |
| 18 |           (Recess taken from 2:45 p.m. to                |
| 19 |     2:46 p.m.)                                           |
| 20 |           MR. SMITH:  Just a couple of                   |
| 21 |     brief follow-ups.                                    |
| 22 | FURTHER EXAMINATION                                      |
| 23 | BY MR. SMITH:                                            |
| 24 |     Q.    Mr. Egeland, are you aware that               |
| 25 | in the context of the Meyer investigation,              |

```
 1                    T. Egeland
 2   Mr. Santos-Neves was reaching out to
 3   contacts telling him that he was conducting
 4   research for a report on various
 5   up-and-coming researchers in environmental
 6   conservation?
 7            MR. BOWKER:  Objection to form.
 8       A.   Yes, I learned of that from one
 9   of his e-mails to me in project review.
10       Q.   Was Miguel Santos-Neves ever
11   working on a report about multiple
12   up-and-coming researchers in environmental
13   conservation?
14            (Continued on next page to
15   include signature and jurat.)
16
17
18
19
20
21
22
23
24
25
```

1               T. Egeland
2      A.    No.
3            MR. BOWKER:  Objection to form.
4            MR. SMITH:  Thank you very much.
5      I have nothing further.
6            (Time noted:  2:47 p.m.)
7
8
9                       _____
10                        TODD EGELAND
11
12   Subscribed and sworn to before me
13   this ___ day of _____, 2016.
14
15   _____