UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SPENCER MEYER, individually and on    :
behalf of those similarly situated,   :
                                      :         15 Civ. 9796
        Plaintiff,                    :
                                      :       OPINION AND ORDER
        -v-                           :
                                      :
TRAVIS KALANICK and                   :
UBER TECHNOLOGIES, INC.,              :
                                      :
        Defendants.                   :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

It is a sad day when, in response to the filing of a

commercial lawsuit, a corporate defendant feels compelled to

hire unlicensed private investigators to conduct secret personal

background investigations of both the plaintiff and his counsel.

It is sadder yet when these investigators flagrantly lie to

friends and acquaintances of the plaintiff and his counsel in an

(ultimately unsuccessful) attempt to obtain derogatory

information about them. The questions here presented, however,

are whether such dubious practices result in waiver of attorney-

client privilege and work-product protection, and whether

disciplinary action is warranted.

The lawsuit in question is the putative antitrust class

action commenced on December 16, 2015 by plaintiff Spencer Meyer

against defendant Travis Kalanick, co-founder and CEO of Uber

1

Technologies, Inc. ("Uber"), to which Uber was later added as a co-defendant.[1]

FACTS

The following facts are undisputed. Immediately after the filing of the lawsuit on December 16, 2015, see Dkt. 1, Uber's General Counsel, Salle Yoo, Esq., wrote to Uber's Chief Security Officer, Joe Sullivan, Esq., saying: "Could we find out a little more about this plaintiff?" See Declaration of James H. Smith in Support of Plaintiff's Memorandum of Law in Support of His Motion for Relief Related to the Ergo Investigation ("Smith Decl."), Exhibit A, Dkt. 104-1, at UBER-0000001. Mr. Sullivan then forwarded Ms. Yoo's email to Uber's Director of Investigations, Mat Henley, saying "Please do a careful check on this plaintiff." Id. Mr. Henley asked Mr. Sullivan: "Want me to outsource or keep in house / open source?" to which Mr. Sullivan responded "Whoever can do it well and under the radar is fine." UBER-0000041.[2]

Mr. Henley thereupon retained Global Precision Research LLC d/b/a Ergo ("Ergo") to conduct the investigation. See Smith Decl., Exhibit C (Henley Dep.), Dkt. 104-3, at 9:18-20.

---

[1] Uber was joined as a co-defendant on June 20, 2016. See Memorandum Order dated June 19, 2016, Dkt. 90.

[2] This document, an email chain including messages from Mr. Henley, Mr. Sullivan, and Ms. Yoo, was inadvertently omitted from the documents that the Court intended to release to plaintiff's counsel following in camera review (see infra). It has now been released.

Specifically, on December 17, 2015, Mr. Henley emailed Ergo Managing Partners Todd Egeland (a former Chief Strategy Officer at the CIA) and Matthew Moneyhon (a former State Department employee), saying "I have a sensitive, very under the radar investigation that I need on an individual here in the U.S." See Smith Decl., Exhibit E, Dkt. 104-5, at ERGO-0001170. On December 18, 2015, Messrs. Egeland and Moneyhon of Ergo indicated that they were "happy to undertake the requested research; we do quite a bit of this work for law firms." Id. at ERGO-0001174. On December 24, 2015, Mr. Henley emailed Messrs. Egeland and Moneyhon attaching the Complaint in the instant case and asking whether, in Ergo's statement of work, Ergo could be "general enough so that the research remains discreet from a discovery perspective." Id. at ERGO-0001176.

At all times relevant, Ergo's investigators were not licensed to conduct private investigations in New York. See N.Y. General Business Law § 70; Smith Decl., Exhibit F (Egeland Dep.), Dkt. 104-6, 17:24-18:6. Nevertheless, on December 28, 2015, Ergo's Mr. Egeland sent to Uber's Mr. Henley a proposal for Ergo's investigation that included plans for

> [a]n initial "light-touch" reputational due diligence, engaging in 7 primary source interviews that . . . should highlight any issues for further digging, such as participating in any past lawsuits (particularly with Andrew Schmidt [plaintiff's counsel]), and his relationship with Andrew Schmidt. As part of this effort on Meyer, we will also look to determine the likelihood

that the attorney, Mr. Schmidt, is actually the driving
force behind the complaint.

Smith Decl., Exhibit E, Dkt. 104-5, at ERGO-0001178. The

proposal further stated that, following the investigation, Ergo

would prepare a report that "highlights all derogatories." Id.

On January 4, 2016, Mr. Henley accepted the proposal, stating

"[a]ll looks good guys, thanks." Id. at ERGO-0001185; Smith

Decl., Exhibit G, Dkt. 104-7, at UBER-0000055.

Ergo's Managing Partner Mr. Egeland then forwarded the

proposal to an Ergo investigator, Miguel Santos-Neves. See Smith

Decl., Exhibit H, Dkt. 104-8. Mr. Santos-Neves embarked on the

investigation, reaching out to 28 acquaintances or professional

colleagues of plaintiff Meyer and plaintiff's counsel Schmidt.

