**HSE**

## Harter Secrest & Emery LLP

ATTORNEYS AND COUNSELORS

WWW.HSELAW.COM

June 21, 2016



**BY ELECTRONIC MAIL**
The Honorable Jed S. Rakoff
United States District Judge
U.S. District Court for the
Southern District of New York
500 Pearl Street, Room 1340
New York, New York 10007

Re: *Spencer Meyer v. Travis Kalanick*, 1:15-cv-9796 (JSR)
  **Confidential** Response to Ergo June 16, 2016 Letter[1]

Dear Judge Rakoff:

We write on behalf of Plaintiff Spencer Meyer ("Meyer") in response to Ergo's letter dated June 16, 2016 (the "Ergo Letter"). The Ergo Letter, at bottom, presents nothing that should affect the Court's forthcoming opinion explaining its June 8 Order.

Ergo begins by asserting that it did not intend to pervert the process of justice and lauding itself as a law-abiding company. But Ergo documents and deposition testimony have confirmed that Ergo engaged in the conduct that led this Court to its initial concerns about the potential perversion of the judicial process, its finding that *in camera* review was warranted, and its conclusion that Ergo documents should be produced—to wit, (1) Uber hired Ergo to investigate Plaintiff, and (2) "the Ergo investigator made material misrepresentations in the course of conducting his investigation." (Dkt. No. 76 at 8).[2] Initial discovery has also shown that: (1) the Meyer investigation was built upon fundamental misrepresentations and pretext that were condoned (at a minimum) at the highest levels of Ergo; and (2) the Meyer investigation was conducted in an unlawful manner by an investigator who (i) operated without a license and (ii) illegally recorded telephone calls with certain sources. (*See, e.g.*, Ergo Log No. 98; Santos-Neves Depo. Tr. at 80:16-21; 183:6-16). Thus, notwithstanding Ergo's professed intentions and self-serving assertions about compliance with the law, Ergo's actions show otherwise.

---

[1] Plaintiff includes the "Confidential" label out of an abundance of caution because this letter references materials that Ergo has previously designated as "Confidential" and requested confidential treatment under the Protective Order. Plaintiff takes no position concerning the confidential nature of these materials and notes that Ergo did not designate as confidential any portion of its June 16 submission to the Court (which similarly referenced Ergo documents and deposition testimony).

[2] Discovery concerning the Ergo matter and the involvement of Uber Technologies, Inc. ("Uber") and Mr. Kalanick remains ongoing.

Harter Secrest & Emery LLP
ATTORNEYS AND COUNSELORS

June 21, 2016
Page 2

The remainder of the Ergo Letter does not provide any law or facts that should affect the Court's reasons for its *in camera* rulings. Two key deficiencies continue to undermine the assertions of work product and privilege concerning the Meyer investigation. *First*, Ergo has not shown that the Meyer investigation (and related communications) is entitled to work product protection in the first instance. Indeed, Ergo's Letter does not address that issue at all. *Second*, even if some work-product protection or other privilege arguably applied to the Meyer investigation, Ergo has not rebutted the applicability of the crime-fraud exception. None of Ergo's authorities undermines the well-settled rule that the crime-fraud exception embraces a wide array of false and misleading conduct. And Ergo's hair-splitting over which statements made by its investigator were true and which were false is of little moment. Ergo cannot deny that its investigator made false statements to acquaintances of Mr. Meyer and his counsel in order to obtain information that he would otherwise not have received. That is paradigmatic misleading and fraudulent conduct; it is not protected by any privilege.

The Ergo Letter, at considerable length, attempts to explain how Ergo's conduct does not, as a matter of law, constitute either a crime or a common law fraud. (Ergo Letter at 2-3). But that argument—even if it were correct—is beside the point. As explained in Plaintiff's June 3 Letter (Dkt. 78 at 2 n.2), Ergo's conduct need not satisfy the elements of common law fraud or crime to trigger the application of the crime fraud exception. *See Madanes v. Madanes*, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001) ("District courts in this circuit have long construed the exception as reaching some conduct beyond crime and fraud."); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 U.S. Dist. LEXIS 159721, at *121 (S.D.N.Y. Nov. 25, 2015) (recognizing that "misconduct fundamentally inconsistent with the basic premises of the adversary system," such as "bad faith litigation conduct" can fall under the crime fraud exception") (internal citations and quotations omitted).

