G739MEY1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     SPENCER MEYER ,
3
                    Plaintiff,
4
                    v.                          15 CV 9796 (JSR)
5
     TRAVIS KALANICK, ET AL.,
6
                    Defendants.
7    ------------------------------x
                                          New York, N.Y.
8                                         July 14, 2016
                                          3:45 p.m.
9    Before:
                         HON. JED S. RAKOFF
10
                                              District Judge
11
                             APPEARANCES
12
     HARTER, SECREST & EMERY
13        Attorneys for Plaintiff
     BY:  BRIAN MARC FELDMAN
14        JEFFREY A. WADSWORTH

15   MILLER FAUCHER & CAFFERTY
          Attorneys for Plaintiff
16   BY:  ELLEN MERIWETHER

17   MCKOOL SMITH
          Attorneys for Plaintiff
18   BY:  JOHN CHRISTOPHER BRIODY
          JAMES SMITH
19
     BOIES, SCHILLER & FLEXNER
20        Attorneys for Defendant Travis Kalanick
     BY:  PETER M. SKINNER
21        JOANNA WRIGHT

22   WILMER CUTLER PICKERING HALE AND DORR
          Attorneys for Third Party Defendant Ergo
23   BY:  DAVID W. BOWKER

24   GIBSON, DUNN & CRUTCHER
          Attorneys for Defendant Uber Technologies, Inc.
25   BY:  REED MICHAEL BRODSKY
          JOSHUA S. LIPSHUTZ

G739MEY1

|     |     |
| --- | --- |
| 1   | (In open court; case called) |
| 2   | MR. FELDMAN:  Good afternoon, your Honor.  Brian |
| 3   | Feldman from Harter, Secrest & Emery on behalf of plaintiff. |
| 4   | THE COURT:  Good afternoon. |
| 5   | MR. WADSWORTH:  Good afternoon, your Honor.  Jeff |
| 6   | Wadsworth on behalf of plaintiff from Harter, Secrest & Emery. |
| 7   | THE COURT:  Good afternoon. |
| 8   | MS. MERIWETHER:  Good afternoon, your Honor.  Ellen |
| 9   | Meriwether, Cafferty Clobes Meriwether & Sprengel on behalf of |
| 10  | plaintiff. |
| 11  | THE COURT:  Good afternoon. |
| 12  | MR. BRIODY:  Good afternoon, your Honor.  John Briody, |
| 13  | McKool Smith, on behalf of plaintiff. |
| 14  | THE COURT:  Good afternoon. |
| 15  | MR. SMITH:  Good afternoon, your Honor.  James Smith, |
| 16  | McKool Smith, on behalf of plaintiff. |
| 17  | THE COURT:  Good afternoon. |
| 18  | MR. SKINNER:  Good afternoon, your Honor.  Peter |
| 19  | Skinner and Joanna Wright from Boies, Schiller & Flexner on |
| 20  | behalf of defendant Travis Kalanick. |
| 21  | THE COURT:  Good afternoon. |
| 22  | MR. BOWKER:  Good afternoon, your Honor.  David Bowker |
| 23  | with WilmerHale on behalf of nonparty Ergo. |
| 24  | THE COURT:  Good afternoon. |
| 25  | MR. BRODSKY:  Finally, your Honor.  Good afternoon. |

G739MEY1

1    Reed Brodsky and Joshua Lipshutz from Gibson, Dunn & Crutcher

2    on behalf of Uber.

3              THE COURT:  Good afternoon.

4              All right.  We have a lot to cover here.  The first

5    motion I want to take up is plaintiff's motion for relief

6    related to the Ergo investigation.  I think the following facts

7    are undisputed but let me state them and if there is

8    disagreement as to these facts let me know before we get into

9    legal argument.

10             So this lawsuit was filed by Mr. Meyer through his

11   counsel, Mr. Schmidt, on December 16, 2015.  It was filed

12   against Mr. Kalanick, the CEO of Uber.

13             On that same day Uber's general counsel, Salle Yoo,

14   wrote to Uber's chief security officer, Joe Sullivan, saying

15   could we find out a little bit more about this plaintiff.

16             Sullivan in turn forwarded that e-mail to Uber's

17   director of security, Mat Henley, stating, "Please do a careful

18   check on this plaintiff."

19             We will get into later the controversy as to what

20   prompted that request.

21             Mr. Henley, the next day, December 17, reached out to

22   Ergo and asked them to conduct an investigation stating, "I

23   have a sensitive, very under-the-radar investigation that I

24   need on an individual here in the U.S."

25             A week later, on December 24, Mr. Henley wrote to

G739MEY1

1    Mr. Egeland at Ergo attaching the complaint and stating that --

2    or asking really whether in Ergo's work "Can you make sure to

3    keep it general enough so that the research remains discrete

4    from a discovery perspective?"

5            On January 4, 2016 Mr. Henley approved a proposal for

6    Ergo's Mr. Egeland that included an investigation not only of

7    Mr. Meyer but also of his counsel Mr. Schmidt.  The proposal

8    stated that Ergo would prepare a written report that,

9    "Highlights all derogatories."  Mr. Egeland then turned over

10   the investigation to one of their investigators,

11   Mr. Santos-Neves.

12           Mr. Santos-Neves eventually reached out to various

13   acquaintances and other persons who he believed had knowledge

14   of Mr. Meyer or Mr. Schmidt in the course of which

15   Mr. Santos-Neves gave false statements about why he was seeking

16   the information and why he was contacting these people.  For

17   example, he stated that he was "Profiling top, up and coming

18   labor lawyers in the United States."  He also said that, "As

19   part of the real estate market research project for a client I

20   am interviewing property owners in New Haven.  We are looking

21   to find out what due diligence steps property owners take to

22   vet a potential tenant."

23           At least eight of these telephone conversations were

24   recorded without the knowledge or consent of the persons to

25   whom Mr. Santos-Neves was talking.

1          An initial draft report was then prepared.  That was

2     circulated between Mr. Santos-Neves, Mr. Egeland who was the

3     Ergo managing partner, and another Ergo partner, Mr. Moneyhon.

4          Mr. Egeland, for example, on January 19, as part of

5     that process, asked Mr. Santos-Neves whether there were,

6     "Enough negative things said about Meyer to write a text box."

7          As part of that process, Mr. Santos-Neves also

8     informed Mr. Egeland and Mr. Moneyhon that he was using false

9     pretenses in connection with the investigation.  For example,

10    on January 16, 2016 Mr. Santos-Neves e-mailed Mr. Egeland

11    saying, "All the sources believe that I am profiling Meyer for

12    a report on leading figures in conservation.  I think this

13    cover could still protect us from any suspicion in the event

14    that I ask such a question," referring to asking a question

15    about derogatory information.

16          On January 19, 2016 Ergo delivered his report to

17    Mr. -- to Mr. Henley and Mr. Clark both at Uber.  Most of the

18    information provided was positive in nature, although the

19    report noted that "Mr. Meyer may be particularly sensitive to

20    any publicity that tarnishes his professional reputation."

21          Around the same time plaintiff's counsel got initial

22    wind of these inquiries being made and on January 19 he had a

23    conversation with Mr. Skinner at the Boies firm.  And

24    Mr. Skinner represented that "It is not us," making the calls.

25    However, after plaintiff's counsel indicated that he would seek

G739MEY1

1    a subpoena relating to Ergo's inquiries, on February 19,

2    Mr. Skinner phoned one of plaintiff's counsel to say that Uber

3    had, in fact, retained Ergo to conduct an investigation.

4            The only other fact that I think is uncontested is

5    that Ergo, though located in New York, had never obtained, as

6    the law of New York requires, a private investigator's license,

7    or at least not one for Mr. Santos-Neves.

8            So, let me just pause there.  Are there any of those

9    facts that I've just stated that any party disputes?  Okay.

10           So now I'm ready to hear argument starting with

11   plaintiff's counsel.

12           MR. BRIODY:  Thank you, your Honor.  John Briody on

13   behalf of the plaintiff Spencer Meyer.

14           I'd like to begin with plaintiff requests for relief

15   by pointing out another matter that is not contested as we sit

16   here today.  And that is no one in this courtroom is going to

17   say that the investigation that was undertaken of Mr. Meyer was

18   an okay thing to do; not Uber, not Ergo, not Mr. Kalanick.  No

19   one will say that this was an okay thing to do, when a

20   litigation is pending, to hire an investigator to reach out to

21   personal contacts, professional sources of a plaintiff, to dig

22   out details that highlight all interrogatories about the --

23   relating to the personal background of a plaintiff.

24           THE COURT:  Well let me just push you a little on

25   that.  I assume -- I'll wait to hear from counsel for the

G739MEY1

```
 1    participants -- that no one is going to be suggesting that this
 2    was conduct that in hindsight they are proud of.  But, there's
 3    nothing wrong, is there, when you're sued to try to find out a
 4    little bit about who is suing you and to find out a little bit
 5    about the lawyer who is representing that person.  You might go
 6    on Google.  You might check around with acquaintances of your
 7    own.  If the lawyer was David Boies presumably you could just
 8    look at the numerous articles that have been published.  But so
 9    that kind of inquiry would not be improper, would it?
10         MR. BRIODY:  And I'm not suggesting that it is, your
11    Honor.  The point that puts the nail in the coffin here is the
12    reach-out and how it was done.  There are lawful ways to do
13    this.  This way was unlawful.  This was pretextual.
14         THE COURT:  We'll hear from the parties on that.  But
15    let's assume arguendo that they conducted -- that Ergo
16    conducted its investigation in an unlawful manner.  Why should
17    either Uber or Mr. Kalanick suffer any consequences when all
18    they did was go and hire this firm to conduct an investigation?
19         MR. BRIODY:  Because as the case law cited in the
20    brief.  This is a situation of willful blindness, your Honor,
21    particularly on the part of Uber.  There's an obligation to
22    supervise.  You can't just turn people loose to find out
23    information and then bury your head in the sand about how it's
24    obtained.  And, you know, that is a theme that's been expressed
25    by the defendants is:  Well, we get a free pass here because
```

G739MEY1

1     they did it, not us.

2          The specifications of the investigation that were

3     sanctioned here, contacting individuals that are acquaintances

4     of the plaintiff, I asked the Uber witnesses -- I took those

5     depositions.  I asked them how, given the mandate that this had

6     to stay under the radar -- and, your Honor, this was kept under

7     the radar.  They are using PGP-encrypted messaging to say

8     anything about this investigation.

9          How is it that you thought Ergo would be able to

10    obtain the information you wanted, deliver the report that you

11    requested while telling them Ergo was asking for this

12    information?  And you know what the response is.  No one could

13    tell me how they could do it without making false

14    representations or somehow tricking someone.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

G7ELMEY2

1           MR. BRIODY:  What was the answer?  I didn't give it a

2     thought.

3           Now, the defendant's papers in further to this issue,

4     what your Honor was getting at, there are references to blanket

5     disclaimers, boilerplate in a master service agreement stating

6     generally that the investigation or any work that Ergo may

7     do -- and they have done multiple and they have done

8     investigations since the minor investigation -- will be

9     conducted in a lawful way.  I submit as soon as they sign off

10    on the parameters of the Meyer investigation, parameters have

11    nothing to do with this proffered safety reason.

12          Well, they have an obligation and they know a

13    litigation is pending, as your Honor stated, and it wasn't

14    disputed.  The prime mover of this investigation was counsel.

15    So there's reasonable steps that you have to take when a

16    litigation is ongoing to make sure that an investigation is

17    carried out the right way and the process of justice is not

18    impacted because the plaintiff can't be in a position of being

19    worried about someone going around and lying to the people that

20    they know, reaching out to business contacts, lying to them to

21    get information for whatever purpose in a litigation.  It's

22    unacceptable.

23          And no one here -- and what I said before -- no one

24    here is going to defend it.  They won't because they shouldn't.

25    And there are also obligations, we cite them in our briefs,

1    about not making misrepresentations to nonparties when the

2    litigation is pending.

3            I mean this is a horizontal price fixing conspiracy

4    case.  Why does someone have to knock on the door of someone's

5    landlord?  Why do they have to call professional colleagues?

6    Why do they have to ask them and seek to get derogatory

7    information?  And what is an observation that someone may be

8    concerned that their professional career would be tarnished due

9    to bad press or whatever?  Nothing to do with this, nothing.

10           And everyone agrees today and my point, your Honor, is

11   that's the investigation that was authorized here.  They didn't

12   think back then or no one thought about it and either sin is

13   equally wrong in the eyes of the law because willful blindness

14   is sufficient.

15           THE COURT:  So under the Supreme Court's most recent

16   articulation of willful blindness in *Global-Tech Appliances v.*

17   *SEB,* 563 U.S. 754, a 2011 decision of the Supreme Court, which

18   if memory serves me correct was written by the late Joseph

19   Scalia, the standard is "a willfully blind defendant is one who

20   takes deliberate actions to avoid confirming a high probability

21   of wrongdoing and who can almost be said to have actually known

22   about the critical facts."

23           So what was the deliberate action that you say Uber or

24   Kalanick took to avoid confirming a high probability of

25   wrongdoing?

G7ELMEY2

1          MR. BRIODY:  With respect to the delegation of this

2     investigation, there was no way this investigation of the

3     parameters that they specified could be accomplished absent

4     using deception.  That was the absolute natural result of the

5     investigation they asked for and was specified.  So to pass

6     that investigation --

7          THE COURT:  By the way, my law clerk who, as usual, is

8     several steps ahead of me, says it was Justice Alito, not

9     Justice Scalia.  A natural confusion.  Go ahead.

10         MR. BRIODY:  No.  In this situation, the parameters of

11    this investigation are what was authorized, your Honor.  There

12    was no way this was going to happen, there was no way this was

13    going to get delivered what was requested without using

14    deception.  And not wanting to know, not even investigating

15    paying no mind, setting this in motion I think is deliberate.

16         THE COURT:  All right.  I'm going to come back to you

17    for some other questions, but I have some questions for defense

18    counsel.  So let's hear from them next and we'll come right

19    back to you in a few minutes.

20         And I guess I want to hear first from counsel for

21    Ergo, even though they are not a party, but it's really their

22    behavior that is the focus of the underlying premise of the

23    claim made here.  Do I understand it correctly that not only

24    did Mr. Santos-Neves make false representations, but that this

25    was known to and at a minimum acquiesced to, if not approved by

G7ELMEY2

1    two of his superiors?

2              MR. BOWKER:  Your Honor, thank you.  David Bowker on

3    behalf of Ergo.

4              It is true that Mr. Santos-Neves dissembled, used

5    false pretenses in the context of his outreach to the people he

6    interviewed.  That's an uncontested fact, as your Honor said at

7    the outset.

8              I think it's somewhat less clear how much his

9    superiors knew about what he was doing.  It is true that there

10   is a document in the record showing that before the report was

11   complete, after the first outreach to interviewees but before

12   the report was complete and when there was still outreach to be

13   done, there is a communication in which he does say in the body

14   of an email that he is using this pretext or false pretense or

15   I think cover is the word that he used, as your Honor quoted.

16             But I will say that Mr. Moneyhon doesn't recall

17   learning that fact and Mr. Egeland acknowledges that he

18   received the email and I think may even have responded to it

19   but doesn't recall focusing on that particular aspect of it.  I

20   think it didn't surprise him that Mr. Santos-Neves had made

21   this decision, regrettable as it is in retrospect, but it

22   hadn't been the focus of his attention at the time.

23             As I wrote in our last submission, Mr. Egeland was at

24   the time undergoing pretty serious treatment for cancer and

25   was, in his own words, somewhat checked out, which may explain

G7ELMEY2

1   some of the lack of focus.  Mr. Santos-Neves did in his

2   deposition testify that the decision to use this cover, if you

3   will, had been his own.  He explained that the reason he did it

4   was not to defraud anyone or cause harm to anyone or even to

5   gather any particular kind of information, but rather to

6   initiate a conversation while protecting the confidentiality of

7   his client, Uber, which he thought was his remit.

8          Let me add to this, your Honor, what I've said in all

9   of my submissions to the Court.  This company takes really very

10  seriously your Honor's concerns about the integrity of the

11  litigation process, very, very seriously.  The CEO of Ergo is

12  here in attendance.  Mr. Moneyhon, managing partner of Ergo, is

13  here in attendance.  They're here because they care about your

14  Honor's concerns and about getting this right.  They have

15  sought to do the right thing since this issue arose in this

16  litigation.

17         We've provided the plaintiffs the information they

18  needed.  It is true that we asserted attorney work product over

19  the documents and the would be testimony and deposition, but we

20  did that only because that work product protection we don't

21  own.  That belongs to Uber.

22         THE COURT:  I'm not troubled by your having asserted

23  that.  Ultimately, I found that you were not entitled and they

24  were not entitled to that protection and I still owe all of you

25  a more detailed written opinion as to why.  But I have no

G7ELMEY2

1   problem at all with any party invoking what they at least have

2   some colorable basis or their client has some colorable basis

3   for saying.

4          Much more disturbing, this is as I understand it a

5   company that holds itself out as very top flight.  Mr. Egeland,

6   for example, I understand was a high level person at the CIA.

7   And not only did their investigator use false pretenses to

8   obtain information for seemingly derogatory purposes, if it

9   could have been found, and not only was that made known, albeit

10  under the circumstances you've just quite fairly mentioned, to

11  higher level people, but he secretly recorded the

12  conversations.  He didn't even hold a New York license, a

13  private investigator's license.  I mean there comes a point

14  where one has to raise one's eyebrows, yes?

15         MR. BOWKER:  Yes.  Your Honor, let me respond to each

16  of these things in turn.

17         First of all, you're absolutely right.  This is a

18  high-end company that does high-end work.  It is run by former

19  U.S. government officials who are people of integrity and

20  people who take the law seriously and legal compliance

21  seriously.

22         Let me explain something about Ergo.  Ergo does not

23  typically engage in litigation related investigations and does

24  not typically engage actually even in the United States.  Ergo

25  does a lot of its work in the transactional context overseas.

G7ELMEY2

1    Ergo leadership has compliance protocols in place for that

2    context.  One of the things they really focus on because they

3    have a very large network of experts is they focus on the FCPA.

