UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SPENCER MEYER, individually and on   :
behalf of those similarly situated,  :
                                     :          15 Civ. 9796
          Plaintiff,                 :
                                     :       OPINION AND ORDER
          -v-                        :
                                     :
TRAVIS KALANICK and                  :
UBER TECHNOLOGIES, INC.,             :
                                     :
          Defendants.                :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Since the late eighteenth century, the Constitution of the

United States and the constitutions or laws of the several

states have guaranteed U.S. citizens the right to a jury trial.

This most precious and fundamental right can be waived only if

the waiver is knowing and voluntary, with the courts

"indulg[ing] every reasonable presumption against waiver." Aetna

Ins. Co. v. Kennedy to Use of Bogash, 301 U.S. 389, 393 (1937);

Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d

171, 188 (2d Cir. 2007). But in the world of the Internet,

ordinary consumers are deemed to have regularly waived this

right, and, indeed, to have given up their access to the courts

altogether, because they supposedly agreed to lengthy "terms and

conditions" that they had no realistic power to negotiate or

contest and often were not even aware of.

1

This legal fiction is sometimes justified, at least where mandatory arbitration is concerned, by reference to the "liberal federal policy favoring arbitration," AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotation marks omitted). Application of this policy to the Internet is said to inhere in the Federal Arbitration Act, as if the Congress that enacted that Act in 1925 remotely contemplated the vicissitudes of the World Wide Web. Nevertheless, in this brave new world, consumers are routinely forced to waive their constitutional right to a jury and their very access to courts, and to submit instead to arbitration, on the theory that they have voluntarily agreed to do so in response to endless, turgid, often impenetrable sets of terms and conditions, to which, by pressing a button, they have indicated their agreement.

But what about situations where the consumer is not even asked to affirmatively indicate her consent? What about situations in which the consumer, by the mere act of accessing a service, is allegedly consenting to an entire lengthy set of terms and conditions? And what about the situation where the only indication to the consumer that she is so consenting appears in print so small that an ordinary consumer, if she could read it at all, would hardly notice it? Writing for the Second Circuit Court of Appeals in 2002, then-Circuit Judge Sonia Sotomayor presciently held that "[r]easonably conspicuous

2

notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." Specht v. Netscape Communications Corp., 306 F.3d 17, 35 (2002). Applying these principles to the matter at hand, the Court finds that the plaintiff here never agreed to waive his right to a jury trial or to submit to mandatory arbitration.

The background of this case is set forth in prior written decisions of this Court, familiarity with which is here assumed. See Opinion and Order dated March 31, 2016, Dkt. 37; Opinion and Order dated May 7, 2016, Dkt. 44; Memorandum Order dated June 19, 2016, Dkt. 90. By way of brief background, on December 16, 2015, plaintiff Spencer Meyer filed suit against defendant Travis Kalanick, alleging that Mr. Kalanick had orchestrated and participated in an antitrust conspiracy arising from the algorithm that co-defendant Uber Technologies, Inc. ("Uber") uses to set ride prices. See Complaint, Dkt. 1. Mr. Kalanick did not, at that time, make any motion to compel arbitration. Instead, he filed a motion to dismiss plaintiff's First Amended Complaint, which was denied on March 31, 2016, as well as a motion to reconsider the Court's determination that plaintiff could seek to proceed via class action, which was denied on May 9, 2016. See Opinion and Order dated March 31, 2016; Opinion and Order dated May 7, 2016. Following these Court rulings, Mr.

3

Kalanick, on May 20, 2016, moved to join Uber as a defendant in this case, see Notice of Motion for Joinder, Dkt. 46, and that motion was granted. See Memorandum Order dated June 19, 2016, Dkt. 90.

Uber had also moved to intervene, see Notice of Motion to Intervene, Dkt. 58, and, once Mr. Kalanick's motion to join Uber was granted, Uber's motion to intervene was denied as moot. See Memorandum Order dated June 19, 2016. But attached to Uber's motion to intervene was a motion to compel arbitration. See Proposed Intervenor Uber Technologies, Inc.'s Memorandum of Law in Support of Motion to Compel Arbitration, Dkt. 59-2. Uber argued that Mr. Meyer was required to arbitrate his claims pursuant to a contract formed when he signed up to use Uber. See id. at 1. On June 7, 2016, defendant Kalanick also moved to compel arbitration. See Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Compel Arbitration ("Kalanick Br."), Dkt. 81. Mr. Kalanick claimed that even though he was not a signatory to the contract that plaintiff had formed with Uber, he could enforce the arbitration provision of that contract against plaintiff. See id. at 1. After Uber was joined as a defendant, it re-filed its motion to compel arbitration. See Uber Technologies, Inc.'s Memorandum of Law in Support of Motion to Compel Arbitration ("Uber Br."), Dkt. 92.

