16-2750-cv, 16-2752-cv
*Meyer v. Uber Technologies, Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:** _____
**DATE FILED:** August 17, 2017

August Term 2016

(Argued: March 24, 2017    Decided: August 17, 2017)

Docket Nos. 16-2750-cv, 16-2752-cv

SPENCER MEYER, Individually and on behalf of those similarly situated,

*Plaintiff-Counter-Defendant-Appellee,*

*v.*

UBER TECHNOLOGIES, INC.,

*Defendant-Counter-Claimant-Appellant,*

TRAVIS KALANICK,

*Defendant-Appellant,*

ERGO,

*Third-Party Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CERTIFIED COPY ISSUED ON 08/17/2017

Before:

RAGGI, CHIN, AND CARNEY, *Circuit Judges*.

---

In this putative class action filed in the United States District Court for the Southern District of New York (Rakoff, *J.*), a user of a technology company's car service smartphone application alleges that the company and its former chief executive engaged in illegal price fixing. Defendants moved in the district court to compel arbitration, contending that the user agreed to a mandatory arbitration provision in the company's terms of service when he registered for an account using the application. The district court denied the motions. In these consolidated appeals, defendants contend, *inter alia*, that the district court erred in concluding that the notice of the Terms of Service was not reasonably conspicuous and that the user did not unambiguously manifest assent to the arbitration provision by registering for an account.

VACATED AND REMANDED.

---

JEFFREY A. WADSWORTH (Brian Marc Feldman, Edwin Michael Larkin, III, Gregory M. Dickinson, *on the brief*), Harter Secrest & Emery LLP, Rochester, New York, *and* Bryan L. Clobes, Ellen Meriwether, Cafferty Clobes Meriwether & Sprengel LLP, Philadelphia, Pennsylvania, *and* Matthew L. Cantor, Ankur Kapoor, Constantine

Cannon LLP, New York, New York, *for Plaintiff-Counter-Defendant-Appellee Spencer Meyer*.

THEODORE J. BOUTROUS JR. (Daniel G. Swanson, Cynthia E. Richman, Joshua S. Lipshutz, Reed Brodsky, *on the brief*), Gibson, Dunn & Crutcher LLP, Los Angeles, California, Washington, D.C., and New York, New York, *for Defendant-Counter-Claimant-Appellant Uber Technologies, Inc.*

Karen L. Dunn, William A. Isaacson, Ryan Y. Park, Peter M. Skinner, Boies, Schiller & Flexner LLP, Washington, D.C. and New York, New York, *for Defendant-Appellant Travis Kalanick*.

Jonathan D. Selbin, Jason L. Lichtman, Lieff Cabraser, Heimann & Bernstein, LLP, New York, New York, *and* Jahan Sagafi, Paul W. Mollica, Outten & Golden LLP, San Francisco, California and Chicago, Illinois, *for Amicus Curiae Public Justice, P.C.*

Alexander H. Schmidt, Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York, *for Amici Curiae Law Professors*.

Rees F. Morgan, Mark L. Hejinian, Skye D. Langs, Coblentz Patch Duffy and Bass LLP, San Francisco, California, *for Amici Curiae Internet Association* and *Consumer Technology Association.*

Kate Comerford Todd, Warren Postman, U.S. Chamber Litigation Center, Washington, D.C., *and* Andrew J. Pincus, Evan M. Tager, Archis A. Parasharami, Mayer Brown LLP, Washington, D.C., *for Amicus*

*Curiae The Chamber of Commerce of the United States of America.*

———————————

CHIN, *Circuit Judge*:

In 2014, plaintiff-counter-defendant-appellee Spencer Meyer downloaded onto his smartphone a software application offered by defendant-counter-claimant-appellant Uber Technologies, Inc. ("Uber"), a technology company that operates, among other things, a ride-hailing service. Meyer then registered for an Uber account with his smartphone. After using the application approximately ten times, Meyer brought this action on behalf of himself and other similarly situated Uber accountholders against Uber's co-founder and former Chief Executive Officer, defendant-appellant Travis Kalanick, alleging that the Uber application allows third-party drivers to illegally fix prices. The district court joined Uber as a defendant and denied motions by Kalanick and Uber to compel arbitration. In doing so, the district court concluded that Meyer did not have reasonably conspicuous notice of and did not unambiguously manifest assent to Uber's Terms of Service when he registered. The district court held that Meyer therefore was not bound by the mandatory arbitration provision contained in the Terms of Service.

