# Exhibit A

Excerpts of Transcript of September 11, 2017,
*Omega v. 375 Canal*, 12 Civ. 6979 (S.D.N.Y.)

H9BHOMEC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  OMEGA SA and SWATCH SA,

4              Plaintiffs,

5         v.                          12 Civ. 6979 (PAC)

6
   375 CANAL, LLC; JOHN DOES 1 –
7  50; and XYZ COMPANIES 1 – 50,
                                      Oral Argument
8
               Defendants.
9
   ------------------------------x
10                                   New York, N.Y.
                                     September 11, 2017
11                                   2:05 p.m.

12 Before:

13              HON. PAUL A. CROTTY,

14                                   District Judge

15                 APPEARANCES

16 COLLEN IP
        Attorneys for Plaintiffs
17 BY:  JOSHUA P. PAUL
        JESS M. COLLEN
18      MICHAEL NESHEIWAT
        JEFFREY LINDENBAUM
19
   DENTONS US LLP
20      Attorneys for Defendants
   BY:  AVI SCHICK
21      KIRAN PATEL

22

23

24

25

H9BHOMEC

1          (Case called)

2          THE COURT:  All right.  I want to give the parties an

3     opportunity to argue whatever matters they want to raise with

4     regard to Mr. Schick's letter of August 4 and Mr. Paul's letter

5     of -- excuse me, of September 4, Mr. Paul's letter of

6     September 7, and Mr. Schick's responsive reply of September 8.

7          So, Mr. Schick, anything you want to add?

8          MR. SCHICK:  I'll just be very brief, your Honor.

9     Obviously, there's been extensive correspondence over the last

10    week.  Just to touch very briefly on three points, the first is

11    materiality.  There's no doubt that these declarations were

12    material.  They were relied on by the Court in its summary

13    judgment decision, which is no surprise because they were cited

14    repeatedly.  Over two dozen times the Cole declaration was

15    cited by plaintiffs in their papers.  And further for the

16    notion of materiality is, of course, the fact that they were

17    first solicited after plaintiffs received or first drafted --

18    after plaintiffs received our summary judgment moving papers.

19    In other words, in the first week of June, June 6, I believe it

20    was, 2016, we submitted our papers on summary judgment.  If one

21    looks at the limited correspondence produced by plaintiffs last

22    week, it reveals that on exactly one week later, they reached

23    out with respect to these declarations.  So they, after reading

24    our papers and preparing their response, that they were

25    relevant and material to the response.  I'll leave it at that

1    on materiality.  Of course, I'll let them speak for themselves.

2            There's also no doubt that they were false.  I don't

3    think that's in serious contention, and so I'm not going to

4    address it.

5            With respect to disclosure, there was no disclosure to

6    either defendants or the Court at the August 2 hearing, which

7    is indisputably after Mr. Cole testified.  Mr. Cole testified

8    that he advised plaintiffs' counsel sometime certainly before

9    that, and plaintiffs' counsel in their papers say it's in July.

10   But certainly before the August 2 hearing, everybody on

11   plaintiffs' side was aware that the declarations were false.

12   We certainly got no disclosure of that, which would have been

13   useful.

14           And finally with respect to disclosure, while there

15   was some limited disclosure of the correspondence between the

16   plaintiffs' counsel and Mr. Cole in connection with the

17   preparation of his declaration, the promised correspondence

18   with respect to the Cole -- I'm sorry, with the Yarborough and

19   Stone declarations never materialized.  So, of course, we have

20   no way to assess what went on there.

21           One final point, I'll be done in 30 seconds, which is

22   that I think defendants really approached this letter writing

23   with a great amount of restraint and lack of finger-pointing.

24   We talk about the evidence, the materiality, and the impact.

25   It was incredible to receive plaintiffs' response which pointed

H9BHOMEC

1    fingers at defendants for apparently not uncovering this

2    earlier.  In that regard, I'll just note that plaintiffs -- or

3    plaintiffs' lawyers were the agents who ordered these reports.

4    They were the agents to whom the reports were sent

5    contemporaneously.  They were the ones who supposedly sat down

6    with these reports to craft and create the declarations which

7    turned out to be false.  So the suggestion that somehow this is

8    a problem, a mistake, of defendants' making, it sort of boggles

9    the mind, and I think it sort of reveals the mindset here,

10   which is not to take responsibility for that which went wrong.

