# Exhibit B

Excerpts of Transcript of September 5, 2017,
*Omega v. 375 Canal*, 12 Civ. 6979 (S.D.N.Y.)

H95POMEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OMEGA SA, SWATCH SA,

             Plaintiffs,

         v.                               12 CV 6979 (PAC)

375 CANAL, LLC, ET AL.,

             Defendants.
------------------------------x
                                          New York, N.Y.
                                          September 5, 2017
                                          2:57 p.m.

Before:

                    HON. PAUL A. CROTTY,

                                          District Judge

                         APPEARANCES

COLLEN IP
     Attorneys for Plaintiffs
BY:  JOSHUA P. PAUL
     JESS MICHOL COLLEN
     MICHAEL NESHEIWAT

SNR DENTON US LLP
     Attorneys for Defendants
BY:  AVI SCHICK
     KIRAN PATEL

1    conversed with the store clerk on that day?

2             Answer:  No, it is not.

3             Now, as I read the cases, you have your two police

4    searches, you have the warning letter, the notice letter of

5    September 28 of 2011.  As I understand the law, you have to

6    show that there's a continuation of supply after the notice

7    letter.  So that turns us to May 19, 2012, purchase.

8             MR. PAUL:  May -- excuse me.

9             THE COURT:  That's an important date.

10            MR. PAUL:  Yes, it is, your Honor.

11            THE COURT:  And Mr. Cole says that his affidavit is

12   somehow inaccurate.

13            MR. PAUL:  So if I may, your Honor, what --

14            THE COURT:  So I don't care about what Mr. Taute says.

15            MR. PAUL:  Of course.

16            THE COURT:  I'm looking at Mr. Cole.

17            MR. PAUL:  Right.

18            THE COURT:  What's accurate about it, and what's

19   inaccurate?  Is it, in fact, inaccurate?

20            MR. PAUL:  It is -- He was present.  He did not make

21   the purchase.  If you'll permit me to explain.  All of this has

22   come out in the depositions of the investigators.  Four

23   investigators --

24            THE COURT:  With due respect, I didn't have the

25   benefit of the depositions of the witnesses when I was reading

1  the motion for summary judgement.  I relied on the affidavits
2  as true.
3              MR. PAUL:  However, your Honor, he came with three
4  people.  They were all within the same area.  Two people went
5  into the store.  We have tape recordings and video --
6              THE COURT:  This affidavit are sworn to under oath.
7  They're not composites.
8              MR. PAUL:  Your Honor, he also testified at his
9  deposition that the reason he was unable to get things right
10 is, at the time we sent the draft to him, his wife was in the
11 hospital getting cancer treatments.
12             THE COURT:  Oh, please.
13             MR. PAUL:  He wasn't focusing.
14             THE COURT:  The dog ate the homework?
15             MR. PAUL:  I'm sorry?
16             THE COURT:  The dog ate the homework?
17             MR. PAUL:  Your Honor, I know it's serious, but -- I
18 agree it's serious, but the point, though, is what's material.
19 The fact -- you said in your opinion that the plaintiffs'
20 investigator purchased a counterfeit Omega watch from a store
21 clerk on May 19th.  We have produced the three people who were
22 working with Mr. Cole that day who were present that day, one
23 purchased, one filmed.
24             THE COURT:  I didn't know that.  I read Mr. Cole's
25 affidavit as being the entire truth, and it turns out it's not

1  the truth.  What am I to do in those circumstances?
2              MR. PAUL:  Your Honor, I think what is material.
3  Well, you have to decide what you're to do under those
4  circumstances.  If you'll permit me, this came to my attention,
5  our attention -- you'll recall when we were here on August 2nd,
6  and I had disclosed to Mr. Schick and to the Court that in the
7  course of talking with Mr. Cole, preparing for trial, a number
8  of additional documents and those three additional witnesses,
9  the people he was working with, came to light to me and my firm
10 for the first time.  We then --
11             THE COURT:  Wait a minute.  You were conducting the
12 investigation, weren't you?  You retained these investigators
13 to go out on your behalf or on behalf of Swatch or Omega.
14             MR. PAUL:  That's correct, your Honor.
15             THE COURT:  So you didn't know how he was doing the
16 investigation?
17             MR. PAUL:  I did not know how he was doing this
18 particular investigation.  We had reports from him, and we
19 relied on those reports.  We have worked with this gentleman in
20 the past.  He's worked with plenty of other brand owners.  I
21 think this was a unique situation where, again, he personally
22 did not purchase, but he saw the purchase.  He had another
23 person actually make the purchase, Mrs. Leslie Quinonez, who
24 testified that she made the purchase.  She recorded the whole
25 thing on a tablet.  Mr. Cole videotaped the entire thing from a

