# EXHIBIT A



# DEMAND FOR ARBITRATION
# CONSUMER ARBITRATION RULES

Complete this form to start arbitration under an arbitration agreement in a contract.

| | |
|---|---|
| 1. Which party is sending in the filing documents? *(check one)* ☑ Consumer ☐ Business | |

**2. Briefly explain the dispute:**

Please see attached.

**3. Specify the amount of money in dispute, if any: $** ≤ $174

**4. State any other relief you are seeking:**

Attorney Fees ☑ Interest ☑ Arbitration Costs ☑ Other; explain: Declaratory and injunctive relief

**5. Identify the requested city and state for the hearing if an in-person hearing is held:** New York, NY

**6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed.**

| **Consumer:** | **Business:** |
|---|---|
| Name: Spencer Meyer | Name: Uber Technologies, Inc. (first respondent) |
| Address: 88 Dromara Road | Address: 1455 Market Street Suite 400 |
| City: Guilford  State: CT  Zip Code: 06437 | City: San Francisco  State: CA  Zip Code: 94103 |
| Telephone: 207.852.3171  Fax: | Telephone: 415.986.2715  Fax: 415.986.2104 |
| Email Address: spencer.meyer@gmail.com | Email Address: |
| **Consumer's Representative (*if known*):** | **Business' Representative (*if known*):** |
| Name: Brian Feldman | Name: Reed Brodsky |
| Firm: Harter Secrest and Emery LLP | Firm: Gibson, Dunn & Crutcher LLP |
| Address: 1600 Bausch & Lomb Place | Address: 200 Park Avenue |
| City: Rochester  State: NY  Zip Code: 14604 | City: New York  State: NY  Zip Code: 10166 |
| Telephone: 585.231.1201  Fax: 585.232.2152 | Telephone: 212.351.4000  Fax: 212.351.4035 |
| Email Address: bfeldman@hselaw.com | Email Address: RBrodsky@gibsondunn.com |
| Date: May 31, 2018 | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;
- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and
- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

Cases may be filed with the AAA by mail, facsimile, email, or on-line. To file by mail send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. To file via fax send the initial filing documents and a completed charge card authorization form for the filing fee to 877-304-8457. To file by email send the filing documents and a check or a completed charge card authorization form for the filing fee to **CaseFiling@adr.org.** Charge card authorization forms are available at www.adr.org/Services/Forms. To file on-line via AAA WebFile, visit **www.adr.org** and click on File & Manage a Case and follow directions to register. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to a completed Affidavit for Waiver of Fees, available on our website.



WWW.HSELAW.COM

**Demand for Arbitration - Supplement**

2.      Briefly explain the dispute (cont.):

On December 16, 2015, Uber user Spencer Meyer filed a complaint in the U.S. District Court for the Southern District of New York (Manhattan) against then-Uber CEO Travis Kalanick alleging that "drivers using the app are independent firms, competing with each other for riders," who "should compete on price" but who instead "have agreed to Kalanick's scheme to fix prices among direct competitors using Uber's pricing algorithm." *See* Complaint at ¶ 5, *Meyer v. Kalanick*, 15-cv-9796, Dkt. 1 (filed Dec. 16, 2015) (attached as **Exhibit 1**). Meyer alleged that "Uber's price fixing is classic anticompetitive behavior," *id.*, and asserted violations of the Sherman Act, 15 U.S.C. § 1, and New York's Donnelly Act, N.Y. Gen. Bus. Law. § 340. On January 29, 2016, Meyer filed an amended complaint. *See* First Amended Complaint, *Meyer v. Kalanick*, 15-cv-9796, Dkt. 26 (filed Jan. 29, 2016) (attached as **Exhibit 2**).

In denying a motion to dismiss, the Court made key findings and conclusions relating to Plaintiff's allegation that Uber is a horizontal price fixing conspiracy. *See* Opinion and Order, *Meyer v. Kalanick*, 15-cv-9796, Dkt. 37 (filed Mar. 31, 2016) (attached as **Exhibit 3**). In particular, the Court held that:

- Plaintiff's claim alleges that Kalanick "had conspired with Uber drivers to use Uber's pricing algorithm to set the prices charged to Uber riders, thereby restricting price competition among drivers to the detriment of Uber riders, such as plaintiff Meyer." (*Id.* at 2).

- "As to the horizontal conspiracy, plaintiff alleges that Uber drivers agree to participate in a conspiracy among themselves when they assent to the terms of Uber's written agreement . . . and accept riders using the Uber app" because, "[i]n doing so, plaintiff indicates, drivers agree to collect fares through the Uber App, which sets fares for all Uber drivers according to the Uber pricing algorithm." (*Id.* at 8.)

- "For an illegal conspiracy to exist, the Supreme Court stated: 'It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.'" (*Id.* at 11).

- "In this case, plaintiff has alleged that drivers agree with Uber to charge certain fares with the clear understanding that all other Uber drivers are agreeing to charge the same fares.

These agreements are organized and facilitated by defendant Kalanick [and Uber]." (*Id.* at 12.).

- It would constitute an illegal horizontal price-fixing conspiracy if "drivers sign up for Uber precisely 'on the understanding that the other [drivers] were agreeing to the same' pricing algorithm," where "drivers' agreements with Uber would 'be against their own interests were they acting independently.'" (*Id.* at 12-13). This is so because "drivers' ability to benefit from reduced price competition with other drivers by agreeing to Uber's Driver Terms plausibly constitutes 'a common motive to conspire." (*Id.* at 13).

After Kalanick's motion to dismiss was denied, Uber joined the suit as a necessary party by Order dated June 20, 2016. *See* Memorandum Order, *Meyer v. Kalanick*, 15-cv-9796, Dkt. 90 (filed Jun. 20, 2016) (attached as **Exhibit 4**). The Court found that, "fairly read, the Amended Complaint alleges that Uber's scheme for setting prices, as well as the terms of Uber's contracts with drivers, constitute an antitrust violation." *Id.* at 5. Both Uber and Kalanick moved to compel arbitration, and the Court granted Uber's motion "without prejudice to Meyer's pursuing his claims against Kalanick in the Uber arbitration." *See* Opinion and Order, *Meyer v. Kalanick*, 15-cv-9796, Dkt. 173 (filed Mar. 5, 2018) (attached as **Exhibit 5**). While Meyer initially appealed that decision, he withdrew the appeal and informed the Court, on April 16, 2018, that he would move forward with arbitration. *See* Email dated Apr. 16, 2018 (**Exhibit 6**).

Meyer now brings this arbitration against both Uber and Kalanick. His key allegation, as reflected in his Complaint, is that Uber's business model is anticompetitive price-fixing. Uber, by its own admission, does not sell rides, but sets prices for independent transportation companies to sell rides. Because the Uber platform operates in such a manner as to effectively prevent price competition, it violates the Sherman Act and the Donnelly Act. Meyer has standing to pursue these claims as a registered Uber user who has been overcharged by, among other things, surge pricing.

The principal factual and legal issues in this dispute have already been resolved in Meyer's favor. Uber admitted the key facts in response to Meyer's Requests for Admissions. *See* Plaintiff's First Set of Requests for Admission to Uber Technologies, Inc., *Meyer v. Kalanick*, 15-cv-9796 (dated July 1, 2016) (attached as **Exhibit 7**); Defendant Uber Technologies, Inc.'s Responses to Plaintiff's First Set of Requests for Admissions ("Admissions"), *Meyer v. Kalanick*, 15-cv-9796 (dated Aug. 8, 2016) (attached as **Exhibit 8**). In particular, Uber admitted that:

- Uber is not a transportation company and has not sold transportation services, such as rides with Uber drivers (Admissions, ¶¶ 10, 12).

- Uber drivers are independent transportation drivers (Admissions, ¶ 13).

- Uber does not provide and is not part of a joint venture to provide transportation services (Admissions, ¶¶ 10-12, 20-21).

- Uber facilitates users' payments to drivers (Admissions, ¶¶ 25-26).

- Uber drivers charge a price set by Uber unless they seek an after-the-fact adjustment (Admissions, ¶ 30).

- Uber drivers typically do not request fare reductions unless they go the wrong way or make a mistake. (Admissions, ¶ 13).

- The Uber algorithm surges prices (Admissions, ¶ 38).

- Uber notifies drivers of surge pricing (Admissions, ¶ 40).

In this arbitration, Meyer seeks:

- Damages sufficient to compensate him for surge pricing he paid as a result of the price-fixing conspiracy, trebled in accordance with the Sherman Act and Donnelly Act (in total, less than $10,000);

- A declaration that the use of the Uber pricing algorithm for setting fares, including surge fares, is unlawful and violates the Sherman Act and the Donnelly Act;

- An injunction prohibiting Uber and Kalanick from continuing to use the Uber pricing algorithm for setting fares, including surge fares; and

- All attorneys' fees and costs incurred in pursuing these and related claims.

