# EXHIBIT N

# AMERICAN ARBITRATION ASSOCIATION

Case Number: 01-18-0002-1956

In the Matter of the Arbitration between

Spencer Meyer
-vs-
Uber Technologies, Inc.

## AWARD OF ARBITRATOR

I, Les J. Weinstein, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

This Arbitration between Claimant Spencer Meyer and Respondent Uber Technologies Inc. came on for hearing on October 23rd, 24th, and 25th, 2019 in New York City. Spencer Meyer, an individual, (hereinafter sometimes Meyer and/or Claimant), was represented by his counsel, Brian M. Feldman and Lauren Mendolara of Harter Secrest & Emery LLP. Uber Technologies, Inc. (hereinafter sometimes Uber and/or Respondent) was represented by William Isaacson, Peter Skinner, Abby Dennis, Alexandra Jumper, and William Weaver of Boies Schiller & Flexner LLP.

Documentary, testimonial and demonstrative evidence was presented. The parties furnished both pre- and post-arbitration briefings to the Tribunal and argued their cases. After reviewing the evidence and the applicable law, this Tribunal directs its Award in favor of Uber technologies, Inc. and against Spencer Meyer. Meyer shall take nothing on his claim.[1]

---

[1] At one point, Uber offered to settle this case, by paying Claimant his asserted treble damages and his attorney's fees (limited to those fees incurred during the arbitration). Uber also offered to code Meyer's personal account to exempt him from future "surge" fees. Uber did not offer any injunctive relief. Meyer refused this offer.

This Arbitration was commenced before the American Arbitration Association on June 4, 2018 after having been ordered to arbitration by the United States District Court which concluded that the matter was subject to arbitral jurisdiction. This Tribunal has determined that none of the prior law and motion decisions of the District Court are here either "law of the case" or issue preclusive.

The dispute between the parties, which first arose in 2015, had a long dance in the federal courts before arriving in the American Arbitration Association's ballroom; here known as arbitration. Its prior history can be found in the public record:

| | | |
|---|---|---|
| Meyer v Kalanick: | 185 F Supp 3d 66 | (2016) |
| | 200 F Supp 3d 410 | (2016) |
| | 291 F Supp 3d 526 | (2018) |
| Meyer v Uber: | 868 F3d 66 | (2017) |

This case began in the federal court as a purported class action involving tens of thousands if not millions of riders challenging Uber's right to charge surge pricing.

Claimant Meyer here, now as an individual, brought on this arbitration against Respondent Uber, alleging that he, as a rider, was overcharged by Uber's "surge pricing" for two rides he took in 2015 and that such charges violated Section 1 of the Sherman Act and the parallel New York Donnelly Act. Meyer stakes his claim by asserting that the surge pricing arrangement by which he was charged beyond standard normal pricing was a "per se" hub and spokes horizontal price fixing violation of Section 1 of the Sherman Act between driver competitors aided by Uber acting as the active sponsoring hub of the horizontal scheme.[2]

The fundamental issue remaining in this case is whether Meyer individually proved that Uber as the "hub" created and facilitated a price fixing conspiracy among and with its driver "spokes" constituting a hub and spokes conspiracy to charge, increase and/or fix the surge pricing paid by

---

[2] Curiously, Meyer chose not to challenge the standard aspects of Uber's normal, non surge, pricing despite the fact that the same legal analysis would appear to apply.

him in connection on the two (2) rides taken by him in 2015 when he was charged "surge" pricing.

If such a horizontal agreement between Uber and the drivers existed, it could supply the horizontal rim of the hub and spokes wheel arguably subject to a per se analysis. Meyer's claimed damages, after trebeleing, was less than 100 dollars; he also sought his statutory attorney's fees and a permanent injunction against Uber's being permitted to charge riders surge pricing to riders in the future.

I find no such hub and spokes conspiracy existed or that any horizontal agreement was proven. Uber's individual relationships with its drivers were purely vertical in nature in regard to the prices paid by riders and the amount earned by drivers. The pricing was controlled and set by Uber.

Meyer premised much of his case on the language, reasoning and the Supreme Court dicta of <u>Interstate Circuit</u> v <u>United States</u>, infra. and argued that it was controlling precedent.

