**EXHIBIT O**

THE ARBITRATION TRIBUNALS OF THE
AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

SPENCER MEYER,
    Claimant,

v.

UBER TECHNOLOGIES, INC.,
    Respondent.

Les Weinstein
AAA No. 01-18-0002-1956

# CLAIMANT SPENCER MEYER'S PRE-HEARING BRIEF

**HARTER SECREST & EMERY LLP**
Brian Marc Feldman
Lauren R. Mendolera
1600 Bausch & Lomb Place
Rochester, New York 14604

**ANDREW SCHMIDT LAW PLLC**
Andrew Arthur Schmidt
97 India Street
Portland, Maine 04101

*Counsel for Claimant Spencer Meyer*

October 16, 2019
New York, New York

# TABLE OF CONTENTS

Preliminary Statement................................................................................................................1

FACTS TO BE PROVEN AT TRIAL................................................................................2

LEGAL STANDARDS ........................................................................................................5

POINT I—UBER HAS ORCHESTRATED A HORIZONTAL AGREEMENT. .........................5

    A.      Uber Has Orchestrated A Horizontal Agreement Between Driver-Partners. ..........5

          1.       The horizontal agreement here mirrors that in *Interstate Circuit*. ...............6

          2.       Uber is liable for orchestrating that horizontal agreement.........................9

    B.      There Is No Reason to Re-litigate The Governing Law. .......................................10

          1.       Issue preclusion prevents re-litigation of Judge Rakoff's holding. ..........10

          2.       Moreover, Judge Rakoff's holding is law of the case..............................13

POINT II—UBER'S PRICE FIXING IS *PER SE* ILLEGAL......................................................14

    A.      The *Per Se* Rule Governs Uber's Price-Fixing......................................................15

    B.      Uber Could Operate Without Violating The *Per Se* Rule......................................18

          1.       Uber could sell rides itself, employ driver-partners as employees or agents, or form a driving joint venture with driver-partners. ...............19

          2.       Uber could franchise driver-partner transportation businesses.................20

          3.       Or, of course, Uber could stop unnecessarily price fixing........................21

POINT III—UBER'S SURGE PRICING HAS INJURED MEYER...........................................24

POINT IV—THIS TRIBUNAL SHOULD IMPOSE MEYER'S REQUESTED REMEDIES....26

Conclusion ......................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Aircraft Banking Sys. Corp. v. Local 856, Int'l Union,*
    97 F.3d 155 (6th Cir. 1996) ...............................................................11

*In re Aluminum Warehousing Antitrust Litig.,*
    833 F.3d 151 (2d Cir. 2016)................................................................25

*Am. Express v. Italian Colors Rest.,*
    570 U.S. 228 (2013)...........................................................................28

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010)......................................................................20,21

*Am. Postal Workers Union v. USPS,*
    736 F.2d 317 (6th Cir. 1984) .............................................................12

*Apple, Inc. v. Pepper,*
    139 S. Ct. 1514 (2019).......................................................................26

*Arizona v. Maricopa Cty. Med. Soc'y,*
    457 U.S. 332 (1982)...........................................................................16

*Arizona v. Maricopa Cty. Med. Soc'y,*
    643 F.2d 553 (9th Cir. 1980) .............................................................16

*Atl. Richfield Co. v. USA Petrol. Co.,*
    495 U.S. 328 (1990)...........................................................................25

*In re Blue Cross Blue Shield Antitrust Litig.,*
    308 F. Supp. 3d 1241 (N.D. Ala. 2018)..............................................23

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982)...........................................................................24

*Bd. of Regents v. NCAA,*
    546 F. Supp.1276 (W.D. Okl. 1982)...............................................27,28

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com,*
    985 F. Supp 2d 612 (S.D.N.Y. 2012)....................................................7

*Broadcast Music Inc. v. Columbia Boradcasting System, Inc.,*
    441 U.S. 1 (1979)..............................................................................21

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)...........................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..........................................................................25

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)....................................................................6,16

*Butler v. Jimmy John's Franchise, LLC*,
    331 F. Supp. 3d 786 (S.D. Ill. 2018) ..........................................10,20

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ...........................................................17

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986)..........................................................................25

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980)....................................................................15,17

*CBS v. Am. Soc'y Composers*,
    562 F.2d 130 (2d Cir. 1977)...............................................................26

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)....................................................................13,14

*Collins v. DR Horton, Inc.*,
    505 F.3d 874 (9th Cir. 2007) .............................................................10

*Conrad v. Jimmy John's Franchise, LLC*,
    2019 U.S. Dist. LEXIS 149892 (S.D. Ill. Aug. 5, 2019) ....................20

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)..........................................................................19

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007).................................................................25

*In re Cox Enters., Inc.*,
    871 F.3d 1093 (10th Cir. 2017) .........................................................15

*Deslandes v. McDonald's USA, LLC*,
    2018 U.S. Dist. LEXIS 105260 (N.D. Ill. June 25, 2018) ..................20

*Drier v. Tarpon Oil Co.*,
    522 F.2d 199 (5th Cir. 1975) .............................................................12

*In re Electronic Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)..................................................7

*FTC v. Superior Court Trial Lawyers Ass'n,*
  493 U.S. 411 (1990).....................................................................................7

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)............................................................... passim

*Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n,*
  804 F.2d 390 (7th Cir. 1986) ......................................................................12

*Hayman Cash Register Co. v. Sarokin,*
  669 F.2d 162 (3d Cir. 1982).........................................................................14

*In re Musical Instuments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ......................................................................8

*In re Ry. Employee No-Poach Antitrust Litig.*,
  2019 U.S. Dist. LEXIS 102906 (W.D. Pa. June 20, 2019)..........................21

*In re Teltronics Serv., Inc.*,
  762 F.2d 185 (2d Cir. 1985)..........................................................................12

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939)............................................................................ passim

*John Morrell & Co. v. Local Union 304A,*
  913 F.2d 544 (8th Cir. 1990) ......................................................................11

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959)........................................................................................9

*Kristian v. Comcast Corp.*,
  446 F.3d 25 (1st Cir. 2006).........................................................................27

*Lafeyette v. La. Power & Light Co.*,
  435 U.S. 389 (1978)......................................................................................26

*Laumann v. NHL,*
  907 F. Supp 2d 465 (S.D.N.Y. 2012)............................................................7

 *Leather v. Ten Eyck*,
  180 F.3d 420 (2d Cir. 1999).........................................................................11

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..................................................................................8,16

*Lucas Auto. Eng'r v. Bridgestone/Firestone,*
  140 F.3d 1228 (9th Cir. 1998) .....................................................................24

*Lummus Co. v. Commonwealth Oil Refining Co.*,
  297 F.2d 80 (2d Cir. 1961)................................................................12

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016)........................................... passim

*Meyer v. Kalanick*,
  15 Civ. 9796, 2016 U.S. Dist. LEXIS 82519 (S.D.N.Y. June 19, 2016)................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
  473 U.S. 614 (1985)................................................................27

