# EXHIBIT P

THE ARBITRATION TRIBUNALS OF THE
AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

SPENCER MEYER,
    Claimant,

v.

UBER TECHNOLOGIES, INC.,
    Respondent.

Les Weinstein
AAA No. 01-18-0002-1956

# CLAIMANT SPENCER MEYER'S POST-HEARING REPLY BRIEF

**HARTER SECREST & EMERY LLP**
Brian Marc Feldman
Lauren R. Mendolera
1600 Bausch & Lomb Place
Rochester, New York 14604
Tel. No. (585) 231-1201
bfeldman@hselaw.com
lmendolera@hselaw.com

**ANDREW SCHMIDT LAW PLLC**
Andrew Arthur Schmidt
97 India Street
Portland, Maine 04101

*Counsel for Claimant Spencer Meyer*

January 6, 2020
New York, New York

## TABLE OF CONTENTS

Preliminary Statement ..................................................................................................................1

Point I—*INTERSTATE CIRCUIT*, NOT *LEEGIN*, CONTROLS ....................................................3

    A.    Uber concedes that *Interstate Circuit*, not *Leegin*, governs Meyer's horizontal claims ................................................................................................3

    B.    Judge Rakoff's same conclusion is law of the case. ................................................3

    C.    Uber fails to distinguish *Interstate Circuit*. ............................................................4

        1.    Uber ignores *Interstate Circuit*'s primary holding: Conspiracies do not always require inter-competitor communications .................................4

        2.    Surge pricing works because it offers drivers "the prospect of increased profits." ......................................................................................6

        3.    Surge pricing requires unanimous adoption, unlike Uber's parade of horribles. ......................................................................................................8

Point II—MEYER IS ENTITLED TO ENJOIN SURGE PRICING *IN TOTO*. ..............................9

    A.    Uber concedes Meyer would be entitled to such an injunction in court. ..................9

    B.    Uber relies entirely on its previously rejected argument that Meyer contracted away this remedy in arbitration. ............................................................9

Point III—UBER'S UNSOLICITED OTHER POSITIONS LACK MERIT. .............................10

Conclusion ..................................................................................................................................12

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Arizona v. California*,
　　460 U.S. 605 (1983) ...................................................................................................4

*Arizona v. Maricopa Cty. Med'l Soc'y*,
　　457 U.S. 332 (1982) .................................................................................................11

*Barry's Cut Rate Stores, Inc. v. Visa, Inc.*,
　　05-MD-1720, 2019 U.S. Dist. LEXIS 205335 (E.D.N.Y. Nov. 20, 2019) .....................5

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
　　441 U.S. 1 (1979) .....................................................................................................11

*Catalano, Inc. v. Target Sales, Inc.*,
　　446 U.S. 643 (1980) .....................................................................................10, 11, 12

*First Nat'l Bank v. Cities Serv. Co.*,
　　391 U.S. 253 (1968) ...................................................................................................5

*FTC v. Superior Court Trial Lawyers Ass'n*,
　　493 U.S. 411 (1990) .................................................................................................10

*Gelboim v. Bank of Am. Corp.*,
　　823 F.3d 759 (2d Cir. 2016) ................................................................................11, 12

*Hayman Cash Register Co. v. Sarokin*,
　　669 F.2d 162 (3d Cir. 1982) .......................................................................................4

*In re Electronic Books Antitrust Litig.*,
　　859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........................................................................6

*In re Insurance Brokerage Antitrust Litig.*,
　　618 F.3d 300 (3d Cir. 2010) .......................................................................................5

*Interstate Circuit v. United States*,
　　306 U.S. 208 (1939) ......................................................................................... passim

*Laumann v. NHL*,
　　907 F. Supp. 2d 465 (S.D.N.Y. 2012) ........................................................................5

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
　　551 U.S. 877 (2007) .......................................................................................1, 2, 3, 4

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ...................................................................... 2, 4, 6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) .......................................................................................................10

*MLB Props., Inc. v. Salvino, Inc.*,
    542 F.2d 290 (2d Cir. 2008) ..........................................................................................11

*Nat'l Soc'y of Prof. Eng'rs v. United States*,
    435 U.S. 679 (1978) .......................................................................................................11

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) .........................................................................................................10

