# EXHIBIT Q

THE ARBITRATION TRIBUNALS OF THE
AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

SPENCER MEYER,
      Claimant,

v.

UBER TECHNOLOGIES, INC.,
      Respondent.

Les Weinstein
AAA No. 01-18-0002-1956

## CLAIMANT SPENCER MEYER'S POST-HEARING BRIEF

**HARTER SECREST & EMERY LLP**
Brian Marc Feldman
Lauren R. Mendolera
1600 Bausch & Lomb Place
Rochester, New York 14604

**ANDREW SCHMIDT LAW PLLC**
Andrew Arthur Schmidt
97 India Street
Portland, Maine 04101

*Counsel for Claimant Spencer Meyer*

November 15, 2019
New York, New York

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................................1

Point I—THIS CASE IS NOT GOVERNED BY *LEEGIN*, BUT BY *INTERSTATE CIRCUIT*....3

A.    *Leegin* does not govern this case. ......................................................................................3

    1.    *Leegin* is limited to vertical theories. .....................................................................3

    2.    *Leegin*'s economic rationales are not at issue.........................................................5

B.    Rather, *Interstate Circuit* controls this case...................................................................7

    1.    All Uber drivers adopt surge pricing at Uber's invitation. ......................................7

    2.    Uber drivers adopt surge pricing because all other Uber drivers do so. .................8

C.    *Leegin* and *Interstate Circuit* are not in conflict.............................................................10

    1.    *Leegin* restraints create winners and losers. .........................................................12

    2.    *Interstate Circuit* restraints benefit all affected competitors. ................................12

    3.    Surge pricing is an *Interstate Circuit* restraint that benefits all Uber drivers.........14

Point II—THIS TRIBUNAL SHOULD ENJOIN SURGE PRICING. ........................................15

A.    Courts regularly enjoin anticompetitive practices *in toto*.................................................16

B.    An injunction against surge pricing is particularly appropriate here. ...............................19

C.    This tribunal is empowered to award this relief, as Uber elsewhere admits......................21

Conclusion .................................................................................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Am. Express v. Italian Colors Restaurant,*
570 U.S. 228 (2013).................................................................................................... 17

*Am. Safety Equip. Corp v. J.P. Maguire & Co.,*
391 F.2d 821 (2d Cir. 1968)....................................................................................... 16

*Bd. of Regents v. NCAA,*
546 F. Supp. 1276 (W.D. Okl. 1982)................................................................. 18, 24

*Bergjans Farm Dairy Co. v. Sanitary Milk Producers,*
241 F. Supp. 476 (E.D. Mo. 1965)............................................................................ 20

*Bigelow v. RKO Radio Pictures,*
150 F.2d 877 (7th Cir. 1945) ....................................................................................... 8

*Blessing v. Sirius XM Radio,*
No. 09-cv-10035, 2011 U.S. Dist. LEXIS 32791 (S.D.N.Y. Mar. 29, 2011)......... 20

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
485 U.S. 717 (1988)..................................................................................................... 5

*CBS v. Am. Soc'y Composers,*
562 F.2d 130 (2d Cir. 1977)....................................................................................... 17

*Continental Airlines, Inc. v. United Air Lines, Inc.,*
136 F. Supp. 2d 542 (E.D. Va. 2001) ................................................................. 3, 17

*Continental TV, Inc. v. GTE Sylvania, Inc.,*
433 U.S. 36 (1977)....................................................................................................... 5

*Eastman Kodak Co. v. Image Tech. Servs.,*
504 U.S. 451 (1992)............................................................................................... 3, 18

*ES Dev., Inc. v. RWM Enterp., Inc.,*
939 F.2d 547 (8th Cir. 1991) ..................................................................................... 17

*Hawaii v. Standard Oil Co.,*
405 U.S. 251 (1972)............................................................................................. 17, 20

*Image Tech. Servs. v. Eastman Kodak Co.,*
125 F.3d 1195 (9th Cir. 1997) ............................................................................ 18, 19

*Image Tech. Servs. v. Eastman Kodak Co.,*
No. C 87-1686, 1996 U.S. Dist. LEXIS 2386 (N.D. Cal. Feb. 28, 1996)......... 18, 19, 20

*In re Insurance Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010).................................................................... 7

*Int'l Salt Co. v. United States,*
    332 U.S. 392 (1947)........................................................................... 20

*Interstate Circuit, Inc. v. United States,*
    306 U.S. 208 (1939)....................................................................... passim

*Kristian v. Comcast Corp.,*
    446 F.3d 25 (1st Cir. 2006).............................................................. 22

*Lafeyette v. La. Power & Light Co.,*
    435 U.S. 389 (1978)........................................................................... 20

*Laumann v. NHL,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012).............................................. 9

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
    551 U.S. 877 (2007)....................................................................... passim

*Meyer v. Kalanick,*
    174 F. Supp. 3d 817 (S.D.N.Y. 2016)........................................... passim

*Meyer v. Kalanick,*
    212 F. Supp. 3d 437 (S.D.N.Y. 2016)............................................. 21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985)...................................................................... 16, 22

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984)............................................................................ 9

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978)...................................................................... 17, 20

*NCAA v. Bd. of Regents of the Univ. of Okla.,*
    468 U.S. 85 (1984)......................................................................... 3, 18

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998)............................................................................. 4

*Premier Elec. Const. Co. v. NECA, Inc.,*
    814 F.2d 358 (7th Cir. 1987) ........................................................... 10

*Schine Chain Theatres v. United States,*
    334 U.S. 110 (1948)............................................................................ 18

*Sheet Metal Works Local No. 20 Welfare & Ben. Fund v. CVS Pharmacy, Inc.*,
  305 F. Supp. 3d 337 (D.R.I. 2018) ........................................................................... 10

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ....................................................................................................... 5

*Toys "R" Us v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ........................................................................... passim

*United States v. Apple*,
  791 F.3d 290 (2d Cir. 2015) ............................................................................. passim

*United States v. Arnold, Schwinn & Co.*,
  388 U.S. 365 (1967) ................................................................................................... 6

*Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc.*,
  546 U.S. 164 (2006) ................................................................................................... 5

*White v. RM Packer Co.*,
  635 F.3d 571 (1st Cir. 2011) ..................................................................................... 9

*Wilk v. Am. Med'l Ass'n*,
  895 F.2d 352 (7th Cir. 1990) ................................................................... 3, 17, 19, 20

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100 (1969) ........................................................................................... 17, 19

## RULES

AAA Consumer Arbitration Rule, R-44(a) .................................................................. 22

## REPORTED ARBITRATION DECISIONS

2016 AAA Consumer LEXIS 444 (Dec. 29, 2016) ..................................................... 23

2018 AAA Consumer LEXIS 8 (Jan. 30, 2018) .......................................................... 23

2019 AAA Consumer LEXIS 258 (May 9, 2019) ....................................................... 23

## Preliminary Statement

This case comes down to two questions.

