# Exhibit 6



January 7, 2020

**BY ELECTRONIC MAIL**
Arbitrator Les J. Weinstein
lesweinsteinadr@gmail.com

        Re:     *Spencer Meyer v. Uber Technologies, Inc.*
                  AAA Case Number 01-18-0002-1956

Dear Mr. Weinstein:

      Claimant Spencer Meyer writes in response to your three questions.

**Question 1**: "How is this different from a franchise such as McDonald's where the franchisor tells the franchisees that they are invited to participate in a forthcoming special publicized pricing offer designed to raise profitability?  Say a quadruple giant Mac for $3.50 on Tuesday.  Or that the Big Mac should be reduced in weight or that fries are to go up 5 cents starting Monday?"

**Response 1**:

      The McDonald's franchise examples above are legally distinct from Uber's surge pricing for at least three independent reasons.  The first two distinctions arise because McDonald's is a franchise and Uber is not.  The third distinction is the nature of the restraint; unlike surge pricing, which works *only if* all drivers on the platform adopt it, each McDonald's proposal works without unanimity.

      *First*, unlike Uber and its drivers, franchises (meaning franchisors and franchisees) may sometimes properly be treated as single entities under the antitrust laws.  A number of "courts have held that a franchisor is incapable of conspiring with its franchisee."  *Search Int'l, Inc. v. Snelling & Snelling, Inc.*, 168 F. Supp. 2d 621 (N.D. Tx. 2001).  That includes fast-food franchisees.  *See, e.g.*, *Williams v. I.B. Fischer Nevada*, 794 F. Supp. 1026, 1032 (D. Nev. 1992) (holding Jack-in-Box franchise to be single entity), *aff'd*, 999 F.2d 445 (9th Cir. 1993); *Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1548 (S.D. Fla. 1995) (holding Burger King franchise to be single entity).  If McDonald's and its franchisees form a single entity, there can be no Section 1 violation.  That

Harter Secrest & Emery LLP
ATTORNEYS AND COUNSELORS

January 7, 2020
Page 2

defense does not apply to Uber because Uber is not a single entity with drivers. Nor has Uber ever argued that it should be considered one.[1]

**Second**, and again unlike Uber, franchisors and franchisees often engage in joint ventures together. When a franchise operates as a joint venture, the ancillary restraints doctrine permits "those restraints that are intended to promote the efficiencies of [the] joint venture." *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J. concurring). The Justice Department recently explained that a franchise may be a "legitimate and procompetitive joint venture," to which *per se* rules would not always apply. *See* U.S. Statement of Interest at 11, *Stigar v. Dough Dough, Inc.* 2:18-cv-00244, Dkt. 38 (E.D. Wash. Filed Mar. 8, 2019); *see also id.* at 13 ("[A]n agreement between them is correctly characterized as horizontal and, if not ancillary to any legitimate and procompetitive *joint venture*, would be per se unlawful") (emphasis added). By contrast, Uber is not alleging any joint venture between and among Uber and its drivers. To the contrary, Uber has already stipulated that its drivers "are not . . . part of any joint venture . . . with Uber." Joint Stip. ¶ 11.

**Third**, the McDonald's proposals differ because none appears to require unanimity to be viable. *Interstate Circuit*'s conditionality element has two parts. The first tests collective benefit. We call this the smoke-filled room test: Whether the restraint presents "the prospect of increased profits" "with substantial unanimity," such that, if all competitors could coordinate directly by sitting down together in a room, they would accept the restraint. *Interstate Circuit v. United States*, 306 U.S. 208, 222-23. Because these McDonald's proposals are "designed to raise profitability" for stores, they would meet that first test (*i.e.*, stores would collectively welcome these proposals).

But the McDonald's proposal would still likely fail the second part of conditionality. The second part tests if the restraint is against independent interest. It asks if a competitor would refuse to go-it-alone. To pass this test, a restraint must "be against [competitors'] own interests were they acting independently." *United States v. Apple, Inc.*, 791 F.3d 290, 319-20 (2d Cir. 2015). Restraints that pass this test *only* work collectively. The restraint has to be one that presents the "risk of a substantial loss," "without substantially unanimous action," 306 U.S. at 222, so that "the only condition on which each . . . would agree" "was if it could be sure its competitors were doing the same thing," *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000). Surge clearly works this way. If drivers on the Uber platform could opt out of surged prices, those drivers would undercut surge.

