**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPENCER MEYER,

              Plaintiff,

      v.

TRAVIS KALANICK and
UBER TECHNOLOGIES, INC.,

           Defendants.

No. 15 Civ. 9796 (JSR)

## CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO VACATE AN ARBITRAL AWARD

Peter M. Skinner
Joseph Aronsohn
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380

William A. Isaacson
Abby L. Dennis
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
(t) +1 202 237 2727
(f) +1 202 237 6131

*Attorneys for Uber Technologies, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 3

I.      The Prior District Court Proceedings............................................................. 3

II.     Meyer Arbitrates His Claims. ...................................................................... 5

        A.      The Pre-Hearing Proceedings. ........................................................... 5

        B.      The Arbitrator Presides Over a Three-Day Hearing. ............................... 7

        C.      Meyer Does Not Raise Bias During the Post-Hearing Submissions. ........... 13

        D.      The Arbitrator Rules in Favor of Uber. ............................................. 14

        E.      Meyer Does Not Raise Bias After the Arbitrator's Decision. ................... 15

DISCUSSION .................................................................................................. 16

I.      Meyer Has Waived His Objections to the Award........................................... 16

II.     The Arbitrator Demonstrated Impartiality and No Fear. ................................. 17

        A.      The Arbitrator's Joke Did Not Manifest Bias...................................... 18

        B.      The Alleged Photograph Is a Sideshow at Best. ................................... 21

        C.      The Arbitrator Reasonably Applied the Governing Law.......................... 22

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
139 F.3d 980 (2d Cir. 1998) ............................................................................................ 2

*Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace & Agr.
Implement Workers, UAW*,
97 F.3d 155 (6th Cir. 1996) ........................................................................................... 23

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015) ....................................................................................................... 24

*Bank of New York v. First Millennium, Inc.*,
607 F.3d 905 (2d Cir. 2010) .......................................................................................... 23

*Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*,
892 F.3d 501 (2d Cir. 2018) .......................................................................................... 18

*Cook Indus., Inc. v. C. Itoh & Co. (Am.) Inc.*,
449 F.2d 106 (2d Cir. 1971) .......................................................................................... 16

*Glob. Liquidity Partners, LLC v. Wegher*,
No. CV162439MASLHG, 2016 WL 7030429 (D.N.J. Nov. 30, 2016) ................................. 20

*Interstate Circuit v. United States*,
306 U.S. 208 (1939) ....................................................................................................... 23

*Leegin v. Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ....................................................................................................... 11

*LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*,
238 F. Supp. 3d 452 (S.D.N.Y. 2017) ........................................................................ 2, 16

*Malone v. Credit Suisse Sec. (USA), LLC*,
No. 18-CV-6872 (VEC), 2019 WL 463434 (S.D.N.Y. Feb. 5, 2019) .................................. 16

*Maraschiello v. City of Buffalo Police Dep't*,
709 F.3d 87 (2d Cir. 2013) ............................................................................................ 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*,
272 F. App'x 174 (3d Cir. 2008) .................................................................................... 19

*Meyer v. Kalanick*,
174 F. Supp. 3d 817 (S.D.N.Y. 2016) ............................................................... 3, 23, 24, 25

*Meyer v. Kalanick*,
200 F. Supp. 3d 408 (S.D.N.Y. 2016) .............................................................................. 5

*Meyer v. Kalanick,*
   291 F. Supp. 3d 526 (S.D.N.Y. 2018) ........................................................................ 5

*Meyer v. Kalanick,*
   No. 15 CIV. 9796, 2016 WL 3509496 (S.D.N.Y. June 20, 2016)............................. 4

*Meyer v. Uber Techs., Inc.,*
   868 F.3d 66 (2d Cir. 2017) ..................................................................................... 5

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,*
   468 U.S. 85 (1984) ................................................................................................. 24

*Ometto v. ASA Bioenergy Holding A.G.,*
   No. 12 CIV 1328 JSR, 2013 WL 174259 (S.D.N.Y. Jan. 9, 2013) ......................... 19

*Rai v. Barclays Capital Inc.,*
   739 F. Supp. 2d 364 (S.D.N.Y. 2010),
   *aff'd*, 456 F. App'x 8 (2d Cir. 2011) ....................................................................... 17

*United States v. Bartsh,*
   69 F.3d 864 (8th Cir. 1995) ................................................................................... 23

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966)............................................................................................... 19

*Weiss v. Sallie Mae, Inc.,*
   939 F.3d 105 (2d Cir. 2019) .................................................................................. 23

*Westerbeke Corp. v. Daihatsu Motor Co.,*
   304 F.3d 200 (2d Cir. 2002) .................................................................................. 14

*Zurich Am. Ins. Co. v. Team Tankers A.S.,*
   811 F.3d 584 (2d Cir. 2016) .................................................................................. 25

## **Statutes**

9 U.S.C. § 10(a) ........................................................................................................... 17

9 U.S.C. § 12 ................................................................................................................ 15

## **Other Authorities**

Am. Arbitration Ass'n, Consumer Arbitration Rules,
   https://www.adr.org/sites/default/files/Consumer_Rules_Web_1.pdf. ................... 3, 6, 14, 17

Uber Technologies, Inc. ("Uber") respectfully submits this memorandum of law in opposition to Plaintiff Spencer Meyer's motion to vacate the arbitral award entered in Uber's favor.

## PRELIMINARY STATEMENT

After a two-year arbitration—following another two years of litigation in this Court and the Second Circuit—encompassing motion practice, voluminous discovery, a three-day merits hearing, extensive post-hearing briefing, and not one accusation of arbitrator partiality, Plaintiff Meyer now seeks a post-game do-over because the arbitral award did not go his way. It is too late for that. Even if Meyer could meet the high burden he must clear to prove partiality (which he cannot), he waived any objection to the Arbitrator's purported bias by failing to raise his concerns during the arbitration proceeding.

During the hearing, Arbitrator Les J. Weinstein ("Arbitrator") was not a potted plant. He asked hard questions (particularly of Uber's founder, Travis Kalanick), told jokes, and bantered with the lawyers and witnesses for both sides. There was no suggestion at the time that any of this was untoward. Nor was it; it was the standard fare of many arbitrations and even proceedings before judges.

Nevertheless, after losing the arbitration, Meyer now says he was apparently harboring unexpressed concerns about the Arbitrator's conduct during the hearing. According to Meyer, he watched as the Arbitrator "photographed" Kalanick, and later listened as the Arbitrator "confessed that he was afraid to rule against Uber." Memorandum of Law in Support of Plaintiff's Motion to Vacate an Arbitral Award ("Pl. Br.") at 7. Neither of these things actually happened. Whatever Meyer and his team think they may have seen, they provide no evidence that the Arbitrator actually photographed Kalanick, and not a single member of Uber's trial team saw the Arbitrator take the purported photo. Further, the alleged confession was a statement made in jest, at the very end of the last long day of a hard-fought hearing.