See Smith Decl., Exhibit L, Dkt. 104-12. In approaching these

sources, Mr. Santos-Neves made materially false statements about

why he was contacting them. For instance, having learned that

plaintiff Meyer was a conservationist associated with Yale

University, Mr. Santos-Neves told sources that "[a]s part of a

research project, [he was] attempting to verify the professional

record and/or previous employment of various up-and-coming

researchers in environmental conservation," Smith Decl., Exhibit

I, Dkt. 104-9, at ERGO-0000467. Likewise, having learned that

Mr. Schmidt's law practice focused on labor law matters, Mr.

Santos-Neves told a source that he was engaged in a "project

4

profiling top up-and-coming labor lawyers in the US," Smith Decl., Exhibit J, Dkt. 104-10, at ERGO-0000626. In still another instance, in an outreach to plaintiff's landlord, Mr. Santos-Neves represented that "[a]s part of the real estate market research project for a client, [he was] interviewing property owners in New Haven" in order "to find out what due diligence steps property owners take to vet a potential tenant." Smith Decl., Exhibit K, Dkt. 104-11 at 223:6-11.[3]

Following up on these initial contacts, Mr. Santos-Neves conducted phone interviews with eight individuals, which he recorded without the knowledge or consent of the individuals with whom he was speaking. See Smith Decl., Exhibit L; Transcript dated July 14, 2016 ("Tr."), at 4:23-25. Mr. Santos-Neves then synthesized his research and corresponded with Ergo Managing Partners Egeland and Moneyhon regarding a draft of the report. See, e.g., Smith Decl., Exhibit N, Dkt. 104-14; Smith Decl., Exhibit Q, Dkt. 104-17. As part of this correspondence, Mr. Santos-Neves wrote to Mr. Egeland on January 15, 2016 that "[a]ll the sources believe that I am profiling Meyer for a report on leading figures in conservation; I think this cover could still protect us from any suspicion in the event that I

---

[3] Ergo also acknowledges that "Mr. Santos-Neves evidently told Mr. Moneyhon and Mr. Egeland (sometime before the project was completed) that he had used false pretenses." See Ergo's Opposition to Plaintiff's Motion for Relief Related to the Ergo Investigation ("Ergo Opp. Br."), Dkt. 114, at 5.

ask such a question [regarding plaintiff's involvement in a lawsuit against Uber]." Smith Decl., Exhibit O, Dkt. 104-15, at ERGO-0000665. Mr. Santos-Neves further noted that "[a]sking such a question could have all sorts of consequences for Meyer himself, as it would get the academic rumor mill going." Id. Mr. Egeland responded: "Miguel, yes, please go back to one or two sources that you believe may have some background on the out of character issue [i.e., whether it was out of character for plaintiff Meyer to be involved in the instant lawsuit]." Id. Additionally, on January 19, 2016, Mr. Egeland asked Mr. Santos-Neves whether there were "enough negative things said about Meyer to write a text box." Smith Decl., Exhibit N, at ERGO-0000697.

On January 19, 2016, Ergo delivered its report to Uber's Mr. Henley. See Plaintiff's Memorandum of Law in Support of His Motion for Relief Related to the Ergo Investigation ("Pl. Br."), Dkt. 103, at 7; Defendants Uber Technologies, Inc. and Travis Kalanick's Joint Opposition to Plaintiff's Motion for Relief Related to the Ergo Investigation ("Defs. Opp. Br."), Dkt. 108, at 6. The report speaks about plaintiff almost entirely in positive or neutral terms, but it states that "Meyer may be particularly sensitive to any publicity that tarnishes his professional reputation." Smith Decl., Exhibit R, Dkt. 104-18, at ERGO-0000823; Declaration of Nicola T. Hanna in Support of

Defendants Uber Technologies, Inc. and Travis Kalanick's Joint
Opposition to Plaintiff's Motion for Relief Related to the Ergo
Investigation ("Hanna Decl."), Exhibit H, Dkt. 109-9, at UBER-
0000059. Mr. Henley sent the report to Mr. Sullivan, Uber's
Chief Security Officer, and to Craig Clark, Esq., Uber's Legal
Director of Security and Enforcement. See id.; see also Letter
dated May 20, 2016, Dkt. 79. Mr. Sullivan, in turn, passed on
the report to Uber's General Counsel Salle Yoo. See Hanna Decl.,
Exhibit H, at UBER-0000059.

Meanwhile, in early to mid-January 2016, plaintiff's co-
counsel Brian Feldman, Esq., was alerted to the fact that Mr.
Santos-Neves had contacted acquaintances of plaintiff and
plaintiff's counsel Mr. Schmidt. See Declaration of Brian M.
Feldman in Support of Plaintiff's Memorandum of Law in Support
of His Motion for Relief Related to the Ergo Investigation
("Feldman Decl."), Dkt. 98, at ¶¶ 2-5. Mr. Feldman reached out
to defendant Kalanick's outside counsel, Peter Skinner, Esq.,
who, on January 20, 2016, wrote Mr. Feldman saying "I followed
up. Whoever is behind these calls, it is not us." See Feldman
Decl. at ¶ 7; Plaintiff's Letter dated June 3, 2016, Exhibit C,
Dkt. 78. Plaintiff's counsel, however, continued to make
inquiries of Mr. Kalanick's counsel, and eventually indicated to
Mr. Skinner that he was prepared to bring the matter to the
attention of the Court in order to seek a subpoena directed to

Ergo. <u>See</u> Feldman Decl. at ¶¶ 8-9; Tr. 45:3-46:2. At that point,
Mr. Skinner initiated further inquiries of Uber's in-house
counsel, who ultimately confirmed that Uber had initiated the
investigation. <u>See</u> Tr. 46:3-23. On February 19, 2016, Mr.
Skinner in turn phoned Mr. Feldman and stated that Uber had, in
fact, hired Ergo. <u>See</u> Feldman Decl. at ¶ 10; Uber Opp. Br. at 8.