Ergo also tries to minimize the significance of its misrepresentations by dissecting its investigator's statements in a search for some kernels of truth. That the Ergo investigator used his real name and identified Ergo does not mitigate the fraudulent misrepresentations made to accomplish the Meyer investigation. Indeed, notwithstanding Ergo's spin, there already is overwhelming record evidence showing the pervasive fraudulent nature of the Meyer investigation. Ergo admits that its investigator, Miguel Santos-Neves (the "Investigator"), mischaracterized the reason for his interviews with people that knew Meyer. (Ergo Letter at 2).[3]

---

[3] Ergo's reliance on *Gidatex, S.r.L. v. Campaniello Imports* is misplaced. 82 F. Supp. 2d 119, 122 (S.D.N.Y. 1999). Ergo Letter at 2. *Gidatex* concerned attorneys' use of investigators to pose as consumers to explore unfair business practices. *Id.* at 120. The Court found that misstatements concerning the purpose of the investigators' questions did not violate ABA and New York State Bar Association ethical rules, holding that "these ethical rules should not govern certain situations where a party is legitimately investigating potential unfair business practices . . . ." *Id.* at 122. That holding has no bearing on the instant facts, where Ergo was not investigating any unfair business practices. Further, the investigators' statements were found to be ethical because "[t]he presence of investigators posing as [consumers] . . . did not cause the sales clerks to make any statements they otherwise would not have made." *Id.* As discussed above, Ergo's misstatements were specifically intended to elicit information from sources that would not have otherwise been provided.

The Investigator reached out to twenty-eight coworkers and acquaintances of Mr. Meyer and Mr. Schmidt to obtain information. Each outreach was based upon an affirmative lie; the Investigator stated he was seeking information on "up and coming researchers in environmental conservation" (Ergo Log No. 67), or "up and coming labor lawyers" (Ergo Log No. 113), or even "what due diligence steps property owners take to vet a potential tenant" in a communication to Mr. Meyer's landlord (Ergo Log No. 98). These representations were the crux of the Investigator's outreach and allowed Ergo to coax information from sources:

> Q. . . . But in the situations where you're unable to tell the primary source that you're doing diligence [on a specific individual], do you think it makes them more forthcoming with information if you say, well, we're doing this general survey as opposed to we're doing a research project on [that specific individual]?
>
> A. · · I think it -- yes, I do.

(Egeland Depo. Tr. at 36:12-20). The misrepresentations were plainly material. *Assured Guar. Mun. Corp. v. Flagstar Bank*, FSB, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) ("'[M]aterial' means '[o]f such a nature that knowledge of the item would affect a person's decision-making.'" (quoting Black's Law Dictionary (7th ed. 1999))). Further, far from being the actions of a lone renegade employee, as suggested by Ergo's counsel at the May 27 Hearing (5/27 Tr. at 27:14-25), the pretext tactic is known and condoned at the highest levels of Ergo, including by its General Counsel. (*See* Egeland Depo. Tr. at 32:21-33:3 (Todd Egeland, managing partner at Ergo: "Q. Do you know if whether or not an analyst will mislead a potential target about the reason that they're reaching out to them to collect information? A. Yes. Q. So Ergo analysts do do that? A. Yes."); *see also* Ergo Log No. 123 (Investigator informing Egeland and Moneyhon (Ergo's General Counsel) that "[a]ll the sources believe that I am profiling Meyer for a report to leading figures in conservation"); Santos-Neves Depo. Tr. at 126:3-13; 285:21-22).

Finally, even putting aside Ergo's use of false statements to induce information, there is *prima facie* evidence that Ergo's investigation was conducted in an unlawful manner. Neither the Investigator nor anyone else at Ergo possesses a New York State Private Investigator's License, which is required in order to conduct "investigations for the purpose of obtaining information with reference to . . . [the] reputation or character of any person . . . ." Art. 7 N.Y. Gen. Bus. Law § 71; Santos-Neves Depo. Tr. at 80:16-21; Egeland Depo. Tr. at 18:3-6. Further, the Investigator testified that he recorded the phone calls with his information sources without their knowledge or permission, which is illegal for at least the calls he had with individuals in Connecticut and New Hampshire. (*See, e.g.*, Santos-Neves Depo. Tr. at 183:6-16; Conn. Gen. Stat. § 52-570d; N.H. Rev. Stat. Ann. § 570-A:2).

*****

Nothing in the Ergo Letter provides any new law, facts, or information that should affect the reasoning for the Court's findings upon its *in camera* review. Plaintiff respectfully submits that the Ergo Letter can be disregarded.

**Harter Secrest & Emery LLP**
ATTORNEYS AND COUNSELORS

June 21, 2016
Page 4

                        Respectfully submitted,

                        Harter Secrest & Emery LLP

                        /s/ Jeffrey A. Wadsworth

                        Jeffrey A. Wadsworth
                        DIRECT DIAL: 585.231.1113
                        EMAIL: JWADSWORTH@HSELAW.COM

cc:    *Counsel of Record*