4    That's a very big concern of theirs and they take that very,

5    very seriously.  They have anti-money laundering provisions in

6    place and all the things that one needs to stay in compliance

7    with law operating overseas.  This particular investigation was

8    a bit of an anomaly for them.

9          The New York investigator's license issue is one I

10   want to address head on as well because I know plaintiffs have

11   made a lot of that.  Some years ago Ergo made the decision that

12   what they were doing with their business model overseas didn't

13   fit the traditional plain meaning of private investigation work

14   in New York.  Their understanding, right or wrong, was that a

15   private investigator's license in New York was for those

16   investigation firms that are engaged in private investigation

17   work -- surveillance and taking photographs of people and

18   trailing people and gathering that information.

19         THE COURT:  You don't think that what was being done

20   in this case was private investigation?

21         MR. BOWKER:  Well, your Honor, we concede that what

22   was done in this case looks an awful lot like what the

23   licensing authority is focused on.  And for that reason, Ergo

24   has some weeks ago now initiated the process of coming into

25   compliance with New York licensing rules, which to be frank

G7ELMEY2

1    they had not previously focused on.  And so but I do want to

2    reassure you that they take that seriously.  They are

3    communicating with the licensing authority on that issue and

4    want to be in full compliance.

5          On the recording of calls, because that was another

6    issue, no one knew that Mr. Santos-Neves was recording these

7    calls.  I don't think that was ever reported up the chain and

8    didn't actually become known to anyone else at Ergo until in

9    the litigation process we needed to retrace the steps and

10   figure out what had happened and what documents existed.  And

11   at that time we made clear, Ergo's leadership made clear to

12   Miguel Santos-Neves we need everything -- texts, any chats, any

13   recorded conversations, absolutely everything, at which point

14   he very forthrightly produced everything he had, including

15   those recordings.

16         He was asked about those recordings in deposition and

17   his response was I recorded those conversations because I'm a

18   very bad typist and literally wanted to make sure his report

19   was accurate.  I don't think plaintiffs have ever taken the

20   position that Mr. Santos-Neves was anything but honest in that

21   deposition.  He was very forthcoming.  He didn't do that for

22   any fraudulent purpose or to use those recordings for any

23   leverage against anyone or anything like that.

24         THE COURT:  Well, according to your adversary, he

25   violated the laws of New Hampshire and Connecticut if he did

G7ELMEY2

1     so, regardless of intent.

2              MR. BOWKER:  I'm not sure that that's right and let me

3     explain why.  In New York, New York law and federal law both

4     allow recording with one party's consent and he was in New York

5     when he recorded those calls.  New Hampshire prohibits

6     recording without all parties consenting except there's a

7     Supreme Court case in New Hampshire saying obviously there

8     would be no liability if someone had a good faith belief that

9     the recording was lawful, which I think was the case here.

10             THE COURT:  And so what you're saying is -- I'm not

11    sure how you get around Connecticut, but you're saying

12    Mr. Santos-Neves, of course, then before recording these

13    conversations, researched or had counsel research the laws that

14    govern his conduct and determined that there was a case here or

15    a loophole there that permitted him to do what he did?  You're

16    not saying that.

17             MR. BOWKER:  No, no, I'm not, your Honor.  He didn't

18    know New Hampshire law or Connecticut law so far as I know.

19    But he did know that New York law and federal law were one

20    party consent jurisdictions.

21             THE COURT:  You told me that Ergo is a high quality

22    outfit, although not till now perhaps a licensed private

23    investigator.  Nevertheless, you have employees, an employee,

24    at least, secretly recording conversations, making false

25    representations with the at least apparent knowledge of

1    superiors; and this is a company that prides itself on its

2    high-level lawful behavior.  Where is the training?  Where is

3    the supervision?  Where is the concern about doing it right?

4    It's one thing for me to put the question to plaintiff's

5    counsel about whether Uber acted with conscious disregard, but

6    I think the question may have more pertinence as to Ergo.

7         MR. BOWKER:  A couple responses.  First, just let me

8    address the recordings issue because there's one important

9    point and that is there's no evidence in the record and, in

10   fact, we don't even know as a matter of fact where these people

11   were located when these calls were recorded.  We know

12   apparently, according to plaintiff's counsel, that at least two

13   of these people had phone numbers consistent with Connecticut

14   and New Hampshire.  But I have a New York phone number; I live

15   in Washington, D.C.  These numbers are portable.

16        THE COURT:  It seems to me that cuts against you.

17   Forgive me.  Maybe I'm misunderstanding.  What you're saying is

18   since we don't know immediately where the persons are that

19   we're talking to on the phone, we can just consciously

20   disregard the laws of other states even if we're in flagrant

21   violation of them because we don't know for sure that someone

22   with a seemingly New Hampshire phone number lives in New

23   Hampshire or someone with a seemingly Connecticut number lives

24   in Connecticut; is that what you're saying?

25        MR. BOWKER:  No, I think that overstates it from our

G7ELMEY2

point of view.  I think our point of view is that this

investigator thought the New York rule applied because he was

making these calls from New York.  He thought with one party's

consent -- his own -- it was enough to record.  He did it not

for any fraudulent or unlawful purpose but rather as a

note-taking measure, in order to check the accuracy of his

notes.

          And I do think it's important -- and this goes to the

quality of the company and the quality of the work product and

the intent -- the report itself speaks volumes.  It's a

factually accurate, overwhelmingly positive report.  It is not

a hatchet job.  It is not the sort of report -- and in fact the

questions asked by Mr. Santos-Neves, and I wish your Honor

could have seen his deposition because a very earnest young

man, the questions that he asked were open-ended questions

designed to get at the truth.

          The only misrepresentation here or the only false

pretense was a false pretense in the written communications to

initiate the conversation where he said I'm looking at several

people or I'm doing a survey of real estate companies or real

estate brokers.  It was not for the purpose of eliciting any

particular information or digging up dirt or doing a hatchet

job.  It was to initiate a conversation, to get over that hump,

and then to have a forthright conversation in which, by the

way, he did say I am Miguel Santos-Neves.  I work for Ergo.

1    I'm doing a research project for a private client and I'd like

2    to speak with you if you'll speak with me.  And I think at that

3    point in the conversation he says about one or two leading

4    figures.

5            Granted, it's not forthright what he did; but it is

6    also not fraudulent.  And I agree with your Honor entirely that

7    the company could have done more.  And I think the company

8    agrees with your Honor entirely that it could have done more

9    here and should have done more here to do this in a particular

10   way given the context.  This was out of the norm for this

11   company.  This was a special context.  I think Mr. Egeland was

12   a little bit checked out for personal reasons.  But even

13   Mr. Egeland, when he did engage on the report, was focused on,

14   Miguel, what did the sources tell you.  Let's factually

15   represent it.  Yes, he asked about do we have enough

16   derogatories to put in a text box, but not gin up derogatories

17   or get me all the derogatories.  It's just as we present the

18   information, do we have enough to highlight them in a text box.

19   It turns out I think the answer to that was no.  If you look at

20   the key findings page, it's basically all positive.

21           THE COURT:  Let me ask you one other question.  At

22   some point Uber has taken the position that the reason they

23   initiated this investigation was to protect against threats to

24   Mr. Kalanick or other Uber personnel.  There's not even a hint

25   of that in any of the communications that have been presented

G7ELMEY2

1    to me between Uber and Ergo, nor do I see any hint of that in

2    any of the investigation that Ergo undertook.  What it appears

3    to be was to try to find out information of the nature and the

4    character and background of Mr. Meyer and Mr. Kalanick with a

5    focus on derogatory information, but not, as you say, in a way

6    that led to false information being reported, but nevertheless

7    looking for the skeletons in the closet but not finding them.

8    But never do I see even the slightest hint that it was

9    motivated by what Uber represents was the motivation.

10             Do you have any contrary information?

11             MR. BOWKER:  I don't have good information on what

12   exactly was motivating Uber.  But, and I can also tell you that

13   from Mr. Egeland's perspective -- and Mr. Egeland was the key

14   point of contact for Uber -- that he had some confusion about

15   what this research was supposed to be about, what this

16   investigation was supposed to be about.

17             THE COURT:  Well, he said in the proposal that was

18   presented and approved by Uber that Ergo would prepare a

19   written report that "highlights all derogatories."  He doesn't

20   say anything in that proposal about and we'll see if there's

21   any threat, which seems even on its face so unlikely that

22   someone who wants to do harm to Mr. Kalanick starts out by

23   filing a public lawsuit.  I mean that seems so absurd on its

24   face, although I want to hear from Uber on it.  But all my

25   question to you is, is there even a hint of that that was known

G7ELMEY2

1    to Ergo?

2              MR. BOWKER:  Well, here's how Mr. Egeland explained it

3    and that is he thought that Uber wanted to know who this person

4    was, why they were suing.  He wasn't exactly sure what the

5    motivations were beyond that.  But I will say in Uber's defense

6    that to understand why someone is suing is certainly related to

7    the issue of security and safety for the CEO.  It's possible

8    that Mr. Henley decided that, well, in the outline that

9    Mr. Egeland has produced to me, they will capture what I'm

10   concerned about and so I don't need to worry about giving them

11   further --

12             THE COURT:  My understanding may be wrong about this

13   that Uber is a frequent plaintiff itself.  So I guess that's

14   just a cover or I should suspect because they bring lots of

15   lawsuits that they're out to do physical harm to the people

16   they're suing?  That's absurd.

17             MR. BOWKER:  Well, I think Uber does realistically

18   face threats that a lot of companies don't face.

19             THE COURT:  That's a different question.  The question

20   was, was this investigation in any way, shape, or form

21   motivated by that.  And my only question to you is, is there

22   anything, because I haven't seen one stitch of suggestion in

23   the Ergo materials that they thought that that's what they were

24   being asked to do.

25             MR. BOWKER:  There's no communication I've seen from

G7ELMEY2

Uber to Ergo conveying that this was the focus.  But one
additional fact which is important and Mr. Egeland highlighted
this in my discussions with him and that is it was coming from
the security office and he made the point that, look, as a
former intelligence officer, I get something from a security
office, I assume there's some security component of what I'm
being asked to do.  So there is that.

        But your Honor is correct that there was no explicit
instruction to focus on that.  I do --

        THE COURT:  Did Mr. Santos-Neves put questions to any
of the 28 people he interviewed along the lines of have you
ever heard of any Mr. Meyer committing any assault, or
Mr. Schmidt, the intimidating lawyer for Mr. Meyer, have you
ever heard of him engaging in beating up the people he sued or
anything remotely like that?  I didn't see anything like that.

        MR. BOWKER:  His questions were open ended and not
directed at eliciting any particular answers or any particular
derogatories.  I think that actually cuts in favor of Ergo
which is to say they were not dirt digging here.  They were
fact finding.

        Now, yes, firms like Ergo are used to highlighting
derogatories because usually that is the information that is
difficult to uncover and it's usually information that makes a
difference for the client and so that's a realistic part of the
assignment.

G7ELMEY2

1              THE COURT:  I agree with you.  The common sense of it

2    is, subject to hearing from Uber, that they wanted to dig up

3    whatever dirt they could.  And I completely agree with you that

4    there's every indication that though improper means were used,

5    there was no attempt by Ergo to falsify information or to slant

6    it in a way that was unfair or anything like that.  So what a

7    disappointment it must have been to Uber when they found out

8    that Mr. Meyer and Mr. Schmidt were pretty good guys.

9              MR. BOWKER:  I'm not sure that's a fair

10   characterization of it, your Honor.  The documents suggest that

11   Uber was trying to find out who is this person and the report

12   certainly gives them who is this person and it even guesses at

13   why this person might be suing.  So I think they got the

14   product that they expected.

15             THE COURT:  Fair enough.  Anything further you wanted

16   to say?

17             MR. BOWKER:  There are a couple really important

18   points for Ergo and one is your Honor just made reference to

19   improper means and Ergo's position is different on this which

20   is we weren't aware of any special duties that would have

21   applied to us as a result of working at the direction of

22   counsel in a litigation context.  We weren't thinking of what

23   Uber's duties may have been.  We were doing a standard sort of

24   due diligence work.  Now, usually it's in a different context

25   overseas, but they went about it doing work that they thought

1    was appropriate and lawful.

2              There is and I think your Honor pointed this out

3    before I got involved at the May 20 hearing that there's

4    nothing per se unlawful about the use of false pretenses in the

5    course of investigation.  And we've cited Southern District --

6              THE COURT:  I don't agree with that, but that's an

7    argument we can get into later.  There are cases going both

8    ways.  That I will agree with you and that's about all I agree

9    with you.  I think there is a good argument for saying that

10   when a lawyer hires a nonlawyer to conduct an investigation,

11   the nonlawyer cannot engage in activity that the lawyer is

12   prohibited under the ethical rules from engaging in.  And I

13   think there's a strong argument that a lawyer could not engage

14   in the activity that was here in the case.

15             MR. BOWKER:  I see what your Honor is saying and I

16   tried to make the slightly different point which is that

17   there's nothing per se unlawful about these the use of these

18   false pretenses or misrepresentations.  I agree with your Honor

19   that the question is a much harder and closer question when

20   someone is working at the direction of counsel and counsel has

21   certain duties.  But it is very important for your Honor to

22   understand that Ergo was not aware of those duties, was not

23   thinking of those duties when it did this work.  Had it known

24   of these duties, it would have done things very differently.  I

25   can assure you of that.

G7ELMEY2

1            The other really important thing here is that Ergo did

2   not intend to do and did not do anything to improperly impact

3   this litigation.  Ergo did not talk to any party.  Ergo did not

4   talk to any witness.  Ergo did not talk to any recipient of a

5   subpoena.  Ergo never sought to interfere with anything that

6   goes on in this very sanctified place and that's very important

7   for Ergo.  Ergo does not want your Honor to think it tried in

8   any way to undermine the litigation process.

9            And when we go back and look at the case law where

10  courts have imposed sanctions on nonparties, we've only found

11  examples where nonparties have either violated a court order,

12  which is not the case here, or committed a fraud on a court and

13  that is directly involved themselves in litigation and done

14  something improper with respect to this process.  Ergo would

15  never do that, did never do that, and I think under the

16  circumstances the partial relief of an injunction that no more

17  investigations like this in this case is acceptable to Ergo,

18  but anything beyond that would be unfairly punitive and I think

19  would exceed the authority.

20            THE COURT:  You raise a point that I should have put

21  to plaintiff's counsel but I will so now.  As near as I can

22  tell, the only request that was made with respect to Ergo in

23  the relief sought was to enjoin Ergo from undertaking any

24  further background investigations of individuals or counsel

25  involved in this litigation, which I take it you consent to.

G7ELMEY2

 1   That's the only relief I saw apropos Ergo.  Now, there was some

 2   uncertainty whether the monetary sanctions were being sought

 3   against anyone other than the defendants, but let me make sure

 4   one way or the other what plaintiff's counsel is seeking in

 5   that regard.

 6         MR. BRIODY:  Your Honor, John Briody for plaintiff.

 7   Our specific request with respect to the monetary sanction is

 8   as to the defendants based on the Ergo discovery related

 9   issues.  That was included, your Honor, to the extent that the

10   Court found that some other sanction should be shared by Ergo

11   to point out that the Court has authority to do so.

12         THE COURT:  My own view, subject to I'm not going to

13   make any final decision today, my at least tentative view is

14   that the only relief against Ergo that would be appropriate is

15   the relief they're consenting to and that the monetary

16   sanctions, if they are to be imposed at all, would have to be

17   imposed against the defendants, not against the third party.

18   So that should at least tentatively put your mind to rest.

19         MR. BOWKER:  Your Honor, I think that's right.  That's

20   consistent with our reading of the law in the Southern

21   District.  We did find a case, the *Jung v. Neschis* case, which

22   is 2009 WL 762835.  That was one of the cases we found where

23   the court had reached to a nonparty to impose a sanction.  But

24   there the court made very clear the only reason it could do so

25   is because the nonparty in that case had behaved as a party,

G7ELMEY2

1    had controlled the plaintiff in that case, and had committed an

2    outright fraud on the court.  And if your Honor were to read

3    that decision you would see it is not one fraud; it's probably

4    five frauds and it's really egregious.

5            THE COURT:  In any event, I don't have to reach the

6    question of what my power is in that regard.  I just think on

7    the facts as they have emerged in this case the appropriate

8    relief for Ergo at this juncture is likely just the relief that

9    you consented to.  I don't mean to suggest in any way that the

10   Court is not bothered and baffled by what happened at Ergo.

11   But being by nature an optimist, I am hopeful that it will

12   never happen again.

13           MR. BOWKER:  Your Honor, I can assure you that it will

14   never happen again at Ergo, and I can assure you that Ergo has

15   learned something about its compliance needs here.  I want to

16   stress again that this was an unusual context, that this is a

17   good company that intended no harm to anyone, plaintiff or

18   otherwise, and certainly did nothing to thwart the process in

19   your Honor's courtroom.  And with that, unless your Honor has

20   additional questions, I'll take a seat.

21           THE COURT:  Very good.  Thank you very much.

22           Let me hear now from counsel for Ergo.

23           MR. BRODSKY:  Do you mean Uber, your Honor?

24           THE COURT:  Uber, I'm sorry.

25           MR. BRODSKY:  Your Honor, would you like me to go to

G7ELMEY2

the podium?

          THE COURT:  Why don't you go to the podium.

          MR. BRODSKY:  Your Honor, I'd like to address the

No. 1 question, your Honor, that I think is most relevant and

then I'll address another issue your Honor brought up which is

is there any evidence whatsoever that Uber knew or willfully

blinded themselves to the use of false pretenses by an Ergo

investigator who was reporting to Mr. Egeland who was then

talking to Ergo supervisors and communicating with security at

Uber and the answer is absolutely no.

          THE COURT:  Let me play devil's advocate and this is

not necessarily the views of the Court at all, but just to

frame the issue.  So first we have Uber saying that the reason

it undertook this investigation was because of common personal

threats to Mr. Kalanick and others that they were concerned

about.  I want to hear you on that, but just to put the

context.  The argument can be made that that is a pretense,

that all the evidence suggests that the reason for this was to

try to dig up dirt about plaintiff and plaintiff's counsel and

that the documentary record does not remotely support that.  So

that's No. 1.