4

As the motions to compel arbitration were then ripe, the Court ordered full briefing. By papers filed on June 29, 2016, plaintiff opposed the motions to compel arbitration filed by defendants Kalanick and Uber. See Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration ("Pl. Opp. Br."), Dkt. 102. On July 7, 2016, Mr. Kalanick and Uber filed separate replies to plaintiff's opposition. See Reply Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Compel Arbitration ("Kalanick Reply Br."), Dkt. 110; Uber Technologies, Inc.'s Reply in Support of Motion to Compel Arbitration ("Uber Reply Br."), Dkt. 113. Thereafter, on July 14, 2016, the Court held oral argument. See Transcript dated July 14, 2016 ("Tr."), Dkt. 124.

Having now carefully considered all these submissions and arguments, the Court hereby denies the motions to compel arbitration filed by Uber and by Mr. Kalanick. It should be noted at the outset that the parties' submissions raise a number of important but subsidiary questions, such as, for example, whether Mr. Kalanick is permitted to enforce an alleged arbitration agreement to which he is not a signatory and whether Mr. Kalanick and/or Uber have waived any right to compel arbitration through their prior statements and participation in litigation in this Court. At this juncture, however, the Court need not decide these questions, since it finds that the motions

are resolved by the threshold question of whether plaintiff actually formed any agreement to arbitrate with Uber, let alone with Mr. Kalanick.

Plaintiff denies that such an agreement was ever formed, on the ground that when he registered to use Uber, he did not have adequate notice of the existence of an arbitration agreement. See Pl. Opp. Br. at 10-14. The question of whether an arbitration agreement existed is for the Court and not an arbitrator to decide, as Uber acknowledged at oral argument. See Tr. 75:2-10; see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 392 (2d Cir. 2011); Celltrace Communs. Ltd. v. Acacia Research Corp., 2016 U.S. Dist. LEXIS 78620, *5-6 (S.D.N.Y. June 16, 2016).

The parties argue, however, over which state's law should be applied to the issue of whether plaintiff agreed to arbitrate his claims. The Court previously indicated that California law would apply to the User Agreement between Uber and its riders – i.e., the agreement that contains the arbitration clause and to which plaintiff is alleged to have assented.[1] See Opinion dated May 7, 2016, at 5-6. Plaintiff supports the application of California law, see Pl. Opp. Br. at 25-27, and in fact,

---

[1] Defendants Kalanick and Uber refer to this agreement as Uber's "Rider Terms." The Court refers to the agreement as the "User Agreement" for the sake of consistency with the Court's previous rulings, but no substantive point depends on this terminological choice.

defendant Kalanick expressly stated in previous briefing in this case that California law applied. See Defendant's Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Dismiss, Dkt. 28, at 23 ("In this case, the relevant contract law is the law of California."); see also Memorandum of Law in Support of Defendant Travis Kalanick's Motion for Reconsideration of the Court's Holding Regarding Plaintiff's Class Action Waiver, Dkt. 41, at 7 n.3 ("Given the facts pled in the Complaint, California law would appear to apply given Uber's connections to California; the only other alternative is New York."). Yet Mr. Kalanick and Uber now contend that New York law should apply to the User Agreement, citing "evidence now available" concerning Uber rides that plaintiff Meyer has taken. See Kalanick Br. at 15-17; Uber Br. at 12-13.

Although the Court does not view the choice between California law and New York law as dispositive with respect to the issue of whether an arbitration agreement was formed, the Court confirms its prior decision to apply California law to the User Agreement. To reach this result, the Court first employed (and again employs) New York's "interest analysis" for deciding which state law to apply in these circumstances. According to that analysis, a court "must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract;

(4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties." Philips Credit Corp. v. Regent Health Grp., Inc., 953 F. Supp. 482, 502 (S.D.N.Y. 1997).

Here, the fact that Uber - one of the parties to the alleged contract, and the contract's drafter — is located in California weighs heavily in favor of the application of California law. Consistent with this finding is the fact that although Uber's May 17, 2013 User Agreement (the one to which plaintiff is alleged to have assented) contains no explicit choice-of-law clause, that agreement indicates that the arbitrator referenced in the agreement's arbitration provision "will be either a retired judge or an attorney licensed to practice law in the state of California," see User Agreement, Dkt. 29-1, at 8. Moreover, later versions of the User Agreement contain an explicit California choice-of-law clause. See Declaration of Jeffrey A. Wadsworth ("Wadsworth Decl."), Exhibit 1, Dkt. 101-1, at UBER-00000221; Wadsworth Decl., Exhibit 2, Dkt. 101-2, at UBER-00000233.

The other interest analysis factors do not favor any other state's law more strongly than that of California. According to the uncontested representation of Uber's Senior Software Engineer Vincent Mi, the plaintiff has taken three Uber rides in New York City; one in Connecticut; three in Washington, D.C.;

and three in Paris. See Uber Br., Exhibit 1, Dkt. 92-1 ("Mi
Decl."), ¶ 4. Plaintiff Meyer lives in Connecticut, see First
Amended Complaint, Dkt. 26, ¶ 7, and he recalls being in Vermont
when he registered to use Uber. See Declaration of Spencer Meyer
("Meyer Decl."), Dkt. 100, ¶ 2. None of these features of the
case, or any others, supports the choice of New York law over
California law. Accordingly, the Court reaffirms its prior
holding that California law applies to the User Agreement.[2]