4

For the reasons set forth below, we vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

**A.    *The Facts***

The facts are undisputed and are summarized as follows:

Uber offers a software application for smartphones (the "Uber App") that allows riders to request rides from third-party drivers.  On October 18, 2014, Meyer registered for an Uber account with the Uber App on a Samsung Galaxy S5 phone running an Android operating system.  After registering, Meyer took ten rides with Uber drivers in New York, Connecticut, Washington, D.C., and Paris.

In support of its motion to compel arbitration, Uber submitted a declaration from Senior Software Engineer Vincent Mi, in which Mi represented that Uber maintained records of when and how its users registered for the service and that, from his review of those records, Mi was able to identify the dates and methods by which Meyer registered for a user account.  Attached to the declaration were screenshots of the two screens that a user registering in

October 2014 with an Android-operated smartphone would have seen during the

registration process.[1]

      The first screen, at which the user arrives after downloading the

application and clicking a button marked "Register," is labeled "Register" and

includes fields for the user to enter his or her name, email address, phone

number, and a password (the "Registration Screen").  The Registration Screen

also offers the user the option to register via a Google+ or Facebook account.

According to Uber's records, Meyer did not sign up using either Google+ or

Facebook and would have had to enter manually his personal information.[2]

      After completing the information on the Registration Screen and

clicking "Next," the user advances to a second screen labeled "Payment" (the

"Payment Screen"), on which the user can enter credit card details or elect to

---

[1]    In his brief, Meyer argues that defendants did not establish a foundation for the screenshots, but yet concedes that the evidence in the record is undisputed.

[2]    The screenshots attached to the Mi Declaration are larger than the actual size of the Samsung S5's screen, which is 5.1 inches, measured diagonally.  The record does not contain accurately sized images of both screens.  Uber submitted an accurately scaled screenshot of the Payment Screen with defendants' joint motion to stay the case pending appeal, which is reproduced below as Addendum A.  In his brief on appeal, Meyer included what he represents are accurately scaled screenshots of both the Registration and Payment Screens.  These are reproduced below as Addendum B.  Although the parties have not challenged the accuracy of these images, we note that the screenshots in Meyer's brief are slightly smaller (approximately 4.8 inches, measured diagonally) than the screenshot of the Payment Screen in the record.

make payments using PayPal or Google Wallet, third-party payment services.

According to Uber's records, Meyer entered his credit card information to pay for

rides.  To complete the process, the prospective user must click the button

marked "REGISTER" in the middle of the Payment Screen.

Below the input fields and buttons on the Payment Screen is black

text advising users that "[b]y creating an Uber account, you agree to the TERMS

OF SERVICE & PRIVACY POLICY."  *See* Addendum B.  The capitalized phrase,

which is bright blue and underlined, was a hyperlink that, when clicked, took the

user to a third screen containing a button that, in turn, when clicked, would then

display the current version of both Uber's Terms of Service and Privacy Policy.[3]

Meyer recalls entering his contact information and credit card details before

registering, but does not recall seeing or following the hyperlink to the Terms

and Conditions.  He declares that he did not read the Terms and Conditions,

including the arbitration provision.

When Meyer registered for an account, the Terms of Service

contained the following mandatory arbitration clause:

---

[3]      Although the hyperlink on the Payment Screen referenced "Terms of
Service," the following screen referenced "Terms and Conditions."  Because the initial
hyperlink, which defendants argue notified Meyer of the arbitration clause, refers to the
relevant agreement the Terms of Service, we use that title throughout this opinion.

**Dispute Resolution**

You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, "**Disputes**") will be settled by binding arbitration, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. **You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.** Further, unless both you and Company otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding.  If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of this Agreement.

Appellants' App. at 111-12.[4]  The Terms of Service further provided that the

American Arbitration Association ("AAA") would hear any dispute, and that the

AAA Commercial Arbitration Rules would govern any arbitration proceeding.

---

[4]      A copy of the Terms of Service in effect at the time Meyer registered for an account was attached to the declaration of Uber Operations Specialist Michael Colman, submitted in support of Kalanick's motion to dismiss the Amended Complaint.  The applicable version of the Terms of Service had been updated last on May 17, 2013.