11            Just the final ten seconds, which is that, again, if

12   one looks at the summary judgment papers, they cite repeatedly,

13   dozens of times, to the various declarations.  They don't cite

14   at all to the reports at issue here.

15            Thank you, your Honor.

16            THE COURT:  What remedy do you want?

17            MR. SCHICK:  Your Honor, we believe that the

18   appropriate remedy would be for the Court to revisit its

19   summary judgment decision as was discussed last week.  I think

20   the supposed sales in May of 2012 were a linchpin of the

21   argument in the case, and they're now unsupported, didn't

22   happen.  Stone can't testify to the supposed Swatch sales as

23   well.  So we think the Court ought to revisit summary judgment.

24            Short of that, if the Court were to be looking to a

25   remedy short of that, the only thing I think that would even

1    come close to remedying the harm would be to preclude any

2    witnesses from the firms, either Diogenes or RJA, that were

3    involved in these declarations.

4              THE COURT:  Mr. Paul.

5              MR. PAUL:  Thank you, your Honor.  There are a number

6    of points I'd like to address.  I also will keep my remarks on

7    the brief side.  First issue is materiality.  You need to

8    understand that when the defendant filed this motion, they did

9    not have Mr. Cole's affidavit.  It didn't exist.  The very

10   record that had for three years, they had the reports.  They

11   chose to move based on a lack of knowledge, which they felt was

12   legally insufficient to trigger secondary liability.  The

13   Court, when you reviewed the papers, I think that it's fairly

14   clear that you acknowledge as much, that the fact that goods

15   were purchased in May of 2012 was not challenged and that the

16   issue was whether or not the knowledge was legally sufficient.

17              So from the vantage point of materiality, at least as

18   I understand it -- of course, I can't put myself in the Court's

19   shoes.  You indicated when we were last before you that you

20   were unhappy -- but from the vantage point of materiality, as a

21   legal matter, I submit that these statements contained in

22   Mr. Cole's declaration, while untrue -- and we're talking about

23   the statements that he purchased -- while untrue and while

24   undoubtedly and understandably makes the Court unhappy and me,

25   makes all of us unhappy that this occurred, I think as a legal

H9BHOMEC

1    matter, you need to conclude that they were not material to the

2    decision to deny summary judgment.

3              THE COURT:  They're material to the issues that you

4    raised, though, because when you prepared your memorandum of

5    law and opposition to motion for summary judgment, you cited

6    the Cole affidavit, paragraphs 3, 4, 5, 6, 14, 15, 9, 12 to 15,

7    15 and 16.  I lost count.  It's well in excess of a dozen.

8    But, I mean, if you go through your brief, the pages 2, 3, 4,

9    4, 5, 6, and 7, it's cited repeatedly.  I mean, you raised the

10   issue.  You raised the issue because in your argument you were

11   making the point that there was continuity in the 375, it

12   continued to violate your rights, and so it's very important to

13   have the May sale.  And you believe that, and that's why you

14   cite the -- and I certainly believed it because I cited the

15   Cole affidavit three times in my decision.  I thought it was

16   relevant --

17             MR. PAUL:  That's fine.

18             THE COURT:  -- including the fact that he bought it.

19             MR. PAUL:  It strikes me that you found it relevant

20   from the vantage point of when I look at your decision at

21   least -- again, your decision -- it appears to me that what

22   drove the decision, what was material, was the fact of the

23   knowledge issues and that the question of whether and, if so,

24   who purchased the watch in May 2012 was not a factor that drove

25   the decision.  And if I may, somewhat out of turn, on the issue

H9BHOMEC

1      of disclosure that Mr. Schick raised, I want to address that.

2              THE COURT:  All right.

3              MR. PAUL:  Yes, we learned at some point in July,

4      early August, but certainly before the August 2 conference with

5      the Court, we began to put things together in talking about it

6      with Mr. Cole.  I think I explained that.  We immediately --

7              THE COURT:  My recollection is you told me that you're

8      getting your witnesses ready --

9              MR. PAUL:  Right, exactly so.

10             THE COURT:  -- to testify.

11             MR. PAUL:  Exactly.

12             THE COURT:  And in that connection, you had them look

13     through their affidavits.