1   cell phone.
2           THE COURT:  Listen, you may be a hundred percent
3   right, but that's not what the affidavit said.  I'm relying on
4   the affidavit.
5           What about the statements here about -- at paragraph
6   6:  This is not to say that all merchants along Canal Street
7   are -- I'm reading from Mr. Cole's affidavit -- are necessarily
8   selling counterfeit goods.  But when the supply is available,
9   there is a high likelihood that, given the opportunity,
10  merchants who sell goods from Canal Street storefronts will try
11  to sell people...
12          He says, I didn't write that.  I did not draft this
13  document.  He signed the document, though.  Did he sign the
14  document?
15          MR. PAUL:  He did sign the document.
16          THE COURT:  He says he didn't draft it.  What good is
17  a document that the --
18          MR. PAUL:  I don't think it's --
19          THE COURT:  -- author of the document says I'm not the
20  author?
21          MR. PAUL:  Your Honor, I'm not going to argue with you
22  on this point.  I think it's not unusual for a lawyer, who's
23  retained an investigator, to prepare an affidavit and ask the
24  investigator to examine it, look at it, have a dialogue.  I
25  think that's pretty much standard.

1           In fact, Mr. Yarborough testified the same thing.  He
2    has worked with firms throughout this city, large firms, small
3    firms, and this is how the work is done.  Lawyers will draft
4    the affidavit based on reports, send it to the investigator,
5    and then there's a dialogue.  Did this happen?  Is this word
6    right?  And the like.
7           THE COURT:  Okay.  Fair enough.  At paragraph 6 of
8    Mr. Cole's affidavit he says what I just read into the record,
9    and he said, I didn't write that.  So you're having a dialogue
10   about an affidavit that maybe lawyers prepared, and he
11   willingly signed because he's earning a fee and wants to
12   preserve his good relationship with the lawyers?  And he says,
13   I didn't write this.  What are you supposed to do in a
14   circumstance like that?
15          MR. PAUL:  I think he didn't write it; that's a
16   factual statement.  I don't think he disavowed that statement.
17   I don't think it was ever inquired, if you were to ask --
18          THE COURT:  It's submitted to me in connection with a
19   motion for summary judgement.  I have to decide the motion for
20   summary judgement.  I'm relying on what he says because motions
21   for summary judgement are not made after hearings.  Maybe they
22   should be, but they're not.  They're made on affidavits
23   submitted, and they're presumed to be accurate.  This turns
24   out, based on his deposition subsequent to his filing this
25   affidavit --

1          MR. PAUL:  I have a suggestion, your Honor.
2          THE COURT:  -- subsequent to my making a decision in
3    your favor on the motion for summary judgement, where the
4    affidavit is wrong.
5          MR. PAUL:  I have a suggestion.
6          THE COURT:  What's the suggestion?
7          MR. PAUL:  My suggestion is that we can have a short
8    evidentiary hearing on the question of whether, given the
9    actual evidence with the people who took -- who did this, we
10   can have a, what, 106 hearing for you to feel comfortable, as a
11   gatekeeper, that there is sufficient evidence of the
12   purchase -- excuse me, of the sale of this watch.  We can do
13   that.
14         THE COURT:  You're trying to --
15         MR. PAUL:  But to put us back, your Honor, when --
16         THE COURT:  You're trying to clean up the stable after
17   the horse has left.
18         MR. PAUL:  Your Honor, the horse has left, that's for
19   sure.  But if you're looking at the question, the dispositive
20   question of was a counterfeit watch purchased from this store
21   on May 19, the facts are unassailable.
22         THE COURT:  Who's going to tell me that?  Not
23   Mr. Cole, right?
24         MR. PAUL:  Well, I don't think --
25         THE COURT:  Even though that's what he told me before.