The arbitration agreement, enforced by the District Court, states that the Company will pay all "AAA filing, administrative and arbitrator fees." A copy of that agreement is attached as **Exhibit 9**. That agreement further specifies that where, as here, Meyer's "claim does not exceed $10,000, then the arbitration will be conducted solely on the basis of documents [Meyer] and Company submit to the arbitrator."

6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed. (cont.):

| **Business:** | | |
|---|---|---|
| Name: Travis Kalanick (second respondent) | | |
| Address: 3800 16th St. | | |
| City: San Francisco | State: CA | Zip Code: 94114 |
| | | |
| **Business' Representative (*if known*):** | | |
| Name: Peter Skinner | | |
| Firm: Boies, Schiller & Flexner LLP | | |
| Address: 575 Lexington Avenue | | |
| City: New York | State: NY | Zip Code: 10022 |
| Telephone: 212.446.2300 | Fax: 212.446.2350 | |
| Email address: pskinner@bsfllp.com | | |

# EXHIBIT 1

ANDREW SCHMIDT LAW PLLC
By:  ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPENCER MEYER, individually and on behalf of those similarly situated,<br><br>                     Plaintiffs,<br><br>     -against-<br><br>TRAVIS KALANICK,<br><br>                  Defendant. | **COMPLAINT**<br><br>1:15 Civ. 9796<br><br>ECF Case<br><br>**Jury Trial Demanded** |

Plaintiff Spencer Meyer, on behalf of himself and those similarly situated, by his counsel, Andrew Schmidt Law PLLC, brings this action against Defendant Travis Kalanick ("Kalanick"), the chief executive officer and co-founder of Uber Technologies, Inc. ("Uber"), alleging as follows:

## NATURE OF THE SUIT

1. This is a civil antitrust action against Kalanick, the co-founder and CEO of Uber. Uber has a simple but illegal business plan: to fix prices among competitors and take a cut of the profits.  Kalanick is the proud architect of that business plan and, as CEO, its primary facilitator. This lawsuit seeks injunctive and monetary relief on behalf of the Uber riders injured by Kalanick's actions.

2. Kalanick designed Uber to be a price fixer.  Kalanick has long insisted that Uber is not a transportation company and that it does not employ drivers.  Instead, Uber is a technology company, whose chief products are smartphone apps.  Those apps match riders with drivers.  The

apps provide a standard fare formula, the Uber pricing algorithm.  Drivers using the Uber app do not compete on price.  Rather, drivers charge the fares set by the Uber algorithm.  Those fares surge at times to extraordinary levels, which are uniformly charged by drivers using the Uber app.  Uber takes a cut of those price-fixed fares.  Kalanick's business plan thus generates profit through price fixing.

3.      Kalanick is not only the co-founder and CEO of Uber, but he is also a driver who has used the Uber app.  Kalanick has live tweeted his own experience driving using the app.  In charging fares to Uber riders, Kalanick charged prices he ultimately controlled.  Every other driver using the Uber app — Kalanick's direct competitors — agreed to use the identical pricing algorithm.  Through the Uber app, Kalanick's direct competitors thus empowered him to set his and their fares.

4.      The price-fixing Kalanick has arranged among Uber drivers is an open secret.  In September 2014, Uber conspired with hundreds of drivers to negotiate an effective hike in fares that would benefit them, collectively, at the expense of their riders.  Uber had initially required drivers of SUVs and black cars to accept a lower fare for rides.  Drivers, who should have been in direct competition with one another over price, instead banded together to ask Uber to reverse its decision and reinstitute higher fares.  Uber colluded with those drivers and put the higher fares back in place.  This collective agreement to fix prices among competitors illustrates Uber's essential role, as designed by Kalanick: to fix prices among competing drivers.

5.      Ironically, Kalanick has touted Uber's business model as procompetitive.  If Uber were to become a transportation company and employ drivers, it would be free to compete with other companies using its pricing algorithm.  But Uber has refused to become a transportation company.  Consequently, drivers using the app are independent firms, competing with each other

for riders.   They should compete on price as do drivers using other ride-share platforms, like Sidecar.   Instead, they have agreed to Kalanick's scheme to fix prices among direct competitors using Uber's pricing algorithm.   Uber's price fixing is classic anticompetitive behavior.

6.      Kalanick's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340.   In this action, Plaintiffs seek injunctive relief preventing Kalanick from continuing his conspiracy and money damages to all Uber riders injured by his actions.   In accordance with N.Y. Gen. Bus. Law § 340(5), notice of commencement of this action is being served upon the New York State Attorney General.

## PARTIES

7.      Plaintiff Spencer Meyer is a resident of Connecticut.   Plaintiff has used Uber car services on multiple occasions, including the uberX car service experience.   In both New York City and elsewhere, Plaintiff paid surge pricing to drivers using UberX.

8.      Plaintiff has paid higher prices for car service as a direct and foreseeable result of the unlawful conduct set forth below.

9.      Upon information and belief, Defendant Travis Kalanick is a resident of California. Kalanick is the mastermind of the Uber pricing conspiracy.   He is Uber's CEO and an Uber Board member.   Kalanick is the public face of Uber, its co-founder and manager of its operations. Kalanick also acts on occasion as a driver with Uber.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. §§ 4 and 15, and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws. The Court has supplemental jurisdiction of the pendant state law claims pursuant to 28 U.S.C. § 1367.   The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because the amount in controversy exceeds $5,000,000, and there are members of the class who are citizens of a different state than the Defendant.

11.     This Court has personal jurisdiction over Kalanick.

12.     Kalanick conducts business within the State of New York and has regularly and systematically transacted and/or solicited business in this State, either directly or through intermediaries.

13.     Kalanick has derived substantial revenue, including as an owner and executive of Uber, from services rendered in New York State.  He has likewise derived substantial revenue from interstate commerce.

14.     Kalanick has purposely availed himself of the benefits of the State of New York and has committed wrongful acts in whole or in part within the State of New York, which have had direct effects in this State.  Kalanick has expected, and should have expected, his actions to have consequences in the State of New York.

15.     Among other things, Kalanick has purposefully directed his illegal activities to artificially raise Uber car service prices for persons within the State of New York.  Activities in furtherance of these activities include, but are not limited to, providing his Uber car service and pricing algorithm in State of New York, engaging in lobbying efforts in this State related to the provision of Uber car services and use of the pricing algorithm, and appearing in this State for interviews and providing public statements regarding Uber's car services and pricing algorithm (including in November 2014 and at least as recently as September 2015 when he appeared as a guest on the Late Show with Stephen Colbert).

16.     The claims in this case arise out of activities that relate to New York State.

17.     This Court's exercise of personal jurisdiction over Kalanick would comport with fair play and substantial justice.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this district.   New York City is reportedly Uber's biggest market in the United States and its most profitable.

19.     Kalanick is engaged in, and his activities substantially affect, interstate trade and commerce.

## CO-CONSPIRATORS

20.     Various persons and entities including Uber driver-partners, known and unknown to Plaintiff and not named as defendants in this action, have participated as co-conspirators with Kalanick in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## BACKGROUND

**Uber and the Uber App**

21.     Kalanick founded Uber in 2009.

22.     Uber is an on-demand car service that seeks to match riders with drivers.

23.     It is Uber's position that it is not a transportation company.  Uber does not provide transportation services itself.

24.     Uber offers an application for smartphone devices (the "Uber App") through which users of the Uber App can request private drivers to pick them up and take them to their desired location.  The Uber App utilizes dispatch software to send the nearest independent driver to the requesting party's location.

25.     Uber offers different car service experiences, including uberX, uberTAXI, UberBLACK, UberSUV, and UberLUX (collectively, "Uber car service").

26.     Following completion of a ride, Uber calculates a fare based on a base amount, ride distance, and time spent in transit, which may be multiplied during "surge" periods if rider demand is high and/or driver supply is low, and then processes a transaction on behalf of the driver.

27.     Uber collects a percentage of the fare as a software licensing fee and remits the remainder to the driver-partner.

**Uber Users:  Riders**

28.     Uber users provide their name, mobile number, email, language, and credit card numbers or PayPal account information to Uber in exchange for an Uber account and access to the Uber App.

29.     To become an Uber account holder, an individual first must agree to Uber's terms and conditions and privacy policy.

30.     Uber account holders can obtain a "Fare Quote" directly from the Uber App by entering their pickup location and destination.  The Uber App calculates the approximate amount based on the expected time and distance.