Uber defended on numerous grounds but relied principally on the defense that there was no "rim" or horizontal agreement between and among drivers which it facilitated or promoted as the "hub". It contended that its relationships with its drivers were purely vertical in nature and was fully justified under the Supreme Court Leegin case, infra, which precluded a "per se" analysis. Uber further defended on the ground that Meyer did not suffer any "antitrust injury" in that the pricing paid by Meyer was based on a competitive marketplace in which both price and timely pick up were the components of the service provided and that he received what a fully competitive market would have provided him.

Although the parties have requested a reasoned award, the AAA Consumer Rules require only a brief explanation of the Award. This tribunal has chosen here in the interest of brevity and economy to offer more than a general explanation and less than what would be a fully reasoned Award complete with citations and references to the hearing record. The above cited federal cases involving Meyer provide ample additional background.

Meyer relies heavily on Interstate Circuit, infra which is here found by this Tribunal inapplicable to the facts presented. Though Interstate Circuit is still good law and not overruled, its analysis and oft cited dicta, infra, is often ill suited to 21st Century technology frequently involving primarily vertical relationships such as those involved in this case. Uber certified drivers are a diverse lot, not generally knowing each other's names or identities. On any given day in any geographic territory or region subject to surge pricing, there might be N drivers or 2xN drivers or 100xN drivers at any given time. They need not be the same group of drivers on any two days or during any single hour of the day. Indeed, it is unlikely that the set of drivers at any time would be identical to the same group at another time. Some of the Uber drivers might, at any time, be serving as a Lyft driver or both an Uber and Lyft driver signing on to the apps that seemed most beneficial to him or her. Indeed, such drivers might also be driving for independent limousine services. Uber deems its drivers to be independent contractors free to choose for whom they drive, their hours and days and how many hours they choose to work or not work. Some drivers might drive as a full time occupation while others as a second or third job. Drivers come and go and their numbers vary from day to day. The issue of their legal status vis a vis Uber does not seem free from doubt and at least in one state is currently seeking to legally deem them employees, which would arguably render them legally incapable of being horizontal co-conspirators. The diverse and varying varying drivers have no club house, membership list, union or periodic routine get together. They are spread throughout the United States and their local regions.

There is no evidence that the drivers entered into any agreement among themselves or collectively with Uber relating to surge pricing, a matter over which they had no control and was

set by Uber. The fees Uber charged a customer for a ride often had no direct or fixed mathematical relation to the driver's compensation. There is no evidence that Uber met with drivers to get them to agree on pricing or that the drivers met with each other to do so.

As a technical and legal matter, Meyer would be required to prove that this alleged hub and spokes conspiracy was in full operation on the very two (2) days in 1915 on which he took his rides and paid a surge price amd which was agreed to by the agreeing drivers then online with Uber. No such proof was offered.

Meyer has here expressly abandoned the alternative theory claimed by him and offered to him in the District Court wherein he could have sought to prove a Section 1 antitrust violation under the "rule of reason." Under such a test, many factors would be considered such as whether the conduct challenged had pro competitive or anticompetitive features, increased prices unreasonably, decreased output, whether it had benefits and the role that it served in the economic marketplace. Nonetheless, this essentially economically based test was abandoned by Meyer in this proceeding. In brief, Meyer alleged that Uber and its driver "partners" when switching to surge pricing formed a "hub and spokes" horizontal antitrust conspiracy among drivers vertically facilitated with or promoted by Uber to increase pricing for riders and drivers which was a "per se" unlawful and permitted of no legal justification.

It was undisputed that Uber conceived of, implemented and used surge pricing in times of high demand by prospective riders in order to induce more drivers to take to the road in an effort to meet the demand of waiting passengers in a timely manner. Uber sought to distinguish itself and compete with both cost effective competitive fares and prompt service with minimum waiting times for riders. Surge pricing typically increased the price from standard pricing and could be as small as a dollar to as much as 10 times standard pricing in times of very high rider demand and low driver supply. Uber saw itself as competing for both drivers and rider passengers in a two-sided marketplace in which timely satisfying riders was paramount to its services and to its

success. It sought to use surge pricing to increase driver supply in times of high demand and to minimize waiting times for riders. It knew that increased pricing at such times might be subject to the lower fares of competitors such as Lyft or taxis or buses etc. Uber was working on a classic supply and demand system in order to compete.

Uber defended on numerous grounds, the primary one being that no hub and spokes conspiracy existed with a horizontal component and that its pricing arrangements with its drivers were purely vertical in nature and not subject to a per se analysis since it lacked a rim horizontally connecting the drivers to any agreement with each other and it turn with Uber. Uber urged that the Leegin case, infra, provided a controlling basis for a decision in its favor in this case.