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)........................................................20

*Montana v. United States*,
  440 U.S. 147 (1979).........................................................11,12,13

*N. Pac Ry. Co. v. United States*,
  356 U.S. 1 (1958)................................................................16

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)................................................................27

*NCAA v. Bd. Of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984)..............................................................22,27

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)................................................................16

*Ogden v. Little Ceasar Enters.*,
  2019 U.S. Dist. LEXIS 126248 (E.D. Mich. July 29, 2019) ...................................20

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  669 F.2d 490 (7th Cir. 1982) ......................................................27

*Pedrina v. Chun*,
  97 F.3d 1296 (9th Cir. 1996) ......................................................12

*Primetime 24 Joint Venture v. Nat'l Broadcasting Co.*,
  219 F.3d 92 (2d Cir. 2000)..........................................................5

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986).......................................................20

*SAS of P.R., Inc. v. P.R. Tel. Co.*,
  48 F.3d 39 (1st Cir. 1995).........................................................25

*SCFC ILC, Inc. v. Visa USA, Inc.*,
36 F.3d 958 (10th Cir. 1994) ........................................................................17,18

*Serpa Corp. v. McWane, Inc.*,
199 F.3d 6 (1st Cir. 1999)...................................................................................25

*Sherman v. Jacobson*,
247 F.Supp. 261 (S.D.N.Y. 1965) .....................................................................12

*Toys "R" Us, Inc. v. FTC.*,
221 F.3d 928 (7th Cir. 2000) ..................................................................... passim

*United States v. A. Lanoy Alston, DMD, PC*,
974 F.2d 1206 (9th Cir. 1992) ...........................................................................17

*United States v. Apple*,
791 F.3d 290 (2d Cir. 2015)......................................................................... passim

*United States v. Bartsh*,
69 F.3d 864 (8th Cir. 1995) ...............................................................................14

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969).............................................................................................15

*United States v. General Motors Corp.*,
384 U.S. 127 (1966)...............................................................................................9

*United States v. Socony Vacuum Oil Co.*,
310 U.S. 150 (1940).................................................................................... passim

*United States v. Ulbricht*,
31 F. Supp. 3d 540 (S.D.N.Y. 2014)....................................................................8

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
83 N.Y.2d 513 (1994) ...........................................................................................5

*Zenith Radio Corp. v. Hazeltine Research*,
395 U.S. 100 (1969)..............................................................................................28

**REPORTED ARBITRATION DECISIONS**

2008 AAA Employment LEXIS 223,
(Nov. 28, 2008) ...................................................................................................13

2019 AAA Consumer LEXIS 141,
(April 9, 2019) ....................................................................................................13

*In re Centra Inc.*,
51 621 0003 90 V, 15 EBC 2713 (August 5, 2013)............................................13

*Wash. Hosp. Ctr.*,
  98/16225-A, 112 BNA LA 495 (April 24, 1999) ....................................................13

**STATUTES**

15 U.S.C. § 1, 15 and 26 ...........................................................................................5

15 U.S.C. § 15 ...........................................................................................................24

15 U.S.C. § 26 ...........................................................................................................24

Donnelly Act, N.Y. Gen. Bus. L. §340 ....................................................................5

## Preliminary Statement

Uber wants to have its cake and eat it too.

Uber chooses to stay out of the rides business. "[D]rivers' work," Uber explains, "is outside the usual course of Uber's business, which is serving as a technology platform."[1] Uber runs a marketplace for independent transportation companies (driver-partners) to sell rides to consumers (riders). Uber itself does not sell rides. And driver-partners are not Uber's employees, agents, joint venture partners, or franchisees. Uber assiduously holds this line. With this choice, Uber avoids *respondeat superior* liability and employment obligations.

Yet Uber also chooses to control driver-partner fares. Uber's basic pitch, in sum and substance, is: "Sell rides on our platform, peg your price to our algorithm, and cut us a percentage." This is most attractive to driver-partners during surge periods. That's when Uber uniformly raises fares by multiples. Its black box algorithm identifies surge zones. When surge pricing kicks in, driver-partners charge more, riders pay more, and Uber takes a cut of a higher fare. With this choice, Uber protects driver-partners from price competition on the platform.

The law does not allow Uber to have it both ways. Sure, Uber can choose to stay out of the ride-selling business. But Uber may not then choose to set fares. Driver-partners selling rides on the Uber platform are independent businesses. Their fares, unlike taxi fares, are not dictated by government regulators. Driver-partners cannot agree to charge, and then uniformly surge, identical fares for identical services at identical times on the Uber platform. Doing so is horizontal price fixing. Yet Uber invites them to do just that. And every driver-partner agrees. Because—and only because—of driver-partners' agreement not to compete on price, Uber can surge the prices they charge riders. That is *per se* price fixing.

---

[1] Uber Chief Legal Officer Tony West, Sept. 11, 2019, *at* https://www.uber.com/newsroom/ab5-update/.

Claimant Spencer Meyer is a consumer and registered Uber rider, who paid surge pricing. This brief previews the evidence Meyer will introduce at the hearing to prove that Uber is violating the antitrust laws. It also provides the standards of law that should govern.

## FACTS TO BE PROVEN AT TRIAL

Mr. Kalanick will testify that Uber was founded by him and Garrett Camp. Mr. Camp first thought up the idea that became Uber. As Mr. Kalanick explained, "He wanted to push a button and get a ride, and he was very excited about it being a nice car." But it was Mr. Kalanick who designed the business model that started the company on the road towards price-fixing.

Mr. Kalanick was a serial startup entrepreneur. His first gig was a startup called Scour, which was a Napster-like company that allowed users to search for content on the internet. As Uber would allow drivers and riders to find each other, Scour allowed uploaders and downloaders to find each other. Eventually, the business was sued for massive copyright infringement in the ballpark, as Mr. Kalanick put it, of "a quarter of a trillion dollars." After Scour and another startup, Mr. Kalanick began helping other startups brainstorm. Around that time, he met Garrett Camp.

Originally, Mr. Camp had conceived of Uber as an app to sell rides in competition with limousine companies and town car services. But Mr. Kalanick soured at the responsibilities that went along with owning a fleet. Uber would instead be a platform, a marketplace for existing car services to sell rides.

It was then that Mr. Kalanick took a dangerous step. Not only would Uber be a marketplace, but it would also to set uniform prices to neutralize competition among sellers. And so Uber became not just a marketplace, but a price fixer. Starting in San Francisco, Mr. Kalanick would not only stand up a platform for car services to sell rides (as Uber's driver-

partners), but he would also guarantee against any price competition in that marketplace.