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ...................................................................................................12

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ................................................................................11, 12

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .............................................................................................................2

*Toys "R" Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................................ passim

*United States v. A. Lanoy Alston, DMD, PC*,
    974 F.2d 1206 (9th Cir. 1992) ......................................................................................11

*United States v. Apple*,
    791 F.3d 290 (2d Cir. 2015) ................................................................................. passim

*United States v. Bartsh*,
    69 F.3d 864 (8th Cir. 1995) ............................................................................................4

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ................................................................................................11, 12

*Wilk v. Am. Med'l Ass'n*,
    859 F.2d 352 (7th Cir. 1990) ..........................................................................................9

**TREATISE**

18 Moore's Fed. Practice-Civil § 134.22[1][a]...............................................................4

# ABBREVIATIONS

| **Arbitration Hearing Transcript** | ABBREVIATION |

Transcript of Proceedings of Oct. 23-25, 2019, *Meyer v. Uber Technologies Inc.*, No. 01-18-0002-1956 (AAA) .................................................... **Trans.**

**Prior Arbitration Party Materials**

Respondent Uber Technologies, Inc.'s Post-Hearing Brief (Dec. 10, 2019) ........................................................................................ **Uber Br.**

Claimant Spencer Meyer's Post-Hearing Brief (Nov. 15, 2019) .................................... **Meyer Br.**

Claimant Spencer Meyer's Closing Slide Deck (Oct. 25, 2019) ............................. **Meyer Closing**

Joint Stipulations of Law and Fact (Oct. 18, 2019) ........................................................ **Joint Stip.**

Claimant Spencer Meyer's Pre-Hearing Brief (Oct. 16, 2019) ...................... **Meyer Pre-Hr'g Br.**

Supplemental Memorandum of Law in Opposition to Uber Technologies, Inc.'s Motion to Dismiss (Mar. 11, 2019) ........................................................................ **Meyer Supp. Inj. Mem.**

Uber's Proposed Arbitral Award for Injunctive and Monetary Relief (Mar. 11, 2019) ............................................................ **Uber's Proposed Award**

Memorandum of Law in Opposition to Uber Technologies, Inc.'s Motion to Dismiss (Jan. 18, 2019) ........................................... **Meyer Inj. Mem.**

**Prior Arbitration Order**

Order (Apr. 16, 2019) ........................................................................................ **Apr. 16 Order**

**District Court Transcript**

Transcript of Proceedings of Mar. 23, 2016, *Meyer v. Kalanick*, 15 Civ. 9796 (S.D.N.Y.) ............................................................. **Rakoff Trans.**

**Prior Brief by Uber in Separate Proceeding**

Uber's Reply in Support of the Motion to Compel Arbitration and to Stay Proceedings, *Capriole v. Uber Techs., Inc.*, 1:19-cv-11941, Dkt. 22 (D. Mass. Nov. 7, 2019) ......... **Uber's *Capriole* Reply Mem.**

**Preliminary Statement**

Uber cannot shield surge pricing from *per se* condemnation under black letter law.

The record is clear.[1] Uber, the parties agree, is a "marketplace of riders and drivers." Trans. 310:16-20 (███). Drivers, not Uber, sell rides. *See* Joint Stip. ¶¶ 7-9. Drivers are competitors, and they have been since Uber's origin. *See, e.g.*, Trans. 143:23 (Kalanick). Uber uses surge pricing to lure drivers to its marketplace. Uber Br. at 6-7. "[T]hey make more money; that's the point of surge." Trans. 811:22-23 (Dr. Carlton). Drivers agree, by contract, to let Uber surge their fares synchronously. *See* Meyer Ex. 25, § 4.1 (driver agreement); Trans. 553:10-557:21. Drivers cannot undercut surge pricing on Uber. *See* Trans. 512:9-15; Trans. 598:24-599:3 (███) (because, if they were so permitted, those rides "would get snapped up"). Uber's platform-wide restraint—against price competition—is the only reason that Uber can pull off surge pricing.

No other market works this way, except Uber copycats (like Lyft). No free marketplace coordinates uniform price hikes among competing marketplace sellers. If any marketplace did operate like Uber—if the NYSE required all share prices to rise by the same amount during bull markets, or if hotels.com required competing hotel chains to increase suite prices in Manhattan by the same amount on Christmas—it would be *per se* illegal. Uber has never cited any marketplace that, by contract with its sellers, increases sellers' prices by uniform amounts at uniform times for uniform services. That should come as no surprise. Antitrust doctrine forbids such a restraint.