**First**: After *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007), can competitors agree to raise prices in unison for their collective benefit through a third-party app? The answer is no. Antitrust law does "not tolerate anticompetitive conduct, whether it occurs in smoke-filled rooms or over the Internet using complex pricing algorithms."[1] And nothing in *Leegin* licenses that moral hazard. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), has always barred vertical actors from tempting competitors with restraints that collectively benefit them while protecting them from competition. Doctrinally, *Leegin* is expressly limited to vertical theories (not horizontal ones) and does not overrule *Interstate Circuit*. But more fundamentally, it does not open Pandora's Box as Uber suggests.

Take the proverbial smoke-filled room. Imagine Leegin's resellers in that smoke-filled room. Those resellers would include high-end boutiques, along with retailers that prefer discounting, like Kay's Kloset, the *Leegin* plaintiff. Would they ever agree to the minimum resale pricing policy endorsed by *Leegin*? No. That restraint, imposed by Leegin, would create winners and losers. Some of the resellers in the smoke-filled room, like Kay's Kloset, would become losers. Kay's Kloset would never commit to that. Those retailer competitors—unlike the horizontal competitors in *Interstate Circuit*—thus did not share a common motive. And *Leegin* did not invite them to organize in any way they would ever have been tempted to conspire in a smoke-filled room.

---

[1] U.S. Justice Department, Press Release, "Former E-Commerce Executive Charged with Price Fixing in the Antitrust Division's First Online Marketplace Prosecution" (Apr. 6, 2015), at https://www.justice.gov/opa/pr/former-e-commerce-executive-charged-price-fixing-antitrust-divisions-first-online-marketplace.

But the Uber smoke-filled room is the opposite, at least when it comes to surge pricing. Uber is a marketplace for competing Uber drivers to sell rides, a commodity. Imagine 100 competing Uber black car drivers in a smoke-filled room, drivers of all sorts: part-timers, full-timers, greedy drivers, cheap drivers. If Uber granted them the power to set baseline pricing, it is true that they probably would not agree on a number. Some might be content with Uber's current pricing; some might think it is too low; others might not understand market conditions well enough. But now imagine if those Uber drivers could instead determine if the surge pricing algorithm should be implemented. That algorithm is designed, as drivers know, to increase fares when demand on the Uber app enables them to command higher prices. Would that roomful of drivers agree to turn it on? Of course, so long as all Uber drivers would be locked into it and unable to undercut them. Uber drivers share a common motive to adopt surge on the app, as long as it is done collectively. The reason why, as Dr. Carlton opined, is that "they make more money; that's the point of surge." Trans. 812:24-25. Every Uber driver wins. Only consumers pay more.

*Leegin* did not overrule *Interstate Circuit* to permit Uber, by common invitation, to do exactly what its drivers would choose to do (only collectively) in a smoke-filled room. Surge tempts competing drivers because it promises, if no one cheats by competing on price, higher prices in unison for their collective benefit. *Interstate Circuit* prevents Uber from taking advantage of that common motive to conspire, and nothing in *Leegin* is to the contrary.

**Second**: Can Uber continue surge pricing with impunity, even if it is *per se* illegal? Again, the answer is no. Uber has succeeded in avoiding class actions by forcing mandatory arbitration. No future Uber rider will rationally pursue arbitration this far, merely to enjoin Uber from surging that individual rider. And it is too much to ask that the government enjoin Uber. For the government to sue, it would need to endorse Uber's characterization of what it is (*i.e.*, neither an

employer nor a seller), and federal and states government are unlikely to take that leap.[2]  In any event, the Clayton Act exists to ensure that private litigants will supplement government enforcement.  Uber demanded that this matter be arbitrated.  This is the right forum to enjoin surge pricing.  It may well be the only one.

This tribunal asked for precedent where a private claimant enjoined a practice nationwide.  Trans. 962:9-25.  There is plenty, which we cite, including two cases heard at the Supreme Court, *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), and *Eastman Kodak Co. v. Image Technology Services*, 504 U.S. 451 (1992).  Indeed, courts have "repeatedly rejected the argument advanced by defendants that injunctive relief should be tailored so narrowly as to remedy only the injuries suffered by the plaintiff."  *Continental Airlines, Inc. v. United Air Lines, Inc.*, 136 F. Supp. 2d 542, 550 n.11 (E.D. Va. 2001), *rev'd on other grounds*, 277 F.3d 499 (4th Cir. 2002).  Individual antitrust injunctions should be designed to "eliminate [the] anticompetitive effects" of an illegal restraint, "not only to the plaintiff[s]" but to "all consumers."  *Wilk v. Am. Med'l Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990).  This AAA tribunal has the power to enjoin Uber's practices *in toto*, as Uber itself has conceded in other rider and driver cases.  To be faithful to the Clayton Act, this tribunal should enjoin Uber's surge pricing.

## POINT I

### THIS CASE IS NOT GOVERNED BY *LEEGIN*, BUT BY *INTERSTATE CIRCUIT*.

**A.**     ***Leegin* does not govern this case.**

*Leegin* does not govern this case.  As a matter of black letter law, *Leegin* governs vertical theories only, not the horizontal theory of this case.  *See infra* I.A.1.  Moreover, the policies at

---

[2] *See, e.g.*, Bloomberg Law, "Uber Hit with $650 Million Employment Tax Bill in New Jersey" (Nov. 14, 2019) ("State says drivers are employees, not contractors").

issue in *Leegin*—encouraging retailer promotional effort and avoiding a free-rider problem—do not apply to Uber's surge pricing. *See infra* I.A.2.

### 1. *Leegin* is limited to vertical theories.

The Supreme Court's *Leegin* decision does not provide the controlling doctrine here because it governs only vertical theories, not horizontal theories concerning vertical agreements. This distinction is dispositive.