---

[1] Nor has Uber ever pretended to be a franchise. *See, e.g.*, Trans. at 30:12-14 (Uber opening) ('we have relationships with contractors instead of employees or franchises"); Trans. at 873:14-16 (Dr. Carlton) ("I don't think I would use the word, franchise, to describe Uber"). Rather, to limit its own liability, Uber distances itself from drivers' work. *See, e.g.*, Meyer Ex. 38, at 2 (Tony West, Uber Chief Legal Officer, asserting "drivers' work is outside the usual course of Uber's business, which is serving as a technology platform for several different types of digital marketplaces").

Harter Secrest & Emery LLP
ATTORNEYS AND COUNSELORS

January 7, 2020
Page 3

*See* Trans. 598:24-599:3 (Trew) (cheaper rides "would get snapped up").[2] So surge *only* works collectively; no driver would go-it-alone. But that is not true of the McDonald's proposals. There is no reason to believe that an individual McDonald's store needs unanimous action to successfully sell a giant Mac, reduce the weight of a Big Mac, or increase fries by five cents. Unlike Uber's platform, where competitors are all selling rides at the same place (the Uber marketplace), McDonald's stores compete in different places; McDonald's stores are not subject to the same instantaneous comparison shopping. (That's why a McDonald's franchisee can charge more in a sport stadium). Because a McDonald's store could go-it-alone and likely adopt any of these changes without unanimity, these proposals do not fit within the *Interstate Circuit* doctrine.

**Question 2**: "To the extent I may be vested with discretion as to relief, what am I to make of your only attacking surge pricing? Does not your theory hold up as to everyday pricing? If so what does it say about your public bona fides?"

**Response 2**:

Meyer limited this arbitration to surge pricing for two good reasons. The first is practical and the second is legal.

*First*, surge is the most pernicious form of price-fixing by Uber drivers. For riders, paying extra during surge pricing, with no room for competition on the platform, is an easy-to-appreciate harm. Surge pricing is experienced, by Meyer and others, as price gouging. Meyer seeks to end that practice.

*Second*, while Uber's surge pricing neatly fits the *Interstate Circuit* doctrine, it would take more work to prove whether everyday pricing does.[3] Surge pricing easily meets *Interstate Circuit's* conditionality element and is therefore horizontal, as set out in Meyer's brief. Where surge and everyday pricing differ is the first test of conditionality, the smoke-filled room test. Surge passes the test by design. It was designed as an incentive, to offer the "prospect of increased profits." It is the type of restraint that drivers, in a smoke-filled room, would happily adopt. Every driver would like more money per ride, which is what surge offers. Surge is all upside: *more* money per ride. But everyday pricing is not all upside. It is a particular baseline. To challenge

---

[2] A principal reason surge works *only* collectively is Uber's marketplace structure. A broker raising a share price $1.00 above a marketplace price will not sell any shares because buyers can purchase the same share (a commodity) for less in the same marketplace, without any effort. Only if the broker agrees with all other sellers could he successfully raise the price. The same is true of Uber. It can surge fares in its marketplace only because a lower price is not available on Uber.

[3] Of course, everyday pricing would be *per se* illegal if drivers adopted it by communicating directly with each other. *See United States v. General Motors Corp.*, 384 U.S. 127 (1966). But surge is a horizontal conspiracy because of the *Interstate Circuit* doctrine, not because of direct contact among drivers. Whether everyday pricing also fits *Interstate Circuit* is a harder question.

**Harter Secrest & Emery LLP**
ATTORNEYS AND COUNSELORS

January 7, 2020
Page 4

everyday pricing, Meyer would need to prove that, like surge, everyday pricing incentivizes drivers by offering them "the prospect of *increased* profits." 306 U.S. at 222-23 (emphasis added). Because surge was designed as an incentive and is all upside, it is the more straightforward case.

As for Meyer's *bona fides*, they are beyond reproach. Meyer has prosecuted the strongest case against Uber for its most harmful pricing practice. In this dispute, Meyer has endured mistreatment that no consumer plaintiff should endure. Soon after Meyer started this case, Uber "hire[d] unlicensed private investigators to conduct secret personal background investigations of both [Meyer] and his counsel," and "these investigators flagrantly lie[d] to friends and acquaintances of [Meyer] and his counsel in an (ultimately unsuccessful) attempt to obtain derogatory information about them." *Meyer v. Kalanick*, 212 F. Supp. 3d 437, 439 (S.D.N.Y. 2016). Meyer took on this case to pursue a public good and found himself the victim of "fraudulent and arguably criminal conduct." *Id.* at 444. He did all this, as explained below, without asking for any windfall fees or recoveries. Meyer has selflessly pursued this case for years.