The accuracy of Meyer's allegations is also beside the point. This is not a case where Meyer stumbled upon evidence of alleged bias after the fact. By his own admission, Meyer believed, *during the hearing*, that the Arbitrator had engaged in conduct that demonstrated bias. Meyer was obligated under the rules of the American Arbitration Association ("AAA") to raise his concerns immediately, but he did not. He sat on them, waiting to see how the Arbitrator would rule. Only when things turned out poorly did he run to this Court shouting bias.

The law is clear that the parties to arbitration proceedings cannot do that. Where, as here, "a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground. His silence constitutes a waiver of the objection." *LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 467 (S.D.N.Y. 2017) (quoting *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998)). Meyer consequently waived his only arguments for vacatur by failing to raise them before the arbitration was closed—which was not until months after the hearing, in February 2020, when the Arbitrator entered the Award against Meyer.

That, in itself, should quickly end the Court's consideration of Meyer's motion. But Meyer would nevertheless lose even had he not waived his objections to the Arbitrator's conduct. His claims rely on shoddy, inconsistent evidence that does not withstand the most cursory scrutiny— much less satisfy the clear and convincing standard applicable here—and that evidence is further rebutted by ample proof of the Arbitrator's impartiality.

The record makes clear that Meyer's antitrust claim did not fail because he encountered bias, but because he was unable to substantiate his own allegations and the evidence was overwhelmingly against him. Accordingly, for the reasons stated herein, Uber respectfully

2

requests that the Court deny Meyer's motion to vacate.

## BACKGROUND

I.      **The Prior District Court Proceedings.**

When he registered for Uber, Meyer agreed not to participate in "any purported class action" and to individually arbitrate "any dispute" related to his use of Uber.  Terms of Service at 9.[1]  He also agreed that any such arbitration would be administered in accordance with the AAA's Consumer Arbitration Rules then in effect, as modified by Uber's Terms of Service.  *Id.*; *see also* Am. Arbitration Ass'n, Consumer Arbitration Rules ("Consumer Rules") at R-1(a)(2), https://www.adr.org/sites/default/files/Consumer_Rules_Web_1.pdf.

Instead of initiating arbitration with Uber, Meyer filed this action against Travis Kalanick. DE 1, 26.  Kalanick promptly moved to dismiss Meyer's claims, arguing that Meyer had failed to plausibly allege the existence of a price-fixing conspiracy and that his claims were barred by a provision in Uber's Terms of Service prohibiting class actions.  DE 28.

On March 31, 2016, the Court denied Kalanick's motion to dismiss, holding, *inter alia*, that Meyer sufficiently alleged a horizontal "hub-and-spoke" conspiracy to fix prices that, if proven, would be *per se* unlawful.  *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824 (S.D.N.Y. 2016). The Court cautioned, however, that its holding was premised on a series of "allegations concerning agreement among the drivers," which the Court presumed true, and from which the Court drew all reasonable inferences in Meyer's favor.  *Id.* at 824-25.  Those allegations included:

- "drivers have a 'common motive to conspire' because adhering to Uber's pricing algorithm can yield supra-competitive prices," *id.* at 821, 824;

- "if the drivers were acting independently instead of in concert, 'some significant portion' would not agree to follow the Uber pricing algorithm," *id.* at 821, 824;

---

[1] Reference here and throughout is to the version of the Terms of Service filed at DE 29-1.

- "drivers 'have had many opportunities to meet and enforce their commitment to the unlawful agreement,'" *id.* at 821, 825;

- "[w]ithout the assurance that all drivers will charge the price set by Uber, . . . adopting Uber's pricing algorithm would often not be in an individual driver's best interest," *id.* at 823-24; and

- "[there were] meetings among Uber drivers and [a] 'September 2014 conspiracy,' in which Uber agreed to reinstitute higher fares after negotiations with drivers," *id.* at 823, 825.

The Court further held that Meyer had adequately pled the existence of a vertical conspiracy, which would be subject to rule-of-reason analysis. *Id.* at 828. The Court did not hold that Meyer had *proven* the existence of either a horizontal or a vertical price-fixing conspiracy, because it was considering a Rule 12 motion, and the question of "whether plaintiff's allegations are in fact accurate is a different matter, to be left to the fact-finding process." *Id*. at 825.

Although his Complaint had articulated claims and sought relief that threatened Uber's "entire business operation," DE 94 at 16:18-22, Meyer had not named Uber as a defendant. After his motion to dismiss was denied, Kalanick thus filed a motion to join Uber as a necessary party, DE 46-47, and Uber separately moved to intervene, DE 58-59. As the Court recognized, the obvious explanation for Meyer's actions was that he sought to circumvent the Arbitration Agreement, which did not expressly cover disputes with Kalanick. *Meyer v. Kalanick*, No. 15 CIV. 9796, 2016 WL 3509496, at *1 (S.D.N.Y. June 20, 2016) (observing that Meyer may have named Kalanick and not Uber "in order to avoid an arbitration clause in the User Agreement between plaintiff and Uber"); *id.* at *2 (rejecting Meyer's assertion that he was not seeking any relief against Uber as "at odds with any fair reading of plaintiff's claim"); DE 124 at 31:1-3 (stating that it was "not implausible on two minutes inspection that that was being done to arguably avoid the arbitration requirement"). The Court granted Kalanick's motion to join Uber as a "necessary party" under Rule 19(a). *Meyer*, 2016 WL 3509496, at *3.

4

Both Kalanick and Uber then filed motions to compel arbitration, citing the dispute resolution provision in Uber's Terms of Service with its users.  DE 58-59, 80-81.  This Court denied those motions, finding that Meyer did not have adequate notice of Uber's Terms of Service. *Meyer v. Kalanick*, 200 F. Supp. 3d 408, 420 (S.D.N.Y. 2016).  Uber and Kalanick both filed interlocutory appeals. DE 131-32.  In 2018, the Second Circuit concluded that the Arbitration Agreement was binding and enforceable against Meyer by both Uber and Kalanick, vacated the Court's Orders denying the motions to compel arbitration, and remanded the case for further proceedings.  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80 (2d Cir. 2017).

Thereafter, Uber and Kalanick timely renewed their motions to compel arbitration, DE 151-52, and the Court permitted Meyer additional discovery on issues related to Meyer's consent to arbitration and a newly raised argument by Meyer that his phone's popup keypad would have blocked the link to Uber's Terms of Service during registration.   DE 157 at 76:24-78:24. Ultimately, this Court granted Uber's motion and, determining that Uber was a necessary party to the action, dismissed Kalanick from the case.  *Meyer v. Kalanick*, 291 F. Supp. 3d 526, 536 (S.D.N.Y. 2018).  In reaching that decision, the Court "conclude[d] that the keypad issue has been waived."  *Id.* at 534.  As the Court reasoned, "Meyer, of course, knew better than anyone how long he had to view the reference to the Terms of Service on the Uber webpage before he entered his payment information," the "facts regarding the pop-up keypad were readily discoverable in 2016 and fully known to Meyer himself," and "[o]n this record, Meyer fails to excuse his failure to raise this issue prior to appeal."  *Id*.