Over the course of the next two months, plaintiff and
defendants engaged in further communications. For example, on
April 25, 2016, Mr. Kalanick's counsel Mr. Skinner offered to
provide plaintiff's counsel with information about the
individuals contacted by Ergo and how these individuals were
contacted, but only if plaintiff would agree "not to use the
information in this litigation for any purpose whatsoever."
Smith Decl., Exhibit T, Dkt. 104-20. Plaintiff declined the
offer. <u>See</u> Smith Decl., Exhibit Z, Dkt. 104-26. On May 18, 2016,
Mr. Kalanick's co-counsel, Alanna Rutherford, Esq., also
provided plaintiff's counsel with a "List of People Who
Communicated with Ergo," containing 11 of the 28 individuals to
whom Ergo's investigator reached out. <u>See</u> Smith Decl., Exhibit
U, Dkt. 104-21.

INITIATION OF JUDICIAL INVOLVEMENT

On May 19, 2016, plaintiff brought the Ergo matter to the
Court's attention via a joint telephone call by the parties to
the Court. Because it appeared likely that the Ergo

8

investigation was intended, at least in part, to affect (directly or indirectly) the case pending before the Court, the Court thereupon convened two in-court conferences on the Ergo matter, on May 20, 2016 and May 27, 2016, respectively. As a result of these hearings and associated telephone conferences, the Court authorized plaintiff to depose Uber's Joe Sullivan, Craig Clark, and Mat Henley, and Ergo's Todd Egeland and Miguel Santos-Neves. See Memorandum Order dated June 7, 2016, Dkt. 76, at 4. The Court also authorized plaintiff to serve document subpoenas on Uber and Ergo, albeit after narrowing the subpoenas' parameters. See id. at 4-5. In response to the subpoenas, Uber and Ergo claimed attorney-client privilege and/or work-product protection over numerous documents and voice recordings, and the Court indicated that it would need to review these materials in camera to determine whether privilege was correctly asserted and/or whether the "crime-fraud" exception to the privilege applied. See id. at 5. The Court further stated that in camera review would also be needed to determine whether plaintiff would be authorized to depose Uber's General Counsel Salle Yoo. See id. at 4-5.

On June 2, 2016, Uber moved for reconsideration of the Court's decision to conduct such in camera review, and the Court denied this motion on June 3, 2016, explaining the reasons for this denial in a Memorandum Order dated June 7, 2016. See id. at

1. Specifically, the Court noted that courts commonly review in camera subpoenaed documents as to which an assertion of privilege has been raised in order to see whether the privilege has been properly asserted. See Memorandum Order dated June 7, 2016, at 6-7. Moreover, the Court stated, plaintiff had provided a sufficient basis to suspect that Ergo had committed a fraud in investigating plaintiff through the use of false pretenses, and to suspect that communications from Uber – which had hired Ergo to conduct an investigation of the plaintiff and given Ergo, in Uber's words, "instructions or assignments" – had furthered such a fraud. See id. at 7-8. The Court also indicated that another relevant area of inquiry was whether Uber or defendant Kalanick, or their counsel, had made misrepresentations to plaintiff's counsel in response to plaintiff's initial inquiries about the investigation. See id. at 9. The Court noted that it had no way to know, prior to reviewing the relevant materials, whether or not the crime-fraud exception did in fact apply to some or all of the materials, but that plaintiff had made the threshold showing sufficient to justify in camera review. See id. at 10.

DISCOVERY RULINGS (INCLUDING CRIME-FRAUD EXCEPTION)

The Court then proceeded to conduct the in camera review, and on June 9, 2016, issued an Order indicating the results of this review. See Order dated June 8, 2016, Dkt. 82, at 1-2. In that Order, the Court denied all claims of privilege and work-

10

product protection as to materials submitted by Ergo; upheld Uber's claims of privilege and work-product protection as to certain materials but not as to others; and denied plaintiff's application to take the deposition of Ms. Yoo. See id. The Court also indicated that an explanation for the Court's rulings would issue in due course. See id. The Court now provides the promised explanation.