          No. 2, we have the counsel for Mr. Kalanick, obviously

in communication with Uber, initially denied that Uber or

Kalanick have anything to do with this investigation going on,

a representation that was not corrected for many weeks.

G7ELMEY2

1           MR. BRODSKY:  Correct, your Honor.

2           THE COURT:  One could draw a negative inferences if

3     one wished from that.  And then we have what I think could

4     fairly be characterized as a total failure to supervise what

5     was going on at Ergo.  No ground rules laid out in advance.  No

6     inquiry into what methodology was being used.  None of what was

7     done until plaintiff's counsel finally had enough to come to

8     court and inquiries began to be made.

9           So the argument would be made -- I can imagine a

10    prosecutor for the Southern District of New York making the

11    argument -- that with all those combination of circumstances,

12    one could draw the inference that there was a willful

13    blindless.

14          MR. BRODSKY:  Respectfully, your Honor, a prosecutor

15    would not touch that case.  A prosecutor would look at --

16          THE COURT:  I bow to your expertise.

17          MR. BRODSKY:  -- failure to supervise there, which is

18    a negligence case.

19          Let me address all those points because those are ones

20    we embrace and would like to address.  Most importantly, your

21    Honor, the context is very important.  An individual sued the

22    CEO, uncommon in sort of a lawsuit.  This is not a typical case

23    where you're going to sue the company.  So the general counsel

24    directing this to security is in the security context.  And the

25    history there, your Honor, is that yes --

G7ELMEY2

1              THE COURT:  Even a dumbbell court found not

2      implausible on two minutes inspection that that was being done

3      to arguably avoid the arbitration requirement I'm going to get

4      into in the next motion around midnight at the rate we're

5      going.

6              MR. BRODSKY:  That's hard to know on day one.  That's

7      hard to know on the day the suit was filed.

8              THE COURT:  So let me make sure I understand.  Your

9      argument is someone using their own name and their lawyer using

10     his own name sues the CEO and that must be because secretly

11     they're plotting to do him harm.

12             MR. BRODSKY:  No, your Honor.  But it does, the fact

13     that the general counsel directed it to security to take a

14     careful look or look at this person is not a suggestion of

15     let's dig up dirt on this plaintiff.  It is --

16             THE COURT:  Why isn't it just because security is the

17     people who have knowledge of who to employ by way of, you'll

18     forgive the phrase, private investigators.

19             MR. BRODSKY:  Because the typical case, the typical

20     case if you're in litigation is that Boies Schiller

21     representing Mr. Kalanick, and the firm, which there was no

22     firm at the time representing Uber, or in-house litigation

23     counsel, would engage an investigator -- because on this side I

24     do that -- engage the investigator, provide them with

25     instructions about what you want, and then direct and oversee

G7ELMEY2

1    the investigation.  This did not happen in that way in any

2    sense.

3              More to the point, it goes to security.  Mr. Joe

4    Sullivan, the head of security, refers it to Mr. Henley.

5    Sullivan and Henley come from Facebook.  They were familiar

6    with what happened to Ceglia and Ceglia had made, as your Honor

7    knows, he was prosecuted criminally and has now escaped or in

8    flight from his criminal charges.  Ceglia filed a fraudulent

9    lawsuit against Facebook and the CEO.  Ceglia was a threat.

10   And through that experience they learned that people do come up

11   with fraudulent lawsuits, fraudulent threats, and it was in

12   that mindset that they initiated an investigation.

13             It's relevant because Mr. Henley and Mr. Sullivan were

14   not being overseen by litigators.  And to tie it back, how do

15   you know, what's the corroboration for the fact that this

16   wasn't litigation motivated; it's the fact that the litigator

17   in house at Uber when they got called from Boies about whether

18   or not Ergo was hired by Uber, they said no, this is not us,

19   because they had no idea.

20             THE COURT:  If litigators weren't involved or

21   litigation concerns were not involved, how is it that way back

22   on December 24, 2015, just a week after the lawsuit was filed,

23   Mr. Henley wrote to Mr. Egeland saying can you make sure to

24   keep your work general enough so that the research remains

25   discrete from any discovery perspective.  That sounds like a

G7ELMEY2

1   litigation concern.

2           MR. BRODSKY:  Mr. Henley is not a lawyer.  Mr. Henley

3   is I don't think thinking about the lawsuit.  Mr. Henley got

4   the referral from the general counsel.  The general counsel

5   refers the case to Joe Sullivan, head of security, who refers

6   it to Mr. Henley.  And the fact that Mr. Henley has that in his

7   mind is not a directive.  There's no proof or evidence it's a

8   directive from the lawyers.

9           THE COURT:  If the whole motivation as you're

10  asserting it is because there's concerns about threats, then

11  how are you able to possibly assert work product protection for

12  all the documents in this case?

13          MR. BRODSKY:  Well, the beginning document your Honor

14  waived the privilege for with respect to Ms. Yoo's

15  communication to Mr. Sullivan and the communications between

16  Mr. Sullivan and Mr. Henley to Ergo, your Honor found that

17  there was no --

18          THE COURT:  I know I found there wasn't, but I'm

19  saying what was your basis if your factual belief was and is

20  that the motivation for this entire investigation was concern

21  over threats to Mr. Kalanick or other persons at Uber, then I

22  don't see what the basis was for asserting work product

23  protection.

24          MR. BRODSKY:  Respectfully, your Honor, if a general

25  counsel initiates an investigation with security in mind in

G7ELMEY2

anticipation of potential litigation of a security nature or

otherwise, I think that can be protected.  So if a client hires

us at Gibson Dunn and says we think our CEO is being threatened

by a group of people and we hire investigators to go

investigate those group of people, I think that's protected by

privilege.

THE COURT:  All right.  Back to your other points.

MR. BRODSKY:  Let me go back to the other points, your

Honor.  I think it's important corroboration though that the

litigation side of the house did not know what the security

side of the house was doing with Ergo.  I think it's also

important, your Honor, to note the following.  Your Honor also

asked about, you know, the documentary evidence with respect to

the supervision of Ergo.  If we look at it, their main argument

is not that -- they use the words willful blindness, but as

your Honor defined it, it's failure to supervise.  The language

they use, the evidence they use about what Uber should have

done to figure out whether or not this was happening at Ergo is

all failure to supervise.

But taking a step back, your Honor.  It was perfectly

permissible for Uber security folks to think that they could

learn about the nature, background, and character of Mr. Meyer

to determine security.

THE COURT:  What did they have, even under your

theory, even the remote basis for believing, Uber or anyone

G7ELMEY2

1    else, that the attorney, Mr. Schmidt, was a security threat?

2              MR. BRODSKY:  I'm glad you brought that up.  You don't

3    see an email from Uber and Uber security to Ergo saying we want

4    to look into the attorney.  The proposal that came back from

5    Ergo to draw some connection between the lawyer and the

6    plaintiff was Ergo's proposal, and Mr. Henley's testimony was

7    he didn't focus on it.

8              THE COURT:  I must say I hear what you're saying and

9    anything is possible, but I've never seen so many high level

10   people at both Ergo and Uber being so unfocused.

11             MR. BRODSKY:  That's fair, your Honor.  That's fair.

12   If you do look at what they did focus on, they did focus on the

13   fact that in -- they hired Ergo relatively recently.  There was

14   no history of believing or knowing that Ergo had done anything

15   inappropriate.  In fact, Ergo has a terrific reputation in the

16   industry.  Their executives there, Mr. Egeland and others,

17   there are many former government people, former CIA.  They have

18   a pristine reputation.  Mr. Bowker didn't want to say it but

19   it's true.  They have a pristine reputation.  They're hired by

20   many law firms across the country to conduct many different

21   types of investigations.  And prior to this one Ergo

22   investigator recording conversations and using false pretenses,

23   there was no known knowledge, privately or publicly, that there

24   was any issue at Ergo.

25             Second, if you look at the master services agreement

G7ELMEY2

that Uber engaged with Ergo, it's far superior than any other.
I would ask the plaintiffs to come up with any other master
services agreement with an investigator that meets that
standard.  Why?  It didn't just say comply with the law.  It
said we want you to comply with all laws.  Not only that, we
want you to use best practices.  And we quoted it, your Honor,
and there was no response from our colleagues, from the
plaintiffs.  But they asked them to use absolute best
practices, which went beyond the law.  And I think that's
important to note because they were doing something that when
they hire investigators, they said we want you to go beyond
that.

          Here's the quote.  They wanted the consultant and its
employees are skilled, experienced, and fully qualified to
perform and deliver the services consistent with the highest
standards of consultant's profession, business, or industry.
That goes beyond comply with the law.

          And then third --

          THE COURT:  No, but of course as we all know, that
certainly wasn't the way they conducted this investigation.  So
the question is in part is it sufficient for Uber to simply
rely on that boilerplate or do they have some obligation to
monitor what's going on.

          (Continued on next page)

G7E9MEY3

1          MR. BRODSKY:  Well they have an obligation that if a

2     red flag comes up, and for willful blindness if you're talking

3     about a criminal prosecutor's perspective, and if you're

4     talking about the standard from the Supreme Court, we're

5     talking about a hurricane of red flags.  That's the analogy

6     that federal prosecutors use in willful blindness cases in

7     front of juries where they say there's a hurricane around the

8     defendant and they ignored it around them.  Let's just take one

9     or two red flags.

10          THE COURT:  I hear what you're saying although I'm

11     having trouble with the mixed metaphor of a hurricane of red

12     flags, but go ahead.

13          MR. BRODSKY:  But the -- there were no red flags here.

14     There were no red flags coming back to Uber that they were

15     using false pretenses or that they were using -- they were

16     recording the conversations.  And they don't point to any.

17     What they said was you should have monitored it better.  You

18     should have overseen it.  You should have instructed them as to

19     the methodology.

20          And their answer to what's the evidence of willful

21     blindness is really a question:  What did they think?  How did

22     they think they were going to get under the radar --

23     information about Mr. Meyer under the radar?

24          THE COURT:  What about -- this really gets to the --

25     they would argue among other things that a red flag was the

G7E9MEY3

1    inquiry from plaintiff's counsel which was met with an

2    inaccurate denial.

3          MR. BRODSKY:  And the miscommunication, no doubt a

4    miscommunication coming from in-house litigators at Uber, is a

5    reflection that neither Uber's lawyers or Boies, or

6    Mr. Kalanick's lawyers were aware of the Ergo investigation

7    and, therefore, this investigation wasn't about this

8    litigation.

9          And when the miscommunication came through and the

10   plaintiff's lawyers then contacted Boies again.  Boies then

11   contacted the litigators, the in-house litigators at Uber, and

12   they found out, they shut it down.  Well, the investigation was

13   already -- had already ceased.  The report had been done at

14   some point.  But they immediately reacted and shut it down.

15         Your Honor has -- I obviously don't want to waive

16   privilege and I think Mr. Clark's communications and other

17   people's communications at Uber internally about their

18   communications relating to this issue are all privileged.  But

19   those -- you've already seen those.  And there is no basis to

20   waive the privilege.

21         But the answer is that is evidence that the

22   investigation or inquiry was not related to the litigation.

23   And as soon as the lawyers learned that it was Ergo, they shut

24   it down and they were not happy with the use of false

25   pretenses, to put it lightly.

1          THE COURT:  So when the inquiry is made from

2    plaintiff's counsel to Mr. Skinner, I believe.  What steps did

3    Mr. Skinner take to ascertain whether or not this was an

4    Uber-generated investigation?

5          MR. BRODSKY:  Thankfully, Mr. Skinner is here.

6          THE COURT:  I'm a little troubled if he's here as a

7    witness that's fine.  If he's here purporting to act as a

8    lawyer I think he is in a potential conflict situation.

9          MR. BRODSKY:  Fair enough.  I'm not representing

10   Mr. Skinner but I can tell you Mr. Skinner, from what I have

11   seen in the record, and I don't think plaintiff's counsel

12   dispute this, the record shows that Mr. Skinner had no

13   knowledge of Ergo's involvement, clearly.  He called, did the

14   right thing and he called in-house counsel at Uber.  In-house

15   counsel at Uber did not know about the Ergo investigation and

16   reported that back to Boies.

17         THE COURT:  Why did in-house -- what is this -- first

18   of all, how many, I guess I should ask.  How many people are we

19   talking about in the location where the general counsel and the

20   head of security are?

21         MR. BRODSKY:  I don't know the answer.  I can find out

22   very quickly.

23         THE COURT:  Are they blocks away, or their office is

24   right next door to each other?

25         MR. BRODSKY:  Also don't know the answer.  Never been

G7E9MEY3

1   there.  Never had the privilege of going to the offices.

2              THE COURT:  And so you would have thought that an

3   inquiry might be made company-wide or at least office-wide and

4   not just asking the litigators about it.

5              But anyway go ahead.

6              MR. BRODSKY:  If you look back, do the litigators wish

7   they had done a broad inquiry and gone to security?

8              THE COURT:  Doesn't sound like -- at least, I'm

9   questioning how broad it would have to be.

10             MR. BRODSKY:  Do they wish they had gone to security

11  immediately and asked them?  Absolutely.  And the

12  miscommunication --

13             THE COURT:  They must have known, from what you've

14  told me earlier, that there had been from time to time threats

15  that sometimes had led to investigations.  I mean they're not

16  that blind, are they?

17             MR. BRODSKY:  They certainly aren't blind to the fact

18  that the CEO has had threats and executives have had threats

19  and they have led to investigations.

20             THE COURT:  Anyway, go ahead.

21             MR. BRODSKY:  They look back and of course they wish

22  they had contacted security.  Eventually it does happen.  And

23  eventually it gets shut down.  And bad faith, with all due

24  respect to the plaintiff's request, it requires, one,

25  evidence -- a failure to supervise is not bad faith.  There's

G7E9MEY3

1   argument here there wasn't a failure to supervise because to

2   supervise they have a master services agreement saying comply

3   with the law, use the best standards, use good training and

4   make an inquiry.  You're going to contact primary sources.

5   There is no sense or any suggestion that they knew or should

6   have known that there would be false pretenses used.

7          Your Honor, I think, put a good point on it.  If Ergo

8   senior executives did not know what the Ergo investigator was

9   doing -- for example, with respect to recordings -- then what

10  the plaintiffs are suggesting is that Uber was willfully blind

11  to individuals at Ergo who were willfully blind to what an

12  investigator was doing.  And, respectfully, that is not a case

13  of bad faith to say that Uber was willfully blind to somebody

14  else being willfully blind.

15         The bottomline, your Honor, is an investigation under

16  the radar could have been done by -- lawfully by saying -- by

17  this Ergo investigator by telling others:  I work for Ergo; I

18  have a private client; and I have questions about Mr. Meyer.

19  That would have elicited responses.  And that's how it could

20  have been done under the radar lawfully as opposed to:  I don't

21  want you to blast this out on the internet; I don't want you to

22  send out a survey; I don't want you to make personal calls; I

23  don't want you to do other things.

24         And finally, your Honor, I do think it's important to

25  go back to, unless your Honor has other questions, there is a

G7E9MEY3

1   sense that the plaintiffs have suggested that Uber was looking

2   for derogatory information about Mr. Meyer.  And I know there's

3   some -- that statement was used by an Ergo investigator, by

4   Mr. Egeland.  And on page 84 and 83 of Mr. Henley's testimony

5   he says he doesn't even think he noticed that detail about

6   derogatory information.

7          And there is no other suggestion in the record, other

8   than internal Ergo communications about derogatory information,

9   there is no other suggestion in the record that Uber was

10  looking for derogatory information which I think, to circle

11  back to where we started, is further evidence that this was not

12  motivated for a litigation purpose.  They were not motivated to

13  go after, find out negative information about Mr. Meyer.

14          THE COURT:  All right.  Thank you very much.

15          MR. BRODSKY:  Thank you, your Honor.

16          THE COURT:  Let me hear, before we hear finally from

17  plaintiff's counsel, from counsel for Mr. Kalanick.

18          MR. SKINNER:  Your Honor, Peter Skinner on behalf of

19  Travis Kalanick.

20          THE COURT:  I am troubled, Mr. Skinner -- I have the

21  highest respect for you and your firm -- but I am troubled that

22  you are a fact witness in this particular situation and yet

23  you're also acting as counsel which is not usually a

24  permissible situation.

25          MR. SKINNER:  Your Honor, I wanted to address that

1    head off.  The first thing I was going to say is I don't plan

2    to say much right now because I think most of this is with

3    respect to Ergo's actions and what happened internally at Uber

4    and, of course, I represent Mr. Kalanick.

5           As the Court notes and noted initially, my name comes

6    up in all of this because I made certain communications to

7    Mr. Feldman, the plaintiff's counsel.  They haven't asked to

8    depose me.  They haven't asked to gather any facts from me.  We

9    have the record that we have.  If they were to seek to reopen

10   it and turn me into a witness, then I think we can cross that

11   bridge if and when we got there, if there's anything on

12   privilege.

13          THE COURT:  Well it seems to me the argument that

14   Uber's counsel has just made was in part that there were no red

15   flags flying and therefore, while Uber may not have been as

16   focused and while its inquiries may not have been as broadly

17   based as with hindsight might have been ideal, there was

18   nothing that warranted an inference of sanctionable misconduct.

19   And this naturally led to the Court's saying well wasn't one of

20   the red flags flying your denial that Uber and Mr. Kalanick had

21   anything to do with this investigation which was not corrected

22   for a period of some weeks.

23          I think I need to ask -- if you feel that today you

24   can't answer this without consulting with counsel, I will

25   accept that -- but I think I need to ask exactly what steps you

G7E9MEY3

1    took when you got the original inquiry.

2              MR. SKINNER:  Placed a phonecall to Uber general

3    counsel's office to ask whether there was anything to --

4              THE COURT:  So, it was you?

5              MR. SKINNER:  Me, yes, your Honor.

6              THE COURT:  The call was from you to whom?

7              MR. SKINNER:  It was from me to Martin White, who is

8    an attorney within the general counsel's office.

9              I honestly don't remember the scope of the

10   conversation.  I don't want to reveal privileged information.

11   I'm trying to walk a line where I'm an officer of the court

12   answering a question from the court.