Turning, then, to the question of whether plaintiff agreed
to arbitrate his claims, defendants first argue that plaintiff
conceded that he had so agreed through a statement made in his
Amended Complaint. See Kalanick Br. at 7; Uber Br. at 8.
Specifically, plaintiff stated in his Amended Complaint that
"[t]o become an Uber account holder, an individual first must
agree to Uber's terms and conditions and privacy policy."
Amended Complaint, ¶ 29. But defendants read this statement out
of context, as the statement does not specifically reference the
plaintiff. And plaintiff's counsel clarified at oral argument
that the statement was not intended as some kind of implicit
waiver, and that, if required, he could amend the complaint to
so clarify. See Tr. 92:1-25. The Federal Rules of Civil

---

[2] Nevertheless, as indicated above, the Court does not see the choice between
California law and New York law as dispositive with regard to the issue of
whether plaintiff formed an agreement to arbitrate. Even if the Court were to
apply New York law, it would hold that plaintiff had not formed such an
agreement.

Procedure provide that "[t]he court should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), and so, for instant purposes, the Court will deem the complaint so amended. Moreover, even without the amendment, the Court does not construe this one sentence of the complaint as somehow a knowing and voluntary waiver of the right to argue that Mr. Meyer was never adequately notified of the alleged agreement to arbitrate.[3]

The Court therefore turns to the heart of plaintiff's argument that he did not agree to arbitrate his claims. As previously indicated, guidance from the Court of Appeals was provided in Specht v. Netscape Commc'ns Corp., 306 F.3d 17 (2d Cir. 2002), and that decision is particularly apt because it applied California law. Applying that law, the Specht court found that certain plaintiffs had not assented to a license agreement containing a mandatory arbitration clause because adequate notice and assent were not present on the facts of that case. See id. at 24, 32, 35.

In the instant case, the essentially undisputed facts relevant to the issue of whether plaintiff assented to the arbitration agreement are as follows. According to a declaration submitted by Uber engineer Mi, plaintiff Meyer registered for

---

[3] The same is even more true of a passing remark plaintiff's counsel made at oral argument in one of the hearings before the Court on another issue. See Transcript dated June 16, 2016, Dkt. 94, at 15:14-15.

Uber on October 18, 2014 via the Uber smartphone application
(the "Uber app") using a Samsung Galaxy S5 phone with an Android
operating system. See Mi Decl. ¶ 3. At the time that Mr. Meyer
registered to use Uber, Uber rider registration using a
smartphone involved a two-step process. See Mi Decl., ¶ 5; Uber
Br. at 14. At the first screen, potential Uber riders were
prompted either to register using Google+ or Facebook, or to
enter their name, email address, phone number, and password and
click "Next." See Mi Decl., Exhibit A, Dkt. 92-2, at 001.
Potential riders who clicked "Next" at the first screen were
directed to a second screen, where they could make payment and
register to use Uber. See Mi Decl., Exhibit A, at 002. Uber has
provided an image of this second screen – the crucial one for
the purposes of determining plaintiff's assent to the
arbitration agreement – that is considerably larger than the
screen that would be faced by the user of a Samsung Galaxy S5
phone. Therefore, the Court attaches to this opinion an image of
the second screen scaled down to reflect the size of such a
phone (with a 5.1" or 129.4 mm display size).[4]

The second screen of the Uber registration process
features, at the top of the screen, fields for users to insert

---

[4] See Tech Specs, Samsung Galaxy S5,
http://www.samsung.com/uk/consumer/mobile-devices/smartphones/galaxy-s/SM-G900FZKABTU.

their credit card details. See Mi Decl., Exhibit A, at 002.
Beneath these fields is a large, prominent button whose width
spans most of the screen; it is labeled "Register." See id.
Beneath this button are two additional buttons, with heights
similar to that of the "Register" button, labeled "PayPal" and
"Google Wallet." See id. These buttons indicate that a user may
make payments using PayPal or Google Wallet instead of entering
his or her credit card information. See id.; Uber Br. at 4; Pl.
Opp. Br. at 3.

Beneath these two additional buttons, in considerably
smaller font, are the words "By creating an Uber account, you
agree to the Terms of Service & Privacy Policy." See Mi Decl.,
Exhibit A, at 002. While the phrase "Terms of Service & Privacy
Policy" is in all-caps, the key words "By creating an Uber
account, you agree to" are not in any way highlighted and,
indeed, are barely legible.[5]

Although the fact that the phrase "Terms of Service &
Privacy Policy" is underlined and in blue suggests that the
phrase is a hyperlink, see Uber Br. at 4; Mi Decl. ¶ 5(b), a
potential user may click on the "Register" button and complete
the Uber registration process without clicking on this

---

[5] In the Court's reckoning, the word "Register" is in approximately 10-point
font, the phrase "Terms of Service & Privacy Policy" is in approximately 6-
point font, and the words "By creating an Uber account, you agree to" may be
in even smaller font and certainly no greater than 6-point font.

hyperlink. See Pl. Opp. Br. at 12. Even if a potential user does click on the hyperlink, she is not immediately taken to the actual terms and conditions. Rather, in the words of Uber engineer Mi, "the user is taken to a screen that contains a button that accesses the 'Terms and Conditions' and 'Privacy Policy' then in effect." Mi Decl. ¶ 5(b); see also Uber Br. at 5.[6] Thus, it is only by clicking first the hyperlink and then the button – neither of which is remotely required to register with Uber and begin accessing its services – that a user can even access the Terms and Conditions.