**B.** *The District Court Proceedings*

On December 16, 2015, Meyer, on behalf of a putative class of Uber

riders, filed this action against Kalanick, alleging that the Uber App allows

drivers to fix prices amongst themselves, in violation of the Sherman Act, 15

U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340.  Meyer amended his

complaint on January 29, 2016; the Amended Complaint also named only

Kalanick, and not Uber, as the defendant.

The district court denied Kalanick's motion to dismiss the Amended

Complaint for failure to state a claim.[5]  Kalanick filed a motion to join Uber as a

necessary party, and Uber separately moved to intervene.  On June 19, 2016, the

district court granted Kalanick's motion and ordered that Uber be joined as a

defendant.  It subsequently denied Uber's motion as moot.

After the parties began to exchange discovery materials, Kalanick

and Uber filed motions to compel Meyer to arbitrate.  The district court denied

the motions, concluding that Meyer did not have reasonably conspicuous notice

of the Terms of Service and did not unambiguously manifest assent to the terms.

*See Meyer v. Kalanick*, 200 F. Supp. 3d 408, 420 (S.D.N.Y. 2016).   Holding that no

---

[5]       In his motion to dismiss, Kalanick "expressly reserve[d] his right to move
to compel arbitration in other cases arising out of the User Agreement."  Supp. App. at
34 n.9.

agreement had been formed, the district court did not reach Meyer's other defenses to arbitration, including whether defendants waived their right to arbitrate by actively participating in the litigation and whether Kalanick was also entitled to enforce an arbitration agreement to which he was not a signatory. *Id.* at 412.

Defendants timely appealed the district court's July 29, 2016 order denying the motions to compel arbitration pursuant to 9 U.S.C. § 16, which permits interlocutory appeals from the denial of a motion to compel arbitration. The district court stayed the underlying action pending appeal on the joint motion of defendants, taking into account, *inter alia*, "the need for further appellate clarification of what constitutes adequate consent to so-called 'clickwrap,' 'browsewrap,' and other such website agreements." *Meyer v. Kalanick*, 203 F. Supp. 3d 393, 396 (S.D.N.Y. 2016).

## DISCUSSION

We consider first whether there is a valid agreement to arbitrate between Meyer and Uber and then whether defendants have waived their right to enforce any such agreement to compel arbitration.

## I.    The Arbitration Agreement

We review *de novo* the denial of a motion to compel arbitration. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002).  The determination of whether parties have contractually bound themselves to arbitrate is a legal conclusion also subject to *de novo* review.  *Id.*  The factual findings upon which that conclusion is based, however, are reviewed for clear error.  *Id.*

The parties dispute whether the district court's determinations regarding the lack of reasonably conspicuous notice or an unambiguous manifestation of assent are findings of fact, subject to clear error review, or conclusions of law, subject to *de novo* review.  Although determinations regarding mutual assent and reasonable notice usually involve questions of fact, *Chi. Title Ins. Co. v. AMZ Ins. Servs., Inc.*, 115 Cal. Rptr. 3d 707, 725 (Cal. Ct. App. 2010) (mutual assent); *Union Oil Co. v. O'Riley*, 276 Cal. Rptr. 483, 492 (Cal. Ct. App. 1990) (reasonable notice), the facts in this case are undisputed, and the district court determined as a matter of law that no reasonable factfinder could have found that the notice was reasonably conspicuous and the assent unambiguous.  *Cf. HM DG, Inc. v. Amini*, 162 Cal. Rptr. 3d 412, 418 (Cal. Ct. App.

2013) ("[I]f the material facts are certain or undisputed, the existence of a contract

is a question for the court to decide." (citation and internal quotation omitted)).[6]

We therefore review the district court's conclusions *de novo*.  *See*

*Specht*, 306 F.3d at 27-28; *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 123

(Cal. Ct. App. 2016) ("Because the material evidence consists exclusively of

screenshots from the Web site and order confirmation e-mail, and the

authenticity of these screenshots is not subject to factual dispute, we review the

issue *de novo* as a pure question of law.").