14             MR. PAUL:  Well --

15             THE COURT:  And you learned at that time that what

16     Mr. Cole said in his affidavit was not so.

17             MR. PAUL:  We were interviewing.  We were

18     interviewing.  I was interviewing Mr. Cole and asking lots of

19     questions and things were not adding up.

20             THE COURT:  Right.  Of course, that's a little bit

21     strange, you have to admit, Mr. Paul, because you prepared his

22     affidavit; right?

23             MR. PAUL:  I did.  Nonetheless, on the issue of

24     disclosure, we were concerned, and we started asking questions.

25     And we began to put together exactly what had happened.  We

1    consulted -- I consulted, and I say my colleagues and I

2    together, we looked at a particular opinion of the bar, city

3    Bar Association, on the question of whether -- we considered

4    whether we had an obligation at that point to inform the Court.

5    The Bar Association opinion talked about the issue of

6    materiality, and we concluded then that -- this is immediately

7    before the August 2 conference -- that the information was not

8    material to the Court's decision and for that reason --

9            THE COURT:  Are you saying the association of the bar

10   is adopting an attitude that says catch me if you can?  You can

11   submit anything --

12           MR. PAUL:  I'm not saying that at all, your Honor.

13           THE COURT:  You can submit anything you want, and it's

14   up to the other side to find it?

15           MR. PAUL:  No.

16           THE COURT:  Because in all the cites you made to the

17   Cole affidavit, you never once mentioned his underlying

18   reports; right?

19           MR. PAUL:  That's correct.  We did attach the

20   underlying reports.

21           THE COURT:  I understand that.

22           MR. PAUL:  And so --

23           THE COURT:  And so you said it's up to us then to find

24   that out?

25           MR. PAUL:  Not at all, your Honor.  We're not saying

H9BHOMEC

1    that.

2              THE COURT:  But you don't disclose it.

3              MR. PAUL:  Well, we did not understand -- I think it's

4    clear from the record that we've put in front of you that I

5    made a mistake early on in drafting the document and certainly

6    provided Mr. Cole with ample opportunity to tell us that there

7    was something wrong with the chronology.  I think that's fairly

8    clear from the correspondence that we've put in front of the

9    Court.  So as to the question of whether there was an

10   intention, an intention to deceive the Court or defense

11   counsel, the answer is no.  You can see we drafted a document.

12   It turned out that we conflated a number of different documents

13   and identified only one person who purchased, and, in fact, it

14   was somebody else.  And we went back at least twice, each time

15   asking the affidavit witness, Mr. Cole, to look at the document

16   carefully, look at his reports, and the like.

17             So I think that on the question of intent, which seems

18   to be important under the various -- if we turn to the various

19   procedural rules on which Mr. Schick relies for the remedy he's

20   seeking, intention is a very important element.  Under

21   Rule 11 --

22             THE COURT:  How about indifference?

23             MR. PAUL:  I wouldn't say that -- well, I would not

24   characterize --

25             THE COURT:  You knew, but -- this is an affidavit.

H9BHOMEC

1    You keep on suggesting that Mr. Cole drafted this affidavit.   I

2    look at the papers now, Mr. Paul, and I come to the conclusion

3    that you drafted the affidavit.

4           MR. PAUL:  Absolutely.  I think that's -- we have

5    not -- I drafted the initial draft.  I think that that is clear

6    from the papers that we put in.  We also --

7           THE COURT:  On the other hand, when Mr. Cole signs the

8    affidavit that it's true and correct under penalty of perjury,

9    he's adopting that as his own testimony, and it's submitted as

10   sworn testimony to convince the judge about arguments that

11   you're making.  I think that that's material, and I also think

12   that because you knew but didn't disclose, that that is

13   significant.

14          MR. PAUL:  No, your Honor, first of all, I'm -- I

15   mean, respectfully, I disagree with you on the question of

16   knowledge and not disclosing.  If you look, there's a July 17,

17   2017, email.  I'm looking at the transmittal emails, my emails

18   with Mr. Cole:  "Please review the attached draft and let me

19   know if it is accurate or if you would like to make any

20   changes."