1           MR. PAUL:  Right.
2           THE COURT:  Now that we know that that's not accurate,
3    you're going to send in --
4           MR. PAUL:  Sure.
5           THE COURT:  -- the truth squad?
6           MR. PAUL:  Mr. Quinonez, who was present and --
7           THE COURT:  Mr. Quinonez and his daughter didn't
8    submit affidavits, did they?
9           MR. PAUL:  No, that's correct.  He was our only
10   affidavit.  That is absolutely correct.  Mr. Cole was the sole
11   affidavit witness on that point, yes.
12          THE COURT:  Okay.
13          MR. SCHICK:  May I, your Honor, one moment?
14          THE COURT:  Just a minute.
15          MR. PAUL:  I just have a few other, unless you have
16   more questions, I'd just like to address --
17          THE COURT:  I think I've heard enough on Mr. Cole.
18          MR. PAUL:  Okay.
19          THE COURT:  What about Mr. Yarborough?
20          MR. PAUL:  Well, Mr. Yarborough, we have no intention
21   of calling.  In fact, let me just be clear.  What he said in
22   his declaration, he was absolutely clear.  He said he made it
23   clear that he personally did not see anything, do anything.  He
24   was recounting the actions of other investigators, as sort of a
25   senior person at the firm.

1            What he said is, one, one particular gentleman, Robert
2    Goldkind toured -- went on tour bus -- tour buses and took down
3    notes of what the tourist guides were telling people about the
4    Canal Street area.  He didn't purport to have seen that
5    himself.
6            No. 2, I think the one statement that he makes that
7    turned out not to be accurate was the fact that there was only
8    one other occasion, other than the December 2010, when there
9    was someone from his agency visited the property.  I'm not
10   sure -- he was incorrect about that.  I'm not sure that that
11   was material to the summary judgement decision.
12           As you pointed out, the failed buys -- as you pointed
13   out in the summary judgement decision, evidence of failed
14   purchases are not relevant.  Again, if I did not have to deal
15   with Larry, Moe and Curly --
16           THE COURT:  Not relevant on the motion for summary
17   judgement because there were enough facts that I could rely on
18   to say that there were questions of fact, general issues of
19   material fact, but, you know, the fact is that doesn't mean
20   that they couldn't be considered at trial.  I was limiting my
21   analysis --
22           MR. PAUL:  Of course.
23           THE COURT:  -- to the motion for summary judgement.
24           MR. PAUL:  Fair.  That's fair.
25           So Mr. Yarborough's testimony is not material to the

1  summary judgement, and we do not plan on calling him at trial.

2  Again, I want to step back and say that I am not

3  pleased that the investigators involved conducted themselves as

4  they did.  I mean, I wish that were not the case, but you know,

5  what we're considering -- what your Honor is considering is

6  some very drastic orders that, you know, are going to prejudice

7  our clients.  But my point is that when there's -- I agree that

8  your Honor is offended, and rightly so, that Mr. Cole did not

9  tell the truth.

10  THE COURT:  Yes.

11  MR. PAUL:  Okay?  I share that, but the point is --

12  THE COURT:  I'm also troubled by the fact that I know

13  I relied on his affidavit in denying the defendant's motion for

14  summary judgement.

15  MR. PAUL:  I understand that.  I understand that.

16  THE COURT:  So I think you procured a judgment which

17  maybe you weren't entitled to.

18  MR. PAUL:  Well, your Honor, I just want to make sure

19  we're clear on one point.  We were entitled, and are entitled,

20  to summary judgement because the evidence is that a counterfeit

21  Omega watch was sold at 375 Canal Street.  That is the

22  evidence.  Ms. Quinonez purchased it.  Mr. Cole and

23  Mr. Quinonez watched her do that, and there were two

24  recordings, one from the sidewalk and one from Ms. Quinonez.

25  THE COURT:  So you say, but that's not what you told

1  me at the motion for summary judgement stage, right?

2  MR. PAUL:  That's correct.  That's not what we
3  understood to be the facts.

4  THE COURT:  So had you told me this, given me this
5  information, or had Mr. Cole and the others not submitted
6  affidavits, which are now regarded as perhaps false but
7  certainly inaccurate, I wouldn't have granted the motion for
8  summary judgement -- I wouldn't have denied the motion for
9  summary judgement.

10  Mr. Schick, you wanted to say something?

11  MR. SCHICK:  Yes, I just wanted to clear up a few
12  short points here so that your Honor has a right context of the
13  facts.

14  Mr. Paul introduced sort of how Mr. Taute will somehow
15  verify the events.  Just to be clear, Mr. Taute was thrown out
16  of the Police Department well before 2012; so he has nothing to
17  say about the events of 2012.

18  THE COURT:  As a matter of fact, he had left the
19  Police Department by 2011; isn't that right?

20  MR. SCHICK:  Correct.  So he has nothing to say about
21  the events that day.

22  With respect to Mr. Paul trying to imply that all the
23  investigators that day were sort of grouped up together, the
24  testimony was that Mr. Cole and Mr. Quinonez were outside the
25  store; so they were not inside the store.  They did not witness