31.     A rider pays a driver a fare, in a transaction facilitated by Uber but to which Uber is not a party.

32.     Uber facilitates payment of that fare by charging the user's credit card or PayPal billing information on file and purportedly serves as the drivers' "limited payment collection agent" in this regard.  Uber then sends a receipt to the user's email address.

**Uber's Other Users:  Driver-Partners**

33.     Uber actively recruits drivers to serve as "partners."

34.     Uber and its drivers "expressly agree that no joint venture, partnership, employment, or agency relationship exists between [the driver and] Uber."

35.     When Kalanick and his subordinates decide to offer Uber App services in a new geographic location, Uber uses social media to advertise for new "partner" drivers and holds meetings with these potential drivers.

36.     Uber also organizes events for its driver-partners to get together.  For example, in September 2015, Uber hosted a picnic at a park in Oregon where more than 150 driver-partners and their families reportedly joined Uber.  Similar "partner appreciation" events have been organized for driver-partners in Burlington, Vermont, Portland, Maine, and New York City, among other places.

37.     Uber tells potential drivers that "Uber gives you the freedom to get behind the wheel when it makes sense for you.  Choose when you drive, where you go, and who you pick up."

38.     Drivers have discretion as to whether to transport riders and may decline or cancel a request if, for example, a rider is unruly or intoxicated.

39.     As of October 2015, Uber had an estimated 20,000 uberX driver-partners operating in New York City.  Uber reported at that time that "average uberX gross fares per hour increased by 6.3% year over year."

40.     At times, Uber has sought to mobilize its driver-partners to lobby on Uber's behalf.

**Kalanick and Uber Control Pricing**

41.     Uber has steadfastly maintained that the driver-partners are not employees of Uber, not part of any Uber joint venture, and are wholly independent.  In exchange for being listed on the Uber App, the drivers agree to pay a percentage of the fare to Uber.

42.     The fares are calculated based on an Uber-generated algorithm.  As demand for car services increases among users, applying the Uber algorithm results in increased fares ("surge pricing").

43.     Kalanick's surge pricing model allows for up to eight times (8x) the standard fare to be charged during periods of high demand, and Kalanick and his co-conspirators have employed surge pricing on a regular basis.

44.     Uber has not publicly revealed the specifics of its pricing algorithm, but Kalanick has commented about the "surge pricing" feature embedded in the algorithm.

45.     Upon information and belief, Kalanick conceived of and implemented the "surge pricing" model into the Uber algorithm.  Kalanick is a fierce defender of the surge pricing model.

46.     In a December 17, 2013 report by Marcus Wohlsen posted on Wired.com and entitled "*Uber boss says surging prices rescue people from the snow,*" Mr. Kalanick is quoted as saying: "We are not setting the price.  The market is setting the price.  We have algorithms to determine what the market is."   www.wired.com/2013/12/uber-surge-pricing (last visited on Oct. 20, 2015).  Mr. Kalanick further explained the "surge pricing" component of the Uber pricing conspiracy:  "There's a harsh reality to situations where demand outstrips supply.  As much as I'd love to give everybody a really cheap option, it's just simply not possible in certain sorts of extreme events. … I guarantee that our strategy on surge pricing is the optimal way to get as many people home as possible." *Id.*

47.     In a September 17, 2015 post on the Uber website, Uber explains Kalanick's surge pricing to riders this way:

> Our goal at Uber is to ensure you can push a button and get a ride within minutes — even on the busiest nights of the year. And due to surge pricing, that's almost always possible. Here's how it works.  When demand for rides outstrips the supply of cars, surge pricing kicks in, increasing the price. You'll automatically see a 'surge' icon

8

next to the products (uberX, UberBLACK, etc.) that are surging. If you still want a ride, Uber shows the surge multiplier and then asks for your consent to that higher price.

The website post continues:

> Surge pricing has two effects: people who can wait for a ride often decide to wait until the price falls; and drivers who are nearby go to that neighborhood to get the higher fares. As a result, the number of people wanting a ride and the number of available drivers come closer together, bringing wait times back down.

> Together with Chris Nosko, a professor at The University of Chicago, we have been studying the effects of surge pricing. On New Year's Eve last year, Uber experienced a technical glitch causing surge pricing in New York City to fail for 26 minutes. This created what we call in economics a "natural experiment" — when something varies, which you can then study after the fact.

> Today we are releasing a case study of rider and driver behavior during the surge glitch, and on the night of a sold-out-concert at Madison Square Garden when surge worked as intended. This study is not exhaustive, but will form the basis of more comprehensive research in the future.

> We found that, without surge pricing, Uber is not really Uber — you can't push a button and get a ride in minutes:

> - On the night of the concert, even though the number of people opening the Uber app experienced a 4x increase, the number of actual ride requests only rose slightly. In other words people decided not to request a ride. Meanwhile, 100% of ride requests were completed and ETAs were virtually unaffected.

> - By comparison on New Year's Eve, without surge, ride requests skyrocketed and only 25% of these requests were completed. ETAs also increased sharply. Without surge pricing, rider and driver behavior did not adapt to the increased interest in getting a ride.

> These two real-world scenarios illustrate a bit of Economics 101: supply and demand adjust in response to price changes. On Uber, this means a ride is more likely than not just a few minutes away, at the simple touch of a button.

48.      In reality, Kalanick's pricing algorithm artificially manipulates supply and demand by imposing his surge pricing on drivers who would otherwise compete against one another on price.

49.     Kalanick and Uber control the fares charged to riders.   Through the pricing algorithm and its surge pricing component, Kalanick and Uber artificially set the fares for its driver-partners to charge to riders.

50.     Uber provides a driver guide for its driver-partners, which contains a FAQs section. One of the questions is "What will the total fare be?"  The answer is:  "Total fare is based on time and distance, so you won't know until the trip ends.  It's not a good idea to estimate fares for riders because the actual charges may be higher."

51.     Although they are independent partners, the drivers are not controlling the fare.

52.     Uber uses "surge pricing" to incentivize its driver-partners to use the Uber App during periods of peak demand.  Uber provides alerts to its driver-partners relating to "surge pricing" based on demand or limited availability of drivers.

53.     Uber also communicates with its driver-partners to inform them of what their increased earnings might have been had they logged into the Uber App during recent busy periods. Uber also provides its driver-partners with information regarding upcoming events that are likely to create high-demand for transportation services (e.g., concerts, sporting events, busy holidays).

54.     Uber manipulates its pricing algorithm by, among other things, encouraging drivers who are not available or willing to receive trip requests to log out of the Uber App in order to show less supply (which equates to higher fares).

55.     As Kalanick is quoted as saying:  "You want supply to always be full, and you use price to basically either bring more supply on or get more supply off, or get more demand in the system or get some demand out.  It's classic Econ 101."

56.     Kalanick has further explained his surge pricing model.  "When demand outstrips supply, the price comes up in a particular neighborhood or across a city."  (Sept. 10, 2015 appearance on Late Show with Stephen Colbert)

57.     Kalanick can turn off surge pricing, if he so chooses.  As he has admitted: "Sometimes, something happens in a city; we don't know what it is.  And if it's an emergency, we basically turn it off.  Because I just think community expectations are [such that in] an emergency, major weather events, things like that, we turn it off."  *Id.*

58.     In fact, very rarely if ever, does Kalanick or his subordinates "turn off" the surge pricing feature of the pricing algorithm.

59.     Instead, Kalanick and his co-conspirators reap artificially high profits during other peak demand periods like New Year's Eve, Valentine's Day, and stormy weather.

**The Driver-Partners Agree To Kalanick's Price-Fixing Scheme**

60.     All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm.

61.     Uber purports to allow its driver-partners to depart downward from the fare set by the Uber algorithm.  In reality, however, drivers cannot do so.  The drivers collect fares through the Uber App, rather than through a direct transaction with the rider.  Accordingly, Uber controls the fare.

62.     Uber's pricing is not always in the individual driver-partner's best interest.  Upon information and belief, some drivers have lamented that Uber's "surge pricing" component can result in greater rider dissatisfaction and fewer rides for drivers.  Upon information and belief, some drivers believe that having a more stable fare would increase rider satisfaction, as well as the number of riders willing to use Uber driver-partners at certain times.

63.     For his part, Kalanick has staunchly defended the Uber price-fixing algorithm. "Airlines and hotels are more expensive during busy times.  Uber is as well.  We don't just charge to make a buck though, we take a small fee of the transaction, but the vast majority goes to the driver so that we can maximize the number of drivers on the road.  ***The point is in order to provide you with a reliable ride, prices need to go up***."