The internet, push button, smart phone, IOT technology of the 21st century is very different than that which existed in the 20th century and it is no surprise that the rules of competition often require more complex analysis in the context of "contract, combination or conspiracy" cases of prior years. It is beyond dispute that Uber and its ride delivery system has worked something of a 21st century miracle and changed much of the commuting habits in the United States and elsewhere. One might debate the pros and cons and the social desirability or potential long term lifespan of this change but the change has occurred ,is in full bloom and affected travelers, transportation and competition in many ways. Today, Uber has increased competition and has spawned a direct competitor such as Lyft and one – Sidecar - which has left the field. Its competition has served to enhance the quality and the price of taxicab and limousine services and no doubt affected public transportation and automobile use in numerous other ways. Many choose to Uber rather than walking or taking a subway or bus or taxi. Indeed, Uber is now a noun, a verb and an adjective as well as an established servicemark. It is the essence of competitive disruption that the Sherman Act is meant to foster.

Meyer's claims must fail for he has not met his burden of proof that Uber's surge pricing is as a matter of law or fact a per se violation of the Sherman Act and/or the parallel New York Donnelly Act. He has failed to prove that the drivers either agreed among themselves or

conspired with Uber on surge pricing. Uber sets surge fares at its option based on market conditions and the amount thereof; drivers are not consulted.

This Tribunal, assuming as it does, that Interstate Circuit, infra, and its progeny remains good law find it inapplicable for the essentially undisputed facts developed during this arbitration. There is arguably a Hub here, Uber. There are from time to time an ever varying number of individual driver "spokes", electronically flashing on and off like a laser beam directed to the hub and from the hub. Rarely are the same spokes present at the same time or for the same length of time.

What is unproven is the any "rim" exists connecting the drivers spokes to any agreement among themselves and the hub (Uber) such rim being the essential element of the horizontal agreement necessary to even make an effort of applying per se theory of a hub and spokes nature. Meyer has sought to prove a wheel which does not roll for the lack of a rim. Indeed there are no spokes in the traditional sense but merely numerous vertical and individual contractual relationships between Uber and its many drivers. There is no true wheel however much Meyer sought to portray it as such.

Here the alleged co conspirators are not known to each other by name or address. They are of a varying number and identity at any given moment of time and for all practical purposes they are not in contact, do not know each other or their identities in any commercially or competitively significant way. They do not meet collectively and have discussions. There is no fixed number and no meeting place. Many drivers work not only for Uber but for Uber's competitors such as Lyft and sometimes do so simultaneously without objection from Uber. The hub is real, the spokes ,if viewed as such,flash on and off in what is more like a light show and there is no rim in any commercially meaningful way practically connecting the driver vertical spokes to one another or creating an agreement among themselves and/or with Uber. Hence, the" rule of reason" law espoused by Leegin is here controlling as to vertical arrangements precluding a per se analysis or test of legality.

Although no rule of reason case was here formally advanced or asserted, both parties put in evidence on the subject that might be part of a rule of a reason case. Indeed, Uber no doubt, out of an abundance of caution, overperformed and put in what would be a large part of a rule of reason defense including offering expert economic testimony indicating that its conduct was reasonable, enhanced competition and was lawful. However, this tribunal need not speculate on the matter. I find as a matter of fact no wheel and no rim and hence no possible per se case. There exists merely a series of vertical restraints, found by Leegin not subject to a per se illegality analysis.

This tribunal here adds some dictum, which in a way goes to the heart of the case and its failure to settle. While Meyer waived and during the hearing first disclaimed any desire for a nationwide injunction, that was the original thrust of the case both here and in the federal court. Such an injunction, if granted would have likely also supported a large attorney's fees. While there is some sparse authority for the ability of an individual private antitrust litigant to gain broad injunctive relief, the very limited nature and small scope of Mr. Meyer's consumer claim, even if it had been successful ,would likely have augured against a granting of such broad injunctive relief, which could have had a draconian effect on the business of Uber. Much has been said of late about the appropriateness of nationwide injunctions being granted by federal district courts and an arbitration tribunal would be especially cautious in this regard es because of the very limited appeal rights in arbitration. Furthermore, neither the Federal Trade Commission nor the Antitrust Division of the United States Department of Justice or any state attorney general have taken any known interest in this case, despite its lengthy public face in the federal courts. These factors would have further likely deterred an arbitrator from entering such a broad injunction even if Meyer prevailed. While an arbitrator fully has power to grant an injunction in an appropriate case it is an extraordinary remedy to be cautiously invoked.