So, Mr. Kalanick and his team went about fixing prices. Uber might be a modern app, but it fixed prices the old-fashioned way. Starting in San Francisco, where Uber first launched, Mr. Kalanick and his team called on the existing players—town car services and limousine companies. They used Google's search engine as their guide. Mr. Kalanick made rounds with the various competitors and pitched Uber's new marketplace as a way for them to have fewer idling cars in their fleet. It was a secondary market of sorts. While it would be priced below the primary market, there would be no price competition. Mr. Kalanick made sure the price was right by talking it through with the market players. After he secured everyone's agreement on a price point, Uber launched in San Francisco.

Soon after launching Uber, Mr. Kalanick invented surge pricing—the practice of raising prices during busy periods. ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ Uber holds out surge as a fine-tuned solution to problems of supply and demand. Whatever its mathematical merits, one thing is clear: It increases fares in specific areas and shows driver-partners where they can collect those higher fares. Unlike sellers on Airbnb or Expedia, driver-partners on Uber do not compete on price. The only fare available to Uber riders during surge is the surged fare. Price competition is technically feasible. But Uber has not permitted it.

With this safeguard against price competition in place, Uber's business spread rapidly. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

successfully took Uber's model on the road. After the launch phase, as driver-partners signed up on their own, driver-partners would agree to let Uber set fares, ensuring no price competition on the platform. No price competition meant that Uber driver-partners could collectively enjoy the benefits of surge pricing—significant fare hikes.

The evidence will show that surge pricing was not inevitable. Even with Mr. Kalanick's choice not to have Uber sell rides itself, Uber did not have to engage in surge. Uber could give riders the choice to opt in or out of surge pricing (*e.g.*, surged rides with shorter waits or cheaper rides with longer waits).

Ms. Kennington will then share driver-partners' motives, in their own words. They understand how Uber works. They want the higher revenues of surge pricing. But they appreciate that surge pricing is only possible because driver-partners agree not to compete against each other. If they had to compete against each other, driver-partners, like any other business, would lower prices to sell their products. Because Uber shields them from price competition on its platform, they can surge their prices along with all other Uber drivers. That is why they agree to Uber's control.

And the result is that riders pay more during surge pricing. That is what happened to Mr. Meyer. He brings this case to stop Uber's price-fixing.

## LEGAL STANDARDS

Section one of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. A defendant violates the law if it (1) engages in concerted action (2) to impose an unreasonable restraint of trade (3) that causes antitrust injury. *See, e.g., Primetime 24 Joint Venture v. Nat'l Broadcasting Co.*, 219 F.3d 92, 103 (2d Cir. 2000).[2] Uber has done so here with driver-partners' surge pricing.

## POINT I

## UBER HAS ORCHESTRATED HORIZONTAL AGREEMENTS.

Uber has orchestrated a price-fixing scheme that is horizontal—*i.e.*, between the driver-partners themselves, not merely between Uber and each driver-partner. At the outset of this dispute, Judge Rakoff set forth the legal test for finding horizontal conduct. *See Meyer v. Kalanick*, 174 F. Supp. 3d 817 (S.D.N.Y. 2016). The evidence will show that driver-partners engage in horizontal concerted action orchestrated by Uber under that test, as described in Part A below. *See infra* I.A. That test governs here, not only because it is correct, but also because, as set out in Part B below, it is preclusive and law of the case. *See infra* I.B.

### A. Uber Has Orchestrated A Horizontal Agreement Between Driver-Partners.

The evidence will show that driver-partners agree horizontally not to compete on price on the Uber platform. There is no dispute that Uber offers driver-partners uniform price terms and that all driver-partners accept those terms. Judge Rakoff held that, given those facts, driver-partners would act horizontally if Meyer proved, additionally, (i) that "drivers agree with Uber to charge certain fares with the clear understanding that all other Uber drivers are agreeing to charge the same fares," and (ii) that such an agreement would "be against [driver-partners'] own

---

[2] The Donnelly Act violations here follow suit. *See X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994) (Donnelly Act generally construed in light of Sherman Act).

interests were they acting independently" that is, if "[w]ithout the assurance that all drivers will charge the price set by Uber . . ., adopting Uber's pricing algorithm would often not be in an individual driver's best interest, since not competing with other Uber drivers on price may result in lost business." *Id.* at 823-24.  The evidence will show these remaining elements are both true. And so will common sense.  When a driver-partner agrees to offer an Uber fare surged from $10 to $30, he does so confident that all other driver-partners on the platform are surging that same ride to $30 and not competing on price.  A driver-partner would not agree, independently, to offer a surged fare of $30 if other driver-partners could compete by offering less than $30 for that ride on the Uber platform.  But drivers collectively benefit from surging $10 fares to $30. Their conduct is thus horizontal under Judge Rakoff's test.  *See infra* I.A.1.  And Uber orchestrates that agreement.  *See infra* I.A.2.

1. **The horizontal agreement mirrors that in *Interstate Circuit*.**

Horizontal conspiracies are restraints on trade among competitors.  *See, e.g.*, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  As Judge Rakoff properly held, the rule of *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), sets the test for any horizontal conspiracy here.

In *Interstate Circuit*, a movie theater sent letters to eight movie distributors who competed with each other.  Each letter copied the competing distributors and invited them to take certain action that would raise profits for both the distributor-recipient and the movie theater. Each distributor accepted.  "[F]rom the beginning[,] each of the distributors knew that the proposals were under consideration by the others," and each "was aware that all were in active competition."  *Id.* at 222.  Each understood that increasing profits would not be feasible "without substantially unanimous action," but that, with concerted action, "there was the prospect of

increased profits." *Id.* at 222. The Supreme Court held that the competitors did *not* need to contact each other to form a horizontal conspiracy:

> It was enough that, knowing that concerted action was contemplated and invited, [each] gave their adherence to the scheme and participated in it. Each . . . was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint . . . and, knowing it, all participated in the plan.

*Id.* at 226-27. This established a "horizontal" conspiracy. *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon. com*, 985 F. Supp. 2d 612, 619 n.2 (S.D.N.Y. 2012) (Rakoff, J.). The Court's holding means that, where competitors with a common motive to conspire adopt "vertical agreements [with] knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012).

Precedents illustrate how this test functions. In *Interstate Circuit* itself, individual film distributors were offered uniform terms (with competitors copied) and accepted only with the lure of "substantially unanimous action" that would benefit them all, collectively. 306 U.S. at 222. Similarly, in *United States v. Apple*, 791 F.3d 290 (2d Cir. 2015), Apple offered uniform terms to collectively benefit book publishers, but which created "a classic collective action problem," because "the only condition on which a [publisher] would agree to [the] terms was if it could be sure its competitors were doing the same thing." *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685-86 (S.D.N.Y. 2012) (quotation marks omitted). And, in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), Toys "R" Us asked toy manufacturers to agree to a group boycott that would collectively benefit them; and, by accepting, the manufacturers formed "a horizontal agreement," even without contacting each other, since each agreed only because it

"could be sure its competitors were doing the same thing." *Id.* at 930, 936. In each case, where competitors could collectively benefit from concerted action, "[i]t was enough that, knowing that concerted action was contemplated and invited, the [competitors] gave their adherence to the scheme and participated in it." *Interstate Circuit*, 306 U.S. at 226-27.[3] Applying *Interstate Circuit* today means a horizontal conspiracy can be formed by sending competitors to "an automated telephone line that offered [them] the opportunity to gather together to engage in [concerted action] by pressing '1.'" *Meyer*, 174 F. Supp. 3d at 825 (quoting *United States v. Ulbricht*, 31 F. Supp. 3d 540, 559 (S.D.N.Y. 2014)).