Uber's surge pricing is illegal and must be enjoined. The two crucial issues, which this tribunal identified at the hearing, are whether: (1) the doctrine of *Interstate Circuit v. United States*, 306 U.S. 208 (1939), governs notwithstanding *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877 (2007), *see* Trans. 1001:23-1002:4, 1002:23-1003:6, and (2) "an individual in an

---

[1] Uber (not Meyer) demanded an evidentiary hearing, but Uber now concedes the material facts.

antitrust case," like Meyer, is entitled to "a nationwide injunction," Trans. 962:9-25. Uber ultimately does not dispute either point, which together resolve this case.

**Point I:** On the merits, Uber does not dispute that *Leegin*'s doctrine is limited to vertical theories (not pursued here) and that *Interstate Circuit* continues to govern horizontal theories. That concession resolves the merits because Uber cannot distinguish *Interstate Circuit*, which held that "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan . . . is sufficient to establish an unlawful conspiracy under the Sherman Act." 306 U.S. at 227. Indeed, the *Interstate Circuit* doctrine applies with more force to a marketplace operator, like Uber. If Interstate Circuit ran a film marketplace for independent sellers, and if it then invited them to let it raise their sale prices synchronously for popular films, it would have more blatantly organized a horizontal conspiracy. But that is what Uber does through surge pricing.

**Point II:** As to remedy, Uber no longer disputes that an individual is entitled to enjoin antitrust restraints nationwide. Uber rests only on its argument that its user agreement restricts Meyer's arbitration remedies. But any such restriction would violate public policy, as the Supreme Court has held. That is why this tribunal properly rejected Uber's same argument months ago.

**Point III:** Finally, Uber briefs a kitchen sink of defenses—none at the request of this tribunal—that defy longstanding *per se* doctrine. Horizontal price fixing crosses a bright line, which is the Supreme Court's "prerogative alone" to redraw. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). Because the *per se* rule governs all industries, old and new alike, "[t]he advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016). Black letter antitrust law prevents Uber from inviting competing drivers on its marketplace to raise their fares in synchronicity through surge pricing. This tribunal should enjoin that practice.

**POINT I—*INTERSTATE CIRCUIT*, NOT *LEEGIN*, CONTROLS.**

**A.     Uber concedes that *Interstate Circuit*, not *Leegin*, governs Meyer's horizontal claims.**

The parties agree that Meyer is pursuing only a horizontal theory here, not a vertical theory. That horizontal theory is not governed by *Leegin*, but by *Interstate Circuit*.

*Leegin* sets vertical doctrine only. The Supreme Court said so itself. *See Leegin*, 551 U.S. at 907-08. "The Court made clear that it was addressing only the lawfulness of the manufacturer's vertical agreements and not the plaintiff's claim that the manufacturer also 'participated in an unlawful horizontal cartel with competing retailers.'" *United States v. Apple*, 791 F.3d 290, 324 (2d Cir. 2015). This was the first point of Meyer's opening post-hearing brief. Meyer Br. at 4.

In response, Uber does not dispute that *Leegin* governs only vertical theories. *Leegin*, as Uber admits, addresses "vertical resale price maintenance." Uber Br. at 14. Uber nowhere claims that *Leegin* governs horizontal theories. That is why Uber, in challenging Meyer's horizontal theory, does not cite *Leegin* at all. *See id.* at 19-24. Meyer's horizontal theory is the only theory in this arbitration; and, uncontestably, it is not governed by *Leegin*.

What governs Meyer's horizontal theory instead is *Interstate Circuit*. The *Interstate Circuit* doctrine, including its application in *Toys "R' Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), remains good law, as the Second Circuit recently held in *Apple*. *See Apple*, 791 F.3d at 319-20 (relying on *Interstate Circuit* and *Toys "R" Us* after *Leegin*). As even Uber concedes, "*Interstate* has [not] been overruled by *Leegin*." Uber Br. at 21. Nor has *Leegin* "covertly changed the law governing hub-and-spoke conspiracies." *Apple*, 791 F.3d at 324. *Interstate Circuit* thus controls.