*Leegin* considered only a "vertical restraint." 551 U.S. at 882. The Court expressly refused to consider whether, in imposing that restraint, Leegin also "participated in an unlawful horizontal cartel." *Id.* at 907. In *Leegin*, as in other cases where the Supreme Court has applied the rule of reason to vertical arrangements, the Court "has explicitly distinguished situations in which a vertical player organizes a horizontal cartel." *United States v. Apple*, 791 F.3d 290, 323 (2d Cir. 2015); *accord NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) (explaining *per se* rule properly applied in cases "involving not simply a 'vertical' agreement between supplier and customer, but a case that also involved a 'horizontal' agreement among competitors"). The relevant restraint here "is not [the] vertical" agreement between Uber and drivers but "the horizontal agreement that" Uber "organized among [competitors] to raise . . . prices." *Apple*, 791 F.3d at 323. "How the law might treat [the] vertical agreements in the absence of a finding that [the vertical actor] agreed to create the horizontal restraint"—*i.e.*, how the *Leegin* doctrine would apply in the absence of a horizontal theory—"is irrelevant." *Id.* at 325.

That means both *Interstate Circuit* and *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000) remain good law after *Leegin*.[3] *See id.* at 319-20 (relying on both cases as to *Leegin*). The *Leegin*

---

[3] Even Leegin, in its successful brief to the Supreme Court, conceded that horizontal rules would remain the same. "[T]here is no reason to believe that the existing per se rules against horizontal

court itself observed that vertical price-fixing agreements may, in certain cases, "be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel," which "is, and ought to be, *per se* unlawful." 551 U.S. at 893. To illustrate this "well established" rule, the Second Circuit cited *Interstate Circuit* and *Toys "R" Us* as examples of vertical agreements that evidenced a horizontal cartel. *Apple*, 791 F.3d at 319-20. The Circuit described both as cases "where multiple competitors sign vertical agreements that would be against their own interests were they acting independently." *Id.* Judge Rakoff thus correctly stated that "*Leegin* did not purport to overrule *Interstate Circuit*, which . . . permits a finding of a conspiracy among competitors in circumstances such as those of the instant case," and that *Leegin* "does not, as defendant would have it, undermine plaintiff's claim of an illegal horizontal agreement." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 826 n.5 (S.D.N.Y. 2016).

In short, *Leegin* does not govern horizontal theories and did not alter horizontal doctrine.

### 2.    *Leegin*'s economic rationales are not at issue.

Not only is *Leegin* doctrinally inapplicable, but, moreover, its policies do not apply either.

*Leegin* was premised on reseller promotional efforts that are not present here. *Leegin* cited the concern that "[a]bsent vertical price restraints, the retail services that enhance interbrand competition might be underprovided." 551 U.S. at 890. By "interbrand competition," the Supreme Court meant competition between "different brands of the same type of product" produced by competing manufacturers.[4] *Id.* As to services that could be underprovided, the Supreme Court

---

collusion and the methods of detecting and punishing such collusion are so lacking as to justify additional per se rules as a prophylactic measure." Pet. Br., *Leegin*, 06-480, at 22 (Jan. 22, 2007).

[4] This is what the Supreme Court has long meant by interbrand competition—competition among resellers of branded products. *See Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006) (branded manufactured trucks); *State Oil Co. v. Khan*, 522 U.S. 3 (1997) (branded manufactured gasoline); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988) (branded manufactured calculators); *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)

gave examples of "fine showrooms," "product demonstrations," and "knowledgeable employees." *Id.*  Those services require the "investment of capital and labor."  *Id.* at 891.

None of this applies to Uber drivers.  As an initial matter, Uber is not a "brand" of the sort described in *Leegin* or other Supreme Court cases because it does not produce any good or service for resale.  *See Meyer*, 174 F. Supp. 3d at 826 ("Here, unlike in *Leegin*, Uber is not selling anything to drivers that is then resold to riders.").  Uber is merely a marketplace.  *See, e.g.* Trans. 310:16-20 ( ███ ("Uber platform" is a "marketplace of riders and drivers"); Trans. 495:1-12, 499:6-11 ( ███ (similar).  Moreover, in contrast to resellers, Uber drivers do not promote their rides on the Uber platform.  Uber alone promotes rides on the platform.  Drivers simply sign up.  *Leegin*'s promotional efforts rationale does not apply to Uber.

*Leegin* also tackled a free-rider problem that Uber drivers do not face.  In retail, as *Leegin* explains, "consumers might decide to buy [a] product because they see it in a retail establishment that has a reputation for selling high-quality merchandise."  *Id.*  Or they might decide to buy the product after learning of it "from a retailer that invests in fine showrooms, offers product demonstrations, or hires and trains knowledgeable employees."  *Id.*  "If the consumer can then buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services."  *Id.*  In other words, discounters can free ride off the efforts of high-end retailers.  But "[m]inimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider.  With price competition decreased, the manufacturer's retailers compete among themselves over services."  *Id.*

---

(branded manufactured televisions); *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967) (branded manufactured bicycles).

This free-rider problem does not exist for Uber. Trans. 970:18-18 (Uber summation) (uncontested). The Uber market is not split between drivers promoting Uber rides and those free riding off their efforts. Uber drivers, unlike discounters in *Leegin*, cannot free ride off other drivers' promotional efforts. Moreover, Uber drivers, unlike retailers, cannot "compete among themselves over services." *Leegin*, 551 U.S. at 891. Service competition is infeasible because riders cannot select drivers. Uber's app matches the drivers instead. *See* Trans. 503:14-18 (███████ That means, without price competition, Uber drivers simply cannot compete with each other at all. *See* Trans. 376:6-23 (██████ Nothing in *Leegin* endorses such an outcome.

*Leegin*'s rationales thus do not help Uber. There are no "concerns about free-riding Uber drivers, or [about] efforts that Uber drivers could make to promote the App that will be under-provided if Uber does not set a pricing algorithm." *Meyer*, 174 F. Supp. 3d at 826. As Judge Rakoff properly found, "the justifications . . . offered in *Leegin* are not directly applicable." *Id.*

**B.      Rather, *Interstate Circuit* controls this case.**

This case is instead controlled by *Interstate Circuit*. Surging pricing fits both of the two elements of *Interstate Circuit*. First, Uber drivers accept surge pricing at the invitation of Uber. *See infra* I.B.1. Second, Uber drivers charge surge pricing only because they know that all other drivers on Uber will do the same thing, so drivers cannot be undercut on price. *See infra* I.B.2.

**1.      All Uber drivers adopt surge pricing at Uber's invitation.**

The first element of an *Interstate Circuit* conspiracy is competitors' acceptance of a vertical actor's invitation to adopt a restraint. Uber drivers meet this element by adopting surge pricing.