**Question 3**: "Am I correct that while Uber offered in settlement to pay your client's attorney's fees you and Uber had a dramatically different idea as to the amount with Uber restricting their offer to fees in the arbitration proceeding and not contemplating a broad injunction or any value attributed to it?"

**Response 3**:

No. In fact, Uber offered to stipulate to pay *all* of the attorneys' fees and expenses that Meyer would be entitled to if he prevailed. But Meyer rejected that offer. He rejected the offer because Uber did not agree to enjoin surge pricing. And, to be clear, at no point in this arbitration has Meyer *ever* sought fees related to the value of the injunction. Meyer seeks only fees and expenses to pay his attorneys for prosecuting this action. Counsel seek no multiplier. Windfall fees are not on the table.

Initially, it is true that Uber proposed an award that limited attorneys' fees and expenses to those incurred in the arbitration (and not the litigation). On December 21, 2018, as Exhibit 1 to its Motion to Dismiss, Uber submitted its Proposed Stipulation of Award. That initial award specifically stated that Uber would not be "responsible for any costs and attorneys' fees accrued . . . as part of any pre-arbitration litigation." Meyer disagreed with that limitation (and still does) because, under applicable law, Meyer's efforts at advancing this action before Judge Rakoff should also be compensable. Early in the motion to dismiss proceedings, the parties, as you recall, disagreed on this term within Uber's offer.

But, after a conference call with this tribunal, Uber offered fees and expenses *without* any such restriction. On March 11, 2019, Uber submitted a revised award that did not so limit fees and expenses. That Proposed Arbitral Award for Injunctive and Monetary Relief stated, by contrast, that Uber would "pay reasonable costs and attorneys' fees for the above-captioned arbitration to

Harter Secrest & Emery LLP
ATTORNEYS AND COUNSELORS

January 7, 2020
Page 5

which [Meyer] is entitled under 15 U.S.C. § 15 and the User Agreement Between Claimant and Uber." Uber made clear that this offer ditched its earlier limitation. This tribunal specifically asked Uber whether it has "in effect offered to tender to Meyer his full claimed treble damages, prejudgment interest on those damages and his attorneys' fees according to law." *See* Uber Suppl. Mem. dated Mar. 11, 2019, at 2. And Uber answered, "yes, with the exception of interest, as Meyer never demanded it." *Id.* As Uber explained, it was offering Meyer *all* "attorneys' fees according to law." *Id.*

Meyer rejected Uber's full-fee offer. That offer matches Meyer's current position on fees—that he is entitled to all attorneys' fees due according to law. To reiterate, the only attorneys' fees Meyer has ever sought to obtain here are those covering the actual work done by his team of lawyers. Meyer has never made any attempt to obtain a multiplier or windfall fees, as might be available in the class action context. In responding to Uber's revised offer—to pay all attorneys' fees due by law—Meyer did not take the position that he was entitled to additional attorneys' fees. Instead, Meyer pointed out that the tribunal would need to resolve the fee issue, which, with Uber's offer, "remain[ed] open." *See* Meyer Suppl Mem. dated Mar. 11, 2019, at 8. Meyer continues to seek attorneys' fees on the same basis, should he prevail now.

The reason Meyer rejected Uber's offer was not because it restricted counsel's fees but because it did not include an injunction against surge. *See id.* at 2 (explaining, in rejecting offer, "Meyer is entitled to enjoin price-fixing if he prevails on the merits."). Then and now, Meyer seeks that injunction to vindicate his rights and the antitrust laws. *See* Trans. 58:25-59:2 ("It's for everyone, not just me."). That is the distinction between what Uber offered previously—*i.e.*, damages, all attorneys' fees under law, and a *narrow* injunction (applying to Meyer only)—and what Meyer seeks now—*i.e.*, damages, all attorneys' fees under law, but a *fulsome* injunction (enjoining surge, *in toto*). Meyer has never sought and will not seek a fee calculation that is tied to the value of that injunction. There are no windfall fees at stake here. Meyer seeks to right a wrong, not to enrich himself or his counsel.

Thank you for considering this response.

Very truly yours,

Harter Secrest & Emery LLP

/s/ Brian M. Feldman

Brian M. Feldman
Partner
DIRECT DIAL:  585.231.1201
EMAIL: BFELDMAN@HSELAW.COM

cc:     Uber counsel