## II.   Meyer Arbitrates His Claims.

### A.      The Pre-Hearing Proceedings.

On May 31, 2018, Meyer filed a demand for arbitration seeking, *inter alia*, a declaration that Uber's pricing algorithm was unlawful and an injunction barring its use nationwide.

5

Declaration of Brian M. Feldman ("Feldman Decl.") Ex. A, at 3-5.  On July 5, 2018, Uber filed its Answer, which made clear that Meyer was "not simply seek[ing] monetary relief for the handful of rides for which he (wrongly) claims he was overcharged, but sweeping declaratory and injunctive relief that would prevent Uber from using its pricing algorithm."  Declaration of Peter M. Skinner ("Skinner Decl.") Ex. 1, at 2.

From the beginning, Uber sought an arbitrator "experienced with antitrust law" and made clear that this was a "substantial antitrust matter" in which Meyer was attempting to "shut down Uber's app—an app that has been used billions of times by millions of users."  Skinner Decl. Ex. 2. Meyer opposed Uber's request, arguing that the "additional requirement for an arbitrator with antitrust experience" was not specified in the arbitration agreement.  Skinner Decl. Ex. 3.  The AAA nevertheless appointed Les J. Weinstein, Feldman Decl. Ex. B, a veteran arbitrator and mediator with considerable antitrust experience, including half a decade of service in the Antitrust Division of the U.S. Department of Justice, Skinner Decl. Ex. 4, at 1.  Shortly after the Arbitrator was appointed, Meyer's counsel dropped his vertical conspiracy allegation and confined his horizontal allegations to challenging surge pricing, not Uber's standard pricing algorithm.  Pl. Br. at 5 n.4; Feldman Decl. Ex. C, at 4.

The arbitration was governed by the AAA Consumer Rules, Pl. Br. at 4-5, under which "[a]ny person appointed or to be appointed as an arbitrator, as well as the parties and their representatives," were required to "provide information to the AAA of any circumstances likely to raise justifiable doubt as to whether the arbitrator can remain impartial or independent," including "any bias," Consumer Rules at R-18(a)(1).  This "obligation to provide disclosure information remain[ed] in effect throughout the arbitration."  *Id.* at R-18(a).  Even after reviewing the initial filings and communications with the AAA making clear the import of the case and the

scope of the relief Meyer was seeking, the Arbitrator did not disclose any reason he would be unable to remain impartial.  Skinner Decl. ¶ 7.

On December 21, 2018, Uber moved to dismiss Meyer's demands for declaratory and injunctive relief, arguing that because the Agreement permitted such relief "only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim," the Arbitrator had no authority to grant Meyer's demand for a nationwide injunction. Feldman Decl. Ex. D, at 4.  On April 16, 2019, the Arbitrator denied Uber's motion without a written opinion, thereby permitting Meyer's demand for a nationwide injunction to proceed. Feldman Decl. Ex. H.  Yet again, despite plainly knowing the scope of the relief at issue, the Arbitrator did not disclose any bias or fear of ruling against Uber.

**B.      The Arbitrator Presides Over a Three-Day Hearing.**

The arbitration hearing commenced on October 23, 2019 in New York City and continued for three days.  Skinner Decl. ¶ 3.  Meyer called six witnesses, including himself, Kalanick, three Uber employees, and an investigator whom Meyer had retained to survey Uber drivers.  *Id*.  Uber, in addition to examining the witnesses proffered by Meyer, called three witnesses:  an additional Uber employee and two experts—one economist and one survey specialist.  The parties also offered opening and closing statements.  *Id*.

As part of Uber's evidence, one of the leading antitrust economists in the country, Dr. Dennis Carlton, testified that Meyer's case was premised on fundamental economic errors.  Dr. Carlton testified that well-established economic literature teaches that certain evidence is associated with price-fixing cartels, including reduced quality and lower output, Tr. 772:22-773:14, 867:2-868:16, and the evidence in this case showed precisely the opposite.  For example, Dr. Carlton explained that the evidence "is completely inconsistent with a claim that [Uber's] surge pricing is a price fixing conspiracy," Tr. 769:7-770:21, because Uber's pricing, including surge, is

7

tied to product quality, and not the price of a static product, *id.* at 785:24-786:21.  Dr. Carlton also explained that Meyer's case depended on the erroneous premise that it is price fixing to offer a different price (a surge price) for a different product (a ride that shows up with a reduced wait time), and that Uber's unilateral decision to offer a surge price for a ride that arrives in a shorter time was a function of the difference in supply and demand for two different products.  Tr. 774:11-776:4.  Uber's policy of permitting unrestricted supply also meant that there could not be any sort of fixed prices, especially supra-competitive ones, on the Uber platform.  Tr. 771:16-772:8 ("[Y]ou can't have a price fixing conspiracy if there is free entry . . . .").  Meyer offered no economic evidence to challenge Dr. Carlton.

The Arbitrator made clear from the beginning of the hearing that he would give Meyer latitude in making his case.  As he explained, the Federal Rules of Evidence did not control, and he would be liberal in allowing evidence into the record.  Tr. 55:15-18.  He further observed, "I am also very mindful of the fact, as I was with regard to the preliminary motions[] that I decided[,] that for all practical purposes, there is no appeal from what is decided here," and, therefore, Meyer was "entitled to, in a sense, certain presumptions that he might not get if there was an Appellate Court sitting there to rule on certain things."  Tr. 55:19-56:5.[2]

Many times during the hearing, the Arbitrator showed a sense of humor.  He told jokes repeatedly.  For example, during opening arguments, Uber's counsel said the Arbitrator would not hear "boo" during the proceeding about the supra-competitive prices Meyer had alleged as a

---

[2] For example, Uber moved to preclude Meyer's investigator from testifying on the grounds that she was a fact witness whom Meyer had masqueraded as an expert because he did not disclose her until after the close of fact discovery and because she intended to admit inadmissible hearsay testimony of her interviews of Uber drivers.  Skinner Decl. ¶ 5.  The Arbitrator denied that motion, noting that while he had "doubts as to the relevancy of her testimony," the more "prudent course" was to admit her testimony, because "one of the few grounds for vacating an award is failure to admit and consider 'relevant' evidence."  Skinner Decl. Ex. 5.

common motive among drivers, and the Arbitrator responded "Is boo Latin?"  Tr. 50:15-51:5.  He

noted at one point, "Even arbitrators have to have fun, you know.  The nice thing about sitting

where I'm sitting is people laugh at your jokes."  Tr.  872:20-24.[3]  Counsel for Meyer articulated

no objection to the Arbitrator's occasional humor, and sometimes participated himself.  Tr. 166:15

("Mr. FELDMAN:  Objection.  That was a joke for the record.").