Regarding the materials that Ergo submitted, Ergo asserted work-product protection, but not attorney-client privilege, over all these materials. See Ergo Privilege Log. As Ergo subsequently clarified, the decision to assert work-product protection "was based on direction from Uber and Ergo's understanding that the protection belonged to Uber and therefore only Uber could waive it." See Ergo's Opposition to Plaintiff's Motion for Relief Related to the Ergo Investigation ("Ergo Opp. Br."), Dkt. 114, at 8. But whether asserted by Ergo or Uber, the claim of work-product protection for Ergo's materials fails, for several reasons:

To begin with, Uber is, by its own statements, estopped from asserting that these materials were "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). Both Uber and Mr. Kalanick have repeatedly represented – accurately or not – that Uber commissioned the investigation of plaintiff in order to determine whether plaintiff constituted a safety

threat to Mr. Kalanick or other Uber employees. See Smith Decl.,
Exhibit S, Dkt. 104-19; Uber Opp. Br. at 2-4; Tr. 30:23-32:12.
Although the Court is profoundly skeptical that this explanation
– which is nowhere reflected in the underlying documents – was
the real reason for the investigation, defendants, having so
represented, cannot then claim that the materials relating to
the investigation were prepared "in anticipation of litigation,"
since this contradicts their own assertion of why the
investigation was done.

Of course, it is more likely, the Court finds (based on the
facts detailed above), that the purpose of the investigation was
to try to unearth derogatory personal information about Mr.
Meyer and his counsel that could then be used to try to
intimidate them or to prejudice the Court against them. But even
then, while Ergo's communications might have been in some sense
prepared "in anticipation of litigation," any possible such
protection would be overcome in light of plaintiff's substantial
need for, and inability to obtain by other means, the Ergo
materials or their substantial equivalent, without undue
hardship. See Fed. R. Civ. P. 26(b)(3)(A)(ii). Plaintiff, who
had (along with his counsel) become the target of an intrusive
and clandestine investigation that included inquiries into
plaintiff's family life, career prospects, and living
arrangements, sought essential information about the ways in

which the investigation was committed and for what purposes.
Ergo's communications contained crucial details about, for
example, the nature of the investigator's contacts and Ergo's
analysis of the discovered information, as well as Ergo's
responses once Ergo was asked to provide details on its
investigation in connection with inquiries made by the plaintiff
and the Court. Moreover, previous attempts by plaintiff to gain
information about the Ergo investigation had resulted, first, in
false denials, and then in an effort by defendants to impose
conditions on plaintiff's access to this information, see, e.g.,
Smith Decl., Exhibit T, as well as to limit the documents and
individuals to which plaintiff would have access for review and
deposition purposes. See Uber Opp. Br. at 9-10. In this
situation, any possible work-product protection attaching to
Ergo's communications was clearly overcome. See Fed. R. Civ. P.
26(b)(3)(A)(ii).

Furthermore, there is a "crime-fraud" exception to the
work-product doctrine, as there is to the attorney-client
privilege. See In re Richard Roe, Inc. (Roe I), 68 F.3d 38, 39
(2d Cir. 1995); In re Grand Jury Subpoena Duces Tecum Dated
Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984). The crime-
fraud exception applies when there is "(i) a determination that
the client communication or attorney work product in question
was itself in furtherance of the crime or fraud and (ii)

13

probable cause to believe that the particular communication with counsel or attorney work product was <u>intended</u> in some way to facilitate or to conceal the criminal activity." <u>In re Richard Roe, Inc. (Roe II)</u>, 168 F.3d 69, 71 (2d Cir. 1999) (internal quotation marks omitted). Here, the Court finds that Ergo, in investigating plaintiff, was engaged in fraudulent and arguably criminal conduct, and that many of the documents over which Ergo claimed work-product protection were intended to facilitate this fraudulent and arguably criminal activity. These documents included emails to Uber representatives concerning the scope of the project, the Ergo investigator's emails to sources and his recordings of phone calls with sources, and emails between Ergo employees preparing the report for transmittal to Uber.

As previously noted, it is undisputed that Ergo's investigator, Mr. Santos-Neves, made blatant misrepresentations to individuals that he contacted in order to gain information about plaintiff and plaintiff's counsel. As Ergo's counsel acknowledged at oral argument, Mr. Santos-Neves "dissembled" and "used false pretenses" in the context of reaching out to the individuals that he interviewed. <u>See</u> Tr. 12:4-6. For example, Mr. Santos-Neves was not, in fact, "attempting to verify the professional record and/or previous employment of various up-and-coming researchers in environmental conservation," "profiling top up-and-coming labor lawyers," or conducting a

14

"real estate market research project for a client." Smith Decl.,
Exhibits I, J, and K.

Ergo contended at oral argument that Mr. Santos-Neves made
these misrepresentations "in the written communications . . . to
initiate the conversation . . . and then to have a forthright
conversation." Tr. 19:17-25. However, the use of an initial
pretext clearly influenced the nature and tenor of the resulting
conversation. Moreover, Mr. Santos-Neves engaged in
misrepresentations during his phone calls, not merely in his
initial outreach emails. For example, Mr. Santos-Neves told one
of his "sources" over the phone: "Let me tell you a little bit
about the research project. It's actually pretty
straightforward, pretty simple. A client hired us to profile up
and coming people in environmental conservation, and so there's
a number of people we've been researching and profiling." ERGO
073, 00:25-00:44. In response to the source's statement "the
whole thing is very mysterious to me," Mr. Santos-Neves stated
"Yeah pretty much I think you got a sense . . . it pretty much
works like a head hunting thought process." Id. at 1:58-2:10.
Mr. Santos-Neves went on to ask the source several questions
about the plaintiff, including whether the source knew "of any
personal issues that might affect [plaintiff's] professional
reputation," id. at 8:35-8:45, and whether the plaintiff had
"butted heads with the law in any way." Id. at 9:32-9:42. The

Ergo investigator's fraudulent misrepresentations, therefore, broadly influenced his interactions with the sources to whom he spoke.