13             THE COURT:  That's why I say if you don't want to

14   answer at this point you don't have to.  If you feel

15   comfortable in sharing whatever you feel comfortable in

16   sharing, that's fine too.

17             MR. SKINNER:  Look, and that's what was done.

18             THE COURT:  Just so I have it clear.  And I'm going to

19   state that this part of the inquiry will not of itself be taken

20   to waive any privilege known to mankind.

21             What you did initially was to put in a call to

22   Mr. White and ask him to find out.  Is that a fair statement?

23             MR. SKINNER:  Yes, your Honor.

24             THE COURT:  And he came back and said it's not us?

25             MR. SKINNER:  Yes.

1          THE COURT:  All right.  And what prompted your

2     correcting that a few weeks later?

3          MR. SKINNER:  Mr. Feldman called me again and he said

4     we want to serve subpoenas on Ergo but we have a discovery stay

5     in place and we want your consent to, with the discovery stay,

6     so that we can serve these subpoenas.  We want to know why Ergo

7     was involved in the investigation they were involved in.

8          As we all know, Ergo identified themselves as the

9     party who was conducting the investigation.  And they were able

10    to figure out who they were.  I think we may have even sent

11    them a link to the website.  I honestly don't remember.

12          But, in any event, I said I don't know if that's

13    right.  And this is the conversation between me and

14    Mr. Feldman.  I said we've already told you it's not us.  I

15    don't know if the discovery mechanism in this case is the right

16    way to gather the information you're trying to gather.  Maybe

17    you should just pick up the phone and call Ergo and see what

18    they say, something to that effect.

19          Mr. Feldman can correct me if he has a different

20    recollection.  But I think I said something to the effect, I

21    don't know if we're going to be able to consent to lift the

22    discovery stay to serve these subpoenas that you want to serve.

23    To my mind, you've asked.  The question has been answered.  And

24    this doesn't have anything to do with the litigation.

25          And he said okay.  I may be going to the judge in

1      order to ask for the relief anyway.  If it's over your

2      objection, it's over your objection.

3                So of course at that point I got back in touch with

4      general counsel's office.

5                THE COURT:  Again Mr. White?

6                MR. SKINNER:  I believe it was Mr. White, yes.

7                To say plaintiff may be seeking relief from the court.

8      I don't know what our position is ultimately going to be but

9      they may be seeking relief from the court.  And we need to

10     figure out what our position is going to be if they make that

11     application.

12               And I also said -- and you better check again, you

13     know, because if these subpoenas are served and it comes out

14     that you were wrong, that's not going to be good.  So let's

15     check again now and let's, you know, triple check this thing.

16     I know you checked before.  Check again.

17               And that's when -- and I think ten days then elapsed

18     actually.  I could be wrong.  But there was a period of time

19     that elapsed.  Until I received a phonecall late on a Friday

20     from another lawyer.

21               THE COURT:  Who was that?

22               MR. SKINNER:  Lindsey Haswell telling me we made a

23     mistake.

24               That's when I called Mr. Feldman that same night.

25               THE COURT:  Let me interrupt one other thing.  By any

G7E9MEY3

1    unlikely chance is Mr. White or who is the other person?

2              MR. SKINNER:  Ms. Haswell.

3              THE COURT:  Are either of them here in the courtroom?

4              MR. SKINNER:  Mr. White is here.

5              THE COURT:  So Mr. White why don't you come on up.

6    I'll just interrupt Mr. Skinner to talk to Mr. White and then

7    come right back to you.

8              Mr. White, I know you weren't going to come here

9    believing the court would ask you questions so feel free to say

10   you'd rather wait until you've consulted with counsel or

11   whatever, but if you are comfortable in answering the

12   questions, what it would be useful to the court to know is what

13   you did at the time of the first inquiry from Mr. Skinner and

14   what you did at the time of the second inquiry.

15             MR. WHITE:  Sure, again, with the proviso I assume

16   that anything --

17             THE COURT:  Is not waiver of anything, right.

18             MR. WHITE:  So I can give you a little bit of context.

19   When I got the call from Mr. Skinner I had been at Uber

20   approximately two months.  So I certainly knew that I hadn't

21   initiated the investigation.  And so I inquired to Ms. Haswell

22   whether we had done so.  And she said she will look into it,

23   but she knew that she had not ordered the investigation.  And

24   so she looked into it.  And came back to me and told me that

25   she had found no evidence that it was us.  We checked both

G7E9MEY3

within the litigation department and the employment department,
because I understand Mr. Schmidt is an employment attorney, and
found no evidence that we had ordered the investigation.

         To give you a little bit of context, you had asked
earlier what -- how Uber is organized.  It's a very, very big
office building.  I know that may not mean all that much to you
but security doesn't sit particularly close to litigation.  In
our practice, if anybody was going to order an investigation in
an ongoing case we would have thought it would be the
litigation department.  So we had no knowledge or reason to
believe that it would be anybody other than us.

         THE COURT:  So are you saying you were not aware that
security had ordered other investigations?

         MR. WHITE:  I believe the testimony in the depositions
is that they have never done so in any kind of litigation
situation.  Now there may be other investigations ordered --

         THE COURT:  So this was the only situation where they
thought that there was a threat that warranted an
investigation?

         MR. WHITE:  I don't believe -- Mr. Kalanick may have
been sued along with the company in a number of other cases but
never in an individual capacity is my understanding.  So that's
my best understanding of it.  I don't know to a positive
certainty but that is my best understanding.

         THE COURT:  Did you understand that -- did you have an

49

1    understanding one way or the other as to whether security had

2    undertaken investigations in a nonlitigation context?

3              MR. WHITE:  Honestly I mean at that point two months

4    into my work at Uber, no, I had no knowledge that we even had a

5    security department.

6              THE COURT:  And just out of curiosity so where is --

7    where are your offices located?

8              MR. WHITE:  In San Francisco near the civic center.

9              THE COURT:  And how many employees are we talking

10   about in security?

11             MR. WHITE:  I couldn't even venture to guess.

12             THE COURT:  Are they on the same floor as you?

13             MR. WHITE:  No, in fact, they're in a different

14   building actually than us.

15             THE COURT:  So go ahead.

16             MR. WHITE:  So at that point I had asked Ms. Haswell.

17   Ms. Haswell conducted her own investigation, got back to me and

18   said whoever it was, this wasn't us.  Then I advised

19   Mr. Skinner of that.  And my understanding is Mr. Skinner

20   advised plaintiff's counsel of that.

21             Then the next inquiry came I believe sometime in

22   January.  I was about to get on a plane.  I got a call from

23   Mr. Skinner.  I immediately -- I mean honestly, your Honor, you

24   have many of these communications in your possession so you can

25   confirm this.  I then texted Ms. Haswell basically what

G7E9MEY3

1    Mr. Skinner had asked.  And maybe this was in February, not

2    January.  I'll correct myself.  And that night I learned for

3    the first time it was -- it, in fact, had been ordered by the

4    security group and I was astonished.

5                THE COURT:  Just so I'm clear what is Ms. Haswell's

6    position?

7                MR. WHITE:  She is the director of litigation at Uber.

8                MR. BRODSKY:  Your Honor, Ms. Haswell would normally

9    probably be attending this.  She has just given birth recently

10   so she is not here for that reason.

11               THE COURT:  Sounds like a weak excuse to me.

12               Okay.  One last question.  Did you or to your

13   knowledge Ms. Haswell consult with Ms. Yoo?

14               MR. WHITE:  I know I did not.  I don't know whether

15   Lindsey did or not at the time.

16               THE COURT:  All right.  Thank you very much.  Let's go

17   back to Mr. Skinner.

18               Now in your capacity as the lawyer anything you wanted

19   to add to the legal argument we've had earlier today.

20               MR. SKINNER:  Sure, your Honor.  Look, I think that I

21   will try to toe the line and keep it in my capacity as a lawyer

22   in responding to the court's questions, obviously an officer of

23   the court, to tell you what I know.

24               We really do not have much to add.  We represent

25   Travis Kalanick.  I think that the evidence is undisputed in

G7E9MEY3

1    this case that Mr. Kalanick was not aware of this investigation

2    in any way.  And there is no evidence that suggests that he

3    participated in any of this in any way or even saw the report

4    or has ever had any communication relating to Ergo or the

5    report that was derived from the depositions.  The Uber

6    witnesses consistently testified that they had no knowledge

7    Mr. Kalanick knew anything about this.  They haven't identified

8    any documents indicating that Mr. Kalanick knew anything about

9    this.  And I think that my client, the CEO of Uber, is divorced

10   and removed from this whole process.  And I think that there is

11   simply no evidence in the record that would support any

12   indication of willful blindness on behalf of my client or that

13   my client was acting in any way in bad faith.

14          THE COURT:  Let me hear finally from plaintiff's

15   counsel.

16          Thank you.

17          MR. SKINNER:  Thank you, Judge.

18          MR. BRIODY:  Thank you, your Honor.

19          I'm going to start by responding to certain of the

20   comments made by Uber's counsel.  And one of the last things he

21   said that I thought was interesting is he talked about how, I

22   think for the second time, Mr. Henley, the individual who was

23   tasked albeit indirectly by Uber's general counsel with

24   conducting this investigation, he didn't notice the detail

25   about the derogatories; therefore, Uber had no interest in

G7E9MEY3

1    derogatory information at all.

2              There was another point before, the statement of where

3    it talks about going into the relationship between Mr. Schmidt

4    and Mr. Meyer.  Again, Mr. Henley.  He wasn't really looking at

5    that.  Red flags right there.

6              This is what the investigation is going to be.  This

7    is how it's going to be carried out.  Mr. Henley wrote back.

8    Sounds good.

9              That's not the only directive he gave to Ergo in

10   connection with this investigation.

11             And your Honor pointed out several statements made by

12   Uber to Ergo when this investigation was tasked out.  Keep it

13   very under the radar; make sure you talk about this -- and I'm

14   paraphrasing here -- in a way that no one is going to find out

15   about it.  Willful blindness.

16             What happens?

17             By the way, I think the standard -- we've talked a lot

18   about willful blindness.  I think there's willful blindness

19   here.  I think under the standard under *Chambers* sanctionable

20   conduct includes wanton conduct, which includes reckless

21   disregard.  I think we've proven that.

22             Let's take a look at what exactly is happening here.

23   Ms. Yoo sets the investigation in motion.  Uber refused to have

24   her testify.  The security purpose, which your Honor points

25   out, on its face untenable, inexplicable, a well pleaded

G7E9MEY3

complaint.  She won't testify about it.  The only person who

comments about it is the person who receives the directive to

undertake it.  And never communicates it to anyone else.

And the documents here speak for themselves.  They

show that the investigation that was conducted, I'd submit to

you the only evidence that's here, is what was approved.  And I

don't think when you sign off on a boilerplate MSA, no matter

what's in there, it lets you turn a blind eye to the

investigation that you wrote and said "sounded good."  That's

Uber.

And it was referenced before in connection with

Mr. Bowker's argument, the notion of you can delegate it down

until I guess no one has to care about it anymore.  If an

attorney who commissions an investigation in connection with a

lawsuit to nonlawyers, that doesn't allow you to ignore the

litigation.  Moreover, one of the most critical things that

doesn't add up, and your Honor touched upon it:  How are you

asserting privilege and work product over all of this?  How are

you instructing Ergo, apparently, to say work product over an

e-mail from an investigator to a nonparty as part of the

investigation; yet, at the same time claim that no one had any

idea that this had anything to do with the case?

I think the record has been shown, based on that,

based on the conduct that happens after, who is behind this.

The first response from the perspective of the plaintiff, we're

G7E9MEY3

 1   being told:  It's not us; not involved.  A month later:  It's

 2   us.  Okay.  Well tell us about it.  What's the response?  No.

 3   You've got to promise you're not going to use it in connection

 4   with the litigation.

 5          Those decisions -- and that's where, by the way,

 6   Mr. Kalanick comes in because he's the one who is writing

 7   letters to us saying I'm not going to tell you about the

 8   investigation unless you agree to X and Y and Z.  And at that

 9   time the pathway to discovery from the plaintiff's perspective,

10   given the nature of the investigation that was uncovered,

11   should be smooth and easy; not riddled with conditions.  But it

12   was.  Every step of the way.

13          Then, later on, May 18 here is the list of everybody

14   who Ergo reached out to.  That list was double the number.

15   Double the number of people that were actually contacted.  I'm

16   not speaking right --

17          THE COURT:  Other way.

18          MR. BRIODY:  Eleven people were on that list or so.

19   The list of actual contacted was 28.

20          Two days later an order from this court.  Tell us who

21   was involved in commissioning the investigation.

22          Mr. Clark.  I took Mr. Clark's deposition.  Did you

23   have anything to do with this?  Nothing.  Didn't know anything

24   about it until I got the report.

25          These are facts which just don't add up, your Honor.

1          When you put that in the context of the relief we are

2    seeking, what is it we are seeking and what is it they are

3    fighting?

4          An order that they can't use to report.  I don't think

5    they're fighting that.  They're deviling on language about

6    whether they can go into Spencer Meyer's background after

7    they've done all of this?  Your Honor, that's the only

8    appropriate result.

9          THE COURT:  Let me interrupt you for a second, just to

10   make sure I know what Uber is and is not contesting in that

11   regard, just as we did with Ergo before.

12         So, plaintiff seeks, first, an order prohibiting

13   defendants from using any of the information obtained through

14   Ergo's investigation in any manner including by presenting

15   arguments or seeking discovery concerning such information.

16         So, is Uber agreeing to that?  Yes or no?

17         MR. BRODSKY:  Your Honor, I know you want a yes or no.

18         THE COURT:  Are you agreeing to it in part?

19         MR. BRODSKY:  The issue is you're essentially asking

20   us if we agree to an order.  To issue that order -- here's my

21   issue with it -- to issue that order, underneath it suggests

22   that Uber did something in bad faith.

23         THE COURT:  I've even heard of consent decrees where

24   people neither admit or deny.

25         Independent of any concession of wrongdoing, are you

1    as a matter of prudence or tactics or anything else agreeable

2    to an order prohibiting you from using any of the information

3    obtained from Ergo's investigation?

4              MR. BRODSKY:  Yes.

5              THE COURT:  Okay.

6              MR. BRODSKY:  May I say, your Honor.  It's glowing

7    information.  I'm not sure why they want that order.  But we

8    certainly accept that.

9              THE COURT:  Okay.  The second thing they want is an

10   order enjoining the defendants and Ergo from undertaking any

11   further personal background investigations of the individuals

12   or counsel involved in the case.

13             Ergo's already agreed to that for their part.  What

14   about Uber?

15             MR. BRODSKY:  So long as it doesn't disallow us, if we

16   get to this stage, your Honor, which maybe after today's

17   arguments we won't, but if we get to the stage where we're

18   asking whether or not, for example, Mr. Meyer is an appropriate

19   class representative, we should be able to ask the necessary

20   questions in the course of litigation.  If they're looking for

21   an order that precludes us from litigating the merits of this

22   case, any part of the merits, we would have an issue with that.

23             THE COURT:  So I think it's a question -- you, as I

24   read what you're saying or hear what you're saying, you have a

25   general agreement to that subject to the limitations that would

G7E9MEY3

1    inevitably occur from the very nature of the litigation.

2         MR. BRODSKY:  Correct.

3         THE COURT:  Okay.

4         The third request is for monetary sanctions.  I have a

5    feeling you're not agreeing to that.  And I think the rest is

6    for any other relief the Court deems just and proper.

7         So let me ask Mr. Skinner.  From Mr. Kalanick's

8    standpoint, are you in the same position as Uber in regard to

9    what was just stated on the record by Uber's counsel?

10        MR. SKINNER:  Yes, we are.

11        THE COURT:  Very good.

12        So let's go back now to plaintiff's counsel.

13        So I think, to be frank, I think we're talking here in

14   practical terms about the monetary sanctions.  The rest may

15   have to be worded carefully but there is at least a general

16   agreement to the injunctive relief you're asking for with

17   certain caveats.

18        So let's focus on the monetary agreement.  The money

19   you're asking for is your attorneys' fees and costs relating to

20   your investigation and motion practice here and I'm not sure as

21   a technical matter that's necessarily even a sanction.  And I'm

22   even less clear -- and I'm just talking aloud -- whether for

23   that purpose you need to show willful disregard or fraud or any

24   of the rest.  You may have already shown that.  But,

25   essentially what you're asking for, at least as I read it, is

G7E9MEY3

```
 1   to say:  True misconduct, whether innocent or not, should never
 2   have occurred, but you were put to various expenses, attorneys'
 3   fees and otherwise, that you would not have incurred but for
 4   that misconduct, and that that should come out of -- even if
 5   Uber is totally innocent, hypothetically, they were the
 6   proximate cause of that misconduct and therefore they should
 7   bear those fees rather than you.
 8           Do I have that right?
 9           MR. BRIODY:  That's right, your Honor.  Frankly, it
10   was positioned as a request for relief and sort of things
11   caught a life of their own vis-a-vis -- whether it's a sanction
12   or not.  We're looking for justice, a just result here.  This
13   is an investigation that everybody agrees was illegal.  No one
14   is fighting that.
15           We should not be forced to shoulder the cost of having
16   to discover the facts and deal with the issues and file these
17   motions.  We want to litigate the merits.
18           This is an issue where -- I think, in addition, there
19   is also the possibility under the inherent powers to also
20   order, you know, someone to reimburse another party for the
21   costs that they incurred as a result of discovery issues or
22   other issues caused in the case that justice requires they not
23   be required to shoulder.
24           And so the general way I would put this is whether
25   framed as a sanction, whether framed as an inherent powers
```

G7E9MEY3

award about the costs that we had to expend -- and I got passed

up the citation.  My understanding is that *DLC Management v.*

*Town of New Hyde Park*, 163 F.3d 124 (2d Cir. 1998) pin cite

136.  That case holds that, you know, under the court's

inherent powers the court may require someone to reimburse a

party for unjustifiable and excessive costs, expenses, and

attorneys' fees.

           Again, we don't -- we think that there's reasons and

grounds for sanctions here.  At the same point, we are

concerned with the relief and that a just result is obtained.