Further still, even if a user were to arrive at the Terms and Conditions, these terms (which the Court calls the "User Agreement") consist of nine pages of highly legalistic language that no ordinary consumer could be expected to understand. And it is only on the very bottom of the seventh page that one finally reaches the following provision:

**Dispute Resolution**

> You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, **"Disputes"**) will be settled

---

[6] In fact, unlike a declaration that Uber submitted in another recent case, Mr. Mi's declaration does not attest that "[t]he Terms & Conditions then in effect would be displayed when the 'Terms & Conditions' button was clicked." Declaration of Paul Holden, Cullinane v. Uber Techs., Inc., No. 14-cv-14750, 2016 WL 3751652 (D. Mass. July 11, 2016) (Dkt. 32-1); see also Resorb Networks, Inc. v. YouNow.com, 30 N.Y.S.3d 506 (N.Y. Sup. Ct. 2016). (Docket numbers in parentheticals refer to docket entries in other cases, usually containing screenshots of websites or other interfaces referenced in other court decisions.)

by binding arbitration, except that each party retains
the right to bring an individual action in small claims
court and the right to seek injunctive or other equitable
relief in a court of competent jurisdiction to prevent
the actual or threatened infringement, misappropriation
or violation of a party's copyrights, trademarks, trade
secrets, patents or other intellectual property rights.
**You acknowledge and agree that you and Company are each
waiving the right to a trial by jury or to participate
as a plaintiff or class User in any purported class
action or representative proceeding.** Further, unless
both you and Company otherwise agree in writing, the
arbitrator may not consolidate more than one person's
claims, and may not otherwise preside over any form of
any class or representative proceeding. If this specific
paragraph is held unenforceable, then the entirety of
this "Dispute Resolution" section will be deemed void.
Except as provided in the preceding sentence, this
"Dispute Resolution" section will survive any
termination of this Agreement.

User Agreement at 7-8 (boldface in the original). The bolded

sentence in the middle of this paragraph is the only bolded

sentence in the User Agreement that is not part of a header,

although other statements in the User Agreement are in all-caps.

See, e.g., id. at 6 ("Limitation of Liability").

Plaintiff Meyer states that he does not recall noticing the

Terms of Service hyperlink when he registered to use Uber and

does not believe that he clicked on the hyperlink. See Meyer

Decl., ¶ 3. Uber does not contest this statement, and the Court

finds no basis for a claim that plaintiff Meyer had "actual

knowledge of the agreement." Nguyen v. Barnes & Noble Inc., 763

F.3d 1171, 1177 (9th Cir. 2014) (applying New York law).

However, an individual may still be said to have assented to an

14

electronic agreement if "a reasonably prudent user" would have been put "on inquiry notice of the terms of the contract." Barnes & Noble, 763 F.3d at 1177; see also Schnabel v. Trilegiant Corp., 697 F.3d 110, 120 (2d Cir. 2012); Specht, 306 F.3d at 20.[7]

Courts addressing electronic contract formation have at times distinguished between two types of agreements: "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." Barnes & Noble, 763 F.3d at 1175–76. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." Be In, Inc. v. Google Inc., No. 12-cv-03373, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013); see also Long v. Provide Commerce, Inc., 200 Cal. Rptr. 3d 117, 123 (Cal. Ct. App. 2016) (internal quotation marks omitted).

---

[7] Much of the case law on electronic bargaining relates to the context of Internet transactions, while the alleged agreement in the instant case was formed via mobile application. However, the Court sees little reason to distinguish between the two contexts, and neither does existing case law. See, e.g., Cullinane, 2016 WL 3751652, at *6.

"Clickwrap" agreements are more readily enforceable, since they "permit courts to infer that the user was at least on inquiry notice of the terms of the agreement, and has outwardly manifested consent by clicking a box." Cullinane, 2016 WL 3751652, at *6; see also Specht, 306 F.3d at 22 n.4; Savetsky v. Pre-Paid Legal Servs., Inc., 14-cv-03514, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015); Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015); United States v. Drew, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009). "Browsewrap agreements are treated differently under the law than 'clickwrap' agreements." Schnabel, 697 F.3d at 129 n.18. Courts will generally enforce browsewrap agreements only if they have ascertained that a user "'had actual or constructive knowledge of the site's terms and conditions, and . . . manifested assent to them.'" Id. (quoting Cvent, Inc. v. Eventbrite, Inc., 739 F. Supp. 2d 927, 937 (E.D. Va. 2010)). This is rarely the case for individual consumers. In fact, courts have stated that "the cases in which courts have enforced browsewrap agreements have involved users who are businesses rather than, as in Specht . . . consumers." Fjeta v. Facebook, Inc., 841 F. Supp. 2d 829, 836 (S.D.N.Y. 2012); see also Berkson, 97 F. Supp. 3d at 396 ("Following the ruling in Specht, courts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations, not against individuals."); Mark A. Lemley, Terms of Use, 91 Minn.