A.     **Applicable Law**

1.     *Procedural Framework*

Under the Federal Arbitration Act (the "FAA"), "[a] written provision

in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of

---

[6]     Meyer argues that the district court proceedings constituted, in essence, a bench trial "on the papers" and therefore that the district court's conclusions are factual findings subject only to clear error review.  Appellee's Br. at 33-34.  The district court here did not present the proceedings as a bench trial, and the record does not reflect that it conducted any fact-finding: there were no material facts in dispute, no hearings conducted, and only limited development of the record.  Those factors distinguish the district court proceedings here from the exceptional case in which, although a district court did not conduct an evidentiary hearing, we might treat as factual findings the court's conclusions about whether parties entered into an arbitration agreement.  *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir. 2001) (holding that district court findings were subject to clear error review where parties did not seek evidentiary hearing and "filed multiple briefs and extensive evidence with the court over a two-year period").

such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The

FAA reflects "a liberal federal policy favoring arbitration agreements," *AT&T*

*Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration

agreements on "the same footing as other contracts," *Schnabel*, 697 F.3d at 118

(quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). It thereby follows

that parties are not required to arbitrate unless they have agreed to do so. *Id*.

Thus, before an agreement to arbitrate can be enforced, the district

court must first determine whether such agreement exists between the parties.

*Id*. This question is determined by state contract law. *Nicosia v. Amazon.com, Inc.*,

834 F.3d 220, 229 (2d Cir. 2016).

Here, the question of arbitrability arose in the context of a motion to

compel arbitration. Courts deciding motions to compel apply a "standard similar

to that applicable for a motion for summary judgment." *Id.* (quoting *Bensadoun*

*v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). On a motion for summary

judgment, the court "consider[s] all relevant, admissible evidence submitted by

the parties and contained in 'pleadings, depositions, answers to interrogatories,

and admissions on file, together with . . . affidavits,'" *Chambers v. Time Warner*,

13

*Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (quoting Fed. R. Civ. P. 56(c)) (second

alteration in original), and draws all reasonable inferences in favor of the non-

moving party.  *Nicosia*, 834 F.3d at 229.

"[W]here the undisputed facts in the record require the matter of

arbitrability to be decided against one side or the other as a matter of law, we

may rule on the basis of that legal issue and 'avoid the need for further court

proceedings.'"  *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master

Fund*, 661 F.3d 164, 172 (2d Cir. 2011) (quoting *Bensadoun*, 316 F.3d at 175).  If a

factual issue exists regarding the formation of the arbitration agreement,

however, remand to the district court for a trial is necessary.  *Bensadoun*, 316 F.3d

at 175; 9 U.S.C. § 4.

If the district court concludes that an agreement to arbitrate exists,

"it should then consider whether the dispute falls within the scope of the

arbitration agreement."  *Specht*, 306 F.3d at 26 (quoting *Genesco, Inc. v. T. Kakiuchi

& Co.*, 815 F.2d 840, 844 (2d Cir. 1987)).  In this case, the parties do not dispute

that Meyer's claims would be covered by the arbitration provision of the Terms

of Service.

## 2. *State Contract Law*

"State law principles of contract formation govern the arbitrability question." *Nicosia*, 834 F.3d at 231. The district court applied California law in its opinion, but acknowledged that it "[did] not view the choice between California law and New York law as dispositive with respect to the issue of whether an arbitration agreement was formed." *Meyer*, 200 F. Supp. 3d at 412-13. Defendants have not challenged the district court's choice of law but state that "if this Court concludes that New York law differs from California law with respect to any determinative issues, it should apply New York law." Appellants' Br. at 17 n.2. We agree with the district court's determination that California state law applies, and note that New York and California apply "substantially similar rules for determining whether the parties have mutually assented to a contract term." *Schnabel*, 697 F.3d at 119.

To form a contract, there must be "[m]utual manifestation of assent, whether by written or spoken word or by conduct." *Specht*, 306 F.3d at 29. California law is clear, however, that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual

15

nature is not obvious." *Id.* at 30 (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 101 Cal. Rptr. 3d 347, 351 (Cal. Ct. App. 1972)). "Thus, California contract law measures assent by an objective standard that takes into account both what the offeree said, wrote, or did and the transactional context in which the offeree verbalized or acted." *Id.* at 30.

Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms. *Schnabel*, 697 F.3d at 120; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Whether a reasonably prudent user would be on inquiry notice turns on the "[c]larity and conspicuousness of arbitration terms," *Specht*, 306 F.3d at 30; in the context of web-based contracts, as discussed further below, clarity and conspicuousness are a function of the design and content of the relevant interface. *See Nicosia*, 834 F.3d at 233.