21          Looking at the next email, July 18, Paul to Cole:

22   "Please review the attached redline carefully.  If you have

23   questions or concerns of any sort, please call me."

24          THE COURT:  We also know from looking at Mr. Cole's

25   letters that he responded, No, it seems fine to me, 28 minutes

H9BHOMEC

1    later, which suggests that he didn't read it.

2              MR. PAUL:  That's not what I took, and I certainly --

3              THE COURT:  It's a seven-page affidavit, and he reads

4    it and comes back and says no problem, when the fact of the

5    matter is you communicated with him before, were suggesting

6    various things, like Chinatown is a known place for

7    counterfeiting.  And you look at that paragraphs 5, 6, and 7 in

8    the affidavit, of his affidavit --

9              MR. PAUL:  Absolutely.

10             THE COURT:  -- you're the sole and exclusive draftsman

11   of that because when he was asked about it, he said:  I didn't

12   draft that.  I didn't know anything about it.  That's his

13   deposition testimony.

14             MR. PAUL:  I have to go to his deposition testimony.

15   I will tell you that I have had a number of discussions with

16   him over the course of this investigation and other projects

17   that he's worked with us on, and this is not a statement that I

18   make up.  This is something that he has expressed to us, and

19   certainly -- and, again, I don't have the deposition testimony

20   in front of me.  So I don't think that you can -- that the

21   Court can really conclude that this was a willful or a -- or

22   anything other than a careless, perhaps careless, statement or

23   putting out incorrect facts to the Court.

24             Certainly, there was no effort made to hide what we

25   were doing, what the facts were.  If there were an intention to

1    conceal, we of course would not have attached the reports.

2    Now, I'm not saying that we attached the reports in order to

3    reveal something that we knew.  That would be bad advocacy, and

4    that's not something that I would do.  I realize I'm not

5    testifying under oath, but I'm telling you, as an officer of

6    the court, it's not something that I would do and it's not how

7    I would communicate with the Court.  I've been practicing too

8    long and too successfully to communicate with the Court in that

9    way.

10            You look like you want to say something.

11            THE COURT:  No, I don't want to say anything.  I guess

12    when you look at the affidavit the way it was drawn, you look

13    at your argument in the brief, "third parties' use of property

14    as a place from which to sell counterfeit Omega," and you cite

15    the Cole affidavit, the Cole affidavit, the Cole affidavit, the

16    Cole affidavit.

17            There's another place where you talk about ubiquitous

18    counterfeiting problems on Canal Street.  Starts out, "The area

19    surrounding Canal Street has long been a haven for people who

20    distribute counterfeit knockoffs."  If you look at the Cole

21    affidavit, that's exactly what he says at paragraph 4 and 5.

22    There's no distinction between what Cole says in his affidavit

23    and what you say in the brief, which indicates to me, as you've

24    already admitted, that you drafted the affidavit.

25            I think that, with all due respect, Mr. Paul, you're

H9BHOMEC

1    responsible for the substantial inaccuracy that says he bought

2    the watch, he had a conversation with the clerk.  That's all

3    portrayed as the first person.  It turns out to be it's false.

4    And then further, you knew about it, and you didn't disclose

5    it.  So I don't see how you can say anything other than you

6    intended to do this or you're so indifferent to what it was

7    that you didn't care to disclose it.  It should have been

8    disclosed.

9            MR. PAUL:  I'll say just a few more words.  I

10   respectfully disagree with your Honor.

11           THE COURT:  You can disagree with --

12           MR. PAUL:  If I may -- excuse me.  I'm sorry.

13           THE COURT:  You can disagree with me.  On the other

14   hand, I've got to decide.

15           MR. PAUL:  Of course.  So let me just make two brief

16   points before I sit down.  If you are considering, the Court is

17   considering, issuing Rule 11 sanctions, then I would ask that I

18   be accorded the procedural protection of an order to show cause

19   or, because certainly Mr. Schick did not write a motion

20   specifically addressing this point, I will retain counsel and I

21   will defend myself.  In fact, I have retained counsel because I

22   took your words very seriously, and if you're going to consider

23   Rule 11, I would like the opportunity to put together a defense

24   with counsel.

25           THE COURT:  Mr. Schick, you want to be heard on that?