64.     Implicit in Kalanick's statement is his manipulation of free market principles by insisting that *all* of the Uber driver-partners must adhere to the Uber algorithm in order to deliver the experience that Kalanick desires:  high-priced reliable rides.  In an efficient market, however, the balance between reliability and price would sort itself out, with some riders willing to pay more for greater reliability and others willing to sacrifice some reliability for a lower fare.  Kalanick, however, has abandoned the free market principles that he purports to support by tilting the scales in favor of higher fares.

65.     Kalanick is the chief architect of the price-fixing conspiracy.  The driver-partners agree to adhere to it because the artificial rates set by the pricing algorithm are higher on average than the fares that Plaintiff and Class Members would otherwise be charged in a competitive marketplace.

**Kalanick is a Driver and a Direct Competitor with Driver-Partners**

66.     Kalanick is not only the CEO and co-founder of Uber; he also has been a driver who has used the Uber App.

67.     Kalanick has publicized his work as a driver.  Among other things, he has live tweeted his driving experience.  For instance, on February 21, 2014, Kalanick tweeted, "Driving a range rover black on black . . . on uberX . . So legit."  That same night, he further tweeted "3 trips down," among other things.  His tweets continued through February 22, 2014.

12

68.     As a driver, Kalanick has competed directly with other drivers using the Uber App.

69.     Kalanick, as Uber's CEO, has ultimate control over the fares charged by himself, as a driver, and other drivers using the Uber App.

70.     Kalanick and his direct competitors, by using the Uber App, agreed to charge identical fares to riders.  Kalanick and his direct competitors using the Uber App understood that, by using the Uber App, they would charge identical fares to riders.

71.     Kalanick's direct competitors delegated to Uber and to Kalanick, as Uber's CEO, the ability to fix prices through the Uber App algorithm.  They agreed to charge those fares by becoming driver-partners and using the Uber App.

**Driver-Partners Have Colluded With Kalanick to Raise Fares**

72.     Kalanick, in his position as Uber CEO, has orchestrated collusion among driver-partners to raise fares.

73.     For instance, in September 2014, drivers using the Uber App in New York City colluded with each other to negotiate the reinstitution of higher fares for riders using UberBLACK and UberSUV services.  Upon information and belief, Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares.

74.     By organizing this price-fixing conspiracy, Kalanick ensured that fares would rise to a level that Uber, and the New York City drivers (*i.e.*, direct competitors), had jointly agreed upon.

75.     As a result, riders using the Uber App have suffered by paying for increased fares resulting from this price-fixing conspiracy.

**Plus Factors**

76.     The driver-partners had a common motive to conspire to adhere to the Uber pricing algorithm and the resulting artificially high fares because they could yield supra-competitive prices through their collective action.

77.     Were it not for the unlawful agreement, individual driver-partners would have sought to differentiate themselves from other drivers on the basis of price, among other factors.

78.     The driver-partners had many opportunities to meet and enforce their commitment to the unlawful arrangement.

79.     Were the driver-partners acting independently, some significant portion would not agree to adhere to the Uber pricing algorithm in charging fares to riders.

**Plaintiff and the Putative Class Suffered Antitrust Injury**

80.     But for Kalanick's conspiracy to fix fares charged by drivers using the Uber App, Uber ride-share service fares would have been substantially lower, including during the implementation of surge pricing.  Absent Kalanick's anticompetitive actions, riders would have been able to obtain rates resulting from fare competition among drivers.

81.     Studies have shown that the result of Kalanick's imposition of surge pricing is not to perfectly match supply with demand as he purports, but instead to remove some demand so that prices stay artificially high and Kalanick reaps artificially high profits.

82.     Upon information and belief, Kalanick's Uber ride-share service comprises approximately 80 percent of the mobile app-generated ride-share service market.

83.     As a result of Kalanick's anticompetitive actions, competition in the market for mobile app-generated ride-share service, and the sub-market of Uber car service, has been restrained.

14

**Nationwide Class**

84.     Plaintiffs sue on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23.  The Class consists of all persons in the United States who, on one or more occasions, have used the Uber App to obtain a ride from an Uber driver-partner and paid a fare for that ride set by the Uber pricing algorithm.  Excluded from the Class is Kalanick, his co-conspirators, Uber's employees, officers, and directors, and Kalanick's legal representatives and heirs.

85.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each Class member can be identified by using Defendant's records and/or the records of Uber.  Plaintiff is informed and believes that there are many thousands of Class members.

86.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

        a.     Whether Kalanick and the Uber driver-partner co-conspirators unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to charge all Uber riders the fare calculated by the Uber algorithm;

        b.     Whether Kalanick's actions in orchestrating the Uber pricing conspiracy violated Section 340 of New York's General Business Law;

        c.     Whether consumers and Class members have been damaged by Kalanick's conduct;

        d.     Whether punitive damages are appropriate;

        e.     Whether Kalanick should disgorge unlawful profits;

15

f.     The amount of any damages; and

g.     The nature and scope of injunctive relief necessary to restore a competitive

market.

87.     Plaintiff's claims are typical of the Class' claims, as they arise out of the same

course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the

practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

88.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has

retained as Class Counsel able class action litigators.

89.     Resolution of this action on a class-wide basis is superior to other available methods

and is a fair and efficient adjudication of the controversy because in the context of this litigation, no

individual Class member can justify the commitment of the large financial resources to vigorously

prosecute a lawsuit against Defendant.  Separate actions by individual Class members would also

create a risk of inconsistent or varying judgments, which could establish incompatible standards of

conduct for Defendant and substantially impede or impair the ability of Class members to pursue

their claims.  A class action also makes sense because Defendant has acted and refused to take steps

that are, upon information and belief, generally applicable to thousands of individuals, thereby

making injunctive relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
### (Violation of the Sherman Act, 15 U.S.C. § 1)

90.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

91.     Plaintiff does not believe it is necessary to prove a relevant market.  To the extent

one is required the relevant product market is mobile app-generated ride-share service, with a

relevant sub-market of Uber car service.

92.     To the extent required, the relevant geographical market is the entire United States.

16

93.     Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination and conspiracy in restraint of trade.  Specifically, Kalanick coordinated an unlawful agreement among the Uber driver-partners to adhere to the Uber pricing algorithm (including its Surge Pricing component) for fares charged to Uber riders.

94.     This unlawful arrangement consists of a series of vertical agreements between Kalanick and each of the Uber driver-partners, as well as a horizontal agreement among the Uber driver-partners to adhere to the Uber pricing algorithm.

95.     Were it not for their understanding that the other driver-partners were agreeing to the same thing, some driver-partners would not have entered the vertical agreements with Kalanick and Uber.

96.     Through Kalanick's and Uber's actions, the Uber driver-partners have been enabled to participate in a horizontal agreement amongst themselves to adhere to the artificial price setting embodied in the Uber pricing algorithm.  Defendant and Uber have sought to obscure the unlawful nature of this arrangement by disingenuously claiming that Uber driver-partners can charge a lower fare than the one generated by the Uber algorithm.  At the same time, Defendant and Uber tout the ability for Uber driver-partners to earn more money by adhering to the Uber algorithm, and they facilitate Uber driver-partners' opportunities to meet together.

97.     In orchestrating the horizontal price-fixing conspiracy, Kalanick committed himself to achieving an unlawful objective:  namely, collusion with and among the co-conspirator drivers to set prices.

98.     Despite Kalanick's position as a vertical market participant, his organizing of the conspiracy subjects him to per se liability for the results of the horizontal price-fixing agreement just as much as if operated at the same level as the driver-partners.

99.     In addition, Kalanick's role as an occasional Uber driver puts him in a horizontal relationship with his driver-partner peers, which further supports per se treatment of his arrangements in restraint of trade.

100.     Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

101.     Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

102.     The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained.   Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340)

103.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

104.     Through unlawful contracts, agreements, arrangements or combinations, Defendant has restrained trade in violation of the New York General Business Law, § 340, *et seq.*,

105.     For the same reasons that Kalanick is liable for a Sherman Act violation for orchestrating an unlawful price fixing agreement among the Uber driver-partners, so too is he liable under the Donnelly Act.

106.     In addition, Kalanick's conduct in requiring Uber driver-partners to adhere to the Uber pricing algorithm, subjects him to liability under the Donnelly Act on the alternative grounds that his actions constitute an unlawful vertical agreement in restraint of trade.  Such vertical price-fixing is unlawful *per se*.

18

107.     Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

108.     Plaintiff and the Class members have sustained substantial damages in an amount to be determined at trial.

109.     The unlawful contracts, agreements, arrangements or combinations will continue unless permanently enjoined and restrained.  Plaintiff and the Class members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY DEMAND

110.     Plaintiff requests a jury trial of all issues triable of right to a jury.

**WHEREFORE**, Plaintiff demands judgment against Kalanick as follows:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel.