Uber (and Lyft) has improved the local taxi business by forcing them to compete in the quality and services offered and no doubt, price. This case allows this tribunal to venture an educated

prediction on how the United States Supreme Court would apply <u>Leegin</u> and apply it to the benefit of Uber's position in a rule of reason case.: 1) The alleged co-conspirator individual sellers of transportation, are presumed to participate in the disruptive technology emanating from the Uber. 2) Unlike Interstate Circuit and Leegin, the drivers are not a set identified group of competitors and vary over time; they can sell their rides of Uber competitors such as Lyft. 3) The surge pricing incentive is designed to increase available drivers and ride products and prompt delivery in times of increased passenger demands. 4) Surge pricing does not guarantee any Uber driver increased profitability for participating in surge pricing over any fixed period of time. Factors such as but not limited to Lyft's competition could actually decrease Uber driver and Uber earnings over any period of Uber surge pricing.

Given Leegin's failure to explore any potential the Hub-and-Spokes aspect in that case, this case before me warrants some explanation. The per se theory that underlies horizontal price fixing cartel like cases rests on the belief that such conduct virtually always increases price to the consumer <u>and</u> limits production or product availability by reducing competition. This is not such a case. Modern digital technology and the internet have changed the world virtually overnight. Here product availability and service are increased as is competition by Uber. Price is just one feature of the product Uber and its competition provide. Waiting for long periods in the rain or cold is a "cost" many riders wish to avoid and are willing to pay to avoid..

Uber was an upstart change agent, fueled by modern technology and backed up by dreamers and financially supported by investors that has disrupted transportation competition in this country in a dramatic way. It is known by virtually all who commute or walk. It has added its competition to the taxi and limousine business, car rental business, local transportation business and even generated the direct competition of Lyft. It provides competition with individual car owners often choosing to use Uber (or Lyft) to commute or make other trips. If anything, its arrangements with its drivers have increased product and quality ,brought on new competitors and stirred competition from its slumber.

Indeed, in this case, Respondent Uber has chosen to overachieve and defend by presenting a rule of reason defense, even though it had no need to do so. It established rather clearly that had Meyer pursued a rule of reason analysis, it would likely have lost, hence explains why the Claimant chose to invest in and pursue only a per se theory. The dictum of Interstate Circuit does not a case make.

In Leegin Creative Leather Products, Inc. v PSKS, Inc., 127 S Ct 2705 (2007), the Supreme Court expressly overruled the holding of Dr. Miles Medical Co. v John D. Park & Sons Co., 220 G.S. 373, 31 S.Ct. 376 that the per se rule of liability under Section 1 of the Sherman Act applied to vertical agreements to fix minimum prices. It held that the "rule of reason" economic analysis would be required in such cases. No mention is made in Leegin of Interstate Circuit v United States, 59 S. Ct 467 (1939) and it has no applicability here except that from Claimant's point of view it furnishes some useful but, in the end, inapplicable dictum. In Interstate, the United States brought an action on behalf of the movie going public against two large and established identifiable horizontal groups of competitors (distributors and exhibitors of motion picture films) which two groups which also had a vertical distribution relationship to one another in which prices to the public were fixed and product was restricted. This was not what is typically considered a hub and spokes case. Meyer focused on the language in Interstate, where the Supreme Court did there state _in dictum_ what is certainly good law in horizontal cases involving competitors:

*"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. United States v. Schenck, D.D., 253 F. 212, 213 affirmed 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Levey v. United States 9 Cir., 92 F.2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan the necessary consequences of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."*

However, in <u>Interstate</u> the Supreme Court concluded that there was ample evidence from which to find as a matter of fact horizontal agreements both expressed and/or implied between and within and between the two sets of horizontal defendants vertically connected. That is a far cry from this case.

The Award in this matter is given to Respondents Uber Technologies, Inc. Claimant Spencer Meyer shall take nothing from this arbitration.

The administrative fees of the American Arbitration Association (AAA) totaling $2,400.00, and the compensation and expenses of the arbitrator totaling $69,196.54 shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_February 22, 2020_
Date

_Les J. Weinstein_
Les J. Weinstein
Arbitrator