An app would be an even savvier way to arrange horizontal concerted action, and that was Uber's approach (along with one-on-one pitches early on). *See id.* ("[T]he capacity to orchestrate such an agreement is the 'genius' of Mr. Kalanick and his company, which, through the magic of smartphone technology, can invite hundreds of thousands of drivers in far-flung locations to agree to Uber's terms."). As in *Interstate Circuit*, *Apple*, and *Toys "R" Us*, the evidence at the hearing will show that competitors are offered identical agreements—here, to let Uber uniformly fix and surge driver-partner prices. The evidence will show a collective action problem, as in those other cases. Mainly, each driver-partner has the same "strong motive for concerted action" to obtain profits from surge pricing.[4] *Interstate Circuit*, 306 U.S. at 222; *accord In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194-95 (9th Cir. 2015) ("Any firm that believes that it could increase profits by raising prices has a motive to

---

[3] Moreover, in each case, as is the case here, the common motive to conspire was not undermined by any free-riding problem, as would be the case in minimum resale price maintenance cases where discounters free-ride on the investments of showrooms. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 913 (2007).

[4] As in *Interstate Circuit*, *Apple*, and *Toys "R" Us*, with Uber there are no "concerns about free-riding drivers." *Meyer*, 174 F. Supp. 3d at 826. And here, "unlike in *Leegin*, Uber is not selling anything to drivers that is then resold to riders." *Id.*

reach an advance agreement with its competitors."). But, for surge to work, "cooperation [is] essential." *Interstate Circuit*, 306 U.S. at 226-27. Driver-partners cannot collectively surge prices on Uber from $10 to $30, if some driver-partners compete at $10 (or even $29.99) on Uber. Surge pricing works only because there is no price competition on the app. As the evidence will show, each driver-partner presented with Uber's uniform pricing would know "concerted action [i]s contemplated and invited" and, by agreeing not to compete on price for Uber fares, "give[s his] adherence . . . and participate[s]." *Id.* at 226. These circumstances establish a horizontal agreement, as Judge Rakoff held. *See Meyer*, 174 F. Supp. 3d at 824-25 (holding, given common pricing offered and accepted by all driver-partners, that *Interstate Circuit* conspiracy would be shown with proof that driver-partners accept "with the clear understanding that all other Uber drivers are agreeing to charge the same fares" and that doing so would "be against their own interests were they acting independently").

      **2.    Uber is liable for orchestrating that horizontal agreement.**

The evidence will also show that Uber is the ringleader that orchestrates the horizontal conspiracy among driver-partners.

It is black letter law that a business orchestrating a horizontal agreement among competitors is equally liable for that conduct, whether or not that business is itself a competitor. This has always been the law. *See, e.g.*, *United States v. General Motors Corp.*, 384 U.S. 127, 145 (1966) (manufacturer liable for orchestrating horizontal agreement among dealerships); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (retailer liable for orchestrating horizontal conspiracy among distributors). In *Interstate Circuit*, *Apple*, and *Toys "R" Us*, the defendant was the orchestrator—not a horizontal actor itself—but was liable nevertheless. *See Interstate Circuit*, 306 U.S. at 232 (affirming judgment against Interstate

Circuit and corresponding injunction, where Interstate Circuit, a movie theater company, orchestrated horizontal conspiracy among film distributors); *Apple*, 791 F.3d at 314 ("Apple orchestrated an agreement with and among the Publisher Defendants, [which was] a horizontal price-fixing conspiracy"); *Toy "R" Us, Inc.*, 221 F.3d at 930 (retailer, Toys "R" Us, liable "as the coordinator of a horizontal agreement among a number of toy manufacturers"); *id.* at 934 (explaining "there was a horizontal agreement" among manufacturers and retailer was "in the center as the ringmaster"). "The idea here is that since the hub orchestrated the horizontal wheel, it can be held per se liable for that horizontal agreement—even though the hub did not enter into a horizontal agreement itself." *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 795 (S.D. Ill. 2018)). "[A]ll participants in 'hub-and-spoke' conspiracies [are] liable when the objective of the conspiracy [is] a *per se* unreasonable restraint of trade." *Apple*, 791 F.3d at 322.

The evidence will show that Uber invited all driver-partners to agree to fixed prices, with no price competition, on the Uber platform. As Judge Rakoff held, this makes Uber liable for orchestrating "a horizontal conspiracy among Uber drivers." *Meyer*, 174 F. Supp. 3d at 826; *see also Meyer v. Kalanick*, 15 Civ. 9796, 2016 U.S. Dist. LEXIS 82519, at *6-7 (S.D.N.Y. June 19, 2016) ("Any antitrust violation that defendant Kalanick is claimed to have committed could only have resulted from . . . the Uber app and Uber's contracts with drivers").

**B.      There Is No Reason to Re-litigate The Governing Law.**

This tribunal should apply the legal standard set by Judge Rakoff. Issue preclusion prevents Uber from re-litigating that standard, and Judge Rakoff's ruling is the law of the case.

### 1.      Issue preclusion prevents re-litigation of Judge Rakoff's holding.

Arbitrators are bound by issue preclusion. *See generally Collins v. DR Horton, Inc.*, 505 F.3d 874, 880-82 (9th Cir. 2007) (collecting cases and holding that "arbitrators are not free to

ignore the preclusive effect of . . . collateral estoppel").  The doctrine precludes "parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Montana v. United States*, 440 U.S. 147, 153-54 (1979).  Indeed, courts will not hesitate to set aside arbitral decisions that improperly permit parties to re-litigate previously decided issues.  *See, e.g.*, *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 548 (8th Cir. 1990) (setting aside arbitral decision because issue preclusion barred the arbitrator from reconsidering an issue); *Aircraft Banking Sys. Corp. v. Local 856, Int'l Union*, 97 F.3d 155, 156 (6th Cir. 1996) (vacating arbitral award because arbitrator did not honor preclusive effects of prior ruling).

Judge Rakoff's holding precludes re-litigation of the standard for horizontal concerted action here.  Issue preclusion applies where "(1) the issues of both proceedings [are] identical, (2) the relevant issues [were] actually litigated and decided in the prior proceeding, (3) there [was a] full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues [were] necessary to support a valid and final judgment on the merits."  *Leather v. Ten Eyck*, 180 F.3d 420, 426 (2d Cir. 1999).  All of those elements exist here because the legal questions have not changed; those questions were actually litigated and decided; there were fair and full opportunities for both sides to be heard; and the decision was valid and final, not tentative.