**B.     Judge Rakoff's same conclusion is law of the case.**

Judge Rakoff explained the governing law four years ago. Contrary to Uber's protests, today's arguments are the same as the ones made back then. Then, as now, Meyer explained that

*Leegin* did not apply, "as a doctrinal matter," Rakoff Trans. at 21-14-19, and that *Interstate Circuit* controlled, *see id.* at 11:19-21. He made the same winners and losers point: In *Leegin*, "the competitors themselves would never form a cartel, or virtually would never form a cartel. The high-end retailers aren't all going to lock themselves in to a high price. That doesn't do them any good. They're still undercut by the discounters." *Id.* at 22:11-16. And he made the same smoke-filled room point: "*Leegin* . . . does not confront the opportunism confronted by Judge Scheindlin in the [*NHL*] case, the Second Circuit in *Apple*, or the Supreme Court in *Interstate*, where [the vertical actor] was coming in and letting competitors do exactly what they dreamed of, forming a cartel that benefitted all of them by rising all boats." *Id.* at 22:18-25.

Judge Rakoff agreed with Meyer on the law. The court held that *Interstate Circuit* governs horizontal conspiracies and that "*Leegin* did not . . . overrule *Interstate Circuit*, which . . . permits a finding of a conspiracy among competitors in circumstances such as those of the instant case." *Meyer*, 174 F. Supp. 3d at 824, 826 & n.5. Meyer concedes Judge Rakoff made no *findings* with preclusive effect. But Uber offers no reason to revisit Judge Rakoff's explication of the *law*. His "prejudgment decision" establishes law of the case, 18 Moore's Fed. Practice-Civil § 134.22[1][a], as to the governing "rule of law," *Arizona v. California*, 460 U.S. 605, 619 (1983), which should be adopted here to protect "uniformity," "the expectations of the parties," *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995), and the comity due to the district court, *see Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982). *See also* Meyer Pre-Hr'g Br. at 13-14.

C. **Uber fails to distinguish *Interstate Circuit*.**

Uber makes three unavailing attempts to distinguish *Interstate Circuit*.

1. **Uber ignores *Interstate Circuit*'s primary holding: Conspiracies do not always require inter-competitor communications.**

Uber defends itself by insisting that Uber drivers never "communicated with each other *at*

4

*all*." Uber Br. at 19, 23. But that point ignores the central holding of *Interstate Circuit*. There, the Supreme Court squarely held that communications between competitors are *not* "a prerequisite to an unlawful conspiracy." 306 U.S. at 226. Conspiracy, instead, can be proven if competitors, "knowing that concerted action was contemplated and invited, . . . gave their adherence to the scheme and participated in it." *Id*. The *Interstate Circuit* doctrine explains when horizontal competitors can conspire together without communicating together. *See, e.g.*, *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, 05-MD-1720, 2019 U.S. Dist. LEXIS 205335, at *178-81 (E.D.N.Y. Nov. 20, 2019); *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012). In *Interstate Circuit*, a common invitation (with conditionality) sufficed to "establish an unlawful conspiracy." 306 U.S. at 227. Thus, under the *Interstate Circuit* doctrine, "an actionable horizontal conspiracy does not require direct communication among the [horizontal] competitors." *In re Insurance Brokerage Antitrust Litig*., 618 F.3d 300, 331 (3d Cir. 2010).

Uber seeks to avoid the express holding of *Interstate Circuit* by limiting it to its facts. But this tribunal may not contravene Supreme Court holdings. In any event, Uber misreads the case. It is true that, in *Interstate Circuit*, competitors had "agreed and conspired among themselves to take uniform action." 306 U.S. at 219, *quoted at* Uber Br. at 21. But the competitors did so solely by accepting a common invitation, like Uber drivers do here, not by contacting one another. The Supreme Court has thus stressed that, in *Interstate Circuit*, "[t]here was no direct evidence showing that the distributors agreed with one another to impose the identical restrictions, but it was shown that each . . . knew that all the other[s] had been approached with the same proposal." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 286-87 (1968). Uber drivers are similarly "approached with the same proposal." And Uber cannot evade the *Interstate Circuit* doctrine by pretending the