What is unique about an *Interstate Circuit* conspiracy is that it does not require actual agreement among competitors. "*Interstate Circuit* [stands] for the proposition that an actionable horizontal conspiracy does not require direct communication among the [horizontal] competitors." *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010). The Supreme Court

in *Interstate Circuit* held that "an agreement of [competitors] among themselves" is "not a prerequisite to an unlawful conspiracy." 306 U.S. at 226-27; *see, e.g.*, *Bigelow v. RKO Radio Pictures*, 150 F.2d 877, 882 (7th Cir. 1945) ("True, no specific agreement to enter into such conspiracy . . . was proven, but that was not necessary."). In lieu of an actual agreement, "[a]cceptance by competitors, without previous agreement, of an invitation to participate in [the] plan" can be "sufficient to establish an unlawful conspiracy under the Sherman Act." *Interstate Circuit*, 306 U.S. at 227; *Bigelow*, 150 F.2d at 882 (same).

Here, Uber invited all of its driver partners to accept surge pricing. *See* Meyer Ex. 25, § 4.1 (driver agreement); Trans. 548:17-21, 553:10-557:21 (███████ Uber offers surge pricing as part of its pricing algorithm through an identical public contract to all drivers. *See id.* All drivers accept those same terms. *See* Meyer Ex. 9, ¶ 19. Uber is the hub, and the drivers are all spokes. *See Meyer*, 174 F. Supp. 3d at 824.

### 2. Uber drivers adopt surge pricing because all other Uber drivers do so.

An *Interstate Circuit* conspiracy's second element is conditionality—competitors adopt a restraint that would be against their own interests were they acting independently and they adopt it only because they are confident their competitors are collectively adopting it. This is true of surge pricing. No rational driver would independently lock himself into surged fares without assurance that all other Uber drivers would do the same; otherwise, an Uber driver could be quickly undercut on surged rides. This conditionality element adds a rim between drivers in Uber's hub-and-spoke conspiracy.

This is "that conditionality" Dr. Carlton described in his testimony. Trans. 882:8. *Interstate Circuit* described it this way: "Each [competitor] was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan." 306

U.S. at 226. And "[e]ach was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions . . . there was risk of a substantial loss of the business . . ., but that with it there was the prospect of increased profits." *Id.* at 222. Conditionality under *Interstate Circuit* means that "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012). This is another way to prove a "'conscious commitment to a common scheme.'" *Apple*, 791 F.3d at 315 (*quoting Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

This conditionality was key to each precedent. In *Interstate Circuit* itself, "there was the prospect of increased profits" with "substantially unanimous action" by all of the distributors, but each faced the "risk of a substantial loss" of business to its competitors "without substantially unanimous action." 306 U.S. at 222. "[T]he economic context made it clear that all . . . needed to act uniformly or all would lose business." *White v. RM Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011). Likewise, in *Toys "R" Us*, the FTC found "that the only condition on which each toy manufacturer would agree to TRU's demands was if it could be sure its competitors were doing the same thing." 221 F.3d at 936; *see also* Trans. 880:19-881:6 (Dr. Carlton) ("Toys R Us negotiated with the manufacturers and said. . . you agree to this condition, please, because this other person, your competitor is agreeing, and it was that coordination that the FTC used to claim that it was a hub-and-spoke conspiracy."). And in *Apple*, "Apple's Contracts created a set of economic incentives pursuant to which the Contracts were only attractive to the Publisher Defendants to the extent they acted collectively." 791 F.3d at 320. If a publisher acted alone, it "stood to make *less money* per sale." *Id.* at 316. But "if the publishers acted collectively," they

could make more.  *Id.*  The conditionality in each case meant that "multiple competitors sign[ed] vertical agreements that would be against their own interests were they acting independently." *Id.* at 320.

Thus, conditionality creates a rim in a hub-and-spoke conspiracy.  This rim is formed if "the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing." *Id.* at 314 (brackets and quotation marks omitted).  That is, even without "an explicit agreement" among competitors, if each competitor "acted against its individual interest . . . with the expectation . . . that competitors would do the same," that conditionality forms "a rim around a spoked hub." *Sheet Metal Works Local No. 20 Welfare & Ben. Fund v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 349-50 (D.R.I. 2018).  A rim exists, as it did in *Toys "R" Us*, if "the only condition on which each [competitor] would agree to [a restraint] was if it could be sure its competitors were doing the same thing." 221 F.3d at 936.

Here, surge pricing creates a rim between Uber drivers.  Surge pricing can deliver higher prices to Uber drivers *only* because all other drivers on the Uber marketplace agree not charge a lower price.  ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████  The reason is obvious.  Given the choice, riders would prefer to pay less. *See, e.g.*, Trans. 109:5-12 (Meyer) ("Q: [I]n certain circumstances, you would pay $20 to get a ride more quickly?  A. Yes.  Q. Would you rather pay $19?  A. Yes.  Q.  What about $18?  A. Sure."). "Each seller has an incentive to shave the price a little in order to sell more; to maintain their sales other firms must reduce price too." *Premier Elec. Const. Co. v. NECA, Inc.*, 814 F.2d 358, 370 (7th Cir. 1987); *accord* Meyer Ex. 111 at 8:12 (Driver) ("So my business is going to go down. When I see one lower, I'm going to go lower.  So for me or anyone, it's not good.").

Here then, as in *Interstate Circuit*, *Toys "R" Us*, and *Apple*, absent substantially unanimous consent, an Uber driver would not agree to lock herself into surge pricing if she could be undercut by competitors on the Uber marketplace not locked into surge. Only with unanimous consent can Uber drivers obtain the surged prices they desire. Surge pricing presents "economic incentives . . . only attractive to the [drivers] to the extent they acted collectively." *Apple*, 791 F.3d at 320. With surge, "multiple competitors sign vertical agreements that would be against their own interests were they acting independently." *Id*. Surge pricing thus fits within *Interstate Circuit*: "[T]he only condition on which each [driver] would agree to [Uber's surge pricing] was if it could be sure its competitors were doing the same thing. That is a horizontal agreement." *Toys "R" Us*, 221 F.3d at 936. Judge Rakoff was right. *Meyer*, 174 F. Supp. 3d at 824-25.

**C.      *Leegin* and *Interstate Circuit* are not in conflict.**

Finally, Uber misreads the caselaw when it claims that applying *Interstate Circuit* here would conflict with *Leegin*. *See, e.g.*, Trans. 979:9-16. *Leegin* governs a distinct fact pattern, as both the Second Circuit and Judge Rakoff have recognized. *See Apple*, 791 F.3d at 319-20; *Meyer*, 174 F. Supp. 3d at 825-26 & n.5.