　　　　In addition to these flashes of levity, the Arbitrator played an active role throughout the

hearing, frequently questioning counsel for both sides and interposing his own questions of

witnesses, particularly Kalanick.[4]  For example, Meyer's counsel asked Kalanick technical legal

questions about Uber's relationship with drivers.   When he did not get quick answers, the

Arbitrator took over, questioning Kalanick at length and challenging how Kalanick could not know

---

[3] *See also* Tr. 165:24-166:2 ("ARBITRATOR:  I don't want to hurt your feelings, but when surge
prices go on, I check Lyft.  [KALANICK]:  That's fair."); Tr. 214:12-16 ("ARBITRATOR:  There
are medallion owners in Los Angeles?  WITNESS:  Yes, there are.  ARBITRATOR:  Shows what
I know."); Tr. 225:18-21 ("[UBER IN-HOUSE COUNSEL]:  [Product managers] get paid better
than lawyers.  ARBITRATOR:  There is a pitch for a raise.  I can see it coming."); Tr. 268:9-10
("ARBITRATOR [reviewing small text]:   I'm glad it's so readable."); Tr. 294:17-20
("ARBITRATOR [to one of Uber's first employees]: . . . Do you regret passing up the job as a
barista?"); Tr. 294:22-24 ("ARBITRATOR [to one of Uber's first employees]:  Have you thanked
your parents [for] kicking you out?"); Tr. 335:16-17 ("ARBITRATOR:  Lawyer's charge by the
hour.  Slow down."); Tr. 536:7-8 ("ARBITRATOR:  I may have gotten the decaf by mistake.");
Tr. 613:3-9 ("ARBITRATOR:  Again, I think this horse has also left the barn, as I recall.  [UBER
IN-HOUSE COUNSEL]:  It's impressive because he is dead.  ARBITRATOR:  They buried it.");
Tr. 615:12-17 ("Q.  What happens if you get – if there are 50 drivers available, do you have to
scroll through all of them?  A.  Yes.  ARBITRATOR:  It's like a dating service."); Tr. 625:11-
626:3 ("ARBITRATOR:  This sounds like the three-city problem for which there will be a prize
in mathematics, there is an unsolvable problem of connecting three cities . . . . You solved it.  You
should put in for the medal."); Tr. 750:18-23 ("ARBITRATOR: . . . My wife can attest to the fact
that any question put to me while I'm driving in traffic bears no relationship to the same question
that I answer later."); Tr. 910:6-9  ("ARBITRATOR [to a witness]:  I'm sorry, you will be leaving
us.  You can have the rest of the day off, as far as I'm concerned.").

[4] The Arbitrator asked the witnesses who testified at the hearing a total of 262 questions.  Skinner
Decl. ¶ 8.

facts about the company when he was the CEO.  Tr. 185-89; Tr. 188:12-21 ("ARBITRATOR:

You are the CEO.  How many times has Uber been sued? . . . You don't know the answer to these

questions?").  Later, the Arbitrator took over the questioning of Kalanick again, Tr. 211-17, and

eventually elicited an "I don't know" response to a question, Tr. 216:19.  Apparently frustrated,

the Arbitrator retorted, "You are on the board of directors, don't they talk about these things?"  Tr.

216:25-217:3.  And in yet another instance when the Arbitrator was dissatisfied with Kalanick's

answers, he accused Kalanick of "being evasive" in response to a question about whether Uber

"sell[s] rides to riders":

> ARBITRATOR:  You were the CEO, you founded this company.
> Why are you being evasive?
>
> KALANICK:  I'm not being evasive.
>
> ARBITRATOR:  You are.
>
> KALANICK:  If I'm being evasive, it's because I don't know the
> answer.  I apologize for not knowing the answer.
>
> ARBITRATOR:  You are worried about saying something wrong.
> It's a simple question he asked.  Isn't it Uber's position that it does
> not sell rides to riders?
>
> THE WITNESS:  I have no idea.  I apologize.
>
> ARBITRATOR:  Don't apologize, you don't know.
>
> KALANICK:  Okay.

Tr. 228:11-229:5.

This heated exchange ended Kalanick's testimony.  After Kalanick said "Okay," Meyer's

and Uber's counsel both said they had no further questions, Kalanick was excused, and a recess

was taken.  Tr. 229:5-12.

Meyer claims it was at this moment that the Arbitrator photographed Kalanick.  Pl. Br. at

7 ("[T]he Arbitrator used his smartphone to photograph Mr. Kalanick following the conclusion of

10

his testimony."). His counsel did not object on the record at the time. Tr. 229:13-19. He did not

mention it to Uber's counsel during the recess. Skinner Decl. ¶ 9;  Declaration of William A.

Isaacson ("Isaacson Decl.") ¶ 5; Declaration of Abby L. Dennis ("Dennis Decl.") ¶ 5. He did not

mention it when he returned from the recess, or at any other time during the hearing. *Id*. No one

else in the room from Uber's side remembers seeing the Arbitrator take a photograph or ask

Kalanick to pose for a picture. Skinner Decl. ¶ 4; Isaacson Decl. ¶ 3; Declaration of Alexandra C.

Jumper ("Jumper Decl.") ¶ 3; Declaration of Eric Lipman ("Lipman Decl.") ¶ 3; Declaration of

Matt Spalding ("Spalding Decl.") ¶ 3.

Following Kalanick's testimony, the hearing continued for another seven witnesses and

summations. Skinner Decl. ¶¶ 3-4. Having begun on a Wednesday, the three-day hearing wrapped

up with closings on a Friday evening. Skinner Decl. ¶ 6. Meyer's counsel argued first, then Uber's

counsel. *Id*. After Uber's counsel concluded his rebuttal, the Arbitrator offered his concluding

remarks, observing that Meyer would have difficulty prevailing unless he could distinguish the

facts of this case as proven at the hearing from the Supreme Court's decision in *Leegin v. Creative*

*Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007):

> I want to say on both sides, the writing has been as good as I have
> seen, and I have seen a lot of writing.  It's been excellent. I want to
> say to you Mr. Meyer, not—Mr. Feldman, not only do you have
> the burden of proof, you have the burden of persuasion.  If you
> think you can distinguish Leegin and you want to brief it, I haven't
> read Leegin recently but if you want to brief it, I will give you the
> opportunity but I think that's where your case rests.  Distinguishing
> Leegin.
>
> Most of the cases we talk about are cases decided before the
> internet existed, before this digital age was upon us which has
> changed a lot of stuff.
>
> I must say I act out of fear.  My fear is if I ruled Uber illegal, I
> would need security. I wouldn't be able to walk the streets at night.
> People would be after me.

11

So I want to thank you for your hospitality.

Tr. 1001:16-1002:16.  The Arbitrator then asked Meyer's counsel, "Do you want to brief it?"  Tr. 1002:17.  Meyer's counsel responded affirmatively, and the parties and the Arbitrator spent the remaining moments on the record discussing logistical issues.  Tr. 1002:18-1004:1.  Meyer's counsel concluded the proceeding—he had the very last word—by thanking the Arbitrator for his time.  Tr. 1003:25-1004:1.