Moreover, Mr. Santos-Neves was not acting as any kind of rogue investigator; his misrepresentations were condoned by the highest levels of Ergo leadership. Mr. Santos-Neves directly and unabashedly referred to his claims to sources as a "cover" in an email to Ergo Managing Partner Egeland. See Smith Decl., Exhibit O, at ERGO-0000665. Mr. Egeland responded by approving a proposal for Mr. Santos-Neves to return to one or two sources. See id. Further, Mr. Egeland testified at his deposition that at the time he received the email containing the "cover" language from Mr. Santos-Neves, he did not see it as a problem that the sources believed (falsely) that Mr. Santos-Neves was creating a report on leading figures in conservation. See Declaration of James H. Smith in Support of Plaintiff's Reply Memorandum of Law in Support of His Motion for Relief Related to the Ergo Investigation ("Smith Reply Decl."), Exhibit D (Egeland Dep.), Dkt. 118-4, 97:17-98:9. Indeed, at his deposition, Mr. Egeland testified that Ergo analysts, as a more general matter, mislead sources about the reason why they are reaching out to them to collect information. See id. at 32:21-33:3. Additionally, Ergo has acknowledged that before the project was completed, Mr. Santos-Neves told another Ergo Managing Partner, Mr. Moneyhon,

16

that he had used false pretenses. See Ergo Opp. Br. at 5. Ergo

cannot, therefore, disavow responsibility for the fraudulent

misrepresentations made by Mr. Santos-Neves.

Furthermore, Ergo's fraudulent misrepresentations were both

intentional and material. The fact that Ergo describes its

conduct as an effort to "help solicit information while also

protecting the identity of his client," Ergo Letter dated June

16, 2016[4] at 2, is not inconsistent with the existence of

fraudulent intent. Likewise, Ergo's false statements to sources

were intended to, and did, induce the investigator's

interlocutors to provide information that they would not

otherwise have provided. Indeed, Ergo acknowledged that Mr.

Santos-Neves used false pretenses "to initiate a conversation,

to get over that hump." Tr. 19:17-24; see also, e.g., Smith

Reply Decl., Exhibit D (Egeland Dep.), 36:12-20.

Ergo argues, however, that its actions did not constitute

fraud because they did not cause actual damages, a requirement

of New York's civil fraud statute. See Ergo Letter dated June

16, 2016 at 2-3, citing Loreley Fin. (Jersey) No. 3 Ltd. v.

Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015) ("Under

New York law, fraud requires proof of (1) a material

misrepresentation or omission of a fact, (2) knowledge of that

---

[4] This letter was sent by Ergo to the Court. Plaintiff responded in a letter
dated June 21, 2016, and Ergo replied in a letter dated June 23, 2016. All
three of these letters will be docketed along with this Opinion and Order.

fact's falsity, (3) an intent to induce reliance, (4)
justifiable reliance by the plaintiff, and (5) damages."); see
also Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370,
1373 (N.Y. 1996) ("The true measure of damage is indemnity for
the actual pecuniary loss sustained as the direct result of the
wrong or what is known as the 'out-of-pocket' rule") (internal
quotation marks omitted).

But Ergo's argument fundamentally misapprehends the nature
of the crime-fraud exception. The purpose of this exception is
"to assure that the seal of secrecy . . . between lawyer and
client does not extend to communications made for the purpose of
getting advice for the commission of a fraud or crime." United
States v. Zolin, 491 U.S. 554, 563 (1989) (internal quotation
marks omitted).[5] As the Second Circuit has stated:

> The rationale for the [crime-fraud] exclusion is closely
> tied to the policies underlying these privileges.
> Whereas confidentiality of communications and work
> product facilitates the rendering of sound legal advice,
> advice in furtherance of a fraudulent or unlawful goal
> cannot be considered "sound." Rather advice in
> furtherance of such goals is socially perverse, and the
> client's communications seeking such advice are not
> worthy of protection.

In re Grand Jury Subpoena, 731 F.2d at 1038. If actual damages
had to be shown in order for "fraud" within the meaning of the

---

[5] While this formulation of the crime-fraud exception is based on the
attorney-client privilege, the crime-fraud exception also applies to the
work-product doctrine, as noted supra. See In re Richard Roe, 68 F.3d at 39;
In re Grand Jury Subpoena, 731 F.2d at 1038.

crime-fraud exception to occur, then the attorney-client privilege and/or work-product doctrine could cover, for example, a communication from a client to a lawyer asking for help in cheating an unsuspecting adversary out of money, as well as the lawyer's response to the client "let's do it, and here's how!" Such a result would be clearly incompatible with the policies underlying the privilege doctrines and exceptions thereto. Moreover, it is worth noting that criminal fraud statutes, such as the federal criminal mail and wire fraud statutes, do not require a showing of damages. See 18 U.S.C. §§ 1341, 1343; Neder v. United States, 527 U.S. 1, 24-25 (1999). In sum, Uber and Ergo may not escape the application of the crime-fraud exception when many of the Ergo materials they seek to protect so manifestly fall within the categories of communications not to be covered by the cloak of privilege.