And we think a situation where an investigation like this is

commissioned, and the hoops that had to be jumped through, and

the motion practice before this court that had to be undertaken

in order to get to the bottom of what happened, that those

costs should not be shouldered by the plaintiff.  Because the

time and expense put to this issue, an issue that is an

absolute personal intrusion in Mr. Meyer's life and has no

place in this case, we don't think that that's a cost that we

should have to shoulder.

           THE COURT:  So let me go back to Uber's counsel.

           MR. BRODSKY:  Yes, your Honor.

           THE COURT:  Assuming again a neither admit nor deny

posture or something of that sort, are you still opposing

reimbursing plaintiffs for the costs they incurred in pursuing

this matter?

G7E9MEY3

         MR. BRODSKY:  With all respect, yes, your Honor.  The
Second Circuit has been very clear on this.  We cited on page
12 and 13 of our brief.  The cases they cite in response on
page two of their reply and page three make it very clear the
standard is that they have to -- in order to sanction Uber to
pay legal fees they have to show that Uber acted in bad faith.

         THE COURT:  Well I think it's either bad faith,
vexatiousness, acted wantonly or for oppressive reasons to
qualify under the inherent power.  But I'm really not pursuing
that question right now.

         Looking at it from a different standpoint, what you
have is conduct that I hope -- so that I don't lose all faith
in the legal process -- everyone agrees was an unfortunate
incident that did not occur in the way it should.

         MR. BRODSKY:  We'll agree to that.

         THE COURT:  The question then is should poor Mr. Meyer
or his counsel Mr. Schmidt have to bear the costs of what then
ensued until it all got sorted out, or should Uber and
Mr. Kalanick -- but I really think Uber is the deep pocket
here -- undertake to reimburse that.  And I would have thought
that that is something that you might want to consider even
independent of -- even if your position is we absolutely did
nothing wrong.  The innocent lamb has nothing on us.  But,
nevertheless, under the equities of the situation that might
not be an unfair way to resolve this particular situation.

G7E9MEY3

1          MR. BRODSKY:  Your Honor, before I spend Uber's money

2     we would like the opportunity to go back and discuss.

3          THE COURT:  Yes.  I understand.  Why don't you think

4     about that.  I'm not going to be deciding this motion for a

5     while, in any event, because I have another motion that we're

6     going to deal with in five or ten minutes.  But why don't you

7     let me know, we'll say within a week, Uber's views on that

8     issue.

9          MR. BRODSKY:  Very good.  Thank you.

10          THE COURT:  Very good.  We're going to take a break.

11     And then resume in about ten minutes to deal with the

12     arbitration motion.

13          (Recess)

14          (Case called)

15          THE COURT:  Actually I don't think we need to go

16     through this.  It's part of the same transcript.  So it's all

17     the usual players.

18          So, by the way, one of my law clerks told me, which I

19     hadn't realized, that there was a hurricane-like thunderstorm

20     during the previous argument outside and he failed to see a

21     single red flag.

22          Okay.  I think there are too many issues here to have

23     oral argument on all of them.  This is the motion -- the

24     motions to compel arbitration filed by the respective

25     defendants.  And, moreover, the fact that I promised to take my

G7E9MEY3

```
 1   wife ballroom dancing tonight does enter into the court's
 2   consideration.  So, what I think makes sense is let me give
 3   each side a half-hour.  So the two defendants can decide right
 4   now among themselves whether they want to do a fifteen and
 5   fifteen or any other way.  Plaintiff will then have a half-hour
 6   to respond.  And I will give each side maybe a five-minute
 7   rebuttal and a five-minute surrebuttal.  And you should all be
 8   aware that I've very, very carefully read the papers here and
 9   I -- for which I'm very grateful to counsel for.  So you don't
10   have to feel you have to repeat everything that was in your
11   papers.  It's all before me.
12          So, with that introduction how do defendants want to
13   divide it?
14          MR. BRODSKY:  If you're willing, it would be helpful
15   if you identified some of the core issues.
16          THE COURT:  I will identify -- these aren't the only
17   issues by any means but first -- well let me say -- here are
18   all the issues and I'll tell you where I think I need argument.
19          The first is the choice of law issue.  Frankly, I
20   don't think I need argument on that but that is an issue.
21          Second is whether plaintiff actually did not enter
22   into an agreement with Uber to arbitrate either because he was
23   on insufficient notice or there were other, if you will,
24   technical defects in the way the contract was presented, things
25   of that nature.  And there I do have a kind of factual
```

question, among other things, which is exactly what did the

notice -- when you became an Uber rider, and there's that

little notice at the bottom about you agree to the terms and

conditions, what font was that in?  How did it appear, for

example, on a telephone, iPad -- a telephone, computer or

whatever, things of that kind of technical nature.

There's a question that relates to that and to several

of these issues, whether these issues are for the court or for

the arbitrator.  I don't think I need argument on that, which

is not to say that's an unimportant issue just I feel it's been

fully briefed.

Then there's the issue of whether, assuming plaintiff

did enter into such an agreement, it was enforceable.

Then there's the issue of whether if the agreement was

otherwise enforceable, either Mr. Kalanick -- how does he

pronounce his name?

MR. SKINNER:  Judge, it's Kalanick.  I always think of

California.

THE COURT:  Kalanick and/or Uber waived the right to

enforce it.  And there, one thing I'm interested in hearing

about is whether Mr. Kalanick expressly waived his right to

arbitration in a manner that constitutes judicial estoppel.

Then, a fifth issue is whether Mr. Kalanick, as a

nonsignatory to the Uber user agreement, can enforce the

arbitration clause.  There I think you've -- both sides have

G7E9MEY3

1     briefed it pretty fully.

2          Next, whether assuming Mr. Kalanick either can't

3     compel arbitration or has waived arbitration or whatever, the

4     Court should also deny Uber's motion to compel arbitration or

5     conversely should stay the suit against Mr. Kalanick while the

6     Uber suit goes forward to arbitration.  And an issue -- that's

7     an issue generally I want to hear a little bit more on.  But a

8     subordinate issue which I don't think was briefed is whether

9     the Court in such a circumstance would have the power to place

10    a time limit on the arbitration.

11         So, believe it or not those are not all the issues but

12    those -- I think that's a fair summary of some of the main

13    issues here and the ones -- I tried to indicate the ones that I

14    might have more interest in.  Okay.

15         MR. SKINNER:  Your Honor, I think we're just going to

16    split our time fifteen and fifteen.

17         THE COURT:  Okay.

18         MR. SKINNER:  If one of us finishes a little early or

19    something, sobeit.

20         THE COURT:  So it's just 6 o'clock so we can start

21    now.  So this is defendant's motion.  So you go first.

22         MR. SKINNER:  One moment, your Honor.  Given the way

23    your Honor ordered those it may make sense for us to --

24         (Counsel confer)

25         MR. BRODSKY:  Uber will start first, your Honor, to

G7E9MEY3

1   address the initial issue of whether the plaintiff actually did

2   or did not agree to the --

3           THE COURT:  You might want to come up to the rostrum.

4           MR. BRODSKY:  I thought what might be helpful, your

5   Honor, handing out some slides which we have copies of that

6   directly address this issue.

7           So, moving beyond the fundamental issue of whether or

8   not -- if you start, your Honor, which is we would ask you to

9   start with what appears to be undisputed to us, paragraph 28

10  and 29 of the plaintiff's amended complaint, which is basically

11  an admission that if you create an Uber account you agree to

12  the terms and conditions.  And from our perspective, in the

13  specific words on paragraph 29, "To become an Uber

14  accountholder an individual must first agree to Uber's terms

15  and conditions and privacy policy."

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

G7ELMEY4

1           MR. BRODSKY:  It appears to be a very clear,

2   unambiguous concession that there's an understanding that if

3   you are going to sign up an Uber account, you're agreeing to

4   those terms and conditions.

5           THE COURT:  Just on that, forgive me.  I'm looking at

6   your first slide.

7           MR. BRODSKY:  Yes, your Honor.

8           THE COURT:  Although I think this is, and we'll get to

9   this in a second, larger than you would see if you were on a

10  phone.  But, in any event, what you see is a request for credit

11  card number and so forth.  And then it says at the bottom, by

12  creating an Uber account, you agree to the terms and service

13  and privacy policy.  And the terms of service and privacy

14  policy are in blue suggesting that if you hit it, it's a link.

15          MR. BRODSKY:  It's a hyperlink, correct.

16          THE COURT:  So this may or may not make a difference,

17  but that's different from the common situation where you are

18  forced to go to a link and then say I agree or do not agree and

19  affirmatively show your acceptance.  Here it's, if you will, an

20  implicit agreement, yes?

21          MR. BRODSKY:  Well, I wouldn't use the word implicit,

22  your Honor.  Certainly it is not an "I agree," but it is quite

23  comparable.  And the reason I say that, your Honor, is if you

24  compare it to the recent decision in *Cullinane* by Judge

25  Woodlock in the District of Massachusetts, which is on slide 3,

G7ELMEY4

slide 2 and 3 of our PowerPoint, it's quite comparable.  It's
obviously quite comparable to that because that's another
example from Uber.

It's comparable to Judge Holwell's decision on slide 5
which is in the *Fteja v. Facebook* case where Judge Holwell in
an excellent thorough analysis was looking at a forum selection
clause and he went through all the history, including the
*Specht* case which is from the Second Circuit.  And he looked at
this.  And this is from the actual case, the Facebook screen.
And he found there that when they hit "sign up," that was clear
and unambiguous.

And then if you compare it to *Nicosia v. Amazon.com*,
which is an Eastern District of New York case, on slide 6,
which is an Amazon.com case and a disclosure, we feel it's
quite comparable.

THE COURT:  So first a couple things about that.

First, most of those cases are applying the laws of
states other than California.  If California law applies, then
it may not be quite the same standard that the courts in those
cases were applying.  For example, in *Cullinane*, the court was
applying Massachusetts law.

Secondly, in *Cullinane*, and as shown by your slide,
the words "by creating an Uber account you agree to the," which
are of course the critical words, are quite prominent.

I had my law clerk play out what, if you were on a

G7ELMEY4

1     standard home computer, what the words that correspond to the

2     slide that's your first slide on page 1 would look like.  Most

3     of the words are in 12-point and 10-point font.  But the

4     critical words, "by creating an Uber account you agree to the,"

5     are in 6-point font, which makes them perhaps if not illegible

6     certainly far from prominent.  So what about that?

7               MR. BRODSKY:  Well, I'm not sure about the font size

8     and so I don't --

9               THE COURT:  We could have an evidentiary hearing on

10    that.

11              MR. BRODSKY:  We could.

12              THE COURT:  But just for today's purposes, assume it's

13    six.

14              MR. BRODSKY:  Here's why I think it's conspicuous and

15    here's why I think it meets the reasonably prudent person on

16    equal notice.  It's a single screen.  It's far more simple and

17    straightforward and less buried than if you compare it to

18    slides 5 and 6 in the *Facebook* case and the *Amazon* case, the

19    *Fteja* case and *Nicosia* case where you have to really, really

20    look for it.

21              The terms of service and the privacy policy are in

22    bold.  They're underlined.  They're in hyperlinked in blue and

23    very, very clear.  It's on one screen.  You don't have to

24    scroll down and look for it, unlike the *Specht* case.  It lacks

25    clutter.  It's conspicuous.  It's very close to "register."

G7ELMEY4

1          And I think the reasonably prudent person who's

2     signing up and registering, they first go to a first page where

3     you enter your name and email address and mobile number and

4     password and then you go to this page and you enter your credit

5     card information.  The reasonably prudent person who's signing

6     up this way, entering their credit card and very little

7     information and sees "register," directly right underneath

8     "register," not very far away, in very clear language, you

9     agree to these terms of service by creating an Uber account.

10          And so under Second Circuit case law -- which is the

11     leader.  I know you talked about choice of law provision.

12     Judge Woodlock followed Second Circuit case law.  There are

13     courts in California that look to Second Circuit case law and

14     the Southern District of New York because the Second Circuit

15     and the Southern District of New York, like in other areas, has

16     been leading the way.  If you look at the lesson learned from

17     the *Specht* case --

18          THE COURT:  You'll do anything to win a case.

19          MR. BRODSKY:  I just tell the truth, your Honor.

20          If you look at the *Specht* case, which is a case in

21     which they struck it down and they said it was not reasonable

22     inquiry notice, that case is very interesting because the

23     plaintiffs were downloading Netscape smart download, which if

24     you wanted to find the terms of service, you have to scroll

25     down and it wasn't on the same page.  And once you downloaded

G7ELMEY4

1    it, it would electronically track you any time you downloaded

2    information from the internet.  So that's sort of a big brother

3    kind of approach and the Court struck it down by saying very

4    critical things, which Judge Holwell distinguished when looking

5    at *Fteja v. Facebook*.

6         THE COURT:  What about the fact that the words "terms

7    of service and privacy policy," which are in larger and more

8    prominent type, to the everyday person would not suggest

9    anything about giving up your right to go to court and agreeing

10   to arbitration.  Privacy policy clearly would not.  And terms

11   of service sounds like to the everyday person, you know, here's

12   what we're going to provide in terms of our services and what

13   we're not going to provide.  But there's no suggestion in those

14   terms, is there, that what we're talking about here are terms

15   of what will happen if you and we get into a dispute.

16        MR. BRODSKY:  Terms of service seems to be the

17   consistent approach time after time by people who are using

18   click wrap or hybrid click wrap notices.  It's what's used in

19   Amazon.  It's what's used in Facebook that have been approved

20   by courts.  Courts time after time have approved those terms.

21   The reasonably prudent person who uses the internet knows that

22   times of service means something and that's what they mean.

23   They govern your use of, in this case, the service or the

24   application.  And it would be far different and something

25   different than any other case if your Honor found that it

G7ELMEY4

1    shouldn't be terms of service.

2            And in terms of the hyperlink, that you have to go to

3    a hyperlink, that's the equivalent, the 21st century equivalent

4    of the *Sun Lines* case which Judge Holwell talked about when

5    there was promotional material talking about a cruise line

6    ticket and people who bought the cruise line ticket before

7    seeing it agreed to those terms as soon as they bought it.  If

8    you had to flip to find the terms of service of a cruise line

9    ticket before buying it, you'd have to visit the office and

10   turn over the ticket.

11           Here it's even better.  It's the equivalent of turning

12   over the ticket, but you can click on that before agreeing,

13   before registering.

14           THE COURT:  You are right that the case law -- and

15   this is part of the questions I have for your adversary -- I

16   think is largely supportive of your position in that regard.

17   But much of it is not binding on this Court and looking at it

18   sort of with a fresh eye, so to speak, we start with what is a

19   contract with the agent.  Everyone agrees that's what's

20   involved here.  We start with a legalistic document that even

21   if someone reads, the everyday citizen may not understand.  And

22   we start with something that -- and here I think it is

23   different under computerization than previously -- we start

24   with something that realistically the overwhelming majority of

25   people are not going to read.

G7ELMEY4

1        That doesn't mean the company doesn't have the right

2   to protect itself and impose terms of service and so forth.  It

3   shouldn't be in the position of just saying, well, because you

4   didn't read it, you get to violate any contractual condition

5   you've at least nominally agreed to.

6        But it does mean perhaps and according to some of the

7   cases -- and a lot of these are in California -- that if

8   there's something really fundamental that's being taken away

9   from you, that according to some California courts, it becomes

10  unconscionable.  Even short of that, it maybe has to be brought

11  to your attention with a greater prominence than is done here.

12       Now, once you get to the terms of service, there is a

13  considerable prominence to the arbitration agreement.  So

14  that's why I'm focusing on whether you're even on notice that

15  anything like that you're agreeing to when the words of

16  "agreement" are very small and the words that are slightly

17  larger are simply "terms of service and privacy policy."

18       Would you say, for example, if Uber had in their

19  provision that said in order to protect against the possibility

20  that we will be held responsible for conversations that just

21  occur between you and your driver, you hereby agree that you

22  giver up all First Amendment rights that you otherwise might

23  have under the Constitution?

24       MR. BRODSKY:  Well, that's not what --

25       THE COURT:  No, it's a much more extreme situation.

G7ELMEY4

1    But my point is it can't be that everything you otherwise are

2    entitled to and waive is okay just because it's attached to one

3    of these contracts of adhesion, can it?

4         MR. BRODSKY:  Well, look, what the law says if you

5    have -- if there's an agreement and we believe that this is a

6    reasonably prudent person once they click register has agreed

7    to these terms -- and, again, we believe the plaintiffs have

8    conceded that.  But once there's an agreement, in terms of

9    unconscionability, if you read the arbitration provision and

10   *Rent-a-Center* and the Supreme Court is very clear, that

11   determination about whether or not it's unconscionable or not

12   is a decision that's decided by the arbitrator and it's a

13   particular decision with respect to each individual who clicked

14   on register.

15        But the Supreme Court seems to me to be very, very

16   clear and Judge Woodlock, it may not have been his personal

17   preference when he explains what the law was, but the law is

18   clear there is a strong presumption in favor of arbitration.

19   There's a strong presumption if there's clarity in terms of the

20   terms of service and there's -- and it's not buried somewhere

21   and it's not on a different screen and you don't have to go

22   roaming around for it and you have to click something as

23   opposed to browsing, then you are -- it is a reflection that

24   you've reached an agreement.

25        And then if you go to the terms of service and you

G7ELMEY4

1    look at the actual agreement, it's actually in fairly good

2    plain English.  I think you'd give them an A in legal writing

3    class for plain English.  And I think you'd find --

4              THE COURT:  Which means they'll never make it in the

5    legal profession.

6              MR. BRODSKY:  Maybe it's not interesting enough.  But

7    it may be that people don't click on the terms of service.  It

8    may just be that the way society works is nobody does.  It may

9    just be the way society is nobody reads the Constitution today.

10   Nobody reads the First Amendment.  You know, nobody goes to

11   school anymore and actually reads a book.  It may just be the

12   way our society is.

13             But the law says that if you've provided the terms of

14   service, you can clearly find it and you click on register or

15   sign up in the case of Facebook, then you've agreed to the

16   terms.