16

L. Rev. 459, 472 (2006) ("An examination of the cases that have
considered browsewraps in the last five years demonstrates that
the courts have been willing to enforce terms of use against
corporations, but have not been willing to do so against
individuals.").

Here, the User Agreement to which plaintiff Meyer allegedly
assented was clearly not a clickwrap agreement. Mr. Meyer did
not need to affirmatively click any box saying that he agreed to
Uber's "Terms of Service." On the contrary, he could sign up for
Uber by clicking on the "Register" button without explicitly
indicating his assent to the terms and conditions that included
the arbitration provision. See Mi Decl., Exhibit A, at 002. As
with a browsewrap agreement, an Uber user could access Uber's
services "without visiting the page hosting the browsewrap
agreement or even knowing that such a webpage exists." Be In,
2013 WL 5568706, at *6.

Nevertheless, Uber's User Agreement differs from certain
browsewrap agreements in which "by visiting the website –
something that the user has already done – the user agrees to
the Terms of Use not listed on the site itself but available
only by clicking a hyperlink." Barnes & Noble, 763 F.3d at 1176
(internal quotation marks omitted); see also Fjeta, 841 F. Supp.
2d at 838 ("Facebook's Terms of Use are somewhat like a
browsewrap agreement in that the terms are only visible via a

17

hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else – click 'Sign Up' – to assent to the hyperlinked terms."). Uber's User Agreement might be characterized as a "sign-in wrap," since a user is allegedly "notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." Berkson, 97 F. Supp. 3d at 399; see also Cullinane, 2016 WL 3751652, at *6. Sign-in wraps have been described as "[a] questionable form of internet contracting." Berkson, 97 F. Supp. 3d at 399. Here, as indicated, the notification was in a font that was barely legible on the smartphone device that a would-be Uber registrant could be expected to use.

Of course, all these labels can take courts only so far. The issue of whether plaintiff Meyer agreed to arbitrate his claims "turns more on customary and established principles of contract law than on newly-minted terms of classification." Cullinane, 2016 WL 3751652, at *6. For while the Internet may have reduced ever further a consumer's power to negotiate terms, "it has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004). One of these principles is that "[m]utual manifestation of assent . . . is the touchstone of contract." Specht, 306 F.3d at 29. Moreover, "[a]rbitration agreements are no exception to

the requirement of manifestation of assent," id. at 30, and

"[c]larity and conspicuousness of arbitration terms are

important in securing informed assent." Id. The Specht standard

provides a way for courts to ascertain whether this fundamental

principle of contract law has been vindicated, and it is this

standard – whether plaintiff Meyer had "[r]easonably conspicuous

notice of the existence of contract terms and unambiguous

manifestation of assent to those terms" – that the Court will

apply. Id. at 35.

While every case is different, the Court has examined the

decisions of other courts that have considered issues of

electronic contract formation, even where, as in many cases,

these decisions are not binding on this Court. In numerous cases

in which electronic contracts were held to have been properly

formed, notice of the existence of those contracts was more

conspicuous – in some cases, much more conspicuous - than in the

instant case, and indications of assent were much more express.

For example, in Mohamed v. Uber Technologies, Inc., a case cited

by Uber, see Uber Reply Br. at 2 n.2, a court in the Northern

District of California concluded that a binding contract had

been formed between Uber drivers and Uber. See Mohamed v. Uber

Techs., Inc., 109 F. Supp. 3d 1185, 1197 (N.D. Cal. 2015).

There, Uber drivers could not access the Uber app without

clicking a button marked "Yes, I agree" beneath the phrase "By

19

clicking below, you acknowledge that you agree to all the contracts above," with those contracts hyperlinked above, and then clicking "Yes, I agree" on a screen containing text stating "Please confirm that you have reviewed all the documents and agree to all the new contracts." Id. at 1190-91. In the instant case, by contrast, plaintiff Meyer did not have to click any button explicitly indicating assent to Uber's User Agreement, and the hyperlink to Uber's "Terms of Service" was nowhere near as prominent as in Mohamed.

In Cullinane v. Uber Techs., Inc., on which Uber also relies, a court held that Uber users had formed an agreement to arbitrate their claims. See Cullinane, 2016 WL 3751652, at *7. There, the applicable version of Uber's registration screen for users, like in the instant case and unlike in Mohamed, did not require users to affirmatively click "I agree." See id. (Dkts. 32-2, 32-3). However, in the user interface that some of the Cullinane plaintiffs faced, the clickable box with the phrase "Terms of Service & Privacy Policy" was clearly delineated, and the words appeared in bold white lettering on a black background, in a size similar to, if not larger than, the size of the "Done" button that users clicked in order to register. See Cullinane, 2016 WL 3751652 (Dkts. 32-3, 32-5). In the instant case, by contrast, the phrase "Terms of Service &

Privacy Policy" is much smaller and more obscure, both in

absolute terms and relative to the "Register" button.[8]

A review of numerous other cases finding that an electronic

agreement was formed highlights the point that the Uber

registration process in plaintiff Meyer's case involved a

considerably more obscure presentation of the relevant

contractual terms.[9] Further, by contrast to the situation in

---

[8] In fact, in the user interface that other Cullinane plaintiffs faced, the phrase "Terms of Use & Privacy Policy" was placed between the field in which the user's credit card number would appear and the numbers that users would tap in order to enter their credit card information – a clearly prominent location. See Cullinane, 2016 WL 3751652 (Dkts. 32-2, 32-4).