Thus, only if the undisputed facts establish that there is "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms" will we find that a contract has been formed. *See Specht*, 306 F.3d at 35.

### 3.    *Web-based Contracts*

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).   "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract," and that "[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016).

With these principles in mind, one way in which we have previously distinguished web-based contracts is the manner in which the user manifests assent -- namely, "clickwrap" (or "click-through") agreements, which require users to click an "I agree" box after being presented with a list of terms and conditions of use, or "browsewrap" agreements, which generally post terms and conditions on a website via a hyperlink at the bottom of the screen.  *See Nicosia*, 834 F.3d at 233; *see also Nguyen*, 763 F.3d at 1175-76.[7]  Courts routinely uphold

---

[7]    This nomenclature derives from so-called "shrinkwrap" licenses, in which a software consumer arguably assents to the license terms contained inside after breaking the shrinkwrap seal and using the enclosed software.  *See Specht*, 306 F.3d at 22 n.4.

clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree."  *See Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases).  Browsewrap agreements, on the other hand, do not require the user to expressly assent.  *See* Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 Rutgers L. Rev. 1307, 1318 (2005) ("[B]rowse-wrap encompasses all terms presented by a web site that do not solicit an explicit manifestation of assent.").  "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions."  *Nguyen*, 763 F.3d at 1176 (citation omitted); *see also Schnabel*, 697 F.3d at 129 n.18; *Specht*, 306 F.3d at 32.

Of course, there are infinite ways to design a website or smartphone application, and not all interfaces fit neatly into the clickwrap or browsewrap categories.  Some online agreements require the user to scroll through the terms before the user can indicate his or her assent by clicking "I agree."  *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 386, 398 (E.D.N.Y. 2015) (terming such agreements "scrollwraps").  Other agreements notify the user of the existence of the website's

18

terms of use and, instead of providing an "I agree" button, advise the user that he or she is agreeing to the terms of service when registering or signing up. *Id.* at 399 (describing such agreements as "sign-in-wraps").

In the interface at issue in this case, a putative user is not required to assent explicitly to the contract terms; instead, the user must click a button marked "Register," underneath which the screen states "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," with hyperlinks to the Terms of Service and Privacy Policy. We were first presented with a similar agreement in *Schnabel*, but the plaintiffs had not preserved the issue of whether they were on inquiry notice of the arbitration provision by a "terms and conditions" hyperlink on an enrollment form available before enrollment. *Schnabel*, 697 F.3d at 121 n.9, 129-30. Most recently in *Nicosia*, we held that reasonable minds could disagree regarding the sufficiency of notice provided to Amazon.com customers when placing an order through the website. *Nicosia*, 834 F.3d at 237.[8]

---

[8]     In *Nicosia*, the Amazon website stated on the left side of the page: "By placing your order, you agree to Amazon.com's privacy notice and conditions of use," with the latter phrases hyperlinked to the terms and conditions. *Nicosia*, 834 F.3d at 236. The user placed an order by clicking on a "Place your order" button on a different part of the page. *Id.*

Following our precedent, district courts considering similar

agreements have found them valid where the existence of the terms was

reasonably communicated to the user.  *Compare Cullinane v. Uber Techs., Inc.*, No.

14-14750-DPW, 2016 WL 3751652, at *7 (D. Mass. July 11, 2016) (applying

Massachusetts law and granting motion to compel arbitration); *Starke v. Gilt*

*Groupe, Inc.*, No. 13 Civ. 5497(LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24,

2014) (applying New York law and granting motion to dismiss); *and Fteja*, 841 F.

Supp. 2d at 839-40 (granting defendant's motion to transfer based on, *inter alia*,

forum selection clause in terms of service); *with Applebaum v. Lyft, Inc.*, No. 16-cv-

07062 (JGK), 2017 WL 2774153, at *8-9 (S.D.N.Y. June 26, 2017) (applying New

York law and denying motion to compel arbitration where notice of contract

terms was insufficient to bind plaintiff).  *See also* Woodrow Hartzog, *Website*

*Design As Contract*, 60 Am. U. L. Rev. 1635, 1644 (2011) ("Courts oscillate on

'notice sentence browsewraps,' which provide users with a link to terms of use

but do not require users to acknowledge that they have seen them.").