B.     A declaration that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct or damage inflicted by any other co-conspirator;

C.     A declaration that the use of the pricing algorithm for setting fares as described above is unlawful;

D.     An award of monetary damages in an amount to be proved at trial, plus interest, to Plaintiff and Class members;

E.     Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or

illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

H.      The costs of bringing this suit, including reasonable attorneys' fees, as further

provided under the statutes cited herein; and

I.      All other relief to which Plaintiff and members of the Class may be entitled at law or

in equity.

Dated:  December 16, 2015

ANDREW SCHMIDT LAW PLLC

By:      _____/s/ Andrew Schmidt_____
ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

*Attorneys for Plaintiffs*

20

# EXHIBIT 2

ANDREW SCHMIDT LAW PLLC
By:  ANDREW ARTHUR SCHMIDT
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0320
Facsimile No. (207) 221-1029
andy@maineworkerjustice.com

HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, New York 14604
Telephone No. (585) 232-6500
Facsimile No. (585) 232-2152

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPENCER MEYER, individually and on behalf of
those similarly situated,

                                    Plaintiffs,

        -against-

TRAVIS KALANICK,

                                    Defendant.

**FIRST AMENDED COMPLAINT**

1:15 Civ. 9796 (JSR)

ECF Case

**Jury Trial Demanded**

Plaintiff Spencer Meyer, on behalf of himself and those similarly situated, by his counsel,

Andrew Schmidt Law PLLC and Harter Secrest & Emery LLP, brings this action against Defendant

Travis Kalanick ("Kalanick"), the chief executive officer and co-founder of Uber Technologies, Inc.

("Uber"), alleging as follows:

## NATURE OF THE SUIT

1.      This is a civil antitrust action against Kalanick, the co-founder and CEO of Uber.

Uber has a simple but illegal business plan: to fix prices among competitors and take a cut of the

profits.  Kalanick is the proud architect of that business plan and, as CEO, its primary facilitator.

This lawsuit seeks injunctive and monetary relief on behalf of the Uber riders injured by Kalanick's

actions.

2.      Kalanick designed Uber to be a price fixer.  Kalanick has long insisted that Uber is

not a transportation company and that it does not employ drivers.  Instead, Uber is a technology

company, whose chief product is a smartphone app.  The app matches riders with drivers.  The app also provides a standard fare formula, the Uber pricing algorithm.  Drivers using the Uber app do not compete on price.  Rather, drivers charge the fares set by the Uber algorithm.  Those fares surge at times to extraordinary levels, which are uniformly charged by drivers using the Uber app.  Uber takes a cut of those price-fixed fares.  Kalanick's business plan thus generates profit through price fixing.

3.      Kalanick is not only the co-founder and CEO of Uber, but also a driver who has used the Uber app.  Kalanick has live tweeted his own experiences as a driver using the app.  In charging fares to his riders, Kalanick charged prices he ultimately controlled.  Every other driver using the Uber app — Kalanick's direct competitors — agreed to use the identical pricing algorithm.  Through the Uber app, Kalanick's direct competitors thus empowered him to set his and their fares.

4.      The price-fixing Kalanick has arranged among Uber drivers is an open secret.  In September 2014, Uber conspired with hundreds of drivers to negotiate an effective hike in fares that would benefit them, collectively, at the expense of their riders.  Uber had initially required drivers of SUVs and black cars to accept a lower fare for rides.  Drivers who should have been in direct competition with one another over price instead banded together to ask Uber to reverse its decision and reinstitute higher fares.  Uber colluded with those drivers and put the higher fares back in place.  This collective agreement to fix prices among competitors illustrates Uber's essential role, as designed by Kalanick: to fix prices among competing drivers.

5.      Ironically, Kalanick has touted Uber's business model as procompetitive.  If Uber were to become a transportation company and employ drivers, it would be free to compete with other companies using its pricing algorithm.  But Uber has refused to become a transportation

company.  Consequently, drivers using the app are independent firms that are in competition with one another for riders.  They should be competing on price as drivers have on other ride-share platforms, like Sidecar.  Instead, drivers have collectively adopted Kalanick's scheme to fix prices among direct competitors using Uber's pricing algorithm.  Uber's price fixing is classic anticompetitive behavior.

6.     Kalanick's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  In this action, Plaintiffs seek injunctive relief preventing Kalanick from continuing his conspiracy and money damages to all Uber riders injured by his actions.  In accordance with N.Y. Gen. Bus. Law § 340(5), notice of commencement of this action has been served upon the New York State Attorney General.

## PARTIES

7.     Plaintiff Spencer Meyer is a resident of Connecticut.  Plaintiff has used Uber car services on multiple occasions, including the UberX car service experience.  In both New York City and elsewhere, Plaintiff paid surge pricing to drivers using UberX.

8.     Plaintiff has paid higher prices for car service as a direct and foreseeable result of the unlawful conduct set forth below.

9.     Upon information and belief, Defendant Travis Kalanick is a resident of California.  Kalanick is the mastermind of the Uber pricing conspiracy.  He is Uber's CEO and an Uber Board member.  Kalanick is the public face of Uber, its co-founder, and the manager of its operations.  Kalanick also acts on occasion as a driver with Uber.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. §§ 4 and 15, and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.

The Court has supplemental jurisdiction of the pendant state law claims pursuant to 28 U.S.C. § 1367.  The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, and there are members of the class who are citizens of a different state than the Defendant.

11.     This Court has personal jurisdiction over Kalanick.

12.     Kalanick conducts business within the State of New York and has regularly and systematically transacted and/or solicited business in this State, either directly or through intermediaries.

13.     Kalanick has derived substantial revenue, including as an owner and executive of Uber, from services rendered in New York State.  He has likewise derived substantial revenue from interstate commerce.

14.     Kalanick has purposely availed himself of the benefits of the State of New York and has committed wrongful acts in whole or in part within the State of New York that have had direct effects in this State.  Kalanick has expected, and should have expected, his actions to have consequences in the State of New York.

15.     Among other things, Kalanick has purposefully directed his illegal activities to artificially raise Uber car service prices for persons within the State of New York.  Activities in furtherance of these activities include, but are not limited to, providing his Uber car service and pricing algorithm in the State of New York, engaging in lobbying efforts in this State related to the provision of Uber car services and use of the pricing algorithm, and appearing in this State for interviews and providing public statements regarding Uber's car services and pricing algorithm (including in November 2014 and at least as recently as September 2015 when he appeared in New York as a guest on the Late Show with Stephen Colbert).

16.     The claims in this case arise out of activities that relate to New York State.

17.     This Court's exercise of personal jurisdiction over Kalanick would comport with fair play and substantial justice.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this district.  New York City is reportedly Uber's biggest market in the United States and its most profitable.

19.     Kalanick is engaged in, and his activities substantially affect, interstate trade and commerce.

## CO-CONSPIRATORS

20.     Various persons and entities including Uber driver-partners, known and unknown to Plaintiff and not named as defendants in this action, have participated as co-conspirators with Kalanick in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## BACKGROUND

### Uber and the Uber App

21.     Kalanick founded Uber in 2009.

22.     Uber is an on-demand car service that seeks to match riders with drivers.

23.     It is Uber's position that it is not a transportation company.  Uber does not provide transportation services itself.

24.     Uber offers an application for smartphone devices (the "Uber App") through which users of the Uber App can request private drivers to pick them up and take them to their desired location.  The Uber App utilizes dispatch software to send the nearest independent drivers to the requesting parties' locations.

25.    Uber offers different car service experiences, including UberX, UberBLACK, UberSUV, and UberLUX (collectively, "Uber car service").

26.    Following completion of a ride, Uber calculates a fare based on a base amount, ride distance, and time spent in transit, which may be multiplied during "surge" periods if rider demand is high and/or driver supply is low, and then processes a transaction on behalf of the driver.

27.    Uber collects a percentage of the fare as a software licensing fee and remits the remainder to the driver-partner.

**Uber Users:  Riders**

28.    Uber users provide their names, mobile numbers, emails, languages, and credit card numbers or PayPal account information to Uber in exchange for Uber accounts and access to the Uber App.

29.    To become an Uber account holder, an individual first must agree to Uber's terms and conditions and privacy policy.

30.    Uber account holders can obtain "Fare Quotes" directly from the Uber App by entering their pickup location and destination.  The Uber App calculates approximate amounts based on the expected time and distance.

31.    A rider pays a driver a fare in a transaction facilitated by Uber but to which Uber is not a party.

32.    Uber facilitates payment of that fare by charging the user's credit card or PayPal billing information on file and purportedly serves as the driver's "limited payment collection agent" in this regard.  Uber then sends a receipt to the user's email address.