"Final" has a special definition within issue preclusion doctrine.  Preclusive effect extends to "any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."  Rest. 2d of Judgments 13.  Judge Friendly

long ago clarified that "'finality' in the context [of issue preclusion] may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961). "Final" does not equate to "the final judgment rule," but, rather, it means *not* "provisional and subject to change and modification in the future by the same tribunal" or "avowedly tentative." *Sherman v. Jacobson*, 247 F. Supp. 261, 270 (S.D.N.Y. 1965). "A judgment may be final," where, as here, "the party has lost its right to appeal because of the circumstances of the case." *Id.* at 268. And issues decided in *denying* motions to dismiss are "final" for this purpose. *See, e.g., Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390 (7th Cir. 1986) (denial of motion to dismiss precluded re-litigation of same issue); *Am. Postal Workers Union v. USPS*, 736 F.2d 317, 319 (6th Cir. 1984) ("A judgment is not required so long as there has been a final decision with respect to the issue to given preclusive effect (in this case, the motion to dismiss)"). Judge Rakoff's denial of the dismissal motion, which can no longer be appealed given Uber's motion to compel arbitration, is therefore "final" and triggers preclusion.

There can be no question that Judge Rakoff's opinion binds Uber, not merely Travis Kalanick. It is a "fundamental precept of common-law adjudication" that issue preclusion applies to "a subsequent suit between the same parties *or their privies*." *Montana*, 440 U.S. at 153 (emphasis added). Uber and Mr. Kalanick—as Uber's CEO, founder, and then-majority shareholder—were in privity with respect litigation about Uber's business. *See, e.g.*, *In re Teltronics Serv., Inc.*, 762 F.2d 185, 190-91 (2d Cir. 1985) (finding privity between corporation and its CEO); *Pedrina v. Chun*, 97 F.3d 1296, 1302 (9th Cir. 1996) (finding privity between corporation and officers); *Drier v. Tarpon Oil Co.*, 522 F.2d 199, 200 (5th Cir. 1975) (same). Moreover, Mr. Kalanick was represented in the district court litigation by Uber's counsel at

Boies Schiller Flexner LLP, ███████████████████████████████████████████████

█████████████; and that same counsel has continued its work by representing Uber (not Mr. Kalanick) in this arbitration. As Mr. Kalanick would testify, it was Uber who handled the decision-making in the suit before Judge Rakoff. Uber thus "plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Montana*, 440 U.S. at 155.

**2.  Moreover, Judge Rakoff's holding is law of the case.**

Even if issue preclusion did not apply, the law-of-the-case doctrine would. Arbitrators apply the law-of-the-case doctrine to avoid reconsidering district court decisions made prior to compulsory arbitration. *See, e.g.,* 2019 AAA Consumer LEXIS 141, at *4 (Apr. 9, 2019) (applying court decision prior to remand as law of the case); 2008 AAA Employment LEXIS 223, at *39 (Nov. 28, 2008) (applying prior decision, "whether based [on] the law-of-the-case doctrine . . . or collateral estoppel"); *Wash. Hosp. Ctr.*, 98/16225-A, 112 BNA LA 495 (Apr. 24, 1999) (treating factual determinations by prior arbitrator as law of case); *In re Centra Inc.*, 51 621 0003 90 V, 15 EBC 2713 (Aug. 5, 1992) (citing law-of-the-case doctrine where issue had "already been decided by the District Court").

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988). The doctrine "prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy." *United States v. Bartsh*,

69 F.3d 864, 866 (8th Cir. 1995). "A disappointed litigant should not be given a second opportunity to litigate a matter that has been fully considered." *Hayman Cash Register Co. v. Sarokin*, 669 F. 2d 162, 169 (3d Cir. 1982), *cited by Christianson*, 486 U.S. at 816.

Here, Judge Rakoff's holding is law of the case and should not be re-litigated. Indeed, "[a]dherence to law of the case principles is even more important" here, in arbitration, because the transferring judge and the arbitrator "are not members of the same court. Here, principles of comity . . . provide a further reason why [this tribunal] should not independently re-examine an issue already decided by a court of equal authority." *Id.* Even beyond these interests in finality, efficiency, and comity, Judge Rakoff's holding follows and applies the binding authorities of *Interstate Circuit* and *Apple*. Under those precedents, the evidence will show that Uber orchestrated a horizontal agreement among driver-partners to surge fares.

## POINT II

### UBER'S PRICE FIXING IS *PER SE* ILLEGAL.

What Uber orchestrated among its driver-partners was illegal price-fixing. Uber driver-partners are independent transportation firms. As the evidence will show, they include traditional limousine and car service companies that, before Uber, did not coordinate their prices. Yet these firms and all other driver-partners—whether incorporated professional fleets or moonlighting sole proprietors—cannot and do not compete on price when they sell rides on the Uber platform. That is price-fixing, and under black letter law, it is *per se* illegal. The *per se* rule is a bright line rule, which does not leave any room for Uber's purported procompetitive justifications. *See infra* II.A.

The evidence will also show that the Uber platform could operate in various other ways to avoid this *per se* violation. As Uber has frequently noted, there are innumerable ways to offer

rides. Uber's *per se* violation is hardly the only way Uber could do business. *See infra* II.B.

**A.     The *Per Se* Rule Governs Uber's Price-Fixing.**

This case is controlled by the bright line *per se* rule prohibiting horizontal price-fixing. "Horizontal price-fixing conspiracies traditionally have been, and remain, the 'archetypal example' of a *per se* unlawful restraint on trade." *Apple*, 791 F.3d at 321 (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)). The Supreme Court has "consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940). "[Any conspiracy] formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price . . . is illegal per se." *Id.* at 223. "Congress has not left" the courts "with the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive." *Id.* at 221. Instead, "[t]he Act places all such schemes beyond the pale." *Id.* The Supreme Court long ago "settled that an agreement to fix prices is unlawful *per se*." *Catalano*, 446 U.S. at 647. Price is just "too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition." *United States v. Container Corp. of Am.*, 393 U.S. 333, 338 (1969).