5

case required inter-competitor communications, when the Court expressly held otherwise.[2]

Here, in fact, Uber's common proposal matches those in *Interstate Circuit* and *Toys "R" Us*. "Just like Toys "R" Us and Interstate Circuit," Uber "coordinated a series of substantively-identical vertical agreements and made clear to its vertical partners that it was offering each of them a similar deal." *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012). The parties agree on these facts. *Compare* Meyer Br. at 8 *with* Uber Br. at 22 (conceding identical "'invitation' to contract with Uber"). And these facts are particularly compelling because Uber is a marketplace operator ideally suited to invite competitors to conspire on synchronous price hikes (surge pricing). As Judge Rakoff held four years ago, there is no need to show inter-driver communications where, as here, Uber "can invite hundreds of thousands of drivers . . . to agree to Uber's terms." *Meyer*, 174 F. Supp. 3d at 825. The evidence shows Uber did just that.

**2. Surge pricing works because it offers drivers "the prospect of increased profits."**

Uber then challenges the conditionality of surge pricing. Uber Br. at 19-24. Conditionality requires that a restraint promise "the prospect of increased profits" with "substantially unanimous action," while presenting a "risk of a substantial loss" "without substantially unanimous action." *Interstate Circuit*, 306 U.S. at 222. Or, as the Second Circuit more recently put it, conditionality is "where multiple competitors sign vertical agreements that would be against their own interests were they acting independently," but that would be in their interests were they acting collectively.

---

[2] Uber similarly misreads *Toy "R" Us*. It is true that "direct evidence of communications" existed there, but it was merely Toys "R" Us's uniform promise to suppliers that, if they all accepted Toys "R" Us's terms, their competitors would too. 221 F.3d at 935, 932. "TRU went so far as to assure individual manufacturers that no one would be singled out." *Id*. at 932. That—and not any inter-competitor contact—was the illicit communication. *See id*.

6

*Apple*, 791 F.3d at 320 (citing *Interstate Circuit* and *Toys "R" Us*). Surge is a perfect example.[3]

Uber's chief tactic is to deny a simple characteristic of surge—that it provides drivers "the prospect of increased profits." Uber Br. at 20. Under *Interstate Circuit*, what matters is not whether drivers actually profit, but whether surge presents "the prospect of increased profits" and a "strong motive for concerted action." 306 U.S. at 222. Here, the evidence established that Uber designed surge pricing to offer drivers precisely that prospect. "[T]he goal of surge," Uber's ▉ testified, "and what the algorithms are designed for are to try and incent drivers" with the prospect of "mak[ing] more money." Trans. 322:10-15 (▉). Indeed, Travis Kalanick invented surge to lure drivers onto the road on a belief that "Uber driver partners generally like when prices go up." Trans. 169:13-16 (Kalanick). And, today, Uber's website explains that, "for drivers," the surge "premium" fare is "an incentive." Meyer Ex. 18. Surge works because, except in "very rare" circumstances, drivers make more money from surged rides than non-surged ones. Trans. 324:23-325:2. Even Uber's own expert, Dr. Carlton, acknowledged that surge offers the prospect of increased profits: "[T]he fact that a driver makes more money in surge, that's the whole point [of] surge, raise the price to get drivers, so if they get the business, they make more money, that's the point of surge." Trans. 811:20-25.

This evidence establishes that surge presents drivers "the prospect of increased profits." *Interstate Circuit*, 306 U.S. at 222. For drivers, "that's the whole point." Trans. 811:20-25.

**3. Surge pricing requires unanimous adoption, unlike Uber's parade of horribles.**

Uber's final *Interstate Circuit* argument is a misplaced parade of horribles—an erroneous claim that Meyer's "test would risk condemnation of all vertical agreements." Uber Br. at 22.

---

[3] Uber's regular pricing differs from surge because it is harder to conclude that regular pricing is in drivers' collective interest. Uber's regular pricing is akin to a salary, which some may welcome and others see as too low. But surge is like a bonus, where none existed before. It is all upside.

7

Uber insists that "any 'invitation' from Uber to have drivers join a platform whereby Uber sets the price is no different than the 'invitation' found in any standard contract." *Id.* That is a false alarm.