*Leegin* creates winners and losers among competitors. High-end retailers win; discounters lose. Vertical actors are not tempting competitors to reach an agreement among themselves. In fact, in *Leegin* cases, vertical actors are in no position to facilitate any agreement that competitors would ever reach directly among themselves. High-end retailers and discounters have competing business models. There is thus no danger they would fix prices among themselves. The high-end retailers would insist on a high price; the discounters would want a lower price to undercut them. And an agreement among the high-end retailers alone would do nothing to stop discounting. Minimum resale price maintenance is thus *not* an invitation for competitors to do what they would

want to do collectively absent antitrust prohibitions. That is why *Leegin* cases produce winners and losers. *See infra* I.B.1.

But *Interstate Circuit* cases stand in stark contrast. There, no affected competitors lose. The illicit invitation in *Interstate Circuit* cases poses a threat to the free market because it invites competitors to indulge in their worst impulses. The invitation takes advantage of all competitors' common motive to conspire. It governs those agreements that competitors would reach directly with one another, if they were willing to so blatantly break the antitrust laws. That is precisely why all competitors expect all others to adopt *Interstate Circuit* restraints—because, with unanimous action adopting these restraints, all boats rise. *See infra* I.B.2.

Here, Uber's surge pricing restraint is an *Interstate Circuit* restraint. No Uber drivers lose out with the promise of making more money per ride. Uber's invitation not to undercut one another when there is enough demand to surge prices draws on Uber drivers' common impulse to extract the highest revenue possible from riders, without the downward pressure of competition on the Uber platform. Increasing fares is exactly the type of restraint that drivers would be tempted to agree to among themselves. That is the flipside of the conditionality coin. It is why drivers would expect all other drivers to adopt surge pricing—it benefits all of them. *See infra* I.B.3.

      1.      **_Leegin_ restraints create winners and losers.**

*Leegin* addresses a very different scenario than *Interstate Circuit*. A producer's demand that resellers agree to minimum resale prices will be welcome to some resellers and unwelcome to others. The practice, as noted, generally solves a free-rider problem in markets with high-end resellers and discounters. With resale price maintenance in place, discounters can no longer undercut the high-end retailers on price. *See Leegin*, 551 U.S. at 913. Rather, they must compete on service. *See id.* Because the high-end retailers provide more service, they are favored by

12

minimum resale price maintenance. But discounters, obviously, will generally oppose the practice. That's why, after all, the discounter Kay's Kloset brought the *Leegin* case in the first place.

Thus, in *Leegin*, there was *not* a common motive among affected competitors to embrace the restraint at issue. Some preferred resale price maintenance. Others, like Kay's Kloset, opposed it. Absent Leegin's demand that all resellers agree to the policy, there is no chance that the horizontal competitors would have agreed to the practice among themselves. Discounters like Kay's Kloset would have rejected such a deal. It is clear that Leegin was not inviting competitors to adopt a policy they all would have adopted directly by conspiracy. Rather, Leegin had to impose the practice. And it created winners (high-end retailers) and losers (discounters).

### 2. *Interstate Circuit* restraints benefit all affected competitors.

By contrast, *Interstate Circuit* conspiracies concern restraints that competitors have a common motive to collectively adopt. That is part and parcel of the conditionality element. The restraints in *Interstate Circuit* cases are ones that competitors would be tempted to adopt if they were communicating directly (as some were in *Apple*). They are restraints against an individual's interest, if acting alone, but in the collective interest. They succeed only with each competitor's conscious commitment. The mischief is obvious. *Interstate Circuit* prevents vertical actors from tempting competitors with restraints that they would want to impose to avoid competition.

This is true in each of the key cases. In *Interstate Circuit*, the restraints promised all affected distributors "the prospect of increased profits." 306 U.S. at 222. That's why the movie distributors, upon seeing their competitors copied, could presume each would accept. As the Supreme Court put it, "[t]here was, therefore, strong motive for concerted action, full advantage of which was taken by Interstate . . . presenting their demands to all in a single document." *Id.* Similarly, in *Toys "R" Us*, adoption of the proposed restraints ensured each manufacturer access

to Toys "R" Us as its "critical outlet" for selling toys, and, if unanimously adopted, threatened none of the manufacturers. 221 F.3d at 930, 935. Likewise, in *Apple*, Apple's proposed terms offered all publishers "the promise of higher prices" on bestsellers. 791 F.3d at 317. Apple knew that all "the publishers hated Amazon's $9.99 price point" and stood to benefit from prices "higher than $9.99." *Id.* The publishers' collective interest was evidenced in *Apple* by even direct communications among publishers supporting the vertical restraint. *See id.* at 300.

Each of these cases concerned all-boats-rise restraints. The illicit restraint proposed by the vertical actor was equally welcomed by all competitors, on the critical condition that substantially all of the other competitors accepted it. Their motive to conspire was truly common. Unlike in *Leegin*, none of the competitors in these cases had any reason to be threatened by the proposed restraint. It tempted them all alike. There were no losers.

### 3. Surge pricing is an *Interstate Circuit* restraint that benefits all Uber drivers.

Here, surge pricing is similarly an all-boats-rise restraint. The idea of more money per ride, as proposed by Uber, is equally welcomed by all Uber drivers, again on the critical condition that substantially all other drivers accept it. Uber drivers share a common motive to adopt surge pricing. No Uber driver loses by making more money on a ride. This is precisely the type of restraint that Uber drivers would be tempted to adopt if they could do so by direct agreement. *Interstate Circuit* does not allow them to adopt the same restraint at Uber's invitation.

Uber drivers have a common motive, as Uber understood. Surge pricing was designed to lure drivers onto the road by promising higher revenues for surged rides. Travis Kalanick, who created surge pricing, explained that "Uber driver partners generally like when prices go up." Trans. 169:13-15. Thus, while surge is "a premium" for riders, "for drivers, it's an incentive." Meyer Ex. 18 (Uber website). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████

██████████████ Trans. 322:10-14. This incentive exists because drivers "make more money with surge in effect than they would if you weren't in a surge period." Trans. 158:2-4 (Carlton); *see also* Trans. 812:20-21; 812:24-25 ("[T]hey make more money; that's the point of surge.") (Carlton). ████████████████████████████████

████████████████████████████ Thus, for all drivers on the Uber platform, surge presents the common lure of higher prices. Surge pricing is an all-boats-rise scenario for all drivers affected by it. This temptation is what the *Interstate Circuit* doctrine prevents.