At no point during this closing colloquy did Meyer object to the Arbitrator's statement that he was acting "out of fear."  Tr. 1001:16-1004:1.  Nor did anyone from Uber's side.  In fact, the lawyers representing Uber all believed the Arbitrator was joking and trying to lighten the mood at the end of a long hearing.  Skinner Decl. ¶ 6; Isaacson Decl. ¶ 4; Dennis Decl. ¶ 4; Declaration of William Weaver ("Weaver Decl.") ¶ 5; Jumper Decl. ¶ 4; Lipman Decl. ¶ 4.

The joke may have been a sarcastic reference to Uber's summary of the evidence, made just moments earlier, in which Uber's counsel detailed how important and revolutionary the Uber App and surge pricing were to consumers—and competition more generally.  Tr. 984:21-985:2 ("You heard uncontested evidence of increased quality, cleaner taxis, Uber, Lyft, stimulating innovation, that this is one of the most revolutionary innovative industries that's ever happened.").  Throughout the hearing, Uber had presented considerable evidence to support this point.  Witnesses described the lengths to which Uber goes in order to generate hundreds of millions of matches between riders and drivers around the globe, Tr. 199:14-201:4, 202:5-18, 364:13-19, 626:14-629:4, and evidence proved that Uber has spurred entry of a host of other transportation network companies while forcing traditional transportation companies "to up their game," Tr. 219:8-220:7.  The primary beneficiaries of this "explosion," Uber argued, had been consumers, tens of millions of whom have flocked from traditional transportation companies to Uber.  Tr. 641:18-642:16.  Uber studies demonstrated that surge pricing produces more trips, lower wait

times, and fewer cancellations.  Tr. 441:23-444:14; *accord* Tr. 439:3-8 ("It maximizes efficiency and it maximizes output in the system").  Uber had done this and managed its app and its pricing unilaterally without consultation with drivers.  Tr. 135:15-21, 159:20-160:2.  The Arbitrator's joke took all this evidence of customer satisfaction to a comical extreme, quipping that consumers are so satisfied with Uber's product that, if it were to disappear, there would be some kind of revolt.

### C.   Meyer Does Not Raise Bias During the Post-Hearing Submissions.

After the hearing, Meyer did not notify the AAA or Uber's counsel that he felt the Arbitrator should be disqualified for bias.  Skinner Decl. ¶ 9.  He continued to litigate the case, submitting two briefs and two supplemental letters seeking to persuade the Arbitrator to rule in his favor on the merits.  In none of those filings did Meyer request that the Arbitrator withdraw from the arbitration, assert that the Arbitrator was biased in Uber's favor, or reference the incidents that Meyer now cites as evidence of the bias.  Feldman Decl. Exs. P, Q; Skinner Decl. Exs. 6-7.  Instead, Meyer focused his post-hearing briefing on a muddled theory of a horizontal conspiracy that, as Uber pointed out, found no support in the record.  *See* Skinner Decl. Ex. 8 ("Uber Post-Hr'g Br.") at 9-24.

As Uber explained in its own post-hearing briefing, Meyer did not win the case by surviving a motion to dismiss in this Court, because the allegations on which Meyer had relied in this Court were not borne out by the evidence at arbitration.  Meyer failed to demonstrate, for example, that drivers shared a common motive to conspire, or that they had the opportunity to attend meetings related to their purportedly unlawful agreement.  *Id.* at 25-26.  Nor did Meyer even attempt to show the existence of supra-competitive prices, or support his allegation that drivers acting independently would depart from the Uber pricing algorithm.  *Id.* at 26.  By contrast, Uber proved, among other things, that it set prices unilaterally, without any consultation with or direction from drivers, *id.* at 19; that surge pricing does not necessarily increase driver earnings

13

because it seeks to balance the market and can have a downward effect on demand, *id.* at 20; that there is no agreement not to charge a lower price, because drivers may drive for Lyft or any other ridesharing platform (or for their own business) when Uber's surge is in effect and "undercut" drivers using the Uber platform, *id.* at 23; and that there were no agreements or direct communications among drivers, or between Uber and drivers, to fix prices in any way, *id.* at 23-24.

### D.    The Arbitrator Rules in Favor of Uber.

On February 22, 2020, the Arbitrator issued the Award in Uber's favor and, pursuant to the Consumer Rules, provided a "brief explanation" of it.  Feldman Decl. Ex. N ("Award") at 6; *see also* Consumer Rules at R-43(b) (requiring "concise written reasons for the decision unless the parties all agree otherwise").  As the Arbitrator explained, he did not have to disagree with this Court's legal reasoning to find in favor of Uber, *cf.* Tr. 958:12-13 ("ARBITRATOR: I have great admiration for Judge Rakoff"), because the Court's reasoning was "inapplicable for the essentially undisputed facts developed during this arbitration," Award at 9.  The Arbitrator found that Meyer introduced "no evidence that the drivers entered into any agreement among themselves or collectively with Uber relating to surge pricing," and "no evidence that Uber met with drivers to get them to agree on pricing or that the drivers met with each other to do so."  *Id.* at 6-7.[5]  Meyer thus lacked facts sufficient to prove that "any 'rim' exists connecting the drivers['] spokes to any agreement among themselves and the hub (Uber)."  *Id.* at 9 ("There is no true wheel however much Meyer sought to portray it as such").  Consequently, notwithstanding this Court's holding that Meyer had sufficiently *alleged* a horizontal price-fixing agreement, he failed to *prove* one in

---

[5] Meyer does not challenge the Arbitrator's recitation of these facts, which "are not subject to judicial challenge" in any event.  *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214 (2d Cir. 2002).

arbitration.  *Id.* at 13.  The Arbitrator awarded Meyer no relief, and the arbitration was closed.  *Id*.

**E.      Meyer Does Not Raise Bias After the Arbitrator's Decision.**

Following the entry of the Award in February 2020, Meyer continued his silence about the Arbitrator's alleged bias.  He did not raise it with the AAA.  Skinner Decl. ¶ 9.  He did not raise it with Uber's counsel.  *Id.*  It was not until May 21, 2020 that Uber's counsel learned for the first time during a teleconference with this Court's chambers that Meyer claimed the Arbitrator was biased.  *Id.* ¶ 10.  On May 22, 2020, the last day on which Meyer could seek to vacate the arbitral award,[6] Uber for the first time learned why Meyer felt the arbitrator was biased when it received Meyer's brief in support of his motion to vacate.  *Id*.