Ergo next seeks to defend itself by citing, in particular, two district court cases in which courts concluded that it was not a violation of attorney disciplinary rules for investigators to pose as customers of the opposing party in order to investigate compliance with a cease-and-desist letter in a trademark case, see Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 119, 122-23 (S.D.N.Y. 1999), or to determine whether the opposing party was complying with the terms of a consent order, see Apple Corps Ltd. v. Int'l

19

Collectors Soc., 15 F. Supp. 2d 456, 461-62, 475-76 (D.N.J. 1998). See Ergo Letter dated June 16, 2016 at 2; see also Ergo Opp. Br. at 3. The instant case, however, is sharply distinguishable from the cases that Ergo cites. Ergo has not claimed that it was seeking to investigate misconduct that plaintiff had perpetrated vis-à-vis Uber (as was the situation in Gidatex), let alone discover whether plaintiff and his counsel were disobeying an existing court order (as was the situation in Apple).

Furthermore, even if (contrary to the Court's interpretation) Gidatex and Apple could be read to support the proposition that investigators working on behalf of a party to litigation may properly make misrepresentations in order to advance their own interests vis-à-vis their legal adversaries, this Court would reject such a proposition. The New York Rules of Professional Conduct require lawyers to adequately supervise non-lawyers retained to do work for lawyers in order to ensure that the non-lawyers do not engage in actions that would be a violation of the Rules if a lawyer performed them. See N.Y. Rules of Professional Conduct § 5.3; see also Upjohn Co. v. Aetna Cas. & Sur. Co., 768 F. Supp. 1186, 1214-15 (W.D. Mich. 1990). Actions that a lawyer may not ethically take include knowingly making a false statement of fact, see N.Y. Rules of Professional Conduct at § 4.1, and engaging in "conduct

20

involving dishonesty, fraud, deceit or misrepresentation," id.
at § 8.4(c).

Even beyond the rules of professional conduct, moreover,
litigation is a truth-seeking exercise in which counsel,
although acting as zealous advocates for their clients, are
required to play by the rules. See Nix v. Whiteside, 475 U.S.
157, 166 (1986). It would plainly contravene this truth-seeking
function if non-lawyers working for counsel, such as Ergo, could
make fraudulent representations in order to surreptitiously gain
information about litigation adversaries through intrusive
inquiries of their personal acquaintances and business
associates.

Remarkably, Ergo seeks to distance itself from rules
governing attorneys' conduct by contending that Ergo was not
"involved . . . in the litigation process at all," Ergo Opp. Br.
at 8, "had no intent to affect this litigation in any way," id.,
and was unaware of any "special duties incumbent on lawyers or
others at Uber who were involved in the litigation," id. Ergo's
protestations of innocent ignorance are at odds with the joint
representation of Ergo's Managing Partners, in writing to Uber's
Mr. Henley to accept Uber's assignment to investigate plaintiff,
that "we do quite a bit of this work for law firms." Smith
Decl., Exhibit E, at ERGO-0001174. Furthermore, Ergo's work
proposal, sent in response to an request from Uber for "some

discreet research on the individual that's filed" a lawsuit,
included "highlight[ing] all derogatories," a proposition that
Uber immediately approved. See Smith Decl., Exhibit E, at ERGO-
0001172, 0001178, 0001185. It bears asking what Ergo's employees
could possibly have thought its research would be used for, if
not to affect in some way the litigation against plaintiff
Meyer. The Court therefore finds unconvincing Ergo's effort to
disclaim any responsibility for conduct that risked perverting
the processes of justice.

    For all of these reasons, the Court rejects Ergo's efforts
to disavow participation in fraudulent and arguably criminal
conduct. Moreover, if Ergo's misrepresentations to sources were
not sufficient evidence of the applicability of the crime-fraud
exception, two additional features of Ergo's conduct highlight
their conduct's impropriety. First, although Ergo was located in
New York, Ergo, as previously noted, did not possess a private
investigator's license to engage in its investigative
activities, as required by New York law. See N.Y. General
Business Law § 70. Violation of this licensing provision may
itself be prosecuted as a criminal misdemeanor. See id.

    Ergo seeks to explain this violation as, variously, an
"oversight[] of a small company with limited resources," see
Ergo Opp. Br. at 6, or as a product of Ergo's understanding that
its work did not "fit the traditional plain meaning of private

investigation work in New York," see Tr. 15:11-18. But if
concocting fictitious stories to induce acquaintances of a
client's litigation adversary to shed light on the adversary's
employment, finances, family life, and motivation for bringing a
lawsuit does not constitute private investigation work, then the
Court does not know what would. Ergo's failure to obey New
York's licensing laws, which carry the threat of criminal
penalties, raises serious concerns about Ergo's commitment to
legal compliance.