17             THE COURT:  Let me ask you a slightly different

18   question.  You said that whether or not the contract is

19   unconscionable is an issue for the arbitrator.  But the issue

20   of whether Mr. Meyer has even entered into an agreement is for

21   the Court, yes?

22             MR. BRODSKY:  Formation, the Court must find that

23   there's -- that Mr. Meyer did enter into an agreement.  Now, we

24   would -- our view is that paragraph 28 and 29, you can stop at

25   paragraphs 28 and 29 of the amended complaint.  Their

G7ELMEY4

```
 1   concession that he did click on register --
 2                THE COURT:  I understand you're saying they conceded.
 3   I just want to make sure I have your position.  Your position
 4   is that once the contract has been agreed to, then issues about
 5   unconscionability, any of the other issues under that are all
 6   for the arbitrator.
 7                MR. BRODSKY:  Yes, your Honor.
 8                THE COURT:  But formation of the contract itself is
 9   for the Court.
10                MR. BRODSKY:  Yes.  I would point out respectfully
11   that the plaintiff has not raised unconscionability.
12                THE COURT:  I agree.  That was going to be my first
13   question to them and now you've taken away my thunder, but I
14   think that's correct.  They don't seem to have raised
15   unconscionability.
16                MR. BRODSKY:  And I think that the case law,
17   thankfully, for us is clear in terms of this is not a browser
18   app.  This is not like I went on Yankees.com, the official
19   Yankees website.  I'm sure you've been on there, your Honor.
20   They have roster --
21                THE COURT:  You didn't want to look at a real baseball
22   team?
23                MR. BRODSKY:  Where would I find that?
24                THE COURT:  Well, my clerks will tell me it's on
25   Mets.com.
```

G7ELMEY4

1          MR. BRODSKY:  They may be wrong, respectfully.

2          If you go to that website and you see the roster and

3     the news, you can scroll and look for all that.  Try to find

4     the terms.  If the terms of use, you have to scroll through

5     many pages.  You find it in the finest points and you have to

6     click on it and that's a browse wrap.

7          This is very, very different.  When you hit that

8     register button, you are clicking on something and agreeing to

9     the terms and it says by agreeing to creating an Uber account,

10    and that is what you do when you register, you're creating an

11    Uber account.  The reasonably prudent person when they get to

12    this, they know they're creating an Uber account; therefore,

13    they're agreeing to the terms of service.

14         THE COURT:  Let me ask you and I apologize because I'm

15    interrupting you and time is going away, but in a question that

16    I don't think the parties address, assuming for the sake of

17    argument that I were to find that Mr. Meyer, that Uber had a

18    right to compel arbitration here but Mr. Kalanick did not and

19    so I were to stay the case as to him while it went forward with

20    arbitration as to Uber, is there anything that would prevent me

21    from saying to the arbitration panel you must decide this case

22    within six months or nine months or something like that?

23         MR. BRODSKY:  I know of nothing that would preclude

24    you from doing it.  I don't know of precedent, but I don't know

25    of any reason why the Court could not do that.  Arbitration is

G7ELMEY4

1    supposed to be faster.

2              THE COURT:  That's what they say.

3              MR. BRODSKY:  That is what they say.  And often it's

4    finding an available arbitrator that is the most difficult

5    challenge for people because they're very busy, or so I'm told,

6    and then the arbitrator often acts quickly and expeditiously.

7    So I don't know of a reason why your Honor couldn't impose

8    that.

9              THE COURT:  I'm going to, because we've now used up

10   almost 25 minutes, I want to hear from your colleagues or at

11   least a short opportunity.

12             MR. BRODSKY:  Thank you, your Honor.

13             MR. SKINNER:  Thank you, your Honor.  Hearing your

14   questions, it sounds like I may be swimming upstream.

15             THE COURT:  No, no.  There's so many interesting

16   issues here, it's going to take me a while to get you a

17   decision because there are so many interesting issues.

18             But I guess I was struck by the fact that

19   Mr. Kalanick -- yes, I'll get it right one of these days --

20   seemingly waived arbitration in his brief on the motion to

21   dismiss, he stated, "although Mr. Kalanick does not seek to

22   compel arbitration here, arbitration would be mandated for the

23   reasons explained below if Mr. Kalanick sought to enforce the

24   arbitration provision of the user agreement.  Mr. Kalanick does

25   not waive and expressly reserves his right to move to compel

G7ELMEY4

1     arbitration in other cases arising under the user agreement."

2     And I relied on that in a decision I wrote in the motion to

3     dismiss.

4              So why isn't that an express binding judicially

5     estoppable waiver of arbitration so far as Mr. Kalanick is

6     concerned?

7              MR. SKINNER:  Well, your Honor, I can tell you what

8     the intent was with the footnote and I think what we're really

9     talking about is what is meant by the word "here."  We had been

10    intending with the footnote primarily to be communicating to

11    others who might be saying oh, free game on the CEO, he's not

12    going to be seeking to enforce the arbitration agreement.  We

13    intended to communicate to others don't think this is a green

14    light to sue the CEO, our client.

15             When we said "here," we, and perhaps it could have

16    been clear -- and I'm not going to say perhaps.  I will say it

17    could have been clearer -- but we were referring to the motion

18    to dismiss, that we were not doing here at this stage in the

19    litigation.  And the reason for that was and what was important

20    to us at that point is that we address what we thought were

21    compelling 12(b)(6) arguments that the plaintiff failed to

22    state a claim upon which relief may be granted, but that we

23    also believed that even if we lost that, the plaintiff had

24    waived his right to seek a class action in the litigation.

25             Now, your Honor disagreed with both those arguments.

G7ELMEY4

You rejected the second part, the class action waiver, in a
footnote, and then we moved for reconsideration.  And on the
same day that we filed our motion for reconsideration, we filed
our answer.  And in our answer we asserted an affirmative
defense that we believed that we could compel arbitration.

Now, the Second Circuit has made clear that really the
first opportunity in a case where you can have an express
waiver is in the answer.  And we didn't waive in the answer.
To the contrary, we made absolutely clear that we were
reserving our right to seek arbitration.

And then in the motion for reconsideration we asked
your Honor to reconsider the ruling with respect to the class
action waiver and your Honor did and told us no, I got it right
the first time.  These two things are bound together in the
arbitration clause and you can't effectuate the class action
waiver outside of arbitration.

So at that point in time we wanted the benefit of the
class action waiver, which we ultimately determined to be an
important thing for us, but we decided we had to move to compel
arbitration, which is what we did.

So the question is --

THE COURT:  Well, I agree with you there may be a
question as to what was meant by "here."  But I just want to
make sure I understand your legal position.  Supposing you come
into court in my hypothetical, this is more extreme than

G7ELMEY4

anything presented by this case, and you say to the judge, your

Honor, we're about to bring a motion to dismiss.  As you know,

though, there's an arbitration clause.  We think we're entitled

to arbitration, but we have decided for the purposes of this

case -- we don't want to waive in any other case -- but for the

purposes of this case, we are prepared to waive totally forever

our arbitration right.  And the judge says great.  Now I can go

ahead and decide the motion to dismiss.  And then after he or

she decides the motion to dismiss contrary to the way you were

hoping it would come out, you come back and say oh, no, we want

arbitration.

          Is it your position that you are not estopped from

coming back and changing your position?  It's different from --

there's lots of cases that say where there's kind of a

circumstantial suggestion of waiver, it's never too late or at

least has to be much, much later in the case to come back.  I'm

talking about where there's, in my hypothetical, an express

explicit unconditional unambiguous waiver.  At that point are

you saying you can still come back?

          MR. SKINNER:  No.

          THE COURT:  Okay.  So your position essentially is

this is ambiguous because of the term "here."

          MR. SKINNER:  It's ambiguous.  The Supreme Court has

made clear that any doubts should be resolved in favor of

arbitration.  The cases that plaintiffs cites -- *Mid-Atlantic*

G7ELMEY4

1   *International, Apollo Theater, Gilmore* –– these are all cases

2   where there were the equivalents of the express waiver that

3   your Honor is referring to at early stages in the proceeding.

4           And it happens all the time.  The filing of a motion

5   to dismiss does not waive your right to seek arbitration if you

6   lose the motion to dismiss.  That happens routinely.  And it's

7   viewed as some benefit by the courts that the motion to dismiss

8   may educate the plaintiffs as to potential weaknesses in their

9   case before it goes to arbitration.

10          Our position here is simply, as you know, that this

11  footnote at the end of our brief was not a clear and

12  unambiguous waiver of our right for this case.

13          THE COURT:  And let me ask you one other question.

14  Assuming for the sake of argument that I were to decide you

15  hadn't waived, is the right remedy to put you on hold while we

16  send Uber to arbitration or do you say there's some other

17  approach the Court then should take?

18          MR. SKINNER:  No, I think that would be the right

19  remedy.  We haven't formally asked your Honor to do that.  If

20  that's the outcome, I can tell you we will be doing that.  And

21  I think that is a remedy under Section 3 of the FAA.  It

22  permits a nonsignatory to an arbitration agreement to request a

23  stay of litigation if the issue involved in such suit is

24  referable to arbitration.

25          Obviously, we can brief that more fully.  But I think

G7ELMEY4

1    the stay under the FAA is automatic.  And I frankly don't know

2    the answer to your Honor's question as to whether the Court has

3    the authority to put a time limit on the arbitrators.  I just

4    don't know that off the top of my head.

5         THE COURT:  The reason that at least occurs to me is

6    although one of the main original benefits of arbitration was

7    speed and efficiency, and the sad truth is many arbitrations

8    now go on for years and years, and since ultimately a case

9    before this court under my hypothetical would be held up by the

10   fact of a parallel case going on before the arbitrator, I would

11   want to make sure that the arbitrator acted expeditiously.

12        I mean I could do it, I suppose, by saying take as

13   long as you want, Mr. Arbitrator, but if you're not finished in

14   nine months, we're going forward with the case against

15   Mr. Kalanick.  But that seems like a less desirable way to

16   approach it than just simply saying the arbitrator is hereby

17   directed to complete its proceedings by date X, if I have that

18   power.  I don't know if I do.

19        MR. SKINNER:  If you do.  As I said, I don't know the

20   answer.  I do know arbitrations are private proceedings.  The

21   parties can reach agreements as to how those proceedings are

22   going to go forward, so perhaps there is something that could

23   be done.

24        I also know that the parties here all I think jointly

25   sought to have these issues resolved expeditiously.  So it's

G7ELMEY4

1    not like a transferal is for purposes of undue delay or

2    anything like that.

3              I know from the perspective of my client this class

4    action waiver is an important part of the case.  And your Honor

5    told us that we were mistaken as to our reading of the contract

6    and that the class action waiver has to be implemented in the

7    context of arbitration, which is why arbitration is now what we

8    seek.

9              THE COURT:  All right.  So I'm going to unfortunately

10   have to cut you off now and we'll heard from plaintiff's

11   counsel.  And since defendants had 35 minutes, you'll have 35

12   minutes as well.

13             MR. FELDMAN:  Good evening, your Honor.  Thank you.

14   Brian Feldman for plaintiff.  Let me start where Mr. Skinner

15   left off.  There has been an express waiver in this case.  To

16   the extent he argues and defendant Kalanick argues that "here"

17   was ambiguous, which I think is a stretch, that was clarified

18   by the last sentence of that same footnote which appeared in

19   both versions of the memorandum of law in support of the motion

20   to dismiss which delineated that their waiver extended to this

21   case versus, quote, other cases, meaning what it says, that 15

22   CV 9796 --

23             THE COURT:  Your point, I take it, is if they were

24   only waiving it as to the motion to dismiss, they would have

25   said that in that clarification, and instead they just

G7ELMEY4

distinguish it from all other cases across the board, which by

negative inference means they were waiving it across the board

in the first sentence.

MR. FELDMAN:  Precisely, your Honor.  In fact, in

other cases they've made that exactly that sort of reservation.

I would refer the Court to *Ricardo Del Rio v. Uber*

*Technologies*.  It's a case in the Northern District of

California, case No. 15 Civil 3667.  Document 16 is a brief

submitted by defendant Uber and footnote 1 says, that's on

page 1, "Defendants do not by this motion seek to compel

arbitration of the plaintiff's particular cause of action at

this time and defendants reserve all rights to do so."

That's the language lawyers use to reserve the right

to raise a defense later in the case.  And we know that not

only because of what Uber has said in other cases when they

intended to do precisely this, but what Uber did in this very

case -- excuse me -- defendant Kalanick did in this case.  I'll

tell you why I can talk about the two of them together.

But defendant Kalanick in this case was confronted in

a single paragraph of the user agreement with three different

clauses -- the ability to arbitrate, the ability to get a class

action waiver, and the ability to get a jury waiver.  And he

made a different decision about what to do with each of those

purported rights.

And I'll get to why there's no contract in a minute,

G7ELMEY4

1   but assuming arguendo there was.  With respect to the class

2   waiver, of course, they raise that at the outset and that's the

3   first choice you could make.  They did that and they were

4   unsuccessful.

5        The second choice one could make is to hold off on

6   raising the defense and reserve it for later.  You could do

7   that silently by not saying a thing or quite noisily.  And

8   Mr. Skinner stood up at the first conference on January 6 and

9   with respect to the jury waiver he was clear to the Court, "I

10  know the plaintiff is seeking a jury trial.  I just want to

11  note defendant reserves his right to oppose that request."

12       They did something very different, obviously, with the

13  purported right to arbitrate which is to tell this Court over

14  and over again in motion to dismiss briefing that he did not

15  seek to compel arbitration here.  So the words speak for

16  themselves.  There is not ambiguity.  Regardless of what was

17  intended, that is not what got into the briefing before this

18  Court.

19       A very important point here, your Honor, is that

20  defendant Uber is also bound by that express waiver.  Uber is

21  bound because Uber was part of the legal team making this

22  motion to dismiss.  How do we know that?  Your Honor --

23       THE COURT:  But the point is you chose to only sue

24  Kalanick, and you were suing him in connection with his

25  activities with Uber.  So, of course, as the CEO of Uber, he's

G7ELMEY4

1    going to be intimately involved with their counsel, as well as

2    his own, in figuring out strategy and all like that.  But that

3    doesn't mean, does it, that Uber is then bound.  You've made

4    the choice in your complaint to separate the two.  Why

5    shouldn't that estop you from saying, oh, they're really one

6    for purposes of this waiver?

7           MR. FELDMAN:  Your Honor, it depends on whether

8    there's actually a claim in this case against Uber, which is

9    the last argument in our brief.  But to the extent Uber and

10   Mr. Kalanick's position appears to be that there's been a claim

11   in this case, there's always been a claim in this case, and for

12   purposes of the Federal Arbitration Act, it's always been an

13   arbitrable issue, which is the position I believe they are

14   taking, then that issue and that right was the right that Uber

15   waived at the very outset.

16          And we know that Uber was controlling or participating

17   in the control of the litigation for at least four reasons.

18   One was that the in-house director of litigation, I believe we

19   heard today, Lindsey Haswell, appeared formally in this

20   courtroom at defense counsel's bench on behalf of Mr. Kalanick

21   and she entered her appearance as Uber Technologies for

22   Mr. Kalanick.  There's no more formal way to show evidence that

23   you are participating in the control of the litigation

24   strategy.

25          The Court also notes secondly that Uber was consulted

G7ELMEY4

```
1   at this phase of the litigation.  We ended up getting a lot

2   more information about that than we normally would because of

3   the Ergo investigation.  Even today it came out that Mr. White

4   and Mr. Skinner were contacts and in touch at this phase of the

5   litigation, which is the same time which Mr. Skinner was able

6   to just pick up the phone and talk to Mr. White in house about

7   the Ergo issues.  I believe that if you asked defense counsel

8   they won't deny for Uber that Uber was participating and knew

9   about this motion and the strategy.

10           In any event, they certainly saw the first motion in

11  support of the dismissal, which included in footnote 9 this

12  very waiver, and it reappeared in the second motion which

13  Ms. Haswell appeared on.

14           THE COURT:  Let me pursue that a little bit.  So

15  supposing you had named both Uber and Mr. Kalanick and they

16  appeared by separate counsel, but counsel announced at the

17  beginning we have a joint defense for purposes of

18  attorney-client privilege or whatever, and then in my

19  hypothetical Mr. Kalanick says we waive arbitration and I'll

20  take it first Uber stands up and says through their counsel we

21  do not waive.  They're not then bound, are they?

22           MR. FELDMAN:  If they preserve their right at that

23  time, no, they would be able.

24           THE COURT:  Now let's take the next possibility in my

25  hypothetical.  Mr. Kalanick's counsel in my hypothetical stands
```

G7ELMEY4

1   up and says we waive arbitration and Uber says nothing.  Have

2   they waived?

3             MR. FELDMAN:  Your Honor, let me try to answer the

4   question as best I can because it's bound up in what the actual

5   posture of the case is and what the basis for Uber's motion is,

6   which really is not articulated in their motion papers.

7             THE COURT:  What I'm getting at is a waiver has to be

8   a knowing and voluntary relinquishment of a known right, and

9   there's no question that there was close cooperation between

10  Uber and Mr. Kalanick at all stages of this litigation.  It

11  could hardly be otherwise.  But I don't see that it necessarily

12  follows that when Mr. Kalanick announces he's waiving

13  arbitration, that is somehow binding on Uber just because Uber

14  has involvement in his legal strategy, if you will.

15            MR. FELDMAN:  In your hypothetical, your Honor, your

16  first hypothetical, there were claims asserted.  Under Rule 18,

17  the plaintiff would have chosen to assert claims against both

18  Mr. Kalanick and Uber.  And the basis for the motion to

19  arbitrate made at that time, motion to compel, would have been

20  those claims.

21            In this particular case, under Rule 18, plaintiff is

22  still free to chose his claims, has not chosen claims against

23  Uber.  Uber is not arguing to the Court, I don't believe, that

24  plaintiff is compelled to raise claims against Uber and that

25  because of those claims, Uber is seeking to compel arbitration.