[9] See, e.g., Defillipis v. Dell Fin. Servs., 14-cv-115, 2016 WL 394003, at *3 (M.D. Pa. Jan. 29, 2016) ("an applicant had to affirmatively click a box agreeing: 'I have read and agree to the Privacy Policy and Terms & Conditions, which contain important account information.'"); Bassett v. Elec. Arts, Inc., 93 F. Supp. 3d 95, 99 (E.D.N.Y. 2015) ("Plaintiff would have been presented with four buttons, two of which are the links to the terms of service and privacy policy, one which reads 'I Do Not Accept,' and one which reads 'I Have Read And Accept Both Documents.' . . . If the registrant . . . does not click the button reading "I ... Accept . . ." . . . the registration process stops and the online features cannot be activated."); Nicosia v. Amazon.com, Inc., 84 F. Supp. 3d 142, 150 (E.D.N.Y. 2015) (Dkt. 53-3) (the statement "By placing your order, you agree to Amazon.com's privacy notice and conditions of use" appears directly under "Review your order" and higher on the page than the button to click to "Place your order," so that "[t]o place his orders, Plaintiff had to navigate past this screen by clicking a square icon below and to the right of this disclaimer, which states: 'Place your order.'"); Whitt v. Prosper Funding, LLC, 15-cv-136, 2015 WL 4254062, at *1 (S.D.N.Y. July 14, 2015) (Dkt. 41-1) ("An applicant could not complete a loan application without clicking the box indicating his or her acceptance of the Agreement."); Tompkins v. 23andMe, Inc., 13-cv-05682, 2014 WL 2903752, at *3 (N.D. Cal. June 25, 2014) ("The account creation page requires customers to check a box next to the line, 'Yes, I have read and agree to the Terms of Service and Privacy Statement' . . . Similarly, during the registration process, . . . [c]ustomers must then click a large blue icon that reads 'I ACCEPT THE TERMS OF SERVICE' before finishing the registration process"); Swift v. Zynga Game Network, Inc., 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) ("Plaintiff admits that she was required to and did click on an 'Accept' button directly above a statement that clicking on the button served as assent to the YoVille terms of service along with a blue hyperlink directly to the terms of service."); Zaltz v. JDATE, 952 F. Supp. 2d 439, 453-54 (E.D.N.Y. 2013) ("defendant's reference to its Terms and Conditions of Service appear above the button" that "a prospective user had to click in order to assent"); 5831 Partners LLC v. Shareasale.com, 12-cv-4263, 2013 WL

Register.com, 356 F.3d 393 at 401-02, there is no evidence that

plaintiff Meyer repeatedly visited Uber's registration screen.[10]

Rather, Uber's interface here shares certain

characteristics in common with instances in which courts have

declined to hold that an electronic agreement was formed. Most

obviously, Uber riders need not click on any box stating "I

agree" in order to proceed to use the Uber app — a feature that

courts have repeatedly made note of in declining to find that an

---

5328324, at *7 & n.4 (E.D.N.Y. Sept 23, 2013) ("defendant's reference to its
Merchant Agreement appears adjacent to the activation button . . . in
determining that the forum selection clause was reasonably communicated to
plaintiff, [the Court] is solely relying on the second page of the sign up
process (in which a prospective merchant must click to activate its account
and is informed that 'By clicking and making a request to Activate, you agree
to the terms and conditions in the Merchant Agreement.'"); Vernon v. Qwest
Commc'ns Int'l, Inc., 925 F. Supp. 2d 1185, 1191 (D. Colo. 2013) ("At each
stage of the enrollment process the consumer was referred to the Subscriber
Agreement and, in some instances, specifically to the existence of an
arbitration clause."); Fjeta, 841 F. Supp. 2d (Dkt. 12 at 17)(the phrase "By
clicking Sign Up, you are indicating that you have read and agree to the
Terms of Policy" appeared directly below the button marked "Sign Up," and,
this Court finds, the symmetry between the "Sign Up" phrases would help to
catch the reader's eye); Guadagno v. E*Trade Bank, 592 F. Supp. 2d 1263,
1267, 1271 (C.D. Cal. 2008) (Dkt. 31-2) (users had to check a box
acknowledging that they had reviewed the Account Agreement); Feldman v.
Google, Inc., 513 F. Supp. 2d 229, 233, 237 (E.D. Pa. 2007) (Dkt. 16-2) (in
order to activate their accounts, users had to click a box stating "**Yes**, I
agree to the above terms and conditions" displayed in a scrollable text box);
Major v. McCallister, 302 S.W.3d 227 (Mo. Ct. App. 2009) (the party seeking
to enforce the contract "did put 'immediately visible notice of the existence
of license terms' — i.e., 'By submitting you agree to the Terms of Use' and a
blue hyperlink — right next to the button that Appellant pushed.").