Classification of web-based contracts alone, however, does not

resolve the notice inquiry.  *See* Juliet M. Moringiello and William L. Reynolds,

*From Lord Coke to Internet Privacy: The Past, Present, and Future of the Law of*

*Electronic Contracting*, 72 Md. L. Rev. 452, 466 (2013) ("Whether terms are classified as clickwrap says little about whether the offeree had notice of them."). Insofar as it turns on the reasonableness of notice, the enforceability of a web-based agreement is clearly a fact-intensive inquiry. *See Schnabel*, 697 F.3d at 124. Nonetheless, on a motion to compel arbitration, we may determine that an agreement to arbitrate exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law. *See Specht*, 306 F.3d at 28.

**B.  *Application***

Meyer attests that he was not on actual notice of the hyperlink to the Terms of Service or the arbitration provision itself, and defendants do not point to evidence from which a jury could infer otherwise. Accordingly, we must consider whether Meyer was on inquiry notice of the arbitration provision by virtue of the hyperlink to the Terms of Service on the Payment Screen and, thus, manifested his assent to the agreement by clicking "Register."

As an initial matter, defendants argue that Meyer is precluded from arguing that no contract was formed by an allegation in his complaint that "[t]o become an Uber account holder, an individual first must agree to Uber's terms

and conditions." Appellants' Br. at 18-19, 32 (quoting Compl. ¶ 29; Am. Compl. ¶ 29). We disagree. First, as the district court observed, the pleading is not obviously a concession in that it makes no reference to Meyer's knowledge. *See Meyer*, 200 F. Supp. 3d at 413. Second, Meyer volunteered to amend his complaint on the record to delete the allegation at issue, an offer that was accepted by the district court. Third, regardless of the allegation or even the validity of Meyer's amendment, Meyer has attested that, at the time he signed up for an Uber account, he was not aware of the existence of the Terms of Service or the arbitration clause contained therein. Construing the facts in Meyer's favor, we decline to hold that he agreed to arbitration based on the purported concession in his complaint. *See Windsor Mills, Inc.*, 101 Cal. Rptr. at 351 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.").

### 1.   Reasonably conspicuous notice

In considering the question of reasonable conspicuousness, precedent and basic principles of contract law instruct that we consider the perspective of a reasonably prudent smartphone user. *See Schnabel*, 697 F.3d at

124 ("[T]he touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them.").  "[M]odern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."  *Riley v. California*, 134 S. Ct. 2473, 2484 (2014).  As of 2015, nearly two-thirds of American adults owned a smartphone, a figure that has almost doubled since 2011.  *See* U.S. Smartphone Use in 2015, Pew Research Center, at 2 (Apr. 2015), http://assets.pewresearch.org/wp-content/uploads/sites/14/2015/ 03/PI_Smartphones_0401151.pdf (last visited Aug. 17, 2017).  Consumers use their smartphones for, among other things, following the news, shopping, social networking, online banking, researching health conditions, and taking classes. *Id.* at 5.  In a 2015 study, approximately 89 percent of smartphone users surveyed reported using the internet on their smartphones over the course of the week-long study period.  *Id.* at 33.  A purchaser of a new smartphone has his or her choice of features, including operating systems, storage capacity, and screen size.

Smartphone users engage in these activities through mobile applications, or "apps," like the Uber App.  To begin using an app, the consumers

need to locate and download the app, often from an application store. Many

apps then require potential users to sign up for an account to access the app's

services. Accordingly, when considering the perspective of a reasonable

smartphone user, we need not presume that the user has never before

encountered an app or entered into a contract using a smartphone. Moreover, a

reasonably prudent smartphone user knows that text that is highlighted in blue

and underlined is hyperlinked to another webpage where additional information

will be found.

   Turning to the interface at issue in this case, we conclude that the

design of the screen and language used render the notice provided reasonable as

a matter of California law.[9] The Payment Screen is uncluttered, with only fields

for the user to enter his or her credit card details, buttons to register for a user

account or to connect the user's pre-existing PayPal account or Google Wallet to

the Uber account, and the warning that "By creating an Uber account, you agree

to the TERMS OF SERVICE & PRIVACY POLICY." The text, including the

hyperlinks to the Terms and Conditions and Privacy Policy, appears directly

below the buttons for registration. The entire screen is visible at once, and the

---

[9]  In evaluating the application interface, we use the actual-size screenshot of the last step in the registration process, as it would have appeared on Meyer's Samsung Galaxy S5.

user does not need to scroll beyond what is immediately visible to find notice of

the Terms of Service.  Although the sentence is in a small font, the dark print

contrasts with the bright white background, and the hyperlinks are in blue and

underlined.[10]  This presentation differs sharply from the screen we considered in

*Nicosia*, which contained, among other things, summaries of the user's purchase

and delivery information, "between fifteen and twenty-five links," "text . . . in at

least four font sizes and six colors," and several buttons and advertisements.