33.    No cash is exchanged directly between riders and drivers.

34.     Nor are riders able to negotiate fares with drivers for rides matched through the Uber App.

35.     Instead, riders pay drivers through the Uber App.

36.     Riders pay drivers the fare set by the Uber App.

**Uber's Other Users:  Driver-Partners**

37.     Uber actively recruits drivers to serve as "partners."

38.     Uber and its driver-partners enter into a written agreement.

39.     Uber and its drivers "expressly agree that no joint venture, partnership, employment, or agency relationship exists between [the driver and] Uber."

40.     When Kalanick and his subordinates decide to offer Uber App services in a new geographic location, Uber uses social media to advertise for new "partner" drivers and holds meetings with these potential drivers.

41.     Uber also organizes events for its driver-partners to get together.  For example, in September 2015, Uber hosted a picnic at a park in Oregon where more than 150 driver-partners and their families reportedly joined Uber.  Similar "partner appreciation" events have been organized for driver-partners in Burlington, Vermont, Portland, Maine, and New York City, among other places.

42.     Uber tells potential drivers that "Uber gives you the freedom to get behind the wheel when it makes sense for you.  Choose when you drive, where you go, and who you pick up."

43.     A driver has discretion as to whether to transport riders and may decline or cancel a request if, for example, a rider is unruly or intoxicated.

44.     As of October 2015, Uber had an estimated 20,000 uberX driver-partners operating in New York City.  Uber reported at that time that "average uberX gross fares per hour increased by 6.3% year over year."

45. At times, Uber has sought to mobilize its driver-partners to lobby on Uber's behalf.

**Driver-Partners Authorize Kalanick and Uber To Control Pricing**

46. Uber has steadfastly maintained that its driver-partners are not employees of Uber, are not part of any Uber joint venture, and are wholly independent. In exchange for being listed on the Uber App, drivers agree to pay a percentage of the fare to Uber.

47. Fares are calculated based on an Uber-generated algorithm. As demand for car services increases among users, applying the Uber algorithm results in increased fares ("surge pricing").

48. Kalanick's surge pricing model allows for up to ten times (10x) the standard fare to be charged during periods of high demand, and Kalanick and his co-conspirators have employed surge pricing on a regular basis.

49. Uber has not publicly revealed the specifics of its pricing algorithm, but Kalanick has commented on the surge pricing feature embedded in the algorithm.

50. Upon information and belief, Kalanick conceived of and implemented the surge pricing model into the Uber algorithm. Kalanick is a fierce defender of the surge pricing model.

51. In a December 17, 2013 report by Marcus Wohlsen posted on Wired.com and entitled "*Uber boss says surging prices rescue people from the snow*," Mr. Kalanick is quoted as saying: "We are not setting the price. The market is setting the price. We have algorithms to determine what the market is." www.wired.com/2013/12/uber-surge-pricing (last visited on Jan. 29, 2016). Mr. Kalanick further explained the surge pricing component of the Uber pricing conspiracy: "There's a harsh reality to situations where demand outstrips supply. As much as I'd love to give everybody a really cheap option, it's just simply not possible in certain sorts of extreme events. … I

guarantee that our strategy on surge pricing is the optimal way to get as many people home as possible." *Id.*

52.     In a September 17, 2015 post on the Uber website, Uber explains Kalanick's surge pricing to riders this way:

> Our goal at Uber is to ensure you can push a button and get a ride within minutes — even on the busiest nights of the year. And due to surge pricing, that's almost always possible. Here's how it works.  When demand for rides outstrips the supply of cars, surge pricing kicks in, increasing the price. You'll automatically see a 'surge' icon next to the products (uberX, UberBLACK, etc.) that are surging. If you still want a ride, Uber shows the surge multiplier and then asks for your consent to that higher price.

The website post continues:

> Surge pricing has two effects: people who can wait for a ride often decide to wait until the price falls; and drivers who are nearby go to that neighborhood to get the higher fares. As a result, the number of people wanting a ride and the number of available drivers come closer together, bringing wait times back down.

> Together with Chris Nosko, a professor at The University of Chicago, we have been studying the effects of surge pricing. On New Year's Eve last year, Uber experienced a technical glitch causing surge pricing in New York City to fail for 26 minutes. This created what we call in economics a "natural experiment" — when something varies, which you can then study after the fact.

> Today we are releasing a case study of rider and driver behavior during the surge glitch, and on the night of a sold-out-concert at Madison Square Garden when surge worked as intended. This study is not exhaustive, but will form the basis of more comprehensive research in the future.

> We found that, without surge pricing, Uber is not really Uber — you can't push a button and get a ride in minutes:

> - On the night of the concert, even though the number of people opening the Uber app experienced a 4x increase, the number of actual ride requests only rose slightly.  In other words people decided not to request a ride. Meanwhile, 100% of ride requests were completed and ETAs were virtually unaffected.

> - By comparison on New Year's Eve, without surge, ride requests skyrocketed and only 25% of these requests were completed.  ETAs also increased sharply. Without surge pricing, rider and driver behavior did not adapt to the increased interest in getting a ride.

These two real-world scenarios illustrate a bit of Economics 101: supply and demand adjust in response to price changes. On Uber, this means a ride is more likely than not just a few minutes away, at the simple touch of a button.

53.     In reality, Kalanick's pricing algorithm artificially manipulates supply and demand, guaranteeing sharply higher fares for drivers who would otherwise compete against one another on price.

54.     Kalanick and Uber are authorized by drivers to control the fares charged to riders. Through the pricing algorithm and its surge pricing component, Kalanick and Uber artificially set the fares for its driver-partners to charge to riders.

55.     Uber provides a driver guide for its driver-partners, which contains a FAQs section. One of the questions is "What will the total fare be?"  The answer is:  "Total fare is based on time and distance, so you won't know until the trip ends.  It's not a good idea to estimate fares for riders because the actual charges may be higher."

56.     Although they are independent partners, drivers do not individually and independently control their fares.  Instead, they relinquish control over fares to Uber with the shared understanding that Uber will set fares without forcing them as drivers to compete with one another.

57.     Uber uses surge pricing to incentivize its driver-partners to use the Uber App during periods of peak demand.  Uber provides alerts to its driver-partners relating to surge pricing based on demand or limited availability of drivers.

58.     Uber also communicates with its driver-partners to inform them of what their increased earnings might have been had they logged into the Uber App during recent busy periods. Uber also provides its driver-partners with information regarding upcoming events that are likely to create high-demand for transportation services (e.g., concerts, sporting events, busy holidays).

59.     Uber manipulates its pricing algorithm by, among other things, encouraging drivers who are not available or willing to receive trip requests to log out of the Uber App in order to show less supply (which equates to higher fares).

60.     Some of Uber's driver-partners likewise manipulate the pricing algorithm.  Drivers report staying offline with UberX during non-surge times to trigger surges and thus obtain artificially increased fares.  These behaviors are incentivized by Kalanick's surge pricing algorithm.

61.     As Kalanick is quoted as saying:  "You want supply to always be full, and you use price to basically either bring more supply on or get more supply off, or get more demand in the system or get some demand out.  It's classic Econ 101."

62.     Kalanick has further explained his surge pricing model:  "When demand outstrips supply, the price comes up in a particular neighborhood or across a city."  (Sept. 10, 2015 appearance on Late Show with Stephen Colbert)

63.     Kalanick can turn off surge pricing, if he so chooses.  As he has admitted: "Sometimes, something happens in a city; we don't know what it is.  And if it's an emergency, we basically turn it off.  Because I just think community expectations are [such that in] an emergency, major weather events, things like that, we turn it off."  *Id.*

64.     In fact, very rarely if ever does Kalanick or his subordinates "turn off" the surge pricing feature of the pricing algorithm.

65.     Instead, Kalanick and his co-conspirators reap artificially high profits during other peak demand periods like New Year's Eve, Valentine's Day, and stormy weather.

66.     On the night of December 31, 2015 and early morning of January 1, 2016, Kalanick's surge pricing reportedly reached as high as 9.9 times standard fares in some U.S. cities.

67.     On January 20, 2016, surge pricing reportedly was at 4.5 times standard fares in Washington, D.C. during a snow storm.

**The Driver-Partners Agree To Kalanick's Price-Fixing Scheme**

68.     All of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm.

69.     Uber claims to allow its driver-partners to depart downward from the fare set by the Uber algorithm.  In reality, however, there is no mechanism by which drivers can do so.  Uber has effectively conceded this fact in other litigation.  Drivers collect fares through the Uber App, rather than through direct transactions with rider.  Accordingly, as drivers all understand and agree, Uber controls the fare.