The *per se* rule is a binary and bright line rule. "Under a per se rule, plaintiffs prevail simply by proving that a particular contract or business arrangement . . . exists." *In re Cox Enters., Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017). "[T]he rationale for *per se* rules" "is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine whether a particular restraint has been unreasonable—an inquiry so often fruitless when

undertaken." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 351 (1982) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). Any argument that "the per se rule [should be] inapplicable because [one's] agreements . . . have procompetitive justifications" is "a misunderstanding of the per se concept" because "[t]he anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some." *Maricopa Cty. Med. Soc'y*, 457 U.S. at 351.[5] The *per se* rule "eliminates the need to study the reasonableness of an individual restraint" and thereby gives "clear guidance for certain conduct." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

*Per se* rules apply on a categorical basis, by the type of conduct, not by the particular industry or context. The rule adopts "a categorical judgment[] with respect to certain business practices that have proved to be predominately anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("Certain categories of agreements . . . have been held to be *per se* illegal"). The Supreme Court has long held that "the Sherman Act . . . establishes one uniform rule applicable to all industries alike," *Socony-Vacuum Oil Co.*, 310 U.S. at 222, and rejected "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation," *Maricopa Cty. Med. Soc'y*, 457 U.S. at 351. An "unfamiliar context of [particular] horizontal price-fixing claims provides no basis to disturb application of the *per se* rule." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016),

---

[5] As Judge Larson explained in a dissent later endorsed by the Supreme Court, an important reason price fixing is *per se* illegal is the danger that "[e]ven though their initial price-tampering may seem benign," it may "inevitably be abused. The Sherman Act requires that these consolidations of power be stopped in their infancy." *Arizona v. Maricopa Cnty. Med. Soc'y*, 643 F.2d 553, 569 (9th Cir. 1980) (Larson, J., dissenting).

*cert. denied*, 137 S. Ct. 814 (2017).  The rule applies categorically, regardless of an industry's "peculiar problems and characteristics."  *Socony-Vacuum Oil Co.*, 310 U.S. at 222.

All of this means that, because price-fixing is *per se* unlawful, "no offsetting economic or efficiency justifications" can "salvage" it.  *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994).  "[T]he fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent it being declared unlawful *per se*."  *Catalano*, 446 U.S. at 649.  Rather, price-fixing schemes "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they may have caused or the business excuse for their use."  *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011) (en banc); *see Apple*, 791 F.3d at 328.  Like any bright line rule, the *per se* rule against horizontal price fixing may sometimes be under- or over-inclusive.  But "[p]rice fixing is illegal regardless of pro-competitive justifications offered therefor:  '[I]t is not [the court's] task to pass upon the social utility or political wisdom of price-fixing agreements."  *United States v. A. Lanoy Alston, DMD, PC*, 974 F.2d 1206, 1208 (9th Cir. 1992) (quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 421-22 (1990)).  There is no room for "case-by-case evaluation."  *Bus. Elecs. Corp.*, 485 U.S. at 723.  "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *Socony-Vacuum Oil Co.*, 310 U.S. at 224 n.59.  They are all "beyond the pale."  *Id.* at 221.

Here, the evidence will show that driver-partners peg their fares to Uber's pricing algorithm.  All rides sold over the platform offer the same price for the same service at the same time and place.  There is no price competition between driver-partners.  This scheme permits

Uber to raise prices uniformly, and often precipitously, with surge pricing. This is "the 'archetypal example' of a *per se* unlawful restraint on trade." *Apple*, 791 F.2d at 321. Uber has formed a horizontal conspiracy "with the effect of raising, depressing, fixing, pegging, or stabilizing" fares on its platform between competing and independent driver-partners, which "is illegal per se." *Socony-Vacuum Oil Co.*, 310 U.S. at 223. There is no room for this tribunal to consider any "economic justification," *id.* at 224 n.59, any "offsetting economic or efficiency justifications," *SCFC ILC*, 36 F.3d at 963, or any other "procompetitive justifications," *Maricopa Cty. Med. Soc'y*, 457 U.S. at 351. "[W]hether or not" Uber's conduct is "wise or unwise, healthy or destructive," is not at issue. *Socony-Vacuum Oil Co.*, 310 U.S. at 221. Because the *per se* rule applies, Uber's fixed pricing for driver-partners—here, surge pricing—is "banned," *Socony-Vacuum Oil Co.*, 310 U.S. at 223, plain and simple.

**B.     Uber Could Operate Without Violating The *Per Se* Rule.**

As the evidence will show, Uber did not have to structure its affairs to violate the *per se* rule against price-fixing. Nor does it need to do so now.

Uber could readily offer its same "push a button, get a ride" matching service by selling rides itself, either employing drivers as agents or employees or by joining in a joint venture with them. But Uber has rejected this approach, presumably to escape employment obligations and *respondeat superior* liabilities. *See infra* B.1. Uber could also trademark a car service business and start a franchise, which might shelter Uber from the *per se* rule. Yet Uber has not franchised driver-partner businesses either. *See infra* B.2.

Of course, Uber could also simply stop fixing driver-partner fares. It could remain merely a technology company with a platform that matches riders with independent driver-partner firms. Or, instead of fixing prices, Uber could follow the model of SideCar, a ridesharing

company that allowed drivers to compete on pricing over its platform. Driver-partners could control prices with bids in advance, in real time, or in some combination (*e.g.*, with default settings subject to changes), choosing whether to accept algorithmic fares or not.

Uber has even more options with respect to surge pricing, the target of this case. Uber could replace surge pricing in any number of ways. Uber could grant driver-partners control over surged fares and create real price competition for rides. Uber could allow driver-partners to turn surge pricing off. Or Uber could offer a parallel product that never surges (but may have different wait times) and call it "UberX No Surge" (or "UberBlack No Surge"). Even more simply, Uber could do away with surge altogether by offering incentives directly to driver-partners to encourage them to pick up riders. The evidence will show that Uber has frequently used incentives this way.

In short, and as detailed below, there is no need for Uber to fix fares among driver-partners, and certainly no need for Uber to uniformly raise fares through surge pricing. *See infra* B.2.

1.      **Uber could sell rides itself, employ driver-partners as employees or agents, or form a driving joint venture with driver-partners.**

The first way Uber could avoid the *per se* rule is by selling rides itself. It is "perfectly plain that an internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). But, as the evidence will show, Uber does not sell rides. Uber does not employ driver-partner. And those firms and their drivers are not Uber's agents. Nor is Uber their agent. Uber's contracts with driver-partners set this out, and these issues have been exhaustively litigated. Uber and its driver-partners are not a single entity.

Nor, relatedly, has Uber entered into a joint venture with driver-partners. It has refused—presumably to stay out of the driving business as a strategy for limiting its obligations and liabilities—to create joint ventures with driver-partners. "The antitrust laws treat agreements on price that are part of an integration of assets or resources of two businesses—which is sometimes known as a joint venture—differently than naked agreements price." ABA Model Jury Instructions in Civil Antitrust Cases B-27. "A joint venture made more efficient by ancillary restraints, is a fusion of the productive capacities of the members of the venture," much like a merger. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 230 (D.C. Cir. 1986) (Bork, J.). Because "joint ventures hold the promise of increasing a firm's efficiency and enabling it to compete more effectively, the Supreme Court has concluded that joint ventures should normally be analyzed under a rule of reason." *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 337-38 (2d Cir. 2008) (Sotomayor, J., concurring); *but see Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) (holding that "independently owned" and "independently managed" businesses were not unitary, even as part of a formal joint venture). The evidence here will show that Uber has expressly disclaimed any joint venture relationship with driver-partners. That is Uber's choice to make.