Uber's parade of horribles ignores the conditionality element of the *Interstate Circuit* doctrine. That element limits the doctrine to restraints like surge, where *all* competitors stand to benefit from a restraint that works *only if* universally adopted. In other words, the doctrine applies to restraints that all competitors would have reason to adopt in a smoke-filled room, where there is "the prospect of increased profits" with "substantially unanimous action," and the "risk of a substantial loss" of business "without substantially unanimous action." *Interstate Circuit*, 306 U.S. at 222; Meyer Br. at 8-11. In *Interstate Circuit*, that meant restraints benefiting all of Interstate Circuit's distributors, *see* 306 U.S. at 222; in *Toys "R" Us*, all of Toys "R" Us's toy manufacturers, 221 F.3d at 930, 935; and in *Apple*, higher bestseller prices for all eBook publishers on Apple's marketplace, 791 F.3d at 317. In each case, with and *only with* unanimous action, *all* competitors stood to benefit.[4] *See* Meyer Br. at 13-14. Here too, all Uber drivers enjoy the prospect of higher prices, but *only if all* agree to surge pricing on the Uber platform. Otherwise, competing drivers on the platform would undercut surge. Surge requires unanimity.

Uber's agreement with drivers to implement surge pricing in the Uber marketplace contrasts sharply with the other "standard" vertical contracts cited by Uber, with retailers, franchises, and distributors. For surge, "the only condition on which each [driver] would agree to [Uber's surge pricing] was if it could be sure its competitors were doing the same thing." *Toys "R" Us*, 221 F.3d at 936. The same is not true of standard vertical contracts.[5] A retailer does not

---

[4] By contrast, minimum resale price maintenance does not promise "the prospect of increased profits" to *all* existing competitors. *See* Meyer Br. at 12-13. That practice disadvantages one set of competitors (discounters) and benefits another set (high-end retailers). *See id.*

[5] Nor is it true of the choice to charge *some* Uber fare at all (versus driving for free). Uber Br. at 18. That choice is in both the drivers' collective and individual interests; a driver would have to

8

gain the "prospect of increased profits" only with the "substantially unanimous action" of competing stores in accepting low-priced inventory from a distributor. A franchisee does not "risk . . . substantial loss" if it adopts a new store layout "without substantially unanimous action" of other franchisees. Ultimately, Uber offers not even a single example—not one—to back up its parade of horribles. Uber builds its false argument only by ignoring the conditionality element.

## POINT II—MEYER IS ENTITLED TO ENJOIN SURGE PRICING *IN TOTO*.

**A.      Uber concedes that Meyer would be entitled to such an injunction in court.**

In a major concession, Uber no longer disputes that Meyer, if he were in district court, could enjoin surge pricing *in toto*. Under the abundant precedents cited in Meyer's opening post-hearing brief, district courts award non-class litigants, like Meyer, injunctions to "eliminate [the] anticompetitive effects," "not only to the plaintiff," but to "all consumers." *Wilk v. Am. Med'l Assn'*, 895 F.2d 352, 371 (7th Cir. 1990); *see* Meyer Br. at 16-20. A district court finding surge illegal would, indisputably then, enjoin surge pricing *in toto*.

**B.      Uber relies entirely on its previously rejected argument that Meyer contracted away this remedy in arbitration.**

Because Uber no longer disputes that a court would enjoin surge *in toto*, Uber relies entirely on its failed argument that the user agreement precludes that same remedy. Uber Br. at 28-30.[6]

But this tribunal already rejected that argument, which was the basis for Uber's earlier motion to dismiss. *See* Apr. 16 Order. The three fatal flaws with Uber's argument, as explained

---

charge *some* fare, no matter what others did. Surge, by contrast, is *only* in the collective interest. Individually, a driver locked alone into surge would be undercut by other Uber drivers. That is why locking into Uber's surge pricing, solo, would cut against his individual interest. Only when all drivers adopt surge collectively does surge offer comfortable prospects for increased fares.

[6] Uber offers one other argument by misconstruing Meyer's testimony to claim that, at the hearing, Meyer had "no intention of riding with Uber again." Uber Br. at 28. But that claim is academic. Meyer currently uses Uber, as Uber (with access to Meyer's ride history) does not contest. *See* Declaration of Spencer Meyer, dated Jan. 6, 2020 ¶¶ 4-7 & Ex. B (Meyer's recent ride history).