There is one more important point here. Surge pricing differs from Uber's baseline pricing. Some drivers may be content with Uber's baseline pricing; but others may think it is too low. If Uber put twenty drivers in a room, they may not all agree that the pegged price is fair. And if they could agree among themselves, they may not all be tempted to choose Uber's baseline price. (Protests support that hypothesis.) As to baseline prices, the conditionality element of *Interstate Circuit*—the idea that the baseline price is one all drivers would choose to collectively impose—is not clear. Uber's baseline pricing may therefore not in fact violate *Interstate Circuit*.

But surge pricing, by contrast, is a relative concept, promising an increase in driver revenue. That simplifies the question. If Uber put twenty drivers in a room, they would all agree that higher fares, if they could get them, are better than lower fares. The design of surge assumes as much. The algorithm is designed to surge prices to the extent riders will pay. The lure of those higher revenues tempts all drivers alike. That common motive is why surge violates *Interstate Circuit*, even if baseline pricing may not. And it is a reason this case is limited to surge pricing.

For all these reasons and those stated at the hearing and in Meyer's pre-hearing brief, Meyer respectfully submits that Uber's surge pricing is not governed by *Leegin*, but by *Interstate Circuit*,

as Judge Rakoff held. 174 F. Supp. 3d at 824-26. As such, it is horizontal concerted action and, because it is price-fixing, it is *per se* illegal.

## POINT II

### THIS TRIBUNAL SHOULD ENJOIN SURGE PRICING.

This tribunal should enjoin Uber's surge pricing *in toto*, not merely as to Meyer. At the hearing, this tribunal asked for precedent in which a private litigant "in an antitrust case got a nationwide injunction." Trans. 962:17-18. As set forth below and in prior briefing, that is what the Clayton Act mandates, and there are many such precedents. *See* Cl. Pre-Hearing Br. at 26-28; Cl. Opp., dated Jan. 18, 2019, at 3-5; Cl. Supp. Opp., dated Mar. 11, 2019 at pages 3-4. *See infra* II.A. Moreover, this tribunal has every right and responsibility to issue such injunctions here, as Uber has elsewhere conceded. Indeed, if this tribunal declined to issue such an injunction, it would frustrate the antitrust laws that are designed to ensure private enforcement for the benefit of the overall market. *See infra* II.B.

A. **Courts regularly enjoin anticompetitive practices *in toto*.**

By design, the Clayton Act empowers private litigants to seek broad injunctive relief. "A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." *Am. Safety Equip. Corp v. J.P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968), *quoted favorably by Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985). The Act's "treble-damage and injunctive remedies" are designed "not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130-31 (1969). And, with these robust remedies, "Congress

has told us that it is willing to go, in certain respects, beyond the normal limits of law in advancing its goals of deterring and remedying unlawful trade practice." *Am. Express v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013).

That is why private litigants are entitled to injunctions stopping an illegal practice *in toto*, not just as to themselves. Courts have "repeatedly rejected the argument advanced by defendants that injunctive relief should be tailored so narrowly as to remedy only the injuries suffered by the plaintiff." *Continental*, 136 F. Supp. at 550. "[A]n injunction against price fixing" is necessary to "avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *ES Dev., Inc. v. RWM Enterp., Inc.*, 939 F.2d 547, 557 (8th Cir. 1991) (same, in private suit). As the Second Circuit long ago observed in private litigation, "normally, after a finding of price-fixing, the remedy is an injunction against the price-fixing." *CBS v. Am. Soc'y Composers*, 562 F.2d 130, 140 (2d Cir. 1977), *rev'd on other grounds sub nom.*, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979). Because an antitrust plaintiff is entitled to stop an illegal practice wholesale, not merely as to himself, the Supreme Court has recognized that an antitrust injunction is the same, whether entered following suit by "the United States Government, the governments of each State, [or] any individual." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972). All "may . . . sue for injunctive relief," and "the fact is that one injunction is as effective as 100, and concomitantly, that 100 injunctions are no more effective than one." *Id.* Thus, even where a private litigant seeks an injunction, an appropriate injunction will "eliminate [the] anticompetitive effects," "not only to the plaintiff[s]" but to "all consumers." *Wilk*, 895 F.2d at 371.

There are plenty of precedents illustrating that antitrust injunctions should benefit the entire market, not just the plaintiff. A familiar example is the Supreme Court case, *NCAA v. Board of*

*Regents of the University of Oklahoma*, 468 U.S. 85. There, only the Universities of Oklahoma and Georgia were the plaintiffs, and the case was not a class action. But the district court enjoined the NCAA's "entire scheme" of price-fixing televised college football games nationwide. *Bd. of Regents of the Univ. of Okla. v. NCAA*, 546 F. Supp. 1276, 1327 (W.D. Okl. 1982). That injunction, which was affirmed in relevant part by the Supreme Court, broke up the "combination which restrains trade . . . to bring [defendant] into compliance with the Sherman Act." *Id.* The district court did not limit the injunction to the two plaintiffs. Rather, it held that the entire plan "simply cannot be allowed to stand," and it enjoined the plan as to all NCAA members. *Id.* at 1326, *aff'd in relevant part after remand*, 601 F. Supp. 307 (W.D. Okl. 1984). And it explained why: "Having found a violation of the Sherman Act, the Court is duty-bound to 'render impotent the monopoly power which violates the Act.'" *Bd. of Regents*, 546 F. Supp. at 1328 (quoting *Schine Chain Theatres v. United States*, 334 U.S. 110, 129 (1948)).

Another familiar case follows the Supreme Court's decision in *Eastman Kodak Co. v. Image Technology Services*, 504 U.S. 451. There, various individual service organizations (ISOs) sued Kodak for discriminatory pricing. *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), *aff'g in relevant part*, *Image Tech. Servs. v. Eastman Kodak Co.*, No. C 87-1686, 1996 U.S. Dist. LEXIS 2386 (N.D. Cal. Feb. 28, 1996). And, as in *NCAA*, the trial court enjoined Kodak's conduct everywhere, as to *all* ISOs, not merely the particular plaintiffs in the suit. *See id.* at 1226-28. The court rejected Kodak's argument that the injunction was overbroad because it protected non-parties, what Kodak protested was "relief on a class-wide basis without a properly certified class." *See* 1996 U.S. Dist. LEXIS 2386, at *10. Kodak was wrong; relief stopping an illegal practice in full is not limited to class actions. Rather, the injunction properly stopped Kodak's practices *in toto* because the private litigants had brought an antitrust suit, not

merely to restore "a unique right," but also to "restore competition in the market place."  *Id.* at
*11-12.  The Ninth Circuit agreed, holding that "[i]njunctive relief covering [non-parties] is proper
under these circumstances."  125 F.3d at 1226.