Meyer did not contact the AAA or the Arbitrator to request the Arbitrator's position with respect to his allegations of bias.  Skinner Decl. ¶ 11.  Uber invited the Arbitrator to submit a declaration addressing Meyer's allegations, Skinner Decl. Ex. 9, but Meyer quickly moved to preclude the Arbitrator from submitting relevant facts, arguing that the AAA rules prevent parties to litigation from calling arbitrators to testify, Skinner Decl. Ex. 10, at 2.  Uber responded that the Federal Rules of Evidence and Civil Procedure rather than the AAA rules govern the scope of the material properly put before this Court, Skinner Decl. Ex. 11, at 1, but the Arbitrator has nonetheless declined to provide a declaration, explaining, through the AAA, that he believes the AAA rules may preclude him from providing evidence in this proceeding unless ordered to do so by the Court, Skinner Decl. Ex. 10 at 1.  While Uber would welcome the opportunity to hear from the Arbitrator, such an order is not necessary because, for the reasons explained below, Meyer waived any objection to the Arbitrator's conduct and cannot meet his burden to show bias on the

---

[6] Notice of a motion to vacate an arbitral award must be served within three months after the award is filed.  9 U.S.C. § 12.  The Award in this case was filed on February 22, 2020.  Award at 11.

existing record in an event.

## DISCUSSION

Meyer's motion should be denied for two independent reasons:  first, he waived the right to seek vacatur by failing to object during the arbitration; and second, he fails to prove by clear and convincing evidence that the Arbitrator was biased.

## I.       Meyer Has Waived His Objections to the Award.

Meyer waived his right to seek vacatur on this motion because he did not raise any objection related to bias prior to the close of arbitration.

It is the clear and settled law of this Circuit that a litigant "cannot remain silent, raising no objection during the course of [an] arbitration proceeding, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first."  *Cook Indus., Inc. v. C. Itoh & Co. (Am.) Inc.*, 449 F.2d 106, 107-08 (2d Cir. 1971); *LGC Holdings*, 238 F. Supp. 3d at 467.  The "waiver rule" "serves the interests of efficiency and finality, as it prevents parties from sitting on their rights during arbitration and then getting a second chance from the courts should they lose."  *Malone v. Credit Suisse Sec. (USA), LLC*, No. 18-CV-6872 (VEC), 2019 WL 463434, at *2 (S.D.N.Y. Feb. 5, 2019) (denying motion challenging the selection of an arbitrator).

That is precisely what Meyer tries to do here.  This motion is Meyer's first time contending that the Arbitrator was biased against him.  He did not object at the hearing or in any way put on the record the factual assertions he raises in this motion—that the Arbitrator allegedly photographed Kalanick and was in actual fear of ruling against Uber.  He did not mention any of his purported concerns to Uber's counsel.  None of Meyer's post-hearing filings before the Arbitrator—including two briefs cumulatively totaling 36 pages, and two supplemental letters to the Arbitrator, submitted over the course of ten weeks—requested that the Arbitrator withdraw, or

16

otherwise suggested that the Arbitrator might lack impartiality.   Nor did Meyer or his representatives contact the AAA to relay "circumstances likely to raise a justifiable doubt as to whether the arbitrator can remain impartial or independent," as the Consumer Rules required.

In *Rai v. Barclays Capital Inc.*, as here, a party moved to vacate an arbitral award on partiality grounds yet had not objected prior to the close of arbitration.  739 F. Supp. 2d 364, 373-74 (S.D.N.Y. 2010), *aff'd*, 456 F. App'x 8 (2d Cir. 2011).   There, one of three arbitrators had disclosed to the parties, before the proceeding began, that he was "the subject of a formal inquiry into his professional ethics."  *Id.* at 369.   Before the district court, the moving party contended that this disclosure evidenced bias, which manifested itself in the arbitral panel's conduct, including an alleged "refus[al] to consider relevant evidence."  *Id.* at 373-74.   But the court rejected this argument, finding that the movant had known the grounds for his motion before the award was issued, and "knowingly and voluntarily consented to continuing with the arbitration."  *Id.* at 374. The moving party's "silence," the court held, "constitutes a waiver of his right to object on those grounds."  *Id*.

Whatever Meyer's concerns may have been with respect to the Arbitrator's partiality, he chose to keep them to himself until after an adverse award had been handed down against him.  By failing to raise the issue of bias prior to the issuance of the Award, Meyer waived the right to challenge the Award on that basis.

## II.    The Arbitrator Demonstrated Impartiality and No Fear.

Meyer's motion to vacate also fails because there is no clear and convincing evidence that the Arbitrator was biased.  Meyer brings this motion under Section 10(a) of the Federal Arbitration Act (the "FAA"), which permits the Court to vacate an arbitral award "where there was evident partiality or corruption in the arbitrators."  9 U.S.C. § 10(a).  As the party challenging the award, Meyer bears the burden of "prov[ing] the existence of evident partiality by clear and convincing

17

evidence." *Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*, 892 F.3d 501, 505 (2d Cir. 2018). This "'requir[es] a showing of something more than the mere "appearance of bias,"'" and courts "will not vacate arbitration awards for evident partiality when the party opposing the award 'identifies no direct connection between [the arbitrator] and the outcome of the arbitration.'" *Id.* at 507 (citations omitted).

Meyer cannot meet that burden here. The Arbitrator's "fear" comment was plainly in jest. Moreover, the totality of the arbitral record—including significant rulings in Meyer's favor and the Arbitrator's aggressive questioning of Uber's co-founder—confirms the Arbitrator's impartiality. Notwithstanding Meyer's attempts to distract from these facts, his motion falls well short of the proof needed to overturn an arbitral award.

### A. The Arbitrator's Joke Did Not Manifest Bias.

Meyer's claim that the Arbitrator's closing remark was an "admission" of partiality is contradicted by the record. Pl. Br. at 14. As discussed *supra*, there is no evidence that anyone, including Meyer, was troubled by the Arbitrator's comment, which was made during the arbitration hearing in the presence of both parties. *See supra* at 11-13. Virtually everyone else who heard the comment understood it to be a joke. *See, e.g.*, Skinner Decl. ¶ 6; Isaacson Decl. ¶ 4; Dennis Decl. ¶ 4; Weaver Decl. ¶ 5; Jumper Decl. ¶ 4; Lipman Decl. ¶ 4. Meyer's counsels' silence suggests that, in the moment, they too may have thought it was said in jest, otherwise they surely would have objected or at least reacted in some way other than to thank the Arbitrator for his time. Similarly, Meyer does not appear to have decided during the post-hearing proceedings that the statement was an admission of bias, as he does not reference it in his four post-hearing filings or in any other submission to the AAA. These circumstances only reasonably permit one reading of the Arbitrator's comment: that it was a joke, one of many that the Arbitrator made throughout the hearing. The joke may have even been aimed at Uber, in light of its frequently

repeated argument that it had revolutionized transportation and was widely popular with consumers—which was supported by considerable evidence in the record.[7]

Even if the issue were open to dispute (which it is not), the fact that there are multiple possible interpretations of the Arbitrator's statement forecloses any relief for Meyer. As this Court previously explained, it "may only find 'evident partiality' sufficient to vacate an award 'when a reasonable person, considering all of the circumstances, would *have* to conclude that an arbitrator was partial to one side.'" *Ometto v. ASA Bioenergy Holding A.G.*, No. 12 CIV 1328 JSR, 2013 WL 174259, at *3 (S.D.N.Y. Jan. 9, 2013) (Rakoff, J.) (emphasis in original) (citation omitted), *aff'd*, 549 F. App'x 41 (2d Cir. 2014). Here, the evidence does not suggest—let alone require—a conclusion that the Arbitrator was partial to Uber, as there is another reasonable conclusion: that the Arbitrator spoke in jest.