Second, it is undisputed that Ergo's investigator Mr.
Santos-Neves recorded his phone calls with sources without their
knowledge or consent. See Tr. 4:23-25.[6] Some of these
individuals, however, had phone numbers traceable to
Connecticut and New Hampshire, where it is illegal to record
telephone calls without the consent of both parties to the call.
See N.H. Rev. Stat. Ann. § 570-A:2; Conn. Gen. Stat. Ann. § 52-
570d. Neither Ergo nor defendants has cited a case or other
legal provision restricting these laws to scenarios in which
both parties, or the party recording the phone call, are
physically located in Connecticut or New Hampshire. Cf. Kearney

---

[6] While Ergo asserts that no one else at Ergo knew that Mr. Santos-Neves was
recording phone calls, see Tr. 16:5-10, Ergo has not suggested that Mr.
Santos-Neves was violating Ergo policy in so doing.

v. Salomon Smith Barney, Inc., 137 P.3d 914, 931 (Cal. 2006).[7]
The Ergo investigator's recording of phone calls without the
consent of his interlocutors was at worst illegal and, at best,
evidence of reckless disregard of the risk of failing to comply
with the law.

For all of the reasons stated above, the Court denied Ergo
and/or Uber's claim of work-product protection for Ergo
communications that were responsive to plaintiff's subpoena (as
narrowed by the Court).

As to Uber-generated materials, Uber asserted attorney-
client privilege and work-product protection over numerous
documents. The Court denied these assertions with respect to
several documents, which were listed in the Court's Order dated
June 8, 2016. The primary reason for this denial was that the
Court found that, in light of defendants' representations
(however doubtful) about the supposed safety-related purpose of
the investigation (see supra), they were estopped from claiming

---

[7] Ergo contends that in New Hampshire, an individual cannot be held to have
violated the law forbidding the recording of a telephone call without consent
if that person acted "with "a good faith belief that [his] conduct was
lawful." See Ergo Letter dated June 23, 2016, citing Fischer v. Hooper, 732
A.2d 396, 400 (N.H. 1999) (internal quotation marks omitted); see also Tr.
17:5-9. However, the Fischer court distinguished such a "good faith belief"
from "intentional or reckless disregard for the lawfulness of [a person's]
conduct." See Fischer, 732 A.2d at 400. Here, the Court finds that that Mr.
Santos-Neves displayed reckless disregard for the lawfulness of his conduct.
Moreover, Ergo's citation of Fischer does not speak to Connecticut law.
Further, even if by chance one of the individuals contacted by Ergo was
located somewhere different from the location suggested by the area code of
his or her phone number, see Tr. 18:7-15, Ergo would have recklessly
disregarded the likely possibility that the individual in question was, in
fact, located in Connecticut or New Hampshire.

that these documents were either "made for the purpose of obtaining or providing legal assistance," In re Cty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007) or were prepared "in anticipation of litigation," Fed. R. Civ. P. 26(b)(3)(A). Moreover, to the extent that Uber claimed work-product protection over the documents that the Court ordered to be released to plaintiff's counsel, the Court found this protection to be overcome, for reasons substantially similar to those discussed supra in connection with claims of work-product protection for Ergo's materials. See Fed. R. Civ. P. 26(b)(3)(A)(ii).

However, as to certain other communications over which Uber claimed privilege, the Court found that they either were covered by attorney-client privilege and/or were covered by a work-product protection that was not overcome by substantial need. These communications included, for instance, emails between Mr. Kalanick's counsel and Uber in-house counsel addressing potential responses to plaintiff's counsel's inquiries and letters about the Ergo investigation. As to the crime-fraud exception, the Court did not find that this exception applied to the documents over which the Court upheld Uber's claims of privilege. For example, the Court did not find that Mr. Kalanick's counsel, in making inaccurate representations to plaintiff's counsel about whether Uber had commissioned the Ergo

investigation, acted with fraudulent intent. Rather, he was the victim of inaccurate representations made to him by Uber's in-house counsel that, while negligent (maybe even grossly negligent), did not evidence intentional falsity. Finally, the Court denied plaintiff's application to take the deposition of Uber's General Counsel Salle Yoo on the basis that the relevant facts concerning her involvement were clearly a matter of record, and the risk that her deposition would involve potential invasion of the remaining attorney-client privilege was high.

<u>PLAINTIFF'S PRAYER FOR RELIEF</u>

Following the foregoing discovery, plaintiff, on June 29, 2016, moved for the following relief:

> (1) an order prohibiting Defendants from using any of the information obtained through Ergo's investigation in any manner, including by presenting arguments or seeking discovery concerning the same; (2) an order enjoining Defendants and Ergo from undertaking any further personal background investigations of individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful means; (3) an order for monetary sanctions, including Plaintiff's attorneys' fees and costs related to the investigation of Plaintiff by Ergo; and (4) any other relief the Court deems just and proper, including against Ergo.

Notice of Motion and Motion for Relief Related to the Ergo Investigation, Dkt. 96. On July 6, 2016, defendants Uber and Kalanick jointly opposed plaintiff's motion in part, directing their opposition primarily against plaintiff's request for

monetary sanctions. See Defs. Opp. Br.[8] On July 7, 2016, third
party Ergo also submitted a response to plaintiff's motion. See
Ergo Opp. Br. Ergo consented to plaintiff's request for an order
enjoining Ergo from undertaking further background
investigations in connection with this litigation, but opposed
further relief against Ergo. See id. at 10. Plaintiff submitted
reply papers on July 8, 2016, and the Court heard oral argument
on July 14, 2016. See Tr. Plaintiff and Ergo, as noted supra,
had also previously sent letters to the Court regarding the
legality and ethical status of Ergo's investigation. See Ergo
Letter dated June 16, 2016; Plaintiff Letter dated June 21,
2016; Ergo Letter dated June 23, 2016.