G7ELMEY4

1    It's an important distinction.

2            Uber is arguing, as far as I can tell, that the issue

3    under the FAA first came up in the suit against Mr. Kalanick,

4    that the reason Uber can compel arbitration of the claim

5    against Mr. Kalanick is because it's the same issue.  And that

6    issue was raised in our complaint at the very first instance

7    against Mr. Kalanick.  And I would just cite because we didn't

8    have this point in a surreply that this control concept --

9            THE COURT:  You're saying, actually going back to my

10   point about the bifurcation, you're saying there's nothing to

11   send to an arbitrator in terms of this lawsuit.  It's still a

12   lawsuit only against Mr. Kalanick.  Uber is there as a

13   necessary party, but that's not the same as saying that the

14   claims of the plaintiff are claims against Uber.  At least

15   arguably the claims of the plaintiff are only against

16   Mr. Kalanick.  They so in effect intertwine with the conduct of

17   Uber's business that Uber becomes a necessary party, as I've

18   already held.  But that doesn't mean that there's a lawsuit

19   against Uber that gets referred to an arbitrator.  So it's

20   really only Mr. Kalanick, you're saying, as to whom the

21   ultimate waiver issue applies.

22           MR. FELDMAN:  That's correct, your Honor, that's

23   correct.  And I don't know if that -- I can't tell from the

24   reply brief at page 19, Uber's reply brief, it does not appear

25   they contest the notion that a party need not assert a claim

G7ELMEY4

1      against a necessary party.  As we explained in our brief with

2      examples, it happens all the time.

3             In fact, in cases cited in our brief, courts have held

4      it's fine to have a necessary party against whom the other

5      party could never raise a claim and it does happen because Rule

6      18 operates independently from Rule 19.  Rule 18 allows a

7      plaintiff to choose his case.  Rule 19 requires that plaintiff

8      or the court to join the necessary party to the case.  An

9      advisory committee note from 1966 to Rule 18 says that they

10     operate independently.

11            So in that context we do come back to the only claim

12     that could be sent to arbitration -- and this is to answer the

13     question you posed to everyone else -- isn't there.  There is

14     no claim against Uber asserted by plaintiff.

15            As for the concept that Uber's control waives any

16     right they may have to compel the arbitration of the only

17     claims in this case, I point the Court to *United States v.*

18     *Montana*, a Supreme Court case from 1979, which explains that

19     the test in an analogous collateral estoppel context for

20     control is that a nonparty will be bound by a decision made by

21     another party if they held a sufficient laboring oar.  And that

22     case cites the New York Court of Appeals decision in *Watts* that

23     explains that could mean sharing in control of the litigation.

24            THE COURT:  Of course, that's only a Supreme Court

25     case.  As I learned from your adversary Mr. Brodsky, that's not

G7ELMEY4

1    nearly as good a citation as the Southern District of New York.

2    But I will consider it.

3          MR. FELDMAN:  If you care for a Second Circuit

4    citation, I would give you *Ferris v. Cuevas*.

5          THE COURT:  I don't know if that's better or worse.

6          MR. FELDMAN:  I don't need to venture it.  That's at

7    118 F.3d 122, your Honor, that says this concept attaches to

8    those who control litigation even from the shadows.

9          So Uber is bound by this waiver.  I have limited time

10   so I will address the implied waiver arguments if you'd like.

11   If not, I will move on to the formation questions, your Honor.

12         THE COURT:  Yes, go ahead.

13         MR. FELDMAN:  So with respect to formation, there are

14   three key points I would like to address.  The first is what

15   the Second Circuit case law really means right now because

16   there's a good deal of guidance that defendants are ignoring in

17   their presentation.

18         The second is the suggestion, respectfully, that Judge

19   Weinstein from the Eastern District had it right in *Berkson* and

20   there doesn't seem to be any argument that under -- if you

21   follow Judge Weinstein, you get to the result that we are

22   arguing.

23         And the third is to talk about the *Cullinane* decision.

24   And I guess a fourth, which I anticipate from you, is what

25   about paragraph 29.  Maybe I'll start there, your Honor.

G7ELMEY4

1          On paragraph 29, it is not a concession.  It is not

2     even a paragraph that mentions the plaintiff.  It's a paragraph

3     that does not specify a time.  It does not in any terms say

4     that the plaintiff agreed to arbitrate this case or agreed to

5     the terms of service.  It does not say that at the time the

6     plaintiff got started using Uber that the world at that time

7     was a world in which you needed to agree to the terms of

8     service.  It is a very vague allegation because it really

9     doesn't matter for our complaint, as we've been over in the

10    equitable estoppel arena.  It's not important to the complaint

11    because our claims don't depend on anything in the user

12    agreement.

13         To the extent the Court is concerned that paragraph 29

14    could operate as a stipulation as Uber and Mr. Kalanick

15    suggest, there is a rule that deals with that and it's Federal

16    Rule of Civil Procedure 15(a)(2) which provides that leave

17    shall freely be given by this Court.  We're happy to amend.  We

18    can stipulate on the record that we can amend.  We can strike

19    out paragraph 29.  It really has no meaning for our complaint.

20         Likewise, the next subdivision of Rule 15 which allows

21    the parties even at trial to conform the pleadings to the

22    evidence certainly suggests that that's what we should do here

23    when all of this evidence about formation came into this case

24    through the affirmative defense by defendants to move to

25    compel.

G7ELMEY4

1          THE COURT:  Let me ask you this.  I totally agree with

2     you that given the free leave to amend, that assuming for the

3     sake of argument that Paragraph 29 is some sort of concession

4     or stipulation or whatever, at this stage of the case you're

5     more than free to amend and change it or eliminate it.  Why

6     isn't that equally true of the alleged waiver of arbitration,

7     which is a footnote, no less.  It's not even a whole paragraph

8     of a complaint.  It's a footnote in a brief.  And let's assume

9     it's unequivocal for the issue we were arguing a minute ago.

10    But, you know, this is still a young litigation.  Why shouldn't

11    that -- sorry about that, Judge.  We really didn't mean to, and

12    the policy in favor of arbitration should allow us to withdraw

13    that concession.  What about that?

14         MR. FELDMAN:  The answer is simple.  There are

15    different standards.  Rule 15 allows parties to amend their

16    pleadings -- and in this case particularly apt because the

17    amendment we have proposed follows the facts and the evidence

18    rather than a strategic decision.  The Second Circuit's case in

19    *Gilmore*, which is the leading express waiver case, which just

20    as an aside is a case in which the party moved to compel

21    arbitration, withdrew their motion to compel -- I believe that

22    was pre-answer -- and, nevertheless, was held to have expressly

23    waived the right to arbitrate.  It wasn't even contested by the

24    time it got up to the Second Circuit.  This is a much more

25    drastic example than the leading case in *Gilmore*.

G7ELMEY4

1        But *Gilmore* says that when a party is making an

2   important strategic decision like that they will be held to it.

3   The language the court uses in *Gilmore* is a party is not free

4   to play fast and loose with the courts.  That was a strategic

5   decision they made presumably in order to get a ruling on the

6   merits that they could then use if they won, and presumably

7   they made that strategic decision in order to avoid a question

8   from your Honor as to why we didn't dispose of this case on a

9   motion to compel or to avoid the thorny formation issues they

10  have.

11       So turning to the rest of the formation argument, the

12  Second Circuit has helpfully provided a test, guidance, and a

13  policy rationale to use to look at this question of formation

14  and the test was by then Judge Sotomayor in the *Specht v.*

15  *Netscape* case where she specifically says this is a concern,

16  formation, when products are free on the internet for

17  downloading.  And that's at page 32 of that opinion.  The test

18  is two-fold.  There must be reasonably conspicuous notice of

19  the existence of contract terms and, second, there must be

20  unambiguous manifestation of assent.  So that's the two-part

21  test -- conspicuous notice of contract and unambiguous

22  manifestation of assent.

23       The guidance comes in Judge Leval's decision in the

24  *Register.com* case where Judge Leval says "no doubt in many

25  circumstances" that clicking on an I agree box, which I can

G7ELMEY4

1   show your Honor what that looks like, very different from here,

2   to accept terms is "essential to the formation of a contract."

3   So the presumption stated by Judge Leval is that no doubt in

4   many circumstances that's exactly what is needed.  Of course,

5   that didn't happen here.

6           And the explanation comes in *Schnabel v. Trilegiant*,

7   the Second Circuit's latest statement on this issue, from 2012.

8   There Judge Sack talked about outside of the internet or online

9   app contexts, this *Lucent* standard for acceptance, including

10  shrink-wrap and the often cited case that "cashiers cannot be

11  expected to read legal documents to customers before ringing

12  them up," which comes from the *Gateway* case in the Seventh

13  Circuit.

14          And Judge Sack explained that it's different online

15  and that, quote, there's no policy rationale that would justify

16  those *Lucent* standards.  He said there are, quote, a plethora

17  of other ways such as requiring express acknowledgment of

18  receipt of terms to meet the minimum requirements.

19          So we have all this guidance from the Second Circuit

20  which applies here.  What Uber could have done and in fact has

21  done in other contexts is provide the express acknowledgment

22  that the Second Circuit referenced in *Schnabel* with the I agree

23  box that the *Registered.com* court talked about.

24          And if I may approach the bench with -- I don't have a

25  slide, but I have a sample.  This is a copy, your Honor, of the

G7ELMEY4

1    Uber page for drivers.  And this is in the case Uber cites,

2    *Mohammed v. Uber*, you can see the case up at the top.  Here's

3    the screen.  It's a picture, which is probably worth a thousand

4    words in this context.  There is conspicuous notice of a

5    contract.  It says, please confirm you've agreed... to this

6    contract.  And there is an unambiguous manifestation of assent.

7    We would not be here if this is what they said -- yes, I agree.

8    That's what they rely on in pages 3 and 4 in their reply brief.

9           If I could provide one more to your Honor, which is in

10   the *Whitt* case by Judge Woods recently.  Thank you, your Honor.

11   This is another case that Uber relies on in its reply brief.

12   And this case was decided just in 2015 in this very court, the

13   Southern District of New York, so I will place great reliance

14   on explaining it to you.

15          The court in this case explained that a user could not

16   complete this website, this form, the loan terms page, without

17   clicking the box at the bottom.  So it is a small box, your

18   Honor.  What it says, click the box below.  And by requiring a

19   click, necessarily that is conspicuous.  The user has to.

20   Their eye is drawn to that box.  It is also an unambiguous

21   manifestation of assent.  But it's very different from what

22   Uber did in this case.

23          We have the slides from Uber and the Mi declaration.

24   As your Honor knows, the button register is large.  It's well

25   defined.  It's user friendly.  It's prominent compared to the

G7ELMEY4

1    much smaller fine print, including the smallest of all on the

2    page, the terms of service.  It's not adjacent.  Counsel has

3    said it's right below it.  It's not right below it.  There's a

4    box.  There's space, a line, two boxes, and more space before

5    you get to the terms.  This is not reasonably conspicuous.

6            And the other half of that first test, it's also not

7    notice of a contract.  And this is discussed extensively by

8    Judge Weinstein, but the word here "terms of service," the

9    phrase doesn't include the term agreement or the term contract.

10   I submit that a user would not understand what that means.

11           The second question from the Second Circuit, is there

12   unambiguous manifestation of assent, the answer is no.  There's

13   no requirement that the user take any action to specifically

14   agree to that term in contrast to the two pictures I just

15   showed you in *Mohammed* and *Whitt*.  And, moreover, there's a

16   mismatch, there's a mismatch between what that fine print says

17   by creating an account on Uber and what the user actually does

18   on the page, which is they hit the button register.  They don't

19   hit any button that says create an account.  And that's an

20   important distinction between the two other cases in the slide

21   deck that are cited by Uber.

22           They provided us on page 5 with the *Facebook* case.  In

23   the *Facebook* case, there's a match of the language.  It says by

24   clicking sign up, and the button is "sign up."  And in

25   *Facebook*, it's also notable that that warning is immediately

G7ELMEY4

1    below.  Now I'm quoting the court in *Facebook* -- it is

2    immediately below the button.  Not so here.

3         The same is true on slide six, the *Nicosia v.*

4    *Amazon.com* case.  In that case too, as you can see, the

5    language is "place your order" on the button.  And the language

6    of the terms of service is by placing your order you've agreed.

7    Again, it's a match.

8         I'm not submitting those are perfect examples, but

9    they're certainly much clearer than the case here.  And the

10   court in *Amazon* also noted that like *Carnival Cruise*, where the

11   customer was told pay attention to this, the first bold

12   language on that page says review your order.  And the

13   *Amazon.com* court said the first line of text immediately below

14   that precaution tells customers they're agreeing to the terms.

15   None of that is true here.

16        What Uber has chosen to do is clearly insufficient

17   under *Berkson*, and I won't go through that because I don't

18   think it's contested.  And in Judge Woodlock's decision in

19   *Cullinane*, it is by Judge Woodlock's own admission not

20   following *Berkson* because "it's contrary to the test in

21   Massachusetts."

22        Now, all the case I've cited -- *Berkson*, *Specht*,

23   *Schnabel*, *Register.Com* -- are decided under either California

24   or New York law.  And those are the choice of law disputes

25   we're having is which of those apply.

G7E9MEY5

1        MR. FELDMAN:  (Continuing)  So those should be

2   followed.

3        Your Honor, if I could, if I have time, there is an

4   evidentiary defect as well.

5        THE COURT:  You actually have ten minutes.  Before I

6   forget though the question I said I would put to you.  Am I

7   correct, I certainly didn't see it in the brief, you're not

8   arguing that the waiver is unconscionable.

9        MR. FELDMAN:  We have not made that argument, no.

10        THE COURT:  Very good.

11        MR. FELDMAN:  So there is an evidentiary problem as

12   well in this case, which frankly we noticed when we received

13   the supplemental submission in the *Cullinane* case.  If you look

14   at the declaration submitted in *Cullinane*, it's the Holden

15   declaration, that's docket 32-1 in that case.  Mr. Holden

16   describes from personal knowledge the fact that the user, the

17   plaintiff, actually experienced and saw the screen that's

18   attached as Exhibit A.  And I won't go through it in detail.

19   But there is great detail in that declaration about that fact.

20        It's conspicuously absent from the declaration

21   submitted here.  And that is an evidentiary problem we raised

22   to defendants and asked them about it.  We have not received

23   more evidence.  They've assured us that that, in fact, is true

24   but it's not in the record.  And we are raising that objection,

25   your Honor.

G7E9MEY5

1          There is a similar case that is strikingly similar in

2     layout to the Uber app where you have this -- the same two

3     issues as this:  An evidentiary defect in the declaration plus

4     a very similar screen.  And it was decided across the street,

5     at New York State Supreme, it would be the last thing I pass

6     up, if I may, your Honor.

7          This is the *Resorb Networks* case.  I will pass up the

8     declaration.  And I'm going to be referring to the exhibit on

9     page three of the declaration.

10         So this is *Resorb Networks v. Younow.com*.  And it's

11    report at 2016 New York Misc. LEXIS 1194 -- I should say it's

12    not reported there but it could be found there.  And the

13    question here was whether or not on page three above paragraph

14    eight the screen on the left provided sufficient notice under

15    the cases we have been discussing.  It looks again strikingly

16    like what the purported Uber interface would be with a, "By

17    signing in you agree to our terms of use below," a number of

18    different ways you can sign in.  I'd submit this is actually a

19    much clearer version for a number of reasons we've discussed.

20         This screen was presented to the court along with an

21    evidentiary problem which is the absence of or questions

22    surrounding whether that link, in terms of use, actually

23    connected to the correct terms of use.  And the court therefore

24    didn't ultimately reach the question whether this screen was

25    sufficient but noted some doubts about whether it would be and

G7E9MEY5

1    ultimately denied the motion to compel in light of primarily,

2    admittedly, the evidentiary defect which we also have here and

3    the screen it was presented with.

4            Your Honor at the end of the day, especially with the

5    logic and rationale laid out by Judge Sack in the *Schnabel*

6    decision, it's very easy even with a contract of adhesion to

7    form -- excuse me, to form a contract over the internet.   And

8    Uber has done that with its drivers in the *Mohamed* case.   Many

9    vendors do that with the separate "I agree" click box.   And

10   that draws users to those terms.

11           What Uber has decided here is instead of using that

12   simple, easy way to get users' attention on the terms of

13   service, they've created a register button that obscures, as

14   Judge Weinstein said, obscures the terms of service at the

15   bottom of the page.   That fails the test set out by Judge

16   Sotomayor.   It's not conspicuous.   It's not unambiguous assent.

17   It avoids what the *Register.com* court said would be required or

18   be essential in many cases, which is a separate box.   And as

19   the *Schnabel* court explains, there is no pragmatic reason to do

20   it that way.   There is no policy rationale for a company to be

21   allowed to hide a term of service at the bottom of a screen

22   when it's very simple to add a click box or a scroll box or a

23   number of other ways to do that.   We submit that Judge

24   Weinstein is correct, that this court should follow *Berkson* and

25   that under *Berkson* and, more importantly, the Second Circuit

G7E9MEY5

1    cases we've cited, there could be no contract formed here to

2    arbitrate this case.

3           THE COURT:  Thank you very much.  That was very

4    helpful.  I will give each of the defendants five minutes.  I'm

5    sorry to cut it so short but I have time constraints as well,

6    and I will give then plaintiff's counsel ten minutes on

7    rebuttal and surrebuttal respectively.

8           MR. BRODSKY:  Your Honor, the plaintiffs are simply

9    just wrong that Uber -- Uber can compel arbitration here even

10   though there is no claim against Uber.  We laid out in our

11   brief.  We cite the cases.  Uber is an aggrieved party.  As

12   your Honor had stated, essentially they have sued Uber.  They

13   just have not named Uber.  The relief they seek is

14   fundamentally about Uber's business.  So their claims are

15   against Uber.  We are an aggrieved party.  They're wrong to

16   contend that an indispensable party must, under Rule 19 --

17          THE COURT:  So I --

18          MR. BRODSKY:  We cite cases to that effect.

19          THE COURT:  I understand that as an abstract point.

20   But exactly what would the arbitrator be asked to decide?

21          MR. BRODSKY:  First of all, we would respectfully ask,

22   your Honor, is that you compel arbitration and you also find

23   that Mr. Kalanick and claims against Mr. Kalanick should go to

24   arbitration.