[13] In Register.com, the Second Circuit drew an analogy between an electronic
contract and an apple stand with a sign, visible only as one turns to exit,
naming the price of apples. The Second Circuit indicated that an individual
who eats an apple without paying might avoid contractual liability the first
time he did so, but he would not be able to do so if he thereafter visited
the stand and ate apples several times a day. See Register.com, 356 F.3d at
401-02. Other courts have since extended the Register.com analogy in
different directions, see Fteja, 841 F. Supp. 2d at 839; Cullinane, 2016 WL
3751652, at *7, but Register.com itself focuses on the repetition of the
activity of seeing the sign.

electronic contract was formed. See, e.g., Barnes & Noble, 763
F.3d at 1176; Specht, 306 F.3d at 22-23; Savetsky v. Pre-Paid
Legal Servs., Inc., 14-cv-03514, 2015 WL 604767, at *4 (N.D.
Cal. Feb. 12, 2015). Nor do the license terms in the instant
case appear on the screen in view of the user. See Motise v. Am.
Online, Inc., 346 F. Supp. 2d 563, 565 (S.D.N.Y. 2004). As the
Seventh Circuit has stated, a court "cannot presume that a
person who clicks on a box that appears on a computer screen has
notice of all contents not only of that page but of other
content that requires further action (scrolling, following a
link, etc.)." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1035
(7th Cir. 2016).

Significantly for the purposes of determining whether
plaintiff was on inquiry notice, the hyperlink here to the
"Terms of Service & Privacy Policy" is by no means prominently
displayed on Uber's registration screen. While the payment
information and "Register" button are "very user-friendly and
obvious," Berkson, 97 F. Supp. 3d at 404, Uber's statement about
"Terms of Service" appears far below and in much smaller font.
As a result, "the design and content of" Uber's registration
screen did not "make the 'terms of use' (i.e., the contract
details) readily and obviously available to the user." Id. at
402; see also Long, 200 Cal. Rptr. 3d at 126 (recognizing "the
practical reality that the checkout flow is laid out in such a

23

manner that it tended to conceal the fact that placing an order was an express acceptance of [defendant's] rules and regulations.") (internal quotation marks and alterations omitted).

Indeed, the Terms of Service hyperlink in the instant case is less conspicuous than the one found not to give rise to an electronically-formed contract in Berkson. In that case, the statement "By clicking 'Sign In' I agree to the terms of use and privacy policy" appeared above the most prominent "Sign In" button on the web page. See Berkson, 97 F. Supp. 3d at 373-74, 403-04. This statement, while plausibly providing inadequate notice, was actually more likely to disrupt viewers' experiences in some way and draw their attention to the terms and conditions than the interface in the instant case, where the hyperlink stating "Terms of Service & Privacy Policy" is located far beneath the "Register" button and takes on the appearance of an afterthought. See Mi Decl., Exhibit A, at 002. Moreover, unlike in Berkson, the registration screen here does not contain parallel wording as between the "Register" button and the statement "By creating an Uber account, you agree to the Terms of Service & Privacy Policy." See Berkson, 97 F. Supp. 3d at 373-74; see also Fjeta, 841 F. Supp. 2d (Dkt. 12 at 17). The relative obscurity of the reference to "Terms of Service" in the Uber interface is significant; courts have declined to hold that

24

a valid electronic contract was formed when "the website did not prompt [a party] to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions." Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), aff'd, 380 F. App'x 22 (2d Cir. 2010).

As this brief review suggests, electronic agreements fall along a spectrum in the degree to which they provide notice, and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways. Consequently, courts must embark on a "fact-intensive inquiry," Sgouros, 817 F.3d at 1034-35, in order to make determinations about the existence of "[r]easonably conspicuous notice" in any given case. Specht, 306 F.3d at 35.

Here, the Court finds that plaintiff Meyer did not have "[r]easonably conspicuous notice" of Uber's User Agreement, including its arbitration clause, or evince "unambiguous manifestation of assent to those terms." Id. Most importantly, the Uber registration screen, as explained supra, did not adequately call users' attention to the existence of Terms of Service, let alone to the fact that, by registering to use Uber, a user was agreeing to them. Like in Long, the "Terms of [Service] hyperlink[] - [its] placement, color, size and other qualities relative to the [Uber app registration screen's]

overall design – [is] simply too inconspicuous to meet [the
Specht] standard." Long, 200 Cal. Rptr. 3d at 125-26. When to
this is coupled the fact that the key words "By creating an Uber
account, you agree to" are even more inconspicuous, it is hard
to escape the inference that the creators of Uber's registration
screen hoped that the eye would be drawn seamlessly to the
credit card information and register buttons instead of being
distracted by the formalities in the language below. And this,
the Court finds, is the reasonably foreseeable result.