*Nicosia*, 834 F.3d at 236-37.  Furthermore, the notice of the terms and conditions

in *Nicosia* was "not directly adjacent" to the button intended to manifest assent to

the terms, unlike the text and button at issue here.  *Id.* at 236.

   In addition to being spatially coupled with the mechanism for

manifesting assent -- *i.e.*, the register button -- the notice is temporally coupled.

As we observed in *Schnabel*,

> inasmuch as consumers are regularly and frequently confronted
> with non-negotiable contract terms, particularly when entering into
> transactions using the Internet, the presentation of these terms at a
> place and time that the consumer will associate with the initial
> purchase or enrollment, or the use of, the goods or services from

---

[10]   Defendants challenge the district court's purported reliance on a low-resolution duplication of the Registration and Payment Screens.  Defendants offer no basis, however, for their assumption that the district court evaluated the black-and-white images reproduced in its opinion rather than the clearer versions available in the record.  *See Meyer*, 200 F. Supp. 3d at 415 (describing blue hyperlink).

which the recipient benefits at least indicates to the consumer that
he or she is taking such goods or employing such services subject to
additional terms and conditions that may one day affect him or her.

*Schnabel*, 697 F.3d at 127. Here, notice of the Terms of Service is provided

simultaneously to enrollment, thereby connecting the contractual terms to the

services to which they apply. We think that a reasonably prudent smartphone

user would understand that the terms were connected to the creation of a user

account.

That the Terms of Service were available only by hyperlink does not

preclude a determination of reasonable notice. *See Fteja*, 841 F. Supp. 2d at 839

("[C]licking [a] hyperlinked phrase is the twenty-first century equivalent of

turning over the cruise ticket. In both cases, the consumer is prompted to

examine terms of sale that are located somewhere else."). Moreover, the

language "[b]y creating an Uber account, you agree" is a clear prompt directing

users to read the Terms and Conditions and signaling that their acceptance of the

benefit of registration would be subject to contractual terms. As long as the

hyperlinked text was itself reasonably conspicuous -- and we conclude that it

was -- a reasonably prudent smartphone user would have constructive notice of

the terms. While it may be the case that many users will not bother reading the

additional terms, that is the choice the user makes; the user is still on inquiry notice.

Finally, we disagree with the district court's determination that the location of the arbitration clause within the Terms and Conditions was itself a "barrier to reasonable notice." *Meyer*, 200 F. Supp. 3d at 421 (citing, *inter alia*, *Sgouros*, 817 F.3d at 1033). In *Sgouros*, the Seventh Circuit determined that the defendant's website actively misled users by "explicitly stating that a click on the button constituted assent for TransUnion to obtain access to the purchaser's personal information," without saying anything about "contractual terms," and without any indication that "the same click constituted acceptance of the Service Agreement." 817 F.3d at 1035-36. The website did not contain a hyperlink to the relevant agreement; instead, it had a scroll box that contained the entirety of the agreement, only the first three lines of which were visible without scrolling, and it had no prompt for the reader to scroll for additional terms. *See id.* at 1035-36 ("Where the terms are not displayed but must be brought up by using a hyperlink, courts outside of Illinois have looked for a clear prompt directing the user to read them. . . . No court has suggested that the presence of a scrollable window containing buried terms and conditions of purchase or use is, in itself,

sufficient for the creation of a binding contract . . . .").  Here, there is nothing

misleading.  Although the contract terms are lengthy and must be reached by a

hyperlink, the instructions are clear and reasonably conspicuous.  Once a user

clicks through to the Terms of Service, the section heading ("Dispute Resolution")

and the sentence waiving the user's right to a jury trial on relevant claims are

both bolded.

Accordingly, we conclude that the Uber App provided reasonably

conspicuous notice of the Terms of Service as a matter of California law and turn

to the question of whether Meyer unambiguously manifested his assent to those

terms.