70.     Driver-partners agree, in writing, to collect fares through the Uber App.  Driver-partners understand and agree that they will not compete with other driver-partners on price because Uber controls the fare.  Driver-partners agree to participate in a combination, conspiracy, or contract to fix prices when they swipe "accept" to accept the terms of Uber's written agreement.

71.     Driver-partners further participate in a combination, conspiracy, or contract to fix prices each time they accept a rider using the Uber App.  Each time a driver accepts a rider, the driver understands and agrees not to compete with any other driver on pricing and to charge Uber's pricing.

72.     Oftentimes, using Uber's pricing would not be in an individual driver-partner's best interests absent an individual driver's assurance that all other driver-partners will charge the price set by Uber.  When using Uber, drivers are unable to compete with other Uber drivers on price. This may result in lost business opportunities for individual drivers.  Foregoing such competition only makes sense because drivers are guaranteed that other Uber drivers will not undercut them on

price and that, consequently, drivers who do pick up riders can collect above-market fares from them.

73.     Moreover, upon information and belief, some drivers have lamented that Uber's surge pricing component can result in greater rider dissatisfaction and fewer rides for drivers.  Upon information and belief, some drivers believe that having more stable fares would increase rider satisfaction, as well as increasing the number of riders willing to use Uber driver-partners at certain times.

74.     For his part, Kalanick has staunchly defended the Uber price-fixing algorithm. "Airlines and hotels are more expensive during busy times.  Uber is as well.  We don't just charge to make a buck though, we take a small fee of the transaction, but the vast majority goes to the driver so that we can maximize the number of drivers on the road.  The point is in order to provide you with a reliable ride, prices need to go up."

75.     Implicit in Kalanick's statement is his manipulation of free market principles by insisting that *all* Uber driver-partners must adhere to the Uber algorithm in order to deliver the experience that Kalanick desires:  high-priced, reliable rides.  In an efficient market, however, the balance between reliability and price would sort itself out, with some riders willing to pay more for greater reliability and others willing to sacrifice some reliability for a lower fare.  Kalanick has abandoned the free market principles that he purports to support by tilting the scales in favor of higher fares.

76.     Kalanick is the chief architect of the price-fixing conspiracy, combination, or contract.  The driver-partners have joined the conspiracy, combination, or contract because the artificial rates set by the pricing algorithm are higher on average than the fares that Plaintiff and Class Members would otherwise be charged in a competitive marketplace.

77.     Driver-partners operate the Uber App with the common goal and purpose of maintaining Uber-controlled pricing, including surge pricing, and with the knowledge and intent that riders will be charged fares at prices set by Uber.

78.     To maintain Uber's price-fixed fares, driver-partners are mutually dependent upon each other's commitment to charge those fares and to not compete on fares.  Kalanick's design ensures that driver-partners will maintain those commitments because his Uber App prevents driver-partners from competing on fares.

79.     Uber reports that in 2015, its U.S. driver-partners were paid more than $3.5 billion.

**Kalanick is a Driver and a Direct Competitor with Driver-Partners**

80.     Kalanick is not only the CEO and co-founder of Uber; he also has been a driver who has used the Uber App.

81.     Kalanick has publicized his work as a driver.  Among other things, he has live tweeted his driving experience.  For instance, on February 21, 2014, Kalanick tweeted, "Driving a range rover black on black . . . on uberX . . So legit."  That same night, he further tweeted "3 trips down," among other things.  His tweets continued through February 22, 2014.

82.     As a driver, Kalanick has competed directly with other drivers using the Uber App.

83.     Kalanick, as Uber's CEO, has ultimate control over the fares charged by himself, as a driver, and other drivers using the Uber App.

84.     Kalanick and his direct competitors, by using the Uber App, agreed to charge identical fares to riders.  Kalanick and his direct competitors using the Uber App understood that, by using the Uber App, they would charge identical fares to riders.

85.     Kalanick's direct competitors delegated to Uber and to Kalanick, as Uber's CEO, the ability to fix prices through the Uber App algorithm.  They agreed to charge those fares by becoming driver-partners and using the Uber App.

**Driver-Partners Have Colluded With Kalanick to Raise Fares**

86.     Kalanick, in his position as Uber CEO, has colluded and agreed with driver-partners to raise fares.

87.     For instance, in September 2014, drivers using the Uber App in New York City colluded with each other to negotiate the reinstitution of higher fares for riders using UberBLACK and UberSUV services.  Upon information and belief, Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these co-conspirators, in which Uber ultimately agreed to raise fares.

88.     By organizing this price-fixing conspiracy, Kalanick ensured that fares would rise to a level that Uber, and the New York City drivers (*i.e.*, direct competitors), had jointly agreed upon.

89.     Riders using the Uber App have suffered by paying artificially increased fares resulting from this price-fixing conspiracy.

**Plus Factors**

90.     Driver-partners have a common motive to conspire to adhere to the Uber pricing algorithm and the resulting artificially high fares because they could yield supra-competitive prices through their collective action.

91.     Were it not for the unlawful agreement, individual driver-partners would have sought to differentiate themselves from other drivers on the basis of price, among other factors.

92.     The driver-partners have had many opportunities to meet and enforce their commitment to the unlawful arrangement.  At numerous meetings and events organized by Uber,

and through smart phone apps facilitating communications between drivers, driver-partners have reinforced and reaffirmed their mutual commitments to this unlawful arrangement.

93.     Were the driver-partners acting independently, rather than concertedly, some significant portion would not agree to adhere to the Uber pricing algorithm in charging fares to riders.

**The Mobile App-Generated Ride-Share Service Market**

94.     Uber competes in the relatively new mobile app-generated ride-share service market.

95.     Upon information and belief, Uber has approximately 80% market share in the U.S. in the mobile app-generated ride-share service market.

96.     Uber's chief competitor in the U.S. mobile app-generated ride-share service market is Lyft, which, upon information and belief, has nearly 20% market share.

97.     A third competitor in the market, Sidecar, left the market at the end of 2015.

98.     As reported by Daniel Miller, in an article entitled "Lyft vs. Uber:  Just How Dominant Is Uber in the Ridesharing Business?," May 24, 2015, available at www.fool.com/investing/general/2015/05/24/lyft-vs-uber-just-how-dominant-is-uber-ridesharing.aspx (last visited January 25, 2016), Uber Dominates The Market In Average Rides Per Month:



(Chart by Daniel Miller. Data source: Uber and Lyft. Note: 2015 figures above are based on the beginning of 2015, not what the companies expect to average through the full-year 2015 -- those figures will likely be higher -- whereas 2014 figures above show the average monthly numbers.)

99.    According to the same report, Uber also dominates the market in net revenue:



(Chart by Daniel Miller. Data from Uber and Lyft leaked to TechCrunch and Bloomberg.)

100.    In addition, Uber has much greater market penetration than its competitors.  A study published in August 2015 reported that 6% of sampled smart phones had the Uber App installed, while only about 1% had the Lyft app installed.

101.    Given Uber's dominant position in the market, Kalanick's price-fixing scheme has resulted in higher prices in the market as a whole.

102.    Uber's market position has already helped force Sidecar out of the marketplace.

103.    Uber's dominant position and considerable name recognition has also made it difficult for potential competitors to enter the marketplace.

104.   Traditional taxi service is not a reasonable substitute for mobile app-generated ride-share service.  Unlike trying to hail a taxi on a busy New York City street, the mobile app-generated ride-share companies allow prospective passengers to arrange for rides at the push of a button and then watch on their mobile phones for the nearest driver approach for pick up.  Those using mobile app-generated ride-share service also need not have cash or credit card on hand, and they can simply get out of the car when they reach their destination without further delay.  In addition, mobile app-generated ride-share service offerors allow a rider to rate their driver and view their driver's name, headshot, the make and model of his car, and overall rating before entering the vehicle.  Moreover, traditional taxi services are heavily regulated, whereas those who offer mobile app-generated ride-share services like Uber are not.

105.   Uber does not consider itself in the same market as taxis.  Among other things, Uber has stated, "It's not Uber versus taxis, we don't see them as a ride-sharing competition."  Uber has also stated that it is not "in competition with taxi."

106.   Traditional cars for hire also are not reasonable substitutes for mobile app-generated ride-share service.  Traditional cars for hire typically need to be scheduled in advance to pick up riders at a pre-arranged times and locations.  The foresight and rigidity required of potential passengers for car for hire service is an important differentiator from those using on-demand, mobile app-generated ride-share service.