### 2. Uber could franchise driver-partner transportation businesses.

Another way for Uber to potentially avoid violating the *per se* rule would be by franchising. In other *per se* contexts, (not in the price-fixing context), courts have suggested that, "if the evidence of franchisee independence is weak . . . then the rule of reason may rear its head." *Butler*, 331 F. Supp. 3d at 797, *objections overruled sub nom. Conrad v. Jimmy John's Franchise, LLC*, 2019 U.S. Dist. LEXIS 149892 (S.D. Ill. Aug. 5, 2019); *see also Ogden v. Little Ceasar Enters.*, 2019 U.S. Dist. LEXIS 126248, at *25 (E.D. Mich. July 29, 2019); *compare*

*Deslandes v. McDonald's USA, LLC*, 2018 U.S. Dist. LEXIS 105260, at *19-20 (N.D. Ill. June 25, 2018) (treating non-compete clauses as ancillary to valid franchise agreements) *with In re Ry. Employee No-Poach Antitrust Litig.*, 2019 U.S. Dist. LEXIS 102906, *37-38 & n.6 (W.D. Pa. June 20, 2019) (treating same clauses as *per se* illegal in absence of franchise relationships).

But Uber is not a franchise, as the evidence will show. The most basic element of any franchise is the licensing of its trademark to licensees. *See generally* FTC Franchise Rule Compliance Guide (May 2008) at 2 ("[T]he right to use the franchisor's mark in the operation of the business—either by selling goods or performing services identified with the mark or by using the mark, in whole or in part, in the business's name—is an integral part of franchising."). Uber, refuses to permit driver-partners to use its trademark in any manner. Moreover, Uber neither considers itself a franchise nor complies with federal or state laws governing franchises. Uber functions only as a platform and lead generator. The "Uber" mark designates its platform, not any car service, just as the "NYSE" mark designates an exchange, not any business traded on it.[6] Uber has every right to decide not to franchise, but Uber has no right, as a mere software provider and technology platform, to fix driver-partner fares.

### 3. Or, of course, Uber could stop unnecessarily price-fixing.

Instead of rearranging its relationships with drivers—who currently remain competitors of each other and mere customers of Uber—Uber could, of course, stop price fixing. Neither the sale of rides nor the business of matching riders and drivers requires price fixing.

We anticipate that Uber will argue, in a misreading of the law, that price fixing is necessary for its business. But nothing about its price-fixing is necessary. It is true that "[w]hen 'restraints on competition are essential if the product is to be available at all,' *per se* rules of

---

[6] According to the U.S. Patent and Trademark Office, the "NYSE" trademark covers "[c]onducting a securities exchange."

illegality are inapplicable." *Am. Needle*, 560 U.S. at 203. In *Broadcast Music Inc., v. Columbia Broadcasting System, Inc.* ("*BMI*"), 441 U.S. 1, 9, 23 (1979), the Supreme Court endorsed a joint venture's "literal" price-fixing because such an agreement was "necessary to market the product at all." BMI sold a blanket license giving broadcasters access to a large portfolio of copyrighted songs at uniform prices. That product combined song rights that no single copyright holder had on its own. Only BMI (and ASCAP), with a trove of copyright holder members, could offer and price access to a blanket license. And "a 'necessary consequence' of the creation of the blanket license was that its price had to be established." *Maricopa Cty. Med. Soc'y*, 457 U.S. at 356. The Supreme Court held that BMI could price the blanket license that only it could sell; otherwise, no blanket license would exist. *See BMI*, 441 U.S. at 23; *see also NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 117 (1984) ("a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved").

The *BMI* rule does not apply to Uber. As explained above, there are many ways Uber could sell rides on its platform without fixing prices between independent firms. Uber could do what BMI did and sell the product itself. Moreover, in contrast to blanket licenses, which could not exist without literal price fixing, neither rides nor matching require any type of price-fixing—and certainly not surge pricing—to exist for at least three reasons. We discuss each below.

***First***, Uber's price-fixing is obviously not necessary to sell *rides*. Uber is price-fixing fares for rides—automotive transportation—which can be offered any number of ways. Uber has long pointed to the multitudinous options for rides. Drivers can market themselves on the street, through traditional telephone or internet service, or through e-hailing apps that do not include

price-fixing.  Uber's price-fixing is not a practice necessary for *rides* to be marketed at all, as was the case with blanket music licensing in *BMI*, 441 U.S. at 10 ("We have never examined a practice like this before"), or with collegiate team sports, as in *NCAA*.  "*BMI* does not provide [any] assistance" because Uber driver-partners "cannot claim they produce a unique product." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1270 (N.D. Ala. 2018).  The products here are rides.  "At most" then, Uber's "argument indicates that [its price-fixing] has permitted them to offer a product . . . in a more attractive matter.  That argument does not establish, though, that the [price-fixing agreements] are necessary to provide" rides.  *Id.* at 1271.  "Even if [the restraint] is therefore desirable, it is not necessary." *Maricopa Cty. Med'l Soc'y*, 457 U.S. at 352-53.  No form of price-fixing is needed to sell *rides* at all.

*Second*, and moreover, price-fixing is not needed to match drivers and riders either.  As an initial matter, Claimant submits this is the wrong analysis; the price-fixing is among driver-partners for fares, not among platforms for matches.  But, even assuming *arguendo* that this question matters, it remains the case that price-fixing is not needed for Uber to match drivers with riders.  The evidence will show that SideCar, an early ridesharing competitor, was able to match drivers and riders on a platform that permitted price competition.  Uber could do the same.

*Third*, and most significantly here, *surge pricing* is completely unnecessary to sell anything—either rides or matches.  There are many ways Uber could match riders and drivers without using surge pricing.  One option for Uber would be making technical changes to its app to introduce competition during times of surge.  These could include some control for drivers as to surge levels.  It could include a driver-partner "off" switch for surge.  Another alternative would be offering new products that never surge.  An Uber driver and rider could use these products (*e.g.* a "No-Surge UberBlack") to see estimated fares and wait times with no surge

pricing applied. And perhaps the simplest option for Uber would be doing away with surge altogether by offering incentives directly to driver-partners. The evidence will show that Uber has long offered bonuses to drivers to pick up riders. These incentives could be expanded to fully replace surge; and if Uber wanted to use its algorithm to determine when it should offer incentives to drivers, it could do so without raising rider fares. Riders could still "push a button and get a ride," without surge.

The evidence will thus show that Uber has plenty of options to avoid a *per se* violation of the antitrust laws. Driver-partners can offer rides, and Uber can match driver-partners with riders, without running full force into the Supreme Court's brightest antitrust prohibition. Uber does not need surge pricing for driver-partners to sell rides on the Uber platform.

**POINT III**

**UBER'S SURGE PRICING HAS INJURED MEYER.**

The evidence will show that Uber's fixing of surge pricing among competing driver-partners has injured, and continues to threaten to injure, Meyer as a registered Uber rider.