9

in prior briefing, were that: (1) the user agreement's standard reflects the same one courts use to enjoin unlawful antitrust restraints, *in toto*, just as Meyer requests, *see* Meyer Inj. Mem. at 3-8; (2) because Uber pushed this case into arbitration by telling Judge Rakoff this tribunal could grant Meyer all the relief he sought, Uber is judicially estopped from now claiming otherwise, *see id.* at 8-12; and, (3) most critically, limiting Meyer's remedies would violate the doctrine of *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985), *see* Meyer Inj. Mem. at 12-18; Meyer Supp. Inj. Mem. at 4-6. Uber has since conceded that "public injunctions can be arbitrated" (*i.e.*, that arbitrators are empowered to enjoin acts, *in toto*), and that the Uber agreement itself nowhere restricts "any specific form of relief," including *in toto* injunctions. Uber's *Capriole* Reply Mem. at 7-8; *see* Meyer Br. at 22-24.

This tribunal should thus enjoin surge pricing *in toto*, just as a district court would do.

**POINT III—UBER'S UNSOLICITED OTHER POSITIONS LACK MERIT.**

Meyer briefed the two issues, above, which this tribunal instructed him to brief. But Uber re-briefs the kitchen sink and criticizes Meyer for not doing the same. Meyer would be pleased to brief any issue helpful to this tribunal, but here addresses them with short bullet points:

- **Meyer already rejected Uber's all-fees-paid offer** (Uber Br. at 1). Uber claims that this case is just a "four-year quest for attorney's fees," Uber Br. at 1, but, as this tribunal knows, Meyer already *refused* Uber's offer to pay all of his attorneys' fees. *See* Uber's Proposed Award § 8 (Mar. 11, 2019). This charge is false.

- **Price fixing is illegal, even in competitive markets** (Uber Br. at 6-7). Because "the absence of proof of market power does not justify" price fixing, any constraint on Uber's pricing (*e.g.*, Lyft) is irrelevant "[a]s a matter of law." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984). "Conspirators need not achieve the dimensions of a monopoly . . . to warrant condemnation under the antitrust laws." *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 436 (1990). Consequently, "[p]rice-fixing agreements" that permit marketplace "price competition" are nevertheless "banned." *Socony-Vacuum*, 310 U.S. at 224 n.59.

- **Shorter waits do not legalize price fixing** (Uber Br. at 9-10). While surge pricing may shorten waits by making "the market more attractive" to drivers, that cannot justify the practice, because, if it did, "it would seem to follow that the more successful an agreement is

in raising the price level, the safer it is from antitrust attack" and "[n]othing could be more inconsistent with [the law]." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649 (1980). The Supreme Court has foreclosed Uber's argument, explaining that even if "competition tends to force prices down and [leads to] an inexpensive item [that] may be inferior to one that is more costly," "the statutory policy precludes inquiry into the question whether competition is good or bad." *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 694-95 (1978).

- **Pegged prices are fixed too** (Uber Br. at 11-12). Uber insists that "Uber and its drivers never agree on any actual price or price level." But "pegging . . . price . . . is illegal *per s*e," *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); it does not matter "that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible," *id.* at 222, or that drivers "were in no position to control" the price, *id.* at 221. Pegging fares to surge is categorically illegal, regardless of "reasonableness" and even when drivers have "no direct agreement on the actual prices." *Catalano*, 446 U.S. at 647.

- **Price fixing is illegal in every context and industry** (Uber. Br. at 11). Price fixing and pegging are *per se* illegal in "all industries alike," "[w]hatever may be its peculiar problems and characteristics," *Socony-Vacuum*, 310 U.S. at 222, no matter how "unfamiliar [the] context," *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016), even in "an industry created by an emergent technology," *Apple*, 791 F.3d at 348 (Jacobs, J., dissenting). Uber's cry that courts have "little antitrust experience" with similar apps is "obviously inconsistent" with precedent, which flatly rejects "the argument that the *per se* rule must be rejustified for every industry." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 349-351 (1982).