The governing principle that antitrust injunctions should extend to entire markets, not
merely the individual plaintiffs, was perhaps best articulated by the Seventh Circuit in *Wilk v.
American Medical Association*, 895 F.2d at 370-31.  There, the American Medical Association
(AMA) was enjoined from illegally discriminating against *any* chiropractors, not merely the
plaintiffs.[5]  The AMA protested that the injunction "should have been limited to the four
communities in which the individual plaintiffs practiced."  *Id.* at 371.  The AMA, echoing Kodak's
(and Uber's) argument, contended that an injunction extending to non-parties was improper "class-
wide relief."  *Id.* at 370-71 n.6.  But the Seventh Circuit disagreed, explaining that the argument
"ignores the public interest served by private antitrust suits."  *Id.*  "Such suits can effectively open
competition to a market that was previously closed by illegal restraints."  *Id.*  An antitrust
injunction should provide relief "not only to the plaintiff[s], but also in a sense to all consumers."
*Id.*  "In this way, competition is served by the injunction."  *Id.*

In sum, private litigants are entitled to enjoin anticompetitive practices, not merely to
protect themselves.  The Clayton Act empowers private litigation to serve "the high purpose of
enforcing the antitrust laws."  *Zenith Radio Corp.*, 395 U.S. at 130-31.  To serve that purpose,
injunctions must "pry open to competition a market that has been closed by defendants' illegal
restraints."  *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476, 488 (E.D.
Mo. 1965) (enjoining restraint as to plaintiffs, as well as non-plaintiffs) (quoting *Int'l Salt Co. v.*

---

[5] The district court enjoined AMA from interfering "with the right of a physician, hospital or other
institution to make an individual decision on the question of professional association."  *Id.* at 366
(quoting district court).  The injunction applied *in toto*, not merely as to the plaintiffs.

*United States*, 332 U.S. 392, 401 (1947)).  Nor is there merit to the argument that class certification is needed to enter such an injunction, *see Wilk*, 895 F.2d at 371 n.6; *Image Tech. Servs.*, 1996 U.S. Dist. LEXIS 2386, at *10; on the contrary, "an injunction asserted by an individual plaintiff . . . would have essentially the same impact on Defendant as an injunction asserted by a certified class," *Blessing v. Sirius XM Radio*, No. 09-cv-10035, 2011 U.S. Dist. LEXIS 32791, at *21 (S.D.N.Y. Mar. 29, 2011); *cf. Standard Oil Co.*, 405 U.S. at 261 ("the fact is that one injunction is as effective as 100").  Under the Clayton Act, injunctive relief "to the extent necessary to protect [against] future damage" means an injunction that "open[s] competition to a market that was previously closed by illegal restraints," "not only to the plaintiff . . . , but also in a sense to all consumers."  *Wilk*, 895 F.2d at 370-71.  That is what a district court would issue here.

B.     **An injunction against surge pricing is particularly appropriate here.**

Moreover, an injunction stopping Uber's ongoing surge pricing is particularly appropriate here because a narrower injunction would be insufficient to prevent harm even to Meyer himself. As courts have long recognized, restraints on trade cause "serious distortion of the rational and efficient allocation of resources" in markets.  *Lafeyette v. La. Power & Light Co.*, 435 U.S. 389, 408 (1978).  "The assumption that competition is the best method of allocating resource in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers."  *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 695.

An injunction aimed at Meyer alone would create more problems than it would solve.[6]  At the hearing, the testimony showed that Uber used surge pricing, deliberately, on the hypothesis

---

[6] The parties stipulated that "Meyer is a registered Uber rider," who "may use the Uber app to obtain rides on any of Uber's product lines (e.g., UberX, Uber Black, or Uber SUV), where those products are available."  Joint Ex. 1, ¶¶ 18-20.  At the hearing, Meyer testified that he desired an

that drivers would move from certain less busy areas to other busier areas.  *See* 311:5-18, 316:4-

22, 317:8-11; 322:10-17 (████ 529:8-18, 533:10-15 (████ The Uber marketplace through

which Meyer hails and purchases rides will remain skewed by surge pricing, even if Uber is

enjoined from surging Meyer's own rides.  To use an analogy from earlier briefing, if Uber surges

prices in busy midtown Manhattan, Meyer may be left in the cold in Brooklyn waiting for rides

that could have been more readily available if drivers did not chase surge into the City.  *See* Cl.

Suppl. Memo at 6-7.  The only way to solve this problem is to enjoin surge pricing *in toto* to

prohibit the market distortions in the first place.

That is the injunction a district court would issue under the Clayton Act in any event.  *See*

*infra* II.A.

### C.    This tribunal is empowered to award this relief, as Uber elsewhere admits.

This tribunal is empowered to enjoin Uber's surge pricing *in toto*, just like a district court.

As an initial matter, the arbitration agreement did not, and could not, limit the remedies

available to Meyer.  As Meyer explained in extensive briefing earlier this year, the arbitration

agreement adopts the same injunction standard as district courts.  *See* Cl. Opp., dated Jan. 18, 2019,

at 3-6.  Even more importantly, any purported limit on Meyer's rights to relief would render the

---

"assurance" that Uber would not unlawfully surveil him again.  Trans. 79:12-22.  Earlier, Meyer
had "become the target of an intrusive and clandestine investigation that included inquiries into
[his] family life, career prospects, and living arrangements."  *Meyer v. Kalanick*, 212 F. Supp. 3d
437, 443 (S.D.N.Y. 2016).  Judge Rakoff made a finding that the "purpose of [Uber's]
investigation was to try to unearth derogatory personal information about Mr. Meyer and his
counsel that could then be used to try to intimidate them."  *Id.*  That investigation was, the Court
held, "fraudulent and arguably criminal conduct."  *Id.* at 444.  Judge Rakoff enjoined Uber "from
undertaking any further personal background investigations of individuals involved in this
litigation through the use of false pretenses, unlicensed investigators, illegal secret recordings, or
other unlawful, fraudulent, or unethical means."  *Id.* at 450.

Following the hearing, Meyer reviewed Judge Rakoff's injunction.  After doing so, Meyer has now
downloaded the Uber app again onto his phone.  Moreover, as Uber can confirm (and we could
prove in the event of any dispute), Meyer has resumed taking rides with his personal Uber account.

arbitration agreement unenforceable.  *See id.* at 12-17; *see also* Cl. Supp. Opp., dated Mar. 11, 2019 at 3-6.   As the Supreme Court explained in *Mitsubishi Motors*, if an arbitration agreement "operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," the Court "would have little hesitation in condemning the agreement as against public policy."  473 U.S. at 637 n.19.  Quite simply, "under federal law, the remedies provided by the antitrust statute cannot be contractually waived."  *Kristian v. Comcast Corp.*, 446 F.3d 25, 46 (1st Cir. 2006).  The arbitration agreement therefore cannot limit Meyer's remedies.