Moreover, the fact that the Arbitrator made the joke does not itself provide grounds to vacate the Award under the FAA. The Third Circuit addressed an arbitrator's joking comment in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*, 272 F. App'x 174 (3d Cir. 2008), where an arbitrator, upon receipt of an empty binder from defense counsel, "joked that cash was inside the binder." *Id.* at 176. On appeal to the Third Circuit, the plaintiff contended that the arbitrator's quip demonstrated "evident partiality," a position that the panel flatly rejected. *Id*. Instead, the panel concluded that "the joke, while not in the best judgment of either the arbitrator or counsel, does not 'powerfully suggest []' that the arbitrator was so biased that he could not render a fair decision, especially considering that it was clearly a joke that was heard by everyone at the

---

[7] *See also United States v. Grinnell Corp.*, 384 U.S. 563, 582-83 (1966) (holding that for a judge's adverse attitude toward a party to warrant disqualification on the grounds of "personal bias and prejudice," it must stem from "an extrajudicial source" rather than "what the judge learned from his participation in the case").

19

hearing." *Id.* (citation omitted) (alteration in original).  Accordingly, the panel upheld the arbitral award.  *Id*.  The same reasoning applies here, where the Arbitrator's comment was clearly a joke that was heard by everyone in the room.  *Glob. Liquidity Partners, LLC v. Wegher*, No. CV162439MASLHG, 2016 WL 7030429, *4 (D.N.J. Nov. 30, 2016) ("the Court does not believe that the Arbitrator's apparent jest . . . demonstrates bias toward Respondents.").

Lastly, Meyer's theory that the Arbitrator "feared . . . ruling Uber's surge pricing illegal" is contradicted by the record, as the Arbitrator declined the opportunity to cabin the scope of injunctive relief available to Meyer.  Pl. Br. at 7.  Uber's pre-hearing motion to dismiss presented the Arbitrator with an opportunity to "take a potential nationwide injunction off the table in advance of the hearing."  Pl. Br. at 5.  Presumably, had the Arbitrator been biased in Uber's favor and afraid to grant such broad relief, he would not have waited until after a three-day hearing to rule against Meyer on the merits; he would have simply accepted Uber's invitation to eliminate that possibility as a matter of law.

But that is not what the Arbitrator did.  Instead, as Meyer acknowledges, the Arbitrator denied Uber's motion, welcoming a hearing in which "Uber's nationwide practice of surge pricing was at stake."  *Id.* at 6.  Meyer makes no effort to reconcile his insistence that the Arbitrator was troubled by this "weighty issue" with the uncontested fact that it was only through the Arbitrator's ruling that Meyer even had the opportunity to litigate it.  *Id.* at 15.  And if, following the hearing, the Arbitrator was concerned about entering a broad injunction against Uber, the Arbitrator could also have declined to enter such an injunction and instead awarded Meyer individual relief.  Award at 10 (noting in dictum that "the very limited nature and small scope of Mr. Meyer's consumer claim, even if it had been successful, would likely have augured against a granting of such broad injunction relief").  Instead, the Arbitrator found that the evidence did not support any of Meyer's

claims.

### B. The Alleged Photograph Is a Sideshow at Best.

Meyer's other evidence of bias—that the Arbitrator allegedly photographed Kalanick—is unreliable, contradicted by others in the same room, and of no actual import in any event. Meyer identifies no support in the arbitration record for his allegation that the Arbitrator took a photograph of Kalanick. Neither Meyer nor his attorneys noted it during the hearing, mentioned it in correspondence with defense counsel, discussed it in their post-hearing filings, or relayed it to the AAA. *See supra* at 10-11, 13.

Moreover, the evidence Meyer belatedly offers now is incomplete and inconsistent. A member of Meyer's litigation team recalls the Arbitrator acting "discreetly to avoid attention" while he "position[ed] his phone in a manner that would capture a photograph of the hearing room, including Mr. Kalanick." Declaration of Kaleigh Wood ("Wood Decl.") ¶ 3. Meyer himself recalls the Arbitrator photographing not the hearing room, but Kalanick alone:

> Following Mr. Kalanick's testimony, I saw the Arbitrator use his smartphone to photograph Mr. Kalanick, as Mr. Kalanick got up from his seat and headed toward the door. The Arbitrator held the phone just barely above the table, as if to conceal it, and hurriedly pointed the camera of the smartphone away from his body and towards Mr. Kalanick, who was about to exit the room. It was apparent to me that the Arbitrator was taking a photograph or photographs of Mr. Kalanick.

Declaration of Spencer Meyer ("Meyer Decl.") ¶ 3. One of Meyer's lawyers remembers something entirely different than the surreptitious photograph recalled by the others, swearing that it instead "appeared to [her]" that the Arbitrator actually "asked Mr. Kalanick to pose for a photograph." Declaration of Lauren Mendolera ("Mendolera Decl.") ¶ 3. And Meyer's remaining lawyer—his lead counsel, Brian Feldman, who questioned Kalanick and would have likely been closest to the Arbitrator and Kalanick at the conclusion of Kalanick's testimony, Skinner Decl.

¶¶ 3-4—apparently does not remember the photo at all, as his declaration is silent on the subject.

Even if the declarations were consistent, there would be ample question as to their reliability given that no one else remembers the alleged photograph. Uber had four people from its litigation team in the room at the time Kalanick concluded his testimony; none of them remember a stealth cellphone photo or Kalanick being asked to pose for a photo. Isaacson Decl. ¶ 3; Jumper Decl. ¶ 3; Lipman Decl. ¶ 3; Spalding Decl. ¶ 3. This contradictory evidence suggests that Meyer's team got it wrong. Perhaps the Arbitrator was merely checking his phone, like many do during breaks in testimony, and he happened to aim it in Kalanick's direction. Whatever the case may be, Meyer has not offered "clear and convincing evidence" that the Arbitrator photographed Kalanick.

Lastly, even assuming the photo took place in one of the manners recollected by Meyer and his team, it would not itself establish evident partiality. An Arbitrator taking a photograph of a witness does not speak directly to the Arbitrator's state of mind. Meyer infers that it shows the Arbitrator was "starstruck" by Kalanick, Pl. Br. at 16, but this is inconsistent with the Arbitrator's actual conduct, which included aggressively questioning Kalanick during the hearing. As explained above, *see supra* at 9-10, the Arbitrator pressed Kalanick many times on his answers, and at one point accused Kalanick of "being evasive."

Further, even if Meyer were right, the Arbitrator's attitude toward Kalanick does not prove that he was biased in favor of Uber. As Kalanick made clear, while he had founded the company, he was no longer running it at the time of the hearing. Tr. 117:20-23. And as explained above, *see supra* at 7, 8 n.2, the Arbitrator issued key rulings against Uber. In short, the Arbitrator could have photographed Kalanick and still been impartial.

### C.  The Arbitrator Reasonably Applied the Governing Law.

Tellingly, Meyer does not argue that the Award was "rendered in manifest disregard of the

law," another permissible ground for vacatur under the FAA. *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019).[8]  Nevertheless, Meyer attempts to bootstrap to his motion a challenge to the Arbitrator's application of the law by characterizing the Award as a "manifestation" of the Arbitrator's purported bias.  Pl. Br. at 17.  This argument is of minimal relevance to Meyer's motion, and is misguided in any event; the Award is consistent with the governing law articulated by this Court.

As Uber explained in briefing before the Arbitrator, the law-of-the-case doctrine does not support Meyer's argument that the outcome of *Interstate Circuit v. United States*, 306 U.S. 208 (1939), controls this case, because this Court's application of *Interstate Circuit* was to Meyer's allegations, rather than to his evidence.  Uber Post-Hr'g Br. at 24-26; *see also Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (law-of-the-case doctrine does not "preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations").  Meyer's cited cases affirm this point. *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995) (law-of-the-case doctrine is not followed where a party introduces "substantially different evidence" than that which was previously ruled on); *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982) ("Another exception exists if new evidence is available to the second judge when hearing the issue.").[9]

---

[8] Had Meyer attempted such an argument, he would have confronted a "heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent."  *Weiss*, 939 F.3d at 109.

[9] Meyer's third case, *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace & Agr. Implement Workers, UAW*, 97 F.3d 155 (6th Cir. 1996), is entirely off point, as it was a case about collateral estoppel (also known as issue preclusion) not law-of-the-case doctrine.  Here, the lack of a valid and final judgment in the district court is fatal to any argument of issue preclusion.  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010).  Moreover, the only issue that was actually litigated at the motion to dismiss stage was whether Meyer had plausibly pleaded claims of an antitrust conspiracy.  *Meyer*, 174 F. Supp. 3d at 828.  That ruling could not have preclusive effect once Meyer had to prove his claim by a preponderance

23

The Court also did not, and *could not*, decide whether to apply the *per se* rule at the motion to dismiss stage and expressly deferred determination of that issue for further factual development. *Meyer*, 174 F. Supp. 3d at 822 (S.D.N.Y. 2016). This decision is in line with the admonition from the Supreme Court that "[p]er se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984); *accord Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000).

Meyer lost in arbitration because he failed to prove the allegations that this Court relied on in denying Kalanick's motion to dismiss and because Uber's evidence was overwhelming in disproving those allegations:

- Meyer alleged that "drivers have a 'common motive to conspire' because adhering to Uber's pricing algorithm can yield supra-competitive prices." *Meyer*, 174 F. Supp. 3d at 821 (quoting complaint).[10] Meyer did not establish any common motive at the hearing, Award at 4-6; Uber Post-Hr'g Br. at 19-24, and never even attempted to prove supra-competitive prices, Uber Post Hr'g Br. at 26-28.

- Meyer alleged that "if the drivers were acting independently instead of in concert, 'some significant portion' would not agree to follow the Uber pricing algorithm." *Meyer*, 174 F. Supp. 3d at 821 (quoting complaint). Evidence, if any, was to the contrary. Award at 5-6; Uber Post-Hr'g Br. at 19-24.

- Meyer alleged that "drivers 'have had many opportunities to meet and enforce their commitment to the unlawful agreement.'" *Meyer*, 174 F. Supp. 3d at 821 (quoting complaint). No evidence to prove this allegation was presented at the hearing. Award at 6 ("There is no evidence that Uber met with drivers to get them to agree on pricing or that the drivers met with each other to do so."); *id.* at 8.

- Meyer alleged that "[w]ithout the assurance that all drivers will charge the price set by Uber . . . adopting Uber's pricing algorithm would often not be in an individual driver's

---

of the evidence. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) ("[I]ssues are not identical if the second action involves application of a different legal standard . . . .").

[10] As noted above, *see supra* at 3, this Court presumed these allegations to be true, and drew all reasonable inferences in Meyer's favor, in denying Kalanick's motion to dismiss.

best interest." *Meyer*, 174 F. Supp. 3d at 823. Meyer abandoned any challenge Uber's standard pricing algorithm at the hearing; he only challenged surge pricing.

● Meyer alleged that driver-partners gained the "capacity to generate 'supra-competitive prices' through agreement to the Uber pricing algorithm." *Meyer*, 174 F. Supp. 3d at 823. There was no evidence of supra-competitive prices at the hearing; the evidence was that such prices could not be implemented for reasons including free entry. Award at 5-7; Uber Post-Hr'g Br. at 5-6, 9-24, 26-28.

● Meyer alleged that "Mr. Kalanick's design has reduced output." *Meyer*, 174 F. Supp. 3d at 821. All of the evidence was that the Uber app and surge increased output. Award at 7 ("Today, Uber has increased competition and has spawned a direct competitor such as Lyft and one—Sidecar—which has left the field."); Uber Post-Hr'g Br. at 9-17.

● Meyer alleged the existence of "meetings among Uber drivers and [a] 'September 2014 conspiracy,' in which Uber agreed to reinstitute higher fares after negotiations with drivers." *Meyer*, 174 F. Supp. 3d at 823. There was no evidence of any such meetings. Award at 6, 8.

● Meyer alleged that "drivers' [had the] ability to benefit from reduced price competition." *Meyer*, 174 F. Supp. 3d at 824. There was no such evidence; instead, the evidence was that higher prices would reduce demand and reduce the earnings of drivers. Uber Post-Hr'g Br. at 9-14; Tr. 146:12-147:4.

In sum, Meyer's lack of evidence—and not any bias on the part of the Arbitrator—prevented him from succeeding on his claims. His lack of evidence of bias should likewise preclude him from prevailing on his motion to vacate. Indeed, there would be little point to engaging in the cost and effort to arbitrate any claim if the result could be upset with the type of unfounded claims of evident partiality that Meyer presents here. *See generally Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016) (observing that the "twin goals of arbitration" are "settling disputes efficiently and avoiding long and expensive litigation").

## CONCLUSION

Accordingly, for the reasons stated herein, Uber respectfully requests that the Court deny Plaintiff's motion to vacate.

Dated: June 12, 2020                    Respectfully submitted,


                                        S/ Peter M. Skinner
                                        Peter M. Skinner
                                        Joseph Aronsohn
                                        BOIES SCHILLER FLEXNER LLP
                                        55 Hudson Yards
                                        New York, NY 10001
                                        (t) +1 212 446 2300
                                        (f) +1 212 446 2380

                                        William A. Isaacson
                                        Abby L. Dennis
                                        BOIES SCHILLER FLEXNER LLP
                                        1401 New York Ave. NW
                                        Washington, DC 20005
                                        (t) +1 202 237 2727
                                        (f) +1 202 237 6131

                                        *Attorneys for Uber Technologies, Inc.*