Largely through the commendable subsequent efforts of the
parties' outside counsel, however, plaintiff's requests for
relief have now been resolved, as follows:

Plaintiff first requests "an order prohibiting Defendants
from using any of the information obtained through Ergo's
investigation in any manner, including by presenting arguments
or seeking discovery concerning the same." See Notice of Motion.
Defendants Uber and Kalanick confirmed at oral argument that
they did not object to such an order, provided that it did not

---

[8] Pursuant to the Court's direction at a joint telephone conference held on
June 28, 2016, the parties were permitted to initially file redacted copies
of their briefs and exhibits and then re-file copies that were unredacted,
with the exception of very limited redactions permitted by the Court.

involve a concession of wrongdoing on defendants' part. See Tr. 55:9-56:4, 57:7-10. In addition to the fact that defendants do not oppose plaintiff's first request for relief, the Court finds perfectly appropriate an order enjoining defendants from making use of the fruits of their own troubling conduct. See Fayemi v. Hambrecht & Quist, Inc., 174 F.R.D. 319, 324 (S.D.N.Y. 1997). For these reasons, the Court hereby enjoins defendants Uber and Kalanick from using in any manner in connection with this case any of the information obtained through Ergo's investigation, including by presenting arguments or seeking discovery concerning the same.

Plaintiff next seeks "an order enjoining Defendants and Ergo from undertaking any further personal background investigations of individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful means." See Notice of Motion. Ergo, for its part, immediately consented to an order enjoining "any further background investigation of any individuals involved in this litigation." See Ergo Opp. Br. at 1; see also Tr. 26:20-25. Uber and Mr. Kalanick also consented to plaintiff's second request for relief, subject to the limitation that defendants would be able to seek information about plaintiff for purposes genuinely relevant to the litigation, such as information that would bear on whether

plaintiff Meyer is an appropriate class representative. See Tr. 56:9-57:2; see also Uber Opp. Br. at 20. The Court is of the view that such a limitation is appropriate, and that the clearest way to enforce such a limitation is to enter the following injunction. Specifically, the Court hereby enjoins both defendants and Ergo from undertaking any further personal background investigations of individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful, fraudulent, or unethical means.

Plaintiff's third request, which was made against defendants Uber and Kalanick, was for monetary sanctions including reimbursement of plaintiff's attorneys' fees and expenses incurred in connection with the aforementioned conduct. See Tr. 27:6-11. A federal district court is authorized to sanction "improper conduct" through its "inherent power," including by assessing attorneys' fees and costs against a party when that party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 948 F.2d 1338, 1345 (2d Cir. 1991) (internal quotation marks omitted).

If the Court were to reach the issue of whether such sanctions were warranted here, it would have to address whether

Uber acted with, at least, wanton disregard for its ethical and legal obligations. Ergo, as noted supra, carried out its investigation in a blatantly fraudulent and arguably criminal manner. Furthermore, Uber lawyers were required by New York's Rules of Professional Conduct to adequately supervise the Ergo non-lawyers that Uber hired to do work. See N.Y. Rules of Professional Conduct § 5.3. As it happens, however, the Court need not determine whether Uber failed in these duties, because the defendants have reached agreement to pay plaintiff a reasonable (though publicly undisclosed) sum in reimbursement of plaintiff's attorneys' fees and expenses incurred in conjunction with these matters.

While pleased that the parties have resolved the last prong of plaintiff's requested relief, the Court cannot help but be troubled by this whole dismal incident. Potential plaintiffs and their counsel need to know that they can sue companies they perceive to be violating the law without having lies told to their friends and colleagues so that their litigation adversaries can identify "derogatories." Further, the processes of justice before the Court require parties to conduct themselves in an ethical and responsible manner, and the conduct here fell far short of that standard. As the Supreme Court long ago stated, "courts of law" have inherent "equitable powers . . . over their own process, to prevent abuses, oppression, and

30

injustice," <u>Gumbel v. Pitkin</u>, 124 U.S. 131, 144 (1888). This Court will not hesitate to invoke that power if any further misconduct occurs.

In sum, for the foregoing reasons, the Court, on consent, hereby enjoins defendants Uber and Mr. Kalanick from using any of the information obtained through Ergo's investigation in any manner, including by presenting arguments or seeking discovery concerning the same; enjoins both defendants and Ergo from undertaking any further personal background investigations of individuals involved in this litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or other unlawful, fraudulent, or unethical means; and retains jurisdiction to enforce Uber's agreement to reimburse plaintiff in the sum agreed to by the parties.

The Clerk of Court is directed to close docket entry 96. SO ORDERED.

Dated:    New York, NY
          July 25, 2016                    _____
                                           JED S. RAKOFF, U.S.D.J.