25          THE COURT:  I understand.  For the sake of argument,

1   if we were in this bifurcated situation, what would -- so I'm

2   referring to you but I'm not referring to Kalanick --

3   hypothetically, what is it that the arbitrator would be asked

4   to decide.

5          MR. BRODSKY:  The claims they have are fundamentally

6   claims about Uber's business and those are the claims that the

7   arbitrator will decide.  Whether or not Uber's business --

8          THE COURT:  They are claims -- some of this goes --

9   it's a conspiracy, an antitrust conspiracy.  And so the intent

10  of the various parties is critical.  And Mr. Kalanick's intent,

11  how would that be the subject of that arbitration?

12         MR. BRODSKY:  Whether or not Mr. Kalanick's intent

13  would be a subject for the arbitration, you know, as your Honor

14  found, "Fairly read, the amended complaint alleges that Uber's

15  scheme for setting prices as well as the terms of Uber's

16  contracts with drivers constitute an antitrust violation."

17  That would be resolved.  They assert, "He seeks no relief

18  whatsoever against Uber" is at odds.  This is what your Honor

19  found.  "His assertion that he seeks no relief whatsoever

20  against Uber is 'at odds with any fair reading of plaintiff's

21  claim.'"

22         THE COURT:  I have no question that they sought relief

23  against Uber.  But if it were only relief, the relief only

24  comes about if the claim was established.  And if the claim

25  can -- if the claim to be established turns on Mr. Kalanick's

G7E9MEY5

1    intent, then I'm not quite sure what the arbitrators decide.

2              MR. BRODSKY:  Respectfully, your Honor, I think then

3    that puts them in a box where there is no other choice that

4    this goes to arbitration with claims against Kalanick.  If

5    they're going to sue Kalanick only and fundamentally sue Uber,

6    Uber is now a necessary party.  We believe we've established

7    that arbitration is compelled.  And, therefore, the entire

8    case, including their claims against Kalanick, should go to

9    arbitration despite their arguments on waiver which cannot be

10   imputed to Uber.

11             THE COURT:  Well if -- and I'm not saying this is

12   where I come out at all on any of these issues.  I'm still very

13   much thinking them through.

14             Supposing Uber is a necessary party only in terms of

15   relief.  Assume that for the moment.  Then maybe the thing to

16   do is if Uber has the right to arbitration and Kalanick does

17   not hypothetically, go forward with the case against Kalanick

18   but not impose any relief until then, once liability is

19   established, if it is, then send it to the arbitrator to

20   determine relief.

21             MR. BRODSKY:  Your Honor, respectfully, fundamentally

22   at odds with what their claims are; fundamentally at odds with

23   the case law *Hollingsworth* and *Konvalinka*.

24             THE COURT:  If the claims are really disguised claims

25   against Uber, which is certainly a plausible possibility, then

G7E9MEY5

1    I see your point.  If claims only involve Uber in terms of

2    relief, then I think it's a different situation.

3              MR. BRODSKY:  If your Honor compels arbitration then

4    the case against Kalanick would have to be stayed, we admit for

5    some limited period of time, but would have to be stayed.

6              THE COURT:  All right.

7              MR. BRODSKY:  I did want to address one thing your

8    Honor.  Mr. Cantor says that he finds interesting arguments as

9    to why your Honor shouldn't find his paragraphs in 28 and 29 to

10   be an admission.  In 29 the same sort of rules and

11   interpretation of the footnote that they want you to interpret

12   with respect to Mr. Kalanick should be applied back to them.

13             In paragraph 29 they say, "To become an Uber

14   accountholder an individual first must agree to Uber's terms

15   and conditions."  They never say, they never say:  But I

16   didn't.  They never say me, Mr. Meyer, which is what -- I am

17   the plaintiff here didn't agree.  I was talking about

18   "individual" abstractly having nothing to do with me.

19             And then what's very interesting is if you go to

20   Mr. Cantor's own statements at the last hearing, and I'm sorry

21   to do this but I have to.  June 16, 2016 page 15 of the

22   transcript lines 14 and 15.

23             "Mr. Cantor:  Yes, your Honor.  The plaintiff here had

24   a contract with Uber.  The contract -- that contract has an

25   arbitration clause."

G7E9MEY5

1        There is no getting around that admission that the

2   plaintiff has acknowledged he had a contract with Uber and,

3   therefore, the case should be arbitrated.

4        Finally, your Honor, he cites the *Specht* case but

5   doesn't read it because if he reads the *Specht* case, everything

6   about the *Specht* case was distinguished in Judge Holwell's

7   decision and subsequent decisions.  That case does not help

8   him.  It hurts him.  That was a case where you had to browse

9   and bury and find where the terms of service are.

10        The *Register.com* case is a browse rap case.  Judge

11   Leval was looking at a browse-wrap case not anything where you

12   clicked.  Here you have to click something so it's a click-wrap

13   case or at least a hybrid click-wrap case.

14        The *Mohamed* case is essentially pointing to a

15   completely different set of an agreement and saying how come

16   you didn't have that.  That's not the law.  I mean you could --

17   they could actually ask:  Why didn't you sit down every user

18   and have them sign an agreement?  Why didn't you do ten other

19   possibilities?  That's not really the law.  The law is whether

20   or not the agreement that Mr. Meyer entered into was something

21   that a reasonably prudent person would recognize as an

22   agreement.

23        What they're trying to do is distract with other

24   examples which they think are clearer.  But that's not the law.

25   The law is that's let's not find other examples.  The law is

G7E9MEY5

1     let's apply the objective test to what he actually clicked on.

2              Terms of service, your Honor.  If their position is

3     that terms of service doesn't reflect a contract, then that's a

4     revolutionary concept which you can't find anywhere in the law.

5     I don't think any judge has found that.  And that would change

6     every corporation in America that has an internet website

7     requiring to click, they'd all have to change, almost all,

8     would have to change what they put on there.

9              And the *Cullinane* decision, finally, your Honor -- I

10    know you're short on time -- but they said in *Berkson* that

11    Judge Woodlock distinguished *Berkson* based on Massachusetts

12    law.  But they forget to tell you the previous sentence.

13    Because when Judge Woodlock talked about *Berkson* and page 19

14    and 20 of the opinion, which I know you have, he started the

15    paragraph by saying the plaintiffs rely heavily on Judge

16    Weinstein's decision in *Berkson*.  And then he said, he laid out

17    the steps by Judge Weinstein.  And then he said that step,

18    however, referring to Judge Weinstein's step, which is the step

19    saying you need substantial evidence that the user was bidding

20    themselves more than just an offer of services or goods.  That

21    step, however, quoting Judge Woodlock, "obliquely disregards

22    the customary contract analysis applied by the vast majority of

23    courts."  Then he says it also doesn't apply to Massachusetts.

24    And he has a footnote which cites Southern District of New York

25    cases.  So I don't think it's fair to say *Cullinane* is

G7E9MEY5

 1    distinguishable based on Massachusetts laws.

 2            THE COURT:  Okay.  Thank you very much.  That was very

 3    helpful but unfortunately you've left your colleague about two

 4    minutes.  But let's see how he does.

 5            MR. BRODSKY:  He was tired anyway.

 6            MR. SKINNER:  Judge, I have to object he keeps taking

 7    all of my time.  This is fun.

 8            MR. BRODSKY:  It's always good to go first.

 9            THE COURT:  I will give you at least five minutes.

10            MR. SKINNER:  I appreciate that.  I actually -- I

11    don't think I have that much to say.  I will note for the

12    record that this is Mr. Feldman, not Mr. Cantor.

13            THE COURT:  I noticed that and --

14            MR. CANTOR:  I'm Mr. Cantor.

15            MR. BRODSKY:  Both handsome men.  I acknowledge that.

16            THE COURT:  It is very strange when a Brodsky can't

17    tell a Cantor from a Feldman.

18            Go ahead.

19            MR. SKINNER:  Thank you, your Honor.  So I just want

20    to respond briefly to a few of the points that Mr. Feldman made

21    with respect to the expressed waiver.

22            First, it's the same point they made in their brief.

23    They can't find an expressed waiver in the first sentence of

24    this footnote.  So they try to look to the second sentence to

25    say, Oh, well, there's a reservation of rights here.  We imply

G7E9MEY5

from the second sentence what the first sentence means.  But
that, of course, turns the standard on its head.  We have a
presumption here.  We know what happens when there's a tie.
The tie goes to the runner in this case.  The presumption goes
in favor of arbitration.  So you can't say that the first
sentence is unclear but we know what it means by looking at the
second sentence.  You have to have an expressed waiver and they
don't have that.

            And really the same thing applies with respect to
their cites to something that Uber said, not Mr. Kalanick but
Uber said.

            THE COURT:  Wait a minute.  I'm not sure I agree with
the point you've just made.

            It is frequent in contractual analysis that courts
will find -- and also statutory analysis, that courts will find
that what is an arguable ambiguity if you look at just one
sentence is resolved by some subsequent sentences.  Sometimes
in contract analysis it's resolved by a paragraph that's five
pages away.  And even in statutory construction it's often
resolved by sentences that come up several pages later.  Here
it's the very next sentence that they say resolves the
ambiguity.

            It may not resolve the ambiguity.  That's a different
question.  If it doesn't resolve the ambiguity then everything
else you've been arguing falls into place.  But if it resolves

G7E9MEY5

1    the ambiguity, the fact that it comes in a subsequent sentence

2    doesn't matter, I don't think.

3        MR. SKINNER:  Well if it's a contract for statutory

4    interpretation, your Honor, you have to have language that is

5    related to the same thing.  Here we have a first sentence which

6    they're saying is an expressed waiver of a right to arbitrate,

7    one that we know that the Supreme Court says is of fundamental

8    importance and the presumption goes in favor of arbitration.

9    The second sentence has nothing to do with that.  It's a

10   reservation --

11       THE COURT:  The argument, I take it, they were making

12   was you said that the word "here" is ambiguous because it's

13   unclear whether that means for purposes of this motion to

14   dismiss or it means for purposes of this case.

15       And they say the second sentence shows that what you

16   meant by "here" was for purposes of this case because in the

17   second sentence you say we reserve our right in other cases to

18   still assert our right to arbitration.

19       Now, whether that resolves it as clearly as they're

20   arguing is an interesting question.  I think that's the

21   argument they're making.

22       The other point which Mr. Brodsky raised, and which

23   the Court raised as well, is how can paragraph 29 of the

24   complaint not be binding if the footnote is binding.  The

25   response was well there are rules that govern.  The complaint

G7E9MEY5

1    can be amended freely.  A waiver of arbitration, it's a

2    different story.  But I don't think that's really the

3    distinction.  I think the distinction may be that the court

4    relied on the arbitration waiver and the court did not rely on

5    paragraph 29 of the complaint so there was judicial estoppel.

6           But that doesn't necessarily resolve the whole issue

7    because you could argue that the court relied upon the waiver

8    only for purposes of the motion to dismiss which is all you say

9    you're waiving.

10          So, I'll have to sort all of that out.  But I think

11   it's a little more complicated than we've been able to get into

12   in this very short discussion.

13          MR. SKINNER:  I think at its core if we're going to

14   have a waiver of arbitration it should be a clear and

15   unequivocal waiver of arbitration.

16          Let's go to the case that they say is the leading case

17   on this issue which is *Gilmore* for the Second Circuit 811 F.2d

18   108.  Let's see what happened there.  In that case first at

19   oral argument, I'm reading from the case, counsel for Shearson

20   conceded that Shearson would not have been entitled to move to

21   compel arbitration of the common law claims if Gilmore had not

22   amended its complaint.

23          So what happened there was you had a complaint.  You

24   had a motion to compel arbitration.  You had a withdrawal of

25   that motion.  And you had everyone in the courtroom, the

defense table, the plaintiff table, the judge, everyone

agreeing that that withdrawal was a waiver.  And then you had a

subsequent concession by defense counsel saying, no, we --

that's right, it was a waiver; what mattered here was the fact

that they filed an amended complaint.

You have nothing like that here.  To the contrary, you

have the party that wrote the footnote saying that they're

intent was never to waive for the purposes the whole case; that

their intent was to explain to the court what they were doing

with respect to this motion to dismiss.  And we've explained

why.  We've now come in and asked for arbitration.

THE COURT:  I don't think the intent matters.  I guess

you want -- you really are determined to be a witness in this

case.

MR. SKINNER:  Again, I don't want to conflict myself

because this is so much funny.  I want to be back for the next

one.

And then later in the case the court says:  As noted

above, Shearson concedes that it waived its right to move to

compel arbitration with respect to the original complaint.

There is no equivalent concession here.

And despite all of that, the Second Circuit concluded

that the amended complaint could have changed things sufficient

that that waiver would not -- that they could have gone back

against that waiver and sought arbitration.

G7E9MEY5

 1          And they said that Shearson must show that the amended

 2     complaint conceded charges that in fairness would nullify its

 3     earlier waiver and allow it to reassess its strategies, for

 4     example, that the amended complaint changed the scope of the

 5     theory, etc.

 6          So even in that extreme example there was still the

 7     opportunity for the party who was alleged to have waived to

 8     come back and have said no.  There are things that have changed

 9     here and we should be permitted to change strategy.

10          That's not what we've done here.  We haven't changed

11     strategy.  Our strategy has been consistent.  But,

12     nevertheless, even under the case the plaintiffs rely, what we

13     could do, what we're doing here, because of the fact that or --

14     the court ruled unequivocally that in order to invoke the

15     waiver of the class, of the class action we have to do it

16     through the arbitration context.

17          THE COURT:  All right.  I need to regretfully cut you

18     off at this point.

19          Let me hear from plaintiff's counsel.

20          MR. FELDMAN:  Thank you, your Honor.

21          I will be as brief as possible to address both points.

22     With respect to the question about what's -- what would be in

23     arbitration if Uber won on its motion to compel and Mr.

24     Kalanick did not.  It sounds like, from what I heard, that

25     defense counsel is struggling to come up with any claims

G7E9MEY5

```
1    against Uber; and that the idea, instead, is that there have

2    been claims in this case against Mr. Kalanick.  Those were the

3    claims at the motion to dismiss stage and those claims will be

4    pushed into arbitration.  I think that's the only logical

5    rationale if you buy their motion to compel argument.  But one

6    reason you shouldn't is because those were the very claims

7    before this court when the defendants jointly made the decision

8    to waive arbitration.  This is the distinction I was trying to

9    make in your Honor's first question.  This is the same

10   complaint today as it was at the time of the motion to dismiss.

11   Nothing has changed.

12        The second point that I want to respond to is that if

13   your Honor is concerned about people getting out of things

14   they've said, go ahead, if you hold them to their concessions

15   on the motion to compel arguments being waived, we never get to

16   the problem about paragraph 29.  So as a logical principle if

17   everybody is held to their positions, and I've explained I

18   think why the law wouldn't allow you to do that; but if you

19   were, we would still come out with the motions to compel being

20   denied.

21        Finally -- yes, I will say finally.  Counsel for Uber

22   said it would be extraordinary and outrageous if this court

23   were to find that the word terms of use did not mean contract

24   and was not understood that way and this would be

25   semi-revolutionary.  But that's exactly what Judge Weinstein
```

G7E9MEY5

said.  In fact, he went through a whole analysis of who

understands what these terms mean and came to the conclusion,

at page 380 of *Berkson*, that an average user wouldn't

understand terms of use.  At page 404 in his holding, part of

the explanation for why there's not reasonably conspicuous

notice of the existence of a contract, in that discussion Judge

Weinstein cites the actual terms which talk about -- excuse me,

actual language which points to terms of use and says that's

insufficient, a user wouldn't understand that.  The way I read

that decision, and I would submit it is the proper way, is that

he's tying those two themes together; otherwise, why would he

have gone through the discussion about the uncertainty of the

word terms of use.

THE COURT:  And we all know that Judge Weinstein is a

cautious and conservative judge and this could hardly be

revolutionary.  I'm sorry.

Anything else?

MR. FELDMAN:  I'd like to go over, your Honor, if I

could.  The defendants try to divorce the first and second

sentence within a footnote.  I submit that's improper even

under defense counsel's own explanation for why it was in

there -- and this is something I didn't know until earlier this

evening -- but defense counsel has submitted, if I heard him

correctly, that the purpose, the unnamed purpose for making

this representation to the court, which is a waiver, but the

G7E9MEY5

 1   purpose was to send a warning to people in other cases that

 2   there will not be an opportunity to sue Mr. Kalanick and not

 3   face a motion to compel.  That's entirely consistent with what

 4   that last sentence says and what we submit is the only way to

 5   read that waiver.

 6           The last point, your Honor, is it goes to the judicial

 7   estoppel argument that you've made.  That principle that it

 8   would be unfair at this point for the defendants to move to

 9   compel is exactly what we've briefed in the implied waiver

10   section of our briefs.  And the prejudice comes down to the

11   fact that the defendants have received discovery in this case

12   that they would not receive in arbitration; that there's been

13   incredible expense.  Not only did your Honor rely on the waiver

14   they made, but we did.  Plaintiff did.  We wouldn't have five

15   firms on plaintiff's side litigating this case to the hilt if

16   that waiver had not been made.

17           For those and the other reasons in our brief we

18   respectfully submit that the Court should deny the motions to

19   compel.

20           THE COURT:  All right.  Well I want to thank all

21   counsel for what was really terrific arguments throughout the

22   afternoon and early evening.  You've left a lot for me to

23   decide so I'm not going to get you the decisions that quickly.

24   But I certainly understand nevertheless the need for some

25   expedition with respect to both of these motions.  So I will

G7E9MEY5

 1    give it very high priority and hopefully get you decisions

 2    reasonably soon and I thank you again for all your many helpful

 3    arguments.

 4              MR. BRODSKY:  Your Honor, as we leave, I just wanted

 5    to note with respect to the letter that we're going to be

 6    submitting, we've talked to counsel for plaintiff.  They're

 7    going to provide us with a sum total of the amount that we

 8    would have to pay.  Then we have an agreement that if -- and if

 9    we get Uber's approval and we would make this offer, it would

10    be contingent on them providing us with time sheets and detail

11    which we would want to verify as the costs being reasonable.

12              THE COURT:  That makes perfect sense.

13              MR. BRIODY:  That's fine.

14              (Adjourned)

15

16

17

18

19

20

21

22

23

24

25