Further still, the wording of Uber's hyperlink adds to the
relative obscurity of Uber's User Agreement. The Court cannot
simply assume that the reasonable (non-lawyer) smartphone user
is aware of the likely contents of "Terms of Service,"
especially when that phrase is placed directly alongside
"Privacy Policy." There is, after all, a "breadth of the range
of technological savvy of online purchasers" (and smartphone
users). Barnes & Noble, 763 F.3d at 1179; see also Long, 200
Cal. Rptr. 3d at 127; Berkson, 97 F. Supp. 3d at 400. The
reasonable user might be forgiven for assuming that "Terms of
Service" refers to a description of the types of services that
Uber intends to provide, not to the user's waiver of his
constitutional right to a jury trial or his right to pursue

26

legal redress in court should Uber violate the law.[11] In other words, "the importance of the details of the contract" was "obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product." Berkson, 97 F. Supp. 3d at 402. There is a real risk here that Uber's registration screen "made joining [Uber] fast and simple and made it appear – falsely - that being a [user] imposed virtually no burdens on the consumer besides payment." Schnabel, 697 F.3d at 127-28.

Additionally, the hurdles for Uber users were not at an end even if they did click on the initial hyperlink. Such users were "taken to a screen that contains a button that accesses the 'Terms and Conditions' and 'Privacy Policy' then in effect." Mi Decl., ¶ 5(b). Once users reached the "Terms of Service" (i.e., the User Agreement), they had to scroll down several pages in order to come across the arbitration provision, located in a "dispute resolution" section. See Sgouros, 817 F.3d at 1033;

---

[11] It may be noted, à propos the expectations of the ordinary consumer, that according to a 2015 study carried out by the Consumer Financial Protection Bureau, "[o]ver three quarters of those who said they understood what arbitration is acknowledged they did not know whether their credit card agreement contained an arbitration clause. Of those who thought they did know, more than half were incorrect about whether their agreement actually contained an arbitration clause. Among consumers whose contract included an arbitration clause, fewer than 7 percent recognized that they could not sue their credit card issuer in court." See Consumer Financial Protection Bureau Study Finds That Arbitration Agreements Limit Relief for Consumers, Consumer Protection Financial Bureau, March 10, 2015, http://www.consumerfinance.gov/about-us/newsroom/cfpb-study-finds-that-arbitration-agreements-limit-relief-for-consumers.

Savetsky, 2015 WL 604767, at *4. While the "dispute resolution"
heading in the User Agreement is bolded, as is the waiver (in
the arbitration context) of the right to a jury trial or class
proceeding, users would have had to reach this part of the
agreement to discover the bolded text at all (unlike, for
example, the prominent warning about the existence of an
arbitration clause in Guadagno v. E*Trade Bank, 592 F. Supp. 2d
1263, 1271 (C.D. Cal. 2008)). Though "[a] party cannot avoid the
terms of a contract on the ground that he or she failed to read
it before signing," Specht, 306 F.3d at 30 (internal quotation
marks omitted), the placement of the arbitration clause in
Uber's User Agreement constituted, as a practical matter, a
further barrier to reasonable notice.

At bottom, what is at stake is the "integrity and
credibility" of "electronic bargaining." Specht, 306 F.3d at 35.
When contractual terms as significant as the relinquishment of
one's right to a jury trial or even of the right to sue in court
are accessible only via a small and distant hyperlink titled
"Terms of Service & Privacy Policy," with text about agreement
thereto presented even more obscurely, there is a genuine risk
that a fundamental principle of contract formation will be left
in the dust: the requirement for "a manifestation of mutual
assent." Schnabel, 697 F.3d at 119 (internal quotation marks
omitted). One might be tempted to argue that the nature of

electronic contracts is such that consumers do not read them, however conspicuous these contracts are, and that consumers have resigned themselves simply to clicking away their rights. But that would be too cynical and hasty a view, and certainly not the law. The purveyors of electronic form contracts are legally required to take steps to provide consumers with "reasonable notice" of contractual terms. See Specht, 306 F.3d at 20. User interfaces designed to encourage users to overlook contractual terms in the process of gaining access to a product or service are hardly a suitable way to fulfill this legal mandate.

"[T]he Federal Arbitration Act . . . does not require parties to arbitrate when they have not agreed to do so." Schnabel, 697 F.3d at 118 (internal quotation marks omitted). The Court finds that, in light of all the relevant facts and circumstances, plaintiff Meyer did not form such an agreement here. Consequently, defendant Uber may not enforce the arbitration clause against Mr. Meyer. As a result, even if defendant Kalanick were entitled to enforce this arbitration clause and had not waived such a right — issues that the Court does not now decide — he too would be unable to enforce the arbitration clause. The Court hence denies the motions to compel arbitration filed by both Mr. Kalanick and Uber.

The Clerk of Court is directed to close docket entries 80 and 91.

SO ORDERED.


Dated:     New York, NY
           July 29, 2016                   _____
                                           JED S. RAKOFF, U.S.D.J.