### 2.    Manifestation of assent

Although Meyer's assent to arbitration was not express, we are

convinced that it was unambiguous in light of the objectively reasonable notice

of the terms, as discussed in detail above.  *See Register.com*, 356 F.3d at 403

("[R]egardless whether [a user] did or did not say, 'I agree' . . . [the user's] choice

was either to accept the offer of contract, taking the information subject to the

terms of the offer, or, if the terms were not acceptable, to decline to take the

benefits."); *see also Schnabel*, 697 F.3d at 128 ("[A]cceptance need not be express,

but where it is not, there must be evidence that the offeree knew or should have

known of the terms and understood that acceptance of the benefit would be

construed by the offeror as an agreement to be bound.").  As we described above,

there is ample evidence that a reasonable user would be on inquiry notice of the

terms, and the spatial and temporal coupling of the terms with the registration

button "indicate[d] to the consumer that he or she is . . . employing such services

subject to additional terms and conditions that may one day affect him or her."

*Schnabel*, 697 F.3d at 127.  A reasonable user would know that by clicking the

registration button, he was agreeing to the terms and conditions accessible via

the hyperlink, whether he clicked on the hyperlink or not.

    The fact that clicking the register button had two functions --

creation of a user account and assent to the Terms of Service -- does not render

Meyer's assent ambiguous.  The registration process allowed Meyer to review the

Terms of Service prior to registration, unlike web platforms that provide notice

of contract terms only after the user manifested his or her assent.  Furthermore,

the text on the Payment Screen not only included a hyperlink to the Terms of

Service, but expressly warned the user that by creating an Uber account, the user

was agreeing to be bound by the linked terms.  Although the warning text used

the term "creat[e]" instead of "register," as the button was marked, the physical proximity of the notice to the register button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take.

The transactional context of the parties' dealings reinforces our conclusion. Meyer located and downloaded the Uber App, signed up for an account, and entered his credit card information with the intention of entering into a forward-looking relationship with Uber. The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship.

Accordingly, we conclude on the undisputed facts of this case that Meyer unambiguously manifested his assent to Uber's Terms of Service as a matter of California law.

### 3. Remand for trial

Finally, we see no need to remand this case for trial. Meyer offers no basis for his argument that we should remand for further factfinding if we vacate

the district court's ruling, other than his assertion that no circuit has previously

compelled arbitration in similar circumstances.  Although Meyer purports to

challenge the evidentiary foundation for the registration screens, defendants

have submitted a declaration from an Uber engineer regarding Meyer's

registration for and use of the Uber App, as well as the registration process and

terms of use in effect at the time of his registration.  Accordingly, we conclude on

this record, as a matter of law, that Meyer agreed to arbitrate his claims with

Uber.[11]

## II.    Waiver

Meyer argues in the alternative that defendants have waived their

right to arbitrate by actively litigating the underlying lawsuit.  "[O]rdinarily a

defense of waiver brought in opposition to a motion to compel arbitration . . . is a

matter to be decided by the arbitrator."  *S & R Co. of Kingston v. Latona Trucking,*

*Inc.*, 159 F.3d 80, 82-83 (2d Cir. 1998) (citing *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d

---

[11]    Although Kalanick is not a party to the Terms and Conditions between
Uber and Meyer, he is nonetheless protected by them.  "Courts in this and other circuits
consistently have held that employees or disclosed agents of an entity that is a party to
an arbitration agreement are protected by that agreement." *See Roby v. Corp. of Lloyd's,*
996 F.2d 1353, 1360 (2d Cir. 1993) (holding that individual defendants were entitled to
rely on arbitration provisions incorporated into their employers' agreements with
investors notwithstanding that the individual defendants were not signatories to any of
the agreements).

438 (2d Cir. 1995)).  When the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver.  *Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002). Because Meyer's waiver argument is based on defendants' defense of this litigation in the district court, we conclude that is a question for the district court rather than an arbitrator.  Accordingly, we remand the case to the district court to consider in the first instance whether defendants have waived their right to arbitrate.

## *CONCLUSION*

For the reasons set forth above, the order of the district court denying defendants' motions to compel arbitration is **VACATED**, and the case is **REMANDED** to the district court to consider whether defendants have waived their rights to arbitration and for any further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

32