107.   Although neither taxis nor traditional cars for hire are reasonable substitutes for mobile app-generated ride-share service, Uber has obtained a significant share of business in the combined markets of taxis, cars for hire, and mobile-app generated ride-share services.  Uber's own experts have suggested that, within certain cities in the United States, Uber captures 50 to 70 percent of business customers among all types of rides.

19

108.    Public transportation offerings, such as subway or bus, are also not reasonable substitutes for mobile app-generated ride-share service because, among other things, they do not pick up riders at the riders' locations, at the times that the rider wants rides, and they do not drop off riders at their preferred destinations.

**Plaintiff and the Putative Class Suffered Antitrust Injury**

109.    Kalanick's actions have restrained competition by inflating prices.    But for Kalanick's conspiracy to fix fares charged by drivers using the Uber App, Uber ride-share service fares would have been substantially lower, including during the implementation of surge pricing. Absent Kalanick's anticompetitive actions, riders would have been able to obtain rates resulting from fare competition among drivers.

110.    Kalanick's actions have further restrained competition by decreasing output.    As independent studies have shown, the result of Kalanick's collusive surge pricing is not, as he claims, to perfectly match supply with demand, but instead to remove some demand so that prices stay artificially high and Kalanick reaps artificially high profits.

111.    Upon information and belief, Kalanick's Uber ride-share service comprises approximately 80 percent of the mobile app-generated ride-share service market.

112.    As a result of Kalanick's anticompetitive actions, competition in the market for mobile app-generated ride-share service, and the sub-market of Uber car service, has been restrained.

**Nationwide Class**

113.    Plaintiff sues on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23.  The Class consists of all persons in the United States who, on one or more occasions, have used the Uber App to obtain rides from Uber driver-partners and paid fares for their rides set

by the Uber pricing algorithm.  Excluded from the Class is Kalanick, his co-conspirators, Uber's employees, officers, and directors, and Kalanick's legal representatives and heirs.

114.    Plaintiff also brings certain of the claims on behalf of himself and a portion of the Class described as the Surge Pricing Subclass.  The Subclass consists of all persons in the United States who, on one or more occasions, have used the Uber App to obtain rides from Uber driver-partners and have paid fares for their rides set by the Uber pricing algorithm that included surge pricing.

115.    The persons in the Class and Subclass are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Class and Subclass are easily ascertainable, as each Class member and Subclass member can be identified by using Defendant's records and/or the records of Uber.  Plaintiff is informed and believes that there are many thousands of Class and Subclass members.

116.    There are common questions of law and fact specific to the Class and Subclass that predominate over any questions affecting individual members, including:

    a.    Whether Kalanick and the Uber driver-partner co-conspirators unlawfully contracted, combined, and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to charge all Uber riders the fare calculated by the Uber algorithm;

    b.    Whether Kalanick's actions in orchestrating the Uber pricing conspiracy violated Section 340 of New York's General Business Law;

    c.    Whether consumers and Class members have been damaged by Kalanick's conduct;

    d.      Whether punitive damages are appropriate;

    e.      Whether Kalanick should disgorge unlawful profits;

    f.      The amount of any damages; and

    g.      The nature and scope of injunctive relief necessary to restore a competitive market.

117.    Plaintiff's claims are typical of the claims of the Class and Subclass, as they arise out of the same course of conduct and the same legal theories as the rest of the Class and Subclass, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class and Subclass as a whole.

118.    Plaintiff will fairly and adequately protect the interests of the Class and the Subclass. Plaintiff has retained as Class and Subclass Counsel able class action litigators.

119.    Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual Class or Subclass member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant.  Separate actions by individual Class or Subclass members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of Class or Subclass members to pursue their claims.  A class action also makes sense because Defendant has acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class and Subclass as a whole.

**FIRST CAUSE OF ACTION**
**(Violation of the Sherman Act, 15 U.S.C. § 1)**

120.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

121.    Under the facts and circumstances of this action, Plaintiff is not required to allege or prove a "relevant market."  To the extent one is required, the relevant product market is mobile app-generated ride-share service, with a relevant sub-market of Uber car service.

122.    To the extent required, the relevant geographical market is the entire United States.

123.    Kalanick, Uber, and Uber's driver-partners have entered into an unlawful agreement, combination or conspiracy in restraint of trade.  Specifically, Kalanick engaged in concerted action with Uber driver-partners to set the Uber pricing algorithm (including its surge pricing component) as the fixed price for Uber riders' fares.

124.    This unlawful arrangement consists of a series of agreements between Kalanick and each of the Uber driver-partners, as well as a conscious commitment among the Uber driver-partners to the common scheme of adopting the Uber pricing algorithm as a fixed fare and of not competing with one another on price.

125.    Were it not for the conspiracy, combination, or agreement between all driver-partners to charge the same price, some driver-partners would not have agreed to the price-fixing arrangement with Kalanick and Uber.

126.    Through Kalanick's and Uber's actions, the Uber driver-partners have been enabled to participate in a conspiracy, combination, or contract among themselves to adhere to the artificial price setting embodied in the Uber pricing algorithm.  Defendant and Uber have sought to obscure the unlawful nature of this arrangement by disingenuously and inaccurately claiming that Uber driver-partners can charge a lower fare than the one generated by the Uber algorithm.  At the same time, Defendant and Uber tout the ability for Uber driver-partners to earn more money by adhering to the Uber algorithm, and they facilitate Uber driver-partners' opportunities to meet together.

127.    In orchestrating this price-fixing conspiracy, combination, or contract, Kalanick committed himself to achieving an unlawful objective:  namely, collusion with and among the co-conspirator drivers to fix prices.

128.    Despite Kalanick's position as an operator of a platform that purportedly seeks to match riders with drivers, his organization of the conspiracy subjects him to per se liability for the results of the price-fixing.

129.    In addition, Kalanick's role as an occasional Uber driver puts him in a horizontal relationship with his driver-partner peers, which further supports per se treatment of his arrangements in restraint of trade.

130.    In the alternative, Kalanick is also liable under Section 1 of the Sherman Act under a "quick look" or a "rule of reason" analysis.

131.    Plaintiff and the Class and Subclass members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

132.    Plaintiff and the Class and Subclass members have sustained substantial damages in an amount to be determined at trial.

133.    The unlawful contracts, agreements, arrangements, combinations, or conspiracies will continue unless permanently enjoined and restrained.  Plaintiff and the Class and Subclass members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**SECOND CAUSE OF ACTION**
**(Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340)**

134.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

135.     Through unlawful contracts, agreements, arrangements, or combinations, Defendant has restrained trade in violation of the New York General Business Law, § 340, *et seq.*,

136.     The conduct and actions that render Kalanick liable under the Sherman Act for orchestrating an unlawful price fixing agreement and arrangement among the Uber driver-partners also renders him liable under the Donnelly Act.

137.     In the alternative, Kalanick is also liable under Section 340 of the Donnelly Act under a "quick look" or a "rule of reason" analysis.

138.     Plaintiff and the Class and Subclass members have been injured and will continue to be injured in their businesses and property by paying more for Uber car service than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

139.      Plaintiff and the Class and Subclass members have sustained substantial damages in an amount to be determined at trial.

140.     The unlawful contracts, agreements, arrangements, or combinations will continue unless permanently enjoined and restrained.  Plaintiff and the Class and Subclass members are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY DEMAND

141.     Plaintiff requests a jury trial of all issues triable of right to a jury.

**WHEREFORE**, Plaintiff demands judgment against Kalanick as follows:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class and Subclass Representative and his counsel of record as Class and Subclass Counsel.

B.     A declaration that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct or damage inflicted by any other co-conspirator;

C.      A declaration that the use of the pricing algorithm for setting fares as described above is unlawful;

D.      An award of monetary damages in an amount to be proved at trial, plus interest, to Plaintiff and Class and Subclass members;

E.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

H.      The costs of bringing this suit, including reasonable attorneys' fees, as further provided under the statutes cited herein; and

I.      All other relief to which Plaintiff and members of the Class and Subclass may be entitled at law or in equity.


Dated:  January 29, 2016


                               ANDREW SCHMIDT LAW PLLC

                        By:      /s/ Andrew Schmidt
                               ANDREW ARTHUR SCHMIDT
                               97 India Street
                               Portland, Maine 04101
                               Telephone No. (207) 619-0320
                               Facsimile No. (207) 221-1029
                               andy@maineworkerjustice.com

                                   *-and-*

HARTER SECREST & EMERY LLP
Brian Marc Feldman
Jeffrey A. Wadsworth
Edwin M. Larkin
Rochester, New York 14604
Telephone No. (585) 232-6500
Facsimile No. (585) 232-2152
bfeldman@hselaw.com
jwadsworth@hselaw.com
elarkin@hselaw.com

*Attorneys for Plaintiffs*