Section 4 of the Clayton Act provides a treble-damages remedy to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. "[A]n increase in price resulting . . . is assuredly one type of injury for which § 4 . . . offers redress." *Blue Shield of Va. V. McCready*, 457 U.S. 465, 482-83 (1982). Section 16 of the Clayton Act provides injunctive relief, even more broadly, to "[a]ny person . . . against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. "The injury itself need only be threatened" and "need not be quantified." *Lucas Auto. Eng'r v. Bridgestone/Firestone*, 140 F.3d 1228, 1234 (9th Cir. 1998).

"The Supreme Court construes the Clayton Act to require a showing of antitrust injury." *Gelboim*, 823 F.3d at 772. This ensures antitrust remedies are available for "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 319-20 (1962). "[T]hreatened loss or damage [must be] 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Price-fixing is *per se* illegal, as set forth above, and thus subject to the "conclusive presumption that the restraint is unreasonable." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 342 (1990). Yet, as also noted above, "[a]ctions *per se* unlawful under the antitrust law may nonetheless have *some* procompetitive effects." *Id.* at 342-43 (emphasis in original). "In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition." *Id.* at 343-44. "The antitrust injury requirement ensures that a plaintiff can recover only if [his] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344.

Here, antitrust injury is readily proven because Meyer paid surge prices and is threatened by similar surge pricing on the platform. "'[C]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.'" *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)); *see also SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 45 (1st Cir. 1995) ("consumers are favored plaintiffs in antitrust cases"). Antitrust injury is established "when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions." *Gelboim*, 823 F.3d at 772; *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 n.12 (2d Cir. 2007) ("overcharges paid to a horizontal

price-fixing cartel are . . . antitrust injuries"). The injury is actionable "without further inquiry because horizontal price-fixing is anathema to an economy predicated on the undisturbed interaction between supply and demand." *Gelboim*, 823 F.3d at 774. In a *per se* price-fixing case, no "showing of actual adverse effect in the marketplace is necessary." *Id.* at 776. "*Per se* violations" are in this way distinct from "rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation." *Id.* Meyer can thus easily prove injury.

## POINT IV

## THIS TRIBUNAL SHOULD IMPOSE MEYER'S REQUESTED REMEDIES.

This tribunal should award Meyer the damages, injunctive, and declaratory relief he seeks and should award him attorneys' fees, expenses and costs as will be sought by post-hearing motion.

***First,*** Meyer is entitled to treble damages based on "the difference between the price [he] paid and the competitive price." *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019). The evidence will show that, on various occasions, Meyer paid surge pricing imposed because of horizontal price-fixing between driver-partners, as orchestrated by Uber.

***Second***, Meyer is entitled to an injunction that prevents ongoing price-fixing by Uber. *See, e.g.*, Claimant Opp. dated Jan. 18, 2019 ("Cl. Inj. Mem."); Claimant Supp. Op. dated Mar. 11, 2019 ("Cl. Supp. Inj. Mem."). As extensively briefed on a motion previously decided by this tribunal, such an injunction is the standard relief for a private litigant. As the Second Circuit has observed, "normally, after a finding of price-fixing, the remedy is an injunction against the price-fixing." *CBS v. Am. Soc'y Composers*, 562 F.2d 130, 140 (2d Cir. 1977), *rev'd on other grounds sub nom.*, *BMI*, 441 U.S. 1 (1979). Restraints on trade cause "serious distortion of the rational

and efficient allocation" in markets, *Lafeyette v. La. Power & Light Co.*, 435 U.S. 389, 408 (1978), and in a price-fixing case "an injunction against price fixing"—and not merely a damage award—is necessary to "avoid a recurrence of the violation and to eliminate its consequences," *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978). The injunction must "breakup[] up this combination which restrains trade, and . . . bring [defendant] into compliance with the Sherman Act." *Bd. of Regents v. NCAA*, 546 F. Supp. 1276, 1327 (W.D.Okl. 1982). Injunctions are not gerrymandered to permit ongoing price-fixing violations against everyone other than the claimant. That is why, when the Supreme Court found that the NCAA had engaged in price-fixing, it did not limit the injunction to benefit only the two member institutions who had sued. *See NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. at 117. Rather, it affirmed an injunction that prohibited the "entire scheme" across all NCAA member institutions. *Bd. of Regents*, 546 F. Supp. at 1327. Uber should similarly be enjoined.

This tribunal previously heard and properly rejected Uber's claim that the arbitration agreement limits the injunction. As Meyer briefed then, an injunction against price-fixing is already narrowly drawn, *see Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 495 (7th Cir. 1982), and, because Uber told Judge Rakoff Meyer could obtain all the relief he sought through arbitration, Uber is estopped from arguing otherwise. *See* Cl. Inj. Mem. at 3-12. Even more significantly, the Supreme Court has repeatedly made clear that arbitration agreements may not limit an antitrust claimant's rights to anything narrower than the full range of statutory relief. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985) (warning that, if an agreement "operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations [the Supreme Court] would have little hesitation in condemning the agreement as against public policy"). "[T]he remedies provided by the antitrust

statute cannot be contractually waived." *Kristian v. Comcast Corp.*, 446 F.3d 25, 46 (1st Cir. 2006)

The reason that both "treble damages and injunctive remedies" must remain available is "not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130-31 (1969). These tools are necessary to "advance[e Congress's] goals of deterring and remedying unlawful trade practices." *Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). And any limitation on either would fail "to serve both [the antitrust law's] remedial and deterrent function." *Id.* at 235. Uber's arbitration agreement did not and could not "eliminat[e] the *right to pursue* [those] statutory remedies." *Id*. at 236 (emphasis in original).

***Third***, Meyer is entitled to declaratory relief. The price-fixing terms within Uber's drive-partner "contracts and their predecessors are the means by which [Uber] has fixed prices, reduced output and monopolized the market. They are the source of threatened antitrust injury to the plaintiffs. They simply cannot be allowed to stand." *Bd. of Regents*, 546 F. Supp. at 1326, *aff'd in relevant part after remand*, 601 F. Supp. 307 (W.D. Okl. 1984) (imposing declaratory relief).

***Finally***, Meyer is entitled to fees and expenses, an issue that the parties have reserved for post-hearing motions.

**Conclusion**

For these reasons and those to be presented at the hearing of this arbitration, this tribunal should hold Uber liable for orchestrating an illegal horizontal price-fixing conspiracy under federal and state law. This tribunal should enter Meyer's proposed final award and permit him to move for attorneys' fees, costs, and expenses.

Respectfully submitted,

By:    <u>/s/ Brian M. Feldman</u>
BRIAN M. FELDMAN
LAUREN R. MENDOLERA
Harter Secrest & Emery LLP
1600 Bausch & Lomb Place
Rochester, New York 14604
Telephone No. (585) 231-1201
bfeldman@hselaw.com
lmendolera@hselaw.com

ANDREW A. SCHMIDT
Andrew Schmidt Law PLLC
97 India Street
Portland, Maine 04101
Telephone No. (207) 619-0884
andy@maineworkerjustice.com