- **Dr. Carlton offered irrelevant opinions and evaded the real issue** (Uber Br. at 11). Price pegging "is illegal regardless of pro-competitive justifications offered." *United States v. A. Lanoy Alston, DMD, PC*, 974 F.2d 1206, 1208 (9th Cir. 1992). "Whatever economic justification particular price-fixing agreements may be thought to have," "the law does not permit an inquiry into their reasonableness." *Socony-Vacuum Oil*, 310 U.S. at 226 n.59. So there was no reason for Meyer to call an economist, and Uber's economic opinion was irrelevant. But Dr. Carlton's refusal to opine on the application of the *per se* rule—the only real issue—was telling. Even after admitting that he teaches antitrust law, Dr. Carlton adamantly pleaded ignorance as to surge's legality. *See* Trans. 865:9-15, 866-17.

- *BMI* **is inapplicable, as this tribunal acknowledged** (Uber Br. at 11-12). Uber cannot rely on *Broadcast Music, Inc., v. Columbia Broadcasting System, Inc.* ("*BMI*"), 441 U.S. 1, 9, 23 (1979), because drivers can sell rides without Uber; because Uber can match (and batch-match) rides without surge pricing; and because there are many alternatives to surge. *See* Trans. 646:21-647:4; Meyer Closing at 67-93. As this tribunal aptly explained, "*BMI* is a situation where no product could have been sold, so it's *sui generis*." Trans. 935:23-25.

- **Ancillary restraints may protect joint ventures, but Uber stipulates none exist** (Uber Br. at 12). Uber relies on the ancillary restraints joint venture doctrine in *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338-39 (2d Cir. 2008) (Sotomayor, J. concurring), which "seeks to distinguish between those restraints that are intended to promote the efficiencies of a joint venture and those that are simply unrelated," *id.*; *see also Rothery Storage & Van Co. v. Atlas*

11

*Van Lines, Inc.*, 792 F.2d 210, 229-30 (D.C. Cir. 1986) (analyzing restraints ancillary to joint venture). But that doctrine is unavailable here because Uber has stipulated that its drivers "are not . . . part of any joint venture . . . relationship with Uber." Joint Stip. ¶ 11.

- **Because surge is *per se* illegal, no two-sided (or any other) economic analysis is required** (Uber Br. at 12-13). It is true that *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), required a two-sided market analysis, but only because the rule of reason applied. *Id.* at 2284-85. Price fixing, by contrast, is *per se* "banned because of [its] actual or potential threat to the central nervous system of the economy." *Socony-Vacuum*, 310 U.S. at 224 n.59. Two-sided market or not, price fixing is "conclusively presumed illegal without further examination under the rule of reason." *Catalano*, 446 U.S. at 650.

- **Uber, not Meyer, must decide how it will comply with antitrust laws** (Uber Br. at 13-14). Uber complains that obeying the law to end surge pricing might "not be popular," "be clunky," or "lose even more money." But "[w]hether [Uber] would have viewed its profits under that scenario as large enough . . . is not an antitrust concern." *Apple*, 791 F.3d at 333. And, at the end of the day, "Congress has not left" any room to decide if "particular price-fixing schemes are wise or unwise, healthy or destructive." *Socony-Vacuum*, 310 U.S. at 221-22.

- **Surge is injury enough** (Uber Br. at 26-28). Finally, Uber is wrong that a consumer must prove pegged prices are supra-competitive. *Gelboim*, 823 F.3d at 772-73. Rather, "when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer" antitrust injury. *Id.* at 772. "*[P]er se* violations" "are presumed illegal" and do not "demand appraisal of the marketplace consequences." *Id.* at 776; *see, e.g.*, *Socony-Vacuum*, 310 U.S. at 220-221 (prices pegged to average market price). Uber simply ignores this controlling precedent, which Meyer discussed at length in his pre-hearing brief. *See* Meyer Br. at 25-26 (citing and quoting *Gelboim*).

**Conclusion**

Uber is popular. But, on its own terms, as a marketplace for drivers and not a joint venture with them, Uber violates black letter antitrust law when it surges independent and competing drivers' fares synchronously. This tribunal should enter Meyer's proposed final award to enjoin surge pricing.

Respectfully submitted,

By: /s/ Brian M. Feldman
BRIAN M. FELDMAN
LAUREN R. MENDOLERA
ANDREW A. SCHMIDT