As to the authority of this tribunal itself, it has fulsome power to enjoin Uber's surge-pricing *in toto*.  Uber itself has repeatedly taken this position.  As previously briefed, in this very litigation Uber informed Judge Rakoff on Uber's (successful) motion to compel arbitration that this tribunal would be "capable of providing Meyer with the same remedies Meyer [sought] in [that] litigation."  Uber Mem., *Meyer v. Kalanick*, Dkt. 151 at 14 (Oct. 6, 2017).  Not only should Uber be estopped from changing that position, *see* Cl. Opp., dated Jan. 18, 2019, at 9-12, but, moreover, Uber was right.  Under the Consumer Arbitration Rules governing this proceeding, the "arbitrator may grant any remedy, relief, or outcome that the parties could have received in court."  AAA Consumer Arbitration Rule, R-44(a).   And AAA arbitrators have repeatedly enjoined respondents from illegal practices *in toto*, without limiting that relief the claimant.[7]  This tribunal thus has the power to enjoin surge pricing *in toto*.

This tribunal's authority is underscored by the fact that Uber, elsewhere, has conceded that Uber's practices may, in AAA arbitration, be enjoined *in toto* without limitation to a claimant.  An

---

[7] For cases in which AAA consumer arbitrators have enjoined practices *in toto* and not merely as to the claimant, *see, e.g.*, 2019 AAA Consumer LEXIS 258, at *31 (May 9, 2019) (enjoining car dealer from wrongful acts as to any consumer, not merely claimant); 2018 AAA Consumer LEXIS 8, at *40 (Jan. 30, 2018) (same); 2016 AAA Consumer LEXIS 444, at *34 (Dec. 29, 2016) (same).

example is *Doe v. Uber Technologies, Inc.*, No. 4:17-cv-06571 (N.D. Cal.). There, a group of

riders sued for an injunction to require Uber to change its policies and procedures *in toto*. They

argued that Uber's arbitration agreement was invalid because, as they read it (and as Uber

ironically has argued here), it purported to "limit[] relief to an individual basis only." Pls. Opp,

*Doe v. Uber Techs., Inc.*, No. 4:17-06571, Dkt. 53 at 11 (N.D. Cal. May 29, 2018). In response,

Uber admitted what it has failed to admit so far in this proceeding—that the rider arbitration

agreement "does not, by its terms, categorically bar Plaintiffs from obtaining public injunctive

relief."[8] Uber Reply, No. 4:17-cv-06571, Dkt. 55 at 13 (N.D. Cal. June 5, 2018). On the contrary,

Uber correctly explained that under its rider agreement, the AAA arbitrator had the same power as

the district court to enter an injunction affecting others. *See id.* at 14 (acknowledging arbitrator

could provide the same "relief available to [claimants] *in the court in which they filed suit*")

(emphasis in original).

Uber made the same concession within the past two months in *Carpiole v. Uber

Technologies Inc.*, 1:19-cv-11941 (D. Mass.). The *Carpiole* plaintiff asked the court to enjoin

purported employment misclassification by Uber, to "benefit not only himself and other Uber

drivers, but also the public at large." *See* Pl. Memo., *Carpiole v. Uber Technologies Inc.*, No.

1:19-cv-11941, Dkt. 4 at 1-4 & n.5 (D. Mass. Sept. 19, 2019). And there, Uber again admitted

that the arbitrator was empowered to grant that sweeping injunctive relief. As Uber put it, even

"public injunctions can be arbitrated." Uber Mem., 1:19-cv-11941, Dkt. 10 at 17 (D. Mass. Oct.

---

[8] By "public injunctive relief," Uber meant relief that does not "benefit[] primarily himself." *Id.*
at 16. Uber has similarly defined "public injunctive relief" as an injunction whose "'benefits by
and large do not accrue to th[e] party, but to the general public in danger of being victimized by
the same practices that the plaintiff suffered.'" Uber Opp., *Carpiole v. Uber Technologies Inc.*,
1:19-cv-11941, Dkt. 11 at 6 (D. Mass. Oct. 17, 2019) (quoting *Magana v. DoorDash, Inc.*, 343 F.
Supp. 3d 891, 901 (N.D. Cal. 2018)). In other words, public injunctions protect the whole public.

17, 2019).  The reason, as Uber admits, is that otherwise its arbitration agreement would be illegal.  *See id.*  Uber concedes that precedent "supports this result:  'The [law] . . . does not prohibit[] the arbitration of public injunctions.  It merely prohibits the *waiver* of the right to pursue public injunctive relief in any forum.'"  *Id.* (quoting *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 827 (9th Cir. 2019)).  That is why, as Uber explains, courts "have repeatedly observed that a claim for public injunctive relief"—*i.e.*, to enjoin Uber as to the general public, not simply the claimant—"may be submitted to arbitration."  Uber Reply, 1:19-cv-11941, Dkt. 22 (D. Mass. Nov. 7, 2019).

Uber is right:  This tribunal may issue an injunction for the benefit not only of Meyer, but also for "the public at large."  *Compare id.* at 22; *with* Pl. Memo., 1:19-cv-11941, Dkt. 4, at 4 n.5.  That is the only way to prevent market distortions.  And it is what the Clayton Act mandates:  "Having found a violation of the Sherman Act, the [tribunal] is duty-bound" to enjoin surge pricing.  *NCAA*, 546 F. Supp. at 1328.  Because Uber's orchestration of surge pricing among independent competitors is *per se* illegal, this tribunal should enter Meyer's proposed award.

**Conclusion**

This tribunal should hold Uber liable for orchestrating an illegal horizontal price-fixing conspiracy. The tribunal should enter Meyer's proposed final award and permit him to move for attorneys' fees, costs, and expenses.

Respectfully submitted,

By:    /s/ Brian M. Feldman
       BRIAN M. FELDMAN
       LAUREN R. MENDOLERA
       Harter Secrest & Emery LLP
       1600 Bausch & Lomb Place
       Rochester, New York 14604
       Telephone No. (585) 231-1201
       bfeldman@hselaw.com
       lmendolera@hselaw.com

       ANDREW A. SCHMIDT
       Andrew Schmidt Law PLLC
       97 India Street
       Portland, Maine 04101
       Telephone No. (207) 619-0884
       andy